# EXHIBIT A

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:     **Lina M. Khan, Chair**
                   **Rebecca Kelly Slaughter**
                   **Alvaro M. Bedoya**

**In the Matter of**

**Intuit Inc.,**
    **a corporation.**

**Docket No. 9408**
**REDACTED PUBLIC**
**VERSION**

**OPINION OF THE COMMISSION**

By Commissioner Alvaro M. Bedoya, for a unanimous Commission.

Table of Contents

I.   INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND .......................................................................................................... 2

    A. Intuit's ▮▮▮▮▮▮ Strategy and TurboTax Offerings ................................. 2

    B. Eligibility for TurboTax Free Edition ............................................................. 3

    C. Intuit's Ad Campaigns for TurboTax Free Edition ....................................... 4

        1.   Video / TV Ads, Radio Ads ..................................................................... 5

        2.   Intuit's Online Advertisements ............................................................. 14

        3.   Paid Search Advertising ........................................................................ 18

        4.   TurboTax Website ................................................................................... 23

    D. The State Settlement ........................................................................................ 32

    E. The Respondent ................................................................................................ 33

III. PROCEDURAL HISTORY ...................................................................................... 33

    A. Pleadings, Motions, Suit for Preliminary Injunction, and Trial ............... 33

B. Initial Decision ........................................................................................... 35

IV. STANDARD OF REVIEW ................................................................................ 35

V. JURISDICTION ............................................................................................... 36

VI. LIABILITY ...................................................................................................... 36

   A. Legal Standard ........................................................................................... 36

   B. What Claims Are Conveyed by the Ads .................................................... 37

     1.   Facial Analysis and Extrinsic Evidence ............................................ 37

     2.   Statements About Free Filing ............................................................ 38

     3.   Disclosures and Other Ad Elements .................................................. 39

   C. Whether Claims Are False or Misleading .................................................. 46

     1.   Respondent's Claims Are False for Most Consumers ........................ 46

     2.   Disclosures on the TurboTax Website ............................................... 47

     3.   Respondent's Extrinsic Evidence ...................................................... 52

     4.   Novemsky Survey .............................................................................. 62

   D. Materiality ................................................................................................. 69

   E. Affirmative Defenses ................................................................................. 70

     1.   Non-constitutional Defenses .............................................................. 70

     2.   Constitutional Defenses ...................................................................... 72

VII. REMEDY ........................................................................................................ 80

   A. A Cease-and-Desist Order Is Necessary .................................................... 80

   B. Order Provisions ........................................................................................ 84

## I.    INTRODUCTION[1]

This proceeding arises from Respondent Intuit Inc.'s nationwide, multichannel advertising for TurboTax, Respondent's online tax preparation service. Complaint Counsel assert that Respondent has marketed TurboTax deceptively in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45 (prohibiting "unfair or deceptive acts or practices"). Compl. ¶¶ 5-8, 119-22; Opp. 4. Complaint Counsel claim that, since at least 2016, Respondent has advertised through television, radio, and online ads that consumers could file their taxes for free using TurboTax, when in fact, two thirds of taxpayers were not eligible to file with the free TurboTax product. Compl. ¶ 21; CCB 10; Johnson Tr. 657. Complaint Counsel allege that Respondent communicated a free offer through the "AbsoluteZero" advertising campaign, which included the words "Free Guaranteed," and informed consumers "at least your taxes are free." Compl. ¶¶ 23-25. They further assert that Respondent ran a "Free, Free, Free, Free" campaign that posed scenarios such as a cattle auction, an exercise class, and a spelling bee in which almost the entirety of every actor's dialog consisted of one word: "free." Compl. ¶¶ 5, 26. Complaint Counsel state that Respondent included disclaimers at the end of its television ads informing consumers that the offer is limited to consumers with "simple tax returns" or similar limiting language. Compl. ¶ 28. However, according to Complaint Counsel, the disclaimers were small, faint, or otherwise inconspicuous, and their "simple returns" language was ineffective. Opp. 4. Complaint Counsel allege that Intuit buttressed deceptive television ads with free-themed web pages, radio ads, social media ads, and paid search ads. *Id.*

Respondent denies the material allegations of the Complaint. Respondent asserts that most of its ads stated that a particular product (such as "TurboTax Free" or "TurboTax Free Edition") was free, and that such statements were true. Br. 1. Respondent asserts that its "simple

---

[1] We use the following abbreviations in this Opinion:

| | |
|---|---|
| Ans. | Answer and Affirmative Defenses of Respondent Intuit Inc. |
| Br. | Respondent Intuit Inc.'s Appeal Brief |
| CCB | Complaint Counsel's Post-Trial Brief |
| CCRB | Complaint Counsel's Post-Trial Reply Brief |
| CCRF | Complaint Counsel's Reply Findings of Fact |
| Compl. | Complaint |
| GX | Complaint Counsel's Exhibit |
| ID | Initial Decision (Revised *In Camera*) |
| IDF | Initial Decision Finding of Fact |
| Opp. | Complaint Counsel's Answering Brief |
| OSF | Order Directing Further Proceedings and Specifying Facts Without Substantial Controversy (Jan. 31, 2023) |
| RB | Respondent's Post-Trial Brief |
| Reply | Respondent's Reply to Complaint Counsel's Answering Brief |
| RFF | Respondent's Post-Trial Proposed Findings of Fact |
| RRFF | Respondent's Post-Trial Reply Proposed Findings of Fact |
| RX | Respondent's Exhibit |
| SD Opinion | Opinion and Order Denying Summary Decision |
| Tr. | Trial Transcript |

PUBLIC VERSION

tax returns" or like disclaimers were sufficiently prominent to meet FTC guidance, were understandable to reasonable consumers, and improved in clarity over time. Br. 10, 40. Reasonable consumers would have known, Respondent says, that they could seek information on their eligibility for free services by visiting the TurboTax website, and many of the disclaimers allegedly so informed them. *E.g.*, Br. 3, 17. In any event, Respondent contends that the Commission need issue no remedial order here because, among other reasons, Respondent has already entered a settlement with the attorneys general of the fifty states and the District of Columbia that Respondent says would prevent any future violation of law. Br. 42-43.

This case went to a multi-week trial before Chief Administrative Law Judge ("ALJ") D. Michael Chappell. Judge Chappell received live or deposition testimony from 41 fact witnesses and six expert witnesses. ID 2. He admitted over 2,300 exhibits into evidence. *Id*. In an Initial Decision issued on August 29, 2023, Judge Chappell found that Complaint Counsel had proved that Respondent had engaged in deceptive advertising in violation of the FTC Act, and he entered a cease-and-desist order. ID 207, 230-37. Respondent timely filed its opening appeal brief on September 26, 2023. Complaint Counsel filed their response on October 25, 2023, and Respondent filed its reply on November 6, 2023. The Commission heard the parties' oral arguments on November 20, 2023.

Based on our *de novo* review of the facts and the law in this matter, we conclude that Intuit has engaged in deceptive advertising in violation of the FTC Act.[2] We further find that the affirmative defenses that Intuit raises lack merit and that entry of a cease-and-desist order is reasonably necessary to prevent future violations of law. We therefore enter such an order in the form attached.

## II.    BACKGROUND

### A.    Intuit's ██████████ Strategy and TurboTax Offerings

According to Complaint Counsel, ██████████████████ ████████████████ involves growing Intuit's customer base by marketing free services. Compl. ¶¶ 9-10; Ans. ¶¶ 9-10. Customers who use TurboTax for free can ████████ ████████████████████████████████████. *See* Compl. ¶ 10; Ans. ¶ 10. Intuit seeks to convert consumers who use TurboTax in early years to file for free into paying customers once they are no longer eligible for the free version. *See* RRFF ¶ 26 (describing Intuit's strategy of "monetizing" customers based on tax complexity as their situations evolve over the years).

Intuit offers differentiated versions of TurboTax (known as "SKUs"[3]) that cover different tax situations and provide varying levels of live assistance. SKUs that allow consumers to prepare and file their tax returns on their own are referred to as "DIY" (for "do-it-yourself")

---

[2] The Commission has reviewed the entire Initial Decision and adopts all portions of it that are consistent with this Opinion. Any portions of it that are inconsistent with this Opinion are rejected.

[3] "SKU" stands for "stock-keeping unit," a method Intuit uses for identifying a particular product. Deal Tr. 1410.

products. IDF ¶¶ 11-12. The four TurboTax DIY SKUs are TurboTax Free Edition, TurboTax Deluxe, TurboTax Premier, and TurboTax Self-Employed. IDF ¶ 16. These SKUs vary according to the complexity of the taxpayer's situation. RX1027 (Deal Expert Report) ¶ 17. For the paid versions of TurboTax, Intuit also offers SKUs with varying levels of assistance. IDF ¶¶ 13-14.

Consumers file their taxes for a particular tax year during the following year. Thus, the tax preparation industry uses the term "Tax Year" ("TY") to refer to the calendar year preceding the period during which consumers prepare and file their annual individual tax returns. JX (Joint Exhibit) 1 ¶ 7. For example, TY 2021 refers to tax returns filed in calendar year 2022 for income earned in calendar year 2021. IDF ¶ 8. Products and ads related to a tax year may be sold or aired, respectively, in the next calendar year. GX288 at CC-00006018 (explaining that Intuit's Consumer segment, including TurboTax, has a seasonal pattern, with sales and revenue typically concentrated in the period from November through April).

During the relevant time period, the free version of TurboTax was called "Federal Free Edition" for TY 2016 and "TurboTax Free Edition" thereafter. OSF ¶ 3. Free Edition is a DIY product. IDF ¶ 16. For a limited time in TY 2020 forward, Intuit also offered products that included different levels of assistance for eligible consumers under the names TurboTax Live Basic and Live Basic Full Service. IDF ¶¶ 17-18 nn.4-5; *see also, e.g.*, RX1428; RX1462.

## B.    Eligibility for TurboTax Free Edition

Intuit restricts eligibility for the free version of TurboTax to taxpayers who have "simple tax returns," as defined by Intuit. OSF ¶¶ 4-5. Intuit's definition of "simple tax returns" has varied during the relevant time period. For TY 2016 and 2017, Intuit defined a "simple" tax return as one that could be filed using a 1040A or 1040EZ tax form. IDF ¶ 26. For TY 2018 and 2019, after the Internal Revenue Service ("IRS") eliminated Forms 1040A and 1040EZ, Intuit defined a "simple" tax return as one that could be filed on a Form 1040, with no attached schedules. IDF ¶ 29. For TY 2020, Intuit defined a "simple" tax return as a return that could be filed on a Form 1040, with no attached schedules, except to claim unemployment income. IDF ¶ 30; GX184. For TY 2021, Intuit defined a "simple" tax return as a return that could be filed on a Form 1040 with limited attached schedules to cover a few distinct tax situations, including student loan interest but not including unemployment income. IDF ¶ 31; GX342 ¶ 197; GX484; *see also* Ans. ¶ 18.

Most taxpayers do not have "simple tax returns," as defined by Intuit, and thus do not qualify to file for free using Free Edition. IDF ¶ 36. Currently, consumers *not* eligible for TurboTax Free Edition include those with mortgage and property deductions, charitable donations over $300, itemized deductions, unemployment income, investment income, rental property income, education expenses (excluding student loan interest), and refinancing deductions. OSF ¶ 6; IDF ¶ 38. Also not eligible are taxpayers who receive income reported through certain types of IRS Forms 1099, including taxpayers who receive independent contractor or small business income. IDF ¶ 32. Such taxpayers include at least some so-called "gig workers" such as rideshare providers, delivery drivers, and various forms of freelance

3

workers.[4] In all, only about one-third of taxpayers are eligible for TurboTax Free Edition. IDF ¶ 36.

Customers may begin preparing their taxes in Free Edition even if they are not eligible for that product. OSF ¶ 7. Upon entering disqualifying information, ineligible customers are presented with a screen that informs them that they will need to upgrade to a paid product in order to continue using TurboTax. *Id.* Such a screen may be referred to as an "upgrade" screen or a "hard stop." IDF ¶ 390 & n.8. The median elapsed time between the point that consumers began their returns in TurboTax Free Edition and the point at which they received an upgrade screen was ███████ in TY 2020 and ███████ in TY 2021. IDF ¶ 391. The median elapsed time in the program before an upgrade screen was triggered by entry of income and wages was ██████ in TY 2020 and ██████ in TY 2021. *Id.* The median elapsed time spent in the program before an upgrade screen was triggered by deductions and credits was █ ████ in TY 2020 and ████████ in TY 2021. *Id.*



The cost for a consumer to upgrade to a paid DIY version for TurboTax varies depending upon the product to which the consumer must upgrade. *See* IDF ¶ 44; RX222 (showing prices of $34.99 for Deluxe, $54.99 for Premier, and $89.99 for Self-Employed in TY 2016); GX261 (showing upgrade prices of $49 for Deluxe and $99 for Self-Employed in TY 2020). These prices matter to consumers. A survey conducted by Respondent's expert witness, Professor John Hauser, showed that 70.4% of survey respondents consider price an important factor in their choice of a tax preparation provider. IDF ¶ 45. Intuit's customer review data for TY 2021, captured and stored by a third-party vendor called Bazaarvoice, contains numerous examples of customers expressing dissatisfaction because they expected to be able to file for free with TurboTax but were unable to do so. IDF ¶¶ 484-88; RX816 (Excel file, "TY21 Bazaarvoice Customer Reviews Data").[5]

### C.     Intuit's Ad Campaigns for TurboTax Free Edition

During the relevant time period, Intuit ran or published dozens of unique ads through a variety of media promoting its free offerings on a nationwide basis. Intuit's message garnered billions of impressions in multiple advertising channels, including television, radio, social media, internet display ads, paid search ads, direct email marketing, and the TurboTax website. OSF ¶ 8; IDF ¶ 49; GX750 (Novemsky Errata Rebuttal Report) ¶ 42; GX434.[6] The "free" television ads

---

[4] *See* https://www.irs.gov/businesses/small-businesses-self-employed/manage-taxes-for-your-gig-work (describing types of gig work, and indicating that such work is sometimes performed as an independent contractor; such income may be reported on various Forms 1099); *see also* RX1027 (Deal Expert Report) ¶ 109 & n.249 (indicating that ride-share companies Uber and Lyft offered promotions allowing some of their drivers to use TurboTax Self-Employed for free during at least part of one year, which otherwise would have been a paid product to them).

[5] Complaint Counsel guided the ALJ through many examples of these customer complaints in a demonstrative exhibit, GXD006, that purported to extract 3831 entries from GX475, which was cross-marked as RX816. We reproduce several of these complaints in Section VI.C.3 (Customer Complaints).

[6] GX431, GX432, GX433, GX436, and GX437 report data on Intuit's television ads. Baburek Tr. 291-97.

alone ran tens of thousands of times on hundreds of television networks, in all 50 states. IDF ¶¶ 52-55. Intuit and its ad agency understood and intended that the advertising for its free products would act as a powerful lure to consumers. *See, e.g.*, GX457 at CC-0009337, 9340 (undated "FY'20 / TY'19 CG GTM Plan") ("Lead with Free to raise heads and drive traffic and acquisition across digital, mobile, social to drive commercial free"; free "not only drives acquisition of simple filers, it lifts heads across the industry, driving trial of all DIY solutions (>40% New Paid start in Free)"); GX688 at CC-00014872 (Wieden+Kennedy) ("Free is very compelling. It gets people's attention. It's a word that works very well for us. Let's remind people how compelling that simple word can be.").

From TY 2014 through TY 2017, Intuit advertised its "AbsoluteZero" promotion.[7] IDF ¶ 51. During this period and in later years, Intuit often included the word "guaranteed" (in association with "free") to dispel any consumer skepticism and reinforce the message that the offer was truly free. *Id.*; GX290 at CC-00006225 (Intuit's goal with adding "guaranteed" was to "address skepticism of free, build credibility of TT Free, and drive trial."); *see, e.g.*, GX383. From TY 2018 through TY 2021, Intuit ran its "free, free, free" campaign, known within Intuit as "The Power of Free." IDF ¶ 52.

### 1.    Video / TV Ads, Radio Ads

Intuit's campaigns sought to promote the TurboTax product as "free" through incessant repetition of the word "free" and through various humorous scenarios culminating in a tagline or other form of emphasis that the user can file their taxes for free. Intuit's ads varied in their content as well as in the nature of their disclosures. In one early ad that aired during the 2015 Super Bowl (the "Boston Tea Party" advertisement), Intuit directly stated that consumers could file for free using TurboTax. The ad features an interaction between British soldiers and American revolutionaries.

FIRST REVOLUTIONARY: No taxation without represent . . .

FIRST BRITISH SOLDIER: Yes, yes, we hear you on the tax thing.

SECOND BRITISH SOLDIER: But what if it were free to file your taxes?

SECOND REVOLUTIONARY: Like, free free?

SECOND BRITISH SOLDIER: Yes, yes. You'd pay nothing. Not a thing. No thing.

THIRD REVOLUTIONARY: Well alright then!

---

RX1030 provides similar information for Intuit's online ads. *Id.* at 297.

[7] From TY 2014 through TY 2017 Intuit offered a promotion called "AbsoluteZero," which allowed customers who used a free TurboTax product for their federal returns to prepare and file their state tax returns for free during the first five weeks of the tax filing season (later expanded to the first fifteen weeks). Intuit used the AbsoluteZero name in its advertising during that period. IDF ¶ 23.

**PUBLIC VERSION**

FOURTH REVOLUTIONARY: Alright then!

THIRD BRITISH SOLDIER: Cheers!

WOMAN: Alright then.

FOURTH BRITISH SOLDIER: Alright then.

GEORGE WASHINGTON: Alright then. Back it up!

While the scene shows George Washington and the American revolutionaries retreating in a boat, a voice-over narrates:

VOICE-OVER: Okay, so maybe that's not exactly how it went down, but you can file on TurboTax for absolutely nothing. Intuit TurboTax. It's amazing what you're capable of.

*See* IDF ¶ 67; GX342 ¶ 24; GX321. During the voice over at the end of the ad, for approximately 3 seconds against a moving background, a disclaimer in small, white print states "TurboTax Federal Free Edition is for simple U.S. returns only. Offer may end without notice. See offer details at TurboTax.com. Screen image simulated." IDF ¶ 68; GX321. The top of the screen includes an unexplained reference to "Federal Free Edition." At the same time, in much larger print, the screen features the words "AbsoluteZero", and underneath, "$0 Fed $0 State $0 To File."



GX321.

PUBLIC VERSION

Intuit ran other ads for its TY 2014-2017 AbsoluteZero offer that either stated or strongly implied that consumers could file for free using TurboTax. For instance, in a 2016 Super Bowl ad, Anthony Hopkins tells an interviewer that he would "never tarnish my name by selling you something. Now if I were to tell you to go to turbotax.com, it's because TurboTax Absolute Zero lets you file your taxes for free." IDF ¶ 69. As the interview proceeds, a small disclaimer in white font appearing for two seconds at the bottom of the screen states: "Screen simulated. TurboTax Federal Free Edition is for simple U.S. returns only. Offer may end without notice. See offer details at TurboTax.com." IDF ¶ 70; GX323.

Intuit also published a series of ads that presented people in humorous situations with the tagline, "at least your taxes are free." For example, in an advertisement called "Fish," several men are fishing on a boat when one is impaled by a swordfish. IDF ¶¶ 71, 73. This dialog follows:

MAN IMPALED BY SWORDFISH: Aww, man. My lucky shirt.

MAN WITH FISHING POLE: At least your taxes are free.

MAN CARRYING BEVERAGES: What happened?

MAN WITH FISHING POLE: It's his lucky shirt.

MAN CARRYING BEVERAGES: Well, with TurboTax AbsoluteZero, at least your taxes are free.

MAN WITH FISHING POLE: That's what I said!

VOICE-OVER: Intuit TurboTax.

IDF ¶ 73 (quoting GX324). At approximately the 0:02 mark of the 30-second advertisement, the following screen displays for approximately 3 seconds:



GX324 at 0:02-0:05. The disclosure text, which is small and portrayed on a moving background, states: "Dramatization. AbsoluteZero product only. For simple U.S. returns. Offer may end without notice, customer must file taxes before offer ends to file for free. See details at TurboTax.com."

In another example, the actor Luis Guzman appears morose in a sheep costume on a farm, complaining about being "a wild tiger trapped in a man's body trapped in sheep's clothing." IDF ¶ 76. He then says, smiling, "But hey, at least my taxes are free." *Id.* In tiny white font, over an off-white and pale green background, a disclaimer appears on the screen after approximately 5 seconds and displays for approximately 7 seconds (of a 15-second ad). It states, in relevant part, "AbsoluteZero product only. For simple U.S. returns. Offer may end without notice," and further, "See offer details at TurboTax.com." IDF ¶ 77 (citing GX344). Below is a screenshot of the ad showing the disclaimer:



GX344.

Below is another example of a disclaimer from one of Intuit's "AbsoluteZero" ads, this one from Intuit's 30-second "Cruise" advertisement. IDF ¶ 82. The action depicts a man who falls overboard from a cruise ship; rather than saving him, his fellow passengers repeatedly assure him that "at least your taxes are free." GX345. The disclaimer appears for a few seconds at the beginning of the ad:

PUBLIC VERSION



IDF ¶ 82 (citing GX345 at 0:01-05).

The ad promoted Intuit's "AbsoluteZero" offer; it did not contain a disclaimer on the static logo screen at the end of the ad:



GX345 at 0:28-0:30.

During TY 2018-2021, Intuit ran its "free, free, free" campaign featuring television ads enacting various scenarios in which nearly every word spoken by the actors was the word "free," except for a voice-over at the end of the advertisement. IDF ¶ 52. Example scenarios included game show contestants competing on the show, IDF ¶¶ 120-33 (GX59); a kid spelling "free" in a spelling bee, IDF ¶¶ 160-75 (GX350); a cattle auction, IDF ¶¶ 176-81 (GX202); a dance exercise

class, IDF ¶¶ 182-87 (GX208); a court reporter reading back text, IDF ¶¶ 134-43 (GX348); a teenage boy and girl reconciling their relationship, IDF ¶ 317 (RX1123); and a dog show, IDF ¶¶ 188-94 (GX204). During the 30-second "Game Show" ad, the participants speak the word "free" approximately 35 times. GX59. In an ad called "Big Kick," a young football player finds inspiration during a game from reminiscing about interactions with his father. IDF ¶¶ 154-55; GX 327. Every word spoken in the ad is 'free," until the voice over, which states, "That's right. TurboTax Free is free. Free, free free free." GX327. As one Intuit document described these ads and their impact, "Consistent, unwavering use of the word 'free' throughout captivates viewers as they make sense of the bizarre single word worlds" and "[t]he promise of a free offer was enticing for many viewers—and differentiated from other brands within the category—which likely contributed to the intrigue to want to trial." IDF ¶ 454.

Like the AbsoluteZero ads, the "free free free" television ads generally contained disclaimers in small white print at the bottom of the screen, which often displayed on a moving background and/or lasted for only a few seconds. IDF ¶¶ 64-66; GX59; GX204; GX299 (small text displays for a few seconds on a moving, then static background); IDF ¶¶ 155-56 (similar) (showing screenshots from GX327). The ALJ describes these disclaimers as "typically faint in color and [ ] virtually lost against the other larger, bolder, printed messages, such as the TurboTax logo and the adjacent word(s), 'free.'" IDF ¶ 65.

The contents of Intuit's written disclaimers changed over time. The small written disclaimers for TY 2018 ads typically stated, "Free Edition product only. For simple U.S. returns. Offer subject to change. See details at turbotax.com." *See, e.g.*, IDF ¶¶ 95-96 (GX328), 106-07 (GX299), 136-37 (showing screenshots from RX1104), 147 (GX326), 155-56 (GX327), 162-63 (GX350). In the 60-second "Lawyer" ad, the disclaimers appeared for approximately a total of 4 seconds over two screens, the courtroom scene and the TurboTax Free logo screen:





IDF ¶¶ 95-96 (citing GX328). The TY 2019 through TY 2021 written disclaimers typically stated, "TurboTax Free Edition is for simple U.S. returns only. See if you qualify at turbotax.com. Offer subject to change." RX1400; RX1115; RX1403; RX1415 at 00:26; GX202 at 00:11; GX206 at 0:34; GX208 at 00:12. The disclaimers were typically in tiny font and displayed for a few seconds, spanning a moving screen and a logo screen. *See, e.g.*, RX1403 (showing disclaimer for 1 second on moving screen and 3 seconds on logo screen during a 30-second ad); RX1119 (showing disclaimer for 1 second on moving screen and 3 seconds on logo screen during a 15-second ad).

Some of Intuit's television ads did not mention a sub-brand, such as TurboTax Free Edition, or did so in small, inconspicuous lettering. IDF ¶ 63. Many TY 2018 ads displayed a logo for "TurboTax Free," *e.g.*, GX59, RX29, while in TY 2019 and later years, Intuit changed this to "TurboTax Free Edition."[8] RX1112; Ryan Tr. 727; GX202 (TY 2020 and 2021).[9]

TurboTax's "free" video ads also had voice overs that changed over time. For TY 2018 and TY 2019, the voice overs at the end of these video ads typically stated "That's right. TurboTax Free is free. Free, free free free." *See, e.g.*, IDF ¶¶ 94 (GX328), 104 (GX299), 122 (GX59), 136 (RX1104), 162-63 (GX350); GX327; IDF ¶¶ 115-117 (RX1400), 129-132 (RX1115), 139-42 (RX1112). Later voice overs often included a reference to TurboTax.com and/or TurboTax Free Edition. *E.g.*, RX1405 ("That's right. TurboTax Free Edition is free. Free, free free free."); GX204 ("That's right. TurboTax Free Edition is free. See details at TurboTax.com"); GX202 (same); IDF ¶¶ 183 (GX208) (same), 190 (GX204) (same). The 5-second video ads for TY 2021 used a shorter tagline, "That's right. TurboTax Free Edition is free." *E.g.*, RX1416. For TY 2022, Intuit's typical voice over disclaimer changed again. That

---

[8] The record does not reveal that Intuit sold a product called "TurboTax Free." *See* Joint Exhibit 1 ¶¶ 9-10.

[9] The TY 2022 video ads that the parties have identified display a logo for TurboTax Live Assisted Basic, not TurboTax Free Edition as suggested in the Initial Decision. *Compare* IDF ¶ 519 (last sentence) to RX1449; RX1445; RX1452.

year, for video advertisements that included audible "free" filing claims for TurboTax products, the ads referred to the filing of "simple returns" for free and audibly stated, "see if you qualify at turbotax.com." RX1449; RX1472. Shorter video ads that made a "free" claim on the screen, but not audibly, did not include an audible disclaimer. *See, e.g.*, RX1466; RX1476. For example, the 6-second "Taxbourine" ad states, in large type, "FILE FREE with EXPERT HELP Through 3/31". A small-print legend at the bottom states, "Simple returns only. See if you qualify at turbotax.com. Ends 3/31. Offer subject to change." RX1476.

In TY 2021, Intuit ran ads known as the "Steven/Spit Take" ads. IDF ¶¶ 195-202. In these ads, the voice over/narrator attempts to overcome "Steven's" skepticism that TurboTax's service is actually free. Here is the dialog from a 28-second ad:

> VOICE-OVER: Steven, did you know that TurboTax is free no matter how you want to file?
>
> [Steven spits out mouthful of coffee]
>
> Steven: I don't believe that.
>
> VOICE-OVER: It's true. Anyone with a simple tax return can get help from an expert, for free.
>
> [Steven spits out coffee again]
>
> Steven: That can't be true.
>
> VOICE-OVER: It is and with TurboTax Live our experts will even do your taxes for you for free.
>
> [Steven spits coffee a third time]
>
> Other man: Honestly, that sounds amazing.
>
> VOICE-OVER: For a limited time TurboTax is free for simple returns no matter how you file.

IDF ¶ 199.

For approximately the last four seconds of the ad, during the voice over, the following screen appears:



IDF ¶ 200.

In TY 2020 and TY 2021, Intuit also advertised its TurboTax Free Edition product on the radio. IDF ¶ 203. Like Intuit's video ads for TurboTax Free Edition, the radio ads drew attention through repetition of the word "free." One 30-second ad consisted of a jingle in which the word "free" is the only word sung and is repeated approximately 32 times. IDF ¶¶ 204-06 (citing GX627). Then, a speaker states, "That's right, TurboTax Free is free. Free, free free free." IDF ¶ 206. During the last five seconds of the ad, while the jingle is still playing in the background, the following words are spoken at a significantly faster rate than the rest of the radio advertisement: "Free Edition product only. For simple U.S. returns. Offer subject to change. See details at turbotax.com." IDF ¶ 207. Intuit ran a similar radio ad in TY 2021, with a jingle using solely the word "free," and a tagline, "That's right, TurboTax Free Edition is free. Free, free free free." IDF ¶¶ 212-214 (GX617). During approximately the last five seconds of the ad, while the jingle is still playing in the background, the following words are spoken at a significantly faster rate: "TurboTax Free Edition is for simple U.S. returns only. See if you qualify at turbotax.com. Offer subject to change." IDF ¶ 215.

## 2.    Intuit's Online Advertisements

Intuit also ran a variety of online advertisements during the relevant time period. Such ads appear as banners on websites or as videos on social media sites such as TikTok, Facebook, or Snapchat. IDF ¶ 220. Static, non-video display ads and moving, short-duration video display ads are collectively referred to herein as "Display Advertisements." *Id*. Further, such ads, along with online video advertisements that appear in connection with online video content, such as YouTube videos ("Online Video Advertisements"), are collectively referred to herein as "Online Advertisements." *Id.* In TY 2020 and TY 2021, Online Advertisements for TurboTax free products generated over 15 billion impressions and were clicked on over 130 million times. IDF

**PUBLIC VERSION**

¶ 221. Consumers who clicked on Display Advertisements for TurboTax Free Edition were taken to the TurboTax Free Edition page on TurboTax's website, referred to as a "landing page." IDF ¶ 225. In particular instances in which advertisements prompted the consumer to "get the app," consumers were directed to an application store to download the TurboTax mobile application. *Id.* Intuit also sent direct email marketing messages to some consumers during the relevant time period, as described below in Section II.C.2.c. IDF ¶ 49.

### a. Non-Video Display Ads

Intuit's non-video display ads included text such as "File Fed & State **FREE.**", "**FREE** guaranteed **$0 Fed $0 State $0 To File**", "Free Fed & State, PLUS **FREE** EXPERT REVIEW **100% FREE**". IDF ¶¶ 232-33, 235; GX552. Many of the non-video display advertisements that referred to a particular TurboTax free product, such as Live Basic or Free Edition, did so in much smaller and/or lighter, less noticeable font, in comparison to the TurboTax logo. IDF ¶ 228. For example:



GX508. As another example:

**PUBLIC VERSION**



GX534; *see also* GX552; GX527.

Some of the non-video display advertisements did not contain the name of a TurboTax free product, but instead referenced only TurboTax. IDF ¶ 227. For example:

PUBLIC VERSION



GX596; *see also* GX587; GX575.

Each of the Display Advertisements contained one of the following phrases in writing: "simple tax returns only," "simple U.S. returns only," or "simple tax returns." IDF ¶ 223. In most of the non-video display ads, the disclaimer language regarding simple returns was much less prominent than the images of "free" or "$0." IDF ¶ 226. In some TY 2021 ads, the discrepancy in size and prominence between the "free" or "$0" claim and the "simple tax returns" disclosure became less pronounced. *See, e.g.*, GX585; GX586; *but see* GX580; GX596; IDF ¶ 252 (discussing GX189, "FREE" ad on white background).

### b. Video Display Ads

Intuit placed video display versions of its "free free free" video ads on YouTube, Facebook, and TikTok during TY 2020 and TY 2021. *See, e.g.*, IDF ¶¶ 306, 313, 314. The ads included those in which nearly all words spoken are "free," such as the "Auctioneer," "Dance Workout," "Dog Show," and "Young Love" ads. *See, e.g.*, IDF ¶¶ 295, 306, 315, 317. The 30-second "Auctioneer" and "Dance Workout" ads (GX200 and GX206) alone generated 15 million views in total. IDF ¶ 222.

The "Auctioneer" ad on YouTube (GX200) is a 30-second ad that is virtually the same as the Auctioneer television advertisement from TY 2021 (GX202). IDF ¶ 295. The ad depicts a cattle auction in which the primary word spoken by the auctioneer is the word "free," repeated approximately 30 times; the auction culminates with the auctioneer announcing "free" as the winning bid. IDF ¶¶ 296-97. The voice over states, "That's right. TurboTax Free Edition is free. See details at TurboTax.com." IDF ¶ 297. For the last approximately four seconds of the ad, text is displayed in tiny white font that reads, "TurboTax Free Edition is for simple U.S. returns only. See if you qualify at turbotax.com. Offer subject to change." IDF ¶¶ 298-99. On the final screen, the ad identifies "Free Edition" in smaller, lighter font than the Intuit TurboTax logo. IDF ¶ 299.

PUBLIC VERSION

The 15-second and six-second versions of this YouTube ad, and the TY 2020 versions of each, feature materially the same action, language, and disclosures as the 30-second version from TY 2021. IDF ¶¶ 302-05.

The "Dance Workout" ad on YouTube (GX206) is a 30-second ad that is conceptually similar to the "Dance Workout" television advertisement (GX208). IDF ¶¶ 306-07. The YouTube ad shows an exercise instructor leading an exercise class set to music, repeating solely the word "free" in a rhythmic cadence to cue the participants in their exercise moves. The voice over, small-print disclosures, and logo screen are comparable to the "Auctioneer" YouTube ad described above.

### c.   Direct Email Marketing

Intuit sends TurboTax email advertisements to individuals who previously used TurboTax or who started their return in TurboTax but had yet to complete it. IDF ¶ 330. These email ads include promotions of TurboTax Free Edition. *Id.* The emails often echoed the forceful "free" claims of Intuit's other ads, with disclosures of "1040EZ/A" or "simple returns" in significantly smaller, less noticeable type than the "FREE" or "$0" claims. For example, GX373 is an email to a consumer from TY 2016 with the subject line, "Your W-2 is Now Available. File Free Today!" Below a graphic that states, "Your W-2 is ready!" appears the statement, in bold face font, "AbsoluteZero 1040EZ/A $0 Fed $0 State $0 To File." The "1040EZ/A" text is written in a much smaller font than the "AbsoluteZero" and "$0" text. GX373. The graphic is accompanied by text stating, "It's back and it's still free. Start and finish your federal and state taxes for $0." *Id.* Near the bottom of the email, in a small-print disclosures section, the email states "*Click here to see TurboTax product guarantees, disclaimers and other important information." "Click here" is presented as a blue color-contrasted hyperlink. *Id.*

In a similar vein, GX383 is an email to a consumer from TY 2019. Beneath a large, bold-face graphic stating "FREE Guaranteed" appear the words "$0 Fed. $0 State. $0 to File." GX383. The next line states "Simple tax returns*" in much smaller, black or dark-grey type. Toward the end of the email, in a small-print section labeled "Legal," "Privacy," and "Security," the following disclosure appears: "*Prices ultimately determined at time of print or e-file. Terms, conditions, features, availability, pricing, fees, service and support options subject to change without notice. [. . .] Click here [blue hyperlink] to see TurboTax product guarantees, disclaimers and other important information." *Id.* Clicking on a hyperlink would have taken the consumer to a webpage on the TurboTax website, https://turbotax.intuit.com/. Joint Exhibit 1 ¶ 63.

More recently, Intuit has provided more fulsome disclosures at the bottom of at least some direct email. *See, e.g.*, GX477.

### 3.   Paid Search Advertising

Intuit obtained paid search advertising by bidding on a variety of key words in auction marketplaces for search engines such as Google and Bing. IDF ¶ 337. If Intuit was the highest bidder, a TurboTax advertisement would appear at the top of the search results page when consumers searched for those keywords. *Id.* In response to users' search engine queries such as, for example, "free file taxes ONLINE," "IRS taxes for free," or "file my taxes for free," a

TurboTax text ad would appear at the top of the results page. IDF ¶¶ 339, 341, 342. Some of the ads lacked a "simple tax returns" or similar disclosure, including some from TY 2022. *See, e.g.*, IDF ¶ 339:



(citing GX342 ¶ 99 (no disclosure of "simple tax returns")); GX724:

PUBLIC VERSION



GX724 (reproduced in relevant part) (TY 2022, no disclosure of "simple tax returns"); GX726:

PUBLIC VERSION



GX726 (reproduced in relevant part) (TY 2022, no disclosure of "simple tax returns"). Other Intuit search ads did mention "simple tax returns." *E.g.*, IDF ¶ 341:

PUBLIC VERSION



(citing GX342 ¶ 121 (stating in small, grey font, "Free For Simple Tax Returns Only")). In some cases, the mention of "simple" appears without reference to tax returns at all:



RX1440 (reproduced in relevant part) (TY 2022). Note that this ad does not appear to indicate whether the adjective "simple" serves to limit the eligible tax returns, or instead describes the benefits of using TurboTax (*i.e.*, that it offers a "simple tax filing" process).

**PUBLIC VERSION**

Repeatedly where the search ads contain a "simple returns" or equivalent disclosure, the "simple returns" text appears in a smaller, lighter font than the "Free Edition" or "$0 Fed. $0 State. $0 To File" text. *See, e.g.*, GX723 ("file taxes for free," Bing TY 2022); GX179 ("free file taxes," Google TY 2020); GX180 ("IRS taxes for free," Google TY 2020).

### 4.    TurboTax Website

The TurboTax website is a key part of TurboTax marketing and is integrated into TurboTax's free advertising. IDF ¶ 348. The website includes three major elements of importance here: the TurboTax homepage, IDF ¶¶ 351-64; the product-specific "landing page," IDF ¶¶ 365-70; and the "products and pricing page," IDF ¶¶ 381-84.

### a.  TurboTax Home Page

The TurboTax home page has amplified the "free" message of TurboTax's other advertising through bold claims of **"Free, free free free," "$0 Fed. $0 State. $0 to File.,"** and "Easily and accurately file your simple returns for FREE, guaranteed." Here is an example image from TurboTax's TY 2018 website:



GX342 ¶ 79, reproduced in IDF ¶ 351.

Intuit's claims in other years are similar. *See* "**FREE Guaranteed.** $0 Fed. $0 State. $0 to File.," IDF ¶ 354 (TY 2019); "**FREE Guaranteed** [;] $0 Fed. $0 State. $0 to File.," IDF ¶ 355 (TY 2020).



IDF ¶ 355 (citing GX342 ¶ 125).

During TY 2021, Intuit displayed the following image on its website:



GX342 ¶ 187.

In TY 2021, the homepage displayed the following image:



GX342 ¶ 190.

Intuit has used hyperlinks, pop-ups, and tiny-font boilerplate to qualify the prominent "free" messages described above. Below the "free" images shown above, the user, by scrolling down, would eventually see a tiny-print offer details and disclosures section that, *inter alia,* listed other TurboTax products and sometimes described limitations on Free Edition. *See* RX1018 (Golder Expert Report) at App'x K-5 (showing fine-print disclosures for TY 2015, which disclose only that free filing of 1040EZ/A is available with "Free Edition"); *id.* at App'x K-6 n.4 (stating that TY 2016 disclosures are similar to TY 2015); RX22 (showing fine-print "Important Offer Details and Disclosures" for TY 2018, which do not describe the qualifications for Free Edition); RX1263-A (showing fine-print "Important offer details and disclosures" section for TY 2021; it states that free offer is for "simple tax returns" (hyperlinked), which means Form 1040 without any additional schedules, and listing covered situations).[10]

---

[10] In TY 2022, TurboTax's home page disclosures stated, in fine print, "If you have a simple tax return, you can file for free with TurboTax Free Edition or TurboTax Live Assisted Basic. . . . A simple tax return is one that's filed using IRS Form 1040 only, without having to attach any forms or schedules. Only certain taxpayers are eligible." RX1500 at 3 (Feb. 1, 2023). The disclosures go on to list certain situations eligible and not eligible.

PUBLIC VERSION

As can be seen from the homepage images reproduced above, the TurboTax homepage typically displayed color-contrasted hyperlinks after the claims about Free Edition. *See, e.g.*, GX342 ¶¶ 79, 125, 187, 190. The links were typically smaller or less prominent than the "free" or "$0" claims. *Id.* Upon clicking the hyperlink, the consumer would typically see a pop-up screen with information and disclosures about the Free Edition product. *E.g.*, IDF ¶¶ 361-63. For example, in TY 2016, TurboTax displayed an AbsoluteZero home page with a blue color-contrasted hyperlink that stated, "No catch, here's why." RX1211. The associated pop-up stated, in relevant part: "What does **$0 Fed $0 State $0 To File** really mean? It means you pay absolutely nothing to file your taxes—from start to finish." "**Seriously, pay nothing?** Yes. With Absolute Zero, we're helping millions of hard-working Americans file their 1040EZ or 1040A for free with Federal Free Edition." "**Who qualifies?** If you're one of the 60 million Americans who file a 1040A/1040EZ, then you qualify. That means you have a taxable income of $100,000 or less and you claim the standard deduction rather than itemizing deductions. [listing other situations that do or don't qualify.]" RX389.

Other Intuit hyperlinks were labeled "See why it's free," "Simple tax returns," "Simple tax returns only," or, for TY 2022, "See if you qualify." RX1018 (Golder Expert Report) at App'x K-3. For example, in TY 2018, clicking on the hyperlinked text "See why it's free" on the TurboTax website, such as reproduced in IDF ¶¶ 351 and 353, would bring up the following pop-up screen:



IDF ¶ 361.

In TY 2021, consumers who clicked on the hyperlinked text "simple tax returns" on the webpage, such as that depicted as follows:

**PUBLIC VERSION**



GX483, would see the following pop-up:



IDF ¶ 363.

In most cases, the "simple tax returns," "See why it's free," and "No catch, here's why" links have appeared in substantially smaller, less prominent font and placement than the claims of "FREE," "AbsoluteZero," or "$0 to file." *See, e.g.*, RX1211; GX342 ¶ 79; IDF ¶¶ 354-55, 357.

Starting in TY 2022, the "free" claims on the TurboTax home page were slightly less prominent than in prior years. *See* IDF ¶ 527 (reproducing representative screenshot). The "simple tax returns only" limitation appeared next to a blue color-contrasted hyperlink stating, "see if you qualify." *Id.* The website also contained a "See if you qualify" webpage that stated, *inter alia,* "A simple return is one that's filed using the IRS Form 1040 only, without attaching any schedules," and that provided information on situations that are and are not qualified for Free Edition. IDF ¶¶ 528-29.

### b. The Landing Page

The TurboTax website also includes a product-specific "landing page" for Free Edition. Consumers can reach the "landing page" through several means, including by clicking on a paid search ad or an online display ad. Rubin Tr. 1564-65; RX1018 (Golder Expert Report) ¶ 191; Ryan Tr. 697. For TY 2019, the top, prominent screen of the landing page repeats the "FREE guaranteed" and "$0 Fed $0 State $0 to File" claims and also contains hyperlinked and non-hyperlinked references to "simple tax returns" or "Simple tax situations." *See* RX1528. Clicking on a hyperlink would bring up a pop-up that describes situations covered and not covered by Free Edition. Rubin Tr. 1566-67. Scrolling down the landing page, past the product reviews, the page displays a grid of TurboTax products and which tax forms they each cover. RX1528. Other Free Edition landing pages are structured similarly. *See, e.g.*, RX1527 (landing page, TY 2018, shows prominent "FREE guaranteed $0 Fed $0 State $0 To File" claim, the "$0 Fed. $0 State. $0 File." claim repeated, with small-font blue links for "Simple tax returns" and "See why it's free"; bottom part of page has grid of products and tax forms); RX1530 (TurboTax Free Edition landing page for TY 2021, with prominent "FREE $0 Fed $0 State $0 To File" claim, containing statements of "For simple tax returns only," including as a blue color-contrasted hyperlink, plus the additional statement, "If you have a simple tax return, you can file your taxes online for free with TurboTax Free Edition." with the words "simple tax return" in blue).

### c. The Products & Pricing Page

When consumers click a button on the TurboTax website to start preparing their taxes, such as the "File for $0" button shown for TY 2018 above, *see* GX342 ¶ 79 (reproduced on p. 23 above), they are taken to the TurboTax website "Products & Pricing" page. Rubin Tr. 1570. The page is shown to all consumers before they start preparing their taxes with any TurboTax product. IDF ¶ 374. The page lists each TurboTax product, its price, and examples of tax situations that are applicable to each product. *See* IDF ¶ 372.

RX138 is an image of the Products & Pricing page for TY 2020. RFF ¶ 418. As shown in the image below, the center of the page has a prominent "FREE guaranteed $0 Fed $0 State $0 To File" claim, with "For simple tax returns only" displayed in a small, blue hyperlinked font

below it. Other places on the page offer similar hyperlinks stating, "For simple tax returns only" or similar language. RX138. Clicking such hyperlinks would lead to a pop-up screen with information on qualifications for Free Edition. IDF ¶ 378.



RX138 (reproduced in relevant part).

The Products and Pricing page contains a tool called the "SKU Selector" that, according to Intuit, seeks to provide a recommendation for a TurboTax product that is appropriate for the consumer's needs. IDF ¶ 379. To use the SKU Selector and receive a product recommendation, consumers can click on one or more of the tiles displayed that describe various life situations,

such as home ownership, stock ownership, or self-employment. IDF ¶ 382. As a consumer clicks on the tiles, the SKU Selector presents different TurboTax product recommendations, which appear below the SKU Selector on the Products & Pricing page. *Id.*[11] Below is an image of the SKU Selector tool from TY 2021:



RX009 (reproduced in relevant part). If a consumer clicked on the tile in the upper left stating that they wanted to "maximize deductions and credits," the SKU Selector would steer them toward TurboTax Deluxe, a paid product. Johnson Tr. 662-63; IDF ¶ 41.

### D.    The State Settlement

In 2019, two separate lawsuits were filed on behalf of the People of the State of California, respectively by the Los Angeles City Attorney[12] and the County Counsel for the County of Santa Clara, California,[13] alleging unfair and deceptive marketing of free versions of TurboTax by Intuit. An investigation by various state Attorneys General followed. On May 4, 2022, Intuit entered a settlement with the Attorneys General of the fifty states and the District of Columbia under which it agreed to pay $141 million to covered consumers and submit to various

---

[11] Complaint Counsel note that the tiles shown on the Products and Pricing page do not cover all situations that do or do not qualify for Free Edition. *See* RX1359 (webpage showing a much more comprehensive list of inclusions and exclusions for TurboTax Free Edition).

[12] *See* GX873 (Complaint, *People v. Intuit Inc.*, No. 19STCV15644 (Cal. Super. Ct. Los Angeles Cnty. May 6, 2019)). This lawsuit alleged that Intuit intentionally misled lower-income consumers who were eligible for a free version of TurboTax that Intuit offered pursuant to an agreement with the IRS, into attempting to use the limited-capacity "TurboTax Free Edition" and thereby becoming subject to paid upgrades. *See, e.g.*, GX873 ¶¶ 1-4. The Complaint alleged, *inter alia*, that Intuit engaged in unfair, fraudulent, and deceptive business acts and practices by "advertising 'FREE Guaranteed' tax filing services when in fact only a small percentage of consumers are able to complete their tax returns for free on the TurboTax Main Website." GX873 ¶ 79(c).

[13] *See* GX874 (Complaint, *People v. Intuit Inc.*, No. 19CV354178 (Cal. Super. Ct. Santa Clara Cnty. Sept. 6, 2019)). This lawsuit alleged that Intuit violated California's false advertising law by disseminating ads stating that consumers could file their taxes for free using TurboTax Free Edition, when it knew that most consumers who attempted to use that product could not actually file for free. GX874 ¶¶ 6-7.

restrictions on its advertising and marketing practices. *See* RX76 (Assurance of Voluntary Compliance or AVC); RX261 (Final J. and Permanent Inj., *People v. Intuit Inc.*, No. 19STCV15644 (Cal. Super. Ct. Los Angeles Cnty. June 25, 2022)) (collectively the "State Settlement").[14] Intuit agreed, *inter alia*, (1) to refrain from misrepresenting the price, cost, limitations, or other characteristics of TurboTax products or services, (2) to cease running the "free free free" or similar advertisements regarding TurboTax, and (3) to make certain disclosures in ads for free tax preparation products, with the nature of the disclosures to depend on the location and type of advertisement. Final J. and Permanent Inj. at II.A-E, III.A-D, G. We provide a more detailed description of the State Settlement's terms in Section VII, Remedy.

Respondent argues that the State Settlement prevents recurrence of the purported violations, rendering this administrative proceeding moot and the remedy unnecessary. Br. 2, 11, 42-43. Complaint Counsel respond that the State Settlement is insufficient. Opp. 40-41. They contend that, as the ALJ found, the State Settlement contains "loopholes" and consequently will not prevent reasonable consumers from being deceived into believing that the free offer is actually free for them. ID 218, 220.

### E.    The Respondent

Respondent Intuit Inc. ("Respondent" or "Intuit") is a publicly traded Delaware corporation with its principal place of business in Mountain View, California. IDF ¶¶ 1-2. Intuit recorded $12.7 billion in annual revenues in 2022. IDF ¶ 2. Intuit offers a number of widely used financial software programs, including TurboTax, which assists consumers with preparing and filing their taxes; QuickBooks, which assists small and medium-sized businesses with accounting; and Credit Karma, which provides consumers personalized recommendations for consumer financial products and services and access to their credit scores and reports. IDF ¶ 3.

Intuit advertises, markets, promotes, distributes, and sells TurboTax. IDF ¶ 4. TurboTax is the most widely used online tax preparation service. IDF ¶ 5.[15] In April 2019, TurboTax's share of sales in the United States was 63%, and by May 2021 its share was 73%. *Id.*

## III.    PROCEDURAL HISTORY

### A.    Pleadings, Motions, Suit for Preliminary Injunction, and Trial

The Complaint in this proceeding was issued on March 28, 2022. The Complaint alleges that Intuit's advertising conveys the message that consumers can file their taxes for free using TurboTax. Compl. ¶¶ 5, 21-44. The Complaint alleges that this advertising is a deceptive business practice in violation of Section 5 of the FTC Act because TurboTax is free for only some users, based on the tax forms they need. *Id.* ¶¶ 6, 8, 14-20, 119-122. Although many of the ads contain disclaimers, the Complaint alleges that the disclaimers are inadequate to cure the misrepresentation that consumers can file their taxes for free using TurboTax. *Id.* ¶¶ 28-35, 43.

---

[14] The Assurance of Voluntary Compliance and the Consent Order contain substantively similar terms. IDF ¶ 538.

[15] Complaint Counsel's challenge relates only to online versions of TurboTax. Compl. ¶ 4.

For many consumers, it is only after they have invested their time and inputted into TurboTax their sensitive personal and financial information that TurboTax tells them they cannot continue for free and need to upgrade to a paid TurboTax product. *Id.* ¶¶ 6, 45-58.

Respondent filed an Answer to the Complaint on April 14, 2022, denying the allegations and asserting affirmative defenses.

At the same time the Commission issued the Complaint in this matter, the Commission authorized FTC staff to seek a preliminary injunction under Section 13(b) of the FTC Act. Complaint Counsel filed a federal court complaint in the Northern District of California. Complaint, *FTC v. Intuit Inc.,* No. 5:22-cv-1973 (N.D. Cal. Mar. 28, 2022). In April 2022, Judge Charles R. Breyer issued a two-page order that denied the request for preliminary relief. First, the Court found that Tax Day, April 18, 2022, had already passed and that prospective harm was therefore attenuated. Order Den. Mot. for Emergency Relief at 2, *FTC v Intuit Inc.*, No. 3:22-cv-01973-CRB (N.D. Cal. Apr. 22, 2022). Second, the court found that Intuit had already ceased to run several of the most "plausibly deceptive" advertisements—specifically, three videos that repeated the word "free" a dozen or more times over 30 seconds before a very brief disclaimer. *Id.* Third, the court noted that, to the extent that other advertisements might violate the FTC Act, Complaint Counsel had brought an administrative proceeding before an ALJ "with expertise in these matters" that would likely yield a ruling before "Intuit resumes its advertising campaign" for Tax Day 2023. *Id.*

On May 4, 2022, Intuit entered the State Settlement, described above. In August 2022, Complaint Counsel moved for summary decision on the entirety of the Complaint. Complaint Counsel's Mot. For Summ. Decision (Aug. 22, 2022). On January 31, 2023, the Commission denied Complaint Counsel's motion, finding that a decision on the merits would benefit from fuller factual development at trial. SD Opinion 19. The Commission noted that Intuit's ads "vary by media and have evolved over time," *id.* at 7, and that granting summary decision on only some of the ads would not resolve the case because the entire course of conduct affects the remedy. *Id.* at 8. Thus, a trial would provide "a fuller factual record and facilitate a more complete and cohesive opinion that addresses all of the relevant legal and factual issues, and advertising claims at once." *Id.* Although the Commission declined in its discretion to grant summary decision, it provided its reasoning, based on the summary decision record, as to some specific claims and ads "which may guide [the ALJ's] assessment at trial." *Id.*

On August 7, 2023, Intuit filed a motion to disqualify Chair Lina M. Khan from participating as an adjudicator in this matter based on a claim of prejudgment. Respondent's motion cited three statements in support of its claim. Respondent Intuit Inc.'s Mot. to Disqualify Chair Lina M. Khan, at 3-4 (August 7, 2023). On October 19, 2023, the Commission, without the participation of Chair Khan, found that none of Chair Khan's statements, alone or in combination, demonstrated prejudgment or warranted disqualification and therefore denied the motion. Order Den. Mot. to Disqualify (Oct. 19, 2023); *see also* Statement of Chair Lina M. Khan Regarding the Petition for Recusal from Involvement in *Intuit Inc.*, No 9408, appended to Order Den. Mot. to Disqualify.

Beginning in March 2023, Judge Chappell held a two-week evidentiary hearing.

PUBLIC VERSION

Complaint Counsel offered fact witnesses and two expert witnesses. ID 2. Respondent presented fact witnesses and four expert witnesses. *Id.* Judge Chappell issued an Initial Decision on September 6, 2023.

### B.     Initial Decision

The Initial Decision held that Respondent had engaged in deceptive advertising in violation of Section 5 of the FTC Act. ID 207. The ALJ found that Intuit had advertised to consumers that they could file their taxes online for free using TurboTax, when in truth, for approximately two-thirds of taxpayers, the advertised claim was false. *Id.*

In the Initial Decision, the ALJ reviewed Intuit's advertising in each of the relevant media (television/video ads, radio, Internet display ads, paid search ads, email marketing, and the TurboTax website), describing and providing screenshots of many of the ads and associated written disclosures. IDF ¶¶ 46-387. The ALJ also reviewed key elements of extrinsic evidence including Complaint Counsel's survey results, Intuit's market research, consumer complaints, and consumer and expert testimony. IDF ¶¶ 394-517.

Applying the Commission's three-part analysis for deceptive advertising (claim conveyed, falsity, and materiality), the ALJ found that Intuit had engaged in deceptive advertising. ID 207. The ALJ found that "free" claims are an innately powerful lure and that this must be considered in evaluating Intuit's disclosures. ID 170.

Moreover, the ALJ found that Intuit's disclosures of "simple tax returns" or "simple U.S. returns only" were uninformative to consumers and failed to mitigate the dominant "free" messaging in the ads. *See, e.g.*, IDF ¶ 436; ID 170-72, 175-76, 180, 186, 188-89. The ALJ agreed with Complaint Counsel's expert, Professor Nathan Novemsky, that, because the word "simple" has a pre-existing meaning, consumers may use their own pre-existing definition of "simple." As a result, the ALJ found, motivated reasoning, wishful thinking, and optimistic bias will drive many consumers to perceive an outcome that is advantageous to them, and they will be unlikely to click on a "simple returns" hyperlink to learn more. IDF ¶¶ 437-44.

The ALJ also found that the "free" claims amounted to deceptive door-openers, the effects of which are not cured by the availability of detailed eligibility information on the TurboTax website. ID 200-04.

The ALJ rejected Intuit's affirmative defenses, including its challenges to the timeliness of the Complaint and to the constitutionality of the FTC and its procedures. ID 207-13. Finally, he accepted Complaint Counsel's proposed remedy and approved their proposed Order, rejecting Intuit's arguments that the remedy was moot, overbroad, unhelpful to consumers, or otherwise problematic. ID 213-30.

## IV.     STANDARD OF REVIEW

The Commission reviews the ALJ's findings of fact and conclusions of law *de novo*, considering "such parts of the record as are cited or as may be necessary to resolve the issues

presented." 16 C.F.R. § 3.54(a).[16] The Commission may "exercise all the powers which it could have exercised if it had made the initial decision." *Id.*; *see also* 5 U.S.C. § 557(b). The *de novo* standard of review applies to both findings of fact and inferences drawn from those facts. *See Otto Bock HealthCare N. Am., Inc.*, 168 F.T.C. 324, 335 (2019); *Realcomp II, Ltd.*, 148 F.T.C. 137, 370 n.11 (2009), *pet. for review denied*, 635 F.3d 815 (6th Cir. 2011).

## V.     JURISDICTION

Under the FTC Act, the Commission has jurisdiction over persons, partnerships, and corporations using unfair or deceptive acts or practices "in or affecting commerce." 15 U.S.C. § 45(a) (enumerating certain exceptions, not relevant here, to the persons, partnerships, and corporations covered). Respondent is a Delaware corporation that has its principal place of business in Mountain View, California. IDF ¶ 1. Respondent has marketed TurboTax and the Free Edition product to consumers in the United States online and through television ads and various other advertising channels, and millions of Americans use the TurboTax Free Edition product. SD Opinion 6. Accordingly, the Commission has jurisdiction over Respondent with respect to its alleged deceptive acts and practices. *Id.*

## VI.     LIABILITY

### A.     Legal Standard

"An advertisement is deceptive if it contains a representation or omission of fact that is likely to mislead a consumer acting reasonably under the circumstances, and that representation or omission is material to a consumer's purchasing decision." *POM Wonderful, LLC*, 155 F.T.C. 1, 10 (2013), *aff'd*, 777 F.3d 478 (D.C. Cir. 2015); *see also California Naturel, Inc.*, 162 F.T.C. 1066, 1078 (2016); *FTC Policy Statement on Deception*, 103 F.T.C. 174, 175 (1984), appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984) ("Deception Statement"). A representation is "likely to mislead" if it is false. *Thompson Med. Co.*, 104 F.T.C. 648, 818-19 (1984), *pet. for review denied*, 791 F.2d 189 (D.C. Cir. 1986). Further, "[d]eception may be accomplished by innuendo rather than by outright false statements." *FTC v. Wilcox*, 926 F. Supp. 1091, 1098 (S.D. Fla. 1995) (quoting *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir. 1963)); *FTC v. Cap. Choice Consumer Credit, Inc.*, No. 02-21050 CIV, 2003 WL 25429612, at *4 (S.D. Fla. June 2, 2003) (same), *aff'd*, 157 F. App'x 248 (11th Cir. 2005). Thus, both express and implied claims may be deceptive. *Kraft, Inc.*, 114 F.T.C. 40, 121 (1991), *aff'd*, 970 F.2d 311 (7th Cir. 1992).

In determining whether an advertisement is deceptive, the Commission considers (1) what claims are conveyed in the ad; (2) whether those claims are false or misleading; and (3) whether the claims are material. *In re Health Research Labs., LLC*, No. 9397, 2021 WL 5711355, at *5 (F.T.C. Nov. 19, 2021); *In re Traffic Jam Events, LLC*, No. 9395, 2021 WL 5124183, at *12 (F.T.C. Oct. 25, 2021), *pet. for review filed*, No. 21-60947 (5th Cir. Dec. 21, 2021); *California Naturel*, 162 F.T.C. at 1078.

---

[16] Commission Rules of Practice, including § 3.54, were amended on July 5, 2023. The Complaint in this case was issued prior to those changes, so the pre-amendment rules govern this matter. *See* 88 Fed. Reg. 42872, 42873-74 (July 5, 2023).

**B.     What Claims Are Conveyed by the Ads**

The determination of what claim is conveyed focuses on the overall net impression of the advertisement for the reasonable consumer-viewer, rather than the literal truth or falsity of the words in the advertisement. *Traffic Jam Events*, 2021 WL 5124183, at *12; *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989); *see also Cap. Choice Consumer Credit*, 2004 WL 5149998, at *32 ("[A] claim may be deceptive even though it is literally true."). Further, "[t]he failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts." *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984); *see also Cap. Choice Consumer Credit*, 2004 WL 5149998, at *33.

Disclaimers or qualifications in any particular ad are "not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *Removatron*, 884 F.2d at 1497; *see also FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066, 1080 (11th Cir. 2021); *Deception Statement*, 103 F.T.C. at 180 ("Qualifying disclosures must be legible and understandable."). Moreover, "if a claim conveys more than one meaning, only one of which is misleading, a seller is liable for the misleading interpretation even if non-misleading interpretations are possible." *Fanning v. FTC*, 821 F.3d 164, 170-71 (1st Cir. 2016) (quoting *Telebrands Corp.*, 140 F.T.C. 278, 291 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006) (quotation marks and brackets omitted)).

**1.     Facial Analysis and Extrinsic Evidence**

The first step in determining the claim conveyed by an advertisement is to examine the advertisement itself (a "facial analysis"). *See POM Wonderful*, 155 F.T.C. at 13; *Thompson Med.*, 104 F.T.C. at 789. When claims are reasonably clear from the face of the advertisement, the finder of fact can rely "on its own reasoned analysis" to determine what claims, including implied ones, are conveyed. *Kraft*, 970 F.2d at 319. In such cases, extrinsic evidence is unnecessary to establish the impression that consumers would take away from an ad. *POM Wonderful*, 155 F.T.C. at 13. "Common sense and administrative experience provide adequate tools to make findings." *Kraft*, 970 F.2d at 320; *see also FTC. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 & n.12 (N.D. Ga. 2008) (holding that extrinsic evidence is only needed when the claims are "barely discernible"), *aff'd*, 356 F. App'x 358 (11th Cir. 2009). However, when extrinsic evidence on the meaning of an ad has been introduced, that evidence must be considered by the Commission in reaching its conclusion. *POM Wonderful*, 155 F.T.C. at 14 (quoting *Bristol-Myers Co.*, 102 F.T.C. 21, 319 (1983)). Such extrinsic evidence does not supplant the Commission's common-sense judgment but may assist the Commission in reaching a sound decision. *Bristol-Myers*, 102 F.T.C. at 319.

We find that Intuit's ads on their face, expressly or by strong implication, conveyed to reasonable consumers the message that they can file their taxes with TurboTax for free. *See Stouffer Foods Corp.*, 118 F.T.C. 746, 798-99 (1994) ("If, after examining the interaction of all the different elements in the ad, the Commission can conclude with confidence that an ad can reasonably be read to contain a particular claim, a facial analysis is sufficient basis to conclude that the ad conveys the claim."). Examining all components of the TurboTax ads, we conclude that the ads clearly conveyed to consumers that they can file their taxes with TurboTax for

PUBLIC VERSION

free.[17] Therefore, extrinsic evidence is unnecessary to determine the impressions reasonable consumers would take away from those ads. Because the parties have introduced extrinsic evidence, we consider it in our analysis. As we explain in the sections that follow, however, we find that extrinsic evidence introduced by Complaint Counsel supports the conclusion of our facial analysis, whereas Respondent's extrinsic evidence is irrelevant, deeply flawed, or otherwise unpersuasive.

### 2.      Statements About Free Filing

The central, primary message of Intuit's ads to consumers is that they can file their taxes for free with TurboTax. Intuit's 2015 Super Bowl television ad explicitly told viewers, "[Y]ou can file on TurboTax for absolutely nothing." IDF ¶ 67. In the 2016 Super Bowl ad, Anthony Hopkins explained that "TurboTax AbsoluteZero lets you file your taxes for free." IDF ¶ 69. For TY 2017, Intuit's television ads featured characters telling one another, "At least your taxes are free" or "With TurboTax AbsoluteZero, at least your taxes are free." IDF ¶¶ 71, 73, 81, 85, 89; *see also* IDF ¶ 76 ("[A]t least my taxes are free."). For TY 2018 and 2019, Intuit's "free, free, free" television ads combined a persistent repetition of the word "free" with the assertion, "That's right. TurboTax Free is free. Free, free free free." *See, e.g.*, IDF ¶¶ 94, 104, 122, 136, 146-47, 155-56, 162-63. For TY 2020 and 2021, Intuit changed the final tagline slightly to assert "That's right, TurboTax Free Edition is free. See details at TurboTax.com," but the underlying message of the ads and their repeated "free" claims remained the same. *See, e.g.*, IDF ¶¶ 177, 183, 190. The ads conveyed to consumers that they could file their taxes for free with TurboTax.[18]

Ads in other media echoed the same message. Radio ads largely parroted the "free, free, free" television campaign, repeating "free" over and over and concluding with a "That's right, TurboTax Free [or TurboTax Free Edition] is free. Free, free free free." IDF ¶¶ 204-219. Display ads stated, in large bold lettering, "FREE guaranteed $0 Fed $0 State $0 to File" (IDF ¶¶ 233, 260), or "File FREE with America's #1 FREE Tax Prep Provider" (IDF ¶ 250), or "$0 File Fed and State Returns FREE" (IDF ¶ 237). Emails had similar messaging. *See, e.g.*, GX373 (subject: "Your W-2 in Now Available. File Free Today!"); GX374 ("FREE Guaranteed $0 Fed. $0 State. $0 to File."). Intuit's paid search ads asserted in the headline, "TurboTax® Official Site – 100%

---

[17] Respondent asserts that the ALJ improperly assessed the ads and disclaimers piecemeal and faults Complaint Counsel with excerpting selected statements from the ads. Br. at 2, Reply at 3-4. Although we disagree with Respondent's characterization of the ALJ's decision and Complaint Counsel's submissions, we clarify that, to the extent we have cited some example ads and excerpted selected portions of them, it is to highlight their central assertions about free filing and the most problematic components. Further, although we address the disclaimers and other elements of the ad after discussing the most prominent assertions about free filing, our conclusions regarding the net impression of the ads are based on a review of each ad in its entirety, taking into account all disclaimers and other visual and audio cues provided.

[18] To the extent some of the ads technically stated that TurboTax Free or Free Edition was free for consumers, rather than that consumers could file for free with TurboTax Free or Free Edition, this is a distinction without a difference in this context. Intuit's own ad testing showed that ads stating "TurboTax Free Edition is free" increased consumer belief that TurboTax "allows me to file my taxes for free." IDF ¶¶ 452-53; GX460 at CC-00009538-41, 63.

Free Online Tax Filing" or "TurboTax® Free Tax Filing – E-file Your Taxes for Free." IDF ¶¶ 339, 341. Other examples include headlines such as "TurboTax® Official Site – $0 Fed. $0 State. $0 To File" or "File For Free With TurboTax | TurboTax® Free Edition." GX724; GX728. In all these ads, the primary message to consumers is clear: you can file your taxes for free with TurboTax.

Although, as discussed, the Commission may determine the message conveyed by an ad through a facial analysis without extrinsic evidence, Intuit's own copy testing is consistent with our finding based on a facial review. In a copy test, consumers are presented advertisements (the "copy") to evaluate how they perceive and react to the ads. IDF ¶ 446. In September 2020, a market research and consulting firm commissioned by Intuit tested a group of TurboTax Free Edition television ads being considered for the TY 2020 filing season in connection with the "free, free, free" campaign. IDF ¶¶ 447, 449. Control group participants were exposed to the TurboTax brand name only, while test group participants were shown one of four "free, free, free" ads—versions of the "Auctioneer," "Dance Workout," "Young Love," and "Spelling Bee" ads. IDF ¶ 449. After viewing the brand name or one of the tested ads, participants were then asked whether TurboTax "[a]llows me to file my taxes for free." IDF ¶ 451. While only 33% of control group participants agreed with that statement, between 45% and 57% of test group participants did. IDF ¶¶ 452-53. Exposure to even a single "free" ad thus significantly increased consumers' belief that they could file for free with TurboTax, which supports our conclusion based on a facial analysis that the ads conveyed this message.[19]

Intuit's and its ad agency's course-of-business documents also indicate that the ads conveyed to consumers that they could file for free with TurboTax. Intuit's Go-to-Market White Paper for fiscal year 2019 stated, ███████████████████████████████████████████████ ██████████████████████████████████████████████ GX428 at CC-00007711; *see also id.* at CC-00007739-40 ██████████████████████████████████████████████. Similarly, a March 2020 presentation prepared for Intuit by its advertising agency stated, ██████████████████████████████████████████████ GX688 at CC-00014878-79; IDF ¶ 469.

### 3.    Disclosures and Other Ad Elements

Respondent disputes that these ads conveyed to reasonable consumers that they could file for free with TurboTax because the ads also contained elements that, Respondent alleges, modified the message. These elements are: (1) references to the specific product, or SKU, (2) disclosures limiting the offer to "simple returns" or "simple U.S. returns" or "simple tax returns," and (3) statements referring consumers to the website, such as "See details at turbotax.com" or, in some later ads, "See if you qualify at turbotax.com." *See* Br. 3,10, 35. We

---

[19] Respondent asserts that the tested versions of the ads were not the same versions that were ultimately aired because the tested ads did not include Intuit's disclosures. Br. 23 (citing, *inter alia*, RFF ¶ 699). However, as discussed in more detail below, one of the tested ads—the Spelling Bee ad—did include the disclosures, and the findings for that ad were similar to the findings with respect to ads that lacked the disclosures. *See* IDF ¶ 450 & n.12.

find that these elements did not alter the overall message conveyed by the individual ads at issue. Considered ad by ad and in each ad's entirety, the ads conveyed to reasonable consumers the net impression that they could file their taxes for free with TurboTax.

### a. Missing Components

At the outset, we note that not all of Intuit's ads had the above components. Some paid search ads touted free filing through TurboTax with no reference to "simple returns." *See, e.g.*, IDF ¶¶ 339-40. Indeed, based on calculations of Respondent's expert witness, Professor Peter Golder, 10% of Intuit's "free" advertising did not include language regarding "simple returns only." IDF ¶ 61.

Some of the ads did not contain a product name or sub-brand but instead referenced only TurboTax. IDF ¶ 227; GX383; GX574; GX575; GX580; GX587; GX596; GX599. Further, for years many display ads had "Simple tax returns only" as the sole disclosure, with no prompting for consumers to see if they might qualify. *See* IDF ¶¶ 230-55, 258-69. Thus, while Respondent argues that the aforementioned three components are part of the "entire mosaic" of their ads, Br. 35, many TurboTax ads were missing tiles.

### b. References to Specific Product

Respondent points out that its ads told consumers that "each offer applied to a specific SKU." Br. 10. The theory, it seems, is that the reference to a particular product like TurboTax Live Basic or TurboTax Free Edition would alert a consumer that only that SKU, not all TurboTax products, was free. RB 41. But Complaint Counsel do not allege, and the ALJ did not find, that the ads conveyed that all TurboTax products were free. Rather, as explained, the ads conveyed to consumers that they could file for free with TurboTax.

Further, many of Intuit's ads did not specify the actual free product but instead referred to TurboTax Free (not an actual product) or AbsoluteZero (an Intuit promotional offer).[20] *See* IDF ¶ 63; GX59; GX299; GX321; GX323; GX325; GX 326; GX 327; GX328; GX330; GX331; GX344; GX345; GX346; GX347; GX348; GX350; GX351; GX356; GX373. An ad that does not actually refer to the relevant TurboTax product generally does not convey to consumers that the offer is limited to that product.[21]

Moreover, consumers are unlikely to pick up on the product or sub-brand and recognize it as distinct from TurboTax more generally. Intuit's own copy tests for TY 2018 ads showed that the ads "communicate the **parent brand**, TurboTax well, however, only about ~5% take away the sub brand (TurboTax Free, TurboTax Live)." GX340 (Intuit) at CC-00006849 (emphasis in

---

[20] *See* Ans. ¶ 32 ("Intuit admits that it has never offered a product called 'TurboTax Free.'"); IDF ¶ 23 (explaining that AbsoluteZero was a promotion used in Intuit's advertising).

[21] In some of the television ads, while the logo and/or voice over referred to AbsoluteZero or TurboTax Free, a faint, small-print disclosure on the bottom contained a reference to Free Edition. Such references were not sufficiently visible to convey to consumers the product to which the ad pertained.

original); IDF ¶ 459. Indeed, the TurboTax Free sub-brand used in some of Intuit's "free, free, free" advertising likely would not register with consumers as a sub-brand at all, because the "Free" that follows "TurboTax" sounds the same as the dozen mentions of "free" that precede it. But even to the extent that a specific SKU comes through the ads and is retained by the viewer, it does not communicate to ineligible consumers that they would not be able to file for free with that product. On the contrary, as the ALJ found, names like "Free Edition" or "AbsoluteZero" reinforce the ads' dominant message of free filing. *See* ID 171.

### c.    "Simple Returns" and "See Details" Disclosures

With respect to the other two elements—the "simple returns" and "see if you qualify" disclosures—in most at-issue advertisements, the disclosures were too inconspicuous to have disclosed anything at all.

In many television and online video ads, the "simple returns" and "see details" or "see if you qualify" disclosures appeared only in small print at the bottom of the screen. *See* IDF ¶ 64 (listing television ad examples); *see also, e.g.*, RX1120; RX1124; RX1123, RX1405; RX1407; RX1409; RX1410; GX174-A (TY 2020 and TY 2021 online video ads); RX1466; RX1476 (TY 2022 online video ads). The small print was often faint in color and was virtually lost against the other larger, bolder, printed messages, such as the TurboTax logo and the adjacent word(s), "free." IDF ¶ 65. The disclosures typically appeared for only a few seconds against a backdrop of other sounds or moving images. IDF ¶ 66 (listing examples). Most commonly, the disclosures were shown in the final seconds of the ad while a voice over simultaneously reinforced the "free" claim. IDF ¶ 66. Even when a viewer is actively looking for the disclosures in these ads, multiple viewings are required to notice and read them.

Disclosures cannot change the net impression of an ad if they are not clear and readily visible. *See Removatron*, 884 F.2d at 1497. The tiny, fleeting disclosures in TurboTax television and video ads are plainly insufficient to affect the net impression of the ads. *See FTC v. US Sales Corp.*, 785 F. Supp. 737, 751 (N.D. Ill.), *modified*, No. 91 C 3893, 1992 WL 104819 (N.D. Ill. May 6, 1992) (finding that "'fine print' disclaimers at the bottom of the screen in the final seconds of the television commercial" were "simply not readable and ha[d] no effect on the overall net impression of the advertisement"). Although some of Intuit's television and online video ads also included an audible "see details at TurboTax.com" disclosure at the end of the tagline, *see* GX200; GX202; GX204; GX208, such *pro forma* statements provide almost no information and do not modify the strong net impression conveyed by "free" claims. *See* Deception Statement, 103 F.T.C. at 180.

Intuit's copy testing for its TY 2020 "free, free, free" ad campaign confirms that the small-print disclosures in its television ads do not make a difference in consumer perception. In that copy test, consumers were exposed to one of four advertisements, three of which did not have the small-print disclaimer and one of which did. *See* IDF ¶ 450. After watching the ads, the percentage of consumers who agreed with the statement that TurboTax "[a]llows me to file my taxes for free" was similar for the ad with the disclosures (48%) as for the three ads that did not have disclosures (45%, 45%, and 57%). IDF ¶ 453 & n.12. This supports the inference that the small-print disclosures did not alter consumers' perception that they could file their taxes for free with TurboTax. *See also* ID 188-89.

The "simple U.S. returns" and "see if you qualify" disclosures in Intuit's "free, free, free" radio ads were also too inconspicuous to alter the strong net impression of those ads. The disclosures were played in a very rapid cadence in comparison to the free messages in the advertisements, which made it difficult to hear and comprehend the purported limiting conditions. IDF ¶¶ 207, 211, 215, 219; ID 171-72.

The search ad disclosures are similarly inadequate. As previously noted, some search ads—namely, those for TY 2019—lacked any "simple returns" or "see if you qualify" disclosures entirely. *See* IDF ¶¶ 339-40. In later search ads, including some for TY 2022, references to "simple tax returns" and/or "see if you qualify" were added to a paragraph in the small-font sub-headline, along with other distracting text. *See, e.g.*, IDF ¶¶ 341-44; GX723; GX724; GX725; GX726; GX727; GX728; RX1437; RX1438; RX1439; RX1440. Against the significantly larger blue lettering of the headline, which touted free filing, disclosures in the small-print sub-headline, without any accentuation, are simply lost. *See* Deception Statement, 103 F.T.C. at 180 ("[A]ccurate information in the text may not remedy a false headline because reasonable consumers may glance only at the headline."); *FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268, 1295 (N.D. Ga. 2022) ("Courts in this Circuit and across the country have determined that, where a disclaimer is buried in fine print and is without accentuation, it is insufficient to alter the net impression.") (collecting cases) (appeal pending); *Book-of-the-Month Club, Inc. v. FTC*, 202 F.2d 486, 488-89 (2d Cir. 1953) (holding that an advertisement offering a free book to new Book-of-the-Month Club members in large print at the top was deceptive despite disclosure in small print at the bottom that the book was free only if the member purchased a minimum of four other books from the Club). One of the ads for TY 2022, which Respondent presented during oral argument as an example of Intuit's newer, clearer search ads, contained the word "simple" in the larger heading text, but the context made it read as if filing online would be simple, rather than as any kind of qualification on offer eligibility. *See* RX1440 ("TurboTax® Official Site – Free Simple Tax Filing Online"). Further, in Intuit's emails, the disclaimer language was often much smaller or less prominent than the free claim. *See, e.g.*, GX373.

Respondent argues that some of Intuit's ads include more prominent "simple returns" references, including video ads where "simple returns" is mentioned audibly as well as various display ads. *See, e.g.*, RFF ¶¶ 217, 252, 257. In many of those ads, the references to "simple tax returns" are still far too easy to miss to make a material difference. In the Steven/Spit Take ad, for instance, the "simple tax returns" is referred to in passing; the ad focuses on free filing with expert help. *See* GX307; GX309. And, to the extent that any ads contained more noticeable disclosures, they would not negate liability for ads where the disclosures are inconspicuous or absent altogether. "Each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads." *Removatron*, 884 F.2d at 1496-97. But, equally important, even in those ads where the "simple tax returns" disclaimer is visible, we find the ads still conveyed to reasonable consumers, including those who did not have "simple returns" as defined by Intuit, that they could file on TurboTax for free; fundamentally, the phrase "simple tax returns" is not an adequate disclaimer, as discussed below.

### d. Inadequacy of "Simple Returns" as a Disclaimer

Disclaimers or qualifications are not adequate to avoid liability "unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Removatron*, 884 F.2d at 1497. A "simple tax returns only" disclosure is anything but clear and unambiguous. Simply put, the phrase does not leave consumers with an accurate impression.

"Simple" has a common meaning, and that common meaning differs from Intuit's definition of the term, which has changed over time to include or exclude various tax situations, *see supra* Section II.B. Reasonable consumers, upon hearing the word "simple," would not understand it to correspond to a particular tax form or depend on the existence of some attached schedules. People may believe their returns are "simple" because they do not have a complicated investment portfolio or because they do not have a large income. *See, e.g.*, GX136 (Schulte Dep.) at 70 (thought "simple tax returns" meant "you're not some huge investor" with "funds sitting in all these in different like locations" requiring you to submit "a stack of different documents"); GX502 at CC-0011525 (thought return was "very simple" because it was for less than $15,000 income); GX138 (Adamson Dep.) at 44 (testifying that he understood "simple tax returns" to mean "if you . . . made under a certain amount of money, that you would not be charged by TurboTax to file your taxes"). Reasonable consumers may not realize that merely having a mortgage or unemployment income or giving a charitable contribution would make their taxes not "simple." While consumer testimony is not essential, *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975), here, multiple consumers testified that they did not correctly understand the term "simple returns." *See* IDF ¶ 514 (listing examples); ID 192-93. And, as noted above, in certain instances the placement of the word "simple" made it sound like the filing itself would be "easy" for the consumer, further compounding the confusion here.

Respondent asks us to hold "*as a matter of law*" that consumers understand what "simple returns" means because the government uses the term and so do other tax preparation companies. Br. 19 (emphasis in original). But Respondent's evidence of federal government use of the term "simple returns" consists of two documents: an IRS slideshow presentation given at a conference in 2008 (RX77) and a 2022 GAO report to Congress (RX78).[22] Respondent has provided no evidence that consumers were even aware of these documents, let alone understood the terms used in them.[23]

---

[22] Respondent also submitted a document from the State of California Franchise Tax Board explaining a program that uses wage and withholding data already in its database to provide pre-filled state income tax returns to "taxpayers who file simple returns." RX79.

[23] Respondent argues that Intuit was unable to present additional evidence regarding IRS use of the term "simple returns" because the ALJ denied its motion seeking that evidence. Br. 20-21 (Order Den. Respondent's Mot. to Compel Production of Documents and a Revised Privilege Log at 2 (Jan. 3, 2023)). This argument is a red herring. The ALJ rejected Respondent's request for an order compelling Complaint Counsel to produce documents reflecting communications between the FTC and the IRS. In doing so, the ALJ noted that Respondent failed to show how communications between the agencies would shed light on whether the phrase "simple tax returns" had been used by the IRS such that the term's meaning was

Other tax preparation companies' use of the term "simple returns" similarly does not indicate that consumers accurately understand the phrase. For one thing, Intuit has a dominant share of voice in advertising relative to its competitors, accounting for 72% of impressions related to "free" tax preparation messaging in television ads between 2018 and 2022. GX749 (Novemsky Rebuttal Report) ¶ 45 & Fig. 4. Even if consumers had seen or heard the phrase in other companies' ads, that says nothing about consumers' understanding as to whether or how the phrase—as used by Intuit—applied to them. In fact, other companies' definitions of the term differed from Intuit's, which if anything would increase consumer confusion, not provide clarity. *Compare* RX1018 (Golder Expert Report) Fig. 17 (H&R Block disclosure regarding "simple returns" including unemployment income), *with* Fig. 27 (TurboTax excluding unemployment income); RX1017 (Hauser Expert Report) ¶ 48 n.87 (noting qualification differences among providers of free tax preparation products).

Notably, none of Respondent's evidence regarding whether consumers understand the phrase "simple returns" actually asked the consumers about their understanding. The only survey of consumers on this question in the record was conducted by Complaint Counsel's expert, Nathan Novemsky, a professor of consumer psychology and marketing at Yale University, GX303 (Novemsky Expert Report) ¶ 1, and it supports the finding that the phrase "simple tax returns" is unclear and not well understood.[24]

Professor Novemsky surveyed consumers who did not have "simple returns" (and were therefore ineligible to use Free Edition) regarding whether they believed they had a "simple U.S. return" as defined by Intuit. IDF ¶ 403; GX303 (Novemsky Expert Report) ¶10. The survey split participants into two groups: Group A consisted of ineligible consumers who had not filed their income taxes using TurboTax within the past three years; Group B consisted of ineligible consumers who had filed their taxes using a paid version of TurboTax within the past three years. GX303 (Novemsky Expert Report) ¶ 7; IDF ¶¶ 408-09. Professor Novemsky found that 55% of consumers in Group A and 28.6% of consumers in Group B believed they had a "simple U.S. return" when in fact they did not. GX303 (Novemsky Expert Report) ¶ 10. Professor Novemsky explained that because "simple" has a pre-existing meaning, consumers can determine whether they have "simple returns" based on their own understanding of that term, and they are more likely to conclude that their tax returns are simple "because motivated reasoning, wishful thinking, and optimistic bias will drive many consumers to give themselves the answer that they perceive is advantageous for them." GX303 (Novemsky Expert Report) ¶ 87; *see also* GX749 (Novemsky Rebuttal Report) ¶ 223.

To be effective, a qualifying disclosure must be understandable. Deception Statement, 103 F.T.C. at 180; *.com Disclosures: How to Make Effective Disclosures in Digital Advertising*

---

commonly understood by reasonable consumers. *See* Order Den. Respondent's Mot. to Compel Production of Documents and a Revised Privilege Log at 2.

[24] Respondent has criticized aspects of the Novemsky survey and its findings. Respondent's arguments are addressed in a separate section below. *See infra* Section VI.C.4. As we discuss later, we find that those arguments do not preclude our use of the survey here.

PUBLIC VERSION

(Mar. 2013) at 6 (A disclosure that "is not seen or comprehended . . . will not change the net impression consumers take from the ad and therefore cannot qualify the claim to avoid a misleading impression."). A disclosure that is vague or that consumers do not understand cannot fix a claim that is otherwise misleading. *See On Point Cap. Partners,* 17 F.4th at 1080 (Disclosures that were "too vague to dispel the misrepresentations otherwise created by the websites" were not "sufficient to disabuse consumers of" false impression.); *Fleetcor Techs*., 620 F. Supp. 3d at 1299 ("Vague disclaimers cannot 'dispel the representation otherwise created' by the advertisements in question." (quoting *On Point Cap. Partners*, 17 F.4th at 1080)); *FTC v. AMG Servs., Inc*., 29 F. Supp. 3d 1338, 1376 (D. Nev. 2014), *rev'd and remanded on other grounds sub nom. AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021), *and vacated sub nom. FTC v. AMG Cap. Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021) ("Ambiguous disclosures, by definition, are not clear, conspicuous, or meaningful disclosures.").[25] Here, a "simple returns" disclosure is not well understood and does not change the strong and powerful net impression of the "free" ads. Even with a visible "simple returns only" disclosure in the ads, reasonable consumers, including many of those who do not qualify, are likely to take away the message that they can file through TurboTax for free.[26]

### e.   The Power of Free

Intuit's disclosures are particularly inadequate when considered in the context of the prominent, repeated "free" claims. In the words of former Intuit Senior Vice President and Chief Growth Officer of its consumer group, Mary Ann Somers, "[W]hen you start talking about free, that's what people hear. They hear free. You can say a lot of other things, but what they hear is free." GX357 (transcript of podcast featuring Ms. Somers); GX358 (audio recording of podcast featuring Ms. Somers).

The ALJ explained that a "free" message is extremely powerful and that, as a result, the need for an advertiser to provide clear and conspicuous disclosures of any limitations or conditions is particularly strong. ID 170. "The word 'free' is a lure. It is the bait. It is a powerful magnet that draws the best of us against our will 'to get something for nothing.'" *Book-of-the-Month Club, Inc.*, 48 F.T.C. 1297, 1312 (1952), *aff'd*, 202 F.2d 486 (2d Cir. 1953). "The astute advertiser well knows that once the average mind has received the impression conveyed by the meaning of the word 'free' it can never be completely eradicated by any other words of explanation or contradiction." *Id.*; *cf. FTC v. Mary Carter Paint Co.*, 382 U.S. 46, 47 (1965) (referring to the word "free" as "commercially exploitable").

---

[25] *See also Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("Advertising capable of being interpreted in a misleading way should be construed against the advertiser.").

[26] Respondents' reliance on Judge Breyer's statement that "nobody thinks it is free to everybody" is misplaced. RX073 at 17; Br. 9. First, this statement did not reflect any conclusion about whether Intuit's ads are deceptive but was part of Judge Breyer's question from the bench for FTC counsel regarding whether the confusion arose out of the term "free" or out of the term "simple." RX073 at 16-17. In his actual ruling, Judge Breyer did not address the merits but stated that the claims would be heard by an ALJ "with expertise in these matters." RX074 at 2. Second, even if consumers understand that TurboTax is not free for everybody—*i.e.*, that there is some limitation—that does not mean consumers are not deceived. Consumers might recognize that some people, like those who have complicated investments, may not be able to file for free, but that is not the same as recognizing that they themselves would not qualify.

Intuit itself has recognized that its "free" advertising is extremely compelling. *See* GX428 at CC-00007716 ██████████████████████████████████████████████████ ████████████ GX460 at CC-00009543 (executive summary of Intuit's TY 2020 ad campaign copy testing, stating that "[c]onsistent, unwavering use of the word 'free' throughout captivates viewers" and that "[t]he promise of a free offer was enticing for many viewers—and differentiated from other brands within the category—which likely contributed to the intrigue to want to trial"); *see also* GX688 at CC-00014872 ████████████████████████████ ████████████████████████████████████████████ IDF ¶ 468. Intuit even called its "free, free, free" advertising campaign, "The Power of Free." IDF ¶ 52.

Respondent faults the ALJ for imposing what it calls a "heightened disclosure standard" for "free" ads, Br. 33, but the ALJ merely recognized, properly, that to affect or qualify the claim conveyed, the disclosure must be commensurate with the strength of the claim. Repeated emphasis on free filing conveys a clear, strong, and compelling message; the disclosure of any limitation on the offer must be similarly clear and strong to make a difference. Intuit's disclosures, often barely visible and relying on the vague term "simple returns," are insufficient to change the ads' message to consumers that they can file their tax returns through TurboTax for free.

Accordingly, we find that many of Intuit's ads, including the disclosures and other elements, conveyed to reasonable consumers that they could file their taxes for free with TurboTax.

### C.     Whether Claims Are False or Misleading

An ad is deceptive if it is likely to mislead a significant minority of reasonable consumers. Deception Statement, 103 F.T.C. at 177 n.20; *Telebrands*, 140 F.T.C. at 291. A representation is "likely to mislead" if it is false. *Thompson Med.*, 104 F.T.C. at 818-19; *FTC v. Am. Home Servicing Ctr.*, *LLC*, No. 8:18-cv-00597-JLS-KES, 2019 WL 7171733, at *6 (C.D. Cal. Dec. 5, 2019); *FTC v. Am. Fin. Support Servs., Inc.*, No. SACV 19-cv-02109 JVS(ADSx), 2019 WL 6337435, at *4 (C.D. Cal. Nov. 26, 2019); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 258 (E.D.N.Y. 1998); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). Here, Respondent's claims are false for most consumers.

### 1.     Respondent's Claims Are False for Most Consumers

Respondent's claims of free filing are false for roughly two-thirds of U.S. taxpayers, who do not meet Intuit's simple tax return qualifications and are therefore ineligible to file for free with TurboTax. IDF ¶ 36. Although eligibility for free filing has changed over time, currently ineligible consumers include those with mortgage and property deductions, charitable donations over $300, itemized deductions, unemployment income, investment income, rental property income, education expenses (excluding student loan interest), and refinancing deductions. OSF ¶ 6; IDF ¶ 38. Also not eligible are taxpayers who receive income reported through certain types of IRS Forms 1099, including taxpayers who receive independent contractor or small business

income. IDF ¶ 32. To file with TurboTax, such taxpayers must upgrade to one of the paid TurboTax products. IDF ¶¶ 40-43.

Respondent argues that we should focus not on all U.S. taxpayers but only on "consumers in the online tax-preparation market," of which roughly 50% qualify for free filing. Br. 22. We think all taxpayers are the more appropriate metric. A taxpayer who filed on paper or through a professional tax preparer one year might switch to an online service the next year, enticed by the promise of "free, free, free" online filing. Indeed, that is a major purpose of advertising—to attract new customers.[27] Moreover, Intuit's own course-of-business documents support this as the relevant customer base, noting that only approximately one-third can file with TurboTax for free. GX115 at CC-00001125 (noting that "we should continue to look at ways to expand our free eligibility beyond the ~35% eligibility we have today"); *see also* IDF ¶ 36. But even if we were to limit the relevant consumer base to only "consumers in the online tax-preparation market" and accept Respondent's contention that 50% of those consumers qualify for free filing, the claim in Intuit's ads that consumers can file for free with TurboTax would still be false for the other 50% of that consumer base, which is more than a significant minority.

## 2.    Disclosures on the TurboTax Website

Respondent argues that we should not assess whether the ads are misleading by looking only at the ads themselves but should also consider the information available on the TurboTax website. It claims that reasonable consumers are not likely to be deceived because consumers must go to the TurboTax website in order to use the product, and there they encounter detailed disclosures regarding the limitations or eligibility restrictions of the "free" offer. *See* Br. 37. This argument does not save the day for Intuit.

"The Federal Trade [Commission] Act is violated if [Respondent] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Resort Car Rental Sys.*, 518 F.2d at 964; *see also Carter Prods., Inc. v. FTC*, 186 F.2d 821, 824 (7th Cir. 1951) (accord); *FTC v. OMICS Grp., Inc.*, 374 F. Supp. 3d 994, 1010 (D. Nev. 2019) (accord), *aff'd*, 827 F. App'x 653 (9th Cir. 2020); *Fleetcor*, 620 F. Supp. at 1299 (accord); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir. 2014) ("A court need not look past the first contact with a consumer to determine the net impression from that contact . . . ." (citation omitted)). This legal doctrine is known as the first-contact or deceptive door-opener rule. Applying it here, if Intuit's ads induce consumers to visit the TurboTax webpage through false advertising, disclosures on the webpage do not absolve the company of liability for the ads.

Respondent asserts that the first-contact rule has no place in e-commerce and should be relegated to transactions taking place at brick-and-mortar stores. Br. 37-38; Reply 5. It claims the first-contact rule has never been applied in the e-commerce context, Br. 2, but that is incorrect. *See FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1220 (D. Nev. 2011), *aff'd in part, vacated in part on other grounds*, 763 F.3d 1094 (9th Cir. 2014) (granting summary decision for the FTC where defendants' email and banner ads "induce[d] . . . initial contact through

---

[27] Given that TurboTax dominates the market for online tax preparation services, with its share of sales being 73% as of May 2021, GX342 ¶ 10 and GX289 at CC-00006221, it is especially unlikely that its ads were intended only to attract customers already using online tax software.

deception, even if consumers later could become fully informed" of the terms and conditions on the defendants' webpage). Respondent also points to two district court cases, both involving state law class actions concerning purportedly undisclosed hotel resort fees, that Respondent claims rejected the first-contact rule in the online context, *Washington v. Hyatt Hotels Corp.*, No. 1:19-cv-04724, 2020 WL 3058118, at *5 (N.D. Ill. June 9, 2020); *Harris v. Las Vegas Sands, LLC*, No. CV 12-10858 DMG (FFMx), 2013 WL 5291142, at *2, *5-6 (C.D. Cal. Aug. 16, 2013). But those cases did no such thing. The cases did not apply the FTC Act; they did not even discuss the first contact rule, let alone reject that rule's application. Both decisions simply found that the defendants did not fail to disclose hotel resort fees on their websites.[28] Neither case stands for the proposition that a company can deceive consumers in its advertising so long as the subsequent disclosure and transaction take place online, rather than in a physical store. As for Respondent's argument that the first-contact rule should not apply to e-commerce, we disagree. On the contrary, we believe it is especially important to reaffirm the rule's application to the online world, which has seen the proliferation of misleading click-bait ads that drive traffic to advertisers' websites under false pretenses. Congress has signaled that it agrees.[29] Customers should not be told by an ad that, if they go to a website, they will receive a free product, only to learn once they are on the website that it is not free for them.

Respondent next argues that this case is analogous to *FTC v. DirecTV, Inc.*, No. 15-CV-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018), and that the first-contact rule should not apply in these circumstances just as it did not apply there. But that case is factually distinguishable. In *DirecTV*, the court found that the company "adequately disclose[d] the details" of the offer in the ads themselves, such that "the net impression" of the advertisements on their face "would not be likely to mislead a reasonable consumer." *Id.* at *9; *see also id.* at

---

[28] In *Washington v. Hyatt Hotels*, the plaintiff alleged that the defendant's initial listing of its prices "lures customers into eventually reserving a room based upon their reliance upon the initial quote." 2020 WL 3058118, at *4. The court rejected this claim because the website adequately disclosed the resort fee. *Id.* at *5. Customers searching for a room on the defendant's website were initially presented with a room rate of "*from* $104 avg/night" (emphasis added), which, the court found, "ma[de] clear to the customer" that the quoted price constitutes the minimum "*starting*" price for a room. *Id.* at *4 (emphasis in original). Customers were expressly informed of the resort fee on the second screen and then again on the third screen in the "Summary of Charges." *Id.* at *4-5. In *Harris v. Las Vegas Sands*, the plaintiff claimed deception on two narrow grounds, neither of which drew the first-contact rule into question. As explained by the court, the plaintiff first alleged that the "Grand Total" on the hotel website's reservation page was false and misleading because it did not include the resort fee, but the court rejected this because right underneath the Grand Total was a disclosure that stated, "*Total does not include applicable daily resort fee of $20 plus tax." 2013 WL 5291142, at *2, *5. The court also found the plaintiff's second objection—that the "applicable resort fee" language did not explicitly state that the fee was mandatory so that a reasonable consumer would think it was optional—unpersuasive. *Id.* at *5.

[29] In the CAN-SPAM Act, 15 U.S.C. §§ 7701-7713, Congress sought to address its concern that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages," causing the recipients of such mail to "incur costs for the . . . time spent accessing, reviewing, and discarding such mail . . . ." *Id*. at § 7701(a)(3), (8). The Act thus prohibits deceptive first-contact door-openers in commercial email by outlawing the sending of emails with misleading subject information. *Id*. at § 7704(a)(2).

*12. The court also found that the ads did not induce first contact through deception. *Id.* at *15. Here, by contrast, Intuit's first contact was deceptive, because the net impression of Intuit's advertising was a claim that was false for about two-thirds of consumers. *DirecTV* does not preclude the application of the first-contact rule in this case.

Respondent also argues, citing *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 477 (7th Cir. 2020), and *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021), that the first-contact rule—which has been in place for over half a century and continues to be cited in FTC deception cases to this day.[30]—is inconsistent with cases holding that deceptive advertising claims should take into account all the information readily available to consumers. Br. 38. These cases, neither of which involved the FTC Act, do not undermine or conflict with the first-contact rule because the "information readily available to the consumer" was information available during that first contact. These courts allowed claims on an ambiguous front label of food packaging to be clarified by other statements on that label, information on the back label, and information reasonable consumers would have already known. *Bell*, 982 F.3d at 474-83; *Moore,* 4 F.4th at 882-83. The cases do not hold that a later-provided clarification must be considered in evaluating an ad claim. Moreover, not all available information is relevant, because "[w]hat matters . . . is how consumers actually behave." *Bell*, 982 F.3d at 481 (noting, in rejecting a motion to dismiss based in part on the presence of information on a back label, that grocery shoppers may "make quick decisions that do not involve careful consideration of all information available to them"). If reasonable consumers are unlikely to seek out the meaning of the phrase "simple returns" because they think their returns are simple, the fact that the actual definition may be available to them does not matter.

Respondent argues that, in this case, disclosures on the TurboTax webpage should be considered in assessing the ad claims because consumers must go to the website to use the product anyway. Br. 37. This ignores the harms that ensue when consumers who never would have visited the website do so after false representations concerning their ability to file for free. Such harms include the time consumers spend navigating the website before learning that, contrary to the representation in the ads, they are unable to file for free. Ads often aim to induce consumers to visit the advertiser's website, where consumers can be exposed to additional sales pitches and are more likely to purchase the product, having invested time perusing the site. But using false claims to engage consumers and induce them to further interact with the company is precisely the conduct that the first-contact rule prohibits. *See Exposition Press*, 295 F.2d at 873 (explaining that advertisement was deceptive even though any prospective customer answering

---

[30] *See, e.g.*, *E.M.A. Nationwide*, 767 F.3d at 632; *Resort Car Rental Sys.*, 518 F.2d at 964; *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961); *Carter Prod.*, 186 F.2d at 824; *Fleetcor*, 620 F. Supp. 3d at 1299; *FTC v. Kutzner*, No. SA CV 16-00999-BRO (AFMx), 2017 WL 4685286, at *7 (C.D. Cal. Sept. 5, 2017), *aff'd sub nom. FTC v. Marshall*, 781 F. App'x 599 (9th Cir. 2019); *FTC v. LeanSpa, LLC*, No. 3:11-CV-1715, 2015 WL 1004240, at *10 (D. Conn. Mar. 5, 2015), *aff'd in part, rev'd in part on other grounds and remanded sub nom. FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016); *FTC v. City W. Advantage, Inc.*, No. 2:08-CV-00609-BES-GWF, 2008 WL 2844696, at *2 (D. Nev. July 22, 2008); *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 307 (S.D.N.Y. 2008); *FTC v. Connelly*, No. SA CV 06-701 DOC (RNBx), 2006 WL 6267337, at *15 (C.D. Cal. Dec. 20, 2006); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1046 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001).

the advertisement was immediately sent literature detailing the offer's terms: "It was a permissible inference that [respondent] by its misleading initial approach attracted business which it would not otherwise have obtained"); *City W. Advantage*, 2008 WL 2844696, at *3 (finding defendants likely employed deceptive first-contact door openers in telemarketing by using misleading offers of free gifts "in order to induce consumers to stay on the line while they, [the Defendants], proposed further purchases"); *see also LeanSpa*, 2015 WL 1004240, at *10 ("[A]n advertisement's material misrepresentation violates Section 5 where it generates a consumer's interest, even if the consumer becomes fully informed before ultimately purchasing the advertised product.").

In any case, the TurboTax website is inadequate to cure a misimpression from Intuit's ads because consumers arriving on the TurboTax homepage would not have encountered clear and conspicuous disclosures but instead would have seen more claims touting free filing. Only by clicking on a small hyperlink or otherwise further interacting with the website would consumers have been informed of the criteria to qualify.

For many years, consumers who saw the TurboTax advertising and then visited the TurboTax homepage were immediately confronted with big, bold "Free" claims echoing the claims in the ads. *See, e.g.*, IDF ¶¶ 351 (TY 2018: "Free, free free free. $0 Fed. $0 State. $0 to File."), 352-55 (TY 2018-20: "FREE Guaranteed. $0 Fed. $0 State. $0 to File."), 358 ("FREE $0 Fed. $0 State. $0 to File."); *see also* IDF ¶ 357 (Mar. 26, 2022: "File FREE with America's #1 free tax prep provider"). One example, from the TurboTax TY 2019 homepage, is provided below:



GX342 ¶ 95, reproduced in IDF ¶ 354; *see also supra* Section II.C.4 (providing screenshots for some other years). To access Intuit's disclosures about eligibility for free filing, consumers had to notice and click on a much smaller hyperlink underneath, typically identified by the words "See why it's free" or "simple tax returns" (or similar), which often appeared near other text about transferring last year's tax information. *See* IDF ¶¶ 351, 353-58. Consumers could easily fail to notice the hyperlink, or they might simply skip over the link and not click it. As Professor Novemsky explained, consumers have an innate desire to conserve mental energy, making it

unlikely that they will click on a "simple returns" hyperlink to learn more when they think they already know what a "simple return" is and are under a pre-existing misimpression that they have one. *See* GX749 (Novemsky Rebuttal Report) ¶¶ 223, 227; Novemsky Tr. 535, 1768; IDF ¶¶ 440-44. [31]

Certain ads linked consumers to the TurboTax Free Edition landing page, rather than the homepage. *See* IDF ¶ 365. The landing page was similar to the homepage, in that it prominently repeated the "free" claims and provided hyperlinks (typically on the words "simple tax returns") to eligibility information, but the customer could also scroll down past statements about how easy it is to file with TurboTax and product reviews to view a chart identifying different tax forms covered by different products. IDF ¶¶ 366-69; *see, e.g.*, RX1528-30; Rubin Tr. 1567-68. To the extent that the chart would even be visible without a consumer specifically selecting the "Tax Forms" tab, [32] many consumers would likely miss information that required scrolling below promotional pronouncements and product reviews, which can signal to consumers that scrolling further will yield little of substance or relevance. This is particularly true given that the chart lacked a heading indicating that it contained information bearing on consumer eligibility to file for free. *See* RX1528-31. [33]

If consumers on the website clicked on a button to start preparing their taxes, they would be taken to a Products & Pricing page where they could utilize the SKU Selector tool and see additional "simple returns" hyperlinks with eligibility information. *See* IDF ¶¶ 375-76, 379. But most new users (53%) did not encounter the Products & Pricing page until after they created a username and password. RX52 at Intuit-FTC-PART3-000602282; *see also* IDF ¶ 373. And the Products & Pricing page also contained a large-font promotion of "FREE" filing with Free Edition and touted the numerous benefits of that product. *See* IDF ¶ 375; GX482. Many ineligible consumers still ended up starting in Free Edition and were presented with an upgrade screen, partway through doing their taxes, telling them that they must purchase one of the TurboTax paid products to continue. *See* Rubin Tr. 1552-53 (14% of all customers who started in

---

[31] Respondent suggests that Professor Novemsky's conclusion, which is based on literature, his expertise, and established principles of consumer psychology (GX749 (Novemsky Rebuttal Report) ¶ 227 & nn.401-03), is contrary to Professor Hauser's Purchase Driver Survey, which purportedly showed that consumers consult three sources on average when researching tax-preparation products. Reply 13. As we discuss below, Professor Hauser's Purchase Driver Survey is riddled with problems and is unreliable. *See infra* Section VI.C.3 (Consumer Skepticism and Research).

[32] Based on the images of the Free Edition landing page in RX1528-31, it appears that the chart was displayed only if the third tab from the left, labeled "Tax Forms," was selected. The record, however, does not have sufficient support for us to make this finding.

[33] Similarly, the hyperlinks at the bottom of many Intuit emails inviting consumers to "Click here to see TurboTax product guarantees, disclaimers and other important information" are inadequate to alter the net impression. GX373; GX383. These hyperlinks were unlikely to be noticed, since they were comparatively small and required scrolling to the very end, past warnings about use of personal information and links to social media. Further, the hyperlinks did not give consumers reason enough to click them. *See* .com Disclosures at 12 ("Hyperlinks that simply say 'disclaimer,' 'more information,' 'details,' 'terms and conditions,' or 'fine print' do not convey the importance, nature, and relevance of the information to which they lead and are likely to be inadequate.").

Free Edition for TY 2021 encountered an upgrade screen); IDF ¶ 390. Consumer complaints and consumer testimony illustrate that many consumers did not learn they could not file for free until they were partway through or at the end of the tax filing process—typically after sinking ███████ ██████ into the process. *See, e.g.*, GX138 (Adamson Dep.) at 58; GX124 (Bodi Dep.) at 33; GX139 (Derscha Dep.) at 57; GX137 (DuKatz Dep.) at 80-82; GX859 (row 52442 columns C, V); *id.* (row 40777, column C); GX860 (row 8417, column V); RX816 (row 263327, column P); *id.* (row 116550, column P); IDF ¶ 391. In short, a person prompted to go to the TurboTax website would not be instantly faced with clear and conspicuous eligibility disclosures but would be subject to more advertising. The website does not render Intuit's ads non-deceptive.

### 3.    Respondent's Extrinsic Evidence

Although the advertisements are false for the vast majority of taxpayers, Respondent argues that the ads are nevertheless not likely to mislead. It submits extrinsic evidence that it asserts supports this argument. Respondent's evidence is not persuasive.

***Consumer Skepticism and Research.*** Respondent asserts that its ads are not likely to mislead consumers because consumers are skeptical of free claims and conduct independent research before selecting a tax-preparation product. Br. 18, 19-20; Golder Tr. 1091-92. Respondent also asserts that reasonable consumers understand that free offers, including free online tax preparation offers, have limitations, even if those limitations are not stated in the advertisements, and that they understand that additional information is available elsewhere. Br. 19.

First, with respect to consumer skepticism, as Professor Novemsky explained, consumers in modern commerce reasonably expect and do receive free products without eligibility restrictions, as is the case with the Google suite of products, Facebook, smart phone games, and including online tax preparation. GX303 (Novemsky Expert Report) ¶ 81 & n.112; *see also* Ans. ¶ 35 ("Intuit admits that at least one company has offered a free online tax preparation and filing service to all customers for five years."). In the typical "freemium" business model with which consumers are familiar, consumers may at their option choose to upgrade from the free product to a premium product with enhanced features, such as by subscribing to ad-free YouTube or making in-app purchases in smartphone games. GX303 (Novemsky Expert Report) ¶¶ 81-82. In fact, Intuit makes money through Free Edition by offering customers the option to purchase additional services like one-on-one help with a TurboTax specialist. *See* GX184; Compl. ¶ 10; Ans. ¶ 10. So, even if consumers understand that a company's "free" offer must ultimately convert to an opportunity for the company to make money, they would not assume that there are eligibility restrictions and that a company touting free filing would not let them actually file for free because, like two-thirds of U.S. taxpayers, they have a mortgage, get unemployment income, or otherwise do not meet some eligibility criteria. It is reasonable for consumers seeing an ad that associates TurboTax with "free" dozens of times in a thirty-second period or states "$0 Fed. $0 State. $0 To File." to believe they would be able to file their taxes for free, even if they understood that there may be a fee if they chose to upgrade to get enhanced features or add-on services. *See* GX 303 ¶¶ 81-82.

Moreover, Respondent's advertising was specifically designed to overcome "free" skepticism. For instance, in many ads for TY 2014 through TY 2017, Intuit included the word

"guaranteed" in conjunction with the "free" claim. IDF ¶ 51; *see also* RX578 at INTUIT-FTC-PART3-000601557 ("[I]ncorporating the word 'guaranteed' into the offering and changing the name from Federal Free Edition to Free Edition will be levers we explore to reduce [consumer] skepticism."). More recently, Intuit has used other methods. The Steven/Spit Take advertisement, aired for TY 2021, expressly addressed consumer skepticism and worked to overcome it:

> VOICE-OVER: Steven, did you know that TurboTax is free no matter how you want to file? Steven: *I don't believe that*. VOICE-OVER: *It's true.* Anyone with a simple tax return can get help from an expert, for free. Steven: *That can't be true*. VOICE-OVER: *It is* and with TurboTax Live our experts will even do your taxes for you for free.

IDF ¶ 199 (emphasis added).

In any case, consumer skepticism does not excuse misleading claims. "Laws are made to protect the trusting as well as the suspicious." *FTC v. Standard Educ. Soc'y*, 302 U.S. 112, 116 (1937). A company making false claims does not get a pass just because consumers do not trust it or are concerned the offer is too good to be true and seek out more information independently. Any other approach would give known fraudsters immunity to make whatever claims they please, because consumers would already know that the company's statements are suspect. The law cannot allow misleading advertising to continue just because consumers have grown used to being misled.

As for independent research, Respondent's claims regarding consumer behavior are unsupported, exaggerated, and do not rule out deception from Intuit's own advertising. Many taxpayers file their returns at the last minute. GX303 (Novemsky Expert Report) ¶ 22 n.20. Tax preparation is not typically a pleasant activity, and consumers may avoid conducting substantial research for that reason. Novemsky Tr. 1777. Without evidence, Dr. Golder testified that the purchase of online tax-preparation products is a "high-involvement process" in which consumers are likely to invest time and conduct research. RX1018 (Golder Expert Report) ¶ 144. However, other than his reasoning about the value of tax refunds to consumers, Dr. Golder does not appear to have a basis for this categorization. Nor does he state for what proportion of consumers this "high-involvement process" holds true.

Respondent's study evidence is no more helpful. Respondent offered an online "Purchase Driver Survey" conducted by John Hauser that purports to be a "census survey of all the various things that people do" when choosing a tax-preparation provider. RX1391 (Hauser Dep.) at 32. However, this work is incomplete: although Professor Hauser asks consumers about their "research," he does not ask them about passive information gathering such as viewing advertisements, doubtless an important part of the purchase process for many consumers. RX1345 (Novemsky Rebuttal Report) ¶ 158. The survey is also methodologically unsound and tends to both (1) overstate the research that individuals actually conduct and (2) fail to detect the routes by which Intuit's deceptive advertisements can infect the purchase process. *See id*. ¶¶ 149-90. Among many examples: Professor Hauser asks overlapping questions that could easily result in double-counting of research activities, *id.* ¶ 164; and he does not ask about the information-gathering activities of the majority of individuals who did not actively consider switching

PUBLIC VERSION

providers in the past year, *id.* ¶ 158. This last choice biases the survey toward its own conclusions by focusing the data on consumers who have already demonstrated that they are open to changing providers and who are therefore likely more willing or able to conduct research on products and features. Moreover, Professor Hauser appears to tacitly assume that only consumers who rely solely on advertising can be deceived, RX1017 (Hauser Expert Report) ¶ 104; however, activities such as performing internet searches and browsing websites can lead directly to Intuit's "free" ad content via paid search ads and Intuit's website, which for many years has touted "FREE" and "$0" filing, integrated with other TurboTax marketing. Nor should conversations with family and friends be classified as a corrective to Intuit's deceptive advertisements, because those family and friends may themselves have been misled or deceived by Intuit's ads. RX1345 (Novemsky Rebuttal Report) ¶ 149.

Based on testimony of Professor Golder, Respondent argues that consumers generally do not expect ads to provide every detail about an offer and understand that more information is available elsewhere. Br. 19; RFF ¶ 511. Neither proposition suggests that consumers expect ads to convey false messages. In any case, "the public is not under any duty to make reasonable inquiry into the truth of advertising." *Resort Car Rental Sys.*, 518 F.2d at 964. As we have explained, the FTC Act is violated if the first contact occurs through deception, even if the consumer later becomes fully informed by doing independent research or by other means. *See id.* We do not endorse Respondent's proposed shift to a model in which consumers must conduct online research to fact-check deceptive ads.

***TY 2022 Copy Test.*** Respondent points to a copy test from TY 2022 as evidence that consumers purportedly were not deceived. Br. 21. According to Respondent, this test showed that, after viewing draft video ads for ████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ RX1543 at 19; Ryan Tr. 773-74. Respondent contends that, because these figures are in line with the percentage of consumers in the general population who actually do qualify for free, and lower than the 50% of consumers in the online tax-preparation market who qualify, the copy test indicates that the challenged ads did not mislead consumers. Br. 21-22; 23-24.[34]

This copy test cannot support the weight that Respondent places on it. First, the copy test concerned only video ads for the TY 2022 filing season. It provides no information about ads from prior years, which often had less prominent disclosures. Additionally, the reported results are ambiguous due to the lack of a reporting scale, as Professor Novemsky explained: ██████ ████████████████████████████████████████████████████████████[35]

---

[34] Comparing the results of the copy test to the proportion of eligible consumers in the online marketplace is inappropriate because, as discussed in Section VI.C.1, the relevant population of tax filers cannot be restricted to online users only. Any type of tax filer (storefront, CPA, pen-and-paper) can switch to an online service, and indeed a primary purpose of advertising is to draw new customers. In fact, Intuit's copy test survey population was not limited to only online filers. *See* RX1543 at 2; Ryan Tr. 773.

[35] RX1543 at 19; Novemsky Tr. 517. If, for example, the highest possible score (the "top box") tallied only those survey participants who stated, "I am certain I can file for free," and did not also tally those

Even more importantly, although the survey firm asked respondents whether they ████████████████████████████████, it did not ███████████████████████████████████████████████████ ID 221 n.42; RX1543 at 2. Absent that latter information, the survey does not tell us whether the 33% who believed they could file for free actually could.[36] Many of the consumers who thought they could file for free could have been ineligible. The TY 2022 test can in no way be seen as evidencing an absence of deception.[37]

   ***Disclosure Benchmark Analysis.*** Respondent offered expert testimony of Peter Golder, a professor of marketing, on several topics. Professor Golder offered a comparison of video and social media ads for free TurboTax SKUs with ads from 18 "benchmark" companies across four industries. Br. 14; Golder Tr. 1133, 1135; RX1018 (Golder Expert Report) ¶¶ 127-38. Professor Golder purported to find that the disclosures in Intuit's TurboTax Free ads were comparable, or superior, to the disclosures in other companies' ads across several metrics drawn from the FTC's .com Disclosures including, *inter alia*, proximity and placement, prominence, distracting factors, and understandable language. RX1018 (Golder Expert Report) ¶¶ 131-36. We find that Professor Golder's "benchmarking" analysis is irrelevant to the question of whether reasonable consumers understood the disclaimers in Intuit's "free" ads. Professor Golder did not survey consumers regarding the message(s) that they took away from the Intuit ads, Golder Tr. 1058, nor did he ask whether they understood the disclaimers in the benchmark ads. Golder Tr. 1249. His analysis also did not appear to consider whether, because Intuit's prevailing "free" messages were so strong, Intuit needed stronger disclosures than the other firms. Thus, comparing Intuit's disclosures to those in other companies' ads fails to address the central issue of the ads' tendency to mislead. *See* SD Opinion 12 (noting Respondent's offer of extrinsic evidence on "peripheral" issues rather than on the meaning of ads). Evidence that, *e.g.*, the disclaimer font and location are similar to those in other companies' ads, is irrelevant. *See* SD Opinion 12.[38]

---

who stated, "I believe I probably can file for free," then the "top box" figure would undercount those who believed they could file for free.

[36] There is no basis to assume perfect knowledge by the participants. In fact, the record contains contrary evidence. As discussed in Section VI.B.3.d above, Professor Novemsky's survey evidence shows that consumers do not understand accurately whether their tax returns are "simple" as Intuit defines it. And Respondent offered evidence to suggest that a certain percentage of consumers are inherently skeptical of free tax preparation offers, RB 59, which implies that a consumer's ability to file or free does not correlate perfectly with the consumer's belief that he or she can do so.

[37] Respondent also appears to argue that the TY 2020 copy test showed little deception from TurboTax ads, Br. 21, but there, the one-third of consumers who believed they could file for free referred to the results for the control group, not those who viewed the ads. IDF ¶¶ 452-53. Of those who actually viewed the ads, 45-57% took away the "free" message. GX303 (Novemsky Expert Rep.) ¶ 97.

[38] Professor Golder's claim regarding the ads' "understandable language" presents an additional problem. He is referring to the ads' use of the phrase "simple returns," a phrase that consumers often do not understand, even if they believe they do. RX1018 (Golder Expert Report) ¶ 136; Section VI.B.3.d. When ads use this disclaimer, consumers with transactions as unremarkable as charitable contributions or certain

*Customer Complaints*. Respondent next argues that the customer complaints Intuit faced were "miniscule," and that Intuit would have been "overwhelmed with complaints, in every channel," if its ads were misleading to a significant minority of consumers. Br. 24. Since that was not the case, says Respondent, a significant minority of consumers was unlikely to be deceived. *Id.* For several reasons, this argument fails.

First, Section 5 of the FTC Act requires proof that a claim is likely to deceive, not proof of actual deception. *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 633 (6th Cir. 2014) ("[A]ctual consumer deception is not necessary to establish [d]efendants' violation of Section . . . ."); *Trans World Accounts Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979) (Actual deception is unnecessary to establish violation of Section 5; "[m]isrepresentations are condemned if they possess a tendency to deceive."); *Novartis Corp.*, 127 F.T.C. 580, 684 (1999). Thus, Complaint Counsel are not required to show, through consumer complaints or otherwise, that any one consumer was actually deceived by relying on Intuit's advertising. *In re Viral Response Sys., Inc.*, No. 9245, 1991 FTC LEXIS 409, at *1 (Aug. 28, 1991) (ALJ decision); *FTC v. Wilcox*, 926 F. Supp. 1091, 1099 (S.D. Fla. 1995) (finding that the FTC "is only required to show that it is likely, not that it is certain, that a reasonable consumer would be mislead [*sic*]") (quoting *FTC v. US Sales Corp.*, 785 F. Supp. 737, 748 (N.D. Ill. 1992)).[39] Although consumer complaints may be indicative of deception, the presence of some satisfied customers is not a defense to liability. *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1206 n.8 (10th Cir. 2005) ("Likewise, the existence of some satisfied customers does not constitute a defense to a § 5 action.") (citation omitted); *United States v. Lasseter*, No. 3:03-1177, 2005 WL 1638735, at *4 (M.D. Tenn. June 30, 2005) ("[F]ailure by consumer victims to file a complaint with the FTC does not indicate that the Defendant has complied with the [FTC] Act."); *Brake Guard Prods., Inc.*, 125 F.T.C. 138, 247 (1998) ("The number of consumer complaints has no bearing on whether the public is being harmed by the respondents' false or unsubstantiated claims.").

Second, empirical research shows that consumers' willingness to complain about fraud varies widely and can be affected by a number of factors, including the number of victims, with mass frauds associated with the lowest complaint rates. *See* Devesh Raval, *Whose Voice Do We Hear in the Marketplace? Evidence from Consumer Complaining Behavior*, 39(1) Marketing Sci. 168, 171 Table 1 (Jan.-Feb. 2020). Here, Professor Novemsky described many reasons why a consumer exposed to Intuit's deceptive "free" advertising may not complain, including: the consumer may not know whether to attribute a false belief about eligibility to TurboTax or to themselves (*e.g.*, if presented with an upgrade screen that attributes the need for an upgrade to "your tax situation," they will not necessarily blame Intuit); they may believe that Intuit did not commit purposeful deception; or they may lack the time and energy to complain, or know where

---

types of 1099 income would take away the incorrect impression that they are eligible for free TurboTax filing, if they mistakenly believe that their situations are "simple" as Intuit defines it.

[39] Respondent mis-cites *Telebrands*, 140 F.T.C. at 447-48 (Initial Decision), for the proposition that FTC cases require ten percent of customers to provide negative feedback in order to indicate deception. Br. 25. Not only are complaints not required, but the cited portion of *Telebrands* relates to a different issue, the percentage of copy test respondents that suffices to indicate that a message was communicated. 140 F.T.C. at 447.

to do so. Novemsky Tr. 1770-72. *Cf. FTC v. Pantron I Corp.*, 33 F.3d 1088, 1098 (9th Cir. 1994) (explaining reasons why low refund rate "may not represent customer satisfaction").[40]

In any event, we find that both the number and contents of consumer complaints are consistent with Complaint Counsel's claims of deception. Respondent focuses on 228 Sentinel complaints identified by Complaint Counsel, but this is just a subset of the consumer complaints identified in the record. As early as TY 2015, Intuit was noting internally that "customers still want more price transparency (*e.g.*, 'Free isn't Free,' required upgrades . . .)." GX411 at 1. Intuit highlighted this customer complaint, among others:

> it was very predatory. i came for a free file, but needed to upgrade to the delux edition, after refusing to upgrade 5 times before. My "particular" situation required the delux. So I have to shell out 35 for that. Then, since I want to pay the 35 out of my tax return, you're charging 35 to take 35 out of my refund! 100% mark up. I signed in for free and ended up paying 70 bucks.

GX411 at 3.

Through a third-party vendor, Bazaarvoice, Intuit captures and maintains a database of reviews by customers who have completed their taxes using a TurboTax product. RX816; IDF ¶¶ 484, 486. For TY 2021 *alone*, Complaint Counsel identified over 3,800 complaints from the Bazaarvoice data that Complaint Counsel maintain are consistent with their allegations of deception. *See* GXD006.[41] These reviews include text such as:

---

[40] Respondent argues that a supposed complaint rate of 0.0025 per 1,000 consumers is much lower than the range "found to support deception" in the cases that Dr. Raval studied. Br. 24. But the .0025 per 1000 figure is incorrect, because it ignores the many Bazaarvoice complaints discussed below. Respondent also misinterprets Raval's work, as Raval did not claim to study whether any particular complaint rate does or does not support deception. Looking at what he did study, the results do not aid Intuit. Raval finds that complaint rates tend to fall as the number of affected consumers rises. 39(1) Marketing Sci. at 171 Table 1. This makes sense, as consumers may assume that the many others will complain and may believe that little will be gained from their investing the time and energy to do so. With 17.6 million TurboTax users, just for TY2021, who match a paradigm scenario of deception, *see* Section VI.C.3 ("Customer Base Analysis"), a comparatively low complaint rate is consistent with Raval's findings and does not disprove the existence of deception.

Professor Golder performed a "benchmark analysis" that compared Intuit's company-wide rate of Better Business Bureau complaints to the "normalized" complaint rates of 18 benchmark companies for the trailing three-year period ending January 3, 2023. RX1018 (Golder Expert Report) ¶¶ 84-90. These comparisons shed little light on deceptive advertising by TurboTax, because, in addition to the reasons to question the significance of complaint rates discussed above, Golder's analysis (1) ignores complaints and reviews made directly to Intuit and (2) includes other Intuit products such as Mint and QuickBooks, diluting the effect of complaints regarding TurboTax. Golder Tr. 1237; Novemsky Tr. 1775; GX749 (Novemsky Rebuttal Report) ¶¶ 218-19. In this case we find the BBB complaint rates non-dispositive. *See FTC v. Vocational Guides, Inc.*, No. 3:01-0170, 2006 WL 3254517, at *14 (M.D. Tenn. Nov. 9, 2006) ("The meaning of a lack of complaints to the BBB is indeterminate.").

[41] These complaints are found in RX816, "TY21 Bazaarvoice Reviews Data.xlsx" (cross-designated as

- "They advertise $0 to file a basic W2 and end up charging you!" RX816 row 150070.
- "Easy to use but not free like they advertise unless you are a teenager who has just started working. Disappointed in the 'free' filing advertising they do but forces you to upgrade at the very end for something so simple that it took 1 click to complete." RX816 row 51511.
- "It's not free as it's advertised." RX816 row 51778.
- "When starting my taxes TurboTax claimed to be able to file for free….but in reality it wasn't free…I usually always use TurboTax but when you advertise as free that means it should be free!" RX816 row 52145.
- "ADVERTISES FREE, FREE, FREE, BUT ITS ACTUALLY FEE, FEE, FEE!" RX816 row 15850.
- "Your TV commercials are a big lie, this company should be put out of business for deceptive practices. Free, free, free, yes right $154.00 to file this return, Free, Free, free," RX816 row 272983.
- "Such false advertising. You state free for simple returns, but over $100 later, that is not the case at all. Every year it is the same crap. False advertising. I will not use you again moving forward." RX816 row 83380.

Intuit's customer service team also recorded customer contacts in its customer relationship management (CRM) system. IDF ¶ 476. The system recorded such entries as:

- "Why are you advertising free when by the end of doing my taxes with you it cost me $140! I will add this to my review of this product??" GX859, 2021.
- The customer "wants to know why it[']s asking him to pay 90 bucks when his tax return was simple." GX857, 2021.
- "PreAuth: Why am I being charged almost $120. For a simple w-2 tax return. Nothing else I'm claiming. I started with the free service then can't process any further until I except the $70 upgrade. That's false advertisement of free." GX859, 2021.
- "Why are you charging me…this is supposed to be FREE." GX862, 2021.[42]

---

GX475). Complaint Counsel brought selected complaints from that exhibit to the ALJ's attention via GXD006, a demonstrative exhibit.

[42] Respondent objects to the ALJ's reliance on Intuit's own CRM data and on Complaint Counsel's evidence of complaints summarized in demonstrative exhibit GXD006. Respondent's concern rests on the claim that the ALJ improperly denied Respondent the opportunity to offer a supplemental expert report of Bruce Deal that would have provided "context" for the complaints. Br. 26. The ALJ denied Intuit's motion to amend its exhibit list after the due date to add the Supplemental Report of Bruce Deal, and he also denied Complaint Counsel's contingent motion to add a Supplemental Report of Erez Yoeli in response. Order Memorializing Bench Rulings (Mar. 28, 2023). These rulings were warranted. Beyond this, Respondent's concern is confusing. The data underlying GXD006 came from RX816, Respondent's own customer review dataset that was admitted by stipulation. *See* JX2 ¶ 1 & Attachment A at 50. Respondent thus could have submitted its own demonstrative exhibit or examined its own company witnesses regarding its data. But, even if we were to consider Mr. Deal's supplemental report as Respondent requests we do, it would not change our view of the complaints identified in RX816, because Mr. Deal's supplemental testimony relates to CRM data, not the Bazaarvoice data highlighted by

In sum, Complaint Counsel have identified a number of complaints consistent with deception, even though such complaints are not a requirement for liability under Section 5. For the legal and factual reasons explained above, we find Intuit's arguments based on the number of customer complaints unpersuasive.

*Customer Base Analysis.* Respondent also relies upon a "customer-base analysis" offered by expert witness Bruce F. Deal, who reaches the astonishing conclusion that only 510 customers out of 55.5 million in TY 2021 exhibited behavior consistent with deception. Br. 28. Putting aside that the 510 are a mere fraction of the customers that year who actually expressed frustration in a manner consistent with deception,[43] Mr. Deal's methodology contains flawed assumptions that render his conclusions unreasonable and irrelevant to our deception analysis. Mr. Deal employs a process-of-elimination method by which he starts with Intuit's TY 2021 "customer base," defined as the 55.5 million individuals who logged into their existing TurboTax accounts or created new accounts during the TY 2021 tax season, and then removes from this group various subsets of individuals whose behavior he considers incompatible with Complaint Counsel's theory of harm. RX1027 (Deal Expert Report) ¶ 98. Mr. Deal then considers additional data about those who remain and opines that there are no more than 510 customers for whom Intuit's alleged deception may have resulted in using a TurboTax paid product. *Id.* ¶¶ 143, 162.[44] Off the bat, Mr. Deal excludes the consumers accounting for millions of visits to the TurboTax website where the visitor left before logging into an account.[45] This exclusion sets aside consumers who could have visited the TurboTax website believing that the service was free for them, then left the site in disappointment or frustration upon learning that it was not. *Cf.* GX749 (Novemsky Rebuttal Report) ¶ 283.

Mr. Deal also eliminates from consideration 17.6 million consumers who logged into an existing TurboTax account or created a new account in TY 2021, but who departed (or as Mr. Deal puts it, "ultimately decided to pursue other options") without starting a return or abandoning an initiated return. RX1027 (Deal Expert Report) ¶ 98. We disagree with Mr. Deal

---

GXD006. Br. Attachment A (Supplemental Expert Report of Bruce F. Deal) ¶¶ 4-7. Even more perplexing, the specific findings of fact that Intuit challenges as CRM data (IDF ¶¶ 488-507, challenged at Br. 26) all in fact are Bazaarvoice data, not covered by Mr. Deal's supplemental testimony. And even apart from the CRM data, the other record evidence of consumer complaints shows that Intuit has substantially understated the extent of consumer complaints. Even if we were to ignore the CRM evidence, we would still find Intuit's arguments based on the number of customer complaints unpersuasive.

[43] *See* discussion of Bazaarvoice customer review data in Section VI.C.3 ("Customer Complaints").

[44] These data include elements such as their history with TurboTax and the satisfaction ratings they provided post-filing. RX1027 (Deal Expert Report) ¶¶ 143, 162.

[45] These excluded visitors account for at least ███████████ interactions with the website. RX1027 (Deal Expert Report) ¶ 87 Fig. 9  *compare to* RX1027 (Deal Expert Report) ¶ 98 (defining "customer base" as 55.5M customers).

that this group is likely undeceived. This scenario is compatible with consumers being driven to the website by the ubiquitous "free" messaging, creating an account and/or tax return, then abandoning that account and/or return after realizing that they could not, in fact, file for free. GX749 (Novemsky Rebuttal Report) ¶ 284. In other words, it matches a paradigmatic scenario of deception, and the fact that Mr. Deal excludes these consumers calls his entire analysis into question. Mr. Deal himself acknowledges that his analysis does not "preclude deception" for any specific one of the consumers he removed through process of elimination. Deal Tr. 1399. We agree. We give no weight to Mr. Deal's customer-base analysis.[46]

***Disclosure Efficacy Survey.*** Respondent claims that a "Disclosure Efficacy Survey" conducted by its expert, John Hauser, provides additional evidence that the challenged ads were not deceptive. Br. 29. Professor Hauser surveyed two groups of study participants, each of whom were shown "free" ads and associated webpages designed to replicate those used by Intuit in marketing its products. RX1017 (Hauser Expert Report) ¶¶ 86-87; Hauser Tr. 852. The first group was shown one of Intuit's "free free free" ads, "Dance Class," with its original disclosures. RX1017 (Hauser Expert Report) ¶ 90.[47] The second group was shown the "Fishing" ad,[48] but, in that ad, Professor Hauser modified the disclosures from the originals to make them more prominent. *Id.*[49] For both groups, Professor Hauser disguised the TurboTax brand by replacing it with a fictional brand, "Vertax." *Id.* ¶ 16. After viewing the materials, the participants were

---

[46] Nor are Mr. Deal's faulty conclusions rehabilitated by the inferences Respondent draws from abandonment and retention rates. Br. 26-27. Respondent argues that the similarity in abandonment rates between free and paid products demonstrates a lack of deception. However, there are many possible reasons why consumers might abandon free and paid products and no reason to expect that the same reasons resulted in the similar abandonment rates for the two categories. *See* GX743 (Yoeli Rebuttal Report) ¶¶ 41-42 (listing alternative reasons for abandonment). In fact, ███████████████████████ ████████████████████████████████ RX765-A at 2, 7. ████████████████████████████████████████████████████████ ███████████████████████ *Id.* at 17; *see also,* GX743 (Yoeli Rebuttal Report) ¶¶ 41-42. Another 2019 study noted, ████████████████████████████ ███████████████████████ GX665 at CC-00014561. Respondent's separate claim that the higher retention rate for paid products than for Free Edition disproves deception, Br. 27, is wholly speculative; it ignores other factors that could affect relative retention rates, such as the tendency for Free Edition taxpayers to develop more complex tax needs over time, and seemingly fails to account for the deception of consumers who failed to qualify for Free Edition and chose not to use a paid TurboTax product, thus never becoming a customer who could be retained.

[47] Cited in Section II.C.1, the ad features an exercise instructor who uses exclusively the word "free" as he leads the participants through a dance routine.

[48] As described in Section II.C.1, the ad offers a humorous depiction of a sport fisherman impaled by a swordfish, with the tagline, "At least his taxes are free."

[49] For example, Professor Hauser increased the font size of the written disclosures, keeping them on the screen longer, and adding a statement that "Not all taxpayers qualify for Free Edition." Hauser Tr. 863-64. The altered voice over stated, "Vertax Free Edition is for simple returns only. Not all taxpayers qualify to file for free. See if you qualify at vertax.com." Hauser Tr. 861-62.

asked about their likelihood of starting their return on Vertax. *Id.* ¶ 92. Professor Hauser reported no statistically significant difference between the groups' responses to the foregoing question. *Id.* Respondent hypothesizes that, if Intuit's ads were deceptive, then the enhanced disclosures that Professor Hauser tested should have discouraged consumers from considering Vertax. Br. 29. Since Professor Hauser's survey did not show such an effect, Respondent argues, the survey rebuts Complaint Counsel's showing of deception. *Id.*

We find Professor Hauser's survey does not undercut Complaint Counsel's showing. Professor Hauser's survey does not directly ask consumers whether they take away the message that they can file for free, nor does it seek information about whether they are actually eligible to do so. Thus, it does not refute the evidence from Professor Novemsky that does address these questions. Put another way, Professor Hauser did not test whether and to what extent the changes he made to the original stimuli had any effect on consumers' misimpression that they could file their taxes for free when that was not the case. GX749 (Novemsky Rebuttal Report) ¶ 119; Novemsky Tr. 1781-82. Although Professor Hauser contends that he has scientifically disproved Complaint Counsel's deceptive door-opener claim, his results are equally consistent with the premise that both the original and revised disclosures are equally ineffective at curing the deceptive impression left by the "free" claims. GX749 (Novemsky Rebuttal Report) ¶¶ 112, 136; Novemsky Tr. 1812-13; RX1017 (Hauser Expert Report) ¶ 91; Opp. 33. For example, both sets of disclosures used the flawed "simple returns" or "simple U.S. returns" language to limit the "free" offer, RX1548 and RX1549, despite the fact that consumers often do not understand Intuit's definition of "simple returns" or may erroneously believe that it applies to them when it does not. *See* Section VI.B.3.d above; Novemsky Tr. 1786-87. Professor Hauser did not attempt to test consumers' comprehension of the phrase "simple return," Hauser Tr. 957, so his survey is not well suited to determine whether such a disclosure is adequate.[50] And, even if Professor

---

[50] At oral argument, Respondent offered the eyebrow-raising claim that Professor Hauser's study was a "gold-standard" test-and-control study that proved that consumers were not deceived and that they understood the disclosures. Oral Arg. Tr. 10. This contention is immediately problematic because, as Professor Hauser acknowledged in testimony, his test/control design was only suited to test the effects of the differences between the two ads (what he called the "delta"), not to directly test the ads themselves. RX1391 (Hauser Dep.) at 77; *see also* RX709 (Shari Seidman Diamond, *Reference Guide on Survey Research, in* Reference Manual on Scientific Evidence (National Academies Press, 3d ed., 2011)) at INTUIT-FTC-PART3-000608657. But even accepting *arguendo* that Professor Hauser's study could show consumer deception or the lack thereof, Respondent's claim about the study's results is grossly unfounded. Respondent contends that the proportion of Professor Hauser's survey respondents who stated that they would likely start their returns in the free edition of Vertax after viewing the ads was roughly the same as the general population (presumably, one-third). Oral Arg. Tr. 10. That is not what Professor Hauser's survey showed. Rather, he found that 43.6% of all original disclosure respondents and 48.8% of all revised disclosure respondents would both consider using Vertax (77.7% and 75.9%, respectively) *and* would be most likely to start in Vertax Free Edition (56.1% and 64.3%, respectively). Hauser Tr. 874; RX1017 (Hauser Expert Report) ¶¶ 92, 95 & Tables 4, 5. Perhaps not satisfied with these results, Professor Hauser appears to have reached the more-favorable (to Respondent) 33% figure by making a further calculation, in a manner not disclosed in his report, using a discount factor related to the likelihood that respondents would start in Vertax Free Edition. *See* CCRF ¶ 743. This adjustment is unexplained, unscientific, and does not provide insight into the likelihood of deception or the meaning of the disclosures. Given the flaws in this "33%" claim, it makes sense that Respondent did not advance the

Hauser had tested the pertinent issue, his decision to show the control group and the test group two markedly different ads, which he claims represent "extremes,"[51] undercuts the value of his findings: the subjects' responses to the different creative content between the "Dance Class" and "Fishing" ads could easily have canceled out the effects of the different disclosures.

***Other Extrinsic Evidence.*** Respondent's remaining extrinsic evidence is equally unavailing. For example, Intuit offers a TY 2020 Net Promoter Score study that assertedly demonstrates that the percentage of respondents who were aware of a free TurboTax product before they decided to use TurboTax (48%) was about the same as the percentage who in fact filed with Free Edition (44%). Br. 22. Respondent claims this means that, of those who knew about a free product, "nearly all used that product and filed for free." *Id.* But Intuit's own data contradict this: ▮▮▮▮ of TurboTax Online's *paid* users reported that they were aware or believed they could file for free before selecting TurboTax, with another ▮▮▮▮ "unsure." GX665 at 44. Thus, a substantial share of paid customers could have been deceived—the opposite of what Respondent would have us take away from this study.

Respondent's use of snippets of consumer deposition testimony is also problematic. For example, Respondent claims that the testimony supports its view that consumers correctly understand Intuit's use of "simple tax returns" as a qualification for free filing. However, most consumer testimony points to the opposite conclusion. *See, e.g.*, GX136 (Schulte Dep.) at 70 (witness inaccurately describes a "simple" tax return); GX138 at 44 (same); GX135 (Phyfer Dep.) at 80 (same); GX138 (Adamson Dep.) at 44 (same); GX142 (Keahiolalo Dep) at 38 (same); GX137 (Dukatz Dep.) at 64 (no understanding of simple return); GX135 (Phyfer Dep.) at 67 (witness "assumed" that her return was simple and did not take steps to check); GX128 (Benbrook Dep.) at 58 (witness believed that the vast majority of people should have been eligible for free filing based on the advertising); GX131 (Bansal Dep.) at 15 (disclosure is unclear as to whether all taxpayers are eligible for free filing). When Respondent does acknowledge this adverse testimony, it responds that the witnesses' "obvious inconsistencies" render their testimony "unreliable." Br. 27-28 (citation omitted). But Respondent's lone example of a so-called "inconsistency" shows that its criticism is flawed. Respondent points to *one* consumer who testified "both that he did not know who qualified for Free Edition and that he understood that Free Edition was only for consumers with simple tax returns." Br. 28. This is not inconsistent: when the examiner pointed out the "simple tax returns" language, the witness acknowledged it, GX137 (Dukatz Dep.) at 59, but stated that the phrase "has no connotation to me because I don't understand what is and is not a simple tax return." *Id*. at 56. As this testimony shows, it is possible to be aware that a free offer has limitations, yet not understand material aspects of how the limitations work.

### 4.     Novemsky Survey

Countering Respondent's evidence that it claims shows a lack of deception, Complaint Counsel point to the Novemsky survey, which found that many consumers ineligible for Free Edition had a misperception that they could file with TurboTax for free and that they had

---

claim in its post-trial brief or in its opening appeal brief.

[51] RX1391 (Hauser Dep.) at 70.

"simple" returns. Specifically, among respondents who had not used TurboTax in the past three years (Group A), 52.7% indicated that they thought they could file their income taxes for free using TurboTax even though they were ineligible. Among those who had used a paid version of TurboTax in the past three years (Group B), 24.1% erroneously thought they could file their taxes for free with TurboTax. GX303 (Novemsky Expert Report) ¶¶ 8, 69-70 & Fig. 1. Additionally, as previously discussed, 55% of Group A and 28.6% of Group B believed that they had a "simple U.S. return" when they did not. *Id*. ¶¶ 10, 85 & Fig. 3. This survey supports the conclusion that many consumers do not correctly understand the limitations on TurboTax's "free" offer and believe that they are eligible to file their taxes for free with TurboTax even though they are not. [52]

Respondent challenges the Novemsky survey on a variety of grounds, but none of their arguments supports discarding the survey results.

### a.   "Simple Returns" Results

Respondent takes issue with the survey's finding that consumers do not accurately understand the meaning of the term "simple U.S. returns." Respondent argues that the survey was flawed because Professor Novemsky did not show participants the actual ads and, as a result, omitted words that accompany the "simple returns" disclosure, such as "see if you qualify

---

[52] The ALJ declined to give "much weight" to Professor Novemsky's separate conclusion that the survey participants' mistaken belief that they could file for free on TurboTax was attributable to the TurboTax advertising or website. ID 190-91. However, those participants themselves pointed to the TurboTax advertisements and website as the most common source for their misimpression. GX303 (Novemsky Expert Report) ¶¶ 9, 77-79. Approximately 73% of participants in both Groups A and B identified either the TurboTax ads, its website, or both as a source of their inaccurate beliefs. GX303 (Novemsky Expert Report) ¶¶ 9, 79. Moreover, Professor Novemsky ruled out alternative explanations for the cause of misimpressions, including by analyzing Intuit's dominant (72%) share of voice in "free" tax preparation television advertising. GX749 (Novemsky Rebuttal Report) ¶¶ 43-46; Novemsky Tr. 361-71. Between 2018 and 2022, the total number of "free" TurboTax television ad impressions exceeded 19 billion, which, when distributed across 160 million taxpayers, results in dozens and dozens of views per taxpayer, regardless of what tax preparation method they may have used. GX749 (Novemsky Rebuttal Report) ¶ 45 & Fig. 4; Novemsky Tr. 369-70; *see also* IDF ¶ 221 ("In TY 2020 and TY 2021, Online Advertisements for TurboTax free products generated over 15 billion impressions and were clicked on over 130 million times."). Further, Intuit's own copy tests show that its ads significantly increased consumers' belief that they could file for free with TurboTax. Novemsky Tr. 364-65; GX303 (Novemsky Expert Report) ¶ 97; GX749 (Novemsky Rebuttal Report) ¶ 29. Given all that, it is reasonable to infer that consumers' mistaken beliefs that they can file on TurboTax for free stem from Intuit's ubiquitous advertising telling consumers exactly that, and we so find.

Respondent's related contention, that Complaint Counsel waived the right to challenge the ALJ's failure to give weight to this aspect of Professor Novemsky's conclusions, lacks merit. As we have repeatedly explained, "the Commission does not treat a prevailing party's objections to an ALJ's failure to rule in its favor on alternative grounds as a matter for cross-appeal." *In re Illumina,* No. 9401, 2023 WL 2823393, at *20 n.12 (F.T.C. Mar. 31, 2023) (citing Order of the Commission, *In re Impax Labs, Inc.*, No. 9373, 2018 WL 3249714, at *1 (F.T.C. June 27, 2018); Order, *In re LabMD, Inc.*, No. 9357, 2015 WL 9412608, at *1 (F.T.C. Dec. 18, 2015)).

PUBLIC VERSION

at turbotax.com." Br. 29-30.[53] Respondent states that, by omitting the language inviting consumers to visit the TurboTax website, Professor Novemsky prevented participants from seeking out additional information to determine the meaning of "simple returns." Br. 30. We find that the omission of the "see if you qualify" language or other components of Intuit's ads does not render the survey flawed or its findings unreliable.

First, as previously discussed, not all of Intuit's ads had a "see if you qualify" disclosure. Prior to TY 2022, Intuit's online display ads had a "simple tax returns only" disclosure with no instruction to "see if you qualify" or "see details." *See* IDF ¶¶ 230-69. In many of Intuit's television ads, a "see details at turbotax.com" disclosure was included but only in tiny, faint, fleeting text, which we have already said was unnoticeable and barely readable. *See, e.g.*, IDF ¶¶ 68, 70, 72, 78, 82, 86, 90, 95, 106, 122, 136, 147, 155, 163 (example screenshots of television ads showing "See details at turbotax.com" or "See offer details at TurboTax.com" in small text on the bottom); *supra* Section VI.B.3.c. Accordingly, even if there were merit to Respondent's critique of the Novemsky survey based on its omission of the "see details" or "see if you qualify" disclosure, it would not undermine the survey results as applied to ads that lacked such a disclosure or in which that disclosure was not noticeable.

Second, even with respect to ads that did include such a disclosure, presenting consumers with the words "see details at turbotax.com" or "see if you qualify at turbotax.com" or showing consumers examples of TurboTax ads would not have changed their understanding of whether they have "simple returns," because neither these words nor any other aspect of the ads provide an explanation of what "simple returns" means. Thus, omission of the "see details" or "see if you qualify" disclosures does not invalidate the finding that many consumers do not understand the meaning of the phrase "simple U.S. returns."[54]

Third, to the extent that Respondent's argument is that Professor Novemsky should have actually let the participants go to the TurboTax website and then navigate to and read the disclaimers and explanations there before answering whether they thought they had "simple U.S.

---

[53] The question (TAT290) stated as follows: "Please consider the statement 'TurboTax Free Edition is for simple U.S. returns only.' Do you think that your 2021 income tax return meets the definition of a 'simple U.S. return' as used in this sentence?" Consumer respondents could choose among the following options:

1. Yes, I think my 2021 income tax return meets the definition of a "simple U.S. return"
2. No, I don't think my 2021 income tax return meets the definition of a "simple U.S. return"
3. Don't know / Not sure

GX303 (Novemsky Expert Report) App'x D at CC-00006562-63.

[54] Respondent's reliance on *McGinity v. Procter & Gamble Co*., 69 F.4th 1093, 1099 (9th Cir. 2023), is misplaced. In that case, the court found that, where the label on the front of the packaging was ambiguous but the back label resolved the ambiguity by listing the ingredients, a survey that omitted the back label was "not informative as to whether the labeling of the products is misleading as a whole." *Id.* Here, the phrases "see if you qualify" or "see details" at turbotax.com do not explain the meaning of the term "simple returns," so omitting those phrases does not affect the validity or usefulness of the survey regarding consumer understanding of the term.

PUBLIC VERSION

returns," that would undermine the point of the survey, which is to help assess consumers' perceptions after being inundated with Intuit's "free" ads. This is like saying that a survey about the message conveyed by an ad must allow participants to first review the terms and conditions in the contract.[55] As we have discussed, consumers have no duty to conduct research, and a misleading first contact cannot be cured just because the terms are made clear at some later point prior to purchase. *See supra* Section VI.C.3 (Consumer Skepticism and Research). Plus, Professor Novemsky's survey took into account all information consumers accumulated from various sources, including the websites they had visited and any TurboTax disclosures they had seen. GX303 (Novemsky Expert Report) ¶ 96.

### b. Survey Design

Respondent criticizes Professor Novemsky's survey design because Professor Novemsky did not show consumers any ads and did not use a control group. Br. 30. Without a control group, Respondent argues, Professor Novemsky had no way to estimate the effect of the survey itself on participants' perceptions. Br. 31.

Professor Novemsky's survey was designed to measure consumer perceptions as shaped by all the information consumers have accumulated from various sources, including the effects of years of Intuit marketing over different media, as well as any disclosures consumers may have noticed or accessed.[56] *See* GX303 (Novemsky Expert Report) ¶¶ 29, 96; GX749 (Novemsky Rebuttal Report) ¶ 21. Such surveys are reliable and broadly used, including by Intuit's own expert. GX749 (Novemsky Rebuttal Report) ¶ 25; Novemsky Tr. 381-82.

Lack of a control group does not make the survey unreliable. In the absence of a control group, other methods may be used to prevent bias, such as by "including 'none of the above', 'don't know/can't recall' and 'other' as possible answers to closed-ended questions." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1078 (C.D. Cal. Aug. 14, 2015). Professor Novemsky did just that, allowing consumers to select "I don't have enough information" and "I'm not sure." GX303 (Novemsky Expert Report) ¶ 68. We find Professor Novemsky's conclusions regarding consumers' misconception of the term "simple U.S. return" to be valid and reliable.

### c. TAT240 Survey Question

Respondent takes issue with the survey's reliance on the multiple-choice question (TAT240), which asked consumers about their understanding of whether they could file their 2021 tax return on TurboTax for free.[57] Respondent asserts that this question invited guessing

---

[55] This would be a ridiculous proposition even if the ad said "see contract for details."

[56] The wide reach of Intuit's marketing—making it difficult, and perhaps impossible, to find a control group untouched by Intuit's allegedly deceptive claims—shaped the Professor Novemsky's approach to survey design. GX749 (Novemsky Rebuttal Report) ¶ 18.

[57] The TAT240 question asked as follows: "Based on your current information and understanding, which

and that questions that preceded it primed participants to answer the way Professor Novemsky wanted. Br. 31. Respondent points to several survey participants who indicated that the survey suggested an answer. *Id.* Respondent also cites Professor Hauser's re-coding analysis (described below), which Respondent contends showed that nearly half of the Novemsky survey participants provided open-ended answers that were inconsistent with their answer to the TAT240 question. Br. 31-32.

First, the survey did not invite guessing. Professor Novemsky used best practices to prevent guesses by giving consumers the option to select "I do not have enough information" as well as "I'm not sure." GX303 (Novemsky Expert Report) ¶ 58 & App'x D at CC-00006562. Additionally, survey respondents were specifically instructed not to guess when they did not know an answer and were required to express explicit agreement with such instructions. GX303 (Novemsky Expert Report) ¶ 58; GX749 (Novemsky Rebuttal Report) ¶ 26.

Moreover, Professor Novemsky's survey questions were not leading and did not "prime" responses. *See* GX303 (Novemsky Expert Report) App'x D at CC-00006561-63 (listing survey questions). Professor Novemsky conducted a pretest of the survey questions and made adjustments where necessary. GX303 (Novemsky Expert Report) ¶¶ 61-63 & App'x G-H at CC-00006608-10. The pretest demonstrated that participants had no difficulty understanding the survey and were unable to guess the survey's sponsor or purpose. GX749 (Novemsky Rebuttal Report) ¶ 93.[58] Respondent points to several participants who, when asked why they thought they could file for free, indicated that the survey influenced their answer, Br. 31, but the responses of those participants (less than 1% of the total sample) do not invalidate the responses of all the other participants who provided other explanations for their belief that they could file for free. *See* GX749 (Novemsky Rebuttal Report) ¶¶ 47, 78.

As for Professor Hauser's re-coding exercise, it was methodologically flawed and unreliable. Professor Hauser's coders reviewed responses to two open-ended questions (TAT220 and TAT230)[59] in the Novemsky survey and assigned those responses to what they thought were the most accurate corresponding options available for the closed-ended question TAT240, regarding whether consumers thought they could file their taxes for free. RX1017 (Hauser Expert Report) ¶¶ 53-54 & App'x E. Professor Hauser excluded as "inconsistent" any responses where the consumers' actual answers to TAT240 differed from what the coders thought those answers

---

of the following best describes your understanding of filing your 2021 income taxes for free with TurboTax?" Survey respondents could select among "I think I can file," "I don't think I can file," or "I do not have enough information to say whether or not I can file" my 2021 income taxes for free with TurboTax, or "I'm not sure." GX303 (Novemsky Expert Report) App'x D at CC-00006562.

[58] Respondent's citation to *Fish v. Kobach*, 309 F. Supp. 3d 1048 (D. Kan. 2018), *aff'd*, 957 F.3d 1105 (10th Cir. 2020) is misplaced. In that case, the survey asked "loaded" questions that were "contaminated by bias because [of] their wording." *Id.* at 1060-61. Novemsky's questions had nothing similar.

[59] TAT220 asked, "Based on your current information and understanding, what can you tell us about whether there is a cost to filing your taxes with TurboTax?" GX303 (Novemsky Expert Report) App'x D at CC-00006561. TAT230 asked, "Based on your current information and understanding, who, if anyone, is eligible to file taxes for free with TurboTax?" *Id.*

should have been based on the open-ended questions and other responses where the coders found a perceived inconsistency between the answers. GX749 (Novemsky Rebuttal Report) ¶¶ 53-54; RX1017 (Hauser Expert Report) at 31, Table 1 n.2. This method, however, resulted in the removal of many responses that were in fact consistent, including responses indicating consumer confusion or misunderstanding regarding the term "simple returns." *See* GX749 (Novemsky Rebuttal Report) ¶¶ 54-60. For example, Professor Hauser's coders excluded the response of an ineligible consumer who indicated an understanding that some filings are free and that a simple tax return could be filed for free, but who nevertheless believed (erroneously) that he or she could file for free because "I have just simple income forms." GX749 (Novemsky Rebuttal Report) Fig. 5 at CC-00015259. Professor Hauser's re-coding thus excluded from the survey some of the very responses that support a finding of deception. Correcting for these mistakes in Professor Hauser's coding analysis, Professor Novemsky found that 46% of participants in Group A believed they could file for free. GX749 (Novemsky Rebuttal Report) ¶ 61.[60] Professor Hauser's re-coding exercise therefore does not undermine the conclusions from the Novemsky survey.

Finally, we note that neither the argument about alleged "priming" nor Professor Hauser's re-coding exercise applies to the survey question TAT290, which asked consumers about their understanding of the term "simple U.S. returns."

### d. Survey Population

Respondent also argues that Professor Novemsky's survey population was unrepresentative and biased. The arguments are unavailing.

First, Respondent asserts that the response rate was less than 5%, which is too low to produce reliable results. Br. 32 (citing *In re AutoZone, Inc.*, No. 3:10-md-02159-CRB, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016), *aff'd,* 789 F. App'x 9 (9th Cir. 2019) (involving a response rate of 6% or less)). However, Respondent's calculation of the response rate improperly included survey participants who were excluded because they were not part of the target population. GX303 (Novemsky Expert Report) ¶ 39 & App'x I. When only the target population is considered, as is appropriate when calculating response rates,[61] the completion rate was 78%, which is more than adequate.[62]

---

[60] Even under Professor Hauser's flawed coding, nearly 22.5% of Group A participants erroneously believed they could file for free using TurboTax. GX749 (Novemsky Rebuttal Report) ¶ 52.

[61] *See* RX709 (Diamond, *Reference Guide on Survey Research*) at INTUIT-FTC-PART3-000608643 n.109 ("[R]esponse rate can be generally defined as the number of complete interviews with reporting units divided by *the number of eligible reporting units in the sample* . . . .") (emphasis added)); *see also AutoZone*, 2016 WL 4208200, at *18 (Nonresponse bias can occur "when particular systemic segments of the *target population* or sample do not provide responses . . . ." (emphasis added)); *accord Vasquez v. Leprino Foods Co.*, No. 1:17-cv-00796-AWI-BAM, 2023 WL 1868973, at *6 (E.D. Cal Feb. 9, 2023) (quoting *AutoZone*, 2016 WL 4208200, at *18).

[62] Of the 779 respondents who were qualified to take the survey, 607 provided responses (8 terminated during the survey and 164 opted out). GX303 (Novemsky Expert Report) ¶¶ 51, 65 & App'x I.

Second, Respondent takes issue with the fact that the survey screened out participants who qualified for Free Edition and had already filed their taxes. Br. 32. Respondent claims that, as a result, the surveyed participants were individuals who were especially unlikely to be familiar with TurboTax and its ads and for whom the ads were definitionally not material since they supposedly believed they could file for free on TurboTax yet chose not to do so. *Id*. But including consumers who were eligible for free filing would defeat the purpose of the survey, which is to measure whether there were misimpressions among consumers who could not file for free. Novemsky Tr. 359; GX303 (Novemsky Expert Report) ¶ 21. Furthermore, excluding consumers who already filed their taxes for the year focuses on those who were in the market for services at the time of the survey and not consumers who may have certainty about whether they could file for free with TurboTax because they had just tried to use it and either successfully filed for free or received an upgrade screen. GX303 (Novemsky Expert Report) ¶ 22.

Respondent suggests that consumers who were ineligible to file for free and had not yet filed their taxes at the time of the survey[63] were less likely to be familiar with the challenged ads. Br. 32. But Respondent engaged in a multi-year mass-marketing campaign, airing ads during Super Bowls and the Olympics, and its "free" ads received billions of advertising impressions. *See* GX749 (Novemsky Rebuttal Report) ¶ 45 & Fig. 4; Novemsky Tr. 369-70; GX303 (Novemsky Expert Report) at CC-00006541 n.125; IDF ¶ 221; GX431; GX432; GX433; GX436; GX437. In any case, what matters is the perception of those who do not qualify, not whether those who do qualify have a better understanding of their eligibility.

Respondent also argues that participants in Group A, who had not filed with TurboTax in the last 3 years, were less likely to have seen and paid attention to Intuit's ads than those who had used its products. Reply 16. This is speculation. And, as we have already discussed, a primary purpose of advertising is to attract new customers. Moreover, Novemsky also surveyed consumers who *had* used TurboTax in the last three years; those were the participants in Group B, 24.1% of whom erroneously believed they could file for free. GX303 (Novemsky Expert Report) ¶ 8. This is a substantial portion of a subpopulation that, due to prior usage, should have been least susceptible to deception. Respondent claims that the fact that 24.1% of respondents in Group B erroneously thought they could file their taxes for free with TurboTax demonstrates the survey's design flaws. Reply 16. Respondent argues it would make no sense for so many respondents who had paid to use TurboTax within the last three years to indicate they could use TurboTax for free. *Id*. But this shows the power of Intuit's "free" claims and supports Novemsky's assertion that motivated reasoning, wishful thinking, and optimistic bias will drive many consumers to conclude that they have "simple returns" and are among the group who can file for free. GX303 (Novemsky Expert Report) ¶ 87.[64]

---

[63] The survey was conducted between March 11, 2022, and March 24, 2022. GX303 (Novemsky Expert Report) ¶ 22.

[64] Nor is there any merit to Intuit's argument that its ads are "definitionally not material" to survey respondents who thought TurboTax was free and had not yet filed their taxes. Br. 32. The ads could have been material to those respondents, inducing them to go on to attempt to file their taxes for free with TurboTax.

Finally, Respondent argues that the survey participants were unrepresentative and biased because participants who completed the survey could opt out after being informed that the survey was collected on behalf of the FTC to gather reactions to Intuit advertisements.[65] Br. 32-33. The notification regarding the opt-out option and purpose of the survey, which is required by the Privacy Act, 5 U.S.C. § 552a(e)(3), was included at the end of the survey, rather than earlier on, thereby avoiding bias in the responses. IDF ¶ 420. Moreover, Respondent has identified no reason to think that those who opted out differed from those who continued to participate in any way that would have affected the survey results. There is certainly no basis for Respondent's suggestion those who opted out were sympathetic to Intuit. It is equally plausible that consumers with positive views of TurboTax were more likely to stay in the survey because they wanted to ensure their answers would help Intuit. *See* GX749 (Novemsky Rebuttal Report) ¶ 73. Further, even under the extreme assumptions that all opt-out respondents were not under a misimpression that they could file for free and that they all fell within Group A, the survey still establishes significant levels of consumer misimpression. *Id.* ¶ 74 (calculating, under the stated assumptions, that 37.5% of survey respondents who did not use TurboTax in the last three years mistakenly believed they could use TurboTax for free).

In summary, we find that Respondent's ad claims are likely to mislead at least a significant minority of reasonable consumers. The "free" claims are false for two-thirds of U.S. taxpayers, and Respondent's arguments that such taxpayers were nevertheless not likely to have been misled are unpersuasive.

### D.    Materiality

A representation is considered material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com*, *LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quotation omitted); *see also Kraft*, 970 F.2d at 322. "Information has been found material where it concerns the purpose, safety, efficacy, or cost of the product or service." *Deception Statement*, 103 F.T.C. at 182-83 (citing cases); *Thompson Med.*, 104 F.T.C. at 816-17.

The ALJ held that Intuit's representation that consumers can file their taxes for free using TurboTax was material. The ALJ observed that numerous cases have found that a representation about the cost of a product is an important factor in a consumer's decision regarding whether to purchase the product and, therefore, material. ID 205 (citing cases). Moreover, consumer

---

[65] The opt-out preface stated, in relevant part:

> This survey is being conducted on behalf of the United States Federal Trade Commission (FTC), the nation's consumer protection agency, in order to collect information about the reactions and experiences of potential customers to advertisements by Intuit, the maker of TurboTax. The FTC investigates unfair and deceptive conduct by companies. The information you provide could help us further our mission under the FTC Act to protect consumers.

GX303 (Novemsky Expert Report) App'x E at 10-11.

testimony as well as Respondent's own surveys and expert witnesses confirm that price matters to consumers. ID 206. The ALJ also held that, even if the representations at issue related not to the cost of the product but to consumers' eligibility to use the product, as Intuit claimed, the misrepresentations are still material because they are likely to affect consumer choice of or conduct regarding the product. ID 206-07. Information concerning product efficacy has been found to be material, and a product has no efficacy for a consumer ineligible to use it. ID 207; *see also* SD Opinion 15-16.

Respondent does not challenge the ALJ's materiality ruling on appeal, and we adopt it. Whether one frames the issue as one of price, as Complaint Counsel propose, or as eligibility, as Intuit would have us do, the message conveyed to reasonable consumers—that they can file for free on TurboTax—was material.

### E.     Affirmative Defenses

Respondent's Answer asserted ten affirmative defenses, including defenses on constitutional grounds challenging the administrative proceeding. None of them is well-founded or requires dismissal of the suit.

Although mootness, vagueness, and overbreadth are asserted as Defenses in the Answer, on appeal, Intuit raises its contention that this proceeding is moot and that the ALJ's order is vague and overbroad in the context of its challenge to the proposed remedy, so we address those issues when discussing the remedy in Section VII. Respondent does not pursue its claim that the Complaint was invalid; the ALJ found that the Commission did vote in favor of the Complaint. ID 208. We address Respondent's non-constitutional defenses, both related to timing, and Respondent's constitutional defenses in turn.

#### 1.     Non-constitutional Defenses

##### a.     Laches

Respondent contends that the doctrine of laches precludes the Commission from imposing an order for "outdated" ads when the Commission had long known about Intuit's ads. Br. 49-50. Respondent explains that the FTC investigation was opened in 2019, but the Complaint was not filed until 2022. Citing *FTC v. DirecTV, Inc.*, No. 15-cv-01129-HSG, 2015 WL 9268119 (N.D. Cal. Dec. 21, 2015), Respondent argues that Judge Chappell was wrong to find "that laches is categorically inapplicable." Br. 50 (citing *id.* at *3).

We agree with Judge Chappell that laches does not preclude a Commission order in this case. It is well settled that the doctrine of laches is not available against the government in a suit by it to enforce a public right. *United States v. Summerlin*, 310 U.S. 414, 416 (1940) (citing cases); *Simeon Mgmt. Corp.* 87 F.T.C. 1184, 1222 (1976) ("The principle of equitable estoppel—laches—may not be applied to deprive the public of the protection of a statute because of . . . lack of action on the part of public officials."); *Rentacolor, Inc.*, 103 F.T.C. 400, 418 (1984) (Laches is not a "defense to an action brought by the government in the public interest.").

*FTC v. DirecTV* does not provide support for a successful laches defense. In that case, the

district court denied an FTC motion to strike an affirmative defense of laches, citing a footnote in *United States v. Ruby Co.*, 588 F.2d 697, 705 n.10 (9th Cir. 1978). *DirecTV*, 2015 WL 9268119, at *2-3. The footnote in *Ruby* explains "[t]he traditional rule is that the doctrine of laches is not available against the government in a suit by it to enforce a public right or protect a public interest," but the Ninth Circuit also posited "that this rule is subject to evolution as was the traditional rule that equitable estoppel would not lie against the government." *Ruby*, 588 F.2d at 705 n.10 (citation omitted). The court in *DirecTV* concluded only that, in light of *Ruby*, it would not strike the affirmative defense at the pleading stage. The district court did not find that laches precluded an order. *DirecTV*, 2015 WL 9268119 at *3. In fact, Respondent points us to no case where the defense of laches has been successfully asserted against the government in the 45 years since the Ninth Circuit suggested a possible evolution in the rule that laches is not available against the government. Indeed, in *Ruby*, the Ninth Circuit found "the policy considerations so strong as to compel denial of the defense of laches." *Ruby*, 588 F.2d at 705 n.10.

Even if a laches defense were somehow available, we find that Respondent did not provide factual support for the defense. "To prove laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) (citation omitted). Here, Respondent identifies a three-year period between the start of the Commission's investigation and issuance of the complaint, but Respondent does not demonstrate that this period was unreasonable. In fact, elsewhere in its brief, Respondent suggests that part of this period was spent discussing settlement. Br. 9; RX391 ¶ 5. Regarding prejudice, Respondent argues that it sought guidance on how to modify its ads, but FTC staff refused to discuss the concerns, allowing several tax seasons to pass. Reply 24. Respondent does not explain how this caused prejudice, but if the theory is that Respondent would have changed its ads in later years to reflect staff guidance, the claim is wholly unsupported and speculative, and offers no possible justification for deceptive ads antedating any request for guidance. [66]

## b.  Statute of Limitations

Respondent claims that ads from TYs 2014–2017 cannot support relief because they occurred outside the three-year statute of limitations applicable to claims under Section 5 of the FTC Act. Br. 50. We disagree. "No statute of limitations attaches to administrative proceedings brought under Section 5 of the Federal Trade Commission Act . . . ." *Rentacolor*, 103 F.T.C. at 418; *E.I. Du Pont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924) ("[A]n action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it."); *United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1489 (9th Cir. 1993) ("In the absence of a federal statute expressly imposing or adopting one, the United States is not bound by any limitations period."). Respondent acknowledges that Section 5 does not have an express limitations period. Br. 50.

Respondent contends that, in the absence of an express limitations period, courts borrow

---

[66] The court in *DirecTV also* explains that, "were laches to apply to the government in enforcing a public right, a showing of affirmative misconduct also would likely be required." *DirecTV*, 2015 WL 9268119, at *2 (citing *Ruby*, 588 F.2d at 705 n.10). Here, Respondent provides no claim of misconduct by FTC staff.

an appropriate rule of timeliness from another source and Respondent argues that a three-year limitations period should be borrowed from Section 19 of the FTC Act or from a state statute. *Id.* (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983)). Again, we disagree. The practice of borrowing a limitations period is "suspended . . . where the government is pursuing a public right or interest." *SEC v. Lorin*, 869 F. Supp. 1117, 1127 (S.D.N.Y. 1994). Thus, courts have found that, "unlike actions brought by individual consumers, no statute of limitations applies to FTC enforcement actions." *FTC v. 4 Star Resol., LLC*, No. 15-CV-112S, 2015 WL 7431404, at *2 (W.D.N.Y. Nov. 23, 2015) (explaining that actions in *DelCostello* were "brought by individual employees against their employers and unions, not by the United States Government"); *FTC v. Instant Response Sys., LLC*, No. 13 Civ. 00976 (ILG)(VMS), 2014 WL 558688, at *3 (E.D.N.Y. Feb. 11, 2014) (refusing to borrow a limitations period from other parts of the FTC Act for claim brought under Section 5 and collecting cases).

Respondent argues that either laches or a statute of limitations must apply to this matter—"[i]f . . . laches does not apply to the government . . . , then . . . it is appropriate to apply a borrowed limitation even against the government. . . . Conversely, if no statute of limitations applies, laches must." Reply 24. Respondent provides no support for this either/or timeliness requirement. In fact, it is contrary to precedent. The Supreme Court explained that "[i]t is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights." *Summerlin*, 310 U.S. at 416.

## 2.    Constitutional Defenses

### a.    Due Process: Fusion of Prosecutorial and Judicial Functions, Agency Bias, and Prejudgment

Respondent claims that the Commission's dual role in the administrative adjudicatory process, in which "the Commissioners who authorized the filing of the complaint against Intuit are now deciding its merit," creates "an unconstitutional potential for bias" that violates due process. Br. 47. The Supreme Court, however, has squarely rejected the proposition that the combination of investigative and adjudicative functions in and of itself creates an unconstitutional risk of bias in administrative adjudication. *Withrow v. Larkin*, 421 U.S. 35, 47, 56 (1975). As the Court explained, it is "very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure . . . does not violate due process of law." *Id.* at 56. Accordingly, "[t]he combination of investigative and judicial functions within an agency has been upheld against due process challenges, both in the context of the FTC and other agencies." *Gibson v. FTC*, 682 F.2d 554, 560 (5th Cir. 1982). The Fifth Circuit recently rejected Respondent's argument in an appeal of an FTC administrative challenge of a merger. In *Illumina, Inc. v. FTC*, the Fifth Circuit explained "that the FTC's structure, which combines prosecutorial and adjudicative functions" does not deprive parties of due process. *See Illumina, Inc. v. FTC,* No. 23-60167, 2023 WL 8664628, at *4 (5th Cir. Dec. 15, 2023). Courts have also rejected arguments of bias based on agencies pursuing injunctive relief in federal court and then adjudicating related claims in their own administrative proceedings. *See Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1106-07 (D.C. Cir. 1988); *Kessel Food Mkts., Inc. v. NLRB*, 868 F.2d 881, 887 (6th Cir. 1989).

**PUBLIC VERSION**

Respondents' citation to *Williams v. Pennsylvania*, 579 U.S. 1 (2016), is inapposite. That case concerned a judge's refusal to recuse despite having recommended pursuing the death penalty in the same case while employed as a district attorney before taking the bench. The case involved specific facts that called the impartiality of the decision maker—in the particular matter at issue—into question. Congress's assignment of both investigatory and adjudicatory functions to the Commission does not raise similar concerns. In any case, *Williams* did not change the rule in *Withrow*. The Court's holding in *Williams* followed from the Court's analysis in *In re Murchison*, 349 U.S. 133 (1955). *Williams,* 579 U.S. at 9. But the Supreme Court had already distinguished administrative agency adjudication from the analysis in *Murchison*, explaining in *Withrow*, 421 U.S. at 53, that "*Murchison* has not been understood to stand for the broad rule that members of an administrative agency may not investigate the facts, institute proceedings, and then make the necessary adjudications."

In addition, the factual premise underlying Respondent's argument is flawed; the lineup of Commissioners who authorize the complaint frequently differs from the group of Commissioners who adjudicate the matter. Here, four Commissioners considered whether to issue the complaint in March 2022. [67] Now, with the passage of time, two of the four Commissioners have left the Commission [68] and a new Commissioner has joined the panel. [69] This case is not unique. In an empirical study of the 145 cases in which the Commission issued a decision in administrative proceedings between January 20, 1977, and July 31, 2016, "in 72 percent of [the] . . . cases, the commissioners who authorized the administrative litigation had either left or no longer formed a majority at the liability-dismissal stage." Maureen K. Ohlhausen, *Administrative Litigation at the FTC: Effective Tool for Developing the Law or Rubber Stamp?*, 12(4) J. Competition L. & Econ. 623, 627 (2016). In other words, from 1977 to 2016, "the same commissioners rarely voted out and later decided [the same] . . . matter." *Id.*

Moreover, the courts have made it clear that adjudicators such as the Commissioners are presumed to be unbiased. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). Respondent seeks to overcome this presumption through a series of arguments, all of which are unpersuasive. First, Respondent points to claims that the Commission has a record of finding liability as evidence of Commission bias that would be constitutionally intolerable. Br. 47. Not so. To begin, the claim that Complaint Counsel have an unblemished winning streak on appeals of ALJ decisions is based on a limited time period from 2007 to 2016 when the Commission brought only twelve administrative cases, which resulted in eleven final decisions. Ohlhausen, *supra,* at 634-35. Eight of the eleven decisions were appealed to a federal circuit court, and the Commission won every appeal. *Id.* at 636 n.36. If anything, these courts of appeals victories confirm that the Commission's decisions were sound and undercut any claim of improper bias. Moreover,

---

[67] In March 2022, the four members of the Commission were Chair Lina M. Khan and Commissioners Noah Joshua Phillips, Rebecca Kelly Slaughter, and Christine S. Wilson.

[68] Commissioner Phillips resigned on October 14, 2022, and Commissioner Wilson resigned on March 31, 2023.

[69] Commissioner Alvaro M. Bedoya was sworn in on May 16, 2022.

Respondent's claim fails to take account of those cases the Commission dismissed. If the time period is expanded to the full period of the study, 1977-2016, "the Commission dismissed 22 percent of its . . . [administratively adjudicated] matters (11 cases) during that period," including five dismissals on the merits. *Id.* at 632. Moreover, dismissals are not a relic of the past; only months ago, the Commission dismissed an administrative complaint that was issued in 2020.[70] Even within the 2007–2016 period, Respondent's claim fails to account for Commission dismissals of substantial portions of the allegations in complaints. *See McWane, Inc.*, 157 F.T.C. 107, 109 (2014) (dismissing six of seven counts in complaint); *Polypore Int'l, Inc.*, 150 F.T.C. 586, 588 (2010) (finding no liability in one of the relevant markets alleged in complaint).

Respondent also points to the current composition of the Commission where all commissioners are from the same party as additional risk of bias, referencing an observation in *Humphrey's Executor* that the FTC is nonpartisan. Br. 47. Respondent fails to acknowledge that the Commission that voted to issue the complaint in 2022 was bipartisan; the Commission was composed of two Democrats and two Republicans. More fundamentally, mere party membership is no basis for overcoming the presumption that adjudicators are unbiased. Nor do Commissioner resignations render Commission action invalid automatically. To the contrary, Congress specifically designed the Commission to continue operating even during times when Commissioner seats were vacant, expressly providing that "[a] vacancy in the Commission shall not impair the right of the remaining Commissioners to exercise all the powers of the Commission." 15 U.S.C. § 41. Today's Commission complies with the statutory mandate that no more than three Commissioners be from the same party, *id.*, and does not reflect improper bias.

Finally, Respondent renews its argument that due process is denied when a Commissioner has prejudged the case, alleging that actions by Chair Khan evidence such prejudgment. Br. 48. We have already fully addressed this issue in detail and need not repeat that analysis here. *See* Order Den. Mot. to Disqualify (Oct. 19, 2023); Statement of Chair Lina M. Khan Regarding the Petition for Recusal from Involvement in Intuit Inc., No. 9408, appended to Commission Order Den. Mot. to Disqualify; s*ee also* Op. and Order Den. Summ. Decision (Jan. 31, 2023). Chair Khan's conduct and statements do not show prejudgment and do not establish an absence of due process.[71]

Respondent's due process arguments are unfounded.

### b.  Article I and the Non-Delegation Doctrine

---

[70] Order to Return Case to Adjudication, Vacate Initial Decision, and Dismiss Compl., *In re Altria Group, Inc. & JUUL Labs, Inc.*, No. 9393 (June 30, 2023).

[71] Respondent argues that Judge Chappell erred when he denied Intuit's motion for discovery on prejudgment. Br. 48 (citing Order Denying Respondent's Mot. for Discovery Pursuant to Rule 3.36 (Nov. 7, 2022)). Because we agree with the ALJ's finding that Respondent had failed to support its assertions as to the possibility of prejudgment by the Commissioners and his ruling that Respondent had therefore failed to establish the link to relevancy required by Commission Rule 3.31(c)(1), 16 C.F.R. § 3.31(c)(1) (requiring that discovery be "reasonably expected to yield information relevant to . . . the defenses of any respondent"), we find that the ALJ's denial of the motion was not error.

Respondent contends that the Commission's discretion to proceed either through an administrative proceeding or before an Article III court is an unconstitutional delegation of legislative power. Br. 49. Respondent points to *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023), and *cert. denied*, 143 S. Ct. 2690 (2023), which found the SEC's forum selection structure unconstitutional. Br. 49. Respondent disputes the ALJ's conclusion that forum selection is a traditional executive power, arguing that forum selection determines which defendants receive certain legal processes, which Respondent claims is a uniquely legislative power. *Id.*

Respondent's non-delegation argument fails. The non-delegation doctrine prohibits Congress from delegating "powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) (quotation omitted). "Legislative power, as distinguished from executive power, is the authority to make laws, not to enforce them . . . ."*Buckley v. Valeo*, 424 U.S. 1, 139 (1976). The federal government's prosecutorial enforcement decisions, however, do not invoke legislative power. *See United States v. Nixon*, 418 U.S. 683, 693 (1974) (Prosecutorial decisions are within the "exclusive authority and absolute discretion" of the Executive Branch.); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999) (describing "prosecutorial discretion" as the "special province of the Executive"); *accord Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Just as it is within a prosecutor's discretion to charge a defendant with violation of one law rather than another when the same conduct violates both laws, *United States v. Batchelder*, 442 U.S. 114, 124 (1979), so too it is within the prosecutor's discretion to determine in which tribunal to charge the violation when multiple tribunals are permitted to hear the case. In other words, the decision regarding where to charge the violation, like the decisions regarding whom to charge and what to charge, is fundamentally an executive—not legislative—function. *United States v. I.D.P.*, 102 F.3d 507, 511 (11th Cir. 1996) (noting that the government's "authority to decide whether to prosecute a case in a federal forum . . . [is the] type of decision [that] falls squarely within the parameters of prosecutorial discretion"); *Hill v. SEC*, 114 F. Supp. 3d 1297, 1312 (N.D. Ga. 2015) ("When the SEC makes its forum selection decision, it is acting under executive authority and exercising prosecutorial discretion."), *vacated on other grounds,* 825 F.3d 1236 (11th Cir. 2016). The non-delegation doctrine therefore does not apply to the Commission's decision regarding whether to bring its case in federal court or in its administrative tribunal.

Congress specified that the FTC's administrative tribunal, as outlined in the FTC Act, in addition to federal courts, may hear Commission challenges to deceptive acts and practices. Allowing the Commission to exercise its prosecutorial discretion to select from between these two specified fora does not constitute an unconstitutional delegation of legislative powers. *See Batchelder*, 442 U.S. at 125-26 (concluding that allowing prosecutor to choose to charge one criminal violation as opposed to another, with identical elements but different penalties, does not "impermissibly delegate to the Executive Branch the Legislature's responsibility to fix criminal penalties"); *Hill*, 114 F. Supp. 3d at 1312 ("Congress has advised the SEC through the enactment of specific statutes as to what conduct may be pursued in each forum. It is for the enforcement agency to decide where to bring that claim under its exercise of executive power. Because the SEC has been made aware of the permissible forums available under each statute, 'Congress has fulfilled its duty.'" (quoting *Batchelder*, 442 U.S. at 126)).

Respondent's reliance on *Jarkesy* is not persuasive. In *Jarkesy*, the Fifth Circuit rejected the argument that the SEC's choice of whether to bring an action in its own tribunal or in an Article III court is an exercise of prosecutorial discretion. *Jarkesy*, 34 F.4th at 461-62. *Jarkesy* took the position that government actions are "legislative if they have the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch." *Id.* at 461 (internal quotation omitted). The court then concluded that allowing the SEC to select whether to bring a case in an agency tribunal or in federal court was a delegation of legislative power because it would let the SEC decide which defendants should receive legal processes associated with Article III court proceedings and which should not. *Id.* at 462. But prosecutorial decisions regarding what offense to charge or whether to charge one at all—decisions the Supreme Court has squarely held concern executive power—also affect defendants' legal rights. For example, charging a defendant with a petty misdemeanor rather than a felony might deprive the defendant of rights to a jury trial and indictment via a grand jury. *See Baldwin v. New York*, 399 U.S. 66, 69-70 (1970); *United States v. Linares*, 921 F.2d 841, 844 (9th Cir. 1990). Under *Jarkesy*, however, such charging decisions would constitute exercises of legislative power. *Jarkesy*'s reasoning therefore conflicts with long-established Supreme Court precedent that charging decisions are a matter of prosecutorial discretion. *See Batchelder*, 442 U.S. at 124.

Even if the non-delegation doctrine did apply here, it is not violated because, contrary to Respondents' contention, Congress provided the FTC with an "intelligible principle" governing the determination to bring an action administratively rather than in federal court. As the Supreme Court has explained, "a delegation is permissible if Congress has made clear to the delegee the general policy he must pursue and the boundaries of his authority." *Gundy*, 139 S. Ct. at 2129 (internal quotation omitted). These standards, the Court tells us, "are not demanding"; as the Court has observed, "[o]nly twice in this country's history . . . have we found a delegation excessive—in each case because Congress had failed to articulate *any* policy or standard to confine discretion." *Id.* (emphasis original) (internal quotation omitted).

Here, Congress has set out both a general policy and the boundaries of the Commission's authority. It has outlawed "unfair or deceptive acts or practices in or affecting commerce" and has directed the FTC to prevent persons and certain entities from using them. 15 U.S.C. § 45(a)(2). It has delineated the boundaries of the FTC's authority by placing certain entities outside the FTC's jurisdiction and by providing that the FTC may hold proceedings on an administrative complaint when the Commission has reason to believe an entity within its jurisdiction "has been or is" using any unfair method of competition or unfair or deceptive act or practice and that an administrative proceeding would be in "the interest of the public." 15 U.S.C. § 45(b). Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides for suit in district court when there is reason to believe a firm "is violating, or is about to violate" a provision of law enforced by the FTC and that such a suit would be in the public interest.[72] Thus, in those circumstances where the FTC has a choice of forum, the public interest must guide its choice. Combined with

---

[72] Construing this language, the Third Circuit has held that in certain circumstances only administrative enforcement is available. In *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159 (3d Cir. 2019), the court held that, although Section 5 permits the Commission to bring an administrative action based on an already-concluded violation of law, the Commission may bring a district court action under Section 13(b) only when the defendant is violating or is about to violate the law.

the different requirements for different proceedings, this provides an intelligible principle for exercising the Commission's authority.

The Fifth Circuit recently rejected the argument that Congress made an unconstitutional delegation of legislative power to the FTC, finding, *inter alia*, that a "public interest" standard provided an intelligible principle governing the FTC's enforcement authority. *See Illumina*, 2023 WL 8664628, at *3. The Fifth Circuit's analysis is consistent with numerous other cases. *See Nat'l Broad. Co. v. United States,* 319 U.S. 190, 225-26 (1943) (upholding delegation to Federal Communications Commission to regulate broadcast licensing as "public interest, convenience, or necessity" require); *New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 25 (1932) (upholding a delegation to the Interstate Commerce Commission to review railroad mergers under a public interest standard and explaining that "the term 'public interest' . . . is not a concept without ascertainable criteria"); *United States v. Diggins*, 36 F.4th 302, 319 n.19 (1st Cir. 2022) (holding that a requirement that prosecutions be "'in the public interest and necessary to secure substantial justice' indisputably satisfies the lax 'intelligible principle' standard under our precedents and those of the Supreme Court"). Indeed, the Supreme Court has recognized that the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 475 (2001). Here, the scope of discretion is very narrow: whether a case that the Commission has determined to bring should be heard administratively or in district court, when the only available remedies are equitable.

For all these reasons, Respondent's Article I arguments are without merit.

### c.   Article II Separation of Powers: Protection from Removal for Commissioners and the ALJ

Respondent contends that the FTC's structure contravenes Article II, which vests "[t]he executive Power . . . in a President of the United States of America," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; § 3. Respondent claims that Commissioners and the ALJ are insulated from presidential removal, which prevents the President from adequately overseeing the administrative proceeding to ensure faithful execution of the laws. Br. 48-49.

With respect to the Commissioners, in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Court specifically found those removal restrictions to be constitutional. And, in *Seila Law, Inc. v. CFPB*, 140 S. Ct. 2183, 2199-200 (2020), contrary to Respondent's claim that the case repudiated *Humphrey's Executor*, the Court expressly declined the petitioners' invitation to revisit that precedent. Respondents suggest that the Commission operates differently today than when *Humphrey's Executor* was decided, but the Court left *Humphrey's Executor* untouched even as it acknowledged that some of the reasoning in that case "has not withstood the test of time." *Id.* at 2198 n.2. Indeed, the *Seila Law* Court noted that Congress could "pursu[e] alternative responses to the problem—for example, converting the CFPB into a multimember agency," *Seila Law*, 140 S. Ct. at 2211, in other words, into an agency more like the FTC. The FTC's core structure as a multimember, bipartisan body of experts, *see Seila Law*, 140 S. Ct. at 2199-200, remains today despite the fact that the Commission presently has two vacancies as the

Senate considers two new nominees. *Humphrey's Executor* remains the law, and we are not at liberty to ignore Supreme Court precedents. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). In fact, the Fifth Circuit recently rejected the argument that the FTC exercised executive power while insulated from presidential removal because *Humphrey's Executor* is binding precedent. *See Illumina*, 2023 WL 8664628, at *3.

As for the removal restrictions for the ALJ, the Commission has previously rejected the argument that his dual-layer removal protections are unconstitutional. *See* Order Denying Respondent's Mot. to Disqualify the Administrative Law Judge, *Axon Enter., Inc.*, No. 9389 (Sept. 3, 2020); *Otto Bock HealthCare*, 168 F.T.C. at 389-90; *1-800 Contacts, Inc.*, 166 F.T.C. 250, 308-09 (2018). In *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), the Supreme Court held unconstitutional the double removal protections granted to members of the SEC's Public Company Accounting Oversight Board, but the Court declined to extend that holding to the removal protections of ALJs. The Court emphasized that, "unlike members of the Board," ALJs (1) "perform adjudicative rather than enforcement or policy making functions," or (2) "possess purely recommendatory powers." *Id*. at 507 n.10. The FTC's ALJ has both these characteristics.

First, the ALJ has no enforcement or policy role. He does not bring enforcement matters or initiate investigations or cases, and he does not establish agency policies or priorities. Rather, he presides over adjudications in a manner "functionally comparable to that of a judge." *Butz v. Economou*, 438 U.S. 478, 513 (1978) (quotation marks omitted). Second, the ALJ's adjudicatory decisions are effectively only "recommendatory." *See* 16 C.F.R. §§ 3.51(b), 3.52(a), 3.54.[73] They do not constitute agency action unless the Commission ratifies them, either tacitly or expressly. The Commission reviews both the ALJ's legal and factual determinations *de novo*, and it may modify or set aside any aspect of the ALJ's decision. 16 C.F.R. § 3.54(a)-(b). The Commission "exercise[s] all the powers which it could have exercised if it had made the initial decision." *Id*. § 3.54(a); *see* 5 U.S.C. § 557(b). The Commission must review an initial decision on the request of either party, 16 C.F.R. § 3.52(b), as in the present proceeding, and may review an initial decision on its own initiative, *id*. §§ 3.51(a), 3.53. The Commission can also request additional information. *Id*. § 3.54(c). The Commission maintains control over the case from the investigation to the very end, and it is responsible for all final agency decisions. Accordingly, the ALJ's removal protections do not interfere with the President's constitutional duties.

Respondent contends that *Jarkesy* governs the analysis. We disagree. In *Jarkesy*, the Fifth Circuit held that the removal protections enjoyed by the SEC's ALJs are unconstitutional, but that decision gives insufficient weight to the Court's discussion of ALJs in *Free Enterprise Fund* and conflicts with the Ninth Circuit's ruling that ALJ removal protections are constitutional. *See Decker Coal Co. v. Pehringe*r, 8 F.4th 1123, 1136 (9th Cir. 2021).

Regardless, neither the Commission's nor the ALJ's removal protections would invalidate this proceeding or the decisions issued in the matter. Even if an officer's removal restriction violates the separation of powers, that does not necessarily void the actions of an officer who was properly appointed. *Collins v. Yellen*, 141 S. Ct. 1761, 1787-88 & n.23 (2021).

---

[73] As noted above, although Commission Rules of Practice, including §§ 3.51, 3.53, and 3.54, have been amended, the pre-amendment rules govern this matter. *See supra* n.16.

The party challenging the unconstitutional removal restriction is not entitled to relief unless that party shows that the removal restriction actually harmed it. *Id.* at 1788-89; *Decker Coal*, 8 F.4th at 1137; *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) and *cert. denied sub nom. Cmty. Fin. Servs. Ass'n of Am. v. CFPB,* 143 S. Ct. 981 (2023); *see also CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023), *petition for cert. filed on other grounds*, No. 22-1233 (U.S. June 23, 2023) ("[T]o void an agency action due to an unconstitutional removal protection, a party must show that the agency action would not have been taken *but for* the President's inability to remove the agency head."). Respondent does not challenge the validity of the Commissioners' or ALJ's appointments, nor has it made any argument concerning harm it has suffered from the President's inability to remove the Commissioners or ALJ. Therefore, even if the removal restrictions were problematic, they would not invalidate decisions rendered in this proceeding.

### d.  Article III Requirement to Use Federal Courts to Adjudicate Private Rights

Respondent contends that advertising is a "core private right" and therefore this case must be decided in an Article III court. Br. 48. Respondent waived this defense by failing to raise it until after trial, presenting it for the first time in its post-trial brief. *See Illumina*, 2023 WL 2823393, at *69 (finding that respondent waived an argument that the proceeding violates the Constitution by failing to raise the defense until after trial); *LabMD, Inc.*, 160 F.T.C. 1373, 1375-76 (2015) (same). In any case, Respondent's Article III argument fails.

This case involves public rights, which properly may be addressed by an administrative agency like the FTC. As the Supreme Court has explained, the "public rights" doctrine "covers matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (quoting *Crowell v. Benson*, 285 U.S 22, 50 (1932)); s*ee also Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 450 (1977) (Public rights cases include "cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact."); *Stern v. Marshall*, 564 U.S. 462, 490 (2011) (describing as involving public rights "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority").

This case falls squarely within the boundaries of public rights. It is between the government and a party subject to its authority, and the matter is connected to the FTC's regulation of unfair and deceptive business practices that harm consumers. *See FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005) (explaining that FTC's case "was not a private or common law fraud action designed to remedy a singular harm, but a government action brought to deter deceptive acts and practices aimed at the public"); *FTC v. Neora, LLC*, No. 3:20-cv-01979-M, 2022 WL 3213540, at *3 (N.D. Tex. Aug. 8, 2022) (explaining that, in seeking injunctive relief, "the FTC is operating in a sovereign capacity for the protection and

furtherance of public rights and interests, namely to protect the public from . . . 'unfair or deceptive acts or practices,' as authorized by the FTC Act").[74]

More broadly, the Commission's adjudication process does not violate Article III because "the institutional integrity of the Judiciary Branch" has not been "impermissibly threaten[ed]." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986). Most of the criteria that underlie *Schor*'s determination that administrative adjudication at the Commodity Futures Trading Commission ("CFTC") did not threaten the integrity of the judiciary apply equally to the present proceeding. First, similar to the regulatory schemes of the CFTC, FTC adjudication deals with only a "particularized area of law," *id.* at 852, involving unfair or deceptive acts or practices or unfair methods of competition. Second, FTC orders, again like those of the CFTC in *Schor,* are enforceable only by order of the district court. *See* 15 U.S.C. § 45(*l*); *Schor*, 478 U.S. at 853. Third, legal rulings of the FTC, similar to the scheme addressed in *Schor*, are subject to *de novo* review on appeal. *Schor*, 478 U.S. at 853. Fourth, the FTC, similar to the CFTC, does not exercise "all ordinary powers of district courts" and thus may not, for instance, preside over jury trials or issue writs of habeas corpus or declaratory judgments. *Id.* These considerations, together with the public-rights nature of the matters involved, make it plain that administrative adjudication of this proceeding does not contravene principles of Article III.

\*\*\*\*\*\*\*\*\*

To summarize, Complaint Counsel have demonstrated that Respondent advertised TurboTax deceptively in violation of the FTC Act, and Respondent's attempts to undermine Complaint Counsel's evidence are unpersuasive. Respondent also failed to substantiate its affirmative and constitutional defenses. Accordingly, we find that Respondent has violated Section 5 of the FTC Act.

## VII.    REMEDY

### A.    A Cease-and-Desist Order Is Necessary

Having found liability, Judge Chappell determined that a cease-and-desist order is warranted. He rejected Respondent's arguments that an order is unnecessary in light of Intuit's current ads and the State Settlement, and he issued an order that mirrored that proposed by Complaint Counsel.

---

[74] Courts have determined that administrative adjudication of a variety of claims brought by the government against parties violating federal law involve "public rights." *See Atlas Roofing*, 430 U.S. at 455 (holding that the administrative scheme for adjudicating Occupational Safety and Health Act violations, resulting in an abatement order and civil penalty, concerned "public rights"); *Simpson v. Off. of Thrift Supervision*, 29 F.3d 1418, 1420-21 (9th Cir. 1994) (upholding administrative adjudication of claims brought against a bank executive by the Office of Thrift Supervision for violations of federal banking laws); *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1488 (Fed. Cir. 1986) (upholding an International Trade Commission investigation and adjudication of unfair acts through importation activities in violation of the Tariff Act and noting that, although the proceeding could affect private rights, "the thrust of the statute is directed toward the protection of the public interest from unfair trade practices in international commerce").

We agree that a cease-and-desist order is essential. Intuit's deceptive advertising campaign has been widespread. It has lasted for years and continues to the present day. Intuit's "free" campaigns continued even after lawsuits and government investigations raised serious concerns about the lawfulness of Intuit's tactics. As discussed below, to the extent that Intuit altered or ceased particular aspects of the unlawful conduct, such changes occurred under intense pressure from public and private enforcers and do not provide assurances against recurrence. Moreover, the State Settlement provides only incomplete relief and does not obviate the need for an order here.

As the Supreme Court has noted, the "power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). Thus, voluntary cessation of an illegal practice, even where proven, does not by itself render the entry of a cease-and-desist order inappropriate. *FTC v. Affordable Media*, 179 F.3d 1228, 1238 (9th Cir. 1999) (Voluntary cessation is "unlikely to moot the need for injunctive relief [because] the defendant could simply begin the wrongful activity again."); *ITT Cont'l Baking Co. v. FTC*, 532 F.2d 207, 222 n.22 (2d Cir. 1976) ("[V]oluntary cessation of an illegal practice is no bar to a Commission cease and desist order."); *Oregon-Washington Plywood Co. v. FTC*, 194 F.2d 48, 50 (9th Cir. 1952); *Benco Dental Supply Co.*, 168 F.T.C. 415, 507 (Oct. 15, 2019) (Initial Decision), decision of the Commission pursuant to 16 C.F.R. § 3.51(a); *cf. Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.*, 528 U.S. 167, 189 (2000) (cleaned up) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways."). Of course, Complaint Counsel, as the moving party, "must satisfy the court that relief is needed." *See W. T. Grant*, 345 U.S. at 633; *see also* 5 U.S.C. § 556(d) (Under the APA, "the proponent of a rule or order has the burden of proof."). Where challenged conduct has ceased, this burden includes demonstrating that "there exists some cognizable danger of recurrent violation, something more than the mere possibility . . . ." *W.T. Grant*, 345 U.S. at 633; *SCM Corp. v. FTC*, 565 F.2d 807, 812-13 (2d Cir. 1977). The factors "relevant to the question whether to issue an order when a respondent professes to have ceased the complained-of activities [are]: the bona fides of the respondent's expressed intent to comply with the law in the future; the effectiveness of the claimed discontinuance; and the character of the past violations." *Int'l Ass'n of Conf. Interpreters*, 123 F.T.C. 465, 656 (1997); *see also Mass. Bd. of Registration in Optometry*, 110 F.T.C. 549, 616 (1988) (citing *W. T. Grant*, 345 U.S. at 633).

The facts here point strongly to the need for a cease-and-desist order. The character of the past violations is egregious. For at least six years, Intuit blanketed the country with deceptive ads to taxpayers across multiple media channels. IDF ¶¶ 48-53, 57, 58. For example, between November 2018 and April 2022, Intuit ran "free, free, free" television advertisements at least 84,356 times across networks in every state of the country. IDF ¶ 53. Intuit continued running the ads, knowing that they led consumers to believe that they could file their returns for free, even though approximately two-thirds of taxpayers are not eligible. IDF ¶¶ 36-37, 453, 457. Moreover, Intuit was aware that taxpayers were frustrated that Intuit led them to believe they could file for free even though Intuit heavily restricted who was eligible for free filing. IDF ¶¶ 472-507.

PUBLIC VERSION

Though Respondent eventually pulled its "free free free" ads, IDF ¶ 534, it did not do so until spring 2022, three years into the FTC investigation and three years after California state and local law enforcers filed lawsuits alleging unfair and deceptive marketing of free versions of TurboTax. Section II.D; ID 216. Respondent finally pulled the "free free free" ads on the eve of the Commission's issuance of the Complaint, and just after Respondent met with the Commission's chair. IDF ¶ 534. This sequence of events reveals that Intuit continued its deceptive ads for years even as it faced serious law enforcement investigations and challenges. *Cf. Fedders Corp. v. FTC*, 529 F.2d 1398, 1403 (2d Cir. 1976) (holding that a cease-and-desist order was proper, despite discontinuance of challenged claim, because it resulted from the respondent's awareness of the Commission's investigation); *see also Am. Home Prod. Corp. v. FTC*, 695 F.2d 681, 703 n.38 (3d Cir. 1982) (holding that a cease-and-desist order was permissible despite withdrawal of challenged claim; withdrawal occurred after proceedings began). Similarly, the changes wrought by the State Settlement were reached under pressure from enforcers. In sum, we find that Respondent's deceptive ad campaign has been sufficiently broad, enduring, and willful to support the need for a cease-and-desist order, even if that misconduct had ceased—which, as discussed next, it has not.

We also find substantial reason to question the effectiveness of Intuit's claimed discontinuance. Intuit points to the allegedly improved clarity of its advertisements over time as evidence that violations will not recur. For example, Intuit cites the results of copy tests for TY 2022 ads that show the percentage of test participants who believed they could file for free was roughly equal to the percentage of filers in the general population who actually could file for free. Br. 40-41.[75] In addition, Respondent claims that compliance with the State Settlement ensures a violation will not recur. Br. 41-42. Respondent argues that cases stating a remedy is appropriate even when a party voluntarily discontinued conduct are inapplicable because the State Settlement compels Intuit to discontinue misleading ads. Reply 20.

It is true that Intuit's advertisements have changed over time. *See* discussion *supra* Section II.C.1. For example, Intuit has ceased its "free, free, free" video advertising campaign, albeit under strong pressure from law enforcers. ID 216. But we reject Respondent's contention that Intuit's changes have fully cured any deception.[76] Intuit's ads continue to include "free" filing claims, IDF ¶ 518, and a number of the ads remain deceptive in one way or another. For example, a paid search ad that Respondent's counsel highlighted during oral argument as compliant with the State Settlement is, in fact, deceptive: the ad promises "free simple tax filing online," which falls short of even the "simple tax returns only" disclosure that we have already found insufficient to cure the deceptive impression created by Intuit's ads. *See* Section VI.B.3.d;

---

[75] We have already discussed the reasons why the TY 2022 copy tests fail to show that Intuit's ads are not deceptive. *See supra* Section VI.C.3 (TY 2022 Copy Test).

[76] Respondent argues that Complaint Counsel conceded that TY 2022 ads are not misleading because Complaint Counsel do not allege liability based on those ads. But, contrary to Respondent's claim, Complaint Counsel do regard Intuit's 2022 ads as deceptive. Transcript of Oral Argument at 81 (Nov. 20, 2023).

Oral Arg. Tr. 65-66.

As with earlier ads, some TY 2022 ads include disclosures that are not sufficiently prominent. For example, a short video advertisement derived from the Taxbourine video ad described in the Initial Decision, *see* IDF ¶¶ 519-20 (describing RX1547), provides large text "File Free with Expert Help through 3/31," but the disclaimer "Simple Returns Only. See if you qualify at turbotax.com" appears only in small font at the bottom of the screen. The advertisement provides no voiceover for either the claim or the disclaimer. *See* RX1476. As previously discussed, when disclaimers are not located near the claim and appear only in small font, they are insufficient to alter the otherwise dominant impression created by an advertisement. *Grant Connect*, 827 F. Supp.2d at 1214, 1220-21; *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 924 n.15 (N.D. Ill. 2006), *amended on reconsideration in part*, 472 F. Supp. 2d 990 (N.D. Ill. 2007), *aff'd*, 512 F.3d 858 (7th Cir. 2008) (small print statement appearing six times "is wholly inadequate to change the net impression of the . . . claims made in the infomercial"); Deception Statement, 103 F.T.C. at 183; Enforcement Policy Statement in Regard to Clear and Conspicuous Disclosure in Television Advertising (Oct. 21, 1970) § I.A ("The disclosure should be presented simultaneously in both the audio and video portions of the television advertisement.").

Some paid search advertising in TY 2022 exhibits similar problems. Often, TY 2022 paid search ads include a "free" filing claim in the headline but provide the statement "See If You Qualify Today" in the sub-headline after other text touting the product. *See, e.g.*, GX724; GX728. In many cases, the ads continue to use the misunderstood phrase "simple tax returns" in the sub-headline. *See, e.g.*, GX723; GX727; RX1437; RX1438; RX1439; *see also* RX1440 ("Free Simple Tax Filing Online").

Even for TY 2022 advertisements where Intuit's changes have made disclaimers more conspicuous, the content of the disclaimers fails to overcome the deceptive impression created by the ads. These disclaimers usually pair "simple returns only" with the statement "see if you qualify." IDF ¶¶ 518-26. As we have previously found, disclosures that continue to use "simple returns" are inadequate to overcome the deceptive claim that consumers can file for free on TurboTax. *See* Section VI.B.3.d. Adding the qualifying phrase "see if you qualify" does not change things. It provides no specific information about eligibility requirements and, when used in combination with "simple returns only," does not change the net impression for consumers who believe their taxes are simple. Moreover, to the extent that Professor Hauser's Disclosure Efficacy Study, which reported no statistically significant differences between responses of groups exposed to ads with and without more extensive and prominent disclosures—including the "simple returns" and "see if you qualify" language—is credited, despite the criticisms discussed above in Section VI.C.3 (Disclosure Efficacy Survey), it suggests that TY 2022 disclaimers did not overcome the ads' deceptive message. *See* GX749 (Novemsky Rebuttal Report) ¶¶ 106, 112.

Respondent contends that there is no cognizable danger of a recurrent violation because of the State Settlement. Under the State Settlement, Intuit agreed, *inter alia*, not to publish the "free, free, free" video advertisements and to make various disclosures when it advertises or markets any tax preparation product as free. Intuit also agreed to refrain from misrepresenting

the price, total cost, restrictions, limitations, conditions, and various other characteristics of TurboTax products or services. *See* IDF 540-50; RX76 (AVC).

We agree with the ALJ that there are gaps in the State Settlement. In ads that are not space-constrained, in addition to disclosing that not all taxpayers qualify, Intuit need only disclose "the existence and category" of the limitation on a consumer's ability to use the free product, *see* IDF 543; RX76 (AVC) at Injunctive Relief III.A, which means Intuit may continue to use the phrase "simple returns only" as a purported disclaimer. As amply demonstrated above, a "simple returns only" disclaimer is not accurately understood by consumers and does not change the deceptive net impression generated by Intuit's "free" claims. In space-constrained video ads that are not online, the State Settlement does not require that an ad direct consumers to a full explanation of eligibility requirements on a landing page on Intuit's website; only "the existence and category" of material limitations and that "not all taxpayers qualify" need be disclosed, leaving consumers to fend for themselves to determine whether they are eligible. *See* IDF 548; RX76 (AVC) at Injunctive Relief III.C. Also, for space-constrained ads that are not video ads, the State Settlement does not require a disclosure that not all taxpayers qualify. *See* IDF 547; RX76 (AVC) at Injunctive Relief III.B. Moreover, the State Settlement's requirements for audio disclosures are inadequate. For the shortest space-constrained video ads, no audio disclosures are required, *see* IDF 549; RX76 (AVC) at Injunctive Relief III.C, which is inconsistent with the long-accepted principle that an audio disclosure must accompany the claim to offset the impression of the claim. *See, e.g.*, Commission Enforcement Policy Statement Regarding Clear and Conspicuous Disclosure in Television Advertising (Oct. 21, 1970); .com Disclosures at 20 ("For audio claims, use audio disclosures."). In short, gaps in the State Settlement allow Intuit to continue many of the deceptive claims that it used prior to May 2022. In fact, we have already determined that some TY 2022 advertisements—displayed after Intuit entered into the State Settlement in May 2022—were deceptive. This clearly shows that the State Settlement does not prevent Intuit from continuing to violate the law through its deceptive advertisements, thereby necessitating further relief.

In any event, even if Intuit made disclosures that exceeded what is required by the State Settlement, this shift would reflect only Intuit's voluntary cessation of the conduct challenged in this proceeding. And, as we noted above, it is well established that voluntary cessation of an illegal practice does not render a cease-and-desist order inappropriate. The potential for Intuit to revert to greater use of deceptive "free" advertising justifies issuance of a cease-and-desist order by the Commission. Thus, even with changes to Intuit's ads and the requirements of the State Settlement, and despite Intuit's claims that it does not intend to deceive taxpayers, we find that there is a likelihood of recurrent violations. Consequently, an order is warranted.

## B.     Order Provisions

The FTC Act authorizes issuance of an order that requires Respondent to cease and desist the deceptive acts or practices. 15 U.S.C. § 45(b). The Commission has broad discretion to select a remedy so long as it bears a "reasonable relation to the unlawful practices found to exist." *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 611-13 (1946); *see FTC v. Nat'l Lead Co.*, 352 U.S. 419, 428 (1957) (noting the Commission's "wide discretion in determining the type of order that is

necessary"). The order must also be sufficiently clear and precise to be understood. *See, e.g.*, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 392 (1965).

The Commission's authority is not merely to halt the actual violations found but also to take such reasonable action as is necessary to prevent the recurrence of those and related violations. *See, e.g.*, *FTC v. Mandel Bros.*, 359 U.S. 385, 392 (1959); *Nat'l Lead*, 352 U.S. at 429-31. "'The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past.'" *Colgate-Palmolive*, 380 U.S. at 395 (quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)). The Commission is permitted "to frame its order broadly enough to prevent respondents from engaging in similarly illegal practices in [the] future . . . ." *Id.* Consequently, an order may include "fencing-in" provisions that are "not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." *Id.* Rather, such provisions serve to "close all roads to the prohibited goal, so that [the Commission's] order may not be by-passed with impunity." *Ruberoid Co.*, 343 U.S. at 473; *accord Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949) (Decrees must be crafted to be "not so narrow as to invite easy evasion.").

When determining whether fencing-in relief is reasonably related to the unlawful practices, the Commission considers "(1) the seriousness and deliberateness of the violation; (2) the ease with which the violative claim may be transferred to other products; and (3) whether the respondent has a history of prior violations." *Stouffer Foods*, 118 F.T.C. at 811; *see also Telebrands*, 457 F.3d at 358; *Kraft*, 970 F.2d at 326. "The reasonable relationship analysis operates on a sliding scale—any one factor's importance varies depending on the extent to which the others are found. . . . All three factors need not be present for a reasonable relationship to exist." *Telebrands*, 457 F.3d at 358-59; *see Stouffer Foods*, 118 F.T.C. at 812 (finding that two elements—"(1) the deliberateness and seriousness of the violations and (2) the transferability of the unlawful practices to other products—combined with the overall circumstances" justified the relief).

Here we find that fencing-in relief is warranted. We agree with the ALJ that Intuit's conduct was serious and deliberate. ID 229. As discussed above, Intuit's free tax filing advertising campaign spanned many years and billions of impressions over multiple media channels. IDF ¶¶ 48-53, 57-58. *See Thompson Med.*, 104 F.T.C. at 833 (explaining that the "seriousness of Thompson's violations is evidenced by the size and duration of Thompson's deceptive advertising campaign"); *Kraft*, 970 F.2d at 326 (identifying Kraft's expensive, nationwide campaign as a factor when evaluating the seriousness of Kraft's conduct).

In addition, Intuit was aware that its ads may be deceiving taxpayers but it continued disseminating those ads anyway. Specifically, Intuit knew full well that its ads led consumers to believe TurboTax was free for them,[77] even though Intuit restricted who was eligible for free filing such that two-thirds of taxpayers did not qualify. IDF ¶¶ 36-37. Moreover, Intuit persisted despite knowing that taxpayers were frustrated and felt misled by Intuit's representations, IDF ¶¶

---

[77] *See, e.g.*, IDF ¶ 453 (describing copy test results showing that after exposure to ads, between 45% and 57% of the test group reported that TurboTax "allows me to file my taxes for free").

472-507. Intuit continued running the "free" ads even as state attorneys general and the FTC were investigating Intuit's ads as of 2019. *See* RX391 ¶ 5; IDF ¶¶ 535-37 (describing 2019 lawsuits); GX876 ¶¶ 5-8, 23 (describing consumer demands for arbitration in 2019 and 2020). All of these factors suggest that Intuit's decision to continue running deceptive ads was deliberate.

Moreover, the kinds of claims at issue in this case would be easily transferable to other products. For instance, Intuit extended its free advertising claims to TurboTax Live when that product was launched in TY 2020. *See, e.g.*, IDF ¶¶ 195-202 (Steven/Spit Take ad for TurboTax Live in TY 2021). Similar misleading claims could be transferred outside the TurboTax product line. In fact, Intuit's ███████████████████████ *See* GX638 at INTUIT-FTC-PART3-000484770-71; GX639 at INTUIT-FTC-PART3-000485010-13.

The Final Order is designed to prevent Respondent from making misleading "free" claims. For example, when Respondent makes "free" claims where fewer than all consumers are eligible, the Final Order requires Respondent to alert consumers, in specified ways, that only a certain percentage are eligible or that a majority of taxpayers do not qualify, as discussed below, as a baseline step toward preventing deception. *See Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294, 307 (7th Cir. 1979) (approving order that required respondent to include the statement "DIETING IS REQUIRED" in all advertisements for nonprescription weight reduction tablets to prevent deception based on record discussed in opinion's liability analysis). Moreover, to ensure that Respondent does not bypass our order, the Final Order imposes fencing-in relief that includes additional disclosure requirements. *See Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 712 (3d Cir. 1982) (upholding as fencing-in an order provision requiring specific disclosure).

Part I of the Final Order prohibits Respondent from making the kinds of misrepresentations regarding "free" offers alleged in the Complaint. In particular, Respondent is prohibited from representing that a good or service is "free" unless Respondent offers the good or service for free to all consumers or makes disclosures specified in other provisions in Part I. Final Order I. If the goods or services are not free for all consumers, then in close proximity to the "free" claim, Intuit must clearly and conspicuously disclose the percentage of taxpayers or consumers that qualify for the free product or service. Alternatively, Respondent may disclose that a majority of consumers do not qualify. Final Order I.B.1.

Further, if the product or service is not free for all consumers, Respondent must make additional disclosures. For advertisements that are not "space constrained," "all the terms, conditions, and obligations upon which receipt and retention of the 'Free' good or service are contingent" must be set forth clearly and conspicuously "so as to leave no reasonable probability that the terms of the offer might be misunderstood." Final Order I.B.2. A space-constrained advertisement is defined to be any advertisement that has space, time, format, size, or technological restrictions that preclude Intuit from being able to make the disclosures regarding the percentage of consumers who qualify (or that a majority do not qualify) together with a description of the terms, conditions, and obligations upon which the free offer is contingent. Final Order Definitions E. Ads on the TurboTax website or app, in emails, or on any advertising platform or medium owned or controlled by Intuit are not space-constrained. Final Order Definitions E. Advertisements are presumed to be not space-constrained, and Intuit bears the

burden of showing that an advertisement is space-constrained. Final Order I.C.

If the goods or services that are advertised in a space-constrained ad as free are not free for all consumers, Respondent must still disclose the percentage of consumers who qualify for the free offer or that a majority do not qualify. Unlike for non-space constrained ads, however, Intuit need not disclose all the terms, conditions, and obligations upon which receipt and retention of the free good are contingent. Rather, Intuit must clearly and conspicuously direct consumers to view eligibility requirements on a landing page or webpage on a TurboTax website that clearly and conspicuously features the disclosure of the terms, conditions, and obligations upon which the free product or service is contingent. Final Order I.C. If the space-constrained advertisement is online, the ad must also include a hyperlink to the landing page with the disclosure of the full terms and conditions or must link to the landing page by clicking on the advertisement itself. Final Order I.C.

Part II of the Final Order prohibits additional misrepresentations. In advertising, marketing, or offering for sale any good or service, Respondent is prohibited from misrepresenting any material fact, including the cost of any goods or services, that consumers can only file their taxes online accurately if they use a paid TurboTax product or service, that consumers can only claim a tax credit or deduction if they use a paid TurboTax product or service, or any other fact material to consumers concerning any good or service, including but not limited to, the total cost, the refund policy, or any material restrictions or limitations. Final Order II. This fencing-in provision ensures that Intuit does not make other false claims about Intuit's products to consumers.

Parts III-VI of the Final Order impose certain record-keeping, notification, and reporting requirements and properly serve to facilitate administration of the Final Order. Part VII provides that the Final Order will terminate in twenty years. This differs from the State Settlement, which imposes restrictions for only ten years.

Respondent registers four objections to the disclosure requirements in Part I of the ALJ's order.

*First*, Respondent contends that Provision I.B in the ALJ's order (referencing "[a]ll the terms, conditions, and obligations" upon which a "free" offer is contingent) is not stated with clarity and precision and is, therefore, unenforceable. Br. 43. The Final Order similarly requires for ads that are not space-constrained that "all the terms, conditions, and obligations upon which receipt and retention of [a] 'Free' good or service are contingent" be set forth clearly and conspicuously "so as to leave no reasonable probability that the terms of the offer might be misunderstood." Final Order I.B.2. Respondent complains that the provision requires clear and conspicuous presentation of the relevant qualifications but "says 'precious little about how this is to be accomplished.'" Br. 43 (quoting *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1237 (11th Cir. 2018)).

We reject the contention that the Final Order is unclear. The terms, conditions, and obligations upon which a "free" offer is contingent are set by and known to Respondent. Moreover, the language at issue has been used by the Commission for more than 50 years. *See*

Guide Concerning Use of the Word "Free" and Similar Representations, 36 Fed. Reg. 21517, 21518 (Nov. 10, 1971), codified at 16 C.F.R. § 251(c); *Reader's Digest Ass'n, Inc.*, 111 F.T.C. 758, 761 (1989) (Commission Response Denying Respondent's Request to Reopen and Modify Consent Orders and for Advice on Interpretation of Consent Order). Courts that have considered the language, when discussing either the FTC guidance or the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/2P, which contains essentially the same language, have not expressed concerns with its precision. *See Cosmetique, Inc. v. ValueClick, Inc.*, 753 F. Supp. 2d 716, 721 (N.D. Ill. 2010) (considering Illinois statute); *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 859 (Ill. 1998) (considering Illinois statute); *N.Y. ex rel. Abrams v. Stevens*, 497 N.Y.S.2d 812, 813 (N.Y. Sup. Ct. 1985) (considering FTC guidance); *State v. Amoco Oil Co.*, 293 N.W.2d 487, 498-99 (Wis. 1980) (discussing FTC guidance).

If Respondent's argument is that the Final Order does not provide specific language for the "terms, conditions, and obligations" disclosure, Respondent seeks something the Commission cannot provide. Intuit has repeatedly changed the eligibility criteria for its free products, and thus Intuit would need to revise the particular language as it revises the eligibility criteria.[78]

If Respondent is objecting to the additional language in the provision requiring that the disclosure be set forth "Clearly and Conspicuously . . . so as to leave no reasonable probability that the terms of the offer might be misunderstood," we again conclude that the Final Order provides sufficient clarity. "Clearly and Conspicuously" is a defined term under the Final Order. Definition B states that to be clear and conspicuous a required disclosure must be "difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers" and then describes in detail how this may be accomplished; it describes *inter alia*, the mode, timing, size, speed, contrast, location, length, cadence, diction, syntax, consistency, and unavoidability of the required disclosures, almost all of which requirements parallel those in the State Settlement.[79]

*Second*, Respondent objects to the required disclosures, claiming that consumers would be harmed. Br. 44-45. Respondent contends that consumers would suffer "information overload" from the requirement to provide all terms upon which the free good or service is contingent. Respondent was particularly concerned about the requirement for space-constrained ads. Br. 44; Reply 21. We are not persuaded. First, and foremost, the Final Order modifies some of the disclosure requirements for space-constrained advertisements: Intuit must disclose only the percentage of taxpayers who are eligible to file for free (or state that a majority do not qualify)

---

[78] The Final Order does include quite specific disclosure requirements for space-constrained ads. Final Order I.B.1, C. These disclosures need not restate varying eligibility criteria.

[79] Respondent quotes *LabMD* to assert that the Final Order does not sufficiently explain how disclosure of the qualifying terms and conditions is to be accomplished. The Eleventh Circuit found the *LabMD* order unenforceable because it did "not enjoin a specific act or practice. Instead, it mandates a complete overhaul of LabMD's data-security program and says precious little about how this is to be accomplished." *LabMD*, 894 F.3d at 1237. In contrast, here, the Order describes specific content that must be disclosed and how it needs to be presented. Respondent's comparison to *LabMD* is inapt.

PUBLIC VERSION

and must direct consumers to view eligibility requirements (including a hyperlink or click-through if online), but Intuit is not required to disclose all the terms and conditions upon which the free good or service is contingent when the ad is space-constrained. Final Order I.C. Second, Respondent bases its information-overload argument, *inter alia*, on the opinion of Professor Golder. Yet, Professor Golder assumed the disclosure would import the 157-word description of the qualifying terms found in a pop-up on the TurboTax website, Golder Tr. 1166-67, 1170-73, rather than the more concise description Intuit could develop for ads with space limitations. We find this assumption implausible for Intuit, which has spent substantial sums producing nationwide ad campaigns. Third, as the ALJ explained, while Professors Golder and Novemsky acknowledged the potential for information overload, neither expert conducted any formal analysis. ID 224. Professor Golder did not try to study the issue, even using his implausible assumption.

Respondent also contends that the provision requiring Intuit to disclose that its free products are not free for a majority of consumers would harm consumers by causing them to assume incorrectly that they do not qualify for the free product. Br. 45. We disagree. The Final Order does not prevent Intuit from advertising its free products; it only requires that Intuit provide consumers with accurate information to prevent deception. Intuit's argument is speculative: it assumes that consumers are unable to assess and analyze additional unambiguous, factual information. Of course, for non-space-constrained ads, the Final Order also requires Intuit to disclose the terms, conditions, and obligations upon which the free products are contingent. For space-constrained ads, Intuit must direct consumers to a landing page or webpage where the eligibility criteria are clearly and conspicuously disclosed. It is unclear why Intuit believes consumers would be at risk of incorrectly assuming that they do not qualify, given that the consumers would be readily provided with the information needed to determine whether they qualify for free TurboTax products or services.

*Third*, Respondent objects to the Final Order because it applies to products other than TurboTax, arguing that the Complaint and the evidence presented do not concern any product other than TurboTax. Br. 45. We reject Respondent's concern. Courts have agreed that fencing-in provisions that extend to products beyond those involved in the violations are appropriate. *See, e.g.*, *Colgate-Palmolive*, 380 U.S. at 394-95; *Telebrands*, 457 F.3d at 361-62; *Kraft*, 970 F.2d at 326-27; *Am. Home Prods.*, 695 F.2d at 704-10; *Litton Indus.*, 676 F.2d at 370-71. As we have already discussed, Intuit's conduct was serious and deliberate and can be easily transferred to other products. Thus, this fencing-in requirement is reasonably related to the violation found. The Order's other fencing-in provisions are also appropriate. This includes the additional disclosure requirements for non-space-constrained ads, Final Order I.B.2, as well as the provisions regarding other misrepresentations about facts material to consumers, Final Order II. The Supreme Court long ago held that "respondents must remember that those caught violating the Act must expect some fencing-in." *Nat'l Lead*, 352 U.S. at 430; *see also Am. Home Prods.*, 695 F.2d at 712. That is precisely what this Final Order does.

*Fourth*, Respondent contends the Final Order's requirement to disclose that a product is "not Free for a majority of U.S. taxpayers" is unconstitutional, violating Intuit's First Amendment rights. Citing *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("NIFLA"), Respondent argues that the government may not compel

commercial speech unless the speech is "noncontroversial," and the compulsion is neither "unjustified [n]or unduly burdensome." Br. 46.

It is well established that the First Amendment does not protect misleading commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). It is also clear that an FTC Order prohibiting the conduct and claims that were found to be misleading does not abrogate the First Amendment rights of respondents. *See, e.g.*, *POM Wonderful*, 777 F.3d at 501-02; *Kraft*, 970 F.2d at 325-26 (Order "is sufficiently narrow to pass constitutional muster . . . [because] the restriction at issue here is . . . directed toward one company's cheese ads and predicated on a specific finding of past deceptive practices.").

For required commercial disclosures, courts have found that an advertiser's First Amendment rights "are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). *Zauderer* found that compelled disclosure of how an attorney's contingent fee rate would be calculated was "purely factual and uncontroversial" about the terms under which the attorney's services will be available. *Id.* Here, the disclosures required by the Order to prevent deception are similarly factual and uncontroversial. Respondent argues that the disclosure statement is controversial because Respondent disputes the relevant taxpayer population used to determine whether a majority of taxpayers qualify for the free good or service. Br. 46. But Respondent's view of "controversial" is inconsistent with precedent. The D.C. Circuit explained that the standard means "controversial in the sense that [the compelled speech] communicates a message that is controversial for some reason other than [a] dispute about simple factual accuracy." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 528 (D.C. Cir. 2015) (brackets in original) ("'[U]ncontroversial,' as a legal test, must mean something different than 'purely factual.'"). In fact, as of January 19, 2024, Respondent's website, turbotax.intuit.com, displayed upfront the notation "~37% of filers qualify," which, as we have noted, would satisfy the requirements of Final Order I.B.1, without need to directly state that a majority of U.S. taxpayers do not qualify.[80] Intuit's own use of this phrase belies its concerns with controversy. Simply put, the fact that Intuit has chosen to state on its website that "~37% of filers qualify," which the Final Order provides as an alternative to the statement that a majority of U.S. taxpayers do not qualify, contravenes Respondent's claim that the disclosure is controversial.

Nor is there any merit to Respondent's claim of undue burden. Respondent complains that Intuit will be disadvantaged in the market, noting that other competitors are making similar "free" claims but are not required to make a similar disclosure. Br. 46. Courts have long held that it is not defense to an order against unlawful practices that others in a marketplace are similarly engaging in unlawful practices. *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 312-13 (1934); *FTC v.*

---

[80] Pursuant to Commission Rule 3.43(f), the Commission may take official notice of "any material fact that is not subject to reasonable dispute in that it is either generally known within the Commission's expertise or capable of accurate or ready determination by resort to sources whose accuracy cannot reasonably be questioned." 16 C.F.R. § 3.43(f). We find that the fact that "~37% of filers qualify" appears or recently appeared on Intuit's website is a material fact not subject to reasonable dispute, and we take official notice of that fact.

*Winsted Hosiery Co.*, 258 U.S. 483, 493 (1922); *Regina Corp. v. FTC*, 322 F.2d 765, 769 (3d Cir. 1963); *see also Moog Indus., Inc. v. FTC*, 355 U.S. 411, 413 (1958); *FTC v. Chemence, Inc.*, 209 F. Supp. 3d 981, 985 (N.D. Ohio 2016). Scholars have long acknowledged the risks of a "race to the bottom," where honest businesses lose sales to unlawful market actors and are forced to adopt similar practices,[81] and the FTC has a long history of tackling deceptive practices that harm honest businesses as well as consumers. *See, e.g.*, *R.F. Keppel & Bro.*, 291 U.S. at 312-13; *Exposition Press*, 295 F.2d at 873. In the bait-and-switch circumstance, the seller that dangles the misleading bait effectively prevails over the seller that plays honestly. Moreover, the fact that Intuit agreed in the State Settlement to disclose that not all taxpayers qualify, *see* RX76 (AVC) at Injunctive Relief III.A, C, and stated on its website that "~37% of filers qualify," suggests that Intuit's claims of marketing damage are overstated.

In sum, we have made some modifications to the order proposed by the Chief Administrative Law Judge. We find no further changes necessary and issue the Final Order as a remedy for Intuit's repeated, longstanding, and widely disseminated deceptive advertising of TurboTax.

---

[81] In his Nobel Prize-winning work about "the market for 'lemons,'" George Akerlof observes that dishonest practices, if left intact, tend to prevail over honest practices. George A. Akerlof, The Market for "Lemons": Quality Uncertainty and the Market Mechanism, 84 Q.J. ECON. 488, 488, 495 (1970).