# EXHIBIT D

# ATTACHMENT 8

8/25/22, 3:09 PM Q&A with FTC Chair Lina Khan: "The Word 'Efficiency' Doesn't Appear Anywhere in the Antitrust Statutes" - ProMarket

Case: 24-60040 Document: 34-1 Page: 2 Date Filed: 03/01/2024



ANTITRUST AND COMPETITION   NEWS

# Q&A With FTC Chair Lina Khan: "The Word 'Efficiency' Doesn't Appear Anywhere in the Antitrust Statutes"

BY GUY ROLNIK    June 3, 2022



FTC Chair Lina Khan sat down with Guy Rolnik to discuss changes in governmental posture toward antitrust enforcement, her goals as head of the FTC and much more.

---

O n June 15th, 2021, Lina Khan, a 32 year-old legal scholar, was sworn in as the chair of the Federal Trade Commission. Her appointment by President Joe Biden came as a complete surprise not only because of her young age, but mostly because she was already well-known in Washington and antitrust circles as part of a movement that wants to uproot and transform the way antitrust is enforced in the US. Antitrust scholar and former FTC Chair William Kovacic wrote last summer that with Khan's appointment—along with those of Jonathan Kanter as Assistant Attorney General for the Antitrust Division at the Department of Justice, and Tim Wu's as Biden's special advisor for technology and competition—the United States now stands at the threshold of a major realignment of the competition policy regime.

In 2017, Khan, still in her last year at Yale Law School, was an invited guest and speaker at the Stigler Center's inaugural antitrust and concentration conference. No one could have predicted at that point that in less than five years, she would return to the conference in 2022 as the keynote speaker and Chairwomen of one of the two most important regulatory agencies in the US.

*Below is an abridged transcript of a conversation Chairwoman Khan had at the 2022 Stigler Center Antitrust conference with Chicago Booth Professor Guy Rolnik.*

[The following interview has been edited and condensed for length and clarity]

**Q: The first time you were here in this room was in March 2017. The title of that inaugural Stigler Conference was "Is There a Concentration Problem in America?" Correct me if I'm wrong, but in DC and in most capitals, this is not a question anymore. But if people would have [asked] me in March 2017, "What are the chances that in 2022 you will be hosting Lina Khan as the chairwoman of the FTC?" my answer would probably be "near zero." Can you explain what happened in the last five years? How did we get this takeover of the Khan, Kanter, and Wu partnership over Washington?**

First of all, let me say it's so great to be back here, and such an honor to be here with you. I don't think you would have been alone in making that wager.

Look, I think it's a remarkable moment. The speed and magnitude of the change that we've seen over the last few years is something that I expect historians to be studying for many, many years to come. There [is] a whole set of factors that I think contributed, but at the end of the day, I think the change is being driven by a deep recognition that something has been awry in how we've been doing antitrust and that how we've been doing antitrust has resulted in, say, a farmer being dependent on a single meat packer and the whims of that meatpacker for their livelihood, or a parent having to ration their child's insulin—that those types of problems in our economy are connected to the decisions that are being made at the FTC and the DOJ. I think that the basic connection of the dots is something that we've seen become much more vivid for people.

I'd be remiss if I didn't acknowledge the important role of many people in this room in drawing those connections and showcasing the deep problems in our economy, and connecting them to how we've been doing antitrust. I think this conference, in particular, played an incredibly important role—including back in 2017 because, at that point, the Stigler conference did a couple of things right. One was it said: Let's ask the question and let's look at the evidence; and when we say let's look at the evidence, let's broaden our aperture and move beyond just IO and look at a broader variety of methods from a broader variety of disciplines. Let's look at what the labor economists have been saying, what the macroeconomists have been saying, and what the non-economists have been saying. I think that fresh look at the evidence at that moment in time was incredibly important.

I also think that the Stigler Center as an institution gave credibility and respectability to a set of questions that, even at that moment in time, were not seen as respectable. It's really important for disciplines to be able to have that healthy type of self-reflection, and I think antitrust over the years had kind of settled into a type of "end of history" moment where there was a sense that the deep contestations and the deep debates had kind of settled and

been resolved. And now there were questions, important questions, but they were mostly at the margins.

There were some exceptions to that. [Former FTC chair] Bill Kovacic, even back in 1998, predicted that there would be a swinging back of the pendulum. Overall, there had been a distancing from the more existential questions for the field, and I think Stigler did a lot to refocus and say, "No, these are legitimate, important, credible questions for this field."

I'd also be remiss if I didn't acknowledge the incredibly important role of Congress and lawmakers. Something that we saw coincide with the period of deep retrenchment over the last few decades was Congress becoming more of a backseat player in antitrust, and I think we've seen remarkable work by lawmakers across the political spectrum to deeply study the problems in our economy, to start educating the public about those problems, and to start introducing a remarkable series of bills and proposals.

I think those are some of the factors that contribute. Again, this is something that's going to be continued to be studied for some time.

> "I think this conference, in particular, played an incredibly important role—including back in 2017 because, at that point, the Stigler conference did a couple of things right. One was it said: Let's ask the question and let's look at the evidence."

Q: In your writing and your research, in law school and Open Markets, you started to develop a theory of what happened to antitrust in the last 30-40 years and why antitrust enforcement had declined. Now that you are almost a year at the helm of the FTC, or down in the trenches really [having] to deliver on those promises, has your perspective on what happened to antitrust changed?

I think the basic story remains the same: there were a set of policy changes and policy choices that were made that led to significant retrenchment in how we do antitrust, and that contributed to a whole set of harms. On the ground floor, you see a whole set of realities at the institution in terms of the severe mismatch between the job that Congress has given to the agency and the set of resources that it has available. By some metrics, staffing at the agency is lower today than it was back in the 1980s.

I think for a place like the FTC, there's also a way in which the ghost of the 70s can loom large in the building. There's a very standard account that's often given of what happened in the 70s and what to learn from it, and it goes something like, "Here you had this agency, it acted boldly, tried to do a lot, and that triggered an enormous political backlash in ways that led to efforts to defund the agency," and that's a cautionary tale for us where we really need to

be, under the radar, doing our job but not rocking the boat too much. I think it's worth, of course, learning the lessons from that period. But I think every moment has a different mandate. In the same ways that antitrust enforcers talk about type one versus type two errors and the cost of action and inaction, I think we need to have that conversation at the institutional level as well, where decades of actual under-enforcement has severe institutional costs as well—kind of rebalancing how we do the analysis. Because inaction means that Congress can start seeing you as irrelevant. The public can lose faith in institutions, and that can also lead to certain types of neglect in ways that have deep institutional costs. Rebalancing how we think about the tradeoffs between action and inaction and realizing that there are severe costs under-enforcement and inaction, I think, is something that is something that within the building we're thinking a lot about as well.

**Q: There was a ton of discussion here about what's going to happen with the courts, if courts are going to be a significant barrier to your new agenda. AAG Kanter said that he's not worried as much about losing cases because he's not a member of "the Chickenshit Club." Do you think if you lose multiple cases but still convince the public or maybe legislators that there needs to be a legislative change, you're still winning? Do you subscribe to this?**

I'm certainly not somebody who thinks that success is marked by a 100 percent court record. I think, as public enforcers, we have a special obligation to be bringing the hard cases. I think it's also really important to be having the institutional dialogue among the three branches. If the antitrust agencies look at the market and think that there's a law violation and the current law might make it difficult to reach, there's a huge benefit to still trying, especially with some of the bigger companies, some of the more high-profile cases. Because if you don't try, the message that sends out to the world is that the enforcers don't think there's a problem in the market. Whereas if you try, even if you lose, that then creates the message for Congress to know, "Hey, here are these law enforcers, they recognize there's a problem here, the current law is not adequate for them to reach it, so let's change the law."

I think that type of institutional dialogue among the three branches is incredible. If instead, as enforcers, you think these are really hard cases, we recognize that there's an enormous risk with bringing them, we don't want to make the law worse, and so you just never bring those hard cases, I think there are severe costs to that that can lead to stagnation and stasis.

**Q: You have a very ambitious agenda and limited resources, or even maybe limited time, considering what might happen in politics. So maybe one of the ways to consolidate gains is by creating real deterrence in the market. So how do you determine which [of the] cases that you pick are worth fighting because winning them will send a strong message to the market?**

It's an incredibly important question and one that we've been given a lot of thought to, given the limited resources and given the importance of promoting deterrence. Oftentimes, we're just looking at where is the most harm happening. Oftentimes, that involves some of the biggest companies and the biggest players.

I think one area where we've seen success is in our merger enforcement work, where over the last few months we've seen significant victories, including in the context of vertical mergers. The FTC challenged in the last few months both the Nvidia-Arm merger and the Lockheed-Aerojet merger, both vertical transactions in both instances, the parties ended up abandoning, which is enormously significant if you think about how even a few years back, when the DOJ challenged that AT&T-Time Warner merger, the atmospherics around that was that was quite radical, the antitrust agencies hadn't brought a vertical challenge in many decades. They ended up losing there, but the fact that we've gone from that outcome then to instances in which the FTC's filing a complaint in these vertical challenges [is] leading companies to abandon, I think, shows remarkable progress. I also think the fact that we challenged Lockheed-Aerojet, in particular, sent a very strong message [to] the defense industry, where for years, the approach has instead been to allow the consolidation to happen to accept settlements and remedies that, in hindsight, I don't think have been as strong. So being able to take that type of action ended up sending an important message that we're not going to be settling for weak remedies. There are some deals that are illegal and can't be remedied, and in those instances, they need to be blocked.

> "I think as public enforcers, we have a special obligation to be bringing the hard cases."

Q: Going back to "terrifying rhetoric," you and AAG Kanter believe that it's time to go back to criminal investigation and enforcement. I know this is the DOJ's purview, but probably your attitude towards it will also carry weight. Do you think that agencies should pursue more criminal investigations, maybe even name the names of executives when they are suing companies?

Yes, absolutely. Last fall, we took some steps to strengthen our ability to more regularly and routinely refer criminal cases to the Justice Department. So that's something that we have underway. We also recently had great success in actually naming an individual in one of our antitrust cases: Martin Shkreli. This was a case that was initiated under my predecessor. In the fall, we ended up settling with a whole bunch of defendants but ended up deciding to actually continue to go to trial on the case against Martin Shkreli personally, and we ended up getting a terrific outcome in January, where we ended up getting a lifetime ban on Shkreli from the pharmaceutical industry, as well as a whole set of additional relief. So I think naming individuals is incredibly important. I'd also be remiss if I didn't recognize here the work of former commissioner and now CFPB director Rohit Chopra, who has given an enormous amount of thought to how you deter law-breaking and, in particular, how you craft remedies to deal with recidivism. He gave an incredibly important speech a few weeks ago at Wharton that lays out some additional tactics, and I think that type of worldview is also informing how we're looking at these things.

Q: You said that Martin Shkreli was banned for life from pharmaceuticals. Do you think that on top of structural remedies, or governance remedies, at some point, we will see agencies, let's say, banning Mark Zuckerberg from going on social networks or limiting his screen time?

I think the industry ban we were able to secure in the Shkreli case is enormously important and somewhat precedent-setting in the antitrust context. The way I think about remedies, and the traditional way to think about remedies, is that there are at least three goals. The immediate goal is to stop the illegal conduct and to stop the recurrence of that conduct. A second goal is to cure the harm that's occurred through the underlying illegal conduct, the harm both to the market as well as to the victims of that conduct. The third is to really disincentivize further law-breaking.

With each of those prongs, we're thinking about how we can be more effective. On the first—stopping the law-breaking—I think we need to act in a more timely manner. We need to be going into court more quickly; we need to be seeking preliminary injunctions. On the consumer protection side, the FTC, a few weeks ago, filed a lawsuit against TurboTax on the consumer protection side, alleging that TurboTax had been showing all these ads that are allegedly deceptive, and that it was really important to get that relief ahead of Tax Day. I think that type of timely intervention and timely filing of lawsuits is incredibly important.

Thinking about how you actually cure the underlying harm is incredibly important. There's this really terrific quote from Justice Robert Jackson where he says that the goal of antitrust lawsuits must really be to pry open the competitive market that had been closed shut by the illegal conduct. Thinking about how you actually do that prying opening of the market, especially in the context of some of these digital markets, is incredibly important, where you need to make sure that some of the illegal gains that were obtained through the illegal conduct—certain types of data, certain types of scale that were achieved through basically determining that unlawful conduct was worth the cost of business because it might help you tip the market or achieve a greater market share—that those are types of business strategies, incentives that we really need to be studying in order to be able to undo the harm, similar with making sure that the victims of that conduct are fully compensated.

The third prong— thinking about how we should be disincentivizing law breaking to begin with—gets into the category of preventing recidivism, thinking about the structure or relief, the relief with regards to individual executives, governance level changes that are incredibly important as well.

Q: At this time of polarization, identity politics, and culture wars, how do you convince the average American that FTC and DOJ policies and actions are very important to their lives?

Yes, it's a great question. And I think in many ways that work has already been done. I think there's already wide recognition that the decisions that are being made in these buildings

have enormous consequences for the way in which people experience power in their lives, whether people do or don't have access to affordable medicines.

We've been doing a few things at the FTC to make sure that we are encouraging and enabling more participation. We've started to do these open monthly meetings, where we have items on the agenda, but we also have a portion of the meeting where people can just sign up and come speak to us, tell us about problems that they're seeing in the marketplace, problems that they think should be on our radar. It's been really terrific to be able to hear regularly from people who are not in Washington, DC, about the types of problems that they're seeing in marketplaces.

We are government officials, we are public servants, we serve the public, and so we need to very actively be listening to the public, learning from the public. I think those types of forums have been really incredibly important. As we do the revision of the merger guidelines, we've also been doing these listening forums where we are inviting market participants who are not the types to be able to hire law firms to write the 100-page submissions to the agencies but really have deep expertise from their own day-to-day experience in these markets, to be able to share with us what they're seeing. A few weeks ago, we did one focused on the healthcare industry, where we heard from physicians who could attest to the effects of private equity roll-ups of physician practices. We heard from nurses, we heard from independent pharmacists, as well as from patient advocates who could share with us their real-world experience, having lived through mergers and acquisitions and the types of harms that those have created.

So I think some of this work is already being done, and people are already realizing how the kind of day to day realities that they're living connect to the decisions being made by antitrust enforcers, but I think there's certainly a lot that the agencies can also be doing to actively encourage and welcome that type of regular public input. It's something that's incredibly important to me, and I think we've already seen some great success in terms of being able to shape our work based on what we're hearing.

Some of the most significant input that we've gotten at our open commission meetings has been from patient advocates, people in particular who come and talk to us about the way in which the price of insulin has surged over the last few years, ways that are leading people to ration their medicine, oftentimes leading to bad health outcomes, even death. We've also heard a lot from independent pharmacists, who have been alleging that the practices of the pharmacy benefit managers are basically squeezing out the pharmacies. So a lot of the input that we received there has basically gone into shaping a study that we hope to be able to do on pharmacy benefit managers, as well as internally how we're thinking about some of our enforcement strategy. So we're really expecting that there's going to be a feedback loop between what we're hearing from people and how that's directly informing our work.

**Q: One of the issues that we discussed a lot today is that maybe there is a tradeoff between efficiency and democracy? If you are a hardcore New Brandeisian, you think the most**

important thing is democracy. If you are more moderate, you think about tradeoffs with efficiency. Where do you stand on that?

The word efficiency doesn't appear anywhere in the antitrust statutes. They're really written to, in the FTC's case, allow the FTC to police unfair methods of competition. Implicit in that prescription is the idea that there are illegitimate forms of competition and legitimate forms of competition, and it's really up to the FTC to be defining what is fair and what is unfair when it comes to competition. It's not that any business practice that increases welfare or increases efficiency is fine. It's really this conception of unfair methods of competition. Embedded within that is a task for the agency to be defining that.

There's a lot of interest right now in having us think about the proliferation of noncompetes in labor contracts. I think we hear a lot of arguments from firms around why those might be efficient in terms of enabling investment, enabling training. I think we've also seen tradeoffs in terms of the type of restrictions that they placed on workers' liberties. I think that's a side where you see some of those arguments made. But I think ultimately, even within the language of the antitrust statutes, as established, we don't see some type of preference given to efficiency over democracy— it's really focused on competition, and in the FTC's case, unfair methods of competition.

### "THE WORD EFFICIENCY DOESN'T APPEAR ANYWHERE IN THE ANTITRUST STATUTES."

Q: One of the issues we discussed here is the question of bigness per se. I think it was Fiona Scott Morton who said that if we think we have a problem with bigness per se, maybe we should have laws on the book that limit size. Say, once you get to a trillion-dollar market cap, we break you up. So how does the FTC, given the current laws, view, bigness per se? For instance, a very large conglomerate goes out and buys a large operating company. On the face of it, there are no horizontal or vertical issues her, but yet we see a $2-3 trillion company gobbling up more and more companies in other industries. How do you view that?

I mean, I think on the first question, there's no doubt that indicators of concentration, consolidation, size, those can oftentimes be proxies for market power, and where market power exists is where market power can be exploited and used in an unlawful way. Focusing on the areas where we see some of the most significant incumbents and instances in which they've been able to maintain dominant positions over a long period of time, I think that can often be a fruitful area to focus on.

This question of conglomerates is incredibly interesting. There was a really robust discussion and engagement with conglomerates back in the 60s and 70s, where the agencies were thinking about law enforcement theories, what happens when you see this type of

8/25/22, 3:09 PM                    Q&A with FTC Chair Lina Khan: "The Word 'Efficiency' Doesn't Appear Anywhere in the Antitrust Statutes" - ProMarket

Case: 24-60040    Document: 34-14    Page: 10    Date Filed: 03/01/2024

conglomeration, what should antitrust and merger law, in particular, have to say about it. Some of those discussions then fizzled out because I think we saw certain diseconomies of scale that hit, and we saw the dissipation of the traditional industrial conglomerate back in the 60s, 70s, and 80s.

I think what we now see, especially in the digital context, is that those diseconomies of scale don't hit in the same way—they either hit at a much later scale or just, you know, might not come into the picture at all. That really invites us to engage with this conglomerate question. We might not think it's worth calling it conglomerate, maybe some of the dynamics are a little different, but the types of instances where we see individual firms establish positions across markets, across sectors invites scrutiny. One thing that we're trying to do with the revision of the merger guidelines is to determine what should we as enforcers be thinking about when we encounter situations like this because, as of right now, this is a somewhat understudied topic in the context of our new economy.

**Q: Next year, we'll convene here again, and hopefully, you will be here again to answer questions. Can you offer us a metric to assess your success at that point, after two years at the helm of the FTC?**

I think it goes back to what I said earlier: are these agencies really showing the country and showing the public that we're willing to take on the fights that matter, the big fights? Again, that's not always going to translate into universal victories in the courts, but I think it's certainly a commitment, a mandate that we feel. I think these types of windows of opportunity where there's deep public hunger for change create enormous responsibility for us to respond and act, and I think that's going to be an important metric for us.

## Related Posts:

1. Populism at the FTC Upsets the Antitrust Religion of Consumer Welfare: A Reply to Sokol and Wickelgren
2. Antitrust Law's Unwritten Rules of Unfair Competition
3. DOJ Antitrust Head Jonathan Kanter: "We Are Making It Very Clear: We're Going to Hold Individuals Accountable"

TAGS   antitrust and competition   Consumer welfare standard   Digital platforms   FTC   Lina Khan   regulatory capture

Previous article                                                                  Next article
Chart of the Week: EU Officials and Economists Disagree Over Sanctioning Russian Natural Gas                       DuckDuckGo, Data Collection Innovation, and Right to Repair

**LATEST NEWS**

8/25/22, 3:09 PM
Q&A With FTC Chair Lina Khan: "The Word 'Efficiency' Doesn't Appear Anywhere in the Antitrust Statutes" - ProMarket

Case: 24-60040    Document: 34-14    Page: 11    Date Filed: 03/01/2024

Cultural Capture of Antitrust Is More Likely in America than Europe

The Corruption of Consumer Welfare

The Thorny Problem of Social Media Platform Political Harms and Freedom of Speech

New Study Warns Antitrust Inaction May Lead To Acceptable Collusion for Public Policy Considerations

Dark Money Dominates Spending by Special Interest Groups and Sways Elections

The "Conspiracy" of Consumer Welfare Theory

Researchers Find Reduced Competition After Pandemic

Voters Still Believe Politics is About the Common Good, Not Just Rent-Seeking

How to Design Data Protection Laws That Actually Work

Are Monopolists or Cartels the True Source of Anticompetitive US Political Power?

**Related Posts:**

8/25/22, 3:09 PM  Q&A With FTC Chair Lina Khan: "The Word Efficiency Doesn't Appear Anywhere in the Antitrust Statutes" - ProMarket

Case: 24-60040    Document: 34-14    Page: 12    Date Filed: 03/01/2024

1. [Populism at the FTC Upsets the Antitrust Religion of Consumer Welfare: A Reply to Sokol and Wickelgren](#)
2. [Antitrust Law's Unwritten Rules of Unfair Competition](#)
3. [DOJ Antitrust Head Jonathan Kanter: "We Are Making It Very Clear: We're Going to Hold Individuals Accountable"](#)

ProMarket is dedicated to discussing how competition tends to be subverted by special interests. The posts represent the opinions of their writers, not necessarily those of the University of Chicago, the Booth School of Business, or its faculty. For more information, please visit ProMarket Policy.

  

**ABOUT US**

MASTHEAD AND CONTACTS

ABOUT THIS PUBLICATION

TERMS AND CONDITIONS

**CATEGORIES**

WHAT WE ARE READING

ANTITRUST AND COMPETITION

NEWS

REGULATORY CAPTURE

MEDIA

RENT SEEKING