# EXHIBIT D

# ATTACHMENT 10



**MARKETING SCIENCE**
Vol. 39, No. 1, January–February 2020, pp. 168–187
ISSN 0732-2399 (print), ISSN 1526-548X (online)

http://pubsonline.informs.org/journal/mksc

# Whose Voice Do We Hear in the Marketplace? Evidence from Consumer Complaining Behavior

Exhibit

RX 1552

**Devesh Raval[a]**

[a] Bureau of Economics, Federal Trade Commission, Washington, District of Columbia 20580
Contact: draval@ftc.gov, ⬡ http://orcid.org/0000-0003-0376-122X (DR)

**Received:** July 13, 2017
**Revised:** June 28, 2018; September 19, 2018
**Accepted:** September 21, 2018
**Published Online in Articles in Advance:**
September 16, 2019

https://doi.org/10.1287/mksc.2018.1140

Copyright: This article was written and prepared by U.S. government employee(s) on official time and is therefore in the public domain

**Abstract.** Consumer voice has increasingly become a major factor in the marketplace through consumer complaints, but little is known about who chooses to complain and how complainants compare with consumers of the product. Any differences in complaint rates across groups can reflect either different propensities to complain or different consumer experiences, making it difficult to assess the degree of self-selection. I utilize a set of law enforcement actions to separate these two explanations by comparing characteristics of complaining consumers to those of victims, and I find much lower complaint rates in heavily minority areas compared with nonminority areas, relative to their respective victimization rates. I find evidence against information-based accounts for why victims from minority areas are less likely to complain and in favor of explanations related to lower levels of trust or general social capital. I then provide a statistical weighting approach to remedy the problem of self-selection and apply it to develop an implied victimization rate using complaints from the Consumer Sentinel database.

**History:** Avi Goldfarb served as the senior editor and Christophe Van den Bulte served as associate editor for this article. This paper has been accepted for the *Marketing Science* Special Issue on Consumer Protection.
**Supplemental Material:** Data files and the online appendix are available at https://doi.org/10.1287/mksc.2018.1140.

**Keywords:** consumer behavior • complaints • customer loyalty • user reviews

## 1. Introduction

Nearly 50 years ago, Hirschman (1970) highlighted the crucial role that consumer "voice" plays in markets. The internet has magnified that role through easily accessible user-generated reviews, which have become a major source of information on the quality of products and companies. In this paper, I focus on consumer complaints; policy makers now receive millions of such complaints per year. They use the information in these complaints to learn about company practices and decide whether a company is violating the law.

Despite the growing power of consumer voice, we know very little about whose voice we hear. Consumers self-select to complain, which could affect both which companies receive complaints and the assessment of quality provided by the complaints. For example, if the demographics of consumers that provide complaints are very different from those of fraud victims, policy makers may not learn about problems that affect communities that do not complain.

Unfortunately, it is difficult to assess the degree of self-selection in complaining behavior. Higher rates of complaints for a given set of consumers could reflect either differences in a consumer's propensity to vocalize, or in the experience the consumer received. The existing literature on complaining behavior has, in general, examined data only on complaining consumers, and so cannot disentangle these two explanations.

I separate these two explanations through a set of nine law enforcement actions ("cases"), for which I can combine information on affected consumers, whom I will refer to as "victims," with complaints on those companies from the Consumer Sentinel Network.[1] I can thus compare how the characteristics of complainants differ from those of consumers for a given company, based on zip code demographics obtained from consumers' addresses. Because the cases I use vary substantially from each other in size, average amount lost, type of fraud, and the demographics of victims, any conclusions about self-selection behavior that hold across cases are likely to hold more generally for fraud-related consumer protection matters.

I find that residents of heavily black and Hispanic areas complain substantially less relative to their rate of victimization after controlling for other demographic characteristics. I examine the differences between complaining consumers and victims through a set of mixed logit models. I find that the complaint rate falls by 61% relative to the victim rate as the percentage of black residents rises from 0% to 100%, and by 43% as the percentage of Hispanic residents rises from 0% to 100%. Across cases, I find effects significantly

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

different from zero for six of nine cases for the percentage of black residents and five of nine cases for the percentage of Hispanic residents. Thus, self-selection in complaining disproportionately reduces the complaint rate for minority communities compared with nonminority communities, relative to their respective level of victimization.

I then turn to examining why residents of heavily minority areas complain at much lower rates than those of other communities, relative to their rate of victimization. The Federal Trade Commission (2016b) (FTC) provided several explanations in a recent report to Congress for why black and Hispanic communities may complain less.

> In the FTC's workshops and conferences, however, many have observed a general reluctance and embarrassment to report fraud. Furthermore, despite the higher prevalence of fraud, some have stated that African American and Latino consumers may distrust the government, may not know where to complain, may believe their complaints will not make a difference, or may have concerns about encountering the government because of their immigration status. (Federal Trade Commission 2016b, p. 4)

I categorize these explanations as based on differences in either information or levels of social trust. To test explanations due to information differences, I compare cases where consumers lost thousands of dollars to those where consumers lost tens of dollars, as consumers would likely know they were defrauded and have incentives to find out how to complain if they lost large amounts of money. Because minority communities complain less than nonminority communities relative to their rate of victimization for both types of cases, I do not find support for explanations based on information.

In contrast, quantitative evidence from the General Social Survey (GSS), as well as qualitative evidence from sociology and marketing, suggests that minorities have lower levels of social trust. Lower social trust could reduce complaining because of mistrust of government specifically, or because a feeling of societal exclusion reduces prosocial activity. I find evidence against mistrust of government, as surveys do not show substantial racial gaps for trust in government, and nongovernmental Better Business Bureau (BBB) complaints exhibit selection patterns similar to those of government complaints.

I then estimate interaction models to examine mechanisms for how alienation could affect complaining behavior. I find lower selection effects for the percentage of Hispanic residents in areas with more foreign-born residents or more speakers of languages other than English. Although inconsistent with explanations through language barriers or fears of immigration enforcement, these findings would be consistent with greater alienation for later-generation Hispanics. The complaint-to-victim ratio falls with an increase in the percentage of minority residents for both more advantaged and less advantaged areas; thus, explanations through societal exclusion cannot be narrowly based on the socioeconomic status of minority residents.

Consumer complaint rates are often used to understand how victimization rates differ between different communities; with self-selection in complaining, such inferences would be misleading. Weighting complaints based on the propensity to complain is one way to adjust for self-selection; communities that are less likely to complain relative to their rate of victimization would receive greater weight. I use my empirical estimates to construct such weights and find that complaint rates from majority black areas should receive about double the weight of the median zip code for their complaint rates to match the level of victimization.

I then use these weights to construct an implied victimization rate by multiplying 2015 aggregate fraud complaint rates from Consumer Sentinel across U.S. communities by these weights to reflect the degree of victimization. Although the aggregate complaint rate is similar in heavily black communities, compared with communities with few blacks, heavily black areas have almost triple the implied victimization rate. The aggregate complaint rate is about 50% lower in heavily Hispanic communities than areas with few Hispanics, whereas the implied victimization rates in Hispanic areas follow an inverse U-shaped pattern, with the highest rates in moderately Hispanic communities. My implied victimization rates are consistent with evidence from victimization surveys that have found much higher rates of victimization for minorities (Anderson 2007, 2013).

This paper relates to a large body of work examining consumer complaining behavior. Although a large body of empirical work has examined how demographics affect complaint behavior, it does not control for victimization (Oster 1980, Singh 1989, Garrett and Toumanoff 2010, Ayres et al. 2013). Thus, it is unsurprising that Garrett and Toumanoff (2010) found that the literature is divided on how demographics such as age, income, education, and race affect the likelihood of consumer complaint. Hirschman's (1970) major question was how market structure affected the likelihood that consumers used voice as opposed to exit; Gans et al. (2017) built a model based on Hirschman's (1970) work that predicted more complaints in more concentrated markets, and found evidence for the model's predictions using tweets to U.S. airlines.

In addition, a more recent literature has examined consumers' reviews on online platforms. Two recent

170

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

papers focused on accounting for selection in negative reviews. Nosko and Tadelis (2015) showed that buyers on eBay typically do not post negative reviews, and that a measure of seller quality based on the fraction of purchases with a review can help to promote higher quality sellers. Fradkin et al. (2017) showed that negative experiences are underreported on Airbnb, and that either paying consumers to review or having sellers and buyers simultaneously review can reduce this underreporting.[2]

This paper proceeds as follows. Section 2 details the legal cases and demographics used in this paper, whereas Section 3 shows how the demographics of complaining consumers compare with those of victims. Section 4 tests explanations for why victims from heavily minority areas are less likely to complain than victims from other areas. Section 5 provides a solution to the problem of self-selection through weighting. Section 6 then concludes.

## 2. Data

The foundation of this paper is a set of legal cases for which I have data on the companies' affected consumers from consumer databases together with complaints for the same companies, and for which I can match consumers to area demographics at the zip code level. Below, I detail the Census demographics and legal cases that I use in the analysis.

### 2.1. Census Demographics

For demographics, I use information at the five-digit zip code level from the 2008–2012 American Community Survey.

I examine several demographic factors that likely proxy for cultural and economic factors that could affect the likelihood that a consumer complains. I first include ethnic demographics, including the fraction of the zip code population that is black, the fraction that is of Hispanic origin, and the fraction that is Asian. I also include the percentage of the zip code's population located in an urban area.

Second, I use information on the economic and family situations of the zip code, including the median household income, median household size, median age, the unemployment rate, and the fraction of the zip code population that is college educated. These factors could affect complaining for several reasons. First, filing a complaint takes time, and so consumers with a higher cost of time, such as those with a higher income, who are employed, or who have kids, might be less likely to complain. On the other hand, poorer consumers may have more pressing concerns, such as food, housing, or safety, than consumer fraud. Another reason for different complaint rates could be knowledge of the appropriate authorities to complain to; college-educated consumers might be more likely to be informed about

authorities that receive consumer complaints and seek to remedy problems.[3]

I exclude zip codes belonging to post office (P.O.) boxes and unique organizations (such as businesses or universities that have their own zip codes) and zip codes with populations of less than 100 in 2010.[4] I also exclude zip codes missing the Census demographic variables described above. This process leaves a set of 28,604 zip codes that I use for my main analyses.

### 2.2. Legal Cases

I match these zip code–level demographics to data from nine legal cases. For each case, I have data from consumer databases detailing the victims of the case as well as consumer complaints about the company involved in the case. To obtain these cases, staff at the Federal Trade Commission undertook a search of recent cases involving violations of consumer protection laws.[5] To be included in this paper, a given case had to have data from a customer database as well as a list of consumer complaints. To have power for statistical analysis, I required that there were at least 150 consumer complaints on the company. In addition, the litigation with the company must have been completed (all defendants either settled or a final judgment was entered), and there could be no legal restrictions barring the use of the data. This process led to nine legal cases to use in the analysis.

Consumer complaints come from the Consumer Sentinel Network, which collects data on consumer complaints from several sources: federal government agencies such as the Federal Trade Commission and Consumer Finance Protection Bureau (CFPB), private actors such as the Better Business Bureau (BBB), and state and local government agencies.[6] For each legal case, I obtain complaints either by direct searches of the Consumer Sentinel database using company names or from the set of complaints used by law enforcement authorities as part of the case.[7] I include only victims and complaints that report a zip code that can be matched to the set of zip codes I detail in Section 2.1.

I summarize the differences across these cases in Table 1. In Appendix A, I provide further details on the cases, including short descriptions and links to further information. In Table 1, I display the number of victims and the number of complaints for each case that can be matched to zip codes with full demographic data, as well as the complaint-to-victim ratio. In addition, I have included an approximate average loss for consumers based on information from either the FTC legal complaint in the case or from redress data, as well as a simple description of the case. Across the nine cases, the number of victims, the complaint-to-victim ratio, and the average loss vary substantially.

The first five cases—labeled Case B,[8] Ideal, Platinum, WinFixer, and SimplePure—have large numbers of

**Raval:** *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Table 1.** Cases with Victim Lists

| Case | Number of victims | Number of complaints | Complaints per 1,000 victims | Average loss | Case description |
|------|------------------|---------------------|------------------------------|--------------|------------------|
| Case B | 12,311,307 | 4,271 | 0.35 | ≈$40–$90 | |
| Ideal | 2,010,169 | 1,403 | 0.70 | ≈$30–$40 | Payday loan applications |
| Platinum | 69,576 | 510 | 7.3 | ≈$110 | Payday loan applications |
| WinFixer | 304,493 | 1,062 | 3.5 | ≈$60 | Computer security |
| SimplePure | 681,124 | 650 | 0.95 | ≈$90 | Dietary supplements |
| AdvStrategy | 11,361 | 322 | 28.3 | ≈$2,200 | Business opportunity |
| Guidance | 6,696 | 193 | 28.8 | ≈$1,600–$8,000 | Business coaching |
| MoneyNow | 1,801 | 259 | 143.8 | ≈$2,800 | Business opportunity |
| PHLG | 2,641 | 289 | 109.4 | ≈$500 | Money transfer for imposter scams |

*Notes.* The number of victims and number of complaints reflect all victims and complaints that can be matched to zip codes in Section 2.1 after duplicate entries are removed. The average loss per victim is approximate and based on available information from the FTC legal complaint, press releases, or redress information.

victims, low complaint-to-victim ratios, and a low average loss per victim. Case B has over 12 million victims, and Ideal 2 million victims, whereas Platinum, WinFixer, and SimplePure have between 50,000 and 1 million victims each. The number of complaints ranges from 0.35 to 7.3 complaints per 1,000 victims across cases, whereas the average victim loss for these cases ranges roughly between $30 and $110.

The remaining four cases—labeled AdvStrategy, Guidance, MoneyNow, and PHLG—each have a much smaller number of victims, a much higher complaint-to-victim ratio, and a large average loss per victim. The number of victims across cases ranges between 1,800 and 7,000 victims. The number of complaints ranges between 25 and 150 complaints per 1,000 victims, whereas the average loss per victim is about $500 in the PHLG case, and over $2,000 in the other three cases.

Beyond these massive differences in the number of victims, the complaint-to-victim ratio, and average loss per victim, the different cases reflect a wide variety of different alleged fraudulent activity. The Ideal and Platinum cases were based on defrauding victims who filed payday loan applications, the WinFixer case was about spyware and computer security scans, and the SimplePure case was about advertising and purchasing herbal supplements. Guidance, MoneyNow, and AdvStrategy were all cases involving business opportunities or business coaching, whereas the PHLG case involved the money transfer element of imposter scams.

## 3. Are the Demographics of Complainants and Victims Different?

In this section, I first show that controls for victimization are necessary because victim demographics vary substantially across the different cases. I then use the set of legal cases to show how the demographics of complainants differ from those of victims, and I find that residents of heavily minority areas complain less than residents of other areas relative to their degree of victimization.

### 3.1. Why Control for Victimization?

Because the degree of victimization varies across demographic groups, the demographics of complainants will, in general, be different from the demographics of the general population even without any selection in who complains. I show in this section that the demographics of victims vary across cases, and that the demographics of victims affect the demographics of complaints. Thus, after controlling for victimization through the ratio of complaints to victims, I can examine how the propensity to complain varies across demographics.

Differences in the demographics of victims across cases likely reflect the behavior at issue in these cases, and make it important to control for victimization to examine complaining behavior. For example, victims in the Ideal and Platinum cases applied for payday loans; victims in the MoneyNow, Guidance, and AdvStrategy cases wanted to create their own businesses; victims in the WinFixer case had to have computers to have spyware; and victims in the SimplePure case were interested in purchasing dietary supplements.

In Figure 1, I demonstrate these differences by showing the per-capita victim rate from majority black zip codes across the legal cases. I define the victim rate as the number of victims in a zip code divided by the 2010 Census population. Because the absolute number of victims varies widely across cases, I normalize the victim rate in majority black areas by dividing by the overall average victim rate for the case; in both cases, I weight across zip codes using population weights. A value of one thus indicates that majority black zip codes have the same per-capita victim rate as the average across all zip codes. Bars in black represent the normalized victim rate for zip codes with a greater than 50% black population.

Four cases have substantially larger per-capita victim rates from majority black zip codes relative to national averages. The per-capita victim rate in majority black zip codes is 50% higher than national averages for Case B, 120% higher for PHLG, 162% higher for Ideal, and 185% higher for Platinum. In the

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

172

**Figure 1.** (Color online) Victim and Complaint Rates for Majority Black Zip Codes, Relative to National Averages, Across Cases



*Notes.* The graph depicts the victim rate (in black) and complaint rate (in grey) for majority black zip codes, for each of the nine legal cases, relative to the corresponding national average (where the national average is the population-weighted average across zip codes). The blue, dashed vertical line indicates a value of one, so majority black zip codes have the same complaint or victim rate as the national average.

SimplePure, WinFixer, AdvStrategy, and MoneyNow cases, the per-capita victim rates from majority black zip codes are similar to national averages. The per-capita victim rate in majority black zip codes is 22% lower for Guidance.

These differences in victim rates also affect per-capita complaint rates. The grey bars in Figure 1 represent the average normalized complaint rates for zip codes with a greater than 50% black population. I define the complaint rate in the same way as the victim rate. The complaint rate is the number of complaints in a zip code divided by the 2010 Census population; I normalize by dividing by the overall average complaint rate in the case and use population weights. For the cases with much larger per-capita victim rates from majority black zip codes, the per-capita complaint rate from majority black zip codes is 82% higher than the national average for Ideal, 42% higher than the national average for Platinum, and 145% higher than the national average for PHLG. Thus, differences in complaint rates do not solely reflect differences in the propensity to complain across demographic groups.

I control for victimization by examining the complaint rate divided by the victim rate, which I call the complaint-to-victim ratio, for majority black or Hispanic zip codes. I normalize this by dividing by the national average for each case, so values less than one indicate that the number of complaints to victims is lower for these zip codes compared with the

national average. Figure 2 depicts these estimates. The complaint-to-victim ratio is higher for majority black zip codes than national averages for only one case, PHLG, and is higher for majority Hispanic zip codes than national averages for two cases, Guidance and PHLG. In all of the other cases, the complaint-to-victim ratio is 13% to 67% lower in majority black zip codes relative to national averages, and 13% to 49% less in majority Hispanic zip codes relative to national averages. Thus, I consistently find lower complaint-to-victim ratios in majority black or Hispanic areas compared with the national average across the different legal cases.

### 3.2. Which Demographic Communities Have a Higher Propensity to Complain?

In Figure 2, I showed that, for most of the legal cases, majority black and Hispanic communities have lower numbers of complaints relative to victims compared with national averages. However, any differences in complaining behavior could be due to other factors, such as differences in income and education across communities. Thus, I now examine all of the demographic characteristics in Section 2.1 and show that heavily black and Hispanic communities continue to have less complaints relative to their victimization rates compared with nonminority communities, after controlling for other demographic characteristics.

I do so by jointly modeling the per-capita complaint rate and per-capita victim rate for each company at

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Figure 2.** (Color online) Complaint-to-Victim Ratios for Majority Black and Hispanic Zip Codes, Relative to National Averages, Across Cases



*Notes.* The graph depicts the complaint-to-victim ratios (the complaint rate divided by the victim rate) from majority black zip codes (in black) and majority Hispanic zip codes (in grey), for each of the nine legal cases, relative to the national average in the same case (where the national average is the population-weighted average across zip codes). The blue, dashed vertical line indicates a value of one, so majority black or Hispanic zip codes have the same ratio of complaint rate to victim rate as the national average.

the zip code level. I identify differences in complaining behavior across communities through the differential effect of demographics on the complaint rate relative to the victim rate. To estimate this specification, I first construct a data set with two observations for each zip code–company combination, the per-capita complaint rate and victim rate. I include all 28,604 zip codes detailed in Section 2.1 for all nine companies. I then estimate the following panel logit model:

$$y^*_{ijk} = \sum_s (\beta^j_s + \gamma_{ks}) D_{is} + \delta^j_k + \eta^j \log(Pop_i) + \rho_i + \epsilon_{ijk}. \quad (1)$$

In the equation above, $i$ represents zip code, $j$ represents whether the observation reflects a complaint rate or victim rate, and $k$ represents the company. The dependent variable $y^*_{ijk}$ is a latent variable for the complaint rate or victim rate. I include all of the demographic variables mentioned in Section 2.1 in $D_{is}$. The variables included are the percentage of black residents, the percentage of Hispanic residents, the percentage of Asian residents, the percentage of urban residents, the local unemployment rate, and the percentage of college graduates, as well as, in logarithmic form, the median age, median household income, and median household size.

My main goal is to understand how the complaint rate and victim rate vary with demographics; $\beta^j_s$ allow each demographic variable $D_{is}$ to separately affect the

complaint rate and the victim rate. Because the complaint-to-victim ratio is the ratio of the complaint rate and victim rate, the difference $\beta^C_s - \beta^V_s$ indicates how demographics affect the complaint-to-victim ratio.[9]

The effect of demographics can vary by company as well, to capture the differences shown in the previous subsection, through $\gamma_{ks}$. I also allow the complaint rate and victim rate to differ by company through $\delta^j_k$. Finally, $\eta^j$ allow the zip code's population to affect the complaint rate and the victim rate. I also include zip code random effects in $\rho_i$. All observations are weighted using 2010 Census population weights. The coefficients from this regression, and all other models estimated in this paper, are detailed in Online Appendix D.[10]

In Figure 3, I depict the estimated percentage change in the complaint-to-victim ratio from changing each of the demographic factors. The $y$ axis indexes a change in each of the demographic factors. For each such factor, I plot the mean effect and the confidence interval around that mean. A null effect indicates that changing a demographic factor affects the victim rate and complaint rate symmetrically, after controlling for all other demographic variables, and so the complaint-to-victim ratio remains constant.

Residents of heavily minority communities have much lower numbers of complaints relative to victims. The complaint-to-victim ratio falls by 61% as the percentage of black residents in the zip code increases from 0% to

**Raval:** *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Figure 3.** (Color online) Percentage Change in Complaint-to-Victim Ratio by Demographic Factors



*Notes.* The graph depicts the estimated percentage changes in the complaint-to-victim ratio (the complaint rate divided by the victim rate) for changes in different demographic factors, as well as the associated 95% confidence intervals. The blue, dashed vertical line indicates a value of zero, so changing the demographic factor does not differentially affect the complaint rate and victim rate, and so the complaint-to-victim ratio is constant. HH, Household; inc., increase; unemp., unemployment.

100%, and by 43% as the percentage of Hispanic residents in the zip code increases from 0% to 100%. The associated confidence intervals imply selection effects for complaining that are greater than 25%.

I find smaller selection effects for the other demographic variables. The estimates indicate that the complaint-to-victim ratio rises by 31% with a 100% increase in median income, falls by 31% with the percentage of the zip code that is urban rising from 0% to 100%, and rises by 4% with a one percentage point increase in the local unemployment rate. The confidence intervals for these effects exclude zero. In addition, the complaint-to-victim ratio falls by 33% with a 100% increase in median household size, rises by 10% as the percentage of residents with a college education increases from 0% to 100%, and falls by 4% with a 100% increase in the median age, although I cannot reject null effects for these variables.

I examine the robustness of the main finding of lower numbers of complaints relative to victims as the fraction of minority residents rises by estimating (1) for each company individually.[11] In Figure 4, I depict the effects across cases; the *y* axis in each panel indexes different cases, and the red solid and dotted vertical lines depict the estimated effect and confidence interval using all companies. For the percentage of black residents, I find a small (18%) and insignificant reduction in the complaint-to-victim ratio when moving from a 0% to 100% black community for only one

case (PHLG). For all of the other eight cases, the estimates indicate a 49% to 88% reduction in the number of complaints relative to the number of victims as the percentage of black residents increases from 0% to 100%.

For the percentage of Hispanic residents, I estimate small (22% to 23%) increases in the complaint-to-victim ratio when moving from a 0% to 100% Hispanic community for only two cases (PHLG and Guidance), although these are measured with considerable error and I cannot reject either null effects or large negative effects. For all of the other seven cases, the number of complaints relative to the number of victims fall by 38% to 73% as the percentage of Hispanic residents increases from 0% to 100%. The confidence intervals imply significant nonzero effects for six of nine cases for heavily black communities, and five of nine cases for heavily Hispanic communities.

To sum up, I find strong evidence that residents of heavily black and heavily Hispanic areas complain at lower rates than those of nonminority areas compared with their levels of victimization. These effects are consistent across cases and are generally statistically significant.

## 4. Why Do Victims From Heavily Minority Areas Complain at Lower Rates?

In the previous section, I demonstrated that residents of heavily minority areas have lower complaint rates

**Figure 4.** (Color online) Percentage Change in Complaint-to-Victim Ratio by Racial Demographics



*Notes.* The graphs depict the estimated percentage changes in the complaint-to-victim ratio, or the complaint rate divided by the victim rate, for changes in different demographic factors, as well as the associated 95% confidence intervals. The red, solid vertical lines depict the mean effect using all companies depicted in Figure 3, whereas the red, dotted vertical lines depict the 95% confidence intervals around this effect. The blue, dashed vertical lines indicates a value of zero, so changing the demographic factor does not differentially affect the complaint rate and victim rate, and so the complaint-to-victim ratio is constant.

than residents of other areas relative to their rates of victimization. In this section, I examine potential explanations for this finding based on information or social trust. I do not find evidence for explanations based on differences in information or based on mistrust of government. I do find limited evidence that differences in social trust based on alienation from society could explain a lower propensity to complain for residents of minority areas.

### 4.1. Information

Differences in a consumer's information set can affect complaining behavior in two major ways. First, consumers may not know that they have been defrauded. Take, for example, the Ideal case, in which Ideal bought payday loan application details and charged consumers without providing any service. Consumers may not have checked their bank statements and seen the payments to Ideal Financial, or may not have realized that they never received any services from Ideal. Second, some consumers may not know who to complain to, or how to complain. They may thus only complain to the company involved, and not to the BBB or consumer protection agencies.

I examine both of these explanations by using the variation across cases in the average amount of loss. I compare the five cases with an average amount of loss between $30 and $110 (Case B, Ideal, WinFixer, Platinum, and SimplePure) to the three cases with an

average loss above $2,000 (Guidance, AdvStrategy, and MoneyNow).[12] All three of the latter cases were business opportunity or business coaching cases where victims never received the promised business opportunity. With an average loss an order of magnitude larger than that in the first five cases, victims will almost certainly know they were victimized. In addition, given the large losses they suffered, victims would likely be willing to spend time to research who they should complain to to recoup their losses, if their reason for not complaining was that they did not know who to complain to. With a small loss, it may not be worth the time or effort to find out who to complain to. As Table 1 shows, the aggregate complaint-to-victim ratios are one to two orders of magnitude higher on average for the large-loss cases than for the small-loss cases.

I estimate (1) separately for the large-loss and small-loss cases and depict the percentage changes in the complaint-to-victim ratio for the percentage black and the percentage Hispanic in the first two rows of Figure 5. Black circles depict the percentage changes from an increase in the fraction of black residents from 0% to 100%, and grey triangles depict the percentage changes from an increase in the fraction of Hispanic residents from 0% to 100%. Heavily minority communities have lower complaint rates, relative to their rates of victimization, for both large-loss and small-loss cases. The complaint-to-victim ratio falls by 52% as the share of black residents increases from 0% to

**Raval:** *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Figure 5.** (Color online) Percentage Change in Complaint-to-Victim Ratio by Demographic Factors



*Notes.* The graph depicts the percentage changes in the complaint-to-victim ratio for the percentages of black residents (black circles) and Hispanic residents (grey triangles) across different specifications. The first row represents estimates for the small-loss cases (combining Case B, Ideal, WinFixer, Platinum, and SimplePure), whereas the second row represents estimates for the large-loss cases (combining Guidance, AdvStrategy, and MoneyNow). The third row represents estimates using only government (Govt) complaints, and the fourth row those using only BBB complaints, for all cases except PHLG and WinFixer. The fifth row represents estimates using only government complaints, and sixth row those using only BBB complaints, for the Ideal case. The blue, dashed vertical line indicates a value of zero, so changing the demographic factor does not differentially affect the complaint rate and victim rate, and so the complaint-to-victim ratio is constant.

100% using the small-loss cases, compared with 80% for the large-loss cases. The complaint-to-victim ratio falls by 76% as the share of Hispanic residents increases from 0% to 100% using the small-loss cases, compared with 47% for the large-loss cases. Thus, the selection effects are substantial and statistically significant for both small-loss and large-loss cases for both the percentage of blacks and the percentage of Hispanics.

## 4.2. Alienation, Trust, and Social Capital

Another potential explanation for lower complaint rates in heavily minority communities is that residents of those communities are alienated from mainstream institutions, or from society more generally. For example, Orlena Blanchard, speaking about her experience in marketing to black communities at the 2016 FTC Changing Consumer Demographics workshop,[13] noted the following:

> [Y]ou're wondering why you don't get a lot of reporting from the African American community, or it doesn't compare in terms of reporting fraud or anything like that, you have to wonder why. And you have to look very deeply in to sort of the lifestyle and experience and cultural identity as to why.... And thinking about really trust issues and consideration for government agencies and where they see themselves in terms of having an equal place in society as

citizens.... When picking up the phone to report or considering that they have just as much right to report an issue and feel that they're going to get an equal response that any other citizen would get. This is a really important consideration for this particular group.

Considerable qualitative and quantitative evidence indicates that members of minority groups have lower levels of trust than whites. The GSS regularly asks a question on trust: "Generally speaking, would you say that most people can be trusted or that you can't be too careful in dealing with people?" (GSS Data Explorer 2019). This measure has become a standard measure of trust, and is known to be lower for blacks relative to whites (Brehm and Rahn 1997, Glaeser et al. 2000, Putnam 2001, Alesina and La Ferrara 2002). In the first three rows of Table 2, I report the proportion of people that say that one "can trust" by race and ethnicity using data from 2000 and after, as well as related questions that ask whether people will try to be fair or try to take advantage (Fairness), and whether people usually try to be helpful or are mostly looking out for themselves (Helpfulness). For all three questions, there is a substantial racial gap, with blacks and Hispanics having much lower levels of trust than non-Hispanic whites. For example, 39% of whites say that one usually can trust people, compared with 16% of blacks and 17% of Hispanics. For fairness, 57% of whites think that people are generally fair, and 50% that

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Table 2.** Beliefs on Trust From the General Social Survey by Race and Ethnicity

| Variable | Non-Hispanic white | Non-Hispanic black | Hispanic |
|---|---|---|---|
| *Trust* | 0.39 | 0.16 | 0.17 |
| | (0.005) | (0.008) | (0.009) |
| *Fairness* | 0.57 | 0.33 | 0.39 |
| | (0.005) | (0.011) | (0.012) |
| *Helpfulness* | 0.50 | 0.36 | 0.32 |
| | (0.005) | (0.011) | (0.012) |
| *Trust in government administrators* | 0.24 | 0.26 | 0.31 |
| | (0.009) | (0.019) | (0.02) |
| *Trust people in government* | 0.24 | 0.25 | 0.30 |
| | (0.008) | (0.018) | (0.02) |

*Notes.* All variables are from the GSS. *Trust* is defined as individuals saying they "can trust" people, for the *trust* variable; *Fairness* is defined as individuals saying that people are generally fair, using the *fairness* variable; and *Helpfulness* is defined as individuals saying that people mostly try to be helpful, using the *helpful* variable. *Trust in government administrators* is defined as individuals saying they strongly agree or agree that most government administrators can be trusted to do what is best for the country using the *poleff17* variable, and *Trust people in government* is defined as people saying strongly agree or agree that most of the time we can trust people in government using the *govdook* variable. *Trust*, *Fairness*, and *Helpfulness* use all GSS years between 2000 and 2016; *Trust in government administrators* is based on the 2006, 2012, and 2016 GSS years; and *Trust people in government* is based on the 2004, 2010, and 2014 GSS years. Estimates take into account sample weights, and standard errors are in parentheses.

they are generally helpful, compared with 33% and 39% for blacks and 36% and 32% for Hispanics. These racial gaps in trust survive extensive controls; for example, Alesina and La Ferrara (2002) report a 24 to 26 percentage point gap between whites and blacks on trust after controlling for income, education, sex, age, marital status, and religion, among other covariates.

The qualitative literature in sociology and marketing has also found evidence that members of minority groups experience more alienation from society and have less trust. Anderson (2000, p. 287), examining poor black communities in North Philadelphia, contrasts between "decent" families, who adopt more mainstream values, and "street" families, who adopt an "oppositional culture [that] is a product of alienation." This alienation may be due to lower self-efficacy (Bandura 1977), where minorities do not believe they can successfully navigate mainstream institutions, or learned helplessness (Seligman 1975), in which past negative experiences have left minorities to conclude that engaging with mainstream institutions is fruitless. For examples of both of these channels, Bone et al. (2014) report that minorities seeking business financing are less likely than whites to receive information on loan terms, more likely to be asked for documentation and financial statements, more likely to see obtaining financing as an uphill journey in which they are in a subservient position, and more likely to experience rejection negatively if they are primed to think about race. Such alienation does not have to be associated with members of minority groups; for example, MacLeod (2018) follows a set of low-income white friends who are extremely alienated from mainstream values and society and a set of low-income

black friends who are not. However, such alienation is likely more prevalent in minority communities.

The lack of trust documented above could also lead minorities to feel that victimization is normal and thus their own fault for being too trusting, rather than abnormal and worth correcting by complaining to the authorities. For example, Anderson (2000, p. 36–37) describes the alienated worldview of the most extreme of street families as follows:

> Highly alienated and embittered, they exude generalized contempt for the wider scheme of things and for a system they are sure has nothing but contempt for them.... For them, people and situations are best approached both as objects of exploitation and as challenges possibly "having a trick to them," and in most situations their goal is to avoid being "caught up in the trick bag." Theirs is a cynical outlook, and trust of others is severely lacking, even trust of those they are close to.

I examine multiple different channels through which a lack of trust could affect complaint rates. First, members of minority groups may mistrust the government in the sense that government officials will misuse information given to them and will not do the best they can. Second, they may feel that sending a complaint may not make a difference, either because it is not possible to improve things or that their complaint will benefit a society which they feel excluded from. I find evidence against the first explanation of governmental mistrust.

**4.2.1. Mistrust of Government.** One way a lack of trust could reduce complaint rates from minority areas is that residents of these areas mistrust the government.

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

The GSS asks multiple questions in particular years about mistrust of government officials. One question asks whether most government administrators can be trusted to do what is best for the country, whereas another asks whether most of the time we can trust people in government. Blacks and Hispanics are more likely to express trust in government administrators or trust in people in government. In the last two rows of Table 2, I report the proportions of people that agree and strongly agree in response to these questions by race and ethnicity. Twenty-six percent of blacks and 31% of Hispanics agree or strongly agree that one can trust government administrators, and 25% of blacks and 30% of Hispanics agree or strongly agree that one can trust people in government, compared with 24% of whites for both questions.[14] The lack of a racial gap for questions specifically on trust in government cast some doubt that mistrust of government can explain lower complaint-to-victim ratios in minority areas.

Another way to test this explanation is by examining which organizations complainants complain to. If mistrust of government is the reason for lower complaint rates relative to victim rates in minority areas, one would expect more selection in complaining to the nongovernmental BBB than to government sources.[15] I test this proposition using data from seven cases for which I can identify the source of the complaint for all complaints.[16] For these cases, examining only government or BBB complaints, government complaints are 55% of complaints for AdvStrategy, 4% for Case B, 59% for Guidance, 54% for Ideal, 85% for MoneyNow, 46% for Platinum, and 79% for SimplePure.

I then estimate (1) separately using only BBB complaint rates or only government complaint rates, after excluding the PHLG and WinFixer cases. In the third and fourth rows of Figure 5, I depict the change in the complaint-to-victim ratio for government complaints compared with BBB complaints. I find similar selection in complaints received by both groups. The complaint-to-victim ratio falls by 82% for government complaints, compared with 51% for BBB complaints, as the percentage of black residents rises from 0% to 100%, and falls by 58% for government complaints, compared with 71% for BBB complaints, as the percentage of Hispanic residents rises from 0% to 100%.

The share of government complaints can be imbalanced across cases—only 4% for Case B, and 79% for SimplePure, for example, which could affect the estimates detailed above if the degree of selection in complaining varies across cases. I thus also estimate (1) using only Ideal Financial complaints, as this case had both large numbers of complaints and victims and a balanced share of government and BBB complaints. In this specification, I again use either government complaint rates or BBB complaint rates when

estimating (1). These results are depicted in the fifth and sixth rows of Figure 5; I continue to find substantial selection in complaining for both BBB and government complaints. Using only Ideal data, the complaint-to-victim ratio falls by 70% for government complaints, compared with 63% for BBB complaints, as the percentage of black residents rises from 0% to 100%, and falls by 58% for government complaints, compared with 74% for BBB complaints, as the percentage of Hispanic residents rises from 0% to 100%. Thus, for the Ideal case, I cannot reject that the degree of selection in complaining is the same for government and BBB complaints.

**4.2.2. Interactions with Education or Income.** A different channel for how lower levels of trust or social capital could affect complaining behavior is that residents of minority communities feel excluded from mainstream institutions, feel that complaints will not benefit their community, or that victimization is normal and so not worth complaining about. The sociological literature finds that such alienation is more likely in poorer, less educated communities. For example, Anderson (2000) finds that the share of alienated "street" families increases as the author ventures to poorer parts of the black community in Philadelphia. Because poorer, less educated minority areas have larger proportions of such alienated residents, we might expect even larger declines in complaint rates in such localities.

I test this proposition by estimating a set of interaction models. In each model, I interact the percentage of black residents and percentage of Hispanic residents with a different variable—the (logged) median household income, the percentage of residents in poverty, the share of college-educated graduates, or the average credit score. I examine credit score because economists have viewed credit score as a measure of social capital (Bricker and Li 2017).[17] I estimate models with interactions by reestimating (1) including both variables and their interaction as part of the set of demographic variables $D_{is}$.

I present these estimates in Figure 6 by reporting the effect of changing the percentage of black residents, or percentage of Hispanic residents, from 0% to 100% at different values of the interaction variable. I find that the complaint rate falls relative to the victimization rate as the percentage of minority residents rises for both low-income, low-education, and low-credit-score areas, as well as for high-income, high-education, and high-credit-score areas. In general, the estimates of interactions are imprecise, and I cannot reject the hypothesis that the selection effects I estimate are the same for both more disadvantaged and less disadvantaged areas. Whereas effects for Hispanic residents in general indicate less selection in

**Raval:** *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Figure 6.** (Color online) Percentage Change in Complaint-to-Victim Ratio by Racial Demographics, with Interactions



*Notes.* The graph depicts the estimated percentage changes in the complaint-to-victim ratio, or the complaint rate divided by the victim rate, for changes in the percentage of black residents (black circles) or Hispanic residents (grey triangles), as well as the associated 95% confidence intervals at different levels of a given interaction variables. The blue, dashed vertical line indicates a value of zero, so changing the demographic factor does not differentially affect the complaint rate and victim rate, and so the complaint-to-victim ratio is constant. HH, Household; Avg, average; Pct, percentage.

complaining in more advantaged areas (with the largest effect for college education), selection effects for black residents sometimes increase when conditioning on a more advantaged area.

The complaint-to-victim ratio falls by 61% as the percentage of black residents in the zip code increases from 0% to 100% for a median household income of $30,000, compared with 66% for a median household income of $100,000. The complaint-to-victim ratio falls by 49% as the percentage of Hispanic residents in the zip code increases from 0% to 100% for a median household income of $30,000, compared with 38% for a median household income of $100,000. For high-poverty areas (30% poverty share), the complaint-to-victim ratio falls by 55% as the percentage of black residents rises from 0% to 100%, and by 45% as the percentage of Hispanic residents rises from 0% to 100%. For low-poverty areas (5% poverty share), the complaint-to-victim ratio falls by 70% as the percentage of black residents rises from 0% to 100%, and by 34% as the percentage of Hispanic residents rises from 0% to 100%. For low-credit-score areas (an average credit score of 630), the complaint-to-victim ratio decreases by 60% as the percentage of black residents rises from 0% to 100%, and by 48% as the percentage of Hispanic residents rises from 0% to 100%. For medium-credit-score areas (an average credit score of 710), the complaint-to-victim ratio falls by 82% as the percentage of black residents rises from 0% to 100%, and by 46% as the percentage of Hispanic residents rises from 0% to 100%.[18]

The interaction with college education is the only interaction for which the selection effect is smaller for both the percentage of black residents and percentage of Hispanic residents in more advantaged areas. At a percentage of college-educated residents of 10%, the complaint-to-victim ratio falls by 66% as the percentage of black residents rises from 0% to 100%, and by 53% as the percentage of Hispanic residents rises from 0% to 100%. For areas with a college-educated percentage of 60%, the complaint-to-victim ratio falls by 53% as the percentage of black residents rises from 0% to 100%, and by 23% as the percentage of Hispanic residents rises from 0% to 100%. The Hispanic selection effect is insignificantly different from zero for areas with a college-educated percentage of 60%, although it is also insignificantly different from the effect for areas with a college-educated percentage of 10%.

**4.2.3. Hispanic-Specific Explanations.** For Hispanic victims specifically, language barriers or fears of immigration enforcement could also lead to lower complaint rates. The FTC and other government agencies take complaints in Spanish both over the phone and online, but Hispanic victims may be unaware of this fact and so may be less likely to complain. Another specific reason for mistrust of government could be fear that information provided to law enforcement authorities could be used for immigration enforcement. For example, Alsan and Yang (2018) find that the take-up of

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

government programs such as food stamps and the Affordable Care Act decline with increases in immigration enforcement.

I examine these concerns by interacting the percentage of Hispanic residents with the percentage of foreign-born residents, or with the percentage of residents speaking a language other than English, with a similar specification to the interaction models described above.[19] In Figure 7, I depict these results. Although the standard errors around these effects are somewhat imprecise, I find results inconsistent with either a language barrier or immigration enforcement explanation; the sign of the selection effect reverses for areas with a high proportion of foreign-born residents, or residents speaking another language. The complaint-to-victim ratio falls by 57% as the percentage of Hispanic residents rises from 0% to 100% in areas where 10% of the population is foreign born, compared with a 52% *rise* in areas where 50% is foreign born. Similarly, the complaint-to-victim ratio falls by 45% as the percentage of Hispanic residents rises from 0% to 100% in areas that have 10% of the population speaking another language, compared with a 20% rise in areas that have 50% of residents speaking another language. These results could be consistent with an explanation of alienation, if second- or third-generation Hispanics are more alienated than first-generation Hispanic immigrants.

## 5. How Can One Account for Self-Selection in Complaining?

The evidence above demonstrates that communities with different demographic groups complain at substantially different rates relative to their degree of victimization. This type of self-selection may distort inferences that policy makers make from complaint data. Take, for example, a policy maker that wants to know whether victimization rates are higher in minority communities and uses average complaint rates as a proxy for victimization.

In Figure 8, I plot how complaint rates vary across communities with different concentrations of blacks and Hispanics using all fraud-related complaints to Consumer Sentinel Network in 2015; Raval (2018) provides a more detailed analysis of how aggregate complaint data vary with demographics, and how this relationship varies by product category and data contributor.[20] The black solid and grey dashed lines depict the average complaint rates for communities defined by their shares of population that are black and Hispanic, respectively. The estimates are based on a nonparametric Locally Estimated Scatterplot Smoothing (LOESS) regression, with the grey area surrounding each graph representing the 95% confidence interval.

Although the average complaint rates are not monotonic, Figure 8 demonstrates that the average complaint rate tends to be lower in areas with a greater

**Figure 7.** (Color online) Percentage Change in the Complaint-to-Victim Ratio with Hispanic-Specific Interactions



*Notes.* The graph depicts the estimated percentage change in the complaint-to-victim ratio, or the complaint rate divided by the victim rate, for changes in the percentage of Hispanic residents, as well as the associated 95% confidence interval, at different levels of a given interaction variable. The blue, dashed vertical line indicates a value of zero, so changing the demographic factor does not differentially affect the complaint rate and victim rate, and so the complaint-to-victim ratio is constant. Pct, Percentage.

**Raval:** *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Figure 8.** Complaint Rates For Black and Hispanic Communities in 2015



*Notes.* The graph depicts the nonparametric LOESS regression of the zip code per-capita complaint rate on the share of the population that is black or Hispanic in the zip code, based on all 2015 fraud complaints to Consumer Sentinel. Black solid line reflects the percentage of black residents, and grey dashed line reflects the percentage Hispanic residents.

share of Hispanic residents. After a small rise in complaint rates from areas that are close to 0% to 15% Hispanic, the complaint rate steadily falls as areas become more Hispanic. Communities that are close to 100% Hispanic have about half the complaint rate of areas that are 0% Hispanic. For black communities, by contrast, the complaint rate is much more constant with respect to the share of the population that is black. Communities that are almost 100% black have less than a 1% higher complaint rate than communities that are 0% black.

A policy maker might take away from Figure 8 that victimization is lower in heavily Hispanic areas, and similar in heavily black areas. However, the previous section demonstrated that complaint rates can diverge substantially from victimization rates, and victims in heavily minority areas are much less likely to complain, so one cannot simply take complaints as a proxy for victimization.

One way to account for self-selection in complaints to reflect victimization is through statistical weighting. Such weights would overweight complaints from groups that complain less than their rate of victimization, relative to national averages. I construct such weights $w_i$ for each zip code $i$ as follows. The per-capita victim rate in a given zip code $i$, $r_i^V$, is equal to the per-capita complaint rate in zip code $i$, $r_i^C$, multiplied by the ratio of the victim rate and the complaint rate:

$$r_i^V = r_i^C \frac{r_i^V}{r_i^C}. \qquad (2)$$

Information on per-capita complaint rates from aggregate Consumer Sentinel data gives us $r_i^C$. I then estimate $r_i^V/r_i^C$, the inverse of the complaint-to-victim ratio, using estimates of (1). The coefficients on demographics $\beta_s^j$ allow me to predict a zip code's complaint rate or victim rate solely based on its demographics. Because $\beta_s^V$ indicates how a given demographic variable $D_{is}$ affects the victim rate, and $\beta_s^C$ how a given demographic variable affects the complaint rate, the difference between the two tells us how the victim-to-complaint ratio changes with demographics. Formally, the predicted victim-to-complaint ratio for zip code $i$ using the estimates of demographic factors from the regression specification in (1) is

$$\frac{r_i^V}{r_i^C} = \frac{\exp(\sum_s(\beta_s^V D_{is}))}{\exp(\sum_s(\beta_s^C D_{is}))} = \exp\left(\sum_s(\beta_s^V - \beta_s^C)D_{is}\right). \qquad (3)$$

I use the expression in (3) to create weights, normalizing these weights by dividing by the weight for the median zip code. Figure 9 depicts these weights both for all zip codes and for majority black zip codes. For all zip codes, 50% of zip codes have a weight between 0.86 and 1.19. However, the weights have a long right tail of large weights; the 90th percentile weight is 1.51, the 95th percentile weight is 1.82, and the 99th percentile weight is 2.41. The median weight for majority black zip codes is about double the median weight for all zip codes at 1.97, with 90% of weights for majority black zip codes between 1.45 and 2.54. Thus, complaints from majority black areas would receive much greater weight under this weighting scheme.

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Figure 9.** Distribution of Weights



(a)                                                                                          (b)

All zip codes                                                           Majority black zip codes

*Notes.* The graph depicts the distribution of weights calculated using (3) with the estimates of (1) using all nine cases. Weights are normalized so that the median zip code has a weight of 1.

Figure 10 depicts a heat map of these weights for the Los Angeles area. Areas near the coast, such as Malibu, Santa Monica, and Venice Beach, are weighted less than one, so zip codes like these complain at higher rates than their rate of victimization relative to the median zip code. By contrast, South Central and East Los Angeles have weights more than double that of the median zip code based on their demographics; complaints from areas such as these are much less common relative to their rate of victimization. Thus, the weighting strategy magnifies the voices of residents of South Central and East Los Angeles compared with those in Santa Monica and Malibu to better reflect victimization rates.

I then multiply the zip code complaint rates in Figure 8 by these weights to construct an implied victimization rate based on all 2015 fraud complaints. The resulting implied victimization rate has a very different relationship with racial demographics than the complaint rate. Figure 11 shows how the implied victimization rate varies across different demographic groups. The implied victimization rate is about 2.8 times as large for areas that are 100% black compared with areas that are 0% black. The victimization rate has an inverse U shape with the percentage of Hispanic residents in a zip code. Areas with a 25% share of Hispanic residents to a 50% share of Hispanic residents have close to a 40% higher victimization rate than areas that are 0% Hispanic, whereas areas with close to a 100%

Hispanic population share have a 7% higher victimization rate than areas that are 0% Hispanic.

## 6. Conclusion

Although consumers self-select into providing complaints, it is typically difficult to separate whether differences across groups in complaint behavior

**Figure 10.** (Color online) Map of Weights for Los Angeles Area



0.14 – 1.00
1.01 – 1.25
1.26 – 1.50
1.51 – 2.00
2.01 – 3.03

*Notes.* The graph depicts a heat map of weights calculated using (3) with the estimates of (1) using all nine cases. Weights are normalized so that the median zip code has a weight of 1.

**Raval:** *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

**Figure 11.** Implied Victimization Rates For Black and Hispanic Communities in 2015



*Notes.* The graph depicts the nonparametric LOESS regression of the zip code per-capita complaint rate multiplied by the weights derived above on the share of the population that is black or Hispanic in the zip code, based on all 2015 fraud complaints to Consumer Sentinel. The black solid line reflects the percentage of black residents, and grey dashed line reflects the percentage of Hispanic residents.

represent differences in the propensity to complain or the underlying rate of victimization. I have exploited a set of law enforcement actions for which I have access to databases of victims as well as complaints for each case, which has allowed me to examine how complaints compare with victimization. I have found that heavily black and heavily Hispanic communities make much fewer complaints than nonminority communities compared with their levels of victimization.

Although my results make clear that selection is a major issue in consumer complaints, it is far from clear how to account for such selection. A statistical approach to doing so would be to weight complaints based on how the complaint rate of their community compares to the degree of victimization; such weights would overweight communities with lower complaint rates and thus highlight their complaints. I have provided such an approach in this paper and have shown both how to construct these weights and how such weights would alter relationships between complaint rates and the demographic composition of communities. This weighting strategy could be used to modify complaint data across many settings with data on both all users of a product and consumers that complain.[21]

An alternative, complementary approach to doing so would be to convince more victims of fraud from minority communities to complain. However, I have found evidence in this paper that the lower likelihood of complaining for victims from heavily minority areas is likely due to differences in social trust, rather than information on whether one was defrauded or who to complain to. Thus, advertising campaigns might increase the probability that victims complain, but not ameliorate the lower propensity to complain for victims from minority areas. Instead, government agencies could conduct outreach campaigns in communities whose residents are less likely to complain when victimized that aim to go beyond simply providing information on how to complain. Such outreach would have to convince residents of such areas that their input is valued and would help their communities, which might require greater engagement with local community organizations.

Finally, this paper has considered the issue of self-selection in the context of complaints to consumer protection authorities. Future work could examine whether patterns of self-selection on demographics are similar for online platforms such as Yelp or Amazon. Self-selection may differ on online platforms because consumers' alienation or lack of social trust affects for-profit private companies differently than public entities. In addition, for online platforms, market actors may influence whose voice we hear, either by promoting reviews through free products, such as through the Amazon Vine program; by filtering suspicious reviews, as Yelp does; or by suppressing negative reviews, a practice that Congress recently banned through the Consumer Review Fairness Act.

## Acknowledgments

The author thanks Avi Goldfarb, Yesim Orhun, Jan Pappalardo, Ted Rosenbaum, Navdeep Sahni, Dave Schmidt, K

Sudhir, David Torok, Catherine Tucker, Brett Wendling, and Nathan Wilson for comments on this paper, as well as Anne Coughlan, Ron Hill, Donald Ngwe, Dina Mayzlin, and Debra Ringold for discussing this paper at different conferences. The author gives special thanks to Michael Shores for originating this project. He also thanks Jonathan Byars, Jason Chen, and Scott Syms for excellent research assistance, and Melissa Dickey, Andrew Hudson, Nicole Fleming, Anne Miles, Patti Poss, Rhonda Perkins, and Michael Waller for helping to obtain the data used in this paper. The views expressed in this article are those of the author. They do not necessarily represent those of the Federal Trade Commission or any of its commissioners.

## Appendix A. Cases

Below, I provide details on the nine cases that I use for my main analysis, including, for each case, the official case title, a short name that I use in this paper, a short description of the case, and links to further details.

I call the first case Case B, as I am unable to disclose the company's name or details on its industry. However, I can say that it has been sued by a government agency for consumer protection violations and that its industry is different from those of the other cases.

The second case, *Federal Trade Commission v. Ideal Financial Solutions Inc., et al.* ("Ideal"), involved a company that bought consumer payday loan applications and then used the bank account details in the applications to withdraw money from the consumers' bank accounts without their consent. The FTC sued Ideal Financial and won summary judgment, with a $43 million judgment against the defendants. (Two additional defendants settled for a $25 million judgment.[22])

The third case, *Federal Trade Commission v. Apogee One Enterprises LLC, et al.* ("Platinum"), also involved payday loan applications as well as telemarketing. The company allegedly called online payday loan applicants and offered them credit cards with heavily deceptive terms; for example, the cards could be used only at the defendant's online store, rather than at any store accepting Visa, Mastercard, or American Express, as promised. The FTC sued Platinum Trust and eventually settled the charges, with a judgment of over $7.4 million, which was returned to consumers via refunds.[23]

The fourth case, *Federal Trade Commission v. Innovative Marketing Inc., et al.* ("WinFixer"), involved a company that the FTC alleged falsely claimed that security scans had discovered malware on consumers' computers. The company then sold computer security software that would "fix" the problems identified. The FTC sued the companies and individuals involved in the scam. Most settled with multimillion dollar judgments, whereas the defendant that went to trial was found liable for more than $163 million.[24]

In the fifth case, *Federal Trade Commission v. Health Formulas, LLC, et al.* ("SimplePure"), the FTC alleged in part that SimplePure and its related companies and individuals misrepresented the health benefits of two dietary supplements and enrolled consumers in a negative option program involving several more products in which they were billed automatically without their consent. The FTC sued

the companies and individuals involved, and the case was settled for a partially suspended judgment of $105 million.[25]

In the sixth case, *Federal Trade Commission v. Advertising Strategies LLC, et al.* ("AdvStrategy"), the FTC alleged that a company used telemarketing to sell consumers fake business or investment opportunities, using various different purported online investment businesses. The FTC settled the case for a monetary judgment of $25 million.[26]

The seventh case combines two separate legal actions over the same fraud, *Federal Trade Commission v. Lift International LLC, et al.* and *Federal Trade Commission v. Thrive Learning LLC, et al.* ("Guidance") In both, the FTC alleged that a set of companies used deceptive telemarketing to sell consumers business coaching services. The FTC settled these cases for between $10 million and $30 million for each set of companies involved. For more details, see https://www.ftc.gov/enforcement/cases-proceedings/152-3233/lift-international-llc, https://www.ftc.gov/enforcement/cases-proceedings/152-3233/thrive-learning-llc, and Federal Trade Commission (2017c).

In the eighth case, *Federal Trade Commission v. Money Now Funding, LLC, et al.* ("MoneyNow"), the FTC alleged that a company falsely promised consumers a business opportunity in which they could run a business from their home referring local businesses to the defendants' money-lending service. The FTC either won judgments or settled with defendants for monetary judgments of varying amounts up to $7.2 million.[27]

Finally, in the ninth case, *Federal Trade Commission v. PHLG Enterprises, LLC* ("PHLG"), the FTC alleged that a company served as a middleman to transfer money from consumers to Indian call centers using Western Union or MoneyGram cash transfers. The Indian call centers were conducting various different scams, such as imposter scams impersonating the Internal Revenue Service or government grant authorities. The FTC settled with defendants in this case for a suspended judgment of $1.5 million.[28]

## Appendix B. Demographics

Table A.1 contains the 1st, 5th, 10th, 25th, 50th, 75th, 90th, 95th, and 99th percentile quantiles of each variable across zip codes. The quantiles are estimated after weighting each zip code by its 2010 population. All of the ethnic demographics are heavily skewed—half of the American population lives in zip codes whose populations are less than 5% black, less than 8% Hispanic, and less than 2% Asian. On the other hand, majority black and majority Hispanic zip codes each comprise more than 5% of population weighted zip codes. The measure of urbanization is similarly skewed; the median zip code is 98% urban, but more than 5% of zip codes are 0% urban.[29]

The other variables are somewhat less skewed. The median age for the median zip code is 37.5, with the bottom 5% of zip codes with a median age below 28 and the top 5% of zip codes with a median age above 47. The median household size is 2.6 for the median zip code, compared with below 2.1 for the bottom 5% of zip codes and above 3.5 for the top 5% of zip codes. The unemployment rate for the median zip code is 5.6%; the bottom 5% of zip codes have an unemployment rate below 2.7%, whereas the top 5% of zip

**Table A.1.** Quantiles of Demographic Variables

| Variable | Quantiles | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1% | 5% | 10% | 25% | 50% | 75% | 90% | 95% | 99% |
| *Percentage black* | 0 | 0.1 | 0.4 | 1.4 | 4.7 | 14.5 | 34.9 | 54.6 | 87.6 |
| *Percentage Hispanic* | 0 | 0.7 | 1.3 | 3 | 7.7 | 20.8 | 46.9 | 65.3 | 90.8 |
| *Percentage Asian* | 0 | 0 | 0.1 | 0.6 | 2 | 5.2 | 12 | 19.1 | 43.7 |
| *Median age* | 23.5 | 28.3 | 30.2 | 33.7 | 37.5 | 41.2 | 44.6 | 47.1 | 54.8 |
| *Household size* | 1.8 | 2.1 | 2.2 | 2.4 | 2.6 | 2.9 | 3.2 | 3.5 | 4.1 |
| *Unemployment rate* | 1.5 | 2.7 | 3.3 | 4.3 | 5.6 | 7.3 | 9.2 | 10.5 | 13.3 |
| *Percentage urban* | 0 | 0 | 28.1 | 74.3 | 98 | 100 | 100 | 100 | 100 |
| *Median household income* (thousands) | 23 | 29 | 33 | 41 | 52 | 68 | 88 | 101 | 130 |
| *Percentage college educated* | 5.1 | 8.6 | 10.9 | 15.8 | 24.1 | 37.4 | 52.4 | 61.2 | 75.5 |

*Note.* The 1st, 5th, 10th, 25th, 50th, 75th, 90th, 95th, and 99th percentile quantiles of each variable across zip codes are included in the table, where the quantiles are estimated after weighting each zip code by its 2010 population.

codes have an unemployment rate above 10.5%. For the median zip code, the median household income is 52 thousand dollars; the bottom 5% have a median income below 29 thousand dollars, and the top 5% have a median income above 100 thousand dollars. Last, in the median zip code, about 24% of the 25-year-old and above population have completed college, compared with less than 8.6% for the bottom 5% of zip codes and above 61.2% for the top 5% of zip codes.

## Endnotes

[1] The Consumer Sentinel database receives complaints reported to federal and state government agencies as well as private actors such as the Better Business Bureau. See https://www.ftc.gov/enforcement/consumer-sentinel-network for more details on the Consumer Sentinel Network.

[2] In addition, Mayzlin et al. (2014) showed evidence of strategic reviewing behavior, as firms place negative reviews of their competitors. Dai et al. (2018) examined how to construct an optimal quality ranking when reviewers vary in the bias and precision of their reviews. Hu et al. (2008) and Ghose and Ipeirotis (2011) examined how the characteristics of reviews and reviewers affect consumer demand.

[3] In Appendix B, I provide greater detail about the distribution of each of these variables.

[4] The U.S. Census Bureau created ZIP Code Tabulation Areas (ZCTAs) to connect Census demographics to zip codes from addresses, because the zip code is not a traditional Census geography. The boundaries of zip codes and ZCTAs do not always line up perfectly, so I exclude zip codes for P.O. boxes and unique organizations to reduce differences between the two.

[5] I am able to access the data used in this paper as part of my duties as an employee of the FTC.

[6] See https://www.ftc.gov/enforcement/consumer-sentinel-network/reports for the Consumer Sentinel Data Book, which contains further details on the Consumer Sentinel database as well as a wealth of statistics on the complaints included in it.

[7] Because the Consumer Sentinel Network has a five year data retention policy, complaints had to either be relatively recent or saved by the legal team for the case. I include complaints from all sources, including identity theft and Do Not Call complaints and complaints given directly to the case team from Consumer Sentinel contributors.

[8] For this case, I am unable to disclose the company's name or details on its industry.

[9] Formally, for complaint rate $r_i^C$ and victim rate $r_i^V$ in zip code $i$, the change in the complaint-to-victim ratio $\frac{r_i^C}{r_i^V}$ from a change in demographic factor $D_{is}$ from $X$ to $Y$ is

$$\frac{r_i^C(D_{is}=Y)}{r_i^V(D_{is}=Y)} \bigg/ \frac{r_i^C(D_{is}=X)}{r_i^V(D_{is}=X)} = \frac{r_i^C(D_{is}=Y)}{r_i^C(D_{is}=X)} \bigg/ \frac{r_i^V(D_{is}=Y)}{r_i^V(D_{is}=X)}$$
$$= \frac{\exp(\beta_s^C(Y-X))}{\exp(\beta_s^V(Y-X))}$$
$$= \exp((\beta_s^C - \beta_s^V)(Y-X)).$$

[10] I also include a robustness analysis using discretized demographic variables in Online Appendix C. I continue to find lower complaint-to-victim ratios in heavily minority communities compared with nonminority communities using discretized demographic variables, although the effects for the percentage of Hispanic residents are more nonlinear.

[11] In these specifications, I exclude random effects.

[12] I exclude the PHLG case, as its loss value was intermediate at about $500, and because 90% of complaints were to Western Union or MoneyGram (because these companies sent payments in the case) rather than the BBB or government entities.

[13] See https://www.ftc.gov/news-events/events-calendar/2016/12/changing-consumer-demographics for videos and transcripts. Blanchard's quote is found on p. 32 of the transcript, located here: https://www.ftc.gov/system/files/documents/videos/changing-consumer-demographics-workshop-part-1/ftc_changing_consumer_demographics_-_transcript_segment_1.pdf.

[14] Answers to these questions may be influenced by the party in power in Washington, but Alesina and La Ferrara (2002) report much smaller racial gaps for similar questions on confidence in government entities than they find for trust over a much different sample period.

[15] Of course, consumers may be mistrustful of authority in general, may believe that the BBB is a government agency, or might correctly realize that information reported to the BBB could be accessed by law enforcement authorities.

[16] The complaint source was not kept for most WinFixer complaints, whereas almost all complaints for the PHLG case were not to government or BBB sources.

[17] For estimates with credit scores, I have to exclude 1,399 zip codes where I do not have credit score information.

[18] In 2010, about 25% of Americans had a credit score below 650, and 53% had a credit score above 700. See https://www.sec.gov/comments/s7-14-11/s71411-316.pdf.

[19] These interactions, unfortunately, may suffer from collinearity problems. The percentage of Hispanic residents is correlated at

Raval: *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

0.69 for the percentage of foreign-born residents and 0.88 for the percentage of residents speaking another language.

[20] This analysis thus excludes identity theft and Do Not Call complaints.

[21] For example, the CFPB may have information on where consumers of financial services live from consumer credit panels as well as zip codes of complaining consumers. Amazon.com and other online retailers have the shipping address of anyone who buys a product from them together with the same information on consumers that lodge complaints, as well as detailed information on their shopping patterns.

[22] See https://www.ftc.gov/enforcement/cases-proceedings/1123211-x130044/ideal-financial-solutions-inc-et-al and Tressler (2016) for additional details on this case.

[23] See https://www.ftc.gov/enforcement/cases-proceedings/1123212/apogee-one-enterprises-llc-also-dba-apogee-enterprises-llc and Federal Trade Commission (2013) for more details.

[24] See https://www.ftc.gov/enforcement/cases-proceedings/072-3137/innovative-marketing-inc-et-al and https://www.ftc.gov/news-events/blogs/business-blog/2014/02/court-appeals-upholds-win-consumers-winfixer-case for more details.

[25] Additional allegations include that (1) defendants induced consumers to order dietary supplements and other products by touting purported "free" trials and then charged consumers for the "free" products unless consumers complied with their onerous refund policy, (2) defendants failed to disclose the terms and conditions of their onerous refund policy to consumers, and (3) defendants called consumers on the Do Not Call list without their consent. See https://www.ftc.gov/enforcement/cases-proceedings/132-3159-x150015/health-formulas-llc-doing-business-simple-pure and Federal Trade Commission (2016a) for more details.

[26] See https://www.ftc.gov/enforcement/cases-proceedings/162-3154/advertising-strategies-llc-et-al and Federal Trade Commission (2017b) for more details.

[27] See https://www.ftc.gov/enforcement/cases-proceedings/122-3216-x130063/money-now-funding-llc and Federal Trade Commission (2015) for more details.

[28] See https://www.ftc.gov/enforcement/cases-proceedings/152-3245-x170019/phlg-enterprises-llc and Federal Trade Commission (2017a) for more details.

[29] Because I exclude P.O. boxes, I likely miss some of the population living in rural areas, who are more likely to use P.O. boxes.

## References

Alesina A, La Ferrara E (2002) Who trusts others? *J. Public Econom.* 85(2):207–234.

Alsan M, Yang CS (2018) Fear and the safety net: Evidence from secure communities. Working paper, Stanford Medical School, Palo Alto, CA.

Anderson E (2000) *Code of the Street: Decency, Violence, and the Moral Life of the Inner City* (W. W. Norton & Company, New York).

Anderson KB (2007) Consumer fraud in the United States: The second FTC survey. Report, Federal Trade Commission, Washington, DC.

Anderson KB (2013) Consumer fraud in the United States, 2011: The third FTC survey. Report, Bureau of Economics, Federal Trade Commission, Washington, DC.

Ayres I, Lingwall J, Steinway S (2013) Skeletons in the database: An early analysis of the CFPB's consumer complaints. *Fordham J. Corporate Finance Law* 19(2):343–391.

Bandura A (1977) Self-efficacy: Toward a unifying theory of behavioral change. *Psych. Rev.* 84(2):191–215.

Bone SA, Christensen GL, Williams JD (2014) Rejected, shackled, and alone: The impact of systemic restricted choice on minority consumers' construction of self. *J. Consumer Res.* 41(2):451–474.

Brehm J, Rahn W (1997) Individual-level evidence for the causes and consequences of social capital. *Amer. J. Political Sci.* 41(3):999–1023.

Bricker J, Li G (2017) Credit scores, social capital, and stock market participation. Working paper, Federal Reserve Board, Washington, DC.

Dai W, Jin G, Lee J, Luca M (2018) Optimal aggregation of consumer ratings: An application to Yelp.com. *Quant. Marketing Econom.* 1(3):289–339.

Federal Trade Commission (2013) FTC sends $7.4 million in refunds to consumers harmed by scheme that sold allegedly bogus 'platinum' credit card. Report, Federal Trade Commission, Washington, DC.

Federal Trade Commission (2015) FTC stops elusive business opportunity scheme. Report, Federal Trade Commission, Washington, DC.

Federal Trade Commission (2016a) Marketers of Simple Pure supplements settle FTC court action. Report, Federal Trade Commission, Washington, DC.

Federal Trade Commission (2016b) Combating fraud in African American and Latino communities: The FTC's comprehensive strategic plan. Technical report, Federal Trade Commission, Washington, DC, https://www.ftc.gov/system/files/documents/reports/combating-fraud-african-american-latino-communities-ftcs-comprehensive-strategic-plan-federal-trade/160615fraudreport.pdf.

Federal Trade Commission (2017a) FTC settlement puts a stop to money mule who profited from India-based IRS and other scams. Report, Federal Trade Commission, Washington, DC.

Federal Trade Commission (2017b) Business opportunity scheme operators banned from telemarketing and selling investment opportunities; will return millions to consumers. Report, Federal Trade Commission, Washington, DC.

Federal Trade Commission (2017c) Defendants involved in selling business coaching programs settle FTC charges. Report, Federal Trade Commission, Washington, DC.

Fradkin A, Grewal E, Holtz D (2017) The determinants of online review informativeness: Evidence from field experiments on Airbnb. Working paper, Boston University, Boston.

Gans JS, Goldfarb A, Lederman M (2017) Exit, tweets and loyalty. Technical report, National Bureau of Economic Research, Cambridge, MA.

Garrett DE, Toumanoff PG (2010) Are consumers disadvantaged or vulnerable? An examination of consumer complaints to the better business Bureau. *J. Consumer Affairs* 44(1):3–23.

Ghose A, Ipeirotis PG (2011) Estimating the helpfulness and economic impact of product reviews: Mining text and reviewer characteristics. *IEEE Trans. Knowledge Data Engrg.* 23(10):1498–1512.

Glaeser EL, Laibson DI, Scheinkman JA, Soutter CL (2000) Measuring trust. *Quart. J. Econom.* 115(3):811–846.

GSS Data Explorer (2019) Accessed March 21, 2019, https://gssdataexplorer.norc.org/variables/441/vshow.

Hirschman AO (1970) *Exit, Voice, and Loyalty: Responses to Decline in Firms, Organizations, and States*, vol. 25 (Harvard University Press, Cambridge, MA).

Hu N, Liu L, Zhang JJ (2008) Do online reviews affect product sales? The role of reviewer characteristics and temporal effects. *Inform. Tech. Management* 9(3):201–214.

Jagdip S (1989) Determinants of consumers' decisions to seek third party redress: An empirical study of dissatisfied patients. *J. Consumer Affairs* 23(2):329–363.

MacLeod J (2018) *Ain't No Makin' It: Aspirations and Attainment in a Low-Income Neighborhood* (Routledge, New York).

**Raval:** *Whose Voice Do We Hear in the Marketplace?*
Marketing Science, 2020, vol. 39, no. 1, pp. 168–187

Mayzlin D, Dover Y, Chevalier JA (2014) Promotional reviews: An empirical investigation of online review manipulation. *Amer. Econom. Rev.* 104(8):2421–2455.

Nosko C, Tadelis S (2015) The limits of reputation in platform markets: An empirical analysis and field experiment. Technical report, National Bureau of Economic Research, Cambridge, MA.

Oster S (1980) The determinants of consumer complaints. *Rev. Econom. Statist.* 62(4):603–609.

Putnam RD (2001) *Bowling Alone: The Collapse and Revival of American Community* (Simon and Schuster, New York).

Raval D (2018) Which communities complain to policymakers? Evidence from consumer sentinel. Report, Federal Trade Commission, Washington, DC.

Seligman MEP (1975) *Helplessness: On Depression, Development, and Death. A Series of Books in Psychology* (WH Freeman/Times Books/Henry Holt & Co., New York).

Tressler C (2016) FTC takes down Ideal Financial Solutions, Inc.'s fraud network. *Consumer Information* (blog) (March 9), https://www.consumer.ftc.gov/blog/ftc-takes-down-ideal-financials-fraud-network.