# EXHIBIT D

# ATTACHMENT 12

```
 1                    UNITED STATES OF AMERICA

 2                    FEDERAL TRADE COMMISSION

 3

 4    In the Matter of:          )

 5    INTUIT, INC.,              )

 6           a corporation,      )    Docket No. 9408

 7                Respondent.    )

 8    ------------------------)

 9

10

11

12                    TRIAL, VOLUME 6

13               WEDNESDAY, APRIL 5, 2023

14                    PUBLIC RECORD

15

16

17

18      BEFORE THE HONORABLE D. MICHAEL CHAPPELL

19            Chief Administrative Law Judge

20

21

22

23

24

25      Reported by:  Susanne Bergling, RMR-CRR-CLR
```

1038

Trial - Public Record

Intuit, Inc.                                                            4/5/2023

```
 1    APPEARANCES:
 2    ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3              ROBERTO ANGUIZOLA, ESQ.
 4              JAMES EVANS, ESQ.
 5              REBECCA PLETT, ESQ.
 6              SARA TONNESEN, ESQ.
 7              Federal Trade Commission
 8              400-7th Street, S.W.
 9              Washington, D.C.  20024
10              ranguizola@ftc.gov
11
12    ON BEHALF OF RESPONDENT:
13              DAVID Z. GRINGER, ESQ.
14              HOWARD SHAPIRO, ESQ.
15              JONATHAN PAIKIN, ESQ.
16              JENNIFER MILICI, ESQ.
17              DEREK WOODMAN, ESQ.
18              BENJAMIN CHAPIN, ESQ.
19              Wilmer Cutler Pickering
20                        Hale and Dorr LLP
21              7 World Trade Center
22              250 North Greenwich Street
23              New York, New York  10007
24              (212) 230-8800
25              david.gringer@wilmerhale.com
```

1039

Trial - Public Record

Intuit, Inc.                                                          4/5/2023

```
 1    ALSO PRESENT:
 2              Thomas Henry, Esq., Intuit
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1040

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

```
 1                         I N D E X

 2

 3   WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS   VOIR

 4   GOLDER            1041     1215    1265       1279

 5

 6

 7   EXHIBITS             FOR ID        IN EVID

 8   Government

 9   None

10

11   Respondent

12   None

13

14   Joint

15   None

16

17

18

19

20

21

22

23
     *All exhibits premarked for identification prior to
24   trial.
     *See full attached list of admitted exhibits following
25   transcript.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial - Public Record
Intuit, Inc.                                              4/5/2023

1    that they expect to be free are going to be

2    angry about that.  They are going to be upset

3    about that.  And I look in the places where I

4    would expect to see that manifested if it were

5    true, and complaints and retention are clearly

6    those places.

7           So I thought it would be, from my

8    perspective, most helpful for the Court to see

9    this evidence, and that is what I undertook,

10   consistent with my academic research, to address

11   the research questions that I have on this

12   assignment.

13        Q.   Okay.  Thank you, Professor Golder.  I

14   took us on a small detour.

15           Let's now go to your work involving

16   principles of marketing research.  Let me start

17   by asking you, Professor Golder, did you use

18   principles of marketing research to show how

19   reasonable consumers are likely to respond to

20   Turbo Tax free product advertising?

21        A.   Yes, definitely.  The principles of

22   marketing research were an important -- an

23   important leg of my analysis here, an important

24   pillar of it.

25        Q.   Okay.  So could you tell us how it is

Trial - Public Record

Intuit, Inc.                                                4/5/2023

1    you relied on the relevant marketing research

2    literature to form your opinion in this case, or

3    opinions I should say?

4        A.    Yes, definitely.  So at a high level

5    here, again, the -- in the top box here, I

6    mentioned the consumer buying process before, so

7    I rely on the consumer buying process

8    extensively because it covers a wide range of

9    consumer buying situations, but I looked at it

10   specifically in the context of this market as

11   well.

12          So I used that general framework but

13   applied it specifically to this case, and then I

14   also wanted to think about the broader context,

15   what is the broader context in which reasonable

16   consumers are viewing these ads, and the

17   marketing literature has much to say about this

18   topic as well.

19       Q.    Okay.  And what were your -- what did

20   you find?

21       A.    So, at a high level here, the key

22   findings, you know, related to the first bullet

23   about the consumer buying process, is that tax

24   preparation is a high-involvement, multi-stage

25   buying process.

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1          And related to the second bullet in

2     that context is that reasonable consumers

3     encounter ads in the context of their prior

4     experiences and their personalized buying

5     process.  So ads are not viewed in isolation.

6     Consumers have a lifetime of experience that

7     they bring with themselves when they view these

8     ads, and that's -- that context is very

9     important to consider in terms of how consumers

10    are viewing the ads themselves.

11         Q.   Okay.  So a couple of clarifying

12    questions on your findings here, Professor

13    Golder.

14         First, what does it mean that tax

15    preparation is a "high-involvement, multi-stage

16    buying process"?

17         A.   It really means that -- the

18    high-involvement piece means that they're

19    just -- they're engaged.  They're motivated to

20    be engaged, and they are engaged, so -- and at a

21    high level, that is it.

22         The multistage piece of it means that

23    it's -- I'm contrasting this really with more of

24    kind of what people think of as an impulse

25    purchase, something you might buy at the grocery

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    store, at the checkout counter, you just buy

2    that item that's sitting there on impulse and

3    haven't really given a lot of thought to it

4    before making the purchase in many cases.

5         Here the contrast is that with tax

6    preparation, it involves multiple stages --

7    which I will get into in more detail -- but that

8    is very important as well because it really is

9    very determinative as to how consumers move

10   through the buying process and the context in

11   which they're viewing the ads.

12        Q.   Okay.  And just -- I think I know what

13   you mean, but so the record is clear, you began

14   by saying "they are engaged."  Who is the "they"

15   you're referring to?

16        A.   Sure.  "They" are the consumers and, in

17   particular, my focus through all of this is

18   reasonable consumers operating in this

19   marketplace.

20        Q.   Okay.  And so your other key finding is

21   that reasonable consumers en -- in this section,

22   reasonable consumers encounter ads in the

23   context of their prior experiences and their

24   personalized buying process.  Can you let the

25   Court know what prior experiences you're

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    referring to there?

2        A.    Yes.   So prior experiences could be

3    within tax preparation broadly.   It could be

4    within online tax preparation, but very

5    importantly, it's in the context of a much

6    broader set of experiences.   Part of those

7    experiences would be exposure to free offerings.

8            So consumers have been exposed to many

9    free offerings throughout their lifetime of

10   experience as customers, and that knowledge is

11   something that they bring with them as they move

12   along their buying process.

13       Q.    And so you've now mentioned the phrase

14   "reasonable consumers" a couple of times, and

15   what is it that we need to understand about

16   reasonable consumers who are engaging in this

17   high-involvement, multi-stage buying process?

18       A.    Yes.   So when I think about a

19   reasonable consumer in this market or any market

20   really, it's the -- it's the degree of care and

21   consideration that a consumer is bringing in the

22   context of this market, and that degree of care

23   and consideration will vary across markets, but

24   that's what I'm thinking about, at a broad

25   level, for a reasonable consumer in this market

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    and across markets.

2        Q.    Okay.  And, sorry, I jumped the gun

3    there on the next slide, but can you tell us,

4    Professor Golder, at a high level, what -- what

5    it is you're referring to when you say "consumer

6    buying process"?

7        A.    Sure.  So on this slide I really want

8    to start by highlighting the five bulleted items

9    at the top of each of these arrows.  So that's

10   problem recognition, information search,

11   evaluation of alternatives, purchase decision,

12   and post-purchase behavior.  So those are the

13   five common stages of the buying process, and

14   they are very relevant to all kinds of

15   purchasing decisions.

16           And consumers will personalize these,

17   as I've said in the previous -- on the previous

18   slide, to their particular buying situation.

19       Q.    And is this buying -- consumer buying

20   process well recognized in marketing research?

21       A.    Extremely well recognized across

22   textbooks, across all my colleagues teaching at

23   Dartmouth, you know, my former colleagues at

24   NYU.  Really, I mean, this is a bedrock

25   framework of marketing.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial - Public Record

Intuit, Inc.                                                      4/5/2023

1      Q.    And so changing to a different category

2   of research, when consumers are engaged in the

3   buying process -- you know, you've mentioned the

4   whole -- I think as the most common going to

5   different provider websites.  What would

6   reasonable consumers typically encounter as they

7   do that?

8      A.    So here's just a couple of examples

9   from H&R Block and from TaxSlayer.  So

10  essentially the left part of this slide is

11  showing the ads that come from those two

12  companies, one ad from each company.  On the

13  right is the -- is the website, H&R Block on the

14  top right, TaxSlayer on the bottom right, and

15  there are multiple messages within here.  I will

16  highlight just a couple of them.

17          So when we look at H&R Block, we see on

18  the left that it's for their free online

19  offering.  On the upper right, we see that free

20  online is clearly one product offering within

21  their set of four offerings, again really

22  mirroring the four levels of the TurboTax

23  offering.

24          For TaxSlayer we see similar

25  information.  The ad in the lower left mentions

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    that this is Simply Free and not TaxSlayer

2    overall, but for taxpayers Simply Free.  When

3    the consumer goes to the website, they could

4    easily see that Simply Free is part of their

5    product line, so we're seeing the -- a product

6    line, which consumers, of course, are very

7    familiar with product lines.  They know that

8    brands typically have a product line underneath

9    them.

10          So we see that as an important part of

11   it, and we also see important disclosure

12   information both within the ads and on the

13   website, and I can go into that in more detail,

14   but I'll leave it at that for now.

15        Q.   Okay.  Now, I have to myself look in

16   really closely here to see it, but who is the

17   H&R Block ad saying the free product is for?

18        A.   Sure.  So the H&R Block is for simple

19   returns only, and that message, again, is

20   reinforced on the website where, directly

21   underneath "free online," it says "simple

22   returns."

23        Q.   And what about TaxSlayer?  Who is their

24   free product for?

25        A.   So if we look at the -- the disclosure

Trial - Public Record

Intuit, Inc.                                              4/5/2023

 1    itself, it says "simply free," and it includes
 2    federal and one state return for zero dollars,
 3    is not available for all tax situations.
 4    Eligibility is limited to qualifying simple tax
 5    situations and is determined at the time of
 6    E-file, which, of course, as we talked about,
 7    again, for TaxSlayer, that's done on their
 8    website.
 9            That disclosure is, again, reinforced
10    on the website, where in the lower -- sorry, in
11    the lower right image, but the left part of that
12    lower right image, we see "simply free," and
13    there it says, "Simple tax situations, basic
14    1040, includes one free federal and one state
15    return."
16            So this is a good -- these are both
17    good examples really of how the -- of how
18    consumers are getting a consistent message
19    between the ad and the website.
20        Q.    Okay.  So what relevance, if any, does
21    it have to your opinions that when consumers are
22    engaged in the consumer buying process and are
23    comparing different tax providers and going to
24    different websites, they come across other free
25    offers for taxpayers with simple returns?

    1        A.    So, I mean, it's very meaningful,
    2    because context related to -- you know, one of
    3    my broader opinions here is that context really
    4    matters, and so context matters in online tax
    5    preparation, and context matters in other
    6    markets as well, but it clearly matters in
    7    online tax preparation because consumers, again,
    8    they understand by looking not only at the
    9    TurboTax website but by looking at competitors'
   10    websites -- which we know they do regularly and
   11    is entirely consistent with consumer behavior in
   12    all kinds of markets that consumers go to
   13    websites, very natural -- and when that happens
   14    on these other companies' websites, they see a
   15    product line, they see "free" as one part of
   16    that product line, and they see that other
   17    products within that product line are paid
   18    products, and they see, both within the ads and
   19    the website, that there are conditions
   20    associated with those free offerings, very
   21    important to my overall opinion is this context.
   22        Q.    Okay.   So that's the industry context.
   23    You had also mentioned consumers' experience
   24    with free offers more broadly.   How would those
   25    experiences affect reasonable consumers'

Trial - Public Record
Intuit, Inc.                                                    4/5/2023

1    perception of TurboTax's free product

2    advertising?

3        A.    So as I mentioned before, I mean, when

4    consumers come to online tax preparation, they

5    are bringing their lifetime of experience as

6    consumers with them, and as part of that

7    experience consumers are seeing free product

8    offers across a whole range of product

9    categories.

10       Q.    And so free -- let's take a look at the

11   examples -- a couple of the examples we have

12   here, Professor Golder, and there's an ad for

13   Holiday Inn.  Do you see that?

14       A.    I do.

15       Q.    And that ad says, if I may, "Kids Stay

16   and Eat Free."

17       A.    It does.

18       Q.    Are there any disclosures of any kind

19   of conditions or qualifications whatsoever in

20   this ad?

21       A.    No.

22       Q.    Okay.  So do you -- in your view, given

23   that there are no qualifications whatsoever in

24   the ad, do reasonable consumers understand that

25   the kids actually have to stay at the Holiday

Trial - Public Record
Intuit, Inc.                                                    4/5/2023

1    Inn for them to eat free?

2        A.    Yes.  I believe a reasonable consumer

3    has that understanding.

4        Q.    Okay.  And what about whether a

5    reasonable consumer understands that kids have

6    to be accompanied by an adult in order to eat

7    free?

8        A.    Yes.  I definitely believe a reasonable

9    consumer has that understanding.

10       Q.    Okay.  And what about reasonable --

11   what do reasonable consumers understand, they

12   think kids can only eat free at the hotel

13   restaurant or can they eat free anywhere they

14   want?

15       A.    A reasonable consumer would understand

16   that this is related to a food offering within

17   the Holiday Inn.

18       Q.    What if you're a kid at heart?  Can you

19   stay and eat free?

20       A.    I do not believe a reasonable consumer

21   would take away that impression from the ad.

22       Q.    Okay.  What if you're a 19-year-old kid

23   and you're on vacation with your parents, can

24   you stay and eat free?  Do reasonable consumers

25   understand that?

Trial - Public Record

Intuit, Inc.                                                4/5/2023

```
 1        A.    I think a reasonable consumer would
 2    know that an adult child would not qualify.  As
 3    much as they might want that to be the case, I
 4    think we understand that that adult child would
 5    not qualify.
 6        Q.    And how is it that a reasonable
 7    consumer can understand these things about the
 8    "Kids Stay and Eat Free" ad without any of them
 9    being stated expressly?
10        A.    Well, we have a lifetime of experience
11    as consumers.  We're exposed to multiple free
12    offers across a wide range of categories.  So we
13    bring that knowledge with us to any new
14    situation, and we know that free offers most
15    commonly come with terms and conditions, you
16    know, and so, yeah, consumers just bring that
17    lifetime of experience with them.  So free
18    offers come with terms and conditions almost
19    always, and consumers bring that understanding
20    with them.
21        Q.    We are going to move on to another
22    example or I'm going to start missing my own
23    kids.
24              Let's go to Domino's and the
25    buy-one-get-one-free, and, again, do you see any
```

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1   qualifications or disclosures in this Domino's

2   Pizza ad?

3       A.    No, none.

4       Q.    Okay.  And a dangerous question at

5   lunchtime, but do you think reasonable consumers

6   would take away from this ad the message that if

7   they bought, say, a six-inch personal pizza with

8   no toppings, that they could get an 18-inch

9   large pizza with all of the toppings for free?

10      A.    No.  Reasonable consumers are commonly

11  exposed to the free one being of equal or lesser

12  value.

13      Q.    Okay.  And how can reasonable consumers

14  understand that without it being stated

15  expressly in the advertisement itself?

16      A.    Because consumers bring that lifetime

17  of experience with them, and, frankly, part of

18  that includes exposure to those free offers, but

19  it includes a sense of reasonableness as well.

20      Q.    Okay, so let's move on.

21            Back to taxes, how would a reasonable

22  consumer's experiences with free offers impact

23  how they would view TurboTax's free product

24  advertisements?

25      A.    So one of the key pieces to this is

Trial - Public Record

Intuit, Inc.                                              4/5/2023

1    because consumers are exposed to all these free
2    offers with terms and conditions is that they
3    will naturally be skeptical of a free offer, and
4    just to highlight some of what's on this slide,
5    Intuit research showed that only 22 percent of
6    Respondents were confident that TurboTax Free
7    Edition was actually free, and this is despite
8    it being a free product.  It is a free product
9    for eligible consumers.
10           On the right are just some quotes that
11   reinforce this, but that consumer skepticism is
12   something that we've heard about in this
13   hearing, and it's really important and another
14   manifestation really of that lifetime of
15   experience that consumers bring to them when
16   they view a free product ad in this context, but
17   in any context.
18      Q.    Now, "skeptical" is a word, Professor
19   Golder -- you know, and I think we probably all
20   understand to some degree what it means -- but
21   could you just tell us a little bit more about
22   what exactly you mean when you say there is
23   skepticism around a free product offer?
24      A.    So a couple of key parts of this would
25   be the idea that consumers would not necessarily

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    I just wanted to clarify the record on that.

2            JUDGE CHAPPELL:  Counsel, do you mean a

3    running objection?

4            MS. PLETT:  Yes, Your Honor.

5            JUDGE CHAPPELL:  You may have that.

6            Go ahead.

7            BY MR. GRINGER:

8        Q.    Would it be helpful -- I didn't even

9    ask that coherent a question, so let me try

10   again.

11           How is it, Professor Golder, that you

12   conducted your analysis of the disclosures in

13   TurboTax's free product ads?

14       A.    So it's important to me, again, to

15   start with the academic literature because it

16   has much to say about this.  So at a conceptual

17   level, I wanted to think about the

18   characteristics of the effective disclosures.

19   So I thought about that initially.

20           Then I went on to the ads themselves,

21   as I've talked about, and there was a detailed

22   and extensive methodology for analyzing the

23   disclosures within the ads, constitutes a major,

24   major part of my report.

25           And the third point here on the slide

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    is that I also analyzed the disclosures on the

2    TurboTax website, and that also includes a

3    methodology contained in detail in my report.

4        Q.    Okay.  And in your opinion, what

5    constitutes an effective disclosure in an

6    advertisement?

7        A.    Sure.  So I think there are -- there

8    are four key criteria really.  The first is that

9    consumers should be aware of the existence of a

10   disclosure, so just that existence of a

11   disclosure.  So we saw some of those earlier

12   ads -- the Holiday Inn, Domino's -- without even

13   the existence of a disclosure, so that existence

14   is a first important criterion.

15          The second important criterion would be

16   that it gives some idea about the type or the

17   category of restriction because, you know, that,

18   again, starts to inform consumers, relevant to

19   where they are in the buying process, about what

20   type of restriction there is for that -- for

21   that free offer.

22          A third important one would be where

23   they can go to get more information.  Consumers,

24   again, know that disclosures can be -- can

25   contain, you know, more information than it

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial - Public Record

Intuit, Inc.                                                4/5/2023

1    would be reasonable to convey in a short TV ad,

2    so pointing them where to go for that additional

3    information would be a third important criterion

4    of effective disclosure.

5            The fourth criterion -- I briefly

6    alluded to this -- would be the idea that it

7    should be consistent with where consumers are in

8    the buying process.  So you want to give

9    consumers information without overloading them

10   with information.  The marketing research

11   literature is very clear about this point, to

12   avoid information overload so consumers can

13   process information.

14           So, for example, a shorter disclosure

15   in a TV ad followed up with a longer disclosure

16   on a website would be entirely consistent with

17   matching those disclosures with where consumers

18   are in the buying process.  So those would be

19   the four criteria for effective disclosures.

20       Q.   Okay.  And I think we have the four

21   disclosures now on the screen.  I think the

22   first three are fairly self-explanatory, but I

23   want to ask for a little more detail on the

24   fourth.

25           What do you mean when you say "they

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial - Public Record
Intuit, Inc.                                              4/5/2023

1    provide information appropriate for the stage in

2    the marketing funnel"?  What are you talking

3    about there?

4         A.    So here it's important -- so earlier we

5    talked about the buying process where you move

6    through those five stages of the buying process.

7    Companies think about this at a more macro level

8    as a marketing funnel, where consumers may move

9    from being unaware to being aware to

10   considering.

11        So as they move through that process,

12   companies, to have their disclosures be

13   effective, want to give consumers information

14   that matches where consumers are in that

15   process.  So what we see is we see, you know,

16   shorter disclosures oftentimes in a TV ad than

17   what we would see on a website.

18        So the key for consumers in doing that

19   is that you are giving them the appropriate

20   amount of information for them to know that

21   there is a restriction, there is a certain

22   category of restriction, and here's where they

23   can go for more information.

24        So that can be in a TV ad, but trying

25   to include all of the words there would lead to

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    a worse information processing environment for

2    consumers, and so when you put that on a

3    website, a couple of important things happen.

4    One, you're getting people at a stage of the

5    buying process where they're, you know, in many

6    cases going to be further along, so they're more

7    engaged with finding that out.

8              As I mentioned before, they still could

9    be at information search when they're there, but

10   they are personally motivated then to look for

11   the disclosure.  And another really key aspect

12   of this is that on a website consumers can

13   control the flow of the information.

14             In a TV ad, everyone sees the

15   information come to them at the same -- at the

16   same rate if they're watching the same ad.  On a

17   website people can slow down.  They can -- they

18   can process it.  They can understand it.  Those

19   with more familiarity may read it more quickly,

20   but that ability for consumers to process

21   information at the speed that's right for them

22   is what makes a website importantly different

23   from a TV ad.

24        Q.   And that last point, that consumers can

25   control the flow of information on a website in

Trial - Public Record
Intuit, Inc.                                                    4/5/2023

1    a way they can't in a TV ad, is that true for

2    anyone's TV ads or -- in any product or is it

3    just a TurboTax thing?

4         A.    It's really across products.  I mean,

5    you know, people are seeing an ad, a 30-second

6    ad.  Everyone is seeing that within -- within 30

7    seconds, processing a huge amount of information

8    within a -- within a short period, even 30

9    seconds being short, but if it's TikTok or

10   Snapchat or something, it's even less time.  So

11   having all consumers process that much

12   information in the same amount of time is not

13   really thinking about a personalized buying

14   process.

15        The website allows people to

16   personalize to essentially get the -- get all

17   the information that they want but do it in a

18   way where they control the pace of that

19   information.  It's definitely going to enhance

20   consumer understanding to do it in that way.

21        Q.    And really more out of curiosity, does

22   every consumer want precise information about

23   every product?

24        A.    No, because consumers are at different

25   stages of the buying process.  They -- they are

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial - Public Record

Intuit, Inc.                                              4/5/2023

1    how consumers interact with a TV ad they know is
2    fundamentally different with how they would
3    interact with something they received through an
4    online channel.
5        Q.   Okay.  And by doing the click-throughs,
6    what exactly do you mean?
7        A.   So when they -- in a social media
8    environment or an online environment, where
9    consumers click, they would go on to more
10   information there, and consumers understand from
11   their experience that they will be able to get
12   to that information.
13            So while the route by which that
14   happens can differ between TV advertising, where
15   the website name, you know, is explicitly there,
16   TurboTax.com, consumers understand that they can
17   do a click-through in an online environment
18   means that consumers know where to go to find
19   more information.
20       Q.   All right.  So let's go through in a
21   little more detail the pieces of the disclosures
22   present in the Turbo Tax free product
23   advertising, and are you familiar with what's on
24   the slide, Professor Golder?
25       A.   Yes, I am, definitely.

Trial - Public Record

Intuit, Inc.                                          4/5/2023

1        Q.    What are you depicting here?

2        A.    So here, as it says on the top, these

3    are disclosures in the Turbo Tax free product TV

4    ads.  They convey the existence -- again, the

5    first two criteria were the existence and

6    category of restriction -- and so here in the

7    top line, just to focus on the top line for now,

8    again, we see the specific name of the product,

9    it's "Free Edition."  It's not all "TurboTax."

10   It's "TurboTax Free Edition."  So we know that

11   there is this -- it reinforces the idea that

12   there are these SKUs, and one of which is free.

13       Q.    Okay.  And now, so, TurboTax Free

14   Edition, why is it that you say that means not

15   all TurboTax products?

16       A.    So because TurboTax, like its

17   competitors or like some of its competitors in

18   this industry, has a -- typically a full product

19   lineup, as is most common.  For TurboTax, it's,

20   you know, the free, deluxe, premier,

21   self-employed.  Other companies have a similar

22   structure, and it's one of those products that's

23   free, and the others are paid, and that

24   information is readily available to consumers on

25   the website and also from their general

Trial - Public Record

Intuit, Inc.                                                        4/5/2023

1    understanding that all of the company's products
2    are not going to be free.
3         Q.   Okay.  Now, next it says "For simple
4    U.S. returns only."  What's your opinion of that
5    phrase?
6         A.   So this phrase, again, by itself
7    conveys the existence of a restriction.  It also
8    employs -- it also depicts the category of the
9    restriction, and here the category is simple,
10   which, of course, relates to tax complexity.
11        Q.   And one thing I'm interested in from
12   your view is we haven't heard much yet in this
13   case, the word "only."  What is "only" doing in
14   this disclosure?
15        A.   "Only" is a really important word as
16   well because it, again, conveys restriction.  I
17   mean, a reasonable consumer understands that
18   "only" is clearly not all, and it is a limiting,
19   restricting word for -- for people, and it's --
20   it's important as part of this -- this overall
21   language.
22        Q.   Okay.  Does a consumer need to
23   understand exactly what constitutes a simple
24   U.S. return in order for this disclosure to be
25   effective?

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1          A.    No.

2          Q.    Why not?

3          A.    Because -- so if I go back to my

4     criteria for effective disclosure -- which,

5     again, are based on the marketing research

6     academic literature -- we have the existence of

7     a restriction, and we have the category

8     restriction, and just in this top line alone, we

9     have existence in three ways, really, and we

10    have category in two ways.

11          So existence is about the product

12    restriction, the simple return restriction, and

13    the only restriction.  The category restriction

14    is both at the product line level and at the tax

15    complexity level.  So we have those first two

16    criteria met in this first line alone.

17          I'll also reference the fourth

18    criterion about "appropriate for the buying

19    process," because this level of disclosure and

20    this level of detail of disclosure is consistent

21    with the buying process and it's consistent with

22    the media that the consumers are engaging with

23    at that stage of the buying process.

24          Q.    Okay.  And let's say a consumer for

25    whatever reason didn't understand what "simple

Trial - Public Record

Intuit, Inc.                                                        4/5/2023

1    U.S. returns" meant, you know, after reading it

2    or hearing it in the voiceover.  Where -- in

3    your work on this case, did you see places where

4    consumers could go to find out what "simple tax

5    returns" means?

6         A.   Sure.  There's much information about

7    simple returns, and I believe there's -- the

8    next slide has some information about simple,

9    but there's much information from -- from the

10   IRS, from competitors, from ordinary everyday

11   language.

12        Q.   Okay.  And.  More broadly, did you form

13   an opinion about how reasonable consumers would

14   interpret the phrase "simple tax returns only"?

15        A.   Sure.  Simple tax returns is logical

16   and common terminology, and it's based on my

17   analysis of this market where Intuit is aligned

18   with what the IRS is doing, which makes a lot of

19   sense.  From a consumer perspective, I think

20   there's also -- critically important here is

21   that consumers are seeing this language used by

22   competitors.

23            So as they go through this research

24   process, not only are they seeing this word

25   for -- from TurboTax, but they're seeing this

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    across the competitors.  So when consumers are

2    searching, this is the word that they're

3    familiar with seeing in many situations.

4         The third point I'll just mention very

5    briefly on this slide is that, you know,

6    "simple" matches a common dictionary definition.

7    So "simple" is -- for a reasonable consumer is

8    clearly the antonym of "complex," and reasonable

9    consumers know that "simple" is not synonymous

10   with "all."

11        MS. PLETT:  Your Honor, objection.  The

12   dictionary definition of "simple," that analysis

13   was not included in Professor Golder's report in

14   this matter.

15        JUDGE CHAPPELL:  Response?

16        MR. GRINGER:  One second, Your Honor.

17        Paragraph 114, footnote 188, he

18   discusses that consumers have an understanding

19   of the term, and that's the antonym of the

20   phrase "complex," and that it continues on that

21   it's very straightforward.

22        JUDGE CHAPPELL:  That's close enough.

23   The objection's overruled.

24        BY MR. GRINGER:

25   Q.   Okay.  So from your review of "simple

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    returns only," can we go back to the slide where

2    Professor Golder is dissecting, for lack of a

3    better term, the TurboTax TV ad disclosures?

4         Okay.  Now, "TurboTax Free Edition is

5    for simple U.S. returns" is not the end of the

6    disclosure.  Am I right?

7         A.   Correct.

8         Q.   And I should say, you heard Professor

9    Novemsky's testimony in this case?

10        A.   I did.

11        Q.   And you've had the opportunity to read

12   his report?

13        A.   Correct.

14        Q.   Do you recall him doing in his

15   perception study any testing of the phrase "see

16   if you qualify at TurboTax.com"?

17        A.   No, I did not.

18        Q.   Okay.  So now I want to ask you about

19   that phrase, "See if you qualify at

20   TurboTax.com."  What work, if any, does that

21   phrase do?

22        A.   So going back to the criteria for

23   effective disclosures, this, again, presents the

24   existence of the disclosure.  So "See if you

25   qualify" is clearly that there will be some

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    restrictions.  It's not going to be all, and
2    importantly, it's directing people to the
3    website, TurboTax.com.  In this way the website
4    and the content of the website is clearly being
5    integrated into the ad by encouraging consumers
6    to go there.
7            So this lower line alone is really
8    existence of restriction.  It's telling
9    consumers where to go for more information, and
10   it's consistent with where they are in the
11   buying process.
12       Q.    And since you've been listening in
13   court for several days now and have heard -- I
14   assume you have heard some of the current
15   TurboTax ads that are running played --
16       A.    I have.
17       Q.    -- and did you hear in those ads the
18   verbal disclosure, "See if you qualify at
19   TurboTax.com"?
20       A.    I did.
21       Q.    Okay.  And let's follow that
22   encouragement, and let's go to the TurboTax.com
23   website.  As a part of your review, did you have
24   an opportunity to look at TurboTax's website?
25       A.    Absolutely.  It's a very important part

Trial - Public Record

Intuit, Inc.                                                    4/5/2023

1    of their marketing.

2        Q.    Okay.  And what did you review the

3    TurboTax website for?

4        A.    So I reviewed the website primarily

5    focusing on the disclosures.  I looked across a

6    range of their pages within that.  I looked at

7    the homepage.  I looked at the simple returns

8    pop-up.  I looked at the Free Edition page.  I

9    looked at the products and pricing page.

10        So I looked at the content of all of

11    those important pages and was certainly paying

12    attention to the disclosure language across

13    those pages.

14        Q.    Okay.  And as part of your review of

15    the TurboTax website, did you review multiple

16    iterations of that site?

17        A.    I did, from tax year 2015 through --

18    through the -- through the present, the most

19    recent I could observe.

20        Q.    Okay.  And you've said now a couple

21    times, Professor Golder, that the TurboTax

22    website is integrated into TurboTax's free

23    product advertising.  What does that mean?

24        A.    To me I view it as integrated because

25    it's specifically invoked within the ad, because

Trial - Public Record

Intuit, Inc.                                          4/5/2023

1    it's mentioned in the ad itself.  Consumers are

2    encouraged within the ad to go to the website,

3    and really this messaging is just reinforcing

4    what consumers are inclined to do anyway.

5          Consumers understand that websites have

6    information.  We see from, you know, some of the

7    earlier slides that consumers are doing -- are

8    looking at websites in particular in this

9    industry, the tax preparation industry, and the

10   ads are really reinforcing that natural kind of

11   behavior of consumers across a range of markets,

12   but particularly in markets where they are --

13   where they are highly involved.

14         So those are the reasons why I view the

15   website really being integrated into the

16   advertising and certainly what customers are

17   thinking about as they view the ads.

18      Q.   Okay.  Now, you say -- and we want to

19   be clear here -- you say the website is

20   specifically invoked in the ads.  What are you

21   referring to specifically?

22      A.   So right here on the screen we see it

23   reads, "See if you qualify at TurboTax.com."  It

24   couldn't be clearer.

25      Q.   Okay.  And, you know, I see the ".com."

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555