**Index of Exhibits Supporting the FTC's Opposition to Intuit's Stay Motion**

| Exhibit | Description |
|---|---|
| A | Administrative Complaint (March 28, 2022) (Public) |
| B | ALJ Initial Decision and Findings of Fact (September 6, 2023) (Public) |
| C | Statement of Chair Lina M. Khan Regarding the Petition for Recusal from Involvement in Intuit Inc., https://www.ftc.gov/system/files/ftc_gov/pdf/statement_of_chair_lina_m._khan_re_intuit_inc.pdf (November 18, 2022) |
| D | Intuit FTC Appeal Brief (September 26, 2023) (Public) |
| E | Janine Perri, TurboTax supercharges its market share during 2021 tax season, https://secondmeasure.com/datapoints/tax-prep-2021-turbotax-hrblock-blucora/ (June 17, 2021) (GX289) |

# EXHIBIT A

192 3119

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**     Lina M. Khan, Chair
Noah Joshua Phillips
Rebecca Kelly Slaughter
Christine S. Wilson

| | |
|---|---|
| **In the Matter of:** | **Docket No. 9408** |
| **Intuit Inc.,** a corporation. | **REDACTED PUBLIC VERSION** |

## COMPLAINT

The Federal Trade Commission, having reason to believe that Intuit Inc., a corporation ("Respondent"), have violated the provisions of the Federal Trade Commission Act, and it appearing to the Commission that this proceeding is in the public interest, alleges:

1.     Respondent Intuit Inc. is a Delaware corporation with its principal office or place of business at 2700 Coast Ave., Mountain View, California 94043.

2.     Respondent has advertised, marketed, promoted, distributed, and sold online tax preparation products and services, including TurboTax.

3.     The acts and practices of Respondents alleged in this complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

### Summary of the Case

4.     Respondent Intuit advertises, markets, promotes, distributes, and sells TurboTax, a commonly used online tax preparation service that enables users to prepare and file their income tax returns. (As used in this Complaint, "TurboTax" only refers to online products and services.)

5.      Much of Intuit's advertising for TurboTax conveys the message that consumers can file their taxes for free using TurboTax, even going so far as to air commercials in which almost every word spoken is the word "free." For example, an ad called "Auctioneer," which depicts a cattle auction with a fast-talking auctioneer and a crowd of grizzled cowboys:



AUCTIONEER: And free, and free, and free, and free, and free. Now a bidder and free! Now give me another bidder and free, and a free here and a free free free a free free free. Now a bidder and free! Now give me another bidder and free, and a free free free. And free, and free, and free, and free free free and free. Here we go at free, free, free and free. Free! Now give me another bidder and free. Hit free and here, free, free, free, freeeeeeeeeeeeee. Free!

VOICEOVER: That's right, TurboTax Free Edition is free. See details at TurboTax.com.

6.      In truth, TurboTax is only free for some users, based on the tax forms they need. For many others, Intuit tells them, after they have invested time and effort gathering and inputting into TurboTax their sensitive personal and financial information to prepare their tax returns, that they cannot continue for free; they will need to upgrade to a paid TurboTax service to complete and file their taxes.

7.      Until 2021, Intuit offered a free online version of TurboTax through the IRS Free File Program, a public-private partnership with the IRS, that was available to low-income consumers regardless of which tax forms they need.

8.      As detailed herein, Intuit has engaged in, and is engaging in, deceptive business practices in the advertising, marketing, distribution, and sale of TurboTax.

## Respondent's Business Activities

### I.      TurboTax's "Freemium" Version: TurboTax Free Edition

9.      



10.      involves, in part, growing Intuit's customer base by offering free services to consumers

11.      also involves persuading consumers to upgrade from free to paid versions of TurboTax.

12.      further involves "brand loyalty," or retention of consumers who previously filed their taxes for free in the "freemium" version of TurboTax returning to TurboTax in subsequent years when they are no longer eligible for the "freemium" version, and paying Intuit for a paid version of TurboTax.

13.      Since at least 2017, Intuit has called the "freemium" version of TurboTax the "TurboTax Free Edition." In 2016, Intuit called the "freemium" version of TurboTax the "Federal Free Edition."

14.      The "freemium" version of TurboTax is available only to consumers with "simple" tax returns, as defined by Intuit; other consumers are required to upgrade to paid versions of TurboTax.

15.      In 2017 and 2018, when consumers filed tax returns for Tax Year ("TY") 2016 and 2017 (*e.g.* taxes filed in 2017 for income earned in 2016), Intuit defined a "simple" tax return as a return that could be filed using a 1040A or 1040EZ tax form.

16.     In 2019 and 2020, when consumers filed tax returns for TY 2018 and 2019, Intuit defined a "simple" tax return as a return that could be filed on a Form 1040, with no attached schedules.

17.     In 2021, when consumers filed tax returns for TY 2020, Intuit defined a "simple" tax return as a return that could be filed on a Form 1040, with no attached schedules, except to claim unemployment income.

18.     Intuit currently (for TY 2021) defines "simple" tax return as a return that can be filed on a Form 1040 with limited attached schedules to cover a few distinct tax situations, including student loan interest paid.

19.     Consumers who receive income reported through certain types of IRS Form 1099 are not eligible for the "freemium" version of TurboTax, regardless of their income. This includes consumers who receive independent contractor or small business income, such as consumers working in the gig economy by, for example, providing rideshare services or delivering groceries.

20.     From TY 2018 to at least TY 2019, consumers who claimed student loan interest deductions were not eligible for the "freemium" version of TurboTax, regardless of their income.

## II.     Advertising Practices: Intuit's Ads Misrepresent that Consumers Can File Their Taxes for Free Using TurboTax

21.     Since at least 2016, Intuit has promoted TurboTax through advertising that represents that consumers can file their taxes for free using TurboTax.

22.     ███████████████████████████████████████████████
███████████████████████████

23.     Intuit has employed ads, including via television, YouTube, and other social media, marketing the "freemium" version of TurboTax, including but not limited to those in its "Absolute Zero" and "Free, Free, Free, Free" campaigns.

24.     Intuit's "Absolute Zero" campaign informed consumers "at least your taxes are free."

25.     For the Absolute Zero campaign, Intuit's goal was for consumers to believe the offering was truly free, and Intuit included the words "Free Guaranteed"

4

in its Absolute Zero marketing to bolster and emphasize the claim that the offer was truly free.

26.    Intuit also continues to run an ad campaign it calls "Free, Free, Free, Free" in which "free" is essentially the only word spoken by the actors in the commercials, until the voice over at the end of the advertisement. Intuit used at least six different advertisements in this campaign, including an advertisement in which "free" was a word in a spelling bee, another in which a court stenographer recorded a legal proceeding in which "free" was the only word used, and another in which an exercise class instructor chants "free" while leading a group workout. A freeze frame with closed captioning from the exercise class commercial, which Intuit is currently airing, appears below. In several ads, the word "free" is repeated over 40 times in a 30-second ad.



27.    Commercials in the "Free, Free, Free, Free" campaign have informed consumers that "TurboTax Free is free, free free free free."

28.    Many of Intuit's ads contain a fine print disclaimer at the end of the commercial informing consumers that the offer is limited to consumers with "simple tax returns" or "simple U.S. returns only."

29.    The disclaimers are inadequate to cure the misrepresentation that consumers can file their taxes for free using TurboTax, when in truth, in numerous instances Intuit does not permit consumers to file their taxes for free using TurboTax. The disclaimers:

5

a) Are disproportionately small compared to the prominent text emphasizing that the service is free.

b) Appear for just a few seconds, when the commercials aired in 15-, 30-, and 60-second versions.

c) Are in writing only, often in font color similar to the background color, and are not read by a voiceover.

30. Depicted below is a copy of a screen displayed to consumers during commercials aired as part of the "Free, Free, Free, Free" campaign, which includes a fine print disclaimer that the free offer was available only to consumers with "simple U.S. returns."



31. What "simple" means can be a matter of interpretation, and Intuit's definition of "simple" has changed over time.

32. While the above screen was shown to consumers during commercials, in at least some of Intuit's commercials, an announcer said: "That's right, TurboTax Free is free. Free, free free free." The announcer did not read the fine print disclaimer that it is for the "Free Edition product only. For simple U.S. returns." Intuit has never offered a product or service named only "TurboTax Free"—those words have always been a component of longer names such as "TurboTax Free Edition" (for the "freemium" version of TurboTax).

33.    Depicted below is a copy of a screen displayed to consumers during commercials currently airing as part of the "Free, Free, Free, Free" campaign, which includes a similar fine print disclaimer:



34.    While the above screen is shown to consumers briefly at the end of the "Free, Free, Free" commercials, an announcer says: "That's right, TurboTax Free Edition is free. See details at turbotax.com." The announcer does not read the fine print disclaimer stating: "TurboTax Free Edition is for simple U.S. returns only."

35.    Given this advertising, reasonable consumers may believe that the TurboTax products and services Intuit advertises as free are free for them—that they can file their taxes for free using TurboTax. In addition, at least one of TurboTax's competitors, Cash App Taxes (formerly Credit Karma Tax), has offered a truly free online tax preparation and filing service to all consumers for five years. Further, online products and services in many industries are routinely offered to consumers completely free of charge, leading consumers to understand that online tax preparation products and services are often truly free.

### III.    Website Practices

#### A.    Intuit's TurboTax Home Page Misleads Consumers into Believing They Can File Their Taxes for Free Using TurboTax

36.    The TurboTax website does not disclose adequately to consumers, including those who see Intuit's advertisements, the limitations on eligibility for the "freemium" version of TurboTax.

37.    For example, for TY 2018, the TurboTax home page contained the following screen, which mimicked the "Free, Free, Free, Free" ad campaign:



38.    The screen above, shown to consumers filing tax returns for TY 2018, failed to disclose adequately the limitations on eligibility for at least three reasons:

    a)    First, the limitations on eligibility were preceded by the words "FREE, guaranteed." Intuit employees responsible for overseeing the marketing and marketing strategy for the "freemium" version of TurboTax included "guaranteed" ▮▮▮▮▮▮▮▮

    b)    Second, the disclosure language stated that consumers could file their "simple tax returns for FREE," but no guidance was given about the meaning of "simple tax return" on that screen. In a significant example, Intuit would not have considered consumers receiving income reported on certain types of IRS Form 1099 as having a "simple tax return." This includes consumers receiving independent contractor or small business income, such as consumers working in the gig economy by, for example, providing rideshare services or delivering groceries.

    c)    Third, the eligibility requirement disclosures were hidden behind a hyperlink over the words "See why it's free." Consumers had to click on the hyperlink to trigger a pop up explaining the limitations.

39.     Consumers who clicked on the orange button saying "File for $0" on the screen above were brought to a login screen to commence an online, automated "interview" to begin entering information to file their taxes. Consumers who were not eligible for the "freemium" version of TurboTax would not learn they were ineligible until they had already invested significant time and effort creating an account and inputting their sensitive personal and financial information into TurboTax.

40.     For TY 2019, Intuit used a similar screen, pictured below, with an even greater emphasis that consumers were "guaranteed" to file their taxes for free. Again, consumers who were not eligible for the "freemium" version of TurboTax would not learn they were ineligible until they had already invested significant time and effort creating an account and inputting their sensitive personal and financial information into TurboTax.



41.     Since TY 2020, Intuit has continued to employ a customer interview model in which consumers who are not eligible for the "freemium" version of TurboTax do not learn they are ineligible until they have already invested significant time and effort creating an account and inputting their sensitive personal and financial information into TurboTax.

42.    The screen Intuit currently uses on its website, for TY 2021, is pictured below.



43.    Once again, Intuit's current website page emphasizes "FREE," "$0," and "File for $0" at the top of the page, when in numerous instances Intuit does not permit consumers to file their taxes for free using TurboTax. While "Simple tax returns only" is hyperlinked to more detailed terms and conditions, the term "simple tax returns" is not understood by many consumers, and consumers who assume they have a "simple tax return" are not likely to click to read more.

44.    Thus, Intuit continues to bombard consumers with the message that they can file their taxes for "free." Intuit baits consumers with deceptive ads and then compound the deception with more false claims and buried disclosures.

**B.    The TurboTax Interview Process Uses Required Upgrades Called "Hard Stops" to Induce Consumers to Upgrade from Free to Paid Versions of TurboTax**

45.    Intuit has represented, and currently represents, to consumers who are not eligible for the "freemium" version of TurboTax that they must pay Intuit to file their tax returns online with TurboTax. Intuit informed consumers of these required upgrades using screens its employees call "Hard Stops." Consumers are later required to pay for the upgraded version of TurboTax, either by providing payment information or agreeing to an additional charge to pay using their tax refund after their returns have been prepared and are ready to file.

46.    When consumers use the "freemium" version of TurboTax, it asks them a series of questions on successive webpages about their financial situation. These questions enable Intuit to determine whether consumers are eligible for the "freemium" version of TurboTax and include, among other things, whether the consumer paid student loan interest or was self-employed.

47.    Next, consumers are prompted to input their income by category. When consumers indicate that they need to report income on certain types of IRS Form 1099 (which could be because entities that paid them classified them as independent contractors, such as consumers working in the gig economy by, for example, providing rideshare services or delivering groceries), the "freemium" version of TurboTax displays a Hard Stop informing them that they cannot proceed for free. For example, Intuit's TY 2019 "Business Income Upgrade" Hard Stop, depicted below, told consumers: "To accurately report this income, you'll need to upgrade." Hard Stop screens then offer consumers the option to upgrade and pay for a paid version of TurboTax, such as TurboTax Deluxe or TurboTax Self-



Employed. At various times during TY 2018 and 2017, Intuit charged $59.99 for TurboTax Deluxe and $119.99 for TurboTax Self-Employed.

48.     The headline in the Business Income Hard Stop states that consumers must upgrade to a paid version of TurboTax to "accurately report this income."

49.



50.     The chart in the Business Income Hard Stop depicted above included a button that said "keep free" below the column for TurboTax Free Edition, even though the consumer could not actually continue using TurboTax Free Edition and report all of their income to the IRS. Indeed, consumers who clicked on the keep free button were shown what Intuit calls its "Are you sure," or "AYS" screen, depicted below.



51.     The Are You Sure screen again used the headline: "You need Deluxe or Self-Employed to accurately report your business income because Free Edition doesn't cover your situation."

52.     Consumers who clicked the "I don't have this income" button on the Are You Sure screen were prompted to re-enter their income. Consumers who again entered the same Form 1099 income were again shown the Business Income Hard Stop; in TY 2018 and prior, when those same consumers again clicked "Keep Free" the second time they encountered it, they would have again been shown the Are You Sure screen, placing those consumers into a feedback loop that ended only if

they upgraded to a paid version of TurboTax or chose not to report that Form 1099 income.

53. A current Hard Stop, depicted below, tells consumers: "To accurately report this income, you'll need to upgrade." The Hard Stop screen offer consumers the option to upgrade and pay up to $59.99 for TurboTax Deluxe and up to $119 for TurboTax Self-Employed at full price (though discounts may be available, as in the case below).



## To accurately report this income, you'll need to upgrade

|  | Free Edition | Deluxe | Self-Employed |
|---|:---:|:---:|:---:|
| **Report W-2 income** | ✔ | ✔ | ✔ |
| **Report multiple sources of income**—1099-NEC, 1099-MISC, 1099-K, & more |  | ✔ | ✔ |
| **One-on-one help**—get personalized answers from a TurboTax specialist |  | 👤 | 👤 |
| **Maximize deductions**—claim business expenses related to auto, utilities, supplies, & more |  |  | ✔ |
|  | $0* | ~~$59~~ $39*<br>State additional | ~~$119~~ $89*<br>State additional<br>Pays for itself |
|  | Don't upgrade | Upgrade | Upgrade |

Don't worry about pulling out your wallet—look for the payment option to deduct the cost from your federal refund when you file.

*Important offer details and disclosures

54. Intuit has used and is using many other Hard Stops to induce consumers who start in the "freemium" version of TurboTax to upgrade to a paid version based on certain types of income, such as income from a farm, farm rental or farm equipment; selling a home; a prior year state tax refund; or investments.

55. Intuit also has used and is using Hard Stops to induce consumers who start in the "freemium" version of TurboTax to upgrade to a paid version when

13

seeking certain tax credits or deductions. An example that was in place during at least TY 2018 and TY 2019 was a deduction for paying student loan interest.

56.



57.     Thus, Intuit's deceptive door-opener ads described above bring consumers to the TurboTax website representing that consumers can file their taxes for free using TurboTax, but once there, many consumers encounter screens that inform them that they cannot complete and file their taxes for free.

58.     In the case of the Hard Stop screens, this confrontation comes after consumers have already created a TurboTax account and expended substantial time inputting sensitive personal and financial information into Intuit's user interface.

## IV.     Intuit's Truly Free Version of TurboTax: The Free File Version

59.     Intuit's advertisements funneled consumers to the purportedly-free version of TurboTax, only to require ██████ upgrade and pay Intuit to file their taxes after consumers had invested time and shared sensitive information with Intuit.

60.     All the while, many low- and middle-income consumers that paid Intuit to upgrade to a paid version of TurboTax would have been eligible to prepare and file their taxes electronically at no cost through the IRS Free File Program, a public-private partnership formed in 2002 between the IRS and a consortium of online tax preparation and filing companies, formerly including Intuit, pursuant to a Memorandum of Understanding ("MOU").

61.



62.     Until 2021, when Intuit left the IRS Free File Program, the Free File version of TurboTax provided an online solution for all IRS tax forms, regardless of consumers' sources or types of income or the variety of their deductions or tax credits, so long as consumers fell within the prescribed adjusted gross income threshold that Intuit set each year. The only other version of TurboTax that would

14

have provided equal coverage for all tax situations and tax forms is its most expensive paid version of TurboTax, TurboTax Self Employed.

### A.    The IRS Free File Program

63.    Under the IRS Free File Program MOU, participating companies offer free online tax preparation services to low- and middle-income Americans. Participating companies are prohibited from marketing to consumers while those consumers use their Free File offerings. In exchange, the IRS agreed not to compete with the participating companies in providing free, online tax return preparation and filing services to consumers. In a December 2019 addendum to the most recent MOU concerning the program, the IRS dropped its agreement to refrain from competing with the private providers; however, there is no current indication that the IRS intends to enter the market.

64.    Historically, consumer participation in the IRS Free File Program has been low. In 2018, approximately three million of the nearly 104 million consumers who were eligible to do so used the IRS Free File Program to file their federal taxes. At its peak usage in 2005, 5,142,125 consumers used the IRS Free File Program to file their federal taxes.

65.    The IRS has set eligibility thresholds for participation in the Free File Program based on consumers' adjusted gross income ("AGI"). Consumers with an AGI equal to or less than 70% of the U.S. consumer population are meant to be eligible for the program. The MOU, however, requires that no company make its Free File offering available to more than 50%, or less than 10%, of eligible consumers. Each company is free to set its own eligibility requirements to stay within that range.

### B.    The Free File Version of TurboTax

66.    From 2003 to October 2021, Intuit offered the Free File version of TurboTax as part of the IRS Free File Program.

67.    Intuit employees involved in marketing and strategy related to offering the "freemium" and Free File versions of TurboTax acknowledged that these two versions of TurboTax competed with each other.

68.    From 2017 (for TY 2016) to 2021 (for TY 2020), Intuit made the Free File version of TurboTax available to all consumers who were eligible for the earned income tax credit.

69.     From 2017 to 2021, Intuit also made the Free File version of TurboTax available to all consumers with an AGI that did not exceed specified AGI thresholds:

| Tax Year | Maximum AGI |
| --- | --- |
| 2016 (returns filed in 2017) | $33,000 |
| 2017 (returns filed in 2018) | $33,000 |
| 2018 (returns filed in 2019) | $34,000 |
| 2019 (returns filed in 2020) | $36,000 |
| 2020 (returns filed in 2021) | $39.000 |

70.     From 2017 to 2021, Intuit also made the Free File version of TurboTax available to all active duty military service members with an AGI that did not exceed specified AGI thresholds:

| Tax Year | Maximum AGI |
| --- | --- |
| 2016 (returns filed in 2017) | $64,000 |
| 2017 (returns filed in 2018) | $66,000 |
| 2018 (returns filed in 2019) | $66,000 |
| 2019 (returns filed in 2020) | $69,000 |
| 2020 (returns filed in 2021) | $72.000 |

(These limits were the maximum AGIs allowable in the IRS Free File Program for any consumer using any participating company for those years.)

71.     Although consumers primarily accessed the Free File version of TurboTax via IRS.gov, they have also accessed it directly via Intuit's internet landing page for the Free File version of TurboTax, which is different from the landing page for its "freemium" and paid versions of TurboTax.

72.     Intuit changed the name of the Free File version of TurboTax several times. Intuit also used different names for the Free File version of TurboTax at the same time, depending on where the Free File version of TurboTax was being marketed.

73.     Prior to TY 2018, Intuit called the Free File version of TurboTax "TurboTax Freedom Edition." Upon information and belief, the internet landing page for TurboTax Freedom Edition prior to TY 2018 was turbotax.intuit.com/taxfreedom.

74.     For TY 2018, Intuit changed the name of the Free File version of TurboTax to "TurboTax Free File Program." Intuit used the same internet landing

16

page for TurboTax Free File Program as it did for TurboTax Freedom Edition: turbotax.intuit.com/taxfreedom.

75.    From at least TY 2016 through and including TY 2018, Intuit used a different name to market the Free File version of TurboTax on the IRS.gov website. On the IRS.gov website, Intuit marketed the Free File version of TurboTax as "TurboTax All Free ℠."

76.    Intuit sought and obtained registered trademark protection for the name TurboTax All Free.

77.    For TY 2019 and 2020, Intuit changed the name of the Free File version of TurboTax to "IRS Free File Program Delivered by TurboTax." This change was required by an amendment to the MOU between the IRS and the participating tax preparation companies that required uniform naming of all IRS Free File Program offerings. The internet landing page for the IRS Free File Program Delivered by TurboTax for TY 2019 was https://freefile.intuit.com/.

C.    **The Tension Between the Free File and "Freemium" Versions of TurboTax**

78.    Intuit has long feared that the government would "encroach" on its tax preparation business. To address this risk, the company had a comprehensive anti-encroachment strategy, including the Free File version of TurboTax, which yielded benefits to the company. Intuit called the company's participation in the IRS Free File Program the "lynchpin" of its efforts to avoid government "encroachment" into the tax preparation industry.

79.    As the Treasury Inspector General for Tax Administration testified before the House Ways and Means Committee on April 6, 2006, the "primary goal" of the Free File Program "is to keep the Federal Government from entering the tax preparation business."

80.    Indeed, Intuit has acknowledged the competitive threat of a government-run free e-filing system. In Securities and Exchange Commission ("SEC") filings, Intuit stated that "We … face potential competitive challenges from publicly funded government entities that offer electronic tax preparation and filing services at no cost to individual taxpayers." Intuit further acknowledged that participation in the IRS Free File Program "has kept the federal government from being a direct competitor to Intuit's tax offerings."

81.     In a Form 10-Q for the quarterly period ending January 31, 2019, Intuit stated that: "Our consumer tax business also faces significant competition from the public sector …. If the Free File Program were to be terminated and the IRS were to enter the software development and return preparation space, the federal government would become a publicly funded direct competitor of the U.S. tax services industry and of Intuit. Government funded services that curtail or eliminate the role of taxpayers in preparing their own taxes could potentially have material and adverse revenue implications."

82.     Intuit employees have recognized a need to keep participation in the IRS Free File Program at numbers sufficiently high to ensure the continued viability of the program.

83.     Intuit has recognized that high participation in the IRS Free File Program would dent its bottom line, but that, at the time, it had to keep Free File enrollments at a certain level to prevent government "encroachment."

84.     At the same time, as one Intuit employee wrote, "we need to make sure that FFA [the Free File Alliance] is not cannibalizing the our [sic] commercial products."

**D.     Consumer Confusion About the Names of the Free File and "Freemium" Versions of TurboTax and Intuit's Decision to Change the Name of the Free File Version of TurboTax**

85.     For several years prior to TY 2018, Intuit employees tasked with overseeing the marketing strategy for both the Free File and "freemium" versions of TurboTax considered changing the name of the Free File version of TurboTax.

86.     Since at least 2013, Intuit knew that consumers were confused by the similarity of the names of these versions of TurboTax.

87.     

88.     Intuit included the word "free" in the name of its commercial "freemium" version of TurboTax, TurboTax "Free Edition," even though, in TY 2020, for example, it was not free for two-thirds of U.S. taxpayers.

89.     From at least TY 2015 through TY 2017, Intuit named the Free File version of TurboTax "Freedom Edition," which does not indicate that it is free

despite being part of a program that provides free tax preparation and filing services for 70% of taxpayers.

90. In 2013, one employee tasked with branding and marketing strategy for both the Free File and "freemium" versions of TurboTax wrote: "As you know, our customers get confused between the 'Freedom Edition' and the 'Federal Free Edition.' We'd like to try to drive more clarity between the two products and I think a name change would help."

91. In 2014, Intuit employees again considered whether to change the name of the Free File version of TurboTax.

92. On June 18, 2018, *Pro Publica,* an independent online investigative journalism organization, reported that the IRS Free File Program was underused by eligible consumers, stating that only about 3% of eligible consumers used it. The article theorized that part of the reason for low usage was that companies such as Intuit had confusing names for their free offerings, noting the similarity between TurboTax Free Edition and TurboTax Freedom Edition. Intuit employees also noted around the same time that *The Hill* and *CBS Sunday Morning* issued similar reports.

93. The next month, in July 2018, Intuit's head of government affairs unsuccessfully urged that the company change the name of the Free File version of TurboTax from TurboTax Freedom Edition to TurboTax Free File Edition.

94. 

95. Although Intuit changed the name of the Free File version of TurboTax to TurboTax Free File Program for TY 2018, it continued to market the Free File version of TurboTax on the IRS.gov website using the trademarked name TurboTax All Free. Moreover, Intuit was aware that changing the name to TurboTax Free File Program would not create any additional clarity for its customers and that consumers would be confused between TurboTax Free File Program and TurboTax Free Edition, especially due to the company's focus on the use of "free" in marketing TurboTax.

96.     In 2019, this time pursuant to an amendment to the IRS Free File MOU, Intuit again changed the name of the Free File version of TurboTax, renaming it to IRS Free File Program Delivered by TurboTax.

**E.    For TY 2018, Intuit Hid Its Free File Landing Page from Search Engines for Approximately Five Months During the Peak of Tax Season**

97.     While Intuit funneled consumers to the "freemium" version of TurboTax and ultimately directed many to upgrade and pay, it made it difficult for consumers to find the Free File version of TurboTax.

98.     

99.     In July 2018, one Intuit employee involved with the marketing strategy related to both the Free File and "freemium" versions of TurboTax explained that: "From a [search engine optimization] perspective, changing to 'Free File' in the name ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ think that any TTFE [TurboTax Freedom Edition] product name ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with our 'Free Edition'."

100.      Revenue growth is the most important financial indicator Intuit uses to assess its business, including revenue growth for each reportable segment of the company.

101.     In September 2018, one Intuit employee explained: "it sounds like we have the ability to block our FFA offering/landing page from organic search if we rename to TurboTax Free Edition. This sounds like a great solution if we learn that TurboTax Free File does start to outrank our commercial Free."

102.     Facing this risk of lost revenue and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for TY 2018, Intuit blocked the landing page for its newly named Free File version of TurboTax so that it would not be indexed (listed) by online search engines. That block was in place from November

13, 2018, to April 26, 2019. This timeframe covered the vast majority of Intuit's 2019 tax filing season, which is the time it received revenue from consumers using TurboTax to file tax returns for TY 2018.

103.    For TY 2017, almost 1,225,000 consumers filed their federal tax returns using the Free File version of TurboTax, representing 3.8% of all of Intuit's online tax filings. For TY 2018, while Intuit had blocked its Free File landing page so it would not appear in organic search engine search results, that number fell to less than 1.2 million consumers, representing 3.5% of all of Intuit's online tax filings.

### F.    Intuit Used Paid Search Terms to Direct Consumers Searching for the IRS Free File Program to the "Freemium" and Paid Versions of TurboTax

104.    As part of its advertising and marketing practices, Intuit bid on paid search terms with search engines such as Google and Bing. When a consumer queried a search engine for a search term and Intuit won the search engine's instant auction for that paid search term, the consumer would be served an ad selected by Intuit that included a hyperlink directing the consumer to a specific website. Intuit selected both the content of the ad and the link directing consumers to a specific website.

105.    For many years, including TY 2018 while Intuit had blocked the landing page for the Free File version of TurboTax from appearing in online search results, Intuit bid on search terms relevant to the IRS Free File Program.

106.    In many instances, these search terms relevant to the IRS Free File Program indicated consumers were likely searching for information about, or links to reach the website for, the IRS Free File Program. ███████████████

███████████████



107.    ███████████ search terms referenced in paragraph 106, during TY 2018 — while Intuit had blocked the landing page for the Free File version of TurboTax from appearing in search results — Intuit inserted hyperlinks into ads

served to consumers for those keywords that directed consumers to Intuit's commercial website with the "freemium" and paid versions of TurboTax, rather than the IRS.gov website for the IRS Free File Program or the landing page for the Free File version of TurboTax.

108.    During TY 2018, Intuit directed consumers towards the website for the "freemium" and paid versions of TurboTax when consumers searched for the Free File version of TurboTax by its exact name: Turbo Tax Free File Program.

109.    Intuit knew that some of its customers were misled by these practices, and Intuit developed an answer for customer service staff to respond to the following question: "How come when I searched for Free TurboTax, it didn't list the FREE IRS version but it took me to your PAID free version, where I ended up having to pay?"

**G.    Intuit's TurboTax Website Does Not Mention the Free File Version of TurboTax and Funnels Consumers to the Paid and "Freemium" Versions of TurboTax**

110.    Intuit's TurboTax website has featured a screen Intuit calls its "Products and Pricing" screen. The current headline on this screen tells consumers: "Let's find the right tax solution for you." A copy of that screen is below.



111.    For TY 2018, the headline on this screen informed consumers: "Tell us about you – we'll recommend the right tax solution." A copy of that screen is below.



112.    When consumers click, or clicked, on one of the tiles pictured in the screens above, the TurboTax website then recommends, or recommended, one of four versions of TurboTax: (1) the "freemium" version of TurboTax, marketed as Free Edition; (2) Deluxe; (3) Premier; or (4) Self-Employed — the latter three being the paid do-it-yourself versions of TurboTax. The bottom of these screens list all four versions of TurboTax with the recommended version highlighted.

113.    These screens did not display the Free File version of TurboTax to consumers.

114.    In TY 2019, the TurboTax website had a site index at the bottom of the home page with a link to "All online tax preparation software." That link brought consumers to the Products and Pricing screen, which did not include the Free File version of TurboTax. Likewise, during TY 2020, the TurboTax app contained a similar list of "all products" that did not include the Free File version of TurboTax.

H.    Summary

115.    For eligible consumers based on their AGI, Intuit's former Free File version of TurboTax covered all tax situations, forms, and deductions, thus providing coverage equal to Intuit's most expensive version of TurboTax, Self-Employed.

116.    ███████████████████████████████████████████████

23



117.

118.

## Count I
## Deceptive Advertisements

119. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of online tax preparation products or services, Respondent represents, directly or indirectly, expressly or by implication, that consumers can file their taxes for free using TurboTax.

120. In fact, in numerous instances Respondent does not permit consumers to file their taxes for free using TurboTax.

121. Therefore, the representation set forth in Paragraph 119 is false or misleading.

## Violations of Section 5

122. The acts and practices of Respondent as alleged in Count I of this complaint constitute unfair or deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act.

## NOTICE

You are notified that on September 14, 2022, at 10:00 a.m., at the Federal Trade Commission offices, 600 Pennsylvania Avenue, NW, Room 532-H,

Washington, DC 20580, an Administrative Law Judge of the Federal Trade
Commission, will hold a hearing on the charges set forth in this Complaint. At that
time and place, you will have the right under the Federal Trade Commission Act to
appear and show cause why an order should not be entered requiring you to cease
and desist from the violations of law charged in this Complaint.

You are notified that you are afforded the opportunity to file with the Federal
Trade Commission ("Commission") an answer to this Complaint on or before the
14th day after service of the Complaint upon you. An answer in which the
allegations of the Complaint are contested must contain a concise statement of the
facts constituting each ground of defense; and specific admission, denial, or
explanation of each fact alleged in the Complaint or, if you are without knowledge
thereof, a statement to that effect. Allegations of the Complaint not thus answered
will be deemed to have been admitted.

If you elect not to contest the allegations of fact set forth in the Complaint, the
answer should consist of a statement that you admit all of the material facts to be
true. Such an answer will constitute a waiver of hearings as to the facts alleged in
the Complaint and, together with the Complaint, will provide a record basis on
which the Commission may issue a final decision containing appropriate findings
and conclusions and a final order disposing of the proceeding. In such answer, you
may, however, reserve the right to submit proposed findings of fact and conclusions
of law under FTC Rule § 3.46.

Failure to answer timely will be deemed to constitute a waiver of your right
to appear and contest the allegations of the Complaint. It will also authorize the
Commission, without further notice to you, to find the facts to be as alleged in the
Complaint and to enter a final decision containing appropriate findings and
conclusions and a final order disposing of the proceeding.

The Administrative Law Judge will hold an initial prehearing scheduling
conference to be held not later than 10 days after the answer is filed by the
Respondent. Unless otherwise directed by the Administrative Law Judge, the
scheduling conference and further proceedings will take place at the Federal Trade
Commission, 600 Pennsylvania Avenue, NW, Room 532-H, Washington, DC 20580.
Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before
the prehearing scheduling conference, but in any event no later than 5 days after the
answer is filed by the Respondent. Rule 3.31(b) obligates counsel for each party,
within 5 days of receiving a Respondent's answer, to make certain initial disclosures
without awaiting a formal discovery request.

The following is the form of the order which the Commission has reason to believe should issue if the facts are found to be as alleged in the Complaint. If, however, the Commission concludes from record facts developed in any adjudicative proceedings in this matter that the proposed order provisions as to Respondent might be inadequate to fully protect the consuming public, the Commission may order such other relief as it finds necessary and appropriate including corrective advertising or other affirmative disclosures.

Moreover, the Commission has reason to believe that, if the facts are found as alleged in the Complaint, it may be necessary and appropriate for the Commission to seek relief to redress injury to consumers, or other persons, partnerships or corporations. Such relief could be in the form of restitution for past, present, and future consumers and such other types of relief as are set forth in Section 19(b) of the Federal Trade Commission Act. The Commission will determine whether to apply to a court for such relief on the basis of the adjudicative proceedings in this matter and such other factors as are relevant to consider the necessity and appropriateness of such action.

## NOTICE OF CONTEMPLATED RELIEF

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the deceptive acts or practices challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, the Commission may order such relief against Respondent as is supported by the record and is necessary and appropriate to fully protect the consuming public, including, but not limited to:

1.      A prohibition against misrepresenting that a good or service is "free."

2.      A prohibition against misrepresenting any material fact, in connection with the advertising, marketing, promoting, or offering for sale of any goods or services, including: (a) the cost of any of Respondent's goods or services, including any TurboTax product or service; and (b) any other fact material to consumers concerning any good or service, such as: the total costs; any refund policy; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

3.      A requirement that Respondent notify customers of the relief ordered by the Commission.

4.      A requirement to file periodic compliance reports with the Commission.

5.    A requirement to create and keep certain records including:
(a) accounting records showing the revenues from all goods or services sold, the costs incurred in generating those revenues, and resulting net profit or loss;
(b) personnel records showing, for each person providing services in relation to any aspect of the relief ordered by the Commission; (c) copies or records of all consumer complaints and refund requests; and (d) a copy of each unique advertisement or other marketing material making a representation subject to the relief ordered by the Commission.

6.    Any other relief appropriate to correct or remedy Respondent's deceptive advertising.

**THEREFORE**, the Federal Trade Commission this twenty-eighth day of March, 2022, has issued this Complaint against Respondent.

By the Commission.


April J. Tabor
Secretary


SEAL:

# EXHIBIT B

**PUBLIC**

**UNITED STATES OF AMERICA**
**FEDERAL TRADE COMMISSION**
OFFICE OF ADMINISTRATIVE LAW JUDGES

───────────────────────────────────────────

**DOCKET NO. 9408**

───────────────────────────────────────────

**In the Matter of**

**INTUIT INC.,**
         **a corporation,**

**Respondent.**

───────────────────────────────────────────

**INITIAL DECISION**

───────────────────────────────────────────

**D. Michael Chappell**
**Chief Administrative Law Judge**

**Date: September 6, 2023**

PUBLIC

# TABLE OF CONTENTS

I.    **INTRODUCTION**................................................................................................. 1

    A.    Summary of the Case ...................................................................1

    B.    Procedural Background.................................................................2

    C.    Evidence ......................................................................................3

II.    **FACTS**................................................................................................................ 5

    A.    Background ...................................................................................5

        1.    Respondent.........................................................................5

        2.    TurboTax Products and Services........................................5

        3.    Eligibility for TurboTax Free Edition ...............................7

    B.    TurboTax Advertisements and Website.....................................11

        1.    Overview..........................................................................11

        2.    Television Advertising .....................................................13

            a.    2015 Super Bowl Advertisement .............................. 14

            b.    2016 Super Bowl Advertisement .............................. 16

            c.    Television Advertisements for TY 2017 ..................... 17

                i.    Fish................................................................ 17

                ii.    Guzman ......................................................... 18

                iii.    Cruise ............................................................ 19

                iv.    Baby .............................................................. 20

                v.    Anthem Launch.............................................. 21

             d.    Television Advertisements for TY 2018 and TY 2019 ................. 23

                i.    Lawyer .......................................................... 23

                ii.    Movie Credits................................................ 25

                iii.    Game Show ................................................... 29

                iv.    Court Reporter .............................................. 33

                v.    Crossword ..................................................... 35

                vi.    Football/Big Kick.......................................... 37

                vii.    Spelling Bee .................................................. 39

             e.    Television Advertisements for TY 2020 and TY 2021 ................. 44

                i.    Auctioneer..................................................... 44

                ii.    Dance Workout .............................................. 45

                iii.    Dog Show...................................................... 47

                iv.    Steven/Spit Take ........................................... 48

        3.    Radio Advertising ............................................................50

            a.    Radio Advertisements for TY 2020 .............................. 51

             b.    Radio Advertisements for TY 2021 .............................. 51

         4.    Online Advertising ...........................................................52

            a.    Non-Video Display Advertisements for TY 2020

                and TY 2021.............................................................. 53

PUBLIC

|   |   |   |   |   |   |
|---|---|---|---|---|---|
|   |   | b. | Video Display Advertisements for TY 2020 and TY 2021 | | 67 |
|   |   |   | i. | Advertisements without Voice-Over | 67 |
|   |   |   | ii. | Advertisements with Voice-Over | 73 |
|   |   | c. | Online Video Advertisements for TY 2020 and TY 2021 | | 83 |
|   |   |   | i. | Echo | 84 |
|   |   |   | ii. | Auctioneer | 85 |
|   |   |   | iii. | Dance Workout | 87 |
|   |   |   | iv. | Dog Show | 88 |
|   |   |   | v. | Teen Love | 88 |
|   | 5. | Email Marketing | | | 89 |
|   |   | a. | Email Details | | 89 |
|   |   | b. | Summaries | | 98 |
|   | 6. | Paid Search Advertising | | | 99 |
|   |   | a. | Paid Search Advertisements for TY 2019 | | 100 |
|   |   | b. | Paid Search Advertisements for TY 2020 | | 101 |
|   |   | c. | Paid Search Advertisements for TY 2021 | | 102 |
|   |   | d. | Summaries | | 105 |
|   | 7. | TurboTax Website | | | 105 |
|   |   | a. | Advertising on TurboTax Website | | 106 |
|   |   | b. | Disclosures | | 110 |
|   |   |   | i. | Hyperlinks on TurboTax Website Home Page | 110 |
|   |   |   | ii. | TurboTax Free Edition Landing Page | 113 |
|   |   | c. | Products & Pricing Page | | 116 |
|   |   | d. | Upgrade Screens | | 122 |
| C. | Extrinsic Evidence | | | | 123 |
|   | 1. | Novemsky Survey and Opinions | | | 123 |
|   |   | a. | Novemsky Survey | | 123 |
|   |   |   | i. | Type of Survey | 123 |
|   |   |   | ii. | Methodology | 124 |
|   |   |   | iii. | Survey Results | 128 |
|   |   | b. | Other Relevant Novemsky Opinions | | 130 |
|   | 2. | Intuit's Market Research | | | 131 |
|   |   | a. | Copy Testing | | 131 |
|   |   | b. | Other Market Research | | 133 |
|   | 3. | Consumer Complaints and Feedback Received by Intuit | | | 136 |
|   | 4. | Consumer Sentinel Complaints | | | 140 |
|   | 5. | Consumer Testimony | | | 140 |
| D. | Intuit's TY 2022 Advertising and Website | | | | 143 |
|   | 1. | TY 2022 Advertisements | | | 143 |
|   | 2. | TY 2022 Website | | | 148 |
| E. | State Settlement | | | | 152 |

| III. | ANALYSIS AND CONCLUSIONS OF LAW | 156 |
|---|---|---|
| A. | Introduction | 156 |
| | 1. Overview of Applicable Law | 156 |
| | 2. Claim Interpretation | 156 |
| | 3. False or Likely to Mislead | 158 |
| | 4. Materiality | 159 |
| B. | Overview of Arguments of the Parties | 159 |
| C. | Overview of the Initial Decision | 160 |
| D. | Background | 160 |
| | 1. The TurboTax Products | 160 |
| | 2. Intuit's Advertising | 162 |
| E. | Deceptive Advertising | 163 |
| | 1. Claim Conveyed | 163 |
| | a. Facial Analysis | 163 |
| | i. Television and Radio Advertising | 163 |
| | (a) Summary of Advertising | 163 |
| | (b) Claim Conveyed | 169 |
| | ii. Online Advertising | 172 |
| | (a) Online Video Advertisements | 173 |
| | (b) Display Advertisements | 176 |
| | iii. Email Advertisements | 180 |
| | iv. Paid Search Advertisements | 184 |
| | b. Extrinsic Evidence | 186 |
| | i. Standards for Acceptable Extrinsic Evidence | 187 |
| | ii. Intuit's Market Research | 187 |
| | iii. Novemsky Survey | 189 |
| | iv. Additional Proof of Consumers' Perception and Understanding of TurboTax Free Advertising | 192 |
| | v. Brand Distinction | 194 |
| | vi. Respondent's Extrinsic Evidence on Advertisement Interpretation | 194 |
| | 2. Falsity | 197 |
| | 3. Materiality | 205 |
| | 4. Conclusion | 207 |
| F. | Affirmative Defenses | 207 |
| | 1. First Defense | 207 |
| | 2. Second Defense | 208 |
| | 3. Third Defense | 208 |
| | 4. Fourth Defense | 209 |
| | 5. Fifth Defense | 209 |
| | 6. Sixth Defense | 210 |
| | 8. Eighth Defense | 211 |
| | 9. Tenth Defense | 212 |

PUBLIC

G. Remedy ..................................................................................................213
  1. Overview..........................................................................................213
  2. Necessity of Order .........................................................................215
    a. Applicable Legal Principles....................................................... 215
    b. Voluntary Cessation of Conduct ................................................ 216
    c. Cognizable Danger of Recurring Violation ............................... 217
  3. Provisions of the Proposed Cease and Desist Order................................222
    a. Disclosure Requirements ........................................................... 222
      i. Consumer Harm .............................................................. 222
      ii. Compelled Speech ........................................................... 226
      iii. Clarity and Precision........................................................ 226
    b. Multi-product Scope .................................................................. 228

**ORDER** ............................................................................................................ 230

PUBLIC

## I.     INTRODUCTION

### A.     Summary of the Case

The Complaint in this case was issued by the Federal Trade Commission ("FTC" or "Commission") on March 28, 2022. In summary, the Complaint alleges that Respondent, Intuit Inc. ("Respondent" or "Intuit") deceptively marketed TurboTax, its online tax preparation service, in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45. Compl. ¶¶ 4-6, 119-122. More specifically, the Complaint alleges that Respondent repeatedly claimed through various advertising channels that consumers could file their taxes for free using TurboTax, when in fact, TurboTax is free for only some consumers, based on the tax filing forms used. Compl. ¶¶ 5-6. The Complaint further alleges that many consumers drawn to the TurboTax website to file their taxes for free will discover, in the course of preparing their tax returns, that they are unable to file for free and will be notified that they have to upgrade to a paid TurboTax product in order to complete their tax filing. Compl. ¶¶ 6, 58. In this way, according to the Complaint, Intuit's advertisements act as a deceptive "door-opener." Compl. ¶¶ 57, 120, 122.

Respondent filed an answer to the Complaint on April 14, 2022, together with affirmative defenses ("Answer"). In summary, Respondent denied engaging in any deceptive advertising and averred that TurboTax Free Edition is in fact free for millions of taxpayers. Answer ¶¶ 5-6, 119-122. Respondent further asserted that its advertising conveyed the limitations on its free tax filing offer. Answer ¶ 28. In addition, Respondent raised a number of affirmative defenses to the Complaint, including that the case is moot and the government is not entitled to a cease and desist order because Intuit has ceased the challenged advertising and has entered into an enforceable settlement agreement with the attorneys general for all 50 states and the District of Columbia to prevent future recurrence; that this action is time-barred; and that these administrative proceedings are unconstitutional or otherwise invalid because of the Commission's prejudgment, the Commission's combination of prosecutorial and adjudicative functions, the Commission's discretion to choose administrative proceedings or adjudication in an Article III court, and the protections held by the Commissioners and the Administrative Law Judge ("ALJ") against removal by the executive. Answer at 24-25.

Upon full consideration of the entire record, and as explained more fully below, the evidence proves that Intuit engaged in deceptive advertising in violation of Section 5 of the FTC Act. An appropriate remedial Order is issued herewith.

### B.      Procedural Background

On August 22, 2022, Complaint Counsel filed a motion for summary decision with the Commission, pursuant to Commission Rule 3.22(a). 16 C.F.R. § 3.22(a). Respondent filed an opposition on August 30, 2022. The Commission issued an Opinion and Order Denying Summary Decision on January 31, 2023. *In re Intuit Inc.*, No. 9408, 2023 FTC LEXIS 18 (Jan. 31, 2023).

The evidentiary hearing in this matter began on March 27, 2023 and was conducted over two weeks. Thereafter, the parties submitted post-trial briefs, proposed findings of fact, and replies to each other's briefs and proposed findings of fact. The record in this matter consists of the testimony of 41 fact witnesses and 6 expert witnesses (2 for Complaint Counsel and 4 for Respondent), presented live or by deposition. Over 2,350 exhibits were admitted into evidence.[1]

---

[1] Pursuant to Commission Rule 3.45(b), orders were issued in this case granting *in camera* treatment to certain material, after finding, in accordance with the Rule, that its public disclosure would likely result in a clearly defined, serious injury to the entity requesting *in camera* treatment or that the material constituted "sensitive personal information," as that term is defined in Commission Rule 3.45(b). In addition, when the parties sought to elicit testimony at trial that revealed information that had been granted *in camera* treatment, the hearing went into an *in camera* session. Rule 3.45(a) allows the ALJ "to grant *in camera* treatment for information at the time it is offered into evidence subject to a later determination by the [administrative] law judge or the Commission that public disclosure is required in the interests of facilitating public understanding of their subsequent decisions." *In re Bristol-Myers Co.*, No. C-8917-19, 1977 FTC LEXIS 25, at *6 (Nov. 11, 1977). As the Commission reaffirmed, since "in some instances the ALJ or Commission cannot know that a certain piece of information may be critical to the public understanding of agency action until the Initial Decision or the Opinion of the Commission is issued, the Commission and the ALJs retain the power to reassess prior *in camera* rulings at the time of publication of decisions." *In re General Foods Corp.*, No. 9085, 1980 FTC LEXIS 99, at *11 n.7 (Mar. 10, 1980). Thus, in instances where a document or trial testimony has been given *in camera* treatment, but the portion of the material cited to in this Initial Decision does not in fact merit *in camera* treatment, such material is disclosed in the public version of this Initial Decision, pursuant to Commission Rule 3.45(a) (the ALJ "may disclose such *in camera* material to the extent necessary for the proper disposition of the proceeding"). *In camera* information in this Initial Decision is indicated in bold font and braces ({ }) in the *in camera* version and is redacted from the public version of the Initial Decision, in accordance with Rule 3.45(e). 16 C.F.R. § 3.45(e).

## C.    Evidence

This Initial Decision is based on a consideration of the whole record relevant to the issues and addresses the material issues of fact and law. The briefs and proposed findings of fact and conclusions of law, and the replies thereto, submitted by the parties, and all contentions and arguments therein were thoroughly reviewed and considered. Proposed findings of fact submitted by the parties that were not accepted in this Initial Decision were rejected, either because they were not supported by the evidence or because they were not dispositive or material to the determination of the merits of the case. Similarly, legal contentions and arguments of the parties that are not addressed in this Initial Decision were rejected, because they lacked support in fact or law, were not material, or were otherwise lacking in merit.

Ruling upon a decision of the Interstate Commerce Commission, and interpreting language in the Administrative Procedure Act ("APA") that is almost identical to language in Commission Rule 3.51(c)(1), the United States Supreme Court held that "[b]y the express terms of [that Act], the Commission is not required to make subordinate findings on every collateral contention advanced, but only upon those issues of fact, law, or discretion which are 'material.'" *Minneapolis & St. Louis Ry. Co. v. United States*, 361 U.S. 173, 193-94 (1959); *accord Stauffer Labs., Inc. v. FTC*, 343 F.2d 75, 82 (9th Cir. 1965); *see also Borek Motor Sales, Inc. v. NLRB*, 425 F.2d 677, 681 (7th Cir. 1970) (holding that it is adequate for the Board to indicate that it had considered each of the company's exceptions, even if only some of the exceptions were discussed, and stating that "[m]ore than that is not demanded by the [APA] and would place a severe burden upon the agency"). Issues of fact or law that do not affect the result in a case are not fairly deemed "material," for purposes of Section 557(c)(3)(A) of the APA, 5 U.S.C. § 557(c)(3)(A), or Rule 3.51(c)(1) of the Commission's Rules of Practice, 16 C.F.R. § 3.51(c)(1), notwithstanding that there may be allegations or evidence presented on such issues. Rather, "a fact is only material if its resolution will affect the outcome" of the case. *Lenning v. Commer. Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001) (summary judgment case); *see also Timpa v. Dillard*, 20 F.4th 1020, 1028 (5th Cir. 2021) (stating in a summary judgment case that "[a] fact is 'material' if it 'might affect the outcome of the suit under the governing law'") (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Furthermore, the Commission has held that ALJs are not required to discuss the testimony of each witness or all exhibits that are

3

PUBLIC

presented during the administrative adjudication. *In re Amrep Corp.*, No. 9018, 1983 FTC LEXIS 17, at \*566-67 (Nov. 2, 1983). In addition, all expert witness opinion evidence submitted in this case has been fully reviewed and considered. Except as expressly relied on or adopted in this Initial Decision, such opinions have been rejected, as either unreliable, unsupported by the facts, immaterial, or unnecessary to the findings and conclusions herein.

Under Commission Rule 3.51(c)(1), "[a]n initial decision shall be based on a consideration of the whole record relevant to the issues decided, and shall be supported by reliable and probative evidence." 16 C.F.R. § 3.51(c)(1). The parties' burdens of proof are governed by Commission Rule 3.43(a), Section 556(d) of the APA, and case law. Pursuant to Rule 3.43(a), "[c]ounsel representing the Commission . . . shall have the burden of proof, but the proponent of any factual proposition shall be required to sustain the burden of proof with respect thereto." 16 C.F.R. § 3.43(a); *accord* 5 U.S.C. § 556(d) ("[E]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof."). "It is well established that the preponderance of the evidence standard governs Federal Trade Commission [ ] enforcement actions." *In re POM Wonderful LLC*, No. 9344, 2012 WL 2340406, at \*171 (F.T.C. May 17, 2012) (citing cases). Under the APA, an ALJ may not issue an order "except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556(d). All findings of fact in this Initial Decision are supported by reliable, probative, and substantial evidence. Citations to specific numbered findings of fact in this Initial Decision are designated by "F."[2]

[2] References to the record are abbreviated as follows:

GX – Complaint Counsel's Exhibit
RX – Respondent's Exhibit
JX – Joint Exhibit
Tr. – Transcript of testimony before the ALJ
Dep. – Transcript of Deposition
IHT – Transcript of Investigational Hearing
CCB – Complaint Counsel's Post-Trial Brief
CCRB – Complaint Counsel's Post-Trial Reply Brief
CCFF – Complaint Counsel's Proposed Findings of Fact
CCRRFF – Complaint Counsel's Reply to Respondent's Proposed Findings of Fact
RB – Respondent's Post-Trial Brief
RRB – Respondent's Post-Trial Reply Brief
RFF – Respondent's Proposed Findings of Fact
RRCCFF – Respondents' Reply to Complaint Counsel's Proposed Findings of Fact

PUBLIC

## II.  FACTS

### A.  Background

#### 1.  Respondent

1.  Respondent Intuit Inc. ("Respondent" or "Intuit") is a Delaware corporation with its principal place of business in Mountain View, California. (Commission Order on Facts Without Substantial Controversy ¶ 1;[3] JX1 (Joint Stipulations of Law and Fact) ¶ 6).

2.  Intuit is a publicly traded corporation with annual revenues of $6.8 billion in 2019, $7.7 billion in 2020, $9.6 billion in 2021, and $12.7 billion in 2022. (GX342 (Complaint Counsel) ¶ 9.b; GX288 (Intuit) at 5, 36, 39; RX922 (Intuit) at INTUIT-FTC-PART3-000611696 (Sep. 2, 2022 SEC Form 10-K), publicly available at https://www.sec.gov/ix?doc=/Archives/edgar/data/896878/000089687822000028/intu-20220731.htm#i355069ae3df44bdb90bff538d4bca755_247 (Item 1 page 4)).

3.  Intuit offers a number of widely used financial software programs, including TurboTax, which assists consumers with preparing and filing their taxes; QuickBooks, which assists small and medium-sized businesses with accounting; and Credit Karma, which provides consumers personalized recommendations for consumer financial products and services and access to their credit scores and reports. (GX288 (Intuit) at CC-00006010).

4.  Intuit advertises, markets, promotes, distributes, and sells TurboTax, a commonly used online tax preparation service that enables users to prepare and file their income tax returns. (Commission Order on Facts Without Substantial Controversy ¶ 2; JX1 (Joint Stipulations of Law and Fact) ¶ 6).

5.  Intuit's TurboTax is the most widely used online tax preparation service. In May 2021, TurboTax's share of sales in the United States of America ("United States" or "U.S.") was 73%; in April 2019, it was 63%. (GX342 (Complaint Counsel) ¶ 10; GX289 (Complaint Counsel) at CC-00006221).

#### 2.  TurboTax Products and Services

6.  TurboTax is the brand name of a suite of online tax preparation products and services offered by Intuit that enable consumers to prepare and file their individual federal income tax returns with the United States Internal Revenue Service ("IRS"). (JX1 (Joint Stipulations of Law and Fact) ¶ 8).

---

[3] On January 31, 2023, the Commission issued an Order Denying Complaint Counsel's Motion for Summary Decision. In connection with that order, the Commission issued an Order Directing Further Proceedings and Specifying Facts Without Substantial Controversy ("Commission Order on Facts Without Substantial Controversy"), which directed that certain facts be deemed established for purposes of this proceeding.

7.      Intuit's tax preparation products and services, including TurboTax, "have a significant and distinct seasonal pattern [referred to as the "tax season"] as sales and revenue from [them] are typically concentrated in the period from November through April." (GX288 (Intuit) at CC-00006018; *see also* Rubin, Tr. 1597 (the first peak of tax season is when people start to get their W-2s, in late January)).

8.      Intuit uses the term "tax year" to refer to the calendar year preceding the period during which taxpayers prepare and file their annual individual tax returns. For example, tax year ("TY") 2021 refers to tax returns filed in calendar year 2022 for income earned in calendar year 2021. (JX1 (Joint Stipulations of Law and Fact) ¶ 7).

9.      Intuit offers several products under the TurboTax brand name that help consumers prepare and file their federal and state tax returns. (Ryan (Intuit) Tr. 690; Johnson (Intuit) Tr. 571-573; RX439-A (Intuit); RX449 (Intuit); GX144 (Soukas (Intuit) Dep.) at 15).

10.     Intuit refers to its TurboTax products as "stock keeping units" or "SKUs." (Johnson (Intuit) Tr. 572; Rubin (Intuit) Tr. 1575; Deal Tr. 1410). TurboTax SKUs are differentiated by (1) the level of assistance to be provided; and (2) the level of complexity of the consumer's taxes, which is tied to the type of IRS forms and schedules the consumer is required to file. (Ryan (Intuit) Tr. 690; Johnson (Intuit) Tr. 568, 570-571; RX439-A (Intuit); RX449 (Intuit)).

11.     TurboTax SKUs fall into three categories of assistance level to be provided: Do-It-Yourself ("DIY"), Live Assisted, and Live Full Service. (Johnson (Intuit) Tr. 572; Ryan (Intuit) Tr. 690-691; RX439-A (Intuit); RX449 (Intuit); RX1223 (Intuit); RX1224- A (Intuit)).

12.     TurboTax DIY SKUs allow taxpayers to prepare and file their tax returns on their own. (Johnson (Intuit) Tr. 563; GX150 (Goode (Intuit) IHT) at 44-45; GX157 (Smith (Intuit) IHT) at 31).

13.     TurboTax Live Assisted SKUs allow taxpayers to prepare and file their tax returns themselves after receiving tax assistance, including a final review before filing. (Ryan (Intuit) Tr. 690).

14.     TurboTax Live Full Service SKUs provide taxpayers with a tax specialist who prepares and files a customer's tax return entirely on the customer's behalf. (Ryan (Intuit) Tr. 691).

15.     Each of the three product categories (F. 12-14) includes four separate SKUs differentiated by the complexity of the consumer's tax situation. (Johnson (Intuit) Tr. 572-573; Ryan (Intuit) Tr. 690).

16.     The four TurboTax DIY SKUs are: TurboTax Free Edition, TurboTax Deluxe, TurboTax Premier, and TurboTax Self-Employed. (Ryan (Intuit) Tr. 690; RX439-A).

PUBLIC

17.     The four TurboTax Live Assisted SKUs are: TurboTax Live Basic,[4] TurboTax Live
        Deluxe, TurboTax Live Premier, and TurboTax Live Self-Employed. (GX144 (Soukas
        (Intuit) Dep.) at 15; RX1224-A (Intuit)).

18.     The four TurboTax Live Full Service SKUs are: TurboTax Live Basic Full Service,[5]
        TurboTax Live Deluxe Full Service, TurboTax Live Premier Full Service, and TurboTax
        Live Self-Employed Full Service. (GX144 (Soukas (Intuit) Dep.) at 15; RX1224-A
        (Intuit)).

### 3.      Eligibility for TurboTax Free Edition

19.     Intuit offers a free version of TurboTax for individuals filing income taxes. The free
        version was called "Federal Free Edition" for TY 2016 and "TurboTax Free Edition"
        thereafter. (Commission Order on Facts Without Substantial Controversy ¶ 3).

20.     TurboTax Free Edition is available to taxpayers with "simple tax returns," as defined by
        Intuit. (Commission Order on Facts Without Substantial Controversy ¶ 4).

21.     Intuit offers a free version of TurboTax in order to grow the number of TurboTax
        customers and build relationships with them so that they return to TurboTax and choose
        its paid products in future years as their tax complexity evolves. (GX156 (Ryan (Intuit)
        IHT) at 87-89 ("My understanding is that by offering a great experience with your simple
        taxes for free, our hope is that a customer grows with us as their life gets more
        complicated."); GX156 (Ryan (Intuit) IHT) at 118-119 ("You know, generally speaking,
        we believe we have the best tax software out there, and getting simple tax filers to use our
        free software and grow with us as their life gets more complicated is my understanding of
        why we are willing to invest marketing dollars for customers that generate no revenue in
        a given year."); GX152 (Johnson (Intuit) IHT) at 124-126 ("[A]s we have relationships
        and [consumers] trust us, over time, whether it's one year, two year, five years, they may
        need us for a service that's more advanced than their current simple tax filings. And as a
        consequence, they will – there is potential future revenue streams."); GX342 (Complaint
        Counsel) ¶ 188 (screenshot from TurboTax Free Edition webpage stating in part: "We
        hope that, over time, as our customers with simple returns need more capabilities as their
        financial situations change (for example owning a home, having a child, managing
        investments), they have loved our products and services so much that they will choose
        our paid TurboTax offerings to prepare and file their returns.")).

22.     Before 2013, consumers with simple tax returns as defined by Intuit could use TurboTax
        Free Edition to file their federal income taxes for free. Filing state income taxes required
        a fee. (Ryan (Intuit) Tr. 707; RX591 (Intuit) at INTUIT-FTC-PART3-000601681).

---

[4] In TY 2020, Intuit offered TurboTax Live Basic for free for individuals with simple tax returns for a limited time
period. (Ryan (Intuit) Tr. 742; Rubin (Intuit) Tr. 1541-1542).

[5] In TY 2021, Intuit offered both TurboTax Live Basic and Live Basic Full Service for individuals with simple tax
returns to file with a tax professional for free for a limited time period. (Ryan (Intuit) Tr. 749-750; GX650 (Intuit) at
CC-00013976).

23. From TY 2014 to TY 2017, Intuit offered a promotion called "AbsoluteZero," which provided customers using a TurboTax free product to file their federal returns the ability to prepare and file their state tax returns for free during the first five weeks of the tax filing season (later expanded to the first fifteen weeks of the tax filing season). Because "the name of [Intuit's free] offer [was] AbsoluteZero" from TY 2014 to TY 2017, Intuit used the AbsoluteZero name in its advertising during that period. (Johnson (Intuit) Tr. 606).

24. In TY 2018, Intuit began making free state tax return filing available with TurboTax Free Edition for the entire year. (Ryan (Intuit) Tr. 711-712, 720-721; Johnson (Intuit) Tr. 602-604; RX581 (Intuit) at INTUIT-FTC-PART3-000601718-719; RX577 (Intuit) at INTUIT-FTC-PART3-000601501; RX300-A (Intuit) at 3).

25. Intuit's definition of "simple tax returns" has changed over time to reflect changes made by the IRS relating to tax forms and schedules. (Johnson (Intuit) Tr. 581, 584; Ryan (Intuit) Tr. 720; *see* F. 26-27, 29-34; *see also* Answer ¶¶ 15-17).

26. Prior to TY 2018, Intuit defined simple tax returns as those that could be filed with an IRS Form 1040EZ or Form 1040A. (JX1 (Joint Stipulations of Law and Fact) ¶ 10; Ryan (Intuit) Tr. 707, 718-719; RX1280 (Intuit); Compl. ¶ 15; Answer ¶ 15).

27. Prior to TY 2018, taxpayers qualified to use IRS Form 1040EZ or 1040A if they made less than $100,000, were only claiming the standard deduction, and met certain other qualifications, such as claiming no dependents (Form 1040EZ) or only reporting limited types of income (Form 1040A). (JX1 (Joint Stipulations of Law and Fact) ¶ 11).

28. Prior to TY 2018, Congress passed tax reform legislation. In response, the IRS eliminated Form 1040EZ and Form 1040A and substituted a new Form 1040. Form 1040 then became the most basic individual tax form. (JX1 (Joint Stipulations of Law and Fact) ¶ 12).

29. For TY 2018 and TY 2019, Intuit modified its definition of simple tax return to mean a return that could be filed on a Form 1040 without any attached forms or schedules. (JX1 (Joint Stipulations of Law and Fact) ¶ 13; Ryan (Intuit) Tr. 702-703).

30. For TY 2020, Intuit modified its definition of simple tax return to mean a return that could be filed on a Form 1040, with no attached schedules, except to claim unemployment income. (Compl. ¶ 17; Answer ¶ 17; GX184 (Complaint Counsel) ("A simple tax return is Form 1040 only OR Form 1040 + Unemployment Income.")).

31. For TY 2021, Intuit modified its definition of simple tax return to mean a return that could be filed on a Form 1040, with certain attached schedules to cover distinct tax situations, including student loan interest. (*See* Answer ¶ 18; GX342 (Complaint Counsel) ¶ 197; GX484 (Complaint Counsel) ("A simple tax return is Form 1040 only. Situations covered by TurboTax Free Edition . . . [1.] W-2 income[, 2.] Limited interest and dividend income reported on a 1099-INT or 1099 DIV[, 3.] Claiming the standard

PUBLIC

deduction[, 4.] Earned Income Tax Credit (EIC)[, 5.] Child tax credits[, and 6.] Student
Loan Interest deduction[.]")).

32.     Taxpayers who receive income reported through certain types of IRS Forms 1099 (for
        example, a 1099-MISC), such as taxpayers who receive independent contractor or small
        business income, are not eligible for TurboTax Free Edition. (GX342 (Complaint
        Counsel) ¶ 200; GX221 (Complaint Counsel); GX239 (Complaint Counsel); GX261
        (Complaint Counsel); GX279 (Complaint Counsel); GX294 (Intuit) at CC-00006302-
        6303 ("Situations not covered in TurboTax Free Edition include: . . . Business or 1099-
        MISC income"); RX1359 (Intuit) (showing forms covered and not covered by Free
        Edition in TY 2022)).

33.     For TY 2018 through TY 2020, taxpayers who claimed the student loan interest deduction
        were not eligible for TurboTax Free Edition, regardless of their income. (*See*
        GX223 (Complaint Counsel); GX241 (Complaint Counsel); GX263 (Complaint
        Counsel)).

34.     For TY 2021, taxpayers who had the following tax situations were not eligible for
        TurboTax Free Edition: "[1.] Itemized deductions[, 2.] Unemployment income reported
        on a 1099-G[, 3.] Business or 1099-NEC income[, 4.] Stock sales[, 5.] Rental property
        income[, and 6.] Credits, deductions and income reported on schedules 1-3." (GX342
        (Complaint Counsel) ¶ 197; GX484 (Complaint Counsel); RX3 (Intuit)).

35.     Many taxpayers do not have "simple tax returns," as defined by Intuit, and so do not
        qualify for TurboTax Free Edition. (Commission Order on Facts Without Substantial
        Controversy ¶ 5).

36.     Approximately two-thirds of taxpayers do not meet Intuit's simple tax return
        qualifications and therefore are not eligible to file for free using TurboTax Free Edition.
        (*See* GX342 (Complaint Counsel) ¶¶ 215-217 (calculating, based on IRS-reported data,
        that in TY 2018, 69.54% of returns filed were not "Returns that filed Form 1040 with no
        Schedules 1-6 or Schedule A attached"); GX336 (Complaint Counsel) (publicly available
        IRS data); GX342 (Complaint Counsel) ¶¶ 215, 218-219 (calculating, based on IRS-
        reported data, that in TY 2019, 63.43% of returns filed were not "Returns that filed Form
        1040 with no Schedules 1-6 or Schedule A attached"); GX337 (Complaint Counsel)
        (publicly available IRS data); GX115 (Intuit) at CC-00001125 ("To avoid further
        disruption from current and new competitors we should continue to look at ways to
        expand our free eligibility beyond the ~35% eligibility we have today, yet stopping short
        of a Free DIY prep solution for all situations."); Johnson (Intuit) Tr. 657 ("Q. Roughly a
        third are eligible for the – for TurboTax Free Edition, correct? A. Yes. . . . . Q. And
        roughly two-thirds are not eligible, correct? A. Yes."); GX654 (Intuit) ("If your return fits
        on a 1040 with no additional schedules, you can file completely for free with TT Free
        Edition. . . . Over 50 million taxpayers are eligible (1/3 of all tax filers[.]")).

37.     Approximately 100 million taxpayers are not eligible to file for free using TurboTax Free
        Edition. (Rubin (Intuit) Tr. 1594-1595 (testifying that 60 million simple tax returns that

would qualify to use TurboTax Free Edition were filed in 2022 out of the 160 million tax returns filed with the IRS); Johnson (Intuit) Tr. 657 (testifying that there are 150 million filers in the U.S. and 50 million are eligible for TurboTax Free Edition); *see* JX1 (Joint Stipulations of Law and Fact) ¶ 14 ("[O]f the 157,682,637 returns filed with the IRS in 2020, 57,671,912 returns included only Form 1040 with no Schedules 1-6 or Schedule A attached.")).

38.    For consumers whose returns are not considered "simple tax returns," as defined by Intuit, Intuit offers paid TurboTax products. For instance, consumers with mortgage and property deductions, charitable donations over $300, itemized deductions, unemployment income, and education expenses can file their taxes using TurboTax Deluxe. Consumers with investment income and rental property income and refinancing deductions can file using TurboTax Premium. And consumers with expenses from self-owned businesses can file their taxes using TurboTax Self-Employed, the most comprehensive TurboTax product. (Commission Order on Facts Without Substantial Controversy ¶ 6).

39.    Customers who are not eligible for Turbo Tax Free Edition may begin preparing their taxes in that product. Upon entering disqualifying information, they are presented with a screen that informs them that they will need to upgrade to a paid product capable of supporting their tax needs in order to continue using TurboTax. (Commission Order on Facts Without Substantial Controversy ¶ 7).

40.    Taxpayers that do not meet Intuit's definition of simple tax returns must upgrade to paid versions of TurboTax to file their taxes online through TurboTax. (Rubin (Intuit) Tr. 1505-1506, 1583-1584; Johnson (Intuit) Tr. 674-676; GX150 (Goode (Intuit) IHT) 240 ("If the customer has a 1099-MISC . . . and they want to complete with TurboTax, they would need to upgrade to Deluxe or Self-Employed.")).

41.    TurboTax Deluxe, TurboTax Live Deluxe, and TurboTax Live Deluxe Full Service are paid versions of TurboTax that can be used by consumers with tax situations that make them ineligible for TurboTax Free Edition, such as mortgage deductions, rental property income, charitable donations over $300, itemized deductions, unemployment income, or education expenses. (Rubin (Intuit) Tr. 1614; RX439-A (Intuit); RX449 (Intuit)).

42.    TurboTax Premier, TurboTax Live Premier, and TurboTax Live Premier Full Service are paid versions of TurboTax that can be used by consumers with IRS forms or schedules beyond those covered by the TurboTax Deluxe SKUs, such as investment income, rental property income, or refinancing deductions. (Johnson (Intuit) Tr. 682-683 (a taxpayer would need to use the Premier product line for stock and investment income); RX439-A (Intuit); RX449 (Intuit)).

43.    TurboTax Self-Employed, TurboTax Live Self-Employed, and TurboTax Live Self-Employed Full Service are paid versions of TurboTax that can be used by taxpayers who file Form 1099-NEC, Form 1099-K, and Schedule C. (RX439-A (Intuit); RX950 (Intuit) at INTUIT-FTC-PART3-000610164-166; RX1539 (Intuit) at 1).

PUBLIC

44.     The cost to upgrade to a paid DIY version for TurboTax ranges from $35 to $119. (*See, e.g.*, RX222 (Intuit) (showing discount prices ranging from $34.99 to $40 for Deluxe and $54.99 to $70 for Premier for TY 2016); GX261 (Complaint Counsel) (showing prices ranging from $49 for Deluxe and $99 for Self-Employed for TY 2020); GX342 (Complaint Counsel) ¶ 202 (showing discounted and regular prices for consumers reporting self-employed income of $89 and $119 for TY 2021)).

45.     The price of a tax preparation product is important to consumers. (Golder Tr. 1084-1085 (testifying that "price is important to consumers"), 1183 ("Consumers are very interested in price.")). A survey conducted by Respondent's expert witness, Professor John Hauser, (referred to as the "Purchase Driver Survey") shows that 70.4% of survey respondents consider price an important factor in their choice of a tax preparation provider. (RX1017 (Hauser Expert Report) ¶ 113; Hauser (Intuit) Tr. 967).[6]

### B.     TurboTax Advertisements and Website

#### 1.     Overview

46.     Intuit advertises for its free and paid TurboTax SKUs, as well as the TurboTax brand generally. (JX1 (Joint Stipulations of Law and Fact) ¶ 16).

47.     Intuit's advertising for TurboTax Free Edition raises awareness for the TurboTax brand in general. (GX160 (Rubin (Intuit) Dep.) at 79-84; *see also* GX146 (Ryan (Intuit) Dep.) at 111 (testifying that "the TurboTax brand is part of the ad, and that drives awareness beyond simple filers . . . which we believe has an overall positive ROI [return on investment]")).

48.     Intuit has promoted its free offering through multiple advertising channels, including television, the TurboTax website, social media, and paid search advertising. (Commission Order on Facts Without Substantial Controversy ¶ 8).

49.     Since at least 2015, Intuit has extensively promoted TurboTax online filing products, including its free versions, such as TurboTax Free Edition, using numerous advertising channels, including television advertisements; online video and audio advertisements; non-video display, mobile, and paid social media advertisements; paid search advertisements; and direct email marketing throughout the United States. (JX1 (Joint Stipulations of Law and Fact) ¶ 17; Ryan (Intuit) Tr. 691-696; GX Summary 001 (Complaint Counsel) (summarizing TV advertisement dissemination data produced by Intuit); GX Summary 002 (Complaint Counsel) (summarizing online advertisement dissemination data produced by Intuit); GX431 (Intuit); GX432 (Intuit); GX433 (Intuit); GX434 (Intuit); GX435 (Intuit); GX436 (Intuit); GX437 (Intuit); GX631 (Intuit) at CC-00013284-285; *see also* RX1018 (Golder Expert Report) ¶ 8; Hauser Tr. 971 ("Intuit did use a multiyear, multimodal campaign.")).

---

[6] Professor Hauser's survey is a census survey of the various things that people do when choosing a tax-preparation provider. (RX1391 (Hauser Dep.) at 32; RX1017 (Hauser Expert Report) ¶ 103).

50. Intuit's advertisements for TurboTax, including its free versions, have been widely disseminated throughout the United States. (F. 49, 53-58, 221-222).

51. From TY 2014 to TY 2017,[7] for the AbsoluteZero promotion (F. 23), Intuit often included the word "guaranteed" to bolster consumer confidence that the claim that the offer was truly free. (*See* GX290 (Intuit) at CC-00006225 (explaining that Intuit added the language "Guaranteed" to "address skepticism of free, build credibility of TT Free, and drive trial"); GX295 (Intuit) at CC-00006316 ("Convince consumers TurboTax AbsoluteZero is truly free . . . Guarantee"), CC-00006333 ("Drive believability of TT Free . . . add 'Guaranteed' in lock-up"), CC-00006351 ("Findings: . . . 'A[bsolute]/Z[ero] Guarantee' is the strongest concept to battle free skepticism")).

52. From TY 2018 through TY 2021, Intuit ran an advertising campaign referred to within Intuit as "The Power of Free," in which "free" is essentially the only word used or spoken in the advertisement, except for a voice-over at the end of the advertisement (referred to herein at times as the "free, free, free" campaign or "free, free, free" advertisements). (Johnson (Intuit) Tr. 588-589; Rubin (Intuit) Tr. 1555 ("We called it 'The Power of Free.'"); GX441 (Intuit) at CC-00007890-892; GX428 (Intuit) at CC-00007711 (describing the "campaign strategy" that "celebrates 'The Power of Free'" where "every word spoken by earnest actors is replaced with the word 'Free.'")).

53. In the course of the "free, free, free" campaign, between November 1, 2018, and April 18, 2022, Intuit aired "free, free, free" television advertisements at least 84,356 times across at least 721 television networks. This included networks in every state in the country. (GX342 (Complaint Counsel) ¶¶ 41, 45, 50, 55, 61, 70, 75, 85, 87, 89, 91, 93, 107, 110, 113, 134, 140, 145).

54. Between January and March of 2022, versions of "free, free, free" television advertisements ("Dance Workout," (F. 182) "Auctioneer," (F. 176) and "Dog Show" (F. 188)) aired more than 11,000 times on national television. (GX Summary 001 (Complaint Counsel) at "Pivot – Ads w-Program Count" B22, B26, B27 & B29; GX431 (Intuit); GX432 (Intuit); GX433 (Intuit)). "Free, free, free" advertisements were aired on national television during the broadcast of the 2022 Olympics. (GX432 (Intuit)).

55. Between February and May 2021, "free, free, free" television advertisements ("Dance Workout," "Auctioneer," and "Dog Show") aired more than 16,000 times on national television. (GX Summary 001 (Complaint Counsel) at "Pivot – Ads w-Program Count" B9, B10, B12, B13, B15, B16; GX436 (Intuit); GX437 (Intuit)).

56. Intuit advertises and has advertised TurboTax through social media platforms like Facebook, Instagram, Twitter (now known as X), Snapchat, and TikTok. (GX156 (Ryan

---

[7] For purposes of this Initial Decision, the reference to a tax year (TY) in which an advertisement appeared refers to the period considered by Intuit to be the tax season for a particular calendar year, generally the period from November to April. (GX288 (Intuit) at CC-00006018; *see* Shiller (Complaint Counsel) Tr. 177).

PUBLIC

(Intuit) IHT) at 28-29; *see also* Ryan (Intuit) Tr. 693; JX1 (Joint Stipulations of Law and Fact) ¶¶ 18, 20).

57.  Intuit advertises and has advertised TurboTax, including its free versions, through paid search advertising, also called pay-per-click advertising, and search engine optimization. (RX582 (Intuit) at INTUIT-FTC-PART3-000601290; Ryan (Intuit) Tr. 696; GX156 (Ryan (Intuit) IHT) at 30-31; JX1 (Joint Stipulations of Law and Fact) ¶ 18).

58.  Intuit markets and has marketed directly to consumers to promote TurboTax, including its free versions, through emails. (Ryan (Intuit) Tr. 689-690, 695-696; GX156 (Ryan (Intuit) IHT) at 40).

59.  Many of Intuit's advertisements contain a written disclosure indicating that the offer is limited to consumers with "simple tax returns" or "simple U.S. returns only" or similar verbiage. (Commission Order on Facts Without Substantial Controversy ¶ 10). Some television or video advertisements also include audible references to "simple tax returns" or "simple returns." (Commission Order on Facts Without Substantial Controversy ¶ 10).

60.  In TY 2018 and TY 2019, of its TurboTax marketing budget, Intuit spent approximately 30% on television advertising, 30% on online display advertising, and 30% on paid search advertising. (Answer ¶ 22; Ryan (Intuit) Tr. 698, 792).

61.  Based on calculations of Respondent's expert witness, Professor Peter Golder, Ph.D., 10% of Intuit's "free" advertising did not include the language regarding "simple returns only." (RX1018 (Golder Expert Report) ¶ 98 & Figure 12).

62.  Consumers who are interested in trying TurboTax are able to access TurboTax products through the TurboTax website. (Johnson (Intuit) Tr. 593).

## 2.  Television Advertising

63.  Some of the television advertisements described in this section II.B.2 do not mention a TurboTax sub-brand, such as TurboTax Free Edition. (*E.g.*, GX299 (Intuit); GX321 (Complaint Counsel); GX323 (Complaint Counsel); GX325 (Intuit); GX328 (Intuit); GX330-GX331 (Intuit); GX344 (Intuit); GX346-GX347 (Intuit), or do so in small, inconspicuous lettering. (GX59 (Complaint Counsel); GX321 (Complaint Counsel); GX326-GX327 (Complaint Counsel); GX348 (Intuit); GX350-GX351 (Intuit); GX352 (Complaint Counsel); GX356 (Intuit)).

64.  In virtually all the television advertisements described in this section II.B.2, references to "simple returns," and "see details" or "see if you qualify" at TurboTax.com, appeared in small print and were located at the bottom of the screen. (*E.g.*, GX59 (Complaint Counsel); GX202 (Complaint Counsel); GX204 (Complaint Counsel); GX208 (Complaint Counsel); GX299 (Intuit); GX307 (Complaint Counsel); GX309 (Complaint Counsel); GX321 (Complaint Counsel); GX323 (Complaint Counsel); GX324-GX325 (Intuit); GX326-GX327 (Complaint Counsel); GX328-GX331 (Intuit); GX332

PUBLIC

(Complaint Counsel); GX344-GX351 (Intuit); GX356 (Intuit); RX1112 (Intuit); RX1115 (Intuit); RX1398-RX1400 (Intuit)).

65.   Where the disclosures referenced in F. 64 appeared, the small print was typically faint in color and was virtually lost against the other larger, bolder, printed messages, such as the TurboTax logo and the adjacent word(s), "free." (*E.g.*, GX59 (Complaint Counsel); GX299 (Intuit); GX307 (Complaint Counsel); GX309 (Complaint Counsel); GX326-GX327 (Complaint Counsel); GX328-GX331 (Intuit); GX332 (Complaint Counsel); GX348-GX351 (Intuit); GX356 (Intuit)).

66.   Where the disclosures referenced in F. 64 appeared, they typically appeared toward the end of the television advertisement and lasted only a few seconds. (*E.g.*, GX59 (Complaint Counsel); GX202 (Complaint Counsel); GX204 (Complaint Counsel); GX208 (Complaint Counsel); GX321 (Complaint Counsel); GX323 (Complaint Counsel); GX324-GX325 (Intuit); GX326-GX327 (Complaint Counsel); GX328-GX331 (Intuit); GX332 (Complaint Counsel); GX345-GX346 (Intuit); GX349-GX351 (Intuit); GX356 (Intuit); RX1115 (Intuit); RX1398-RX1399 (Intuit)). In addition, they typically appeared against a backdrop of other sounds or moving images. (*E.g.*, GX59 (Complaint Counsel); GX204 (Complaint Counsel); GX208 (Complaint Counsel); GX299 (Intuit); GX323 (Complaint Counsel); GX324-GX325 (Intuit); GX326-GX327 (Complaint Counsel); GX332 (Complaint Counsel); GX344-GX351 (Intuit); GX356 (Intuit); RX1112 (Intuit); RX1115 (Intuit); RX1398-RX1399 (Intuit)), including, in some advertisements, a voice-over simultaneously claiming that filing with TurboTax was free. (GX59 (Complaint Counsel); GX204 (Complaint Counsel); GX208 (Complaint Counsel); GX299 (Intuit); GX309 (Complaint Counsel); GX326-GX327 (Complaint Counsel); GX328-GX331 (Intuit); GX332 (Complaint Counsel); GX348 (Intuit); GX350-GX351 (Intuit); GX356 (Intuit); RX1112 (Intuit); RX1115 (Intuit); RX1398-RX1400 (Intuit)).

### a.    2015 Super Bowl Advertisement

67.   GX321 is a video recording of a 60-second television advertisement placed by Intuit that ran during the 2015 Super Bowl (the "Boston Tea Party" advertisement). (GX321 (Complaint Counsel); GX342 (Complaint Counsel) ¶¶ 20-22). The Boston Tea Party advertisement depicts a fictionalized version of the Boston Tea Party. The following describes the words and actions in the Boston Tea Party advertisement:

>   FIRST REVOLUTIONARY: No taxation without represent . . .

>   FIRST BRITISH SOLDIER: Yes, yes, we hear you on the tax thing.

>   SECOND BRITISH SOLDIER:  But what if it were free to file your taxes?

>   SECOND REVOLUTIONARY: Like, free free?

PUBLIC

SECOND BRITISH SOLDIER: Yes, yes. You'd pay nothing. Not a thing. No thing.

THIRD REVOLUTIONARY: Well alright then!

FOURTH REVOLUTIONARY: Alright then!

THIRD BRITISH SOLDIER: Cheers!

WOMAN: Alright then.

FOURTH BRITISH SOLDIER: Alright then.

GEORGE WASHINGTON: Alright then. Back it up!

While the scene shows George Washington and the American revolutionaries retreating in a boat, a voice-over begins, transcribed below:

VOICE-OVER: Okay, so maybe that's not exactly how it went down, but you can file on TurboTax for absolutely nothing. Intuit TurboTax. It's amazing what you're capable of.

(GX321 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 24).

68. At approximately the 0:54 mark of the 60-second Boston Tea Party advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 3 seconds. (GX321 (Complaint Counsel) at 0:54-0:57).

15

PUBLIC

### b.  2016 Super Bowl Advertisement

69.    GX323 is a video recording of a 30-second television advertisement placed by Intuit that ran during the 2016 Super Bowl (the "Never a Sellout" advertisement). The Never a Sellout advertisement depicts an interview with the actor Sir Anthony Hopkins. (GX323 (Complaint Counsel); GX342 (Complaint Counsel) ¶¶ 20, 25-26; *see also* Johnson (Intuit) Tr. 657-658). The following is a transcription of the words spoken in the Never a Sellout advertisement:

> INTERVIEWER: Sir Anthony Hopkins, every actor at some point considers selling out.
>
> SIR ANTHONY HOPKINS: I would never tarnish my name by selling you something. Now, if I were to tell you to go to turbotax.com, it's because TurboTax AbsoluteZero lets you file your taxes for free.
>
> INTERVIEWER: You're . . . you're not selling anything.
>
> HOPKINS: It's free. There's nothing to sell. Come here, TurboTax.com. [dog jumps on his lap]. Such a good girl, TurboTax.com.

(GX323 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 28; *see also* Johnson (Intuit) Tr. 660).

70.    As the interview proceeds, at approximately the 0:18 mark of the 30-second Never a Sellout advertisement, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (GX323 (Complaint Counsel) at 0:18-0:19).

PUBLIC

c. **Television Advertisements for TY 2017**

i. **Fish**

71. GX325 is a video recording of a 15-second television advertisement for TY 2017 placed by Intuit (the "Fish 15-second" advertisement). (GX325 (Intuit); GX342 (Complaint Counsel) ¶ 31; F. 75). The Fish 15-second advertisement depicts several men on a boat fishing, when one of the men is suddenly impaled by a swordfish. The following is a transcription of the words spoken in the Fish 15-second advertisement after the incident with the swordfish:

> MAN: At least your taxes are free.
>
> VOICE-OVER: Intuit TurboTax.

(GX325 (Intuit); GX342 (Complaint Counsel) ¶ 32).

72. Beginning at approximately the 0:02 mark of the Fish 15-second advertisement, while the action plays out, the following screen appears:



The duration of the foregoing screen is approximately 3 seconds. (GX325 (Intuit) at 0:02-0:05).

73. A 30-second version of the Fish advertisement (the "Fish 30-second" advertisement) depicts the same action as that described in F. 71. The following is a transcription of the words spoken in the Fish 30-second advertisement after the incident with the swordfish:

> MAN IMPALED BY SWORDFISH: Aww, man. My lucky shirt.
>
> MAN WITH FISHING POLE: At least your taxes are free.
>
> MAN CARRYING BEVERAGES: What happened?

17

> MAN WITH FISHING POLE: It's his lucky shirt.
>
> MAN CARRYING BEVERAGES: Well, with TurboTax AbsoluteZero, at least your taxes are free.
>
> MAN WITH FISHING POLE: That's what I said!
>
> VOICE-OVER: Intuit TurboTax.

(GX324 (Intuit); GX342 (Complaint Counsel) ¶ 30; *see also* Shiller (Complaint Counsel) Tr. 187).

74. At approximately the 0:02 mark of the Fish 30-second advertisement, the same screen as that depicted in F. 72 appears for approximately 3 seconds. (GX324 (Intuit) at 0:02-0:05).

75. The 15-second Fish advertisement and the 30-second Fish advertisement aired on television between January 17, 2018, and February 5, 2018. (GX60 (Intuit) at CC-00000669; Shiller (Complaint Counsel) Tr. 186-187; GX324 (Intuit); GX342 (Complaint Counsel) ¶ 29; GX60 (Intuit) at CC-00000669).

### ii.   Guzman

76. GX344 is a video recording of a 15-second advertisement placed by Intuit for TY 2017 (the "Guzman" advertisement). (GX344 (Intuit); GX342 (Complaint Counsel) ¶ 34; F. 79. The Guzman advertisement depicts the actor, Luis Guzman, appearing in a sheep costume on a farm, unhappy, and complaining about being "a wild tiger trapped in a man's body trapped in sheep's clothing." (GX344 (Intuit)). He then says, smiling, "But hey, at least my taxes are free." (GX344 (Intuit) at 0:08).

77. At approximately the 0:05 mark of the 15-second Guzman advertisement, as the actor says his lines, the following screen appears:



The duration of the foregoing screen is approximately 7 seconds. (GX344 (Intuit) at 0:05-0:12).

78.    Beginning at approximately the 0:08 mark of the 15-second Guzman advertisement, while the actor states "At least my taxes are free," the following screen appears:



The duration of the foregoing screen is approximately 4 seconds. (GX344 (Intuit) at 0:08-0:12).

79.    The Guzman advertisement aired on television between January 31, 2018, and February 20, 2018. (GX60 (Intuit) at CC-00000669).

### iii.    Cruise

80.    GX345 is a video recording of a 30-second television advertisement placed by Intuit for TY 2017 (the "Cruise" advertisement). (GX345 (Intuit); GX342 (Complaint Counsel) ¶ 35; GX61 (Intuit) at CC-00000683).

PUBLIC

81.     The Cruise advertisement depicts a man conversing with others on a cruise ship when he
        suddenly falls backwards into the water. Following the man's falling into the water, his
        companions state: "Hey, at least your taxes are free. . . . With TurboTax AbsoluteZero, at
        least your taxes are free." (GX345 (Intuit)).

82.     At approximately the 0:01 mark of the 30-second Cruise advertisement, as the action
        begins and the man falls overboard, the following screen appears:



        The the duration of the foregoing screen is approximately 4 seconds. (GX345 (Intuit) at 0:01-
        0:05).

83.     The Cruise advertisement aired on television between January 7, 2018, and January 26,
        2018. (GX60 (Intuit) at CC-00000669).

                              iv.    **Baby**

84.     GX346 is a video recording of a 15-second television advertisement for TY 2017 placed
        by Intuit (the "Baby" advertisement). (GX346 (Intuit); GX342 (Complaint Counsel) ¶ 36;
        GX61 (Intuit) at CC-00000683).

85.     The Baby advertisement depicts a couple, neither of whom have red hair, cooing over a
        newborn baby with red hair at a hospital when they are suddenly interrupted by a male
        visitor with red hair. The nurse, observing the scene, tells the husband, "At least your
        taxes are free." (GX346 (Intuit)).

PUBLIC

86. Beginning at approximately the 0:09 mark of the 15-second Baby advertisement, while the scene plays out, the following screen appears:



The duration of the foregoing screen is approximately 4 seconds. (GX346 (Intuit) at 0:09-0:13).

87. At approximately the 0:14 mark of the 15-second Baby advertisement, just after the nurse states, "At least your taxes are free," the following screen appears:



The duration of the foregoing screen is approximately 1 second. (GX346 (Intuit) at 0:14-0:15).

### v.    Anthem Launch

88. GX347 is a video recording of a 45-second advertisement for TY 2017 placed by Intuit (the "Anthem Launch" advertisement). (GX347 (Intuit); GX342 (Complaint Counsel) ¶ 37; GX61 (Intuit) at CC-00000683).

PUBLIC

89.     The Anthem Launch advertisement begins by depicting a mechanic working under a car being crushed by the car. His coworker responds by stating: "With TurboTax AbsoluteZero, at least your taxes are free." (GX347 (Intuit) at 0:06-0:09). A series of additional catastrophic scenes is shown, with the responding phrase "at least your taxes are free" repeated throughout. (GX347 (Intuit) at 0:10-0:39).

90.     Beginning at approximately the 0:01 mark of the 45-second Anthem Launch advertisement, while the action plays out, the following screen appears:



The duration of the foregoing screen is approximately 3 seconds. (GX347 (Intuit) at 0:01-0:04).

91.     At approximately the 0:43 mark of the 45-second Anthem Launch advertisement, the following screen appears for 2 seconds:



(GX347 (Intuit) at 0:43-0:45).

PUBLIC

    **d.    Television Advertisements for TY 2018
and TY 2019**

    **i.    Lawyer**

92.    GX328 is a video recording of a 60-second television advertisement for TY 2018 placed by Intuit (the "Lawyer 60-second" advertisement). (GX328 (Intuit); GX342 (Complaint Counsel) ¶ 56; GX60 (Intuit) at CC-00000668-669).

93.    The Lawyer 60-second advertisement depicts a lawyer in a courtroom making an impassioned argument before a jury. (GX328 (Intuit)).

94.    The following is a transcription of the words spoken in the Lawyer 60-second advertisement:

> LAWYER: Free free free free free free free free free free. Free free. Free free free free. Free free free. Free free free free. Free free free free free free free.
>
> SECOND LAWYER: Free! Free!
>
> JUDGE: Free free. Free.
>
> LAWYER: Free free free. Free free free free free free free free. Free free free free free free free! Free free free free free. Free free free free. Free free free free free free!
>
> JUROR: Free.
>
> OTHER JURORS: Free. Free. Free. Free. Free.
>
> [jurors give lawyer a standing ovation]
>
> UNIDENTIFIED VOICES: Free free free.
>
> VOICE-OVER: That's right. TurboTax Free is free. Free, free free free.

(GX328 (Intuit); GX342 (Complaint Counsel) ¶ 57).

PUBLIC

95. At approximately the 0:56 mark of the Lawyer 60-second advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (GX328 (Intuit) at 0:56-0:58).

96. At approximately the 0:58 mark of the Lawyer 60-second advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (GX328 (Intuit) at 0:58-1:00).

97. GX329 is a video recording of a 30-second television advertisement for TY 2018 placed by Intuit (the "Lawyer 30-second" advertisement), depicting the same action as F. 93. (GX329 (Intuit); GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

98. The following is a transcription of the words spoken in the Lawyer 30-second advertisement:

> LAWYER: Free free free free free free free free free. Free free free.
> Free free free. Free free free free free. Free free free free free free
> free. Free free free free free free!
>
> JUROR: Free.
>
> OTHER JURORS: Free. Free. Free.
>
> [jurors give lawyer a standing ovation]
>
> UNIDENTIFIED VOICES: Free free free.
>
> VOICE-OVER: That's right. TurboTax Free is free. Free, free free
> free.

(GX329 (Intuit); GX342 (Complaint Counsel) ¶ 59; *see also* Shiller (Complaint Counsel)
Tr. 182-183).

99.   At approximately the 0:26 mark of the Lawyer 30-second advertisement, during the
      voice-over, the same screen as that depicted in F. 95 appears for approximately 1 second.
      (GX329 (Intuit) at 0:26-0:27).

100.  At approximately the 0:27 mark of the Lawyer 30-second advertisement, during the
      voice-over, the same screen as that depicted in F. 96 appears for approximately 3
      seconds. (GX329 (Intuit) at 0:27-0:30; *see also* GX342 (Complaint Counsel) ¶ 156).

101.  The Lawyer 30-second advertisement and the Lawyer 60-second advertisement aired on
      television throughout the United States at least 2,115 times on at least 124 television
      networks between November 1, 2018, and April 18, 2019. (GX342 (Complaint Counsel)
      ¶¶ 60-61).

### ii.    Movie Credits

102.  GX299 is a video recording of a 30-second television advertisement for TY 2018 placed
      by Intuit (the "Movie Credits 30-second" advertisement). (Shiller (Complaint Counsel)
      Tr. 183-184; GX299 (Intuit); GX342 (Complaint Counsel) ¶ 63; GX60 (Intuit) at CC-
      00000668-669; GX61 (Intuit) at CC-00000682-683).

103.  The Movie Credits 30-second advertisement depicts a man walking while throwing a
      lighter behind him. The lighter lands on the ground and causes an explosion behind the
      man, who continues to walk away. (GX299 (Intuit)).

104.  The following is a transcription of the words spoken in the Movie Credits 30-second
      advertisement:

MAN: Free. Free free free.

VOICE-OVER: That's right. TurboTax Free is free. Free, free free
free.

(GX299 (Intuit); GX342 (Complaint Counsel) ¶ 64; *see also* Shiller (Complaint Counsel)
Tr. 184).

105.    Beginning at approximately the 0:12 mark of the Movie Credits 30-second advertisement,
and continuing to the 0:25 second mark, the movie "credits" begin rolling, consisting
only of the words "free." (GX299 (Intuit)). Representative screens are set forth below:





(GX299 (Intuit) at 0:12-0:25).

106.    At approximately the 0:26 second mark of the Movie Credits 30-second advertisement,
during the voice-over, the following screen appears:

PUBLIC



The duration of the foregoing screen is approximately 1 second. (GX299 (Intuit) at 0:26-0:28).

107.   At approximately the 0:28 mark of the Movie Credits 30-second advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (GX299 (Intuit) at 0:28-0:30).

108.   GX330 is a video recording of a 30-second television advertisement for TY 2018 placed by Intuit (the "Movie Credits Version 2" advertisement). (GX330 (Intuit); GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

109.   The Movie Credits Version 2 advertisement depicts the same action as that described in F. 103. (GX330 (Intuit); GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

110.   The words spoken in the Movie Credits Version 2 advertisement are the same as those in F. 104. (GX330 (Intuit); GX342 (Complaint Counsel) ¶ 66).

PUBLIC

111. At approximately the 0:27 mark of the Movie Credits Version 2 advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 3 seconds. (GX330 (Intuit) at 0:27-0:30).

112. GX331 is a video recording of a 15-second television advertisement for TY 2018 placed by Intuit (the "Movie Credits 15-second" advertisement). (GX331 (Intuit); GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

113. The words spoken in the Movie Credits 15-second advertisement are the same as those in F. 104. (GX331 (Intuit); GX342 (Complaint Counsel) ¶ 68).

114. At approximately the 0:12 mark in the Movie Credits 15-second advertisement, during the voice-over, the same screen as shown in F. 107 appears, for approximately 3 seconds. (GX331 (Intuit) at 0:12-0:15).

115. RX1400 is a video recording of a 15-second television advertisement for TY 2019 placed by Intuit (the "Movie Credits 15-second Version 2" advertisement). (RX1400 (Intuit); JX1 (Joint Stipulations of Law and Fact) ¶ 39; *see* Rubin (Intuit) Tr. 727, 1562).

116. The Movie Credits 15-second Version 2 advertisement depicts the same action as that described in F. 103. (RX1400 (Intuit)).

PUBLIC

117. At approximately the 0:12 mark of the Movie Credits 15-second Version 2 advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 3 seconds. (RX1400 (Intuit) at 0:12-0:15).

118. Collectively, the Movie Credits 30-second advertisement, the Movie Credits Version 2 advertisement, and the Movie Credits 15-second advertisements appeared on television throughout the United States at least 4,651 times on at least 195 television networks between November 1, 2018, and April 18, 2019 for TY 2018. (GX342 (Complaint Counsel) ¶¶ 69-70; Shiller (Complaint Counsel) Tr. 184; GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

119. The Movie Credits 15-second Version 2 advertisement appeared throughout the United States at least 6,216 times on at least 721 television networks between November 1, 2019, and July 15, 2020 for TY 2019. (GX342 (Complaint Counsel) ¶¶ 90-91; *see also* Shiller (Complaint Counsel) Tr. 184; Rubin (Intuit) Tr. 727, 1562).

### iii.    Game Show

120. GX59 is a 39-second video recording containing a 30-second television advertisement for TY 2018 placed by Intuit (the "Game Show 30-second" advertisement). (Shiller (Complaint Counsel) Tr. 180-182; GX59 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 51; GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

121. The Game Show 30-second advertisement depicts a man and a woman working together as contestants on a game show in which the woman must guess what the man is miming. "Free" is the only word spoken by the contestants and is repeated dozens of times. The scene concludes with the contestants celebrating winning the game. (GX59 (Complaint Counsel); Shiller (Complaint Counsel) Tr. 181).

PUBLIC

122.  At the end of the Game Show 30-second advertisement, at the 0:31 mark of the video recording, the following screen appears while the voice-over states "That's right, TurboTax free is free. Free, free free free":



The duration of the foregoing screen is approximately 2 seconds. (GX59 (Complaint Counsel) at 0:31-0:33).

123.  At the end of the Game Show 30-second advertisement, at the 0:33 mark of the video recording, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. GX59 (Complaint Counsel) at 0:33-0:35).

PUBLIC

124.    GX356 is a video recording of a 15-second television advertisement for TY 2018 placed by Intuit (the "Game Show 15-second" advertisement). (GX356 (Intuit); GX342 (Complaint Counsel) ¶ 51; Shiller (Complaint Counsel) Tr. 181-182; GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

125.    The Game Show 15-second advertisement depicts the same action as that described in F. 121. (GX356 (Intuit)).

126.    At approximately the 0:11 mark of the Game Show 15-second advertisement, the same screen as shown in F. 122 appears while the voice-over states "That's right, TurboTax free is free. Free, free free free." The duration of the screen is approximately 2 seconds. (GX356 (Intuit) at 0:11-0:13).

127.    At approximately the 0:13 mark of the Game Show 15-second advertisement, during the voice-over, the same screen as shown in F. 123 appears for approximately 2 seconds. (GX356 (Intuit) at 0:13-0:15).

128.    The Game Show 30-second advertisement and the Game Show 15-second advertisement aired on television throughout the United States in connection with TY 2018 at least 5,858 times on at least 140 networks between November 1, 2018, and April 18, 2019. (Shiller (Complaint Counsel) Tr. 181-182; GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683; GX342 (Complaint Counsel) ¶¶ 54-55).

129.    RX1115 is a video recording of a 15-second television advertisement for TY 2019 placed by Intuit (the "Game Show TY 2019" advertisement). (RX1115 (Intuit); JX1 (Joint Stipulations of Law and Fact) ¶ 41; *see* Shiller (Complaint Counsel) Tr. 181-182, 244-245).

130.    The Game Show TY 2019 advertisement depicts the same action as that described in F. 121. (RX1115 (Intuit)).

131.    At approximately the 0:11 mark of the Game Show TY 2019 advertisement, the following screen appears while the voice-over states "That's right, TurboTax free is free. Free, free free free":

PUBLIC



The duration of the foregoing screen is approximately 2 seconds. (RX1115 (Intuit) at 0:11-0:13).

132. At approximately the 0:13 mark of the Game Show TY 2019 advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (RX1115 (Intuit) at 0:13-0:15).

133. The Game Show TY 2019 advertisement appeared throughout the United States at least 4,656 times on at least 214 television networks between November 1, 2019, and July 15, 2020. (GX342 (Complaint Counsel) ¶¶ 88-89; *see also* Shiller (Complaint Counsel) Tr. 181-182).

PUBLIC

### iv.    Court Reporter

134.    GX348 is a video recording of a 15-second television advertisement for TY 2019 placed by Intuit (the "Court Reporter" advertisement). (Shiller (Complaint Counsel) Tr. 176-177; GX348 (Intuit); GX342 (Complaint Counsel) ¶¶ 39-41, 84-85).

135.    The Court Reporter advertisement depicts a legal proceeding in which the court stenographer reads back a transcript consisting only of the word "free." The word "free" is repeated approximately 18 times. (GX348 (Intuit); GX342 (Complaint Counsel) ¶ 39).

136.    At approximately the 0:09 mark of the 15-second Court Reporter advertisement, the following screen is shown while a voice-over states "That's right, TurboTax Free is free. Free, free free free":



The duration of the foregoing screen is approximately 2 seconds. (GX348 (Intuit) at 0:09-0:11; *see also* Shiller (Complaint Counsel) Tr. 176).

137.    At approximately the 0:11 mark of the 15-second Court Reporter advertisement, during the voice-over, the following screen is shown:



The duration of the foregoing screen is approximately 4 seconds. (GX348 (Intuit) at 0:11-0:15).

PUBLIC

138. The Court Reporter advertisement appeared on television throughout the United States at least 1,358 times on at least 112 television networks between November 1, 2018, and April 18, 2019. (GX342 (Complaint Counsel) ¶¶ 40-41; *see also* Shiller (Complaint Counsel) Tr. 177).

139. RX1112 is a video recording of a 15-second television advertisement for TY 2019 placed by Intuit (the "Court Reporter TY 2019" advertisement). (RX1112 (Intuit); JX1 (Joint Stipulations of Law and Fact) ¶ 38; Ryan (Intuit) Tr. 726-727; Rubin (Intuit) Tr. 1560-1563).

140. The Court Reporter TY 2019 advertisement depicts the same action as that described in F. 135. (RX1112 (Intuit)).

141. At approximately the 0:09 mark of the 15-second Court Reporter TY 2019 advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (RX1112 (Intuit) at 0:09-0:11).

142. At approximately the 0:12 mark of the 15-second Court Reporter TY 2019 advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 3 seconds. (RX1112 (Intuit) at 0:12-0:15).

143. The Court Reporter TY 2019 advertisement appeared on television throughout the United States at least 1,502 times on at least 126 television networks between November 1, 2019, and July 15, 2020. (GX342 (Complaint Counsel) ¶¶ 84-85; *see also* Shiller (Complaint Counsel) Tr. 177).

### v.    Crossword

144. GX326 is a video recording of a 15-second advertisement for TY 2018 placed by Intuit (the "Crossword" advertisement) that appeared on television throughout the United States at least 1,187 times on at least 55 television networks between November 1, 2018, and April 18, 2019. (Shiller (Complaint Counsel) Tr. 177-179; GX326 (Complaint Counsel); GX342 (Complaint Counsel) ¶¶ 42, 44-45; GX61 (Intuit) at CC-00000682-683).

145. The Crossword advertisement depicts a man sitting at a kitchen table working on a crossword puzzle where all the answers to the puzzle are the word "free." (GX326 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 42).

146. At approximately the 0:10 mark of the 15-second Crossword advertisement, the following screen appears while the voice-over says "That's right, TurboTax Free is free":



The duration of the foregoing screen is approximately 3 seconds. (GX326 (Complaint Counsel) at 0:10-0:13).

PUBLIC

147.  At approximately the 0:13 mark of the 15-second Crossword advertisement, the following screen appears while the voice-over says "Free, free free free":



(GX326 (Complaint Counsel) at 0:10-0:15).

148.  RX1398 is a video recording of a 15-second television advertisement for TY 2019 placed by Intuit (the "Crossword TY 2019" advertisement) which appeared on television throughout the United States at least 3,195 times on at least 327 television networks between November 1, 2019, and July 15, 2020. (RX1398 (Intuit); JX1 (Joint Stipulations of Law and Fact) ¶ 40; GX342 (Complaint Counsel) ¶¶ 86-87; *see also* Shiller (Complaint Counsel) Tr. 178-179).

149.  The Crossword TY 2019 advertisement depicts the same action as that described in F. 145.

150.  At approximately the 0:10 mark of the 15-second Crossword TY 2019 advertisement, the following screen appears while the voice-over says "That's right, TurboTax Free is free":



The duration of the foregoing screen is approximately 3 seconds. (RX1398 (Intuit) at 0:10-0:13).

36

PUBLIC

151. At approximately the 0:13 mark of the 15-second Crossword TY 2019 advertisement, the following screen appears while the voice-over states "Free, free free free":



The duration of the foregoing screen is approximately 2 seconds. (RX1398 (Intuit) at 0:13-0:15).

### vi.    Football/Big Kick

152. GX349 is a video recording of a 60-second television advertisement for TY 2017 placed by Intuit (the "Big Kick 60-second" advertisement). (GX349 (Intuit); GX342 (Complaint Counsel) ¶ 48; GX60 (Intuit) at CC-00000668-669).

153. GX327 is a video recording of a 30-second television advertisement for TY 2018 placed by Intuit (the "Big Kick 30-second" advertisement). (Shiller (Complaint Counsel) Tr. 179-180; GX327 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 46; GX61 (Intuit) at CC-00000682-683).

154. Both the Big Kick 60-second advertisement and the Big Kick 30-second advertisement depict a young football player playing football while reminiscing about his father. "Free" is the only word spoken by the football player and the father. (GX327 (Complaint Counsel); GX349 (Intuit); GX342 (Complaint Counsel) ¶ 46).

PUBLIC

155.    At approximately the 0:26 mark of the Big Kick 30-second advertisement, the following
        screen appears while the voice-over says "That's right, TurboTax Free is free":



The duration of the foregoing screen is approximately 2 seconds. (GX327 (Complaint
Counsel) at 0:26-0:28).

156.    At approximately the 0:28 mark of the Big Kick 30-second advertisement, the following
        screen appears while the voice-over says "Free, free free free":



The duration of the foregoing screen is approximately 2 seconds. (GX327 (Complaint
Counsel) at 0:28-0:30).

157.    At approximately the 0:57 mark of the Big Kick 60-second advertisement, during the
        voice-over, the same screen as that shown in F. 155 appears for approximately 2 seconds.
        (GX349 (Complaint Counsel) at 0:57-0:59).

158.    At approximately the 0:58 mark of the Big Kick 60-second advertisement, during the
        voice-over, the same screen as that shown in F. 156 appears for approximately 2 seconds.
        (GX349 (Complaint Counsel) at 0:58-01:00).

159. Collectively, the Big Kick 60-second advertisement and the Big Kick 30-second advertisement appeared on television throughout the United States at least 2,811 times on at least 139 television networks between November 1, 2018, and April 18, 2019. (GX342 (Complaint Counsel) ¶¶ 49-50; *see also* Shiller (Complaint Counsel) Tr. 180).

### vii.    Spelling Bee

160. GX350 is a video recording of a 30-second television advertisement for TY 2018 placed by Intuit (the "Spelling Bee Version 1" advertisement). (GX350 (Intuit); Shiller (Complaint Counsel) Tr. 186; GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

161. The Spelling Bee Version 1 advertisement depicts a spelling bee in which "free" is the word that the contestant undertakes to spell. (GX350 (Intuit)).

162. At approximately the 26-second mark of the 30-second Spelling Bee Version 1 advertisement, the following screen appears while the voice-over says "That's right, TurboTax Free is free":



The duration of the foregoing screen is approximately 2 seconds. (GX350 (Intuit) at 0:26-0:28).

39

PUBLIC

163.    At approximately the 28-second mark of the 30-second Spelling Bee Version 1 advertisement, the following screen appears while the voice-over says "Free, free free free":



The duration of the foregoing screen is approximately 2 seconds. (GX350 (Intuit) at 0:28-0:30).

164.    GX351 is a video recording of a 30-second television advertisement for TY 2018 placed by Intuit (the "Spelling Bee Version 2" advertisement), depicting the same action as that described in F. 161. (GX351 (Intuit); Shiller (Complaint Counsel) Tr. 186; GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

165.    At approximately the 26-second mark of the 30-second Spelling Bee Version 2 advertisement, the following screen appears while the voice-over says "That's right, TurboTax Free is free":



The duration of the foregoing screen is approximately 2 seconds. (GX351 (Intuit) at 0:26-0:28).

40

166.  At approximately the 28-second mark of the 30-second Spelling Bee Version 2
      advertisement, the following screen appears while the voice-over says "Free, free free
      free":



The duration of the foregoing screen is approximately 2 seconds. (GX351 (Intuit) at 0:28-
0:30).

167.  GX332 is a video recording of a 15-second television advertisement for TY 2018 placed
      by Intuit, depicting the same action as that described in F. 161 (the "Spelling Bee 15-
      second" advertisement). (GX332 (Complaint Counsel); Shiller (Complaint Counsel) Tr.
      186; GX60 (Intuit) at CC-00000668-669; GX61 (Intuit) at CC-00000682-683).

168.  At approximately the 0:11 mark of the Spelling Bee 15-second advertisement, the
      following screen appears while the voice-over says "That's right, TurboTax Free is free":



The duration of the foregoing screen is approximately 2 seconds. (GX332 (Complaint
Counsel) at 0:11-0:13).

PUBLIC

169. At approximately the 0:13 mark of the Spelling Bee 15-second advertisement, the following screen appears while the voice-over says "Free, free free free":



The duration of the foregoing screen is approximately 2 seconds. (GX332 (Complaint Counsel) at 0:13-0:15).

170. The Spelling Bee Version 1 advertisement, the Spelling Bee Version 2 advertisement, and the Spelling Bee 15-second Advertisement appeared throughout the United States at least 5,141 times on at least 313 television networks between November 1, 2018, and April 18, 2019. (GX342 (Complaint Counsel) ¶¶ 74-75; *see also* Shiller (Complaint Counsel) Tr. 186).

171. RX1399 is a video recording of a 15-second television advertisement for TY 2019 placed by Intuit (the "Spelling Bee 15-second Version 2" advertisement). (RX1399 (Intuit); JX1 (Joint Stipulations of Law and Fact) ¶ 42; Shiller (Complaint Counsel) Tr. 186; *see* Ryan (Intuit) Tr. 726-727; Rubin (Intuit) Tr. 1560-1563).

172. RX1399 depicts the same action as described in F. 161. (RX1399 (Intuit)).

173. At approximately the 0:11 mark of the Spelling Bee 15-second Version 2 advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (RX1399 (Intuit) at 0:11-0:13).

174.    At approximately the 0:13 mark of the Spelling Bee 15-second Version 2 advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (RX1399 (Intuit) at 0:13-0:15).

175.    The Spelling Bee 15-second Version 2 advertisement appeared throughout the United States at least 2,618 times on at least 322 television networks between November 1, 2019, and July 15, 2020. (GX342 (Complaint Counsel) ¶¶ 92-93; *see also* Shiller (Complaint Counsel) Tr. 186; Ryan (Intuit) Tr. 726-727; Rubin (Intuit) Tr. 1560-1563).

43

PUBLIC

e.  **Television Advertisements for TY 2020
    and TY 2021**

i.  **Auctioneer**

176.  GX202 is a video recording of a 15-second advertisement placed by Intuit, depicting a cattle auction in which the only word spoken by the auctioneer is the word "free" (the "Auctioneer" advertisement). (GX202 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 130).

177.  The following is a transcription of the words spoken in the Auctioneer advertisement:

> AUCTIONEER: And free, and free, and free, and free, and free. Now a bidder and free! Now give me another bidder and free and a free here and a free free free a free free free. Now a bidder and free! Now give me another bidder and free, and a free free free. And free, and free here, and free there, and free free and free. Make it Free. Free!

> VOICE-OVER: That's right. TurboTax Free Edition is Free. See details at TurboTax.com.

(GX342 (Complaint Counsel) ¶ 130; GX202 (Complaint Counsel)).

178.  At approximately the 0:11 mark of the Auctioneer advertisement, during the voice-over, the following screen is shown:



The duration of the foregoing screen is approximately 2 seconds. (GX202 (Complaint Counsel) at 0:11-0:13).

179. At approximately the 0:13 mark of the Auctioneer advertisement, during the voice-over, the following screen is shown:



The duration of the foregoing screen is approximately 2 seconds. (GX202 (Complaint Counsel) at 0:13-0:15).

180. The Auctioneer advertisement appeared on television throughout the United States at least 8,281 times on at least 670 television networks between November 1, 2020, and May 17, 2021. (GX342 (Complaint Counsel) ¶¶ 106-107; *see also* Shiller (Complaint Counsel) Tr. 167-168).

181. The Auctioneer advertisement appeared on television throughout the United States at least 1,876 times on at least 86 television networks between November 1, 2021, and April 18, 2022. (GX342 (Complaint Counsel) ¶¶ 133-134; *see also* Shiller (Complaint Counsel) Tr. 167-168).

### ii. Dance Workout

182. GX208 is a video recording of a 15-second television advertisement placed by Intuit (the "Dance Workout 15-second" advertisement), depicting a dance instructor leading a dance exercise class. (GX208 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 136).

183. The following is a transcription of the words spoken in the Dance Workout 15-second advertisement:

> DANCE WORKOUT INSTRUCTOR: Free! And free! And free! And free! Free. And free, and free. Free free. And free, and free, and free, and free, and free.
>
> VOICE-OVER: That's right, TurboTax Free Edition is free. See details at TurboTax.com.

(GX208 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 136).

45

PUBLIC

184.    At approximately the 0:10 mark of the Dance Workout 15-second advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (GX208 (Complaint Counsel) at 0:10-0:12).

185.    At approximately the 0:12 mark of the Dance Workout 15-second advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 3 seconds. (GX208 (Complaint Counsel) at 0:12-0:15).

186.    The Dance Workout 15-second advertisement appeared throughout the United States at least 9,909 times on 714 television networks between November 1, 2020, and May 17, 2021. (GX342 (Complaint Counsel) ¶¶ 109-110; *see also* Shiller (Complaint Counsel) Tr. 171).

PUBLIC

187.   The Dance Workout 15-second advertisement appeared throughout the United States at least 7,988 times on at least 623 television networks between November 1, 2021, and April 18, 2022. (GX342 (Complaint Counsel) ¶¶ 139-140; *see also* Shiller (Complaint Counsel) Tr. 171).

### iii.   Dog Show

188.   GX204 is a video recording of a 15-second television advertisement for TY 2020 and TY 2021 placed by Intuit (the "Dog Show" advertisement). (Shiller (Complaint Counsel) Tr. 172-173; GX204 (Complaint Counsel); GX342 (Complaint Counsel) ¶¶ 112-113, 141).

189.   The Dog Show advertisement depicts a dog competition in which a judge is evaluating four dog finalists. (GX204 (Complaint Counsel)).

190.   The following is a transcription of the words spoken in the Dog Show advertisement:

> DOG SHOW JUDGE: Free, free, free!
>
> WINNING DOG HANDLER: Free! Free!
>
> VOICE-OVER: That's right, TurboTax Free Edition is free. See details at TurboTax.com.

(GX204 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 143; *see also* Shiller (Complaint Counsel) Tr. 172).

191.   At approximately the 0:10 mark of the 15-second Dog Show advertisement, during the voice-over, the following screen appears:



PUBLIC

The duration of the foregoing screen is approximately 2 seconds. (GX204 (Complaint Counsel) at 0:10-0:12).

192.   At approximately the 0:13 mark of the 15-second Dog Show advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (GX204 (Complaint Counsel) at 0:13-0:15).

193.   The Dog Show advertisement appeared on television throughout the United States at least 10,435 times on 685 television networks between November 1, 2020, and May 17, 2021. (GX342 (Complaint Counsel) ¶¶ 112-113; *see also* Shiller (Complaint Counsel) Tr. 173).

194.   The Dog Show advertisement appeared on television throughout the United States at least 4,559 times on at least 499 television networks between November 1, 2021, and April 18, 2022. (GX342 (Complaint Counsel) ¶¶ 144-145; *see also* Shiller (Complaint Counsel) Tr. 173).

### iv.   Steven/Spit Take

195.   GX307 is a video recording of a 14-second television advertisement for TY 2021 placed by Intuit (the "Steven/Spit Take 14-second" advertisement). (Shiller (Complaint Counsel) Tr. 173-175; GX307 (Complaint Counsel); GX342 (Complaint Counsel) ¶¶ 147, 154-155).

196.   The following is a description of the Steven/Spit Take 14-second advertisement:

VOICE-OVER: Steven, did you know that a TurboTax Live expert can do your simple tax return for you?

Steven: Hmm

VOICE-OVER: For free.

PUBLIC

[Steven spits out coffee]

VOICE-OVER: It is true. For limited time TurboTax is free for simple returns even when an expert files for you.

(GX307 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 149; *see also* Shiller (Complaint Counsel) Tr. 174-175).

197.    At approximately the 0:09 mark of the Steven/Spit Take 14-second advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 5 seconds. (GX307 (Complaint Counsel) at 0:09-0:14).

198.    GX309 is a video recording of a 28-second television advertisement placed by Intuit (the "Steven/Spit Take 28-second" advertisement). (GX309 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 151).

199.    The following is a description of the Steven/Spit Take 28-second advertisement:

VOICE-OVER: Steven, did you know that TurboTax is free no matter how you want to file?

[Steven spits out mouthful of coffee]

Steven: I don't believe that.

VOICE-OVER: It's true. Anyone with a simple tax return can get help from an expert, for free.

[Steven spits out coffee again]

PUBLIC

Steven: That can't be true.

VOICE-OVER: It is and with TurboTax Live our experts will even do your taxes for you for free.

[Steven spits coffee a third time]

Other man: Honestly, that sounds amazing.

VOICE-OVER: For a limited time TurboTax is free for simple returns no matter how you file.

(GX309 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 153).

200. At approximately the 0:24 mark of the Steven/Spit Take 28-second advertisement, during the voice-over, the following screen appears:



The duration of the foregoing screen is approximately 4 seconds. (GX309 (Complaint Counsel) at 0:24-0:28; GX310 (Complaint Counsel)).

201. Collectively, the Steven/Spit Take 14-second advertisement and the Steven/Spit Take 28-second advertisement appeared throughout the United States at least 13,341 times on at least 637 television networks between November 1, 2021, and April 18, 2022. (GX342 (Complaint Counsel) ¶¶ 154-155; see also Shiller (Complaint Counsel) Tr. 175).

202. The Steven/Spit Take 14-second advertisement aired during the live broadcast of the Oscars on March 27, 2022. (GX312 (Complaint Counsel) ¶ 34; GX307 (Complaint Counsel)).

### 3. Radio Advertising

203. In TY 2020 and TY 2021, Intuit marketed its TurboTax Free Edition product on the radio. (RRCCFF ¶ 195; see JX1 (Joint Stipulations of Law and Fact) ¶ 19).

PUBLIC

### a.    Radio Advertisements for TY 2020

204.    GX627 is an audio recording of a 31-second radio advertisement for TY 2020 placed by Intuit (the "31-second Radio" advertisement). (GX627 (Intuit); RRCCFF ¶ 196).

205.    The 31-second Radio advertisement consists of a jingle in which the word "free" is the only word sung and is repeated approximately 32 times. (GX627 (Intuit)).

206.    The following words are spoken at approximately the 0:22 mark of the 31-second Radio advertisement: "That's right, TurboTax Free is free. Free, free free free." (GX627 (Intuit) at 0:22-0:26).

207.    At approximately the 0:26 mark of the 31-second Radio advertisement, while the jingle is still playing in the background, the following words are spoken at a significantly faster rate than the rest of the radio advertisement: "Free Edition product only. For simple U.S. returns. Offer subject to change. See details at turbotax.com." (GX627 (Intuit) at 0:26-0:31).

208.    GX630 is an audio recording of a 31-second radio advertisement for TY 2020 placed by Intuit (the "31-second Radio Version 2" advertisement). (GX630 (Intuit); RRCFF ¶ 200).

209.    The 31-second Radio Version 2 advertisement consists of a jingle in which the word "free" is the only word sung and is repeated approximately 27 times. (GX630 (Intuit)).

210.    At approximately the 0:21 mark of the 31-second Radio Version 2 advertisement, the following words are spoken: "That's right, TurboTax Free is free. Free, free free free." (GX630 (Intuit) at 0:21-0:25).

211.    At approximately the 0:26 mark of the 31-second Radio Version 2 advertisement, while the jingle is still playing in the background, the following words are spoken at a significantly faster rate than the rest of the radio advertisement: "Free Edition product only. For simple U.S. returns. Offer subject to change. See details at turbotax.com." (GX630 (Intuit) at 0:26-0:31).

### b.    Radio Advertisements for TY 2021

212.    GX617 is an audio recording of a 30-second radio advertisement for TY 2021 placed by Intuit (the "30-second Radio" advertisement). (GX617 (Intuit); RRCCFF ¶ 204).

213.    The 30-second Radio advertisement consists of a jingle in which the word "free" is the only word sung and is repeated approximately 32 times. (GX617 (Intuit)).

PUBLIC

214.   At approximately the 0:21 mark of the 30-second Radio advertisement, the following words are spoken: "That's right, TurboTax Free Edition is free. Free, free free free." (GX617 (Intuit) at 0:21-0:25).

215.   At approximately the 0:25 mark of the 30-second Radio advertisement, while the jingle is still playing in the background, the following words are spoken at a significantly faster rate than the rest of the advertisement: "TurboTax Free Edition is for simple U.S. returns only. See if you qualify at turbotax.com. Offer subject to change." (GX617 (Intuit) at 0:25-0:30).

216.   GX618 is an audio recording of a 30-second radio advertisement for TY 2021 placed by Intuit (the "30-second Radio Version 2" advertisement). (GX618 (Intuit); RRCCFF ¶ 208).

217.   The 30-second Radio Version 2 advertisement consists of a jingle in which the word "free" is the only word sung and is repeated approximately 27 times. (GX618 (Intuit)).

218.   At approximately the 0:20 mark of the 30-second Radio Version 2 advertisement, the following words are spoken: "That's right, TurboTax Free Edition is free. Free, free free free." (GX618 (Intuit) at 0:20-0:24).

219.   At approximately the 0:24 mark of the 30-second Radio Version 2 advertisement, while the jingle is still playing in the background, the following words are spoken at a significantly faster rate than the rest of the advertisement: "TurboTax Free Edition is for simple U.S. returns only. See if you qualify at turbotax.com. Offer subject to change." (GX618 (Intuit) at 0:24-0:30).

### 4.   Online Advertising

220.   Online advertisements include traditional display advertisements, such as banners displayed on websites, and display or video advertisements placed on social media sites such as TikTok, Facebook, or Snapchat. (Ryan (Intuit) Tr. 693; GX156 (Ryan (Intuit) IHT) at 27). F. 230-252, 254-256 are screenshots of display advertisements that appear online in non-video, or static, format ("Non-Video Display"). F. 259-269, 273-289 are screenshots from display advertisements that appear online in moving, or non-static, format ("Video Display"). Collectively, Non-Video Display and Video Display are referred to as "Display Advertisements." F. 290-317 are online video advertisements appearing in connection with online video content, such as YouTube videos ("Online Video Advertisements"). Collectively, Display Advertisements, Video Display, and Online Video Advertisements are referred to as "Online Advertisements." Paid search advertisements that appeared online are addressed separately in section II.B.6.

221.   In TY 2020 and TY 2021, Online Advertisements for TurboTax free products generated over 15 billion impressions and were clicked on over 130 million times. (Baburek

(Complaint Counsel) Tr. 318-323, 337; GX Summary 002 (Complaint Counsel) (Data Online Advertisements Combined)).

222.  Two TurboTax YouTube Online Video Advertisements (GX200 and GX206) alone received over 15 million views in total.  (Shiller (Complaint Counsel) Tr. 272; GX342 (Complaint Counsel) ¶¶ 129, 135).

223.  Each of the Display Advertisements contained one of the following phrases in writing: "simple tax returns only," "simple U.S. returns only," or "simple tax returns." (F. 226-289; CCRRFF 248).

224.  Most of the Display Advertisements contain the name of a TurboTax free product, such as TurboTax Free Edition or TurboTax Live Basic. (*See* GX173 (Intuit); GX174-A (Intuit); GX175-A (Intuit); GX187 (Intuit); GX188 (Intuit); GX189 (Intuit); GX196 (Intuit); GX197 (Intuit); GX198 (Intuit); GX199 (Intuit); GX505 (Intuit); GX506 (Intuit); GX507 (Intuit); GX508 (Intuit); GX509 (Intuit); GX511 (Intuit); GX512 (Intuit); GX513 (Intuit); GX514 (Intuit); GX515 (Intuit); GX516 (Intuit); GX517 (Intuit); GX519 (Intuit); GX520 (Intuit); GX521 (Intuit); GX523 (Intuit); GX524 (Intuit); GX525 (Intuit); GX526 (Intuit); GX527 (Intuit); GX528 (Intuit); GX529 (Intuit); GX530 (Intuit); GX531 (Intuit); GX532 (Intuit); GX533 (Intuit); GX534 (Intuit); GX535 (Intuit); GX536 (Intuit); GX537 (Intuit); GX538 (Intuit); GX542 (Intuit); GX543 (Intuit); GX545 (Intuit); GX546 (Intuit); GX547 (Intuit); GX549 (Intuit); GX550 (Intuit); GX551 (Intuit); GX552 (Intuit); GX553 (Intuit); GX554 (Intuit); GX556 (Intuit); GX557 (Intuit); GX558 (Intuit); GX559 (Intuit); GX561 (Intuit); GX562 (Intuit); GX563 (Intuit); GX564 (Intuit); GX566 (Intuit); GX569 (Intuit); GX583 (Intuit); GX584 (Intuit); GX585 (Intuit); GX586 (Intuit); GX588 (Intuit); GX600 (Intuit); GX843 (Intuit); RX139 (Intuit); CCRRFF 250).

225.  Consumers who clicked on Display Advertisements for TurboTax Free Edition were taken directly to the TurboTax Free Edition page on TurboTax's website, referred to as a "landing page." In particular instances, where the advertisements prompted the viewer to "get the app" (*see, e.g.*, GX511 (Intuit), GX513 (Intuit), GX515 (Intuit), GX534 (Intuit), GX555 (Intuit), GX596 (Intuit)), consumers were directed to an application store to download the TurboTax mobile application. (Johnson (Intuit) Tr. 595-596; Rubin (Intuit) Tr. 1563-1565; Ryan (Intuit) Tr. 697; JX1 (Joint Stipulations of Law and Fact) ¶ 61).

### a.   Non-Video Display Advertisements for TY 2020 and TY 2021

226.  In most of the Non-Video Display Advertisements, words such as "simple returns only," "simple U.S. returns only," or "simple tax returns," are much less prominent than the language or images of "free" or "$0." (GX173 (Complaint Counsel); GX189 (Complaint Counsel); GX189-A (Complaint Counsel); GX199 (Complaint Counsel); GX505 (Intuit); GX508 (Intuit); GX527 (Intuit); GX534 (Intuit); GX551 (Intuit); GX552 (Intuit); GX553 (Intuit); GX556 (Intuit); GX566 (Intuit); GX574 (Intuit); GX575 (Intuit); GX580 (Intuit); GX585 (Intuit); GX586 (Intuit); GX587 (Intuit); GX588 (Intuit); GX596 (Intuit)).

PUBLIC

227. Some of the Non-Video Display Advertisements do not contain the name of a TurboTax free product, such as Basic or Free Edition, but instead reference only TurboTax. (*E.g.*, GX574 (Intuit); GX575 (Intuit); GX580 (Intuit); GX587 (Intuit); GX596 (Intuit)).

228. Many of the Non-Video Display Advertisements that refer to a particular TurboTax free product, such as Basic or Free Edition, do so in much smaller and/or lighter, less noticeable font, in comparison to the TurboTax logo. (*E.g.*, GX173 (Complaint Counsel); GX189 (Complaint Counsel); GX189-A (Complaint Counsel); GX196 (Complaint Counsel); GX198 (Complaint Counsel); GX508 (Intuit); GX527 (Intuit); GX551 (Intuit); GX552 (Intuit); GX553 (Intuit); GX554 (Intuit); GX555 (Intuit); GX556 (Intuit); GX585 (Intuit); GX586 (Intuit); GX588 (Intuit)).

229. Some of the Non-Video Display Advertisements that refer to a particular TurboTax free product, such as Basic or Free Edition, do so in slightly smaller and/or lighter, less noticeable font, in comparison to the TurboTax logo. (*E.g.*, GX505 (Intuit); GX506 (Intuit); GX507 (Intuit); GX534 (Intuit)).

230. GX505 is a Non-Video Display Advertisement placed by Intuit for TY 2020. A screenshot of GX505 is pictured below.



(GX505 (Intuit)).

231. GX506 is a Non-Video Display Advertisement placed by Intuit for TY 2020. A screenshot of GX506 is pictured below.



(GX506 (Intuit)).

PUBLIC

232. GX507 is a Non-Video Display Advertisement placed by Intuit for TY 2020. A screenshot of GX507 is pictured below.



(GX507 (Intuit)).

233. GX508 is a Non-Video Display Advertisement placed by Intuit for TY 2020. A screenshot of GX508 is pictured below.



(GX508 (Intuit)).

234. GX527 is a Non-Video Display Advertisement placed by Intuit for TY 2020. A screenshot of GX527 is pictured below.

PUBLIC



(GX527 (Intuit)).

235.  GX534 is a Non-Video Display Advertisement placed by Intuit for TY 2020. A screenshot of GX534 is pictured below.



(GX534 (Intuit)).

236.  GX173 is a Non-Video Display Advertisement placed by Intuit for TY 2020. A screenshot of GX173, as displayed on Facebook on February 11, 2021, is pictured below:



(GX342 (Complaint Counsel) ¶ 114; GX173 (Complaint Counsel); *see also* Shiller (Complaint Counsel) Tr. 189-190).

237.   GX551 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A screenshot of GX551 is pictured below.



(GX551 (Intuit)).

PUBLIC

238.    GX552 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A
screenshot of GX552 is pictured below.



(GX552 (Intuit)).

239.    GX553 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A
screenshot of GX553 is pictured below.



(GX553 (Intuit)).

240.    GX554 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A
screenshot of GX554 is pictured below.



(GX554 (Intuit)).

PUBLIC

241. GX555 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A screenshot of GX555 is pictured below.



(GX555 (Intuit)).

242. GX556 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A screenshot of GX556 is pictured below.



(GX556 (Intuit)).

PUBLIC

243.    GX566 is a Non-Video Display Advertisement placed by Intuit for TY 2021.
A screenshot of GX566 is pictured below.



(GX566 (Intuit)).

244.    GX574 is a Non-Video Display Advertisement placed by Intuit for TY 2021.
A screenshot of GX574 is pictured below.



(GX574 (Intuit)).

PUBLIC

245.   GX575 is a Non-Video Display Advertisement placed by Intuit for TY 2021.
A screenshot of GX575 is pictured below.



(GX575 (Intuit)).

246.   GX580 is a Non-Video Display Advertisement placed by Intuit for TY 2021.
A screenshot of GX580 is pictured below.





(GX580 (Intuit)).

247. GX585 is a Non-Video Display Advertisement placed by Intuit for TY 2021.
A screenshot of GX585 is pictured below.



(GX585 (Intuit)).

248. GX586 is a Non-Video Display Advertisement placed by Intuit for TY 2021.
A screenshot of GX586 is pictured below.



(GX586 (Intuit)).

249. GX587 is a Non-Video Display Advertisement placed by Intuit for TY 2021.
A screenshot of GX587 is pictured below.



(GX587 (Intuit)).

PUBLIC

250. GX588 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A screenshot of GX588 is pictured below.



(GX588 (Intuit)).

251. GX596 is a Non-Video Display Advertisement placed by Intuit for TY 2021. A screenshot of GX596 is pictured below.



(GX596 (Intuit)).

252. On March 30, 2022, the following two TurboTax advertisements were displayed on the Apple News application:



(GX342 (Complaint Counsel) ¶ 161; GX189 (Complaint Counsel); GX189-A (Complaint Counsel); *see also* Shiller (Complaint Counsel) Tr. 193-196).

253.  The TurboTax advertisements marked GX189 and GX189-A appeared repeatedly on the Apple News application between March 20, 2022 and April 18, 2022. (GX342 (Complaint Counsel) ¶ 162).

254.  On April 7, 2022, the following TurboTax advertisement was displayed on Reddit:

PUBLIC



(GX342 (Complaint Counsel) ¶ 169; GX196 (Complaint Counsel); GX197 (Complaint Counsel)).

255.    On April 8, 2022, the following TurboTax advertisement was displayed on Reddit:



(GX342 (Complaint Counsel) ¶ 170; GX198 (Complaint Counsel)).

PUBLIC

256.    On April 14, 2022, the following TurboTax advertisement appeared on the webpage of the Milwaukee Journal Sentinel, *jsonline.com/travel/*:



(GX342 (Complaint Counsel) ¶ 171; GX199 (Complaint Counsel); *see also* Shiller (Complaint Counsel) Tr. 196-197).

**b.    Video Display Advertisements for TY 2020 and TY 2021**

257.    In most of the Video Display Advertisements, the words "simple returns only," "simple U.S. returns only," or "simple tax returns" are much less prominent than the language or images of "free" or "$0." (GX509 (Intuit); GX513 (Intuit); GX520 (Intuit); GX523 (Intuit); GX527 (Intuit); GX529 (Intuit); GX561 (Intuit); GX581 (Intuit); GX582 (Intuit); GX590 (Intuit); GX592 (Intuit); GX593 (Intuit); GX599 (Intuit)).

**i.    Advertisements without Voice-Over**

258.    F. 259-269 represent Video Display Advertisements placed by Intuit in TY 2020 and TY 2021 that do not have any accompanying voice-over. Each advertisement has a moving display. The advertisements vary in duration, ranging from 6 to 10 seconds.

PUBLIC

259. GX509 is a Video Display Advertisement placed by Intuit for TY 2020. The neon words repeatedly flash the word "free," creating an emphasis on the word. A screenshot from GX509 is pictured below.



(GX509 (Intuit)).

260. GX520 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX520 is pictured below.



(GX520 (Intuit)).

261. GX522 is a Video Display Advertisement placed by Intuit for TY 2020. Screenshots from GX522 are pictured below.

 

(GX522 (Intuit)).

262.    GX523 is a Video Display Advertisement placed by Intuit for TY 2020. The word
        "FREE" moves about the screen, creating an emphasis on the word. A screenshot from
        GX523 is pictured below.



(GX523 (Intuit)).

263.    GX524 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot
        from GX524 is pictured below.

69

PUBLIC





(GX524 (Intuit)).

264. GX539 is a Video Display Advertisement placed by Intuit for TY 2020. The advertisement depicts a dancing W-2 form, and then displays the words "File your taxes FREE," followed by a display of the words "Plus, get a FREE final expert review." This advertisement does not reference a TurboTax sub-brand such as Free Edition. The concluding screenshot from GX539 is pictured below.



(GX539 (Intuit)).

70

PUBLIC

265.   GX545 is a Video Display Advertisement placed by Intuit for TY 2020. Screenshots from GX545 are pictured below.



(GX545 (Intuit)).

266.   GX557 is a Video Display Advertisement placed by Intuit for TY 2021. A screenshot from GX557 is pictured below.



(GX557 (Intuit)).

PUBLIC

267. GX561 is a Video Display Advertisement placed by Intuit for TY 2021. A screenshot from GX561 is pictured below.



(GX561 (Intuit)).

268. GX562 is a Video Display Advertisement placed by Intuit for TY 2021. A screenshot from GX562 is pictured below.



(GX562 (Intuit)).

PUBLIC

269.   GX599 is a Video Display Advertisement placed by Intuit for TY 2021. This advertisement does not reference a TurboTax sub-brand such as Free Edition. A screenshot from GX599 is pictured below.



(GX599 (Intuit)).

### ii.    Advertisements with Voice-Over

270.   F. 273-289 represent Video Display Advertisements placed by Intuit in TY 2020 and TY 2021 that have an accompanying voice-over. Each of these advertisements has a moving display. The advertisements vary in duration, ranging from 6 to 10 seconds.

271.   Some of the Video Display Advertisements begin with a voice-over stating, "Simple tax returns only. File your federal and state taxes for free. Guaranteed." In some of these advertisements, the phrase "File your federal and state taxes for zero dollars" is used instead of "File your federal and state taxes for free." (GX510 (Intuit); GX511 (Intuit); GX512 (Intuit); GX513 (Intuit); GX514 (Intuit); GX515 (Intuit); GX516 (Intuit); GX517 (Intuit); GX518 (Intuit); GX519 (Intuit); GX526 (Intuit); *see also* Baburek (Complaint Counsel) Tr. 334-336 (referencing GXD002 (Complaint Counsel) at 8-17, referencing GX510 (Intuit); GX511 (Intuit); GX512 (Intuit); GX513 (Intuit); GX514 (Intuit); GX515 (Intuit); GX516 (Intuit); GX517 (Intuit); GX518 (Intuit); GX519 (Intuit)).

272.   Some of the Video Display Advertisements include a voice-over stating, "simple tax returns only" at or near the end. (GX581 (Intuit); GX582 (Intuit); GX590 (Intuit); GX592

(Intuit); GX593 (Intuit)). The audio in GX597 does not include the words "simple tax returns only." (GX597 (Intuit)).

273.   GX510 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX510 is pictured below.



(GX510 (Intuit)).

274.   GX511 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX511 is pictured below.



(GX511 (Intuit)).

275. GX512 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX512 is pictured below.



(GX512 (Intuit)).

276. GX513 is a Video Display Advertisement placed by Intuit for TY 2020. Screenshots from GX513 are pictured below.





(GX513 (Intuit)).

PUBLIC

277.  GX514 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX514 is pictured below.



(GX514 (Intuit)).

278.  GX515 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX515 is pictured below.



(GX515 (Intuit)).

PUBLIC

279. GX516 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX516 is pictured below.



(GX516 (Intuit)).

280. GX517 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX517 is pictured below.

PUBLIC



(GX517 (Intuit)).

281.  GX518 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX518 is pictured below.



(GX518 (Intuit)).

PUBLIC

282. GX519 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX519 is pictured below.



(GX519 (Intuit)).

283. GX526 is a Video Display Advertisement placed by Intuit for TY 2020. A screenshot from GX526 is pictured below.



(GX526 (Intuit)).

PUBLIC

284.    GX581 is a Video Display Advertisement placed by Intuit for TY 2021. A voice-over
states: "File your taxes free, your way. Do it yourself free. Get unlimited advice from tax
experts free or have an expert do it all for you 100% free only from turbo tax. Simple tax
returns only. Must file by February 15th." A screenshot from GX581 is pictured below.



(GX581 (Intuit)).

285.    GX582 is a Video Display Advertisement placed by Intuit for TY 2021. The voice-over
states: "Now file your taxes free your way. Do it yourself, file with unlimited help, or
have an expert do it all for you. Pay zero to file only from Turbo Tax. Simple tax returns
only. Must file by February 15th." A screenshot from GX582 is pictured below.



(GX582 (Intuit)).

PUBLIC

286.   GX590 is a Video Display Advertisement placed by Intuit for TY 2021. The spoken words are: "File your taxes free your way. Do it yourself free. Get unlimited advice from tax experts free or have an expert do it all for you. 100% free. Only from Turbo Tax. Simple tax returns only. Must file by March 31st." A screenshot from GX590 is pictured below.



(GX590 (Intuit)).

287.   GX592 is a Video Display Advertisement placed by Intuit for TY 2021. The words spoken in the voice-over in GX592 are materially the same as those in GX590. A screenshot from GX592 is pictured below.



(GX592 (Intuit)).

288. GX593 is a Video Display Advertisement placed by Intuit for TY 2021. The words spoken in the voice-over in GX593 are materially the same as those in GX590. A screenshot from GX593 is pictured below.



(GX593 (Intuit)).

289. GX597 is a Video Display Advertisement placed by Intuit for TY 2021. The voice-over states: "How I file my taxes free, my way. I get free unlimited advice from tax experts, or I hand it off and they do it all for me. File fed and state 100 percent free, even when an expert does your taxes." The words "simple tax returns only" are not spoken. A screenshot from GX597 is pictured below.



(GX597 (Intuit)).

### c.    Online Video Advertisements for TY 2020 and TY 2021

290. Consumers who clicked on the Online Video Advertisements at GX601-GX608, GX613-GX616, GX620-GX626, GX628, and GX629 were immediately directed to a webpage on the TurboTax website, https://turbotax.intuit.com/. (JX1 (Joint Stipulations of Law and Fact) ¶ 59).

PUBLIC

### i.     Echo

291.   RX1124 (also admitted into the record as GX609) is a 15-second YouTube video advertisement placed by Intuit for TY 2020 that depicts a woman hiking. When she reaches the top, she yells, "free" and listens while the word "free" echoes back (the "Echo" advertisement). (RX1124 (Intuit)).

292.   At approximately the 0:10 mark of the Echo advertisement, the following screen appears:



The duration of the foregoing screen is approximately 2 seconds. (RX1124 (Intuit) at 0:10-0:12).

293.   At approximately the 0:13 mark of the Echo advertisement, the following screen appears, while a voice-over states: "That's right. turbo tax free edition is free. Free, free, free, free."



The duration of the foregoing screen is approximately 2 seconds. (RX1124 (Intuit) at 0:13-0:15).

PUBLIC

294.    RX1404 (also admitted into the record as GX605) is a six-second version of the Echo video advertisement placed on YouTube by Intuit for TY 2020. (RX1404 (Intuit)). Although significantly shorter, the action, language, and disclosures in this advertisement are otherwise materially the same as RX1124. (F. 291-293).

### ii.    Auctioneer

295.    GX200 is a 30-second YouTube video advertisement placed by Intuit as it appeared on March 28, 2022 (the "Auctioneer YouTube advertisement"). (Shiller (Complaint Counsel) Tr. 165-167; GX200 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 129) The action, language, and disclosures in this video advertisement are materially the same as the Auctioneer television advertisement identified as GX202. (*Compare* F. 177-179 *with* F. 296-299).

296.    The Auctioneer YouTube advertisement depicts a cattle auction in which the only word spoken by the auctioneer is the word "free." The word "free" is repeated many times, and the auction culminates with the auctioneer announcing "free" as the winning bid. (GX200 (Complaint Counsel)).

297.    The following is a transcription of the words spoken in the Auctioneer YouTube advertisement:

> AUCTIONEER: And free, and free, and free, and free, and free. Now a bidder and free! Now give me another bidder and free and a free here and a free free free a free free free. Now a bidder and free! Now give me another bidder and free, and a free free free. And free, and free, and free, and free free and free. Here we go at free, free, free, and freeeeeeeeeeee. Free!

> VOICE-OVER: That's right. TurboTax Free Edition is free. See details at TurboTax.com.

(GX342 (Complaint Counsel) ¶ 132; GX200 (Complaint Counsel); *see also* Shiller (Complaint Counsel) Tr. 166-167).

298.    At approximately the 0:26 mark of the Auctioneer YouTube advertisement, the following screen is shown:

PUBLIC



The duration of the foregoing screen is approximately 1 second. (GX200 (Complaint Counsel) at 0:26-0:27).

299.    At approximately the 0:28 mark of the Auctioneer YouTube advertisement, the following screen is shown:



The duration of the foregoing screen is approximately 2 seconds. (GX200 (Complaint Counsel) at 0:28-0:30).

300.    As of March 28, 2022, the Auctioneer YouTube advertisement (GX200) had over 5.6 million views on YouTube. (GX342 (Complaint Counsel) ¶ 129; *see also* Shiller (Complaint Counsel) Tr. 272).

PUBLIC

301.    RX1415 (also admitted into the record as GX623) is a video recording of a 30-second advertisement placed by Intuit. (RX1415 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as the Auctioneer advertisement identified as GX200. (F. 295-299).

302.    RX1405 (also admitted into the record as GX606) is a 30-second YouTube video advertisement placed by Intuit for TY 2020. (RX1405 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as GX200. (F. 295-299).

303.    RX1407 (also admitted into the record as GX610) is a six-second version of the Auctioneer YouTube advertisement placed by Intuit for TY 2020 and TY 2021. (RX1407 (Intuit)). Although significantly shorter, the action, language, and disclosures in this video advertisement are otherwise materially the same as GX200. (F. 295-299).

304.    RX1408 (also admitted into the record as GX611) is a 15-second version of the Auctioneer YouTube advertisement placed by Intuit for TY 2020. (RX1408 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as GX200. (F. 295-299).

305.    RX1119 (also admitted into the record as GX621) is a 15-second version of the Auctioneer YouTube advertisement placed by Intuit for TY 2021. (RX1119 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as GX200. (F. 295-299).

### iii.    Dance Workout

306.    RX1122 (also admitted into the record as GX608) is a 15-second YouTube video advertisement placed by Intuit for TY 2020. (RX1122 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as the "Dance Workout" television advertisement identified as GX208. (F. 182-185).

307.    GX206 is a 30-second YouTube video advertisement placed by Intuit, as it appeared on March 28, 2022. (Shiller (Complaint Counsel) Tr. 169-170; GX206 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 135). The action, language, and disclosures in this video advertisement are materially the same as GX208. (F. 182-185).

308.    As of March 28, 2022, the 30-second version of the Dance Workout YouTube video advertisement (GX206) had been viewed over 11.3 million times on YouTube. (GX206 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 135; *see also* Shiller (Complaint Counsel) Tr. 170, 272).

309.    RX1409 (also admitted into the record as GX612) is a six-second YouTube video advertisement placed by Intuit for TY 2020. (RX1409 (Intuit)). Although significantly shorter, the action, language, and disclosures in this video advertisement are otherwise materially the same as GX208. (F. 182-185).

PUBLIC

310.   RX1412 (also admitted into the record as GX628) is a 30-second YouTube video advertisement placed by Intuit for TY 2021. (RX1412 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as GX208. (F. 182-185).

311.   RX1414 (also admitted into the record as GX620) is a 30-second video advertisement placed by Intuit for TY 2021. (RX1414 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as GX208. (F. 182-185).

312.   RX1417 (also admitted into the record as GX625) is a 15-second video advertisement placed by Intuit for TY 2021. (RX1417 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as GX208. (F. 182-185).

313.   GX174-A is a six-second video advertisement placed by Intuit, which was active on Facebook on February 11, 2021. (GX174-A (Complaint Counsel); GX342 (Complaint Counsel) ¶ 116). Although significantly shorter, the action, language, and disclosures in this video advertisement are otherwise materially the same as GX208. (F. 182-185).

314.   GX175-A is a 30-second video advertisement placed by Intuit that was active on TikTok on January 11, 2021. (GX175-A (Complaint Counsel); GX342 (Complaint Counsel) ¶ 117). The action, language, and disclosures in this video advertisement are materially the same as GX208. (F. 182-185).

### iv.    Dog Show

315.   RX1120 (GX615) is a 15-second YouTube video advertisement placed by Intuit for TY 2020. (RX1120 (Intuit)). The action, language, and disclosures in this video advertisement are materially the same as the "Dog Show" television advertisement identified as GX204. (F. 188-192).

316.   RX1410 (GX613) is a six-second YouTube video advertisement placed by Intuit for TY 2020. (RX1410 (Intuit)). Although significantly shorter, the action, language, and disclosures in this video advertisement are otherwise materially the same as GX204. (F. 188-192).

### v.    Teen Love

317.   RX1123 (GX629) is a YouTube video advertisement placed by Intuit for TY 2021, depicting a teenage boy and teenage girl appearing to reconcile their relationship while communicating through only the word "free." (RX1123 (Intuit)). At approximately the 0:12 mark, the following screen appears, while a voice-over states "That's right. turbo tax free edition is free. Free, free, free, free":

PUBLIC



The duration of the foregoing screen is approximately 3 seconds. (RX1123 (Intuit) at 0:12-0:15).

### 5. Email Marketing

#### a. Email Details

318.  FTC Investigator Diana Shiller created an email address to receive email advertisements from TurboTax for purposes of the investigation of Intuit. GX171 and GX172 are partial redacted copies of email advertisements that Shiller received from TurboTax on March 9, 2020 and July 14, 2020, respectively. GX181 is a partial redacted copy of an email advertisement Shiller received from TurboTax on January 5, 2021. GX480 is a partial redacted copy of an email advertisement Shiller received from TurboTax on February 11, 2022. (Shiller (Complaint Counsel) Tr. 197-200, 257-258 (Shiller acknowledging that the exhibits were not the full emails she received, but were partial and redacted); GX342 (Complaint Counsel) ¶¶ 102, 103, 122, 173; GX171 (Complaint Counsel); GX172 (Complaint Counsel); GX181 (Complaint Counsel); GX480 (Complaint Counsel)).

319.  GX171 is copied below:



(GX171 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 102).

320.    GX172 is copied below:

PUBLIC



(GX172 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 103).

321.    GX181 is copied below:

PUBLIC



(GX181 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 122).

322.    GX480 is copied below:



(GX480 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 173).

323.   GX477 is a complete copy of an email advertisement received by a consumer from
       TurboTax, with only the consumer's identifying information redacted, which was
       received by Shiller on April 18, 2022 from FTC staff in connection with the
       investigation. (GX342 (Complaint Counsel) ¶ 172; Shiller (Complaint Counsel) Tr. 252-
       253, 257-258). GX477 is copied below:

PUBLIC



PUBLIC



(GX477 (Complaint Counsel); GX342 (Complaint Counsel) ¶ 172).

324. An asterisk in an email advertisement indicates that there is additional information in the email below the asterisk. (Shiller (Complaint Counsel) Tr. 253).

325. GX171, GX172, GX181, and GX480 show an asterisk next to the phrase "simple returns only," but these emails were knowingly submitted by Complaint Counsel in partial form

95

only. (GX342 (Complaint Counsel) ¶¶ 102, 103, 122, 173; Shiller (Complaint Counsel) Tr. 257-258).

326.   GX477 shows an asterisk next to the words "simple tax returns only." GX477 also shows the words associated with the asterisk describing the situations covered in TurboTax Free Edition, TurboTax Live Basic, and TurboTax Live Full Service Basic. (F. 323).

327.   It is inferred that the complete versions of the emails that were submitted in partial form as GX171, GX172, GX181, and GX480 would have contained the same or substantially the same disclosures as those shown in GX477. (F. 323).

328.   GX371 is a complete TurboTax email advertisement dated April 11, 2018. GX371 is copied below:



**IMPORTANT INFORMATION**

TurboTax Free Edition: $0 federal (forms 1040EZ/1040A) offer only available with TurboTax Free Edition; State filing charges apply. TurboTax online and mobile pricing is based on your tax situation and varies by product. Actual prices are determined at the time of print or e-file and are subject to change without notice.

#1 Best-Selling Brand: Based on aggregated sales data for all tax year 2016 TurboTax products.

Fastest tax refund with e-file and direct deposit; tax refund times will vary.

Visit https://turbotax.intuit.com/lp/yoy/guarantees.jsp for TurboTax product guarantees and other important information. Intuit, TurboTax and TurboTax Online, among others, are registered trademarks and/or service marks of Intuit Inc. in the United States and other countries.

(GX371 (Complaint Counsel)).

329.   The following TurboTax promotional emails included various styles of "free" claims, some of which also included small print disclosures of "simple returns only" or "1040EZ/A," asterisks, hyperlinks to additional information, or other disclosures at the end of the email:

GX373 (Schulte) (Feb. 6, 2017 email from TurboTax: "Your W-2 is ready!" "start the transfer and get your guaranteed biggest refund fast and FREE!" "File Free Today!" "AbsoluteZero®, 1040EZ/A, $0 Fed $0 State $0 To File"; asterisk at the end of email with a color contrasted apparent hyperlink, "*click here to see TurboTax product guarantees, disclaimers and other important information.");

GX374 (Schulte) (Dec. 10, 2017 email from TurboTax: "Get your biggest refund for free again this year[.] AbsoluteZero® GUARANTEED $0 Fed $0 State $0 To File." "Forms 1040EZ/1040A, limited time only"; asterisk at the end of email with a color contrasted apparent hyperlink, "*click here to see TurboTax product guarantees, disclaimers and other important information.");

GX377 (Schulte) (Dec. 9, 2018 email from TurboTax: "Welcome back to TurboTax. Get your biggest refund for free this year[.]" "FREE guaranteed - $0 Fed $0 State $0 To File," with small print reference: "for simple tax returns");

GX381 (Schulte) (Feb. 10, 2019 email from TurboTax: "FREE guaranteed $0 Fed $0 State $0 To File" and "File your simple tax returns for FREE Free, free free free FREE! You have everything you need to finish and file for free, free, free and yes __FREE!" "TurboTax Free Edition, for simple tax returns");

GX383 (Schulte) (Jan. 17, 2020 email from TurboTax: "FREE Guaranteed $0
Fed. $0 State. $0 to File." "Simple tax returns only*"; asterisk at end stating:
"*Prices ultimately determined at time of print or e-file. Terms, conditions,
features, availability, pricing, fees, service and support options subject to
change without notice"; a color contrasted apparent hyperlink on last page
stating, "click here to see TurboTax product guarantees, disclaimers and other
important information");

GX386 (Adamson) (Jan 5, 2020 email from TurboTax: "FREE guaranteed $0
Fed $0 State $0 To File" "TurboTax Free Edition, simple tax returns*"); and

GX388 (Adamson) (Dec. 9, 2016 email from TurboTax: "Get your biggest
refund absolutely free." "Join the millions who file for $0" "AbsoluteZero®
1040EZ/A $0 Fed $0 State $0 To File").

**b.    Summaries**

330.    TurboTax email advertisements, including those for TurboTax Free Edition, are sent only
to individuals who had previously used TurboTax or had started their return in TurboTax
but had yet to complete it. (Ryan (Intuit) Tr. 769; Shiller (Complaint Counsel) Tr. 256;
*see also* RX1018 (Golder Expert Report) ¶ 160; CCRRFF ¶ 283).

331.    Of the email advertisements described in this section II.B.5, most referred to "TurboTax
Free Edition" or "AbsoluteZero®." (GX171 (Complaint Counsel); GX172 (Complaint
Counsel); GX181 (Complaint Counsel); GX373 (Complaint Counsel); GX374
(Complaint Counsel); GX381 (Complaint Counsel); GX386 (Complaint Counsel);
GX388 (Complaint Counsel); GX477 (Complaint Counsel); GX480 (Complaint
Counsel)).

332.    Many of the email advertisement exhibits in the record did not reference a specific
TurboTax product in the subject line or in the body of the email, and/or failed to clearly
or conspicuously display the specific product name up front in the email. (GX171
(Complaint Counsel); GX172 (Complaint Counsel); GX181 (Complaint Counsel);
GX182 (Complaint Counsel); GX373 (Complaint Counsel); GX377 (Complaint
Counsel); GX378 (Complaint Counsel); GX379 (Complaint Counsel); GX380
(Complaint Counsel); GX381 (Complaint Counsel); GX382 (Complaint Counsel);
GX383 (Complaint Counsel); GX386 (Complaint Counsel); GX387 (Complaint
Counsel); RX127 (Intuit); RX128 (Intuit); RX129 (Intuit); *compare* GX371 (Complaint
Counsel)).

333.    The email advertisement exhibits in the record that contained a reference to TurboTax
AbsoluteZero® did so in a way that reinforced a claim that TurboTax was free. (*See, e.g.*,
GX374 (Complaint Counsel); GX388 (Complaint Counsel); GX389 (Complaint
Counsel)). An example is GX388, pictured below:

PUBLIC



(GX388 (Complaint Counsel)).

334.    The email advertisement exhibits in the record that contained language such as
        "1040EZ/A" or "simple tax returns only" or "for simple tax returns" presented the
        language in a significantly smaller and/or lighter, less noticeable font, in comparison to
        the words or images "free" or "$0." (GX171 (Complaint Counsel); GX172 (Complaint
        Counsel); GX181 (Complaint Counsel); GX373 (Complaint Counsel); GX374
        (Complaint Counsel); GX377 (Complaint Counsel); GX381 (Complaint Counsel);
        GX383 (Complaint Counsel); GX386 (Complaint Counsel); GX477 (Complaint
        Counsel); GX480 (Complaint Counsel). *See also, e.g.,* GX182 (Complaint Counsel);
        GX379 (Complaint Counsel); GX380 (Complaint Counsel); GX381 (Complaint
        Counsel); GX382 (Complaint Counsel); GX386 (Complaint Counsel); GX387
        (Complaint Counsel); RX127 (Intuit); RX128 (Intuit); RX129 (Intuit).

335.    Some of the email advertisements described in this section II.B.5 included at the bottom
        of the email color-contrasted hyperlinks next to an asterisk, for example: "Click here to
        see TurboTax product guarantees, disclaimers and other important information." (GX373
        (Complaint Counsel); GX374 (Complaint Counsel); GX383 (Complaint Counsel);
        GX477 (Complaint Counsel)).

336.    Consumers who clicked on any hyperlink in GX181, GX373, GX374, GX377, GX381,
        GX383, GX386, GX477, and GX480 were immediately directed to a webpage on the
        TurboTax website, https://turbotax.intuit.com/. (JX1 (Joint Stipulations of Law and Fact)
        ¶ 63).

                        **6.    Paid Search Advertising**

337.    Paid search is a form of digital marketing where search engines such as Google and Bing
        allow advertisers to show advertisements on their search engine results pages ("Paid
        Search Advertisements"). For paid search advertising, Intuit bids on a variety of

99

keywords in an auction marketplace, and if Intuit is the highest bidder, a TurboTax advertisement would appear at the top of the search results page when consumers search for those keywords. (Ryan (Intuit) Tr. 696-697; GX151 (Ison (Intuit) IHT) at 61-63; GX156 (Ryan (Intuit) IHT) at 31). Intuit submits components of the advertising copy that is to appear in the advertisement and writes and approves the headline and sub-headline text in the advertisement.  (Ryan (Intuit) Tr. 697).

338.    Based on calculations of Respondent's documents performed by Respondent's expert witness Professor Peter Golder, in TY 2021, over 20% of consumers who arrived at the TurboTax website did so after clicking on paid search advertising. (RX1018 (Golder Expert Report) Figure 24 (*citing* RX825 (Intuit); RX52 (Intuit) at INTUIT-FTC-PART3-000602247)).

### a.    Paid Search Advertisements for TY 2019

339.    In TY 2019, the following Paid Search Advertisement appeared on the Google search results page in response to a search for "free file taxes ONLINE":



(GX342 (Complaint Counsel) ¶ 99; GX168 (Complaint Counsel); GX168-A (Complaint Counsel)).

340.    In TY 2019, the following Paid Search Advertisement appeared on the Google search results page in response to a search for "free file":



(GX342 (Complaint Counsel) ¶ 101; GX170 (Complaint Counsel)).

### b. Paid Search Advertisements for TY 2020

341. In TY 2020, the following Paid Search Advertisement appeared on the Google search results page in response to a search for "IRS taxes for free":



(GX342 (Complaint Counsel) ¶ 121; GX180 (Complaint Counsel)).

c.      **Paid Search Advertisements for TY 2021**

342.    In TY 2021, the following Paid Search Advertisements appeared on the Bing search
results page in response to a search for "file my taxes for free":



PUBLIC



(GX342 (Complaint Counsel) ¶¶ 163-165; GX190 (Complaint Counsel); GX191 (Complaint Counsel); GX192 (Complaint Counsel)).

343.   In TY 2021, the following Paid Search Advertisements appeared on the Google search
results page in response to a search for "file my taxes for free":



(GX342 (Complaint Counsel) ¶¶ 166, 168; GX193 (Complaint Counsel); GX195
(Complaint Counsel)).

PUBLIC

344.  In TY 2021, the following Paid Search Advertisement appeared on the Google search results page in response to a search for "free tax filing":



(GX342 (Complaint Counsel) ¶ 167; GX194 (Complaint Counsel)).

### d.  Summaries

345.  Consumers who clicked on Paid Search Advertisements for TurboTax Free Edition were taken directly to the TurboTax Free Edition page on TurboTax's website, referred to as a "landing page." (Rubin (Intuit) 1564-1565; Ryan (Intuit) Tr. 697; JX1 (Joint Stipulations of Law and Fact) ¶ 62).

346.  Many of the Paid Search Advertisement exhibits in the record stated in the headline that the advertisement was for "TurboTax Free Edition."  (GX167 (Complaint Counsel); GX169 (Complaint Counsel); GX170 (Complaint Counsel); GX178 (Complaint Counsel); GX179 (Complaint Counsel); GX190 (Complaint Counsel); GX191 (Complaint Counsel); GX192 (Complaint Counsel); GX193 (Complaint Counsel); GX194 (Complaint Counsel); GX195 (Complaint Counsel)).

347.  Many of the Paid Search Advertisement exhibits in the record included the language "for simple tax returns only" in the text below the headline. (GX178 (Complaint Counsel); GX179 (Complaint Counsel); GX180 (Complaint Counsel); GX190 (Complaint Counsel); GX191 (Complaint Counsel); GX192 (Complaint Counsel); GX193 (Complaint Counsel); GX194 (Complaint Counsel); GX195 (Complaint Counsel); GX496 (Complaint Counsel); GX497 (Complaint Counsel); GX666 (Complaint Counsel)).

### 7.  TurboTax Website

348.  The TurboTax website is a very important part of TurboTax marketing and is integrated into TurboTax's free advertising. (Johnson (Intuit) Tr. 593, 600-601; Ryan (Intuit) Tr. 697, 757).

349.    Any consumer "interested in trying to use TurboTax," including TurboTax Free Edition, must "access the product through" the TurboTax website (or its mobile app equivalent). (Johnson (Intuit) Tr. 593; GX439 (Ryan (Intuit) Decl.) ¶ 28).

350.    Consumers can arrive at the TurboTax home page in various ways, including by clicking on (1) links in online search results; (2) certain TurboTax display advertisements; (3) links on third-party websites, blogs, or media articles; or (4) links to the home page on the TurboTax website, blogs, or press releases. (Ryan (Intuit) Tr. 697, 757; GX178 (Intuit); RX505 (Intuit) at INTUIT-FTC-PART3-000601014, 1016; RX93 (Intuit) at 1; RX64 (Intuit) at 3; *see also* Rubin (Intuit) Tr. 1564-1565).

### a.    Advertising on TurboTax Website

351.    During TY 2018, the TurboTax website home page included the following image:



(GX342 (Complaint Counsel) ¶ 79; GX163 (Complaint Counsel)).

352.    In its repetition of the word "free," the advertisement described in F. 351 is materially similar to the "free, free, free," television and online video advertisements described in sections II.B.2, B.4.c.

PUBLIC

353. During TY 2018, the TurboTax website home page included the following image:



(GX342 (Complaint Counsel) ¶ 79; GX164 (Complaint Counsel)).

354. During TY 2019, the TurboTax website home page included the following image:



(GX342 (Complaint Counsel) ¶ 95; GX166 (Complaint Counsel); *see also* Shiller (Complaint Counsel) Tr. 200; GX166-A (Complaint Counsel)).

PUBLIC

355.   During TY 2020, the TurboTax website home page included the following image:



(GX342 (Complaint Counsel) ¶ 125; GX183 (Complaint Counsel); GX183-A (Complaint Counsel)).

356.   During TY 2021, the TurboTax website home page included the following image:



(RX367 (Intuit) at INTUIT-FTC-PART3-000608428; Johnson (Intuit) Tr. 593).

PUBLIC

357.    On March 26, 2022, the TurboTax website included the following image:



(GX342 (Complaint Counsel) ¶ 190; GX486 (Complaint Counsel)).

358.    On March 31, 2022, the TurboTax website included the following image:



(GX342 (Complaint Counsel) ¶ 187; GX483 (Complaint Counsel); GX483-A (Complaint Counsel); *see also* Shiller (Complaint Counsel) Tr. 201).

b.    **Disclosures**

i.    **Hyperlinks on TurboTax Website Home Page**

359.    In Tax Years 2021 and prior, advertisements for TurboTax free filing offers on the
TurboTax website home page that referred to "simple tax returns" or "simple tax returns
only" or "Forms 1040EZ/1040A" were themselves color-contrasted hyperlinks or were
adjacent to hyperlinked text stating "See why it's free." (RX1263-A (Intuit); RX1215
(Intuit); RX1214 (Intuit); RX1213 (Intuit); RX1212 (Intuit); RX1211 (Intuit); RX1210
(Intuit)).

360.    In TY 2017, the TurboTax website utilized a pop-up screen in connection with the
TurboTax "AbsoluteZero" offer, depicted below:



(RX25 (Intuit); RX389 (Intuit); RX1271-A (Intuit)).

361.    In TY 2018, consumers who clicked on the hyperlinked text "See why it's free" on the
TurboTax website, such as that appearing in GX163 and GX164, referenced in F. 351
and F. 353, would receive the following pop-up screen:



(GX342 (Complaint Counsel) ¶ 80; GX165 (Complaint Counsel)).

362.  In TY 2020, consumers who clicked on the hyperlinked text "simple tax returns" on the TurboTax website home page, such as that appearing on GX183 (F. 355), would receive the following pop-up screen:

PUBLIC



(GX342 (Complaint Counsel) ¶ 127; GX184 (Complaint Counsel)).

363. In TY 2021, consumers who clicked on the hyperlinked text "simple tax returns only" on the TurboTax website, such as that appearing on RX367, GX483, and GX486, referenced in F. 356-358, would receive the following pop-up screen:



(Johnson (Intuit) Tr. 594-595; RX3 (Intuit); GX342 (Complaint Counsel) ¶ 188; *see also* Shiller (Complaint Counsel) Tr. 201-202).

364. The pop-up disclosure screen that is hyperlinked to "simple returns only" language on advertisements on the TurboTax website has contained materially the same disclosures as the screen reproduced in F. 362 (TY 2020) and in F. 363 (TY 2021) since TY 2018, although the applicable qualifications disclosed varied by the year. (RX4 (Intuit); RX20 (Intuit); RX21 (Intuit); RX390 (Intuit)).

### ii.    TurboTax Free Edition Landing Page

365. For Online Display Advertisements and Paid Search Advertisements for TurboTax Free Edition, consumers who clicked on the advertisements were taken directly to the TurboTax Free Edition page on TurboTax's website, referred to as a "landing page." (Johnson (Intuit) Tr. 595-596; Rubin (Intuit) Tr. 1563-1565; Ryan (Intuit) Tr. 697).

366. RX1527 is a screenshot of a pertinent portion of the TurboTax Free Edition landing page in TY 2018.



(RX1527 (Intuit)).

367. In TY 2019, the TurboTax Free Edition landing page included two color contrasted hyperlinks for the "simple tax return[s]" qualification. (RX1528 (Intuit); *see also* RX1529 (Intuit) (TY 2020 TurboTax Free Edition landing page with color contrasted hyperlinks, "For simple tax returns only" and "If you have a simple tax return, you can file your taxes online for free with TurboTax Free Edition."); RX1530 (Intuit) (TurboTax Free Edition landing page for TY 2021, containing two statements of "For simple tax returns only," one in color contrasted hyperlink, plus the additional statement, "If you have a simple tax return, you can file your taxes online for free with TurboTax Free Edition." )).

PUBLIC

368. A screenshot of the TurboTax Free Edition landing page for TY 2021, referenced in F. 367, is set forth below:



(RX1530 (Intuit)).

369. The TurboTax Free Edition landing page includes a chart listing every TurboTax product and identifying which IRS tax forms and schedules each product covers. (RX1527 (Intuit); RX1528 (Intuit); RX1529 (Intuit); RX1530 (Intuit); RX1531 (Intuit); *see also* Rubin (Intuit) Tr. 1567-1568). The chart on the TurboTax Free Edition landing page in TY 2021, presented as follows:



115

PUBLIC

370. A consumer does not have to enter any personal information in order to review any of the information on the TurboTax Free Edition landing page, including the hyperlinked information. (Rubin (Intuit) Tr. 1566-1567).

### c. Products & Pricing Page

371. When consumers click a button on the TurboTax website to start preparing their taxes, such as the "File for $0" button shown on the image in F. 354 (GX166), they are taken to the TurboTax website "Products & Pricing" page. (Rubin (Intuit) Tr. 1570).

372. The Products & Pricing page lists each TurboTax product, its price, and the type of tax situations that are applicable to each product. (F. 375-376). The purpose of the Products & Pricing page is to direct consumers to "the right products." (Johnson (Intuit) Tr. 598).

373. In TY 2021, 47% of new TurboTax users viewed the TurboTax website Products & Pricing page before creating a username and password. (RX52 (Intuit) at INTUIT-FTC-PART3-000602282).

374. The TurboTax website Products & Pricing page is shown to all consumers before they start preparing their taxes with any TurboTax product. (Johnson (Intuit) Tr. 567; Rubin (Intuit) Tr. 1570-1571; RX52 (Intuit) at INTUIT-FTC-PART3-000602282; RX578 (Intuit) at INTUIT-FTC-PART3-000601612).

PUBLIC

375.  In TY 2021, the TurboTax website Products & Pricing page appeared as follows:



(GX342 (Complaint Counsel) ¶ 181; GX482 (Complaint Counsel)).

376.  RX138, shown in part below, is a screenshot of the TY 2020 Products & Pricing page on the TurboTax website.

PUBLIC



(RX138 (Intuit)).

377. The TurboTax website Products & Pricing pages in tax years prior to TY 2020 were materially similar to those shown in F. 375 and F. 376. (RX13 (Intuit); RX52 (Intuit) at INTUIT-FTC-PART3-000602282; RX210 (Intuit)).

378. References on the TurboTax website Products & Pricing page to the phrase "simple tax returns only" and its variants were color contrasted hyperlinks. (F. 375-376). When clicked, these hyperlinks brought up a pop-up screen, such as that shown in F. 363, with details on qualifications for TurboTax Free Edition. (Johnson (Intuit) Tr. 597-598; Shiller (Complaint Counsel) Tr. 210-211, 219-222).

379. The TurboTax website Products & Pricing page includes a tool (the "SKU Selector") that seeks to provide a recommendation for a TurboTax product that is appropriate for the consumer's needs. (Johnson (Intuit) Tr. 565-567, 572, 596; Rubin (Intuit) Tr. 1575,

PUBLIC

1579-1582). A portion of the TurboTax website Products & Pricing page for TY 2021 (F. 375), set forth below, is an example of the SKU Selector in TY 2021:



Tell us about you – we'll recommend the right tax solution

Select all that apply:

| I want to maximize deductions and credits | I want a tax expert to do my taxes for me | I have a job (received W-2) | I sold stock, crypto, or other investments | I own a home | I have children or dependents |
|---|---|---|---|---|---|
| I want a tax expert to review my return | I donated over $300 to charity | I'm paying off student loans | I own rental property | I'm self-employed/an independent contractor <br> Am I self-employed? | I own a small business |

(*See also* RX009 (Intuit); Shiller (Complaint Counsel) Tr. 213-214).

380. The SKU Selector on the TurboTax website Products & Pricing page has looked largely the same since TY 2016. (GX150 (Goode (Intuit) IHT) at 104-105; RX13 (Intuit); RX381 (Intuit); RX8 (Intuit); RX1532 (Intuit); *see also* F. 531 (screenshot from RX1532)).

381. Consumers were able to use the SKU Selector without creating a TurboTax account or entering any personally identifiable information. (Johnson (Intuit) Tr. 596, 599-600; Rubin (Intuit) Tr. 1571).

382. To use the SKU Selector and receive a product recommendation, consumers can click on one or more of the tiles displayed that describe various life situations, such as home ownership, stock ownership, or self-employment. As a consumer clicks on the tiles, the SKU Selector presents different TurboTax product recommendations, which appear below the SKU Selector on the Products & Pricing page. (Johnson (Intuit) Tr. 565-566, 599, 662-664, 672; Rubin (Intuit) Tr. 1575-1577, 1579-1581, 1613-1614; RX009 (Intuit); Shiller (Complaint Counsel) Tr. 213-215).

383. The SKU Selector contains four different tiles with tax situations. The tile(s) selected, if any, result in a recommendation for TurboTax Free Edition. For example, if taxpayers indicate that they rent their home, have a job with W-2 income, and have children or dependents, the SKU Selector would recommend TurboTax Free Edition. (Johnson (Intuit) Tr. 565-566, 599, 662-664, 672; Rubin (Intuit) Tr. 1575-1577, 1579-1581, 1613-1614; Shiller (Complaint Counsel) Tr. 216-217).

384.   If a consumer selected a tax situation not covered by TurboTax Free Edition, the SKU
Selector would shade out the TurboTax Free Edition product as an option and
recommend a paid TurboTax product instead. (Shiller (Complaint Counsel) Tr. 215-218;
RX11 (Intuit) (reproduced below)). For example, if taxpayers selected that they owned a
home, the SKU Selector would suggest the TurboTax Deluxe product. (RX11 (Intuit)). If
taxpayers selected that they "sold stock, crypto, or own rental property," the SKU
Selector would recommend the TurboTax Premier product. (RX12 (Intuit) (reproduced
below)).



(RX11 (Intuit)).

PUBLIC



(RX12 (Intuit)).

385.   Approximately 60% of new TurboTax customers use the SKU Selector, and
       approximately 57% of returning TurboTax customers use the SKU Selector. (Rubin
       (Intuit) Tr. 1581; RX53 (Intuit) at INTUIT-FTC-PART3-000601883, 1885).

386.   Between 40% and 50% of consumers who use the SKU Selector receive a
       recommendation to start in TurboTax Free Edition. (Rubin (Intuit) Tr. 1581-1582).

387.   Consumers can choose to start their return in any TurboTax SKU, regardless of the
       recommendation made by the TurboTax SKU Selector. (Rubin (Intuit) Tr. 1640-1641).

### d.    Upgrade Screens

388.    Once consumers select a TurboTax product, they begin preparing their returns by entering their personal or tax information. To guide the entry of the relevant tax information, the TurboTax program asks a series of questions (an "interview") about the consumer's tax situation, such as sources of income, deductions, and potential tax credits. (Johnson (Intuit) Tr. 672, 680-683).

389.    The TurboTax interview process begins with inquiring about the taxpayer's sources of income. Most commonly, a taxpayer's sources of income determine the right TurboTax product for them. (Rubin (Intuit) Tr. 1541).

390.    If customers provide information indicating that the TurboTax product they selected does not support their individual tax situation, they will immediately be presented with a large screen, such as RX318, reproduced below, advising them that they will need to upgrade to a different TurboTax product in order to complete their tax filing (an "upgrade" screen).[8] (Rubin (Intuit) Tr. 1505-1506, 1583-1584; Johnson (Intuit) Tr. 674-676; RX318 (Intuit)).



---

[8] The upgrade screen is also sometimes referred to in the record as a "hard stop." (*See, e.g.*, Novemsky Tr. 1765-1766, 1771; GX631 (Intuit) at CC-00013296-297).

PUBLIC

391.    The median time between the point that consumers began their returns in TurboTax Free Edition and the point at which they received an upgrade screen (the "elapsed time")[9] was  in TY 2020 and ▮▮▮▮▮▮▮ in TY 2021. The median elapsed time in the program before an upgrade screen was triggered by entry of income and wages was ▮▮▮▮▮▮ in TY 2020 and ▮▮▮▮▮▮ in TY 2021. The median elapsed time spent in the program before an upgrade screen was triggered by deductions and credits was ▮▮▮▮▮▮ in TY 2020 and ▮▮▮▮▮▮ in TY 2021. (GX631(Intuit) at CC-00013296-297).

392.    Based on calculations of Intuit customer data performed by Respondent's expert witness, Bruce Deal, in TY 2021, for those consumers using TurboTax Free Edition who sought to report sources of income other than W-2 income and limited interest and dividend income, approximately 50% received an upgrade screen within an elapsed time of 30 minutes, and approximately 25% received an upgrade screen within an elapsed time of 15 minutes. (Rubin (Intuit) Tr. 1541; Deal Tr. 1334-1340; RX1027 (Deal Expert Report) ¶ 105 & Figure 12).

393.    Consumers who encounter an upgrade screen after starting their tax return with TurboTax can stop their use and leave TurboTax, which Intuit refers to as "abandonment." Based on calculations of Intuit customer data performed by Respondent's expert witness, Professor Peter Golder in TY 2021, the abandonment rate for TurboTax online filing products was approximately 21%. (RX1018 (Golder Expert Report) ¶ 59 & Figure 4; *see also* Rubin (Intuit) Tr. 1585-1587).

## C.    Extrinsic Evidence

### 1.    Novemsky Survey and Opinions

#### a.    Novemsky Survey

394.    Complaint Counsel's expert witness, Professor Nathan Novemsky, Ph.D., designed and implemented an online consumer perception survey (the "Novemsky Survey") to address several questions of interest about taxpayers who do not qualify for TurboTax Free Edition under Intuit's criteria. (GX303 (Novemsky Expert Report) ¶ 6).

##### i.    Type of Survey

395.    A perception survey, rather than a copy test, is the appropriate design to measure existing consumer perceptions. (GX303 (Novemsky Expert Report) ¶ 30; *see also* Novemsky Tr. 384-385).

396.    In a copy test, test group respondents are shown a stimulus such as an advertisement that contains the allegedly deceptive claims, whereas control group respondents are shown a

---

[9] The "elapsed time" measures only the length of time that the TurboTax website was open on the consumer's browser and does not measure the length of time the consumer was actively engaged in tax preparation. (Deal Tr. 1336-1338).

PUBLIC

stimulus that does not contain the allegedly deceptive claims or are shown no stimulus at all, and the responses from each group are compared. A critical component of this framework is the ability to identify a control group that has not been exposed to the allegedly deceptive claims so that their perceptions are not tainted by the claims being tested in the survey. (GX303 (Novemsky Expert Report) ¶ 30).

397. Given the extent of Intuit's advertising, a copy test that measures the impact of a single or a few allegedly deceptive advertisements is not appropriate for measuring the cumulative effect of Intuit's marketing campaign. (GX749 (Novemsky Rebuttal Expert Report) ¶¶ 18, 21-23).

398. Perception surveys are used to determine what consumers are thinking based on their reactions to information that is already available in the real marketplace. (Novemsky Tr. 352, 385, 521).

399. A key advantage of measuring existing consumer perceptions through a perception survey is that these perceptions are shaped by all the information consumers have accumulated from various sources, for example, the "free, free, free" advertisements, as well as any disclosures they may have noticed and accessed. (GX303 (Novemsky Expert Report) ¶ 96; *see also* Novemsky Tr. 405 ("Consumers responding to my survey, [have] seen whatever they saw in the world – so if these ads were in the marketplace prior to my survey being launched, then these may well have been something that the consumers were exposed to prior to seeing my survey and may have [been] included in their responses to my survey."); Novemsky Tr. 521 ("I wanted to get reactions from people as they would have seen them or not seen them or paid attention or not paid attention in the real marketplace. I was not trying to artificially draw their attention to a specific ad or a specific claim in an ad . . .")).

## ii. Methodology

400. The design and implementation of the Novemsky Survey were consistent with guidelines for survey research offered in litigation that are set forth in the Federal Judiciary Center's "Reference Guide on Survey Research" and articulated in the Manual for Complex Litigation. The Novemsky Survey sample was chosen to be representative of the population of interest and the results of the survey can be generalized to the population at large with a degree of scientific certainty. (GX303 (Novemsky Expert Report) ¶ 5; *see* F. 401-421).

401. The consumers of interest for the Novemsky Survey are potential taxpayers who at the time the survey was conducted were considering using an online tax software to file their 2021 taxes and would not have qualified for TurboTax Free Edition. Consistent with this target, Novemsky recruited into the survey respondents who: (i) were planning to file an income tax return in 2022 (based on income in 2021); (ii) make or contribute to tax-filing decisions in their household; (iii) have considered or might consider using an online tax software; and (iv) who would not have qualified for TurboTax Free Edition. (GX303 (Novemsky Expert Report) ¶ 21).

PUBLIC

402. The Novemsky Survey was conducted between March 11, 2022 and March 24, 2022 among people who were planning to file their taxes in the last five weeks prior to the tax filing deadline and people who planned to file their taxes after the tax filing deadline. Fielding the survey in this time period had the advantage of reaching potential taxpayers when tax filing is more top-of-mind, as many consumers are thinking in earnest about how they will file their taxes. (GX303 (Novemsky Expert Report) ¶ 22).

403. Novemsky screened out individuals who could file their taxes for free using TurboTax according to the criteria set forth by Intuit.[10] (GX303 (Novemsky Expert Report) ¶¶ 24-25; Novemsky Tr. 379-380).

404. Because the purpose of the Novemsky Survey was to determine the impressions that consumers who were ineligible to file for free had about their ability to file for free, excluding consumers who were eligible to file for free resulted in the correct target population. (GX303 (Novemsky Expert Report) ¶ 21; Novemsky Tr. 359).

405. Novemsky screened out individuals who had already filed their 2021 taxes by the time the Novemsky Survey was conducted in March 2022. (GX303 (Novemsky Expert Report) ¶ 22; Novemsky Tr. 360).

406. Because consumers who had already filed their taxes might already know for a fact whether they were eligible to use TurboTax to file their returns for free and because the intended audience for TurboTax marketing at the time that the Novemsky Survey was conducted consisted of taxpayers who had not yet filed their returns, excluding consumers who had already filed their taxes resulted in the correct target population. (GX303 (Novemsky Expert Report) ¶¶ 21-22; Novemsky Tr. 378-379).

407. Within the target population, Novemsky analyzed survey results for two subgroups (F. 408-409) (referred to herein collectively as the "Survey Respondents"). (GX303 (Novemsky Expert Report) ¶ 7; *see also* Novemsky Tr. 411-412).

408. The main group of interest in the Novemsky Survey (Group A) consisted of respondents who reported that they had not filed their income taxes using TurboTax within the past three years and, as such, were less likely to respond to survey questions based on their past experience using TurboTax. (GX303 (Novemsky Expert Report) ¶ 7; *see also* GX749 (Novemsky Rebuttal Expert Report) ¶ 52).

---

[10] Based on Intuit's criteria, taxpayers who were not eligible to use TurboTax Free Edition for filing 2021 taxes included those who had (i) itemized deductions, (ii) unemployment income reported on a Form 1099-G, (iii) business or Form 1099-NEC income, (iv) stock sales, (v) rental property income, or (vi) credits, deductions and income reported on other forms or schedules. (GX303 (Novemsky Expert Report) ¶ 24). Thus, to qualify to participate in the Novemsky Survey, individuals had to satisfy one or more of the following three conditions: (i) earned income either from unemployment, working as an independent contractor, self-employment, or a small business owner (reported on a Form 1099-NEC, Form 1099-MISC, or Schedule C), stock sales, or rental properties; (ii) had only W-2 income, but plans to itemize deductions; or (iii) had only W-2 income and plans to take the standard deduction, but received alimony or received, exercised, or disposed of stock options issued by an employer as part of their compensation. (GX303 (Novemsky Expert Report) ¶¶ 21 n.19, 25).

PUBLIC

409. The second group of interest in the Novemsky Survey (Group B) consisted of respondents who reported that they had filed their income taxes using a paid online version of TurboTax within the past three years. (GX303 (Novemsky Expert Report) ¶ 7; Novemsky Tr. 380-381). Because Group B respondents recently paid to use TurboTax, they would be more familiar with TurboTax product offerings than Group A respondents and would be expected to be less likely than Group A respondents to have formed the impression that they could file for free using TurboTax. (GX303 (Novemsky Expert Report) ¶ 8; Novemsky Tr. 412, 526-527).

410. Novemsky analyzed results for Group A and Group B separately, as they are distinct populations and should not be combined with one another. (GX749 (Novemsky Rebuttal Expert Report) ¶ 52; Novemsky Tr. 525).

411. In designing the Novemsky Survey, Novemsky undertook a number of measures to ensure reliable survey results. These included: (a) requiring participants to pass attention checks and agree to comply with survey instructions, which screened out inattentive survey participants; (b) using pretests to verify that Survey Respondents had no difficulty understanding the survey and were able to answer the questions without difficulty; (c) presenting a clear set of choices and answers that included options such as "I do not have enough information," "[o]ther," "[d]on't know/[n]ot sure" or "I'm not sure" to avoid the possibility of Survey Respondents guessing in response to closed-ended questions; and (d) rotating the answer options to control for order effects. [11] (GX303 (Novemsky Expert Report) ¶¶ 40-41, 57-58, 60, 62-63; Novemsky Tr. 386, 391-396).

412. The Novemsky Survey included both open-ended questions (*i.e.*, questions that require the respondent to formulate and express an answer in his or her own words) and closed-ended questions (*i.e.*, questions that provide the respondent with an explicit set of responses from which to choose). (GX303 (Novemsky Expert Report) ¶ 43; Novemsky Tr. 387).

413. The Novemsky Survey used open-ended questions to prompt Survey Respondents to contemplate the issues relevant for answering closed-ended questions and motivate them to invest more effort into the thoughts that inform their answers to closed-ended questions. (GX303 (Novemsky Expert Report) ¶ 43; *see also* Novemsky Tr. 387-390, 393).

---

[11] To control for order effects, the order of the questions and the order of the response choices in a survey are rotated, so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product B listed first, and one-third of the respondents have Product C listed first. If the three different orders are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the three will provide a reasonable estimate of response level. (GX303 (Novemsky Expert Report) ¶ 60 n.86 (*citing* Shari Seidman Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, D.C.: The National Academies Press, 2011), p. 396).

PUBLIC

414.    Novemsky designed the Novemsky Survey around closed-ended questions because closed-ended questions are more suitable for assessing choices between well-identified options. (GX303 (Novemsky Expert Report) ¶ 43; *see also* Novemsky Tr. 390-391).

415.    Novemsky deliberately used phrases in the answer choices that allowed Survey Respondents to express their state of mind, *i.e.*, "I think I can file my 2021 income taxes for free using TurboTax online software" and "I don't think I can file my 2021 income taxes for free using TurboTax online software." He chose these phrases rather than more definitive wording that expresses certainty or specific knowledge, such as "I can file for free" or "I am sure I can file for free," because the level of certainty in a consumer's knowledge about the cost of filing with TurboTax does not need to be absolute for that consumer to try to use TurboTax for free. (GX303 (Novemsky Expert Report) ¶ 49; *see also* Novemsky Tr. 391).

416.    After the completion of the Novemsky Survey, Novemsky conducted robustness checks to confirm that results were consistent under other reasonable approaches or assumptions, which confirmed that his baseline results are qualitatively unchanged across each of these robustness tests. (GX303 (Novemsky Expert Report) ¶¶ 92-94).

417.    There is no factual basis for concluding that any Survey Respondents who may have been familiar with any litigation against Intuit biased the results of the Novemsky Survey. (GX749 (Novemsky Rebuttal Expert Report) ¶ 75; *see also* Novemsky Tr. 469 ("Q. So you didn't do anything to identify whether or not any of the people that participated in your survey were aware of the litigation, right? A. I did. I looked at thousands of open-ended responses to see if there was any mention of the litigation and I found exactly one out of the thousand.")).

418.    Novemsky allowed participants to opt out of the Novemsky Survey upon completion of the survey and ensured that their submissions were deleted. (GX303 (Novemsky Expert Report) ¶¶ 50-51; *see also* Novemsky Tr. 397).

419.    Approximately 21% of survey participants (164 of 771) opted out of the Novemsky Survey. (GX303 (Novemsky Expert Report) ¶¶ 51, 71; *see also* Novemsky Tr. 397).

420.    Because the opt-out question came at the conclusion of the Novemsky Survey, after the main questionnaire, the structure of the Novemsky Survey ensured that the identification of the sponsor of the survey did not influence the survey responses themselves. (GX303 (Novemsky Expert Report) ¶ 50).

421.    Fewer than 1% (6 of 771) of the Survey Respondents indicated that the elements of the survey influenced their responses. Excluding these respondents would have had no material effect on the conclusions Novemsky reached. (GX749 (Novemsky Rebuttal Expert Report) ¶ 47; Novemsky Tr. 524 ("Q. And what proportion of your total survey population are those six respondents? A. They are less than 1 percent. Q. And what does that proportion say to you about the reliability of your survey? A. It says the reliability is very good. They were asked directly why do you think this, and if less than 1 percent say

PUBLIC

it was something about the survey, it suggests that the survey was not a substantial cause of this misperception.")).

### iii. Survey Results

422. The Novemsky Survey included two open-ended questions to get Survey Respondents to explain their thoughts and center them to think actively about the issues of interest in this case. The two open-ended questions were: "What is your understanding about whether or not there is a cost to filing your own income taxes using TurboTax online software?" and "You may have already said this above, but please tell us again, in your understanding, who, if anyone, can file their taxes for free using TurboTax online software?" (GX303 (Novemsky Expert Report) ¶ 44).

423. The open ended-questions were followed by a closed-ended question aimed at assessing the respondents' beliefs about whether they are able to file for free: "You may have already said this above, but please tell us again, which of the following best describes your understanding of filing your 2021 income taxes for free using TurboTax online software?" (GX303 (Novemsky Expert Report) ¶ 45) (emphasis in original).

424. Of the Survey Respondents who had not used TurboTax in the previous three years (Group A), 52.7% believed that they could use TurboTax for free even though they could not. (GX303 (Novemsky Expert Report) ¶¶ 8, 69 & Figure 1; Novemsky Tr. 360-361).

425. Of the Survey Respondents who had paid to use TurboTax in the last three years (Group B), 24.1% believed that they could use TurboTax for free even though they could not. (GX303 (Novemsky Expert Report) ¶¶ 8, 70 & Figure 1; Novemsky Tr. 381).

426. A substantial portion of Survey Respondents who were not eligible for the TurboTax Free Edition had the misimpression that they could file their taxes for free with TurboTax. (F. 424-425; GX303 (Novemsky Expert Report) ¶¶ 8, 69, 70 & Figure 1; Novemsky Tr. 354, 358-359).

427. To the extent consumers who recently paid for TurboTax believed that they could file for free, this provides some indication of the power of "free" messaging, and its potential to overcome even the past experiences of those who have previously paid to use TurboTax. (GX303 (Novemsky Expert Report) ¶ 70; *see also* Novemsky Tr. 380 ("So to me, it's testament to the power of the marketing.")).

428. Disclaiming a free claim may be particularly difficult because such claims are powerful and consumers are drawn to them. (GX749 (Novemsky Rebuttal Expert Report) ¶¶ 143-144; Novemsky Tr. 1769).

429. Consumers are familiar with free online products and services that are free for all consumers. For example, there are free music streaming platforms that are free for all consumers, but that include advertisements, with consumers able to upgrade to a paid

PUBLIC

version to avoid those advertisements. Intuit does not have a version of TurboTax that is free for all taxpayers. (*See* GX749 (Novemsky Rebuttal Expert Report) ¶¶ 246-248).

430.    The Novemsky Survey included a question, asking in relevant part: "In some of its advertisements, TurboTax mentions 'simple U.S. returns.' Do you think that your 2021 income tax return meets TurboTax's definition of a 'simple U.S. return'?" (GX303 (Novemsky Expert Report) Appendix E at 10 (emphasis in original)).

431.    None of the Survey Respondents had a 2021 income tax return that met TurboTax's definition of a "simple tax return." (F. 403).

432.    Of the Survey Respondents who had not used TurboTax in the previous three years (Group A), 55% believed that they had a "simple U.S. return." (GX303 (Novemsky Expert Report) ¶¶ 10, 85 & Figure 3; Novemsky Tr. 373-374).

433.    Of the Survey Respondents who had paid to use TurboTax in the last three years (Group B), 28.6% believed that they had a "simple U.S. return." (GX303 (Novemsky Expert Report) ¶ 85 & Figure 3).

434.    A substantial portion of Survey Respondents believed that their returns met TurboTax's definition of a "simple U.S. return." (F. 432-433; GX303 (Novemsky Expert Report) ¶¶ 10, 83; Novemsky Tr. 354, 373).

435.    The analysis of the results in the Novemsky Survey (F. 424-425, 432-433) was consistent with guidelines for survey research offered in litigation that are set forth in the Federal Judiciary Center's "Reference Guide on Survey Research" and articulated in the Manual for Complex Litigation. (GX303 (Novemsky Expert Report) ¶ 5).

436.    The use of the phrase "simple returns" is an ineffective disclosure because it fails to convey to consumers that they may not qualify in a manner that is consistent with TurboTax's qualification criteria and does not cure the false impression that they can file for free with TurboTax. (GX749 (Novemsky Rebuttal Expert Report) ¶ 250; Novemsky Tr. 373-375 (discussing GX486 (Complaint Counsel) and GX855 (Complaint Counsel – iSpot.tv)) ("Q. And in your opinion, how effective is the disclaimer for 'simple returns only?' A. In my opinion, it's not very effective, because as my survey data show, many people who do not have simple returns, as TurboTax is using the phrase, think they have simple returns. So telling them it's only for simple returns doesn't cure the false impression that they think they can file for free with TurboTax. Q. Why else are the disclaimers we just looked at not effective? A. Well, the other part of it is having to find them. So as you saw, they were in small print in the TV ads, shown only for a few seconds right at the end, not the exciting part of the ad that's going to get people to turn their heads to the screen. And on the website, again, in small print under much bigger claims about free.")).

437.    The phrase "simple returns" suggests a standard for consumers to determine the meaning of the phrase for themselves, and because the word "simple" has a pre-existing meaning,

PUBLIC

consumers can ask themselves, "Is my tax return simple" and answer "yes" using their own pre-existing definition of "simple." (GX303 (Novemsky Expert Report) ¶ 87).

438.  Consumers are more likely to answer "yes" to the question of whether their tax returns are simple because motivated reasoning, wishful thinking, and optimistic bias will drive many consumers to give themselves the answer that they perceive is advantageous for them. (GX303 (Novemsky Expert Report) ¶ 87).

439.  Consumers are likely to have a preconceived notion as to what "simple" means, particularly in the context of their taxes. (GX749 (Novemsky Rebuttal Expert Report) ¶ 223).

### b.   Other Relevant Novemsky Opinions

440.  People tend to be cognitive misers, meaning they constantly try to conserve mental energy, expending it only when motivated to. (GX749 (Novemsky Rebuttal Expert Report) ¶ 223).

441.  For cognitive misers, the tendency to minimize cognition may reveal itself in a tendency to assume that TurboTax's use of "simple" matches the consumer's own understanding. (GX749 (Novemsky Rebuttal Expert Report) ¶ 223).

442.  Intuit's placement of a fuller disclaimer behind a "simple returns" hyperlink made it unlikely that consumers would reach the disclaimer. (GX749 (Novemsky Rebuttal Expert Report) ¶ 227; Novemsky Tr. 535, 1768).

443.  Since consumers tend to be cognitive misers, they are unlikely to click on a hyperlink or conduct further research when they think they know what a "simple return" is and are under a pre-existing misimpression that they have one. (GX749 (Novemsky Rebuttal Expert Report) ¶¶ 223, 227).

444.  Hyperlinks are unlikely to be sufficient for presenting important information like eligibility criteria because they require more action than simply reading a description of "simple returns" on the current webpage, and consumers are even less likely to process such information when it is relegated to a hyperlink. (GX749 (Novemsky Rebuttal Expert Report) ¶ 227).

445.  Buy-one-get-one or BOGO offers refer to bundles of products and are thus not applicable to consumers' perceptions of the advertisement of a standalone product as a free product. (GX749 (Novemsky Rebuttal Expert Report) ¶ 247).

PUBLIC

## 2.    Intuit's Market Research

### a.    Copy Testing

446.   Intuit has conducted copy testing of advertising, which involves presenting advertisements (the "copy") to individuals that Intuit has determined are in its target market. The purpose of the copy testing is to evaluate how a particular message or idea is resonating. Intuit has commissioned copy testing on its TurboTax television advertisements in the regular course of business to understand consumer perception of and consumer reaction to the advertisements. (Ryan (Intuit) Tr. 701, 723, 735; Hauser Tr. 880).

447.   Copy testing was conducted for Intuit in September 2020, in advance of the TY 2020 filing season (the "TY20 Campaign Copy Testing"), by Ipsos, a market research and consulting firm. (GX460 (Intuit); Ryan (Intuit) Tr. 735-740, 821-825; *see also* Novemsky Tr. 364-366, 499-508; Hauser Tr. 876-891).

448.   The survey population for the TY20 Campaign Copy Testing consisted of taxpayers who (1) had filed taxes the previous year, (2) considered themselves the tax decision maker for their household, and (3) were between the ages of 18 and 49. (GX460 (Intuit) at CC-00009537; Ryan (Intuit) Tr. 736).

449.   The TY20 Campaign Copy Testing's survey population was divided into one control group and four test groups. Each group had roughly 200 participants. (GX460 (Intuit) at CC-00009563). The control group was shown only the TurboTax brand name and was not shown any TurboTax advertisements. (GX460 (Intuit) at CC-00009537; Hauser Tr. 878). The test groups were shown, within a cluttered multimedia environment, one of four TurboTax Free Edition advertisements that were being considered for the TY 2020 filing season. Each of the tested advertisements was a version of one of the television advertisements created in connection with Intuit's "free, free, free" marketing campaign, in which nearly every word in the advertisement consisted of the word "free": "Auctioneer," "Dance Workout," "Young Love," and "Spelling Bee" ("copy test advertisements"). (GX460 (Intuit) at CC-00009538-541; Ryan (Intuit) Tr. 735, 738-739; *see also* Hauser 878-879).

450.   One of the four copy test advertisements used in the TY20 Campaign Copy Testing was a version of the Spelling Bee advertisement from TY 2018 similar to that described in F. 160-161, which included written disclosures on the final screens of the advertisement similar to those described in F. 162-163. The other three copy test advertisements, Auctioneer, Dance Workout, and Young Love, did not include any written disclosures, such as those contained in the final screens of the advertisements described in F. 179, 185. (Ryan (Intuit) Tr. 736-738; *see also* RX1496 (Bennett (WK) Decl.) ¶¶ 5-7).

451.   After exposure to either the TurboTax brand name or one of the copy test advertisements, the TY20 Campaign Copy Testing participants were asked whether they agreed with a

PUBLIC

variety of brand attributes of TurboTax, including whether TurboTax "Allows me to file my taxes for free." (GX460 (Intuit) at CC-00009563; Ryan (Intuit) Tr. 738-739).

452. After exposure to the TurboTax brand name, 33% of the control group in the TY20 Campaign Copy Testing were reported as agreeing with the statement that TurboTax "Allows me to file my taxes for free." (GX460 (Intuit) at CC-00009563; Ryan (Intuit) Tr. 739).

453. After exposure to the copy test advertisements, between 45% and 57%[12] of the test group in the TY20 Campaign Copy Testing were reported as agreeing with the statement that TurboTax "Allows me to file my taxes for free," an increase from the 33% reported for the control group, which had only been exposed to the TurboTax brand name. (GX460 (Intuit) at CC-00009563; Ryan (Intuit) Tr. 740). The report on the TY20 Campaign Copy Testing noted that these test group results were "[s]ignificantly different from" the control group. (GX460 (Intuit) at CC-00009563).

454. The executive summary of the results of Intuit's TY20 Campaign Copy Testing concluded in part: "Consistent, unwavering use of the word 'free' throughout captivates viewers as they make sense of the bizarre single word worlds" and "[t]he promise of a free offer was enticing for many viewers – and differentiated from other brands within the category – which likely contributed to the intrigue to want to trial." (GX460 (Intuit) at CC-00009543).

455. Advertisement copy testing conducted for Intuit in December 2018 by System1 Research (the "TY18 Copy Testing") tested a draft of the Spelling Bee advertisement that did not include any final screen disclosures, such as those included in the advertisement described in F. 162-163 ("Spelling Bee copy test advertisement"). (GX340 (Intuit) at CC-00006857, 6885; Ryan (Intuit) Tr. 725).

456. The survey population for the TY18 Copy Testing consisted of taxpayers who (1) were between the ages of 21 and 49, (2) considered themselves the partial or full household decision maker for tax returns, and (3) earned under $150,000 income. (GX340 (Intuit) at CC-00006845; Ryan (Intuit) Tr. 724).

457. The results of the TY18 Copy Testing showed that 73% of the 250 survey respondents took away from the Spelling Bee copy test advertisement the message: "That i [sic] can file my taxes for free." (GX340 (Intuit) at CC-00006857; Ryan (Intuit) Tr. 725).

458. The summary of the TY18 Copy Testing concluded in part: "About half of viewers take away the 'free' offering in Spelling Bee . . . ." (GX340 (Intuit) at CC-00006883).

---

[12] The rate at which survey respondents believed they could file their taxes for free was 48% for the Spelling Bee advertisement that was tested and 57%, 45%, and 45% respectively for the Auctioneer, Dance Workout, and Young Love advertisements that were tested.

PUBLIC

459. The TY18 Copy Testing showed that the advertisements tested, including the Spelling Bee copy test advertisement, "communicate **the parent brand**, TurboTax well, however, only about ~5% take away the sub brand (TurboTax Free, TurboTax Live)." (GX340 (Intuit) at CC-00006849 (emphasis in original); *see also* Ryan (Intuit) Tr. 817-818).

460. The TY18 Copy Testing showed that for the advertisements tested, including the Spelling Bee copy test advertisement, "[m]ost viewers can recall TurboTax, but only a handful mention the specific product name" when asked "Which brand do you think this ad was for?" (GX340 (Intuit) at 00006856).

### b. Other Market Research

461. A 2019 marketing research report conducted by Intuit evaluating consumer perception found that "[f]ree has been a key lever to drive double digit growth" and showed that 49% of consumers were confident that TurboTax Free Edition is "truly free." (RX597 (Intuit) at INTUIT-FTC-PART3-000601649, 1665).

462. An Intuit study designed to measure brand attributes and "awareness of free" from mid-season TY 2018 showed that 22% of consumers were confident that TurboTax Free Edition is free. (RX595 (Intuit) at FTC-PART3-000602711, 2714, 2725).

463. Intuit developed a Go-to-Market White Paper for fiscal year 2019 that includes recommendations for how to take Intuit's products to market, including its communication plan, pricing activities, and the way Intuit targets its products ("FY'19 GTM White Paper"). (Johnson (Intuit) Tr. 647-648 (referencing RX49 (Intuit) also admitted as GX428 (Intuit)); GX145 (Berger (Intuit) Dep.) 125-127 ("[E]very team cross-functionally provides some input" on the FY'19 GTM White Paper, and it is designed to provide a detailed view of Intuit's "go-to-market plans for fiscal year 2019.")).

464. The FY'19 GTM White Paper, in the context of discussing Intuit's "free, free, free" advertising campaign strategy, acknowledged: "In every case, the viewer cannot miss the message, that filing your taxes with TurboTax Free is "'Free. Free free free, free.'" (GX428 (Intuit) at CC-00007711).

465. The FY'19 GTM White Paper recommended, as a key strategy to "Win in Free," to have "a clear and compelling FREE offering and messaging" and to "[l]ead with Free to raise heads and drive traffic and acquisition across digital, mobile, [and] social [channels]." (GX428 (Intuit) at CC-00007716).

466. The FY'19 GTM White Paper includes a recommendation to "[u]se top-consideration driver to reinforce 'you can file for free'" and a recognition that ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GX428 (Intuit) at CC-00007740).

PUBLIC

467.    A Go-to-Market White Paper for fiscal year 2018 developed by Intuit specifically addressed consumer skepticism surrounding free tax preparation offers and made recommendations for how to overcome it, stating under a section titled Drive Believability of TurboTax Free: "Consumer testing and insights continue to reveal high levels of skepticism that tax prep can be truly free regardless of the brand, but especially for TurboTax given our position in market and focus on monetization. . . . [I]ncorporating the word 'guaranteed' into the offering and changing the name from Federal Free Edition to Free Edition will be levers we explore to reduce that skepticism. . . . Customer research indicates that we can increase believability of our truly Free offering with the addition of 'Guaranteed'." (RX578 (Intuit) at INTUIT-FTC-PART3-000601557).

468.    Intuit's realization that "free" is compelling and attracts customers is demonstrated in its marketing strategy documents. (*E.g.*, GX57 (Intuit) at CC-00000646 (2014 marketing strategy document finding that "Free/Free offer is compelling enough to drive considerable (1.2M) incremental customer growth"); GX403 (Intuit) at CC-00007485 (noting initiative to "[e]volve free messaging and continue to leverage it to raise heads"); GX457 (Intuit) at CC-00009340 ("Lead with Free to raise heads and drive traffic and acquisition across digital, mobile, social to drive commercial free.")).

469.    Intuit's awareness of the impression that the "free" advertisements would leave with consumers is demonstrated in the March 18, 2020 presentation developed by the advertising agency Wieden+Kennedy for Intuit titled ███████████████

███████████████████████████████████████████████
███████████████████████████████████████████

• ███████████████████████████████████████████
██████████████████████████████████████

• ███████████████████████████████████████████
██████████████████████████████████████



- 

- 

470.  Mary Ann Somers, while Senior Vice President and Chief Growth Officer of Intuit's consumer group, was interviewed on the September 20, 2019 episode of the podcast "Renegade Thinkers Unite." (GX148 (Sommers (Intuit) Dep.) at 34-35, 46-48; GX357 (Complaint Counsel) (transcript of podcast featuring Somers); GX358 (Complaint Counsel) (audio recording of podcast featuring Somers)). During the interview, Somers said the following with regard to the TurboTax "free free free" campaign:

> I'll start with the part that really was the aha moment, and that was the insight. We know a lot about our free customer. We know what their journey is, a lot of things. But the key insight for us was, when you start talking about free, that's what people hear. They hear free. You can say a lot of other things, but what they hear is free. We said, "Huh, well, if that's the truth, then how do we create a campaign that builds upon that truth?" And that's the campaign that you saw.

(GX357 (Complaint Counsel); GX358 (Complaint Counsel) at 26:06-26:36 (audio)).

471.  A 2019 Intuit study showed that of consumers leaving TurboTax, ▮▮▮ stated that price was a reason. (RX765-A (Intuit) at 7).

135

PUBLIC

### 3.    Consumer Complaints and Feedback Received by Intuit

472.    In 2019, Intuit was aware of approximately 500 consumer online posts on various platforms regarding eligibility for taxpayers to file for free using TurboTax, with 69% of those posts expressing a "negative sentiment," including about being required to upgrade to a paid TurboTax product when they had previously been able to file with TurboTax for free. (GX415 (Intuit) at CC-00007582-583).

473.    Based on a customer defection study conducted by Intuit regarding TY 2018, Intuit was aware in 2019 that dissatisfaction with price increased significantly as a reason for customers leaving TurboTax in TY 2018. For customers who had previously used the free product but did not return, reasons cited included "want[ing] to do" their taxes "for free," "too many unexpected fees" and "having to upgrade" when preparing their return. (RX765-A (Intuit) at 17).

474.    In an Intuit TY 2020 Net Promoter Score study, Intuit customers reported "hidden costs that were not expected" as a reason not to recommend TurboTax online filing. Comments included, "They always say it's free [] but it's never free. They always charge for something" and "It basically tricks you into having to pay to file your taxes because you're never qualified for the free return." (GX665 (Intuit) at CC-00014561).

475.    Consumers can contact Intuit directly through Intuit's customer success team and/or Intuit's customer care team by phone or chat. (GX158 (Berger (Intuit) Dep.) at 7-8).

476.    When customers are connected with an Intuit customer agent, a record of the contact is created in Salesforce, Intuit's customer relationship management ("CRM") database, by the customer agent. (GX158 (Berger (Intuit) Dep.) at 8-9). The information entered into Salesforce includes "the name of the customer, what product they're using, what they may be contacting [Intuit] about," "notes captured about the interaction" by the customer agent, and any resolution. (GX158 (Berger (Intuit) Dep.) at 9).

477.    Intuit analyzes the information that comes into Salesforce for trends in consumer complaints on a weekly basis. (GX158 (Berger (Intuit) Dep.) at 15).

478.    Intuit's CRM data from 2021 includes a customer review with the text "Why are you advertising free when by the end of doing my taxes with you it cost me $140! I will add this to my review of this product??" (GX859 (Intuit) at CC-00015471, row 39720, column V).

479.    Intuit's CRM data includes a customer review with the text "PreAuth: Why am I being charged almost $120. For a simple w-2 tax return. Nothing else I'm claiming. I started with the free service then can't process any further until i except the $70 upgrade. That's false advertisement of free." (GX859 (Intuit) at CC-00015471, row 40777, column C).

480.    Intuit's CRM data includes a customer review with the text "Customer is insulted that TurboTax advertises Free and then when someone enters the[i]r[] info system pushed

PUBLIC

them into other packages. It was explained to cx that the system does pick up when other features are required that may not be needed. Customer stated because it was not free he would find another provider and hung up on agent." (GX860 (Intuit) at CC-00015472, row 8417, column V).

481.   Intuit's CRM data includes a customer review with the text "i want to know why do i have to pay to do my taxes it was supposed to be free." (GX858 (Intuit) at CC-00015470, row 24574, column D).

482.   Intuit's CRM data includes a customer review stating that the customer "wants to know why it[']s asking him to pay 90 bucks when his tax return was simple." (GX857 (Intuit) at CC-00015469, row 1423, column D).

483.   Intuit's CRM data includes a customer review with the text "Why are you charging me ...this is supposed to be FREE." (GX862 (Intuit) at CC-00015474, row 60802, column D).

484.   Intuit uses a third-party vendor called Bazaarvoice to capture and store customer reviews. These reviews are available to be viewed by Intuit's marketing team and might also be posted on the TurboTax website. (GX149 (Crosby (Intuit) Dep.) at 42-43; Johnson (Intuit) Tr. 666-667).

485.   The data stored in the Bazaarvoice database includes the product name, the relevant tax year, the method by which the customer filed their taxes the prior year, and life changes that would impact the customer's tax situation. (GX149 (Crosby (Intuit) Dep.) at 92-95).

486.   In order for a consumer review and accompanying data to be captured in the Bazaarvoice database, the customer must complete filing their taxes using a TurboTax product. (GX149 (Crosby (Intuit) Dep.) at 42-43, 47).

487.   The Excel file "TY21 Bazaarvoice Customer Reviews Data" shows customer reviews collected by Bazaarvoice and includes an overall customer rating for the product, a review ID, a review title, and review text, for customers who filed their TY 2021 taxes using a TurboTax product and completed the Bazaarvoice survey. (*See generally* RX816 (Intuit) INTUIT-FTC-PART3-000490341 (also admitted into the record as GX475) (hereafter "Intuit's TY 2021 customer review data"); *see also* RX1027 (Deal Expert Report) at D-36).

488.   Intuit's TY 2021 customer review data contain numerous reviews from customers expressing dissatisfaction over expecting to be able to file for free with TurboTax, including based on TurboTax advertising, but being unable to do so. (RX816 (Intuit); summarized in GXD006). Representative samples of such reviews are set forth below in F. 489-507.

489.   Intuit's TY 2021 customer review data includes a customer review containing the statements "TurboTax is a dec[ei]ving company" and "Your TV commercials are a big

PUBLIC

lie, this company should be put out of business for deceptive practices. Free, free, free, yes right $154.00 to file this return, Free, Free, free." (RX816 (Intuit) at row 272983, columns A, E, P).

490.   Intuit's TY 2021 customer review data includes a customer review containing the statements "TURBO TAX ISNT FREE, EVER!" and "ADVERTISES FREE, FREE, FREE, BUT ITS ACTUALLY FEE, FEE, FEE!"  (RX816 (Intuit) at row 15850, columns A, E, P).

491.   Intuit's TY 2021 customer review data includes a customer review containing the statements "Horrible" and "They advertise $0 to file a basic W2 and end up charging you!" (RX816 (Intuit) at row 150070, columns A, E, P).

492.   Intuit's TY 2021 customer review data includes a review containing the statements "Disappointed" and "I would give a higher review, however they keep promoting that it is free free free and yet it is NOT NOT NOT." (RX816 (Intuit) at row 44033, columns A, E, P).

493.   Intuit's TY 2021 customer review data includes a review containing the statements "NOT TRUL[]Y FREE AS ADVERTISED" and "NOT FREE AS ADVERTISED,,, THE LAST TIME I USED TURBO TAX FEDERAL WAS FREE THIS TIME IT WAS NOT WHICH I AM NOT HAPPY ABOUT .. THE COMMERCIALS ADVERTISE FREE FREE FREE FREE THIS IS B***s****." (RX816 (Intuit) at row 120171, columns A, E, P).

494.   Intuit's TY 2021 customer review data includes a review containing the statements "more bullsh*T" and "commercial after commercial telling you its free its free, go to hell with that." (RX816 (Intuit) at row 75870, columns A, E, P).

495.   Intuit's TY 2021 customer review data includes a review containing the statements "I would of given ZERO stars!!!!!!!!!" and "Your COMMERCIALS in the STATE of MINNESOTA says FREE FREE FREE FREE.  YOU CHARGE FOR FILING!!! FALSE ADVERTISEMENT!!!!!  YOU NEED TO REFUND ME FOR FILING!!!!!!!!!!!!!!!!!!  STOP LYING about being FREE!!!!!!!!!!!!!!!!!!!!!!!!!" (RX816 (Intuit) at row 124340, columns A, E, P).

496.   Intuit's TY 2021 customer review data includes a review containing the statements "FEES!" and "Turbo Tax claims I can file for free but that is not true as I try every year and it does not allow any option to file for free! Very disappointed with Tu[r]bo Tax bait and switch tactics and their abuse of taking advantage of the hard-working poor." (RX816 (Intuit) at row 30132, columns A, E, P).

497.   Intuit's TY 2021 customer review data includes a review containing the statements "Misleading" and "This process is very misleading. It promotes free,free,free until its t[i]me to checkout and then all of a sudden there is a fee that was more than the return itself." (RX816 (Intuit) at row 263327, columns A, E, P).

PUBLIC

498. Intuit's TY 2021 customer review data includes a review containing the statements "Y'all are thieves," and "Turbo Tax will help you get the biggest return! and then they will take half of it because they charge you for so much. You can file for free! LOL JK you stupid fools should be Turbo Taxes actual slogan." (RX816 (Intuit) at row 255488, columns A, E, P).

499. Intuit's TY 2021 customer review data includes a review containing the statements "Turbo Tax's thing is that it is FREE. This is the second year I've filed my own taxes and they charged me almost 200$ for filing my federal taxes! Complete scam!!!" (RX816 (Intuit) at row 182906, columns A, E, P).

500. Intuit's TY 2021 customer review data includes a review containing the statements "Probably won't use Turbotax again" and "I got told it was a free upgrade to Turbotax Live on the website itself (it prompted that it was free) and from an ad on T.V. I still had to lose half of my refund because it was a complete lie." (RX816 (Intuit) at row 265027, columns A, E, P).

501. Intuit's TY 2021 customer review data includes a review containing the statements "Free to file my a55" and "Such false advertising. You state free for simple returns, but over $100 later, that is not the case at all. Every year it is the same crap. False advertising. I will not use you again moving forward." (RX816 (Intuit) at row 83380, columns A, E, P).

502. Intuit's TY 2021 customer review data includes a review containing the statements "Your commercials say that you['r]e free" and "Every year I see the commercials that say you are a free tax filing service yet you charge me over $100 to file every year. If it is not free for a broke college student who is in the lowest tax bracket, then who exactly is it free for?" (RX816 (Intuit) at row 187204, columns A, E, P).

503. Intuit's TY 2021 customer review data includes a review containing the statements "Overall, TurboTax is great and easy to use. However, my only complaint was that you originally advertise the tax program to be free. Once you reach the end of the tax form however, you come to find out that it is indeed not free, but is going to cost at least a minimum of $39 or more. So that's not cool. False advertising if you ask me." (RX816 (Intuit) at row 116550, columns A, E, P).

504. Intuit's TY 2021 customer review data includes a review containing the statements "Ah it's not that bad, not free thou[gh] like they said in the commercial." (RX816 (Intuit) at row 197881, columns A, E, P).

505. Intuit's TY 2021 customer review data includes a review containing the statements "It advertises as FREE. Why am I paying for it???" (RX816 (Intuit) at row 40791, columns A, E, P).

PUBLIC

506.   Intuit's TY 2021 customer review data includes a review containing the statements
"Lies" and "It[']s an easy site to use but they have unexpected fees when the commercial
clearly say free, IT[']S NOT FREE!!" (RX816 (Intuit) at row 35974, columns A, E, P).

507.   Intuit's TY 2021 customer review data includes a review containing the statements "It's
not free, has never been free, stop lying about how it's free." (RX816 (Intuit) at row
123687, columns A, E, P).

### 4.   Consumer Sentinel Complaints

508.   Between January 1, 2016, and March 28, 2022, the Consumer Sentinel Network
("Sentinel"), the FTC's consumer complaint database, received consumer complaints
concerning TurboTax. Between 120 and 228 of these Sentinel complaints raised issues
encompassed by the deceptive advertising allegations in the Complaint. (*See* RX277
(Intuit) at 3 & Attachment A (summarizing GX502 & GX503 (Complaint Counsel)
(reporting 228 relevant Sentinel complaints received Jan. 1, 2016 to Mar. 28, 2022);
Golder (Intuit) Tr. 1199-1201, 1207-1208 (addressing his analysis of Sentinel complaints
produced by Complaint Counsel and finding 120 relevant Sentinel complaints in same
period); *see also* RX1018 (Golder Expert Report) ¶¶ 71-82)).

509.   Forty-three of the relevant Sentinel complaints referenced in F. 508 were recorded
between January 1, 2021, and March 28, 2022, and 26 were recorded between November
1, 2021, and March 28, 2022. (RX277 (Intuit) at 3 & Attachment A (summarizing GX502
& GX503 (Complaint Counsel)) (Sentinel complaints received Jan. 1, 2016 to Mar. 28,
2022)).

510.   Of the 26 relevant Sentinel complaints recorded between November 1, 2021, and March
28, 2022 referenced in F. 508:

   a)   26 of 26 consumers indicated that they believed that filing taxes with
        TurboTax would be free;

   b)   22 of 26 consumers mentioned advertising about a free TurboTax
        option; and

   c)   20 of 26 consumers indicated that they were charged for or paid for
        TurboTax.

(RX277 (Intuit) at 3 & Attachment A (summarizing GX502 & GX503 (Complaint
Counsel)) (Sentinel Complaints received Jan. 1, 2016 to Mar. 28, 2022)).

### 5.   Consumer Testimony

511.   Consumer testimony supports a conclusion that consumers' expectations that they can
file for free with TurboTax is an important factor in deciding to use TurboTax. (*See, e.g.*,
GX125 (Beck (Consumer) Dep.) at 55 (testifying that TurboTax free advertising was "the

PUBLIC

key message that brought me to TurboTax in the first place"); *see also* GX138 (Adamson (Consumer) Dep.) at 42, 56, 57; GX128 (Benbrook (Consumer) Dep.) at 55; GX124 (Bodi (Consumer) Dep.) at 31-33; GX139 (Derscha (Consumer) Dep.) at 76; GX137 (DuKatz (Consumer) Dep.) at 27-28, 82-83; GX142 (Keahiolalo (Consumer) Dep.) at 76-77; GX123 (Lee (Consumer) Dep.) at 53-54; GX135 (Phyfer (Consumer) Dep.) at 79-80, 88-90, 104-105; GX130 (Tew (Consumer) Dep.) at 52-54)).

512.    Consumer testimony supports a conclusion that cost is an important factor in deciding to use a tax filing service. (GX138 (Adamson (Consumer) Dep.) at 56; GX125 (Beck (Consumer) Dep.) at 15, 27, 30; GX128 (Benbrook (Consumer) Dep.) at 22; GX139 (Derscha (Consumer) Dep.) at 41, 88; GX132 (Dougher (Consumer) Dep.) at 41-42; GX137 (DuKatz (Consumer) Dep.) at 74-75, 80-82; GX134 (Hobson (Consumer) Dep.) at 20; GX142 (Keahiolalo (Consumer) Dep.) at 42, 61, 77; GX135 (Phyfer (Consumer) Dep.) at 54, 103, 109; GX130 (Tew (Consumer) Dep.) at 53-54)).

513.    Consumer testimony supports a conclusion that TurboTax's "free" advertising claims were memorable and were retained by consumers. (GX138 (Adamson (Consumer) Dep.) at 55-56 (testifying that TurboTax free advertising was "ubiquitous"); GX125 (Beck (Consumer) Dep.) at 22 ("I'm not sure if there was any one particular thing that I remember other than the ads that they started doing where it would just say the word 'free' over and over and over again."), 23, 30, 55; GX128 (Benbrook (Consumer) Dep.) at 53-55 (testifying that all he remembered from TurboTax advertisements was "free" and "zero dollar" "repeated numerous times across all ads"); GX139 (Derscha (Consumer) Dep.) at 58-59 ("Q: [W]hat TurboTax advertisements did you see in 2019 specifically? A: Oh, lord, there were several. There were several on Facebook, several of them on YouTube . . . [A]t that point in time they were all over the place."), 60 (testifying that TurboTax advertisements "caught [her] attention"); GX132 (Dougher (Consumer) Dep.) at 35-36 (testifying that he "thought [TurboTax] was free for everybody"); GX137 (DuKatz (Consumer) Dep.) at 29-30 (testifying to being able to "vividly" recall a TurboTax advertisement "where everyone talks by just saying the word 'free'"), 93-94; GX142 (Keahiolalo (Consumer) Dep.) at 25 ("Q: "What do you know about TurboTax? A. TurboTax, it's free. That's all I know. They advertise as free. That's all I know."), 26, 32-33, 42; GX123 (Lee (Consumer) Dep.) at 54 (testifying that his initial impression from advertisements was that TurboTax was "simple, easy and free" to file); GX135 (Phyfer (Consumer) Dep.) at 79-82; GX141 (Robinson (Consumer) Dep.) at 41-43; GX136 (Schulte (Consumer) Dep.) at 14-15)).

514.    Consumer testimony supports a conclusion that many consumers do not understand Intuit's eligibility criteria for TurboTax Free Edition. (GX137 (Dukatz (Consumer) Dep.) at 19 ("I don't understand what a simple return is, and no, I don't understand who would qualify for that and under what conditions that would be true. Like, I don't understand who falls into a simple return."), 56 (testifying that the phrase simple tax returns "has no connotation to me because I don't understand what is and is not a simple tax return"), 64 (testifying that the phrase "[f]or simple tax returns only" "doesn't mean anything to me"); GX138 (Adamson (Consumer) Dep.) at 44 (testifying that he understood "simple tax returns" to mean "if you . . . made under a certain amount of money, that you would not

be charged by TurboTax to file your taxes"), 58-59 ("Q: What does simple returns mean to you? A. I don't know exactly. . . ."); GX139 (Derscha (Consumer) Dep.) at 47-48, (testifying that she "thought" her "standard tax preparation" was a simple tax return and that she "didn't understand that there [were] different versions of a standard"), 62 testifying that she "wasn't aware of the differences between like a simple file or anything like that"); GX142 (Keahiolalo (Consumer) Dep.) at 37-38; GX135 (Phyfer (Consumer) Dep.) at 66-67 (testifying that she "assumed" that her tax return was a simple tax return), 75-76 (testifying that she understood she had a simple tax return because nothing had changed since the previous year "in [her] income"), 92-93; GX141 (Robinson (Consumer) Dep.) at 41-42, 58-59; GX136 (Schulte (Consumer) Dep.) at 70 (testifying that he interpreted "simple tax returns" to mean a "situation where your tax situation's not over[ly] complicated . . . Like essentially you're not some huge investor" requiring a "stack of different documents that you're going to have to submit)).

515.	Consumers may be reluctant to switch tax preparation providers in the course of completing their taxes, particularly after putting in substantial time on their return. (GX124 (Bodi (Consumer) Dep.) at 33 (testifying that upon reaching "the end" of her TurboTax filing and realizing she would be charged, "at that point [she] did not want to . . . find another online tax preparer"); GX139 (Derscha (Consumer) Dep.) at 57 (testifying that she did not change tax preparation providers upon reaching the end of her filing because "there were circumstances that made it difficult for [her] to have to go back through the whole process over again"); GX137 (DuKatz (Consumer) Dep.) at 80-82; GX138 (Adamson (Consumer) Dep.) at 58 (testifying to having spent between 30 and 45 minutes entering his tax information on TurboTax before learning he could not file for free.)).

516.	One consumer explained his reluctance to switch tax preparation providers in the course of completing his taxes after putting in substantial time on his return as follows:

> I'd already spent the time. It's like if you were – Let's say you ordered something from IKEA and you were building, like, a wardrobe, and you spent four hours on the wardrobe, and then you realize that you have to go buy another piece to do it – to complete it. You're going to go buy that piece. You're not just going to, like, throw it in the dumpster. Like, it has to be done now. (GX137 (DuKatz (Consumer) Dep.) at 80). . . .

> It would be like if you bought a plane ticket, you got on an airplane, they flew you across the country, and then to leave the airplane, they were like, "Actually, it's $100 to leave the airplane. Otherwise we're just going to fly you back." And you're like, "But I already paid for my vacation, like for my hotel and stuff," and they're like, "You're going to have to pay the $100 to get out of the airplane." So that's the way that I would phrase that. (GX137 (DuKatz (Consumer) Dep.) at 81).

517.	Consumer testimony supports a conclusion that consumers do not necessarily perceive or understand the significance of color-contrasted hyperlinks on TurboTax's website.

PUBLIC

(GX125 (Beck (Consumer) Dep.) at 34-36 (testifying that: she was not aware that blue text on a webpage indicates a hyperlink with additional information; and that blue hyperlinks for "simple tax returns" on TurboTax's Products & Pricing page were not "obvious" given the small print and other blue colored content on the page)).

### D.    Intuit's TY 2022 Advertising and Website

####    1.    TY 2022 Advertisements

518.    Advertisements placed by Intuit for TY 2022 include "free" filing claims for TurboTax products, as well as certain disclosures, described in F. 519-526.

519.    Intuit's TY 2022 video advertisements that include verbal "free" filing claims for TurboTax products refer to the filing of "simple returns" for free and audibly state "see if you qualify at turbotax.com." (*E.g.*, RX1444 (Intuit) ("Filing your simple return for free? . . . "see if you qualify at turbotax.com.")). These advertisements also include a final screen with written words: "Simple returns only. See if you qualify at turbotax.com" and a reference to the specific TurboTax free product, such as TurboTax Free Edition. (*E.g.*, RX1445 (Intuit); RX1449 (Intuit); RX1452 (Intuit); RX1547 (Intuit)).

520.    Intuit's TY 2022 video advertisements for TurboTax Free Edition include text stating, "File A Simple Return For Free" and include a final screen referencing TurboTax Free Edition, and stating: "Simple returns only. See if you qualify at turbotax.com." (*E.g.*, RX1547 (Intuit) (the "Taxbourine" video advertisement)). The representative screenshots are set forth below:



PUBLIC



(RX1547 (Intuit)).

521.    Intuit's TY 2022 Video Display Advertisements that include free filing claims for TurboTax products include written disclosures stating both "Simple tax returns only" and "See if you qualify," and also contain the name and/or logo of the free product being advertised – TurboTax Free Edition or TurboTax Live Basic. (RX1421 (Intuit); RX1423 (Intuit); RX1428 (Intuit); RX1429 (Intuit); RX1430 (Intuit); RX1454 (Intuit); RX1455 (Intuit); RX1456 (Intuit); RX1457 (Intuit); RX1458 (Intuit); RX1459 (Intuit); RX1460 (Intuit); RX1461 (Intuit); RX1462 (Intuit); RX1463 (Intuit); RX1464 (Intuit); RX1465 (Intuit); RX1466 (Intuit); RX1467 (Intuit); RX1468 (Intuit); RX1469 (Intuit); RX1470 (Intuit); RX1471 (Intuit); RX1472 (Intuit); RX1473 (Intuit); RX1474 (Intuit); RX1475 (Intuit); RX1476 (Intuit); RX1477 (Intuit); RX1478 (Intuit); RX1479 (Intuit); RX1480 (Intuit); RX1481 (Intuit); RX1482 (Intuit); RX1483 (Intuit); RX1484 (Intuit); RX1485 (Intuit); RX1486 (Intuit); RX1487 (Intuit); RX1488 (Intuit); RX1489 (Intuit); RX1480 (Intuit); RX1481 (Intuit); RX1482 (Intuit); RX1483 (Intuit); RX1484 (Intuit); RX1485 (Intuit); RX1486 (Intuit); RX1487 (Intuit); RX1488 (Intuit); RX1489 (Intuit)). A representative screenshot is set forth below:

PUBLIC



(RX1421 (Intuit)).

522.    Intuit's TY 2022 Video Display Advertisements for TurboTax products that include
verbal "free" filing claims include a voice-over stating that consumers can file "a simple
return for free" or that free filing is for "simple returns only." Video Display
Advertisements with verbal free claims also state audibly "see if you qualify" at the
TurboTax website. (RX1421 (Intuit); RX1423 (Intuit); RX1428 (Intuit); RX1429
(Intuit); RX1430 (Intuit); RX1454 (Intuit); RX1455 (Intuit); RX1456 (Intuit); RX1457
(Intuit); RX1462 (Intuit); RX1463 (Intuit); RX1464 (Intuit); RX1465 (Intuit); RX1470
(Intuit); RX1471 (Intuit); RX1472 (Intuit); RX1473 (Intuit)).

523.    Intuit's TY 2022 Non-Video Display Advertisements that include "free" filing claims for
TurboTax products include written disclosures stating "Simple tax returns only.  See if
you qualify." They also contain the name and/or logo of the free product being
advertised, TurboTax Free Edition or TurboTax Live Basic.  (GX730-GX741 (Complaint
Counsel); RX1419 (Intuit); RX1420 (Intuit); RX1422 (Intuit); RX1424 (Intuit); RX1425
(Intuit); RX1426 (Intuit); RX1427 (Intuit); RX1431 (Intuit); RX1432 (Intuit); RX1433
(Intuit); RX1434 (Intuit); RX1435 (Intuit)). A representative screenshot is set forth
below:

145

PUBLIC



(GX734 (Complaint Counsel)).

524. Intuit's Paid Search Advertisements for TY 2022 that include "free" filing claims for TurboTax products include written statements in the subtext, beneath the headline and sub-headline, such as, "Free for Simple Tax Returns Only With TurboTax Free Edition" and/or "See if you qualify today." (GX723 (Complaint Counsel); GX724 (Complaint Counsel); GX725 (Complaint Counsel); GX726 (Complaint Counsel); GX727 (Complaint Counsel); GX728 (Complaint Counsel); GX729 (Intuit); RX1436 (Intuit); RX1437 (Intuit); RX1438 (Intuit); RX1439 (Intuit); RX1440 (Intuit); RX1442 (Intuit); RX1443 (Intuit)). A representative screenshot is set forth below:

PUBLIC



(RX1440 (Intuit)).

525. Consumers who click on a TY 2022 Paid Search Advertisement for TurboTax Free Edition or TurboTax Live Basic are taken directly to the TurboTax Free Edition or TurboTax Live Basic landing page. (Johnson (Intuit) 595-596; Ryan (Intuit) Tr. 697; Rubin (Intuit) 1563-1565).

526. Intuit's email advertisements for TY 2022 that include "free" filing claims for TurboTax products include written disclosures underneath the offer to file for free, stating "TurboTax Free Edition, for simple returns only. See if you qualify." The advertisements also include written disclosures stating that "Not all taxpayers" qualify and specify certain eligibility qualifications for simple tax returns. (RX1431 (Intuit); RX1432 (Intuit); RX1433 (Intuit); RX1434 (Intuit); RX1435 (Intuit)). Representative screenshots are set forth below:

PUBLIC





(RX1431 (Intuit)).

**2.    TY 2022 Website**

527.    In TY 2022, advertisements for TurboTax free filing offers on the TurboTax home page that referred to "simple tax returns only" were adjacent to a color-contrasted hyperlink

PUBLIC

stating "see if you qualify." (RX1263-A; RX1500 (Intuit); RX19 (Intuit); RX20 (Intuit); RX21 (Intuit); RX22 (Intuit); RX23 (Intuit); RX24 (Intuit)). A representative screenshot is set forth below:



(RX1500 (Intuit)).

528. Since at least August 2022, the TurboTax website has included a "See if you qualify" webpage, which contains details on the qualifications for TurboTax's free tax filing products (the "See if you qualify" TurboTax webpage). (RX6 (Intuit); RX1501 (Intuit); GX439 (Ryan (Intuit) Decl.) ¶ 39).

529. The "See if you qualify" TurboTax webpage states, "Simple tax return? You could file for free[.] A simple return is one that's filed using the IRS Form 1040 only, without attaching any schedules." The page further details the tax situations that are and are not covered by free TurboTax products, and answers frequently asked questions, such as "How does TurboTax make money?" (RX6 (Intuit); RX1501 (Intuit)).

530. RX1501, shown in part below, is a screenshot of a portion of the TurboTax "See if you qualify" webpage from TY 2022:

PUBLIC



(RX1501 (Intuit)).

531.    RX1532, shown in part below, is a screenshot of the TY 2022 TurboTax Products
& Pricing webpage.

PUBLIC



(RX1532 (Intuit); Rubin (Intuit) Tr. 1570-1571).

532.    A screenshot of the SKU Selector from the TY 2022 TurboTax website Products & Pricing page is set forth below:

PUBLIC



(RX1532 (Intuit)).

**E.      State Settlement**

533.    The Complaint in this matter was issued after an investigation into Intuit's acts and practices conducted by the Commission's Bureau of Consumer Protection staff together with the offices of several state attorneys general (the "investigation"). The investigation began in May 2019. (*See* GX312 (Complaint Counsel) ¶¶ 3-9, 12-18, 20-26 & Appendix).

534.    During the course of the investigation into Intuit's advertising practices and settlement negotiations prior to the issuance of the Complaint, Intuit continued making "free" claims in its advertising and airing advertisements from its "free, free, free" campaign. On March 24, 2022, Intuit's general counsel met with FTC Chair Lina Khan to discuss the FTC's concerns regarding Intuit's advertising. After the meeting, Intuit discontinued its "free, free, free" video advertising campaign. (GX438 (Intuit) ¶ 16; *see* GX Summary 001 (Complaint Counsel) at "Ads w-Program Count" (summarizing television advertisement dissemination data produced by Intuit for television advertisements that made free claims principally in calendar years 2021 and 2022); GX Summary 002 (Complaint Counsel) at "Summary-Online_Ads" (summarizing online advertisement dissemination data produced by Intuit for online advertisements that made free claims in calendar years 2021 and 2022)).

535.    On May 6, 2019, the State of California, by and through the Los Angeles city attorney, filed a complaint against Intuit, seeking injunctive relief, restitution, and civil penalties, alleging that Intuit's free tax filing advertising was false or misleading under California's Unfair Competition Law (Bus. & Prof. Code §§ 17200 et seq.). (GX873 (Complaint Counsel), *e.g.*, ¶ 79c (alleging Intuit "advertis[ed] 'FREE Guaranteed' tax filing services

152

PUBLIC

when in fact only a small percentage of consumers are able to complete their tax returns for free . . . .")).

536. On September 6, 2019, the State of California, by and through the Santa Clara County Counsel, filed a complaint against Intuit, seeking injunctive relief, restitution, and civil penalties, alleging that Intuit's free tax filing advertising violated California's False Advertising Law. (GX874 (Complaint Counsel), *e.g.*, ¶ 75a (alleging that Intuit "[f]alsely represent[ed] in numerous television advertisements that if taxpayers used TurboTax Free Edition they would be able to file for free, including in an ad campaign using the tagline: 'Free, free free free,'" and "[f]alsely represent[ed] in extensive online advertisements that if taxpayers used the TurboTax Free Edition they would be able to file for free")).

537. On September 13, 2019, a consolidated class action complaint was filed against Intuit in the United States District Court for the Northern District of California, captioned as *In re Intuit Free File Litigation* ("Consolidated Class Action Complaint"), alleging, among other things, that Intuit's free tax filing advertising was deceptive. (GX875 (Complaint Counsel) (publicly available from N.D. Cal.) ¶ 83).

538. On May 4, 2022, Intuit entered into a settlement agreement with the attorneys general of all 50 states and the District of Columbia to resolve an investigation by the attorneys general into Intuit's marketing, advertising, promotion, and sale of certain online tax preparation products and whether Intuit's conduct constituted deceptive or unfair business acts or practices in violation of the states' consumer protection laws. (RX76 (Intuit) (Assurance of Voluntary Compliance); RX261 (Intuit) (June 25, 2022 Consent Order entered in the Los Angeles County Superior Court settling case with the State of California)). The Assurance of Voluntary Compliance and the Consent Order contain substantively similar terms (collectively the Consent Order and the settlement agreement are referred to herein as the "State Settlement").

539. The State Settlement requires Intuit to comply with the consumer protection laws of each state and any amendments to those laws, regulations, and rules that may be adopted. (RX261 (Intuit) at 6; RX76 at 18).

540. The State Settlement prohibits Intuit and "Intuit's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Judgment, whether acting directly or indirectly, in connection with promoting or offering any online tax preparation products" from, among other prohibitions, misrepresenting "expressly or by implication" that consumers can "file their taxes for free with the TurboTax Free Edition Product when that is not the case" or "[a]ny other fact material to consumers concerning any tax preparation product or service, such as the price; total cost; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics." (RX261 (Intuit) at 6-7; RX76 (Intuit) at 18-19).

PUBLIC

541. The State Settlement prohibits Intuit from publishing "in any medium (1) its 'free, free, free' Video Advertisements . . . and (2) Video Advertisements that are substantially similar in their repetition of the word free." (RX261 (Intuit) at 8; RX76 (Intuit) at 21).

542. The State Settlement requires certain disclosures, described in F. 543-550, in connection with the advertising of any tax preparation products as "free, whether directly or indirectly." (RX76 (Intuit) at 19-20; RX261 (Intuit) at 7).

543. The State Settlement requires in any "non-Space-Constrained Advertisement of free tax preparation products other than on a TurboTax Website" that Intuit disclose "Clearly and Conspicuously, and in Close Proximity to the representation that the product is free: (1) the existence and category of material limitations on a consumer's ability to use that free product; and (2) that not all taxpayers qualify for the free product." (RX76 (Intuit) at 20; RX261 (Intuit) at 7).

544. The State Settlement defines "Space-Constrained Advertisement" as any online advertisement (including but not limited to "Paid Display Advertisements" and "Paid Search Advertisements"[13]) or video advertisement, except for advertisements on a TurboTax website, "that has space, time, format, size, or technological restrictions that limit Intuit from being able to make the disclosures required by" the State Settlement. (RX76 (Intuit) at 5-6). "Intuit bears the burden of showing that there is a constraint or insufficient space and time to make a required disclosure that is Clear and Conspicuous and in Close Proximity to the triggering term." (RX76 (Intuit) at 5-6; RX261 (Intuit) at 4-5).

545. The State Settlement defines "Clearly and Conspicuously" to mean that the disclosure is "difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers." (RX261 (Intuit) at 2-3). For example, "[a] visual disclosure, by its size, contrast, location, the length of time it appears . . . must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood." (RX261 (Intuit) at 3). Any audio disclosure must "be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it." (RX261 (Intuit) at 3; RX76 (Intuit) at 3-4).

546. The State Settlement defines "Close Proximity" to mean that the disclosure is "very near the triggering representation and that the disclosure is made simultaneously with the triggering representation and remains or is repeated throughout the duration of the Advertisement." This definition further provides that a "disclosure made through a hyperlink, pop-up, interstitial, or other similar technique is not in Close Proximity to the triggering representation." (RX261 (Intuit) at 3-4; RX76 (Intuit) at 4).

---

[13] "Paid Display Advertisement" is defined in relevant part as an online advertisement "in which Intuit pays, or causes another to pay," for an advertisement to be displayed on a website, regardless of whether consumers click on the advertisement. The term "Paid Search Advertisement" refers to payment for advertising to be displayed with search engine results for a particular search term, in which payment is made only when consumers click on the advertisement. (RX261 (Intuit) at 4; RX76 (Intuit) at 5).

PUBLIC

547. The State Settlement requires that in any "Space-Constrained Advertisement of free tax preparation products," (other than space-constrained video advertisements) Intuit must disclose that "eligibility requirements apply." If the space-constrained advertisement is online, Intuit must also "(1) Clearly and Conspicuously include a hyperlink to a landing page or webpage on a TurboTax website that Clearly and Conspicuously contains full disclosure of all material eligibility restrictions or (2) link by clicking on the Advertisement itself to a landing page or webpage on a TurboTax Website that Clearly and Conspicuously sets forth full disclosure of all material eligibility restrictions." (RX76 (Intuit) at 20; RX261 (Intuit) at 7).

548. The State Settlement requires that for a period of ten years, in any "Space-Constrained Video Advertisements of free tax preparation products," Intuit must "visually disclose, Clearly and Conspicuously, and in Close Proximity to the representation that the product is free: (1) the existence and category of material limitations on a consumer's ability to use that free product; and (2) that not all taxpayers qualify for the free product." (RX76 (Intuit) at 20; RX261 (Intuit) at 7-8).

549. The State Settlement requires that for a period of ten years, "Space-Constrained Video Advertisements of free tax preparation products" that are 9 seconds or longer must "verbally disclose, Clearly and Conspicuously, and in Close Proximity to the representation that the product is free, that not all taxpayers qualify." (RX76 (Intuit) at 20; RX261 (Intuit) at 7-8).

550. The State Settlement requires that in any advertisement of free tax preparation products on a TurboTax website and "any space on a TurboTax Website listing, describing, offering, or promoting such free products, Intuit must disclose (1) Clearly and Conspicuously and very near to the representation all material limitations on a consumer's ability to use that free product, including, but not limited to, eligibility criteria for that free product, or (2) through a hyperlink (i) that is very near to the representation, (ii) that indicates that there are material limitations on a consumer's ability to use that free product, and (iii) that links to a landing page or webpage that Clearly and Conspicuously sets forth all material limitations on a consumer's ability to use that free product, including, but not limited to, eligibility criteria for that free product." (RX76 (Intuit) at 21; RX261 (Intuit) at 8).

## III.    ANALYSIS AND CONCLUSIONS OF LAW

### A.    Introduction

#### 1.    Overview of Applicable Law

This is a deceptive advertising case brought by the Federal Trade Commission ("FTC" or "Commission") against Respondent Intuit Inc. ("Respondent" or "Intuit") under Section 5(a) of the FTC Act. Intuit advertises and sells TurboTax, a commonly used online tax preparation service that enables users to prepare and file their federal income taxes. F. 4-5.[14] Section 5(a) declares unlawful "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

"An advertisement is deceptive if it contains a representation or omission of fact that is likely to mislead a consumer acting reasonably under the circumstances, and that representation or omission is material to a consumer's purchasing decision." *In re POM Wonderful, LLC,* No. 9344, 2013 WL 8364895, at *6 (F.T.C. Jan. 10, 2013), *aff'd sub nom. POM Wonderful, LLC v. FTC,* 777 F.3d 478 (D.C. Cir. 2015); *FTC Policy Statement on Deception* (appended to *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 1984 WL 565319 (Mar. 23, 1984)) ("*Deception Statement*"). Thus, the determination of whether an advertisement is deceptive considers three elements: (1) the claims conveyed in the advertisement; (2) whether those claims are false or misleading; and (3) whether the claims are material. *In re Health Research Labs., LLC*, No. 9397, 2021 WL 5711355, at *5 (F.T.C. Nov. 19, 2021); *In re California Naturel, Inc.,* No. 9370, 2016 WL 7228668, at *5 (F.T.C. Dec. 5, 2016).

#### 2.    Claim Interpretation

The claim conveyed by an advertisement may be express or implied. Express claims directly state the representation at issue, while implied claims are any claims that are not express. *In re Kraft, Inc.,* No. 9208, 1991 WL 11008502, at *58 (F.T.C. Jan. 30, 1991), *aff'd sub nom.*

---

[14] Under the FTC Act, the Commission has jurisdiction over persons, partnerships, and corporations using unfair or deceptive acts or practices "in or affecting commerce." 15 U.S.C. § 45(a)(2). Respondent is a Delaware corporation that has its principal office or place of business in Mountain View, California. F. 1. Respondent has marketed TurboTax to consumers in the United States of America ("U.S.") online as well as through television advertisements and various other advertising channels. F. 46-50. Millions of Americans use Intuit's TurboTax Free Edition product, discussed in more detail *infra*. *See* F. 2, 5. Accordingly, the Commission has jurisdiction over Respondent with respect to its alleged deceptive acts and practices.

*Kraft, Inc. v. FTC,* 970 F.2d 311 (7th Cir. 1992). Implied claims "range from claims that would be virtually synonymous with an express claim through language that literally says one thing but strongly suggests another to language which relatively few consumers would interpret as making a particular representation." *In re Thompson Med. Co.*, 104 F.T.C. 648, 1984 FTC LEXIS 6, at *312 (Nov. 23, 1984).

'"Deception may be accomplished by innuendo rather than by outright false statements.'" *FTC v. Wilcox,* 926 F. Supp. 1091, 1098 (S.D. Fla. 1995) (*quoting Regina Corp. v. FTC,* 322 F.2d 765, 768 (3d Cir. 1963)); *FTC v. Capital Choice Consumer Credit, Inc.,* No. 02-21050 CIV, 2003 WL 25429612, at *4 (S.D. Fla. June 2, 2003) (same), *aff'd,* 157 F. App'x 248 (11th Cir. 2005). Thus, both express and implied claims may be deceptive. *Kraft,* 1991 WL 11008502, at *58.

The first step in determining the claim conveyed by an advertisement is to examine the advertisement itself (a "facial analysis"). *See POM,* 2013 WL 8364895, at *8; *Thompson Med.*, 1984 FTC LEXIS 6, at *313; *Cliffdale,* 1984 WL 565319, at *37. A proper facial analysis requires '"an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction.'" *POM,* 2013 WL 8364895, at *8 (*quoting Deception Statement*, 103 F.T.C. at 172). The determination of what claim is conveyed by an advertisement focuses on the common-sense, overall "net impression" of the advertisement for the reasonable consumer-viewer, rather than the literal truth or falsity of the words in the advertisement. *In re Traffic Jam Events, LLC*, No. 9395, 2021 WL 5124183, at *12 (F.T.C. Oct. 25, 2021); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp.2d 1167, 1189 (N.D. Ga. 2008), *aff'd,* 356 F. App'x 358 (11th Cir. 2009). In this regard, the advertisement must be viewed as a whole "without emphasizing isolated words or phrases apart from their context." *Removatron,* 884 F.2d at 1496 (*quoting American Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982); *see also FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) ("The entire mosaic should be viewed rather than each tile separately.").

Where claims are reasonably clear from the face of the advertisement, the finder of fact can rely "on its own reasoned analysis to determine what claims, including implied ones, are

PUBLIC

conveyed . . . ." *Kraft*, 970 F.2d at 319; *see also In re Stouffer Foods Corp.*, No. 9250, 1994 FTC LEXIS 196, at *9 (Sept. 26, 1994) ("If, after examining the interaction of all the different elements in the ad, the Commission can conclude with confidence that an ad can reasonably be read to contain a particular claim, a facial analysis is sufficient basis to conclude that the ad conveys the claim.").

"[W]hen confronted with claims that are implied, yet conspicuous, extrinsic evidence is unnecessary" because common sense and administrative experience provide adequate tools to make findings. *Kraft*, 970 F.2d at 319-20. However, if extrinsic evidence regarding the meaning of an advertisement is submitted by the parties, it will be considered. *POM*, 2013 WL 8364895, at *16-18.

### 3. False or Likely to Mislead

The determination of whether a representation or omission is deceptive is based on whether it is false or likely to mislead, not whether it has caused actual deception. *Deception Statement*, 103 F.T.C. at 172; *Thompson Med. Co. v. FTC*, 791 F.2d 189, 197 (D.C. Cir. 1986); *Trans World Accounts Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979) ("Proof of actual deception is unnecessary to establish a violation of Section 5."). The question of whether the claim is likely to mislead assesses the likelihood to mislead a consumer "acting reasonably under the circumstances." *Deception Statement*, 103 F.T.C. at 171; *Southwest Sunsites v. FTC*, 785 F.2d 1431, 1436 (9th Cir. 1986); *Wilcox*, 926 F. Supp. at 1098.

"[A] claim may be deceptive even though it is literally true." *Cap. Choice Consumer Credit*, 2004 WL 5149998, at *32. Moreover, a true statement can be false or misleading by omission. "The failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts." *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984); *see also Cap. Choice Consumer Credit*, 2004 WL 5149998, at *33.

If a "claim conveys more than one meaning, only one of which is misleading, a seller is liable for the misleading interpretation even if non-misleading interpretations are possible. Liability may be imposed if 'at least a significant minority of reasonable consumers [would be] likely to take away the misleading claim.'" *Fanning v. FTC*, 821 F.3d 164, 170-71 (1st Cir.

PUBLIC

2016) (*quoting Telebrands Corp.*, 140 F.T.C. 278, 291 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006)).

### 4.    Materiality

A representation is considered material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com,* 453 F.3d 1196, 1201 (9th Cir. 2006) (quotation omitted); *see also Kraft,* 970 F.2d at 322. "Information has been found material where it concerns the purpose, safety, efficacy, or cost of the product or service." *Deception Statement*, 103 F.T.C. at 190 (citing cases); *Thompson Med.,* 1984 FTC LEXIS 6, at *375.

### B.    Overview of Arguments of the Parties

Counsel representing the government on the Complaint ("Complaint Counsel") contends that Respondent engaged in a deceptive practice by advertising to consumers, for many years and through a variety of marketing channels, that they could file their taxes online for free using TurboTax. This advertising was false and/or likely to mislead consumers, according to Complaint Counsel, because two-thirds of taxpayers do not, in fact, meet the conditions and qualifications for TurboTax's free online tax filing offer. Complaint Counsel argues further that the cost of a product is a material fact influencing a consumer's choice with respect to a product. Therefore, Complaint Counsel concludes, Respondent engaged in deceptive advertising in violation of Section 5 of the FTC Act.

Respondent argues that Complaint Counsel has failed to prove that Intuit's advertising was deceptive. In summary, Respondent maintains that Intuit's advertising made clear to any reasonable consumer that the TurboTax free offering was limited, conditional, and not available to everyone; that the conditions and qualifications were sufficiently disclosed in its advertising and further available to consumers on its website; and that the relatively small proportion of consumer complaints and other extrinsic evidence rebut the assertion that Respondent's advertisements were misleading and demonstrate that reasonable consumers were not deceived.

### C.    Overview of the Initial Decision

As further explained below, Complaint Counsel has demonstrated that Respondent violated Section 5 by engaging in deceptive advertising. Numerous, widely distributed advertisements for TurboTax expressly or impliedly represented that the consumer-viewer would be able to file their taxes online for free using TurboTax, when, for a significant proportion of these consumers, this was simply untrue. Respondent's purported disclosures of the conditions and qualifications for the free online filing offer were typically inconspicuous, unclear, or otherwise insufficient to inform a reasonable viewer of the terms of the offer or to modify the dominant message of "free." In addition, Respondent's representations and omissions were material. Accordingly, the evidence proves that Respondent engaged in a deceptive practice, as defined by the FTC Act and applicable cases and authorities.

This Initial Decision first provides some background on Intuit and an overview of the advertising at issue. Next, the Initial Decision sets forth and explains the findings and conclusions regarding the deceptive claims and omissions contained in Respondent's video and radio advertising, and online advertising, including social media advertising, paid search advertising, and direct mail advertising. Thereafter, Respondent's affirmative defenses are addressed. Finally, the Initial Decision addresses the appropriate remedy.

### D.    Background

#### 1.    The TurboTax Products

TurboTax is the most widely used online tax preparation service in the country. F. 5. The TurboTax brand of online tax preparation products and services encompasses three categories of products – Do-It-Yourself ("DIY"), Live Assisted, and Live Full Service – that offer different levels of tax-filing assistance. F. 11.[15] Each category includes four different products, or "stock keeping units" ("SKUs"). F. 10, 15. The various SKUs cover different tax situations related to

---

[15] TurboTax DIY SKUs allow taxpayers to prepare and file their tax returns on their own; TurboTax Live Assisted SKUs allow taxpayers to prepare and file their tax returns themselves after receiving tax assistance, including a final review before filing; and TurboTax Live Full Service SKUs provide taxpayers with a tax specialist who prepares and files a customer's tax return entirely on the customer's behalf. F. 12-14. TurboTax has at times offered a limited promotion of free assisted SKUs, referred to as TurboTax Live Basic. F. 17-18.

the level of complexity of the consumer's taxes, which is tied to the type of income and/or deductions the taxpayer has. F. 15; *see also* F. 16-18.

Since at least 2016, Respondent has offered a free version of TurboTax for individuals filing income taxes. F. 19; *see also* F. 22-31. The free version of TurboTax was called "Federal Free Edition" for tax year ("TY")[16] 2016 and "TurboTax Free Edition" thereafter. F. 19. From TY 2014 to TY 2017, Intuit offered a promotion, called AbsoluteZero, which allowed customers using a free Turbo Tax SKU, such as TurboTax Free Edition, for their federal taxes to also prepare and file their state tax returns for free during the first five weeks of the tax-filing season (later expanded to the first fifteen weeks of the tax filing season). F. 23.[17] In TY 2018, Intuit began offering free federal and state returns to TurboTax Free Edition customers for the entire year. F. 24.

TurboTax Free Edition is available only to taxpayers with "simple tax returns," as defined by Intuit. F. 20. Intuit has changed the definition of simple tax returns over time to reflect changes made by the United States Internal Revenue Service ("IRS"), such that which consumers could file for free with TurboTax has varied depending on the tax year. F. 25.

For TY 2016 and TY 2017, Intuit defined simple tax returns as those that could be filed with an IRS Form 1040EZ or Form 1040A. F. 26. In response to tax reform legislation passed by Congress effective in TY 2018, the IRS eliminated Form 1040EZ and Form 1040A and substituted a new Form 1040. F. 28. Form 1040 then became the most basic individual tax form. F. 28.

After the IRS discontinued Form 1040EZ and Form 1040A, Intuit changed its definition of simple tax returns for TY 2018 and TY 2019 to mean returns that could be filed on a Form 1040, with no attached schedules. F. 29. For TY 2020, Intuit modified its definition of simple tax returns to mean returns that could be filed on a Form 1040, with no attached schedules, except to

---

[16] For purposes of this Initial Decision, the reference to a tax year (TY) in which an advertisement appeared refers to the period considered by Intuit to be the tax season for a particular calendar year, generally the period from November to April. F. 7-8, 51 n.7.

[17] Because the name of the free state tax filing promotion from TY 2014 to TY 2017 was "AbsoluteZero," Intuit used the AbsoluteZero name in its advertising during that time period. F. 23.

claim unemployment income. F. 30. For TY 2021, Intuit modified its definition of simple tax returns to mean returns that could be filed on a Form 1040, with certain attached schedules to cover distinct tax situations, including student loan interest. F. 31.

Many taxpayers do not meet Intuit's definition of "simple tax returns" and therefore do not qualify for Turbo Tax Free Edition. F. 35. This includes taxpayers with mortgage and property deductions, itemized deductions, unemployment income, education expenses, charitable donations of over $300, investment or rental property income, and expenses from self-owned businesses. F. 38. Approximately two-thirds of taxpayers (approximately 100 million taxpayers) are not eligible to file for free using TurboTax Free Edition. F. 36-37.

Taxpayers who are not eligible for TurboTax Free Edition may utilize one of Intuit's paid products, such as TurboTax Deluxe, TurboTax Premium, or TurboTax Self-Employed. F. 40-43. Taxpayers who are not eligible for TurboTax Free Edition may begin preparing their taxes in Free Edition, but upon entering disqualifying information, taxpayers are presented with a screen that informs them that they need to upgrade to a paid product in order to complete their return using TurboTax. F. 39-40. Upgrading to a paid version of TurboTax can cost a taxpayer up to $119 to file their taxes using a Do-It-Yourself version. F. 44.

## 2. Intuit's Advertising

Intuit offers a free version of TurboTax with the hope that those customers who use it will return to TurboTax and choose its paid products in future years as their tax complexity evolves. F. 21. While Intuit advertises for its free and paid TurboTax products, as well as the TurboTax brand generally, Intuit's advertising for TurboTax Free Edition raises awareness for the TurboTax brand in general. F. 46-47. Intuit's advertising for its TurboTax free products has been widely disseminated throughout the U.S. F. 50.

Since at least 2015, Intuit has extensively promoted TurboTax online filing products, including its free versions, such as TurboTax Free Edition, using numerous advertising channels, including television and radio advertisements and online video and display advertisements. F. 49; *see* section II.B.2-4. More specifically, Intuit has advertised its TurboTax free tax filing products through social media platforms such as Facebook, Instagram, Twitter (now known as X),

Snapchat, and TikTok, and on video platforms such as YouTube. F. 56; *see* section II.B.4. Intuit has also used paid search advertising through which Intuit bids on keywords to return a TurboTax advertisement at the top of an online search results page when consumers search for those keywords. F. 57; *see* section II.B.6. In addition, Intuit has engaged in direct email marketing. F. 58; *see* section II.B.5.

As detailed in the facts and addressed below, from TY 2018 through TY 2021, Intuit ran an advertising campaign referred to within Intuit as "The Power of Free," in which the word "free" is essentially the only word used or spoken in the advertisements, except for a voice-over at the end of the advertisement (referred to herein at times as the "free, free, free" campaign or "free, free, free" advertisements). F. 52. From TY 2018 through TY 2021, Intuit aired "free, free, free" television advertisements at least 84,356 times across at least 721 television networks. F. 53. This included television networks in every state in the country. F. 53. Online video advertisements placed by Intuit, principally on YouTube, for TY 2020 and TY 2021, reflect a continuation of the "free, free, free" campaign. *See* F. 291-317. These video advertisements were viewed millions of times. *See* F. 222.

### E.      Deceptive Advertising

#### 1.      Claim Conveyed

##### a.      Facial Analysis

###### i.      Television and Radio Advertising

####### (a)      Summary of Advertising

A 60-second television advertisement referred to as the "Boston Tea Party" advertisement aired during the 2015 Super Bowl. F. 67. The advertisement depicts a fictionalized version of the Boston Tea Party and interposes the following during the "battle":

> FIRST REVOLUTIONARY: No taxation without represent . . .
>
> FIRST BRITISH SOLDIER: Yes, yes, we hear you on the tax thing.
>
> SECOND BRITISH SOLDIER:  But what if it were free to file your taxes?

PUBLIC

SECOND REVOLUTIONARY: Like, free free?

SECOND BRITISH SOLDIER: Yes, yes. You'd pay nothing. Not a thing. No thing.

THIRD REVOLUTIONARY: Well alright then!

[music]

FOURTH REVOLUTIONARY: Alright then!

F. 67. While the scene shows George Washington and the revolutionaries retreating in a boat, a voice-over begins:

Okay, so maybe that's not exactly how it went down, but you can file on TurboTax for absolutely nothing. Intuit TurboTax. It's amazing what you're capable of.

F. 67.

Near the end of the Boston Tea Party advertisement, during the voice-over and while the screen action continues, a screen appears referencing TurboTax Federal Free Edition and "AbsoluteZero." The following relevant language appears at the bottom of the screen in small, white print:

TurboTax Federal Free Edition is for simple U.S. returns only. Offer may end without notice. See offer details at TurboTax.com.

F. 68.

A 30-second advertisement that aired during the 2016 Super Bowl, titled "Never a Sellout," shows a purported interview with the actor Sir Anthony Hopkins. F. 69. The interview includes the following relevant exchange:

INTERVIEWER: Sir Anthony Hopkins, every actor at some point considers selling out.

SIR ANTHONY HOPKINS: I would never tarnish my name by selling you something. Now, if I were to tell you to go to turbotax.com, it's because TurboTax AbsoluteZero lets you file your taxes for free.

INTERVIEWER: You're . . . you're not selling anything.

164

> HOPKINS: It's free. There's nothing to sell. Come here, TurboTax.com. [dog
> wearing TurboTax.com vest jumps on his lap] Such a good girl,
> TurboTax.com.

F. 69. As the interview proceeds, for approximately three seconds, small, white print at the
bottom of the screen displays the same relevant language as that at the end of the Boston Tea
Party advertisement, *i.e.*, "TurboTax Federal Free Edition is for simple US returns only. Offer
may end without notice. See offer details at TurboTax.com." F. 70.

Respondent's television advertisements for TY 2017 set up humorous or ironic situations
between characters, which culminate in the statement, "At least your taxes are free" or "With
TurboTax AbsoluteZero, at least your taxes are free." F. 71, 73, 81, 85, 89; *see also* F. 76 ("[A]t
least my taxes are free."). Some advertisements also displayed the TurboTax AbsoluteZero logo.
F. 87, 91. As with the 2015 and 2016 Super Bowl advertisements, these TY 2017 television
advertisements very briefly displayed – at varying points in the advertisements, while the action
proceeded in the background – white, small print lettering. The relevant language in these
advertisements consisted of: "For simple U.S. returns. Offer may end without notice, customer
must file taxes before offer ends to file for free. See offer details at TurboTax.com" (F. 82, 90) or
"AbsoluteZero product only. For simple U.S. returns. Offer may end without notice, customer
must file taxes before offer ends to file for free. See offer details at TurboTax.com." F. 72, 74,
77-78, 86.

For TY 2018 through TY 2021, Respondent ran television advertisements, of varying
lengths ranging from 15 to 60 seconds, that can be characterized as the "Free, Free, Free"
advertisements. These advertisements present situations, such as a lawyer before a jury (F. 92-
94, 97-98), contestants in a game show (F. 120-121, 129-130), competitors in a spelling bee
(F. 160-161, 164, 167, 171-172), an auctioneer (F. 176-177), or a dance workout instructor
(F. 182-183), in which virtually the only word spoken is the word "free." As an example, the
"Lawyer" advertisement consists of a lawyer making an impassioned summation before a jury,
as follows:

PUBLIC

LAWYER: Free free free free free free free free free. Free free free. Free free free. Free free free free free free. Free free free free free free free free free. Free free free free free!

JUROR: (applauding) Free!

OTHER JURORS: Free. Free. Free.

UNIDENTIFIED VOICES: Free free free.

F. 94, 98; *see also* F. 102-105, 108-110, 112-113, 115-116 ("movie credits" advertisement, where the "credits" all read "free"); F. 134-135, 139-140 ("court reporter" advertisement, where a court stenographer reads back a transcript consisting only of the word "free"); F. 144-145, 148-149 ("crossword" advertisement, where all the answers are "free"); F. 152-154 ("big kick" advertisement in which a father and son play football and speak only the word "free"); F. 188-190 ("dog show" advertisement, in which "free" is the only word spoken by the judge and the dog handler).

A voice-over at the end of many TY 2018 and TY 2019 television advertisements stated, "That's right. TurboTax Free is free. Free, free free free." F. 94, 98, 104, 122, 126, 131, 136; *see also* F. 146, 150, 155, 162, 165, 168 ("That's right. TurboTax Free is free."). These "free, free, free" advertisements included, for a few seconds toward the end of each advertisement, during the voice-over, a screen featuring the TurboTax logo, the repeated written word "free" and small, white lettering at the bottom that read: "Free Edition product only. For simple U.S. returns. Offer subject to change. See details at turbotax.com." F. 95-96, 99-100, 106-107, 111, 114, 122-123, 126-127, 136-137, 147, 155-158, 162-163, 165-166, 168-169.

PUBLIC

A representative screen is set forth below:



F. 96.

In TY 2020 and TY 2021 television advertisements, after stating, "That's right. TurboTax Free Edition is free," the voice-over added: "See details at TurboTax.com." F. 179, 183 190. Beginning in TY 2019 for some television advertisements and continuing for television advertisements in TY 2020 and TY 2021, the small white print at the bottom of the screen at the end of the advertisements read: "TurboTax Free Edition is for simple U.S. returns only. See if you qualify at turbotax.com. Offer subject to change." F. 117, 131-132, 141-142, 150-151, 173-174, 178-179, 184-185, 191-192. A representative screen is set forth below:

PUBLIC



F. 179.

Respondent also aired on television for TY 2021 an advertisement referred to as the "Steven/Spit Take" advertisement. F. 195-202. These 14 to 28-second advertisements promoted a free version of "TurboTax Live," which offered free filing with the help of an expert. The longer version of this advertisement is described below:

> VOICE-OVER: Steven, did you know that TurboTax is free no matter how you want to file?
>
> [Steven spits out mouthful of coffee]
>
> Steven: I don't believe that.
>
> VOICE-OVER: It's true. Anyone with a simple tax return can get help from an expert, for free.
>
> [Steven spits out coffee again]
>
> Steven: That can't be true.
>
> VOICE-OVER: It is and with TurboTax Live our experts will even do your taxes for you for free.
>
> [Steven spits coffee a third time]
>
> Other man: Honestly, that sounds amazing.

PUBLIC

> VOICE-OVER: For a limited time, TurboTax is free for simple returns no
> matter how you file.

F. 199. At the end of the 28-second Steven/Spit Take advertisement, during the voice-over, wording appears in the middle of the screen that reads, "Intuit TurboTax Live," and the "simple returns" language from the voice-over is included in small, white print at the bottom of the screen. F. 200 ("For simple tax returns only. See if you qualify at turbotax.com. Must file by 2/15 for free offer. Offer subject to change.").

Respondent also placed radio advertisements for TY 2020 and TY 2021 that paralleled the structure of the "free, free, free" television advertisements. These advertisements consisted of a jingle where the only word sung is "free." F. 204-205, 208-209, 212-213, 216-217. As in the television advertisements summarized above, a voice-over near the end of the radio advertisements states, "That's right, TurboTax Free is free. Free, free free free." F. 206, 210*; see also* F. 214, 218 ("That's right, TurboTax Free Edition is free. Free, free free free."). For the radio advertisements, the voice-over is immediately followed by another voice-over, stating in a rapid cadence: "Free Edition product only. For simple U.S. returns. Offer subject to change. See details at turbotax.com." F. 207, 211, 215, 219.

### (b)    Claim Conveyed

As stated above, where a claim is reasonably clear on the face of an advertisement, a facial analysis is legally sufficient to determine the claim conveyed, including implied claims. *Kraft*, 970 F.2d at 319-20. As detailed in section II.B.2, 3 and summarized above, Respondent disseminated advertisements through television and radio that, on their face, either expressly or by strong implication claimed that the consumer viewing or hearing such advertisements can file their taxes for free with TurboTax. For example, the Boston Tea Party advertisement states, expressly, "you can file on TurboTax for absolutely nothing." F. 67. The free filing claim is clearly implied in other advertisements, particularly in the "free, free, free" advertisements. The unrelenting repetition of the word "free," combined with the assertion, "That's right. TurboTax Free [or TurboTax Free Edition] is free. Free, free free free," expressly or clearly implies that TurboTax is free for the viewer. *E.g.*, F. 94, 104, 122, 136, 206, 214; *see also* F. 146, 155, 162 ("That's right, TurboTax Free is free"), F. 177, 190 (That's right. TurboTax Free Edition is

169

PUBLIC

Free."); F. 71, 73, 81, 85, 89 (television advertisements for TY 2017 stating that "At least your taxes are free"). At a minimum, a facial analysis supports a conclusion that at least a significant minority of reasonable consumers would take away the claim that they can file their taxes for free with TurboTax. *See Deception Statement*, 103 F.T.C. at 177 n.20 (noting that a reasonable interpretation is one that would be shared by a "significant minority" of reasonable consumers).

Respondent maintains that its advertising conveyed to consumers that its free tax filing offer was limited, and not necessarily free for everyone. Specifically, Respondent asserts the advertising disclosed to viewers (1) that the free filing offer was only for a specific TurboTax free product (SKU), (2) that a consumer's ability to use the free SKU was tied to the complexity of that consumer's tax return (*i.e.*, "simple" tax returns), and (3) that there was additional information about the SKU and its qualifications on the TurboTax website. RB at 37. Respondent argues that these disclosures should be included in assessing the overall net impression of the advertisement. These disclosures have been considered, and for the reasons explained below, they are insufficient to alter the overall net impression that the consumer viewing the advertisement could file their taxes for free with TurboTax.

In evaluating Respondent's disclosures, the power of a "free" claim must be considered. As a general matter, it is well established that disclosures or qualifications must be clear and conspicuous in order to modify the dominant message in an advertisement. *See Removatron*, 884 F.2d at 1497 ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression."); *see also Deception Statement*, 103 F.T.C. at 184 ("Qualifying disclosures must be legible and understandable."). Given the power of "free" messaging, the need for the advertiser to provide clear and conspicuous disclosures of any limitations or conditions is particularly strong. "The word 'free' is a lure. It is the bait. It is a powerful magnet that draws the best of us against our will 'to get something for nothing.'" *In re Book-of-the-Month Club, Inc.*, 48 F.T.C. 1297, 1952 WL 104729, at \*14 (May 8, 1952). "The astute advertiser well knows that once the average mind has received the impression conveyed by the meaning of the word 'free' it can never be completely eradicated by any other words of explanation or contradiction." *Id.*; *cf. FTC v. Mary Carter Paint Co.*, 382 U.S. 46, 47 (1965) (referring to the word "free" as "commercially exploitable").

PUBLIC

Respondent first asserts that its advertisements conveyed that the free offer only applied to TurboTax's free products, such as TurboTax Free Edition, and that this disclosure notified the consumer that the free offer was not unlimited. As a preliminary matter, some of the television advertisements at issue do not specify a particular free product, such as TurboTax Free Edition, or do so in small, inconspicuous lettering. F. 63. The radio advertisements that mention TurboTax Free Edition do so at a significantly faster speed than the content of the rest of the radio advertisement. F. 207, 211, 215, 219. Even if a consumer perceived that the advertisement was limited to a TurboTax free product, such as TurboTax Free Edition, the inclusion of the product name does not disclose anything about potential limitations on the free offer. Without any further disclosures, the mere name of the product is unlikely to dispel a viewer's impression that TurboTax Free Edition, AbsoluteZero, or TurboTax Basic, was free for them. In fact, the reference to AbsoluteZero could be interpreted as reinforcing the "file for free" claim, rather than detracting from it.

Respondent also points to written words appearing in many of the television advertisements which referred to "simple returns" or "simple returns only."[18] However, this purported disclosure was not conspicuous. In virtually all the television commercials, this disclosure was in small print and located at the bottom of the screen. F. 64. In many of these advertisements, the small font was relatively faint in color and was virtually lost against the other larger, bolder, printed messages, such as the TurboTax logo and the adjacent word(s), "free." F. 65. Small print disclosures such as those used by Respondent that are not readily visible are generally insufficient to alter the otherwise dominant impression of an advertisement. *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1214, 1220-221 (D. Nev. 2011), *vacated in part on other grounds*, 763 F.3d 1094 (2014); *Deception Statement*, 103 F.T.C. at 183. In addition, these disclosures in Respondent's television advertisements typically appeared near the end of the advertisement and lasted only a few seconds. F. 66. Moreover, the disclosures often appeared against a backdrop of other sounds or moving images, including at times a voice-over simultaneously reinforcing the "free" claim. F. 66. The disclosures in the "free, free, free," radio advertisements were stated at the end of the advertisement, after the repetitive singing of the

---

[18] Based on calculations of Respondent's expert witness, Professor Peter Golder, Ph.D., 10% of Intuit's "free" advertising did not include the language regarding "simple returns only." F. 61.

PUBLIC

word "free", and after a voice-over reinforcing the "free" claim, F. 204-219. Furthermore, these stated limitations were played in a very rapid cadence in comparison to the free messages in the advertisements. F. 207, 211, 215, 219. All of these factors detract from a consumer's ability to hear and comprehend the purported limiting conditions.

In addition, the interjection of "simple tax returns" tends to contradict the generalized "free" claim that dominates the advertisements, and thereby injects an ambiguity that serves to confuse the viewer. Confusing or ambiguous qualifiers are, by definition, not "clear." *See In re Daniel Chapter One*, No. 9329, 2009 FTC LEXIS 157, at \*215 (Aug. 5, 2009). Indeed, qualifications must be unambiguous in order "to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Removatron*, 884 F.2d at 1497; *see also Deception Statement*, 103 F.T.C. at 184 (noting that qualifying disclosures must be both legible and understandable). To the extent Respondent's advertisements could be interpreted as conveying *either* an unqualified free offer available to the viewer *or* a qualified offer that may not apply to the viewer, such ambiguity is construed against the advertiser. *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("Advertising capable of being interpreted in a misleading way should be construed against the advertiser.").

Finally, Respondent relies on language on the disclosure screen stating "see details" or "see if you qualify" on the TurboTax website as evidence that the advertisement notified the viewer that the free offer was not necessarily free for them. This language, which, like Respondent's other purported disclosures, appeared briefly in small, typically faint print, or was speedily announced at the end of the radio advertisements, was not conspicuous. In addition, such boilerplate or "pro forma statements" such as "see details" or "see if you qualify" are unlikely to alter the overall net impression of an advertisement. *Deception Statement,* 103 F.T.C. at 183. At best, such messages create ambiguity in Respondent's dominant "free" messaging rather than materially modify it.

### ii.    Online Advertising

As noted above, Respondent uses online advertising to reach consumers. F. 49, 56. Online advertisements include display advertisements, such as banners displayed on websites,

172

and display or video advertisements placed on social media sites such as TikTok, Facebook, or Snapchat. F. 220. Respondent's online advertisements were widely disseminated. F. 50. In TY 2020 and TY 2021, TurboTax Free online advertisements generated over 15 billion impressions and were clicked on over 130 million times.[19] F. 221-222.

### (a)    Online Video Advertisements

The online video advertisements placed by Intuit, principally on YouTube, for TY 2020 and TY 2021 reflect a continuation of the "free, free, free" campaign widely distributed on television from TY 2018 through TY 2021. *See* F. 291-317. Intuit's online video advertisements were viewed millions of times. *See* F. 222, 300, 308.

An example of the online video advertisements placed on YouTube for TY 2020 is a video consisting solely of a woman hiking, yelling "free" when reaching the top of a mountain, and listening as the word "free" echoes back (the "Echo" advertisement). F. 291. In a similar vein, a YouTube video advertisement placed for TY 2021 depicts a teenage boy and teenage girl appearing to reconcile their relationship while communicating through only the word "free" (the "Teen Love" advertisement). F. 317.

At the end of both the Echo and Teen Love advertisements, a screen appears referencing TurboTax Free Edition, but the reference is immediately adjacent to repetition of the written words "free, free, free, free," as shown below:

---

[19] Complaint Counsel's exhibits include 43 static display advertisements, 47 non-static display advertisements, and 19 online video advertisements offered in support of its claim of deceptive advertising. All of these exhibits have been reviewed, but fact findings have not been included for each advertisement exhibit. Some advertisement exhibits were incomplete. Moreover, it is unnecessary to undertake fact findings and a facial analysis of each proffered exhibit, particularly where, as here, doing so would not affect the outcome in the case. *In re Amrep Corp.*, 1983 FTC LEXIS 17, at *566-67.



F. 293, 317. The written words "free, free, free" are also reinforced by a voice-over ("That's right. Turbo Tax Free Edition is free. Free, free, free, free."). F. 293, 317.

In both the Echo and Teen Love advertisements, the purported qualification for "simple U.S. returns only" is in very small print. F. 292-293, 317. Although the wording of the concluding disclosure screens is modified from that of the "free, free, free" television advertisements – stating "See if you qualify at turbotax.com" instead of "See details at turbotax.com" (*compare* F. 292-293, 317 *with* F. 96, 106, 123, 137, 147, 156, 163) – viewed in their entirety, the final screen disclosures in the Echo and Teen Love online video advertisements are materially the same as those in the "free, free, free" television advertisements.

Intuit's other online video advertisements for TY 2020 and TY 2021 that materially replicate the claims and purported disclosures in the TurboTax television advertisements include:

- the "Auctioneer" advertisement, F. 177, 297 (AUCTIONEER: And free, and free, and free, and free, and free. Now a bidder and free! Now give me another bidder and free and a free here and a free free free a free free free. Now a bidder and free! Now give me another bidder and free, and a free free free. And free, and free, and free, and free free and free. Here we go at free, free, free, and freeeeeeeeeeee. Free! VOICE-OVER: That's right. TurboTax Free Edition is Free. See details at TurboTax.com");

- the Dance Workout advertisement, F. 183, 306-307, 310-312, 314, (DANCE WORKOUT INSTRUCTOR: Free! And free! And free! And free! Free. And free, and free. Free free. And free, and free, and free, and

174

free, and free. VOICE-OVER: That's right, TurboTax Free Edition is free. See details at TurboTax.com"); and

- the Dog Show advertisement, F. 190, 315 (DOG SHOW JUDGE: Free, free, free! WINNING DOG HANDLER: Free! Free! VOICE-OVER: That's right, TurboTax Free Edition is free. See details at TurboTax.com").

The final screens with purported disclosures in the foregoing advertisements are also materially the same as the television versions of these advertisements. *Compare* F. 178-179, 184-185, 191-192, *with* F. 298-299, 306-307, 310-312, 315.

As with the television advertisements addressed in section III.E.1.a.i above, based on a facial analysis, the unrelenting repetition of the word "free" in the online video advertisements, combined with the assertion, "That's right. TurboTax Free Edition is free. Free, free free free," expressly conveys – or at a minimum clearly implies – that TurboTax is free for the viewer. Thus, a facial analysis supports a conclusion that at least a significant minority of reasonable consumers would take away the claim that they can file their taxes for free with TurboTax. And, as with the "free, free, free" television advertisements, the small print, relatively faint lettering displayed briefly at the end of the advertisement referencing "simple returns only" was inconspicuous and virtually lost against the larger, bolder, printed words, and the voice-over stating, "free, free, free, free." To the extent any consumer would perceive the purported limitation to "simple returns," the language tends to contradict the dominant message of "free," and thereby interjects confusion and ambiguity into the advertisement, which should be construed against the advertiser. Similarly, the small print lettering stating "See if you qualify" was not conspicuous and, even if visible, is in the nature of a "pro forma" statement" that is unlikely to alter the overall net impression of an advertisement. *Deception Statement*, 103 F.T.C. at 183.

Finally, while the online video advertisements reference TurboTax Free Edition in writing and by voice-over, the inclusion of the product name does not itself signify any limitation on who qualifies for the free offer or disclose any qualification criteria. Without any further information, the product name TurboTax Free Edition is unlikely to dispel a viewer's impression that the product is free for them. In fact, juxtaposing the

PUBLIC

"Free Edition" name to the written and audible words "Free, free, free, free" serves to reinforce the "file for free" claim, rather than to detract from it.

(b)    <strong>Display Advertisements</strong>

Intuit placed numerous display advertisements online for TY 2020 and TY 2021, including on social media and other websites, that contained prominent, express claims that filing with TurboTax online was "FREE" and/or cost "$0." *See* F. 230-256. Clicking on the display advertisements for TurboTax Free Edition takes the viewer to the general landing page for that product on the TurboTax website. F. 225.

The purported limiting qualifications upon which Respondent relies – *i.e.,* inclusion of a specific TurboTax free product and a reference to "simple returns only" – are not, in many of Respondent's display advertisements, sufficient to alter the dominant, facially clear claim that filing online with TurboTax was free to the consumer viewing the advertisement. In many cases, the language, "simple returns only," or its variants, was much less prominent than other elements of the advertisements, especially the language or images of "FREE" or "$0." F. 226. Similarly, where the display advertisements at issue contain the name of a TurboTax free product, such as TurboTax Free Edition or TurboTax Live Basic, they do so in significantly smaller, and/or lighter, less noticeable font, compared to the "TurboTax" logo. F. 228. Representative examples of such advertisements are set forth below:



F. 233; *see also* F. 236, 254.



F. 234; *see also* F. 238, 243, 252.

A facial analysis of the display advertisements in TY 2020 and TY 2021, such as the foregoing, in which the representations of "FREE" and/or "$0" clearly dominate the relatively inconspicuous words of qualification or limitation, supports the conclusion that at least a significant minority of reasonable consumers would take away the impression that they could file for free using TurboTax.

Some of the display advertisements at issue show the phrase "simple tax returns only" in a way that is arguably more conspicuous, for example, by showing the words directly adjacent to the free claim and in a noticeable font size and appearance. Examples are shown below:



F. 232.



F. 231.



F. 266.

PUBLIC



F. 261.

Some of the online video display advertisements at issue also have an accompanying voice-over. F. 270. In these, some begin with a voice-over stating, "Simple tax returns only. File your federal and state taxes for free. Guaranteed." F. 271. In others, the voice-over stating "simple tax returns only" is at or near the end. F. 272. A representative example is GX581, which includes the screenshot below and a voice-over that states: "File your taxes free, your way. Do it yourself free. Get unlimited advice from tax experts free or have an expert do it all for you. 100% free. Only from TurboTax. Simple tax returns only. Must file by February 15th."



F. 284.

PUBLIC

Even if advertisements disclosing a "simple returns only" limitation in conspicuous written language and/or in voice-over are reasonably interpreted as making a qualified or limited free offer, as urged by Respondent, this would not negate a finding that at least a significant minority of reasonable consumers could take away the impression that TurboTax tax filing was free for them. The advertisements themselves do not include any of the material terms of such limitations. Without further information on the face of the advertisement, the language "simple returns only" tends to render the free offer (often stated as "guaranteed") ambiguous and confusing at best. Such ambiguity in an advertisement is construed against the advertiser. *Resort Car Rental*, 518 F.2d at 964; *Daniel Chapter One*, 2009 FTC LEXIS 157, at *215.

Notwithstanding the foregoing, extrinsic evidence relevant to the potential effect of the purported disclosures of "simple returns only" and the Free Edition product name on the message conveyed to consumers will be considered *infra.*

### iii.    Email Advertisements

Intuit sends email advertisements, including those for TurboTax Free Edition, to individuals who had previously used TurboTax or started their return in TurboTax but had yet to complete it. F. 330. Typically, the emails begin with prominent representations that the recipient can file for free with TurboTax. *E.g.*, F. 319-323, 328. Two examples of the beginning portions of the emails at issue are set forth below:

180

PUBLIC

### *** (Please Sign in to Your Account) E-File With Direct Deposit for Your Fastest Refund

Received: Friday, January 15, 2021 7:26 PM

From: TurboTax TurboTax@em1.turbotax.intuit.com

To: 



F. 321.

PUBLIC



F. 323.

The asterisk in GX477, displayed in F. 323 above, next to the reference to "simple returns only," was tied to lengthy disclosure language toward the bottom of the email, the material portion of which is set forth below:

182

PUBLIC



F. 323. Other emails in the record also included asterisks adjacent to "simple returns only."
F. 319-322 (GX171, GX172, GX181, GX480).[20]

Many of the email advertisement exhibits in the record did not reference a specific TurboTax product in the subject line or in the body of the email, and/or failed to conspicuously display the specific product name upfront in the email. F. 332. Moreover, email advertisements that contained a reference to the TurboTax AbsoluteZero promotion tended to place and highlight the AbsoluteZero reference in a way that reinforced the claim that filing with TurboTax cost "$0." F. 333. In addition, in the email advertisement exhibits in the record that contained language such as "1040EZ/A" or "simple tax returns only" or "for simple tax returns," the language was presented in a significantly smaller and/or lighter, less noticeable font, in comparison to the words or images "free" or "$0." F. 334. A number of email advertisements included what appear to be color-contrasted hyperlinks, including one embedded in the phrase simple returns only and others directing consumers to "guarantees, disclaimers and other important information." F. 322, 329, 335.

---

[20] Complaint Counsel's investigator, without explanation, provided email advertisement exhibits GX171, GX172, GX181 and GX480 in partial form only, omitting potential text that may have been associated with the asterisks shown on those exhibits next to the phrase "simple tax returns only." F. 318, 324-325. It is being inferred that the asterisks in those email advertisements would have been associated with language materially the same as the language in GX477, which was provided in full. F. 326-327.

While the email advertisements at issue contain conspicuous representations of "free," extrinsic evidence will be considered to determine the likely effect of the advertisements' disclosures on the overall net impression conveyed.

### iv.    Paid Search Advertisements

Paid search advertising refers to advertisements whose placement on an online search engine results page is based on an auction marketplace. F. 337. Intuit bids on a variety of keywords in an auction marketplace, and if Intuit is the highest bidder, a TurboTax advertisement would appear at the top of the online search results page when consumers search for those keywords. F. 337. Intuit writes and approves the text of the advertisement, including the text of the headline and sub-headline that appear in the online advertisement. F. 337. In TY 2021, over 20% of consumers who arrived at the TurboTax website did so after clicking on paid search advertising. F. 338. Consumers who clicked on paid search advertisements for TurboTax Free Edition were taken directly to the TurboTax Free Edition page on TurboTax's website, referred to as a "landing page." F. 345.

Intuit's paid search advertisements varied over time between TY 2019 and TY 2021. *See* F. 339-344. For TY 2019, in response to a Google online search for "free file" on July 10, 2020, the advertisement shown in relevant part below appeared, with the headline, "TurboTax® Free Tax Filing – E-file Your Taxes For Free."

**Ad** · turbotax.intuit.com/free/efile ▾

TurboTax® Free Tax Filing - E-file Your Taxes For Free

Fast, Easy And 100% **Free** Tax Filing With TurboTax®. $0 Federal. $0 State. $0 To **File**. Over 50 Million Americans Can **File** With TurboTax® **Free** Edition. Get Your Taxes Done Today.

F. 340. A substantially similar advertisement appeared, also on July 20, 2020, in response to a Google online search for the phrase "free file taxes ONLINE." F. 339 ("TurboTax® Official Site – 100% Free Online Tax Filing."). Neither of the foregoing paid search advertisements specified a TurboTax free product or referenced any qualifications for the offer, such as "simple returns only."

A Google online search on January 11, 2021 for the phrase "IRS taxes for free" produced a TurboTax advertisement with the headline: "$ 0 Fed. $ 0 State. $ 0 to File. – TurboTax®

184

Official Site" but with a sub-headline noting qualifications for the offer, including "Free For Simple Tax Returns Only." F. 341. The relevant portion of the advertisement is set forth below:



F. 341.

An advertisement in response to a Bing online search on March 31, 2022 for the phrase "file my taxes for free" returned an advertisement with the headline "TurboTax® Free Edition | $ 0 Fed. $ 0 State. $ 0 To File," and sub-headline stating, "Free For Simple Tax Returns Only with TurboTax® Free Edition," as shown in the relevant portion printed below:

F. 342. Substantially similar advertisements for TY 2021 were provided in response to the same or similar online searches in Google. F. 343-344.

Intuit's paid search advertisements for TY 2019 contain headlines and sub-headlines that expressly convey that the recipients of the advertisement can file their taxes for free with TurboTax (*i.e.*, "TurboTax® Free Tax Filing – E-file Your Taxes For Free. . . . Fast, easy and 100% free"). Alternatively, to the extent the claims are not clearly express claims, a facial analysis of these advertisements supports the conclusion that at least a significant minority of reasonable consumers would take away the message that they can file their taxes for free with TurboTax.

Intuit's paid search advertisements for TY 2020 and TY 2021 maintain the unequivocal headline that TurboTax tax filing is free ("$0 Fed. $ 0 State. $ 0 to File"), but attempt to qualify that message in a sub-headline referencing "for simple returns only." The font size and color of

this purported disclosure, however, makes the disclosure inconspicuous in relation to the bold, larger headline of the advertisement. Moreover, as in the case of Respondent's other advertisements using the phrase "simple returns only," the material terms of this purported limitation on the "free" offer are not disclosed. In addition, in interpreting the meaning of the advertisements to a consumer, it is relevant that a consumer conducting an Internet search for "free tax filing," or similar words, is likely seeking that service, and potentially more primed to focus on the "free" representations, which are responsive to the search, rather than on less conspicuous qualifications. Furthermore, the impact of adding the product name Free Edition to the TurboTax headline in Intuit's TY 2021 paid search advertising, as a limitation or qualification on the "free" offer, is not apparent. Indeed, the name Free Edition arguably reinforces the "free" claim presented in the headline. For the foregoing reasons, a facial analysis supports the conclusion that at least a significant minority of reasonable consumers would take away the impression that they could file their taxes for free online with TurboTax. Nevertheless, extrinsic evidence relevant to the potential effect of the purported disclosures of "simple returns only" and the Free Edition product name on the message conveyed to consumers will be considered.

## b.    Extrinsic Evidence

As held above, a facial analysis demonstrates that Respondent disseminated advertisements that represented either expressly or by strong implication that consumers could file their taxes online for free using TurboTax. Moreover, in most cases, the purported limiting disclosures, such as a limitation to TurboTax Free Edition or to "simple tax returns," where these disclosures appeared at all, were inconspicuous or ambiguous, and therefore insufficient to alter the dominant "free" message of those advertisements. While extrinsic evidence is unnecessary to support the foregoing conclusions, relevant extrinsic evidence submitted by the parties has been considered. *See POM*, 2013 WL 8364895, at *16 (considering extrinsic evidence submitted by the parties, "[e]ven though only a facial analysis [was] necessary to determine" that the respondent "made the claims alleged by Complaint Counsel").

PUBLIC

Particularly relevant is evidence bearing on the question of how consumers would interpret the purported limitations, where such limitations, especially the phrase "simple returns only," were visible and/or communicated audibly.

### i. Standards for Acceptable Extrinsic Evidence

Extrinsic evidence that is relevant to interpreting advertising claims includes, but is not limited to, "reliable results from methodologically sound consumer surveys." *Kraft*, 1991 WL 11008502, at *121; *Cliffdale*, 1984 WL 565319, at *37. In determining whether a consumer survey is methodologically sound, the Commission will look to whether it "draw[s] valid samples from the appropriate population, ask[s] appropriate questions in ways that minimize bias, and analyze[s] results correctly." *Thompson Med.*, 1984 FTC LEXIS 6, at *315. "The Commission does not require methodological perfection before it will rely on a copy test or other type of consumer survey, but looks to whether such evidence is reasonably reliable and probative." *Stouffer*, 1994 FTC LEXIS 196, at *10-11 (*citing Bristol-Myers Co.*, 85 F.T.C. 688, 1975 FTC LEXIS 218, at *127 (1975)). "Flaws in the methodology may affect the weight that is given to the results of the copy test or other consumer survey." *Id.* at *11.

As summarized in *Thompson Medical*, in addition to consumer surveys addressing the specific advertisements at issue, relevant extrinsic evidence includes evidence "showing how consumers might ordinarily be expected to perceive or understand representations like those contained" in the advertising at issue, such as "principles derived from market research, as expressed by marketing experts, which show that consumers generally respond in a certain manner to ads that are presented in a particular way, and presume that consumer reactions to a particular ad before us would be consistent with the general response pattern." 1984 FTC LEXIS 6, at *315-16. Such marketing principles, which may be cited by marketing expert witnesses, are to be derived "from research presented in references generally accepted as reliable in the field of marketing." *Id.* at *316.

### ii. Intuit's Market Research

Market research performed by or for Intuit in the ordinary course of business shows that at least a significant minority of consumers believe that they can file their taxes for free with

PUBLIC

TurboTax. *E.g.*, F. 453, 457-458, 461-462. For example, an Intuit study from TY 2018 to measure brand attributes and "awareness of free" showed that 22% of consumers were confident that TurboTax Free Edition is free. F. 462. A 2019 marketing research report conducted by Intuit evaluating consumer perception found that "[f]ree has been a key lever to drive double digit growth" and showed that 49% of consumers were confident that TurboTax Free Edition is "truly free." F. 461.

In addition, Intuit has conducted copy testing of its advertisements, in the regular course of business, for the purpose of evaluating consumer perception of and reaction to its advertising (the "copy"). F. 446. This copy testing supports the conclusion derived from the facial analysis that Respondent's advertising clearly communicated to viewers that they could file their taxes for free using TurboTax. For example, a December 2018 copy test found that 73% of the 250 survey respondents took away from the "Spelling Bee" television advertisement the message: "That [I] can file my taxes for free." F. 457. A September 2020 copy test involving 200 participants exposed control group participants to the TurboTax brand name and exposed test group participants to one of four TurboTax Free Edition advertisements that were being considered for the TY 2020 filing season. F. 447, 449. The advertisements shown to the test group participants were versions of television advertisements created in connection with Intuit's "free, free, free" marketing campaign, in which nearly every word in the advertisement consisted of the word "free." F. 449. After exposure to one of the four advertisements, the test group participants were asked whether they agreed with a variety of brand attributes of TurboTax, including whether TurboTax "[a]llows me to file my taxes for free." F. 451. While only 33% of control group participants agreed with that statement, between 45% and 57% of test group participants did. F. 452-453. That increase of up to 24 percentage points compared to the control group is a significant increase, which even Intuit tagged as "[s]ignificantly different from benchmark." F. 453.

Respondent discounts the significance of the TY 2018 and TY 2020 copy testing because most of the advertisements tested did not include the written disclosures upon which Respondent relies as disclosing limitations on the free offer, such as the TurboTax Free Edition name or the phrase "simple returns only." However, the Spelling Bee advertisement, which was tested as part of the TY 2020 copy testing, did include written disclosures. F. 450. Yet, significantly, 48% of

survey respondents exposed to that advertisement still agreed with the statement that TurboTax "[a]llows me to file my taxes for free." F. 453. This supports the inference that the disclosures in the Spelling Bee advertisement did not alter consumers' perception that they could file their taxes for free with TurboTax.

### iii.   Novemsky Survey

Complaint Counsel offers a consumer perception survey conducted by its expert witness, Professor Nathan Novemsky (the "Novemsky Survey").[21] The purpose of the Novemsky Survey was to assess, through the use of open and closed ended questions, the impressions that consumers who were ineligible for free filing with TurboTax had regarding their ability to file their federal taxes for free using TurboTax. F. 394, 404, 412.[22]

Survey respondents consisted of two groups: Group A consisted of respondents who reported that they had not filed their income taxes using TurboTax within the past three years; and Group B consisted of respondents who reported that they had filed their taxes using a paid version of TurboTax within the past three years. F. 408-409. None of the survey respondents were eligible to use TurboTax Free Edition at the time of the survey. F. 403.[23] Professor

---

[21] Professor Nathan Novemsky is well qualified to offer opinions in this case. Dr. Novemsky holds a Ph.D. and M.A. in Social Psychology from Princeton University and is a tenured professor of consumer psychology and marketing at Yale University, where he has been teaching for over 20 years. GX303 (Novemsky Expert Report) ¶¶ 1, 12, Appendix A. Professor Novemsky's research has focused on individual decision-making – the manner in which individuals acquire and process information when forming perceptions and preferences, the effect of product attributes (such as price and product features) and information presentation on consumers' purchase and consumption decisions, and the effect of different marketing mix activities (such as advertising) on consumers' buying decisions and consumer experiences. *Id.* ¶ 12. Professor Novemsky has conducted, supervised, or evaluated hundreds of surveys, including many related to consumer behavior and information processing and his research has been published in leading marketing and psychology journals. *Id.* ¶¶ 12, 16.

[22] The two open-ended questions were: "What is your understanding about whether or not there is a cost to filing your own income taxes using TurboTax online software?" and "You may have already said this above, but please tell us again, in your understanding, who, if anyone, can file their taxes for free using TurboTax online software?" F. 422. The closed-ended question was: "You may have already said this above, but please tell us again, which of the following best describes your understanding of filing your 2021 income taxes for free using TurboTax online software?" F. 423.

[23] Professor Novemsky screened out survey participants who could file their taxes for free with TurboTax Free Edition based on the criteria set forth by Intuit (taxpayers who had (i) itemized deductions, (ii) unemployment income reported on a 1099-G, (iii) business or 1099-NEC income, (iv) stock sales, (v) rental property income, or (vi) credits, deductions and income reported on other forms or schedules). F. 401, 403.

PUBLIC

Novemsky determined, based on the results of his consumer survey, that (1) consumers who were ineligible for the TurboTax Free Edition nevertheless believed that they could file their taxes for free with TurboTax; (2) the source of most of these consumers' false belief was either TurboTax advertising or the TurboTax website (or both); and (3) a substantial portion of consumers who did not meet the TurboTax Free Edition eligibility criteria for simple returns nevertheless had the impression that they did have a simple return. GX303 (Novemsky Expert Report) ¶¶ 8-10.

Respondent argues that the Novemsky Survey is unreliable and should be given no weight. Regarding consumers' expressed belief that they could file for free with TurboTax, Respondent asserts that the survey structure improperly suggested this response. Respondent further argues that the conclusion that those asserted beliefs are connected to TurboTax advertising is unreliable because: the survey included persons who had not used TurboTax in the previous three years and who were therefore unlikely to be familiar with TurboTax's products and advertising; Professor Novemsky did not show those survey respondents any TurboTax advertisements; and Professor Novemsky did not use a control group to test the conclusion that survey respondents' beliefs were attributable to TurboTax advertising.

Having considered the arguments of the parties, the Novemsky Survey is reasonably reliable as proof that a significant percentage of consumers who are ineligible to file for free have the misimpression that they can file their taxes for free with TurboTax. F. 400, 426, 435. Specifically, among the Group A respondents, 52.7% believed that they could use TurboTax for free, even though they could not, and among the Group B respondents, 24.1% believed that they could use TurboTax for free, even though they could not. F. 424-425. Even though the response rate for Group B was lower than that for Group A, the 24.1% result for Group B nevertheless represents a significant minority of consumers who believed they could file their taxes for free even though they could not.[24] However, Professor Novemsky's conclusion that the source of survey participants' beliefs that they could file their taxes for free is TurboTax's advertising or

---

[24] Moreover, it would be expected that Group B respondents would be less likely than Group A respondents to form the misimpression that they could file for free using TurboTax because the Group B respondents had recently paid to use TurboTax and would therefore have more familiarity with TurboTax product offerings than Group A, who had not recently filed their income taxes using TurboTax. F. 408-409.

PUBLIC

TurboTax's website lacks a firm grounding and is not entitled to much weight, primarily because Professor Novemsky did not expose the survey participants to any particular advertisements or marketing communications and did not use a control group to test this conclusion. RX1017 (Hauser Expert Report) ¶ 27.

The results of the Novemsky Survey also constitute persuasive evidence that consumers do not accurately understand the meaning of "simple returns only" as a limitation on their qualification for TurboTax's free tax filing offer. F. 400, 434, 435. The Novemsky Survey included the following question: "In some of its advertisements, TurboTax mentions 'simple U.S. returns.' Do you think that your 2021 income tax return meets TurboTax's definition of 'simple U.S. return'?" F. 430 (emphasis in original). While none of the survey respondents in either Group A or Group B had "simple U.S. returns" as defined by Intuit, a substantial proportion nevertheless believed that they did. F. 431, 434. Specifically, among the Group A and Group B respondents respectively, 55% and 28.6% believed that they had a "simple U.S. return" even though they did not. F. 432-433.

Respondent criticizes Professor Novemsky's survey question regarding the phrase "simple returns" as failing to provide survey respondents with context for the phrase, which might have been in a TurboTax advertisement, such as a direction to "see details" at TurboTax.com or a hyperlink to additional information on the TurboTax website. However, neither the "see details" disclosure or the presence of a hyperlink explains the meaning of "simple returns." It does not logically follow that simply exposing survey respondents to these elements in an advertisement would materially alter their perception of their qualification for "simple returns." Moreover, Professor Novemsky's explanations of why consumers would conclude they have "simple returns" are logical and persuasive. As Professor Novemsky explained, because the "simple returns" reference fails to include any additional details about this qualification (F. 436), the phrase "simple returns" invites consumers to determine the meaning of the phrase for themselves. F. 437. And, because the word "simple" has a pre-existing meaning, consumers are likely to have a preconceived notion as to what "simple" means, such that when asking themselves whether their tax return is "simple," consumers feel equipped to answer using their own pre-existing definition of "simple" without seeking out additional information. F. 437, 439. In addition, reasonable consumers are likely to decide that they have "simple returns" out of

**PUBLIC**

wishful thinking and optimistic bias, because they perceive it will be advantageous for them to have a "simple" return. F. 438.

### iv. Additional Proof of Consumers' Perception and Understanding of TurboTax Free Advertising

Consumer testimony taken in this case further supports the conclusion that Respondent's advertising conveyed the claim that consumers can file their taxes for free with TurboTax. Testifying consumers strongly associated TurboTax with its free filing claims. *See* F. 511, 513. Moreover, these consumers' beliefs about TurboTax's free filing offer appear to stem from pervasive exposure to such claims in the marketplace, as opposed to specific recollection of a particular advertisement. F. 513 (GX138 (Adamson (Consumer) Dep.) at 55-56 (testifying that TurboTax free advertising was "ubiquitous"); *see also* (GX125 (Beck (Consumer) Dep.) at 22 ("I'm not sure if there was any one particular thing that I remember other than the ads that they started doing where it would just say the word 'free' over and over and over again."); GX128 (Benbrook (Consumer) Dep.) at 53-55 (recalling "free" and "zero dollar" "repeated numerous times across all ads"); GX137 (DuKatz (Consumer) Dep.) at 29, 30 (recalling "vividly" a TurboTax advertisement "where everyone talks by just saying the word 'free'"); GX142 (Keahiolalo (Consumer) Dep.) at 25 ("Q: What do you know about TurboTax? [A.] TurboTax, it's free. That's all I know. They advertise as free. That's all I know."); GX139 (Derscha (Consumer) Dep.) at 58-59 ("Q: [W]hat TurboTax advertisements did you see in 2019 specifically?" A: "Oh, lord, there were several. There were several on Facebook, several of them on YouTube . . . [A]t that point in time they were all over the place.")).

Consumer testimony further supports the conclusion that many consumers do not accurately understand the meaning of "simple returns only" as a limitation on their qualification for TurboTax's free tax filing offer, F. 514, which is also consistent with the misimpressions as to TurboTax eligibility criteria found among participants in the Novemsky Survey. Consumers testified, for example, that they did not "know exactly" what the phrase "simple returns only" means, or that the phrase "doesn't mean anything" to them. *See* F. 514 (GX139 (Derscha (Consumer) Dep.) at 62 (testifying that she "wasn't aware of the differences between like a simple file or anything like that"); GX137 (DuKatz (Consumer) Dep.) at 56 (testifying that the phrase simple tax returns "has no connotation to me because I don't understand what is and is

not a simple tax return")). Other consumer testimony showed a misunderstanding of the phrase or a misimpression that it applied to them. *See* F. 514 (GX138 (Adamson (Consumer) Dep.) at 44 (testifying that he understood "simple tax returns" to mean "if you . . . made under a certain amount of money, that you would not be charged by TurboTax to file your taxes"); GX139 (Derscha (Consumer) Dep.) at 47-48 (testifying that she "thought" her "standard tax preparation" was a simple tax return and that she "didn't understand" that there were "different versions of a standard"); GX135 (Phyfer (Consumer) Dep.) at 66-67 (testifying that she "assumed" that her tax return was a simple tax return), 75-76 (testifying she believed she had a simple tax return because "nothing had changed since the previous year" in her income); GX136 (Schulte (Consumer) Dep.) at 70) (testifying that he interpreted "simple tax returns" to mean a "situation where your tax situation's not over[ly] complicated . . . Like essentially you're not some huge investor" requiring a "stack of different documents that you're going to have to submit")).

While Respondent asserts that Intuit's internal testing of consumer understanding of "simple tax returns" found that consumers found the phrase very "easy to understand" (RFF 134 (citing Rubin (Intuit) Tr. 1544-1546; RX304 (Intuit)), Intuit's results do not address what consumers understood the phrase to mean or whether their understanding was accurate. Therefore, Intuit's testing results do not contradict the substantial evidence addressed above demonstrating that consumers do not accurately understand the meaning of "simple returns only," including with regard to application of the limitation to their own tax situation. Similarly, Respondent's argument that consumers are familiar with the phrase "simple returns" because it is used by TurboTax's competitors and/or by the IRS (*e.g.*, RB 9; RFF 141-142; RX1018 (Golder Expert Report) ¶¶ 112-113) says little or nothing about consumers' understanding as to whether, or how, the phrase applies to them.[25]

---

[25] Respondent's contention that "simple tax returns" is an IRS term familiar to consumers was not supported by any IRS evidence, such as public communications or other IRS documents. The evidence on which Respondent relies regarding uses of the qualification "simple returns" by TurboTax's competitors fails to demonstrate that their qualification criteria are the same as those applied by TurboTax for TurboTax Free Edition. (*Compare* RX1018 (Golder Expert Report) Figure 17 (H&R Block disclosure regarding "simple returns" including unemployment income) *with* Figure 27 (excluding unemployment income); RX1017 (Hauser Expert Report) ¶ 48 n.87 (noting qualification differences among providers of free tax preparation products)).

PUBLIC

### v.     Brand Distinction

Respondent argues that disclosing that TurboTax's free filing offer is limited to TurboTax Free Edition is sufficient to convey that the offer is qualified and not necessarily free for the consumer viewing the advertisement. However, even assuming the reference to TurboTax Free Edition in an advertisement was displayed in a reasonably conspicuous manner, the mere inclusion of the sub-brand does not by itself inform the consumer that the product does not necessarily apply to them or logically negate the dominant message in the advertising that consumers could file their taxes for free.

Moreover, the facts demonstrate that consumers do not necessarily internalize Respondent's free offer as being for a sub-brand distinct from TurboTax. Testifying consumers, addressing the advertising claims at issue, referred to the TurboTax brand generally, rather than any sub-brand. F. 511, 513. The conclusion that consumers do not associate the TurboTax free tax filing offer with a TurboTax sub-brand is also supported by Intuit's TY 2018 and TY 2020 copy testing. Results from Intuit's TY 2018 copy testing found that the advertisements tested, including the Spelling Bee copy test advertisement, "communicate **the parent brand**, TurboTax well, however, only about ~5% take away the sub brand (TurboTax Free, TurboTax Live)." F. 459 (emphasis in original). The TY 2018 copy testing further showed that "[m]ost viewers can recall TurboTax, but only a handful mention the specific product name" when asked, "[w]hich brand do you think this ad was for?" F. 460. In the TY 2020 campaign copy testing, one group of participants was exposed only to the TurboTax brand name and not to any advertising copy. F. 449. After such exposure, 33% of this group reported agreeing with the statement that TurboTax "[a]llows me to file my taxes for free." F. 452.

### vi.     Respondent's Extrinsic Evidence on Advertisement Interpretation

Most of the extrinsic evidence proffered by Respondent does not directly address the meaning of the advertisements to consumers. For example, Respondent does not offer any consumer surveys regarding the claims conveyed or other evidence regarding consumer interpretation of the language used in TurboTax advertisements.[26] Respondent's extrinsic

---

[26] As observed by the Commission in its order denying summary decision in this matter:

PUBLIC

evidence that is arguably relevant to assessing consumers' understanding of Respondent's free claims is addressed below.

Respondent relies on the opinion of its expert witness, Professor Peter Golder, that reasonable consumers understand that free offers, including free online tax preparation offers, have limitations, even if those limitations are not stated in the advertisements.[27] In support of this opinion, Professor Golder points to advertising campaigns such as "buy one get one free" (BOGO) or "free with purchase" promotions, which require a purchase in order to get a free product. Professor Golder also references tiered service offers, which give customers free access to products or content, but with limitations, such as the requirement to view advertisements in free versions of YouTube and Spotify, or limited features, such as with free versions of Adobe. RX1019 (Golder Expert Report) ¶¶ 164-165. This evidence is unpersuasive. BOGO and "free with purchase" offers advertise bundles of products and are thus not comparable to an advertisement for a standalone product as a free product, such as TurboTax Free Edition. F. 445. For the same reason, tiered service offerings are factually distinguishable from the free product advertising at issue in this case. Even if there were evidentiary support for the conclusion that reasonable consumers understand that a standalone free offer has qualifications, this would not mean that consumers necessarily understood the nature of the qualifications imposed by Intuit's free offer and does not rebut the proof in the record that at least a significant minority of reasonable consumers did not understand Intuit's free filing qualifications.[28]

---

[M]uch of Respondent's extrinsic evidence concerns peripheral issues – for example, whether its disclaimer font is similar to that used by other companies, whether consumers are comfortable switching between tax-preparation providers, whether TurboTax has high consumer satisfaction and retention rates, and whether most consumers who start in Free Edition eventually file with that product. This type of evidence does not address what message the ads conveyed to reasonable consumers and would not override findings based on a facial analysis. Conclusory statements by experts that consumers were not deceived based on that same peripheral evidence are similarly inadequate.

*Intuit*, 2023 FTC LEXIS 18, at *31 (citations omitted).

[27] Professor Peter Golder has a B.S. in Mechanical Engineering and Ph.D. in Business Administration and is a professor of marketing at Dartmouth College's Tuck School of Business. RX1018 (Golder Expert Report) ¶¶ 1-2.

[28] Respondent asserts that consumer testimony demonstrates that consumers understood that TurboTax's free filing offer was not free for everyone and/or that not every taxpayer would qualify. *See* RFF 635. As noted above, however, even if there were evidentiary support for the conclusion that reasonable consumers understand that a free offer has qualifications, this alone would not rebut the evidentiary proof in the record, including the consumer

PUBLIC

Respondent also asserts that the evidence proves consumers are skeptical of free offers and tend to disbelieve them as "too good to be true." RB at 59. As proof of this skepticism, Respondent points to its internal market research from 2018 in which the percentage of consumers reporting that they were "confident" that TurboTax Free Edition was free was 22%. *See* F. 462. However, 22% is not an insignificant percentage, and this figure supports the conclusion that at least a significant minority of consumers takes away the impression that TurboTax online tax filing is free for them. Moreover, Respondent's 2019 market research showed that 49% of consumers were confident that TurboTax Free Edition is "truly free," which indicates that Respondent's "free" advertisements tend to overcome skepticism regarding free offers. F. 461. In addition, the evidence shows that Respondent's advertising was designed to overcome such skepticism, not only through the pervasive and repetitive use of the word free, but also through the frequent use of the word "guaranteed" in conjunction with the "free" claim. *E.g.*, F. 51 (Intuit document explaining that Intuit added the language "Guaranteed" to "address skepticism of free, build credibility of TT Free, and drive trial"); F. 467 (Intuit document explaining "incorporating the word 'guaranteed' into the offering and changing the name from Federal Free Edition to Free Edition will be levers we explore to reduce that skepticism. . . . Customer research indicates that we can increase believability of our truly Free offering with the addition of 'Guaranteed'."). In fact, the text of the Steven Spit/Take advertisement, aired for TY 2021, expressly addresses consumer skepticism and works to overcome it:

> VOICE-OVER: Steven, did you know that TurboTax is free no matter how you want to file? Steven: *I don't believe that*. VOICE-OVER: *It's true.* Anyone with a simple tax return can get help from an expert, for free. Steven: *That can't be true*. VOICE-OVER: *It is* and with TurboTax Live our experts will even do your taxes for you for free.

F. 199 (emphasis added); *see also* F. 67 (Boston Tea Party advertisement: SECOND BRITISH SOLDIER: But what if it were free to file your taxes? SECOND REVOLUTIONARY: *Like, free free*? SECOND BRITISH SOLDIER: Yes, yes. You'd pay nothing. Not a thing. No thing. THIRD REVOLUTIONARY: Well alright then!) (emphasis added).

---

testimony summarized above, that at least a significant minority of reasonable consumers do not understand Intuit's qualifications and/or erroneously believe that they meet Intuit's qualifications.

Respondent further contends, based upon the opinion of its expert witness, Professor Golder, that consumers know to look for and where to find qualifications in advertisements for free tax-preparation products, and know how to seek out additional information elsewhere. RFF 471, 514. However, as noted above, even if consumers were to see the disclosure limiting Intuit's free filing offer to "simple returns," the facts demonstrate that at least a significant minority of reasonable consumers do not accurately understand the "simple returns" limitation, including how it would apply to their own tax situation.

In summary, Respondent's extrinsic evidence, to the extent it demonstrates that some consumers would understand, in the abstract, that Respondent's free tax filing offer was not free for everyone and/or had some qualifications, nevertheless fails to rebut the substantial proof that at least a significant minority of reasonable consumers would still take away the impression from Respondent's advertising that TurboTax online tax filing was free *for them.*

### 2. Falsity

According to IRS data, only about one-third of taxpayers file their taxes using a Form 1040 without any attached schedules. Therefore, applying Intuit's eligibility requirements, approximately two-thirds of taxpayers, or approximately 100 million taxpayers, are ineligible to file for free using TurboTax's free tax filing product, TurboTax Free Edition. F. 36-37. For these taxpayers, Respondent's advertising claim that consumers can file for free using TurboTax is clearly false.

Respondent contends that the two-thirds figure is the wrong metric because many taxpayers file on paper or use accountants, storefront tax preparers, or other non-online filing options, and that the appropriate baseline is the number of taxpayers who use online tax preparation products. According to Respondent, only about 75 million consumers use online tax-preparation products such as TurboTax, and 38 million of these, or approximately 50.7%, have simple returns, as defined by Intuit. *See* RFF ¶ 129. Respondent's metric fails to account for the possibility that taxpayers who previously used non-online filing methods might be induced to switch to online filing, including because of TurboTax's advertised "free" filing offer. In addition, Respondent's own documents acknowledge that only about one-third of taxpayers are

eligible to file for free with TurboTax, which casts doubt on the commercial significance of Respondent's alternative proposed metric. F. 36 (referencing Intuit's desire "to expand [TurboTax's] free eligibility beyond the ~35% eligibility" TurboTax has). Even if Respondent's smaller universe of potential online filers were accepted, the assertion that 50.7% of online filers – a bare majority – have simple tax returns and thus qualify for TurboTax Free Edition would mean that nearly half do not have simple returns and do not qualify for TurboTax Free Edition. Taxpayers with common tax scenarios such as mortgage deductions, stock sales, rental property income, charitable donations over $300, itemized deductions, unemployment income, or education expenses would have to use one of TurboTax's paid products. F. 38-43. For this significant percentage of consumers, Respondent's "free" advertising claim is false.

Respondent further argues that because TurboTax Free Edition is in fact free, advertising that TurboTax Free Edition is free is not false. However, some of the advertisements at issue do not mention TurboTax Free Edition and those that do, do so in small, inconspicuous lettering. F. 63, 227-228. Furthermore, as set forth above in section III.E.1.b.v, the facts show that consumers associate the free filing offer with the parent brand TurboTax, as opposed to a sub-brand.

More important, the focus in interpreting an advertisement is the overall net impression, not the literal truth or falsity of individual elements. *Traffic Jam Events*, 2021 WL 5124183, at \*12. "[A] claim may be deceptive even though it is literally true." *Cap. Choice Consumer Credit,* 2004 WL 5149998, at \*32; *see also Thompson Med.*, 791 F.2d at 197 ("[L]iterally true statements may . . . be found deceptive[.]"). As held by the Commission in its order denying summary decision, "[i]f an ad that literally states that TurboTax Free Edition is free is written in a way that falsely conveys to at least a significant minority of reasonable consumers that they can file their taxes for free with TurboTax, the ad is deceptive." 2023 FTC LEXIS 18, at \*36. Based on a full consideration of the evidence presented in this case, it has been determined that much of Respondent's advertising has been written in such a way as to falsely convey to at least a significant minority of reasonable consumers that they could file their taxes for free with TurboTax.

In addition, an advertisement, even if containing true statements, can be deceptive by omission. "'The failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts.' *Sterling Drug*, 741 F.2d at 1154; *see also Cap. Choice Consumer Credit,* 2004 WL 5149998, at *33." *Intuit,* 2023 FTC LEXIS 18, at *36. In the instant case, the evidence proves that Respondent's purported disclosures as to limitations and qualifications for the free tax filing offer are insufficient to render the advertisements nondeceptive. In most advertisements, especially the television and video advertisements, the disclosures were too inconspicuous to be deemed to have disclosed anything effectively. To the extent the purportedly limiting disclosure "simple returns only" was visible in any advertising, with the arguable exception of Respondent's email advertising, no material explanatory information was included, and the evidence proves that the phrase itself was not accurately understood by consumers. Thus, Respondent's advertising was false, through affirmative representation and through omission.

Respondent contends that its free tax filing advertising was not likely to mislead reasonable consumers into a false belief that they could file for free with TurboTax because consumers are likely to seek out additional information regarding a free offer, particularly when choosing a complex product such as a tax preparation product.[29] Respondent argues that because its advertising notified consumers, in writing and at times audibly, to "see details" or "see if you qualify" at TurboTax.com, consumers would obtain complete information as to the terms and conditions of eligibility for TurboTax Free Edition on Respondent's website, through clicking on various hyperlinks – such as hyperlinks for "simple returns only" – and reviewing the resulting "pop-up" disclosure screens. *See, e.g.*, F. 359-364.[30]

---

[29] As explained above, the second element in determining whether advertising is deceptive, after assessing the claim conveyed, is whether those claims are false *or* likely to mislead consumers. *Health Research Labs.*, 2021 WL 5711355, at *5; *California Naturel*, 2016 WL 7228668, at *5. Because it has been determined that, for at least a significant minority of reasonable consumers, Respondent's "free" advertising was false, it is unnecessary to determine whether the advertising was also likely to mislead consumers. Nevertheless, certain of Respondent's arguments in this regard are addressed herein in an exercise of discretion.

[30] Although it is not entirely clear, Respondent's argument seems to imply that reasonable consumers are not actually misled because they are unlikely to rely on the claims presented in Respondent's advertising, and instead will seek out additional information. However, the law is clear that an advertisement can be deemed misleading and in violation of the FTC Act even absent proof that any consumer actually relied on the claims. "The applicable standard is whether a claim is likely to mislead; proof that particular consumers were actually deceived is not required." *In re Novartis Corp.*, No. 9279, 1999 FTC LEXIS 90, at *46 (May 13, 1999) (citations omitted).

Respondent's argument is unavailing, for several reasons. *First*, the assertion is contrary to the weight of the evidence, explained above, showing that at least a significant minority of consumers could reasonably, and did in fact, take away from Respondent's advertising the false impression that they could file for free with TurboTax.

*Second*, even if some consumers may choose to conduct research in response to an advertising claim, the law protects those who do not: "[T]he public is not under any duty to make reasonable inquiry into the truth of advertising." *Resort Car Rental*, 518 F.2d at 964. "Laws are made to protect the trusting as well as the suspicious. *FTC v. Standard Education Soc'y*, 302 U.S. 112, 116 (1937); *see also FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (stating that "*caveat emptor* is simply not the law"); *Book-of-the-Month Club*, 1952 WL 104729, at *13 (holding that "there is no obligation on the part of the customer to protect himself" against misleading advertising "by pursuing an advertisement to the bitter end").

*Third*, information available on Intuit's website cannot be used to counter or cure a false claim contained in other advertising. *See In re ECM Biofilms, Inc.*, 160 F.T.C. 652, 2015 WL 13879743, at *49 n.75 (Oct. 11, 2015) ("It is well-established that an advertiser cannot 'cure the deception' in one advertisement with different statements in another."); *see also Book-of-the-Month Club*, 1952 WL 104729, at *13 ("A seller may not make one representation in one part of his advertisement and withdraw it in another part . . ."); *see Deception Statement*, 103 F.T.C. at 183 (collecting cases). As a general rule, the FTC Act is deemed violated if the first contact with the consumer is induced through deception, "'even if the buyer later becomes fully informed before entering the contract.'" *Intuit*, 2023 FTC LEXIS 18, at *32-33 (*quoting Resort Car Rental*, 518 F.2d at 964; *see also Carter Prods., Inc. v. FTC*, 186 F.2d 821, 824, 47 F.T.C. 1788 (7th Cir. 1951); *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1010 (D. Nev. 2019), *aff'd* 827 F. App'x 653 (9th Cir. 2020); *Fleetcor*, 2022 U.S. Dist. LEXIS 142053, 2022 WL 3273286, at *12).

Respondent contends that the "first contact" rule expressed above, referred to as the "deceptive door opener" rule, should not apply to this case because online tax preparation is a complex product and consumers do not expect to see all qualifying details in advertisements for

such a product. It is true, as Respondent notes, that consumers must visit the TurboTax website in order to use TurboTax Free Edition, and that the website included additional information about the limitations and qualifications for using TurboTax Free Edition. F. 349-350, 359-379. However, no FTC case has held that the deceptive door opener rule does not apply to transactions that take place online rather than in a brick-and-mortar store. *Intuit*, 2023 FTC LEXIS 18, at \*33. Free claims, in particular, have the tendency to act as "a lure. It is the bait. It is a powerful magnet that draws the best of us against our will 'to get something for nothing.'" *Book-of-the-Month Club*, 1952 WL 104729, at \*14.

As authority for rejecting application of the deceptive door opener theory in this case, Respondent cites cases upholding the adequacy of disclosures of hotel resort fees made during an online booking process. These cases do not apply FTC law and also have different factual contexts that fail to support a conclusion that the deceptive door opener rule should not apply in this case. *See Washington v. Hyatt Hotels Corp.*, No. 1:19-cv-4724, 2020 U.S. Dist. LEXIS 101118 (N.D. Ill. June 9, 2020) (interpreting state law and finding disclosure of resort fee adequate, where fee was disclosed more than once and consumer was offered details during the online booking process prior to final confirmation); *Harris v. Las Vegas Sands LLC*, No. CV 12-10858, 2013 U.S. Dist. LEXIS 185587, at \*13-17 (C.D. Cal. Aug. 16, 2013) (interpreting state law and finding that there "simply [was] no ambiguity, and no reasonable consumer could be misled" by the resort fees disclosed during booking).

Respondent principally relies on *FTC v. DirecTV, Inc.*, No. 15-cv-1129, 2018 U.S. Dist. LEXIS 139192 (N.D. Cal. Aug. 16, 2018), which rejected the FTC's argument that the deceptive door opener rule should apply to that case. Respondent's reliance is misplaced, as explained below.

In *DirecTV*, the FTC alleged that DirecTV's advertisements for subscription satellite television services were misleading because they failed to adequately disclose certain material terms of the purchase, such as the facts that the advertised rate was for a limited introductory period; that there was a 24-month commitment; that early cancellation would incur early cancellation fees for the remainder of the commitment period; and that premium channels being provided were for a limited period and additional charges would be incurred unless the consumer

PUBLIC

cancelled before the end of the period (the "negative option"). 2018 U.S. Dist. LEXIS 139192, at *3-4.

The court found that the FTC had failed to prove that the challenged advertisements were misleading. The court described an advertisement that contained, on its face, extensive information about the terms and conditions of the satellite subscription service:

> As would be expected for a complex multi-option product like a satellite television subscription, the advertisement contains a large amount of information about various programming packages, pricing and equipment options, product quality and installation logistics. Roughly the middle third of the advertisement describes three tiers of programming packages: the Entertainment Package, the Choice Package and the Xtra Package. Each package includes a different number of channels and a different number of on demand titles . . . .
>
> The text box for each package includes a price "for 12 months" "after instant savings." . . . The price in the red bubble has a caret next to it, which directs the viewer to the following bolded text in the first line of a section of disclosures in black text against a white background at the bottom of the page: "**BILL CREDIT/PROGRAMMING OFFER: IF BY THE END OF PROMOTIONAL PRICE PERIOD(S) CUSTOMER DOES NOT CONTACT DIRECTV TO CHANGE SERVICE THEN ALL SERVICES WILL AUTOMATICALLY CONTINUE AT THE THEN-PREVAILING RATES**." Because most of the text in the disclosure box is not bolded, not in all capital letters, and not partially underlined, this information stands out visually. *See* Ex. 1119 (FTC ".com Disclosures" guidance) at 17 ("A disclosure in a color that contrasts with the background emphasizes the text of the disclosure and makes it more noticeable.").

*Id.* at *23-24 (emphasis in original).

Based on a facial analysis, the court found:

> [T]he net impression a reasonable consumer would take away from this advertisement is that a promotional price applies for 12 months, that a 24-month agreement is required, that an early cancellation fee of $20 per month will apply if the customer cancels before the end of the 24-month period, that services will continue at the end of any promotional period at the then-applicable regular rate unless the customer contacts DIRECTV to change the services, and that the customer needs to call a toll-free number or go to DIRECTV's website to subscribe. These provisions are adequately disclosed throughout the advertisement, and while the ad contains a substantial amount of information, a reasonable consumer would understand that this is because subscription satellite television service is a complex product with a number of options for price, level

of service, package features and other components. . . . Because the advertisement adequately discloses the details that the FTC claims were omitted due to a lack of prominent disclosure, the net impression of the advertisement on its face would not be likely to mislead a reasonable consumer.

*Id.* at *26-27.

After concluding that neither the facial analysis nor the extrinsic evidence supported the misleading net impression alleged by the FTC, the court addressed, and rejected, the FTC's argument that, because DirecTV induced first contact through deception, DirecTV advertising served as a deceptive door opener to subscriptions subsequently ordered online or by telephone, regardless of whether the buyer later became fully informed before entering into the subscription contract. *Id.* at *44. The court held that the deceptive door opener principle was inapplicable because the DirecTV advertisements at issue did not contain information that contradicted the actual purchase terms; and "for a complex product like subscription satellite television services, a reasonable consumer would understand the limitations of how information is presented in a one- or two-page flyer." *Id.*

*DirecTV* is readily distinguishable. In the instant case, unlike in *DirecTV*, it has been determined, based on a facial analysis and extrinsic evidence, that the net impression of Respondent's advertising is that consumers could file their taxes for free with TurboTax, and that for approximately two-thirds of consumers, this claim is false. Moreover, in *DirecTV*, the court found that the material terms of purchase were sufficiently disclosed on the face of the advertisements themselves. In the instant case, the advertisements at issue did not disclose material facts explaining the limitations on the free offer, including facts required to understand the "simple returns" limitation. Unlike *DirecTV*, Respondent's contention that those material omissions could be remedied by visiting the TurboTax website squarely implicates application of the deceptive door opener doctrine.

Even if the hyperlinks and related pop-up disclosures on the TurboTax website upon which Respondent relies were considered, the evidence fails to prove that they would be effective to alter or prevent consumers' misimpression that they can file for free using TurboTax. Disclaiming a free claim can be particularly difficult because such claims are powerful and consumers are drawn to them. F. 428. Furthermore, consumers are unlikely to view information

PUBLIC

behind hyperlinks. As Professor Novemsky explained, consumers tend to be cognitive misers, meaning they constantly try to conserve mental energy. F. 440. Thus, hyperlinks are unlikely to be sufficient for presenting important information such as the eligibility criteria for simple returns only because it requires more action than simply reading a description of the eligibility criteria on the face of an advertisement. F. 444. Consumer testimony taken in this case buttresses the conclusion that consumers do not necessarily perceive or understand the significance of color-contrasted hyperlinks on TurboTax's website. F. 517. Moreover, consumers are particularly unlikely to click on a hyperlink or conduct further research where, as the facts here indicate, reasonable consumers think they already know what a "simple return" is and are under a pre-existing misimpression that they have one. F. 443.[31]

Lastly, Respondent contends that the evidence fails to prove consumers were actually deceived by its advertising. RB at II.D.2-4; RFF IX.C-E. Based primarily on expert witness analysis and opinion, Respondent points to consumer satisfaction scores and retention rates; the rate at which consumers starting in a TurboTax free product choose to upgrade to a paid TurboTax product or finish in the free product, or are likely to switch to other providers; and the number of consumer complaints registered. *Id.* The law is clear that liability for deception under the FTC Act turns on whether a material claim is false, or likely to mislead, and not whether it has caused actual deception. *Deception Statement*, 103 F.T.C. at 172; *Thompson Med.*, 791 F.2d at 197. Proof of actual deception is unnecessary to establish a violation of Section 5. *Trans World Accts.*, 594 F.2d at 214. Because Complaint Counsel need not show actual consumer

---

[31] Complaint Counsel's brief does not include website advertisements as among the advertisements claimed to be deceptive in this case. *See* CCB at II.C.1 (addressing advertisements from television and radio, social media and video advertisements, email marketing, and paid search advertisements). While Complaint Counsel asserts that Respondent's advertising in *other* media serves to lure consumers to the TurboTax website, where advertisements there "contribute" to the false impression created by Intuit's other challenged advertising, CCB at 17-19, Complaint Counsel's challenge to Respondent's website is primarily defensive, focused principally on rebutting Respondent's arguments that disclosures on the website were legally and/or factually adequate to prevent consumers from ultimately being misled about the conditions and qualifications for TurboTax's free filing product. CCB at III.D.3. Nevertheless, to the extent this case challenges Intuit's free filing advertisements on its website independently of the deceptive door opener theory, *i.e.*, encompasses the effect of those advertisements on consumers viewing them for the first time on the TurboTax website, such advertisements are materially similar to other advertisements found herein to have conveyed the false impression to reasonable consumers that they can file for free using TurboTax (F. 351-358), and, as shown above, at least a significant minority of reasonable consumers are unlikely to click on hyperlinks purportedly disclosing the meaning of "simple returns only," due to preexisting assumptions and misimpressions of the meaning of the phrase. *See* section II.C.1.b, F.440-444. For the sake of completeness, and to aid in any appeal of this Initial Decision, the TurboTax advertisements, disclosures, and other material portions of TurboTax's website during the tax years relevant to the case are detailed in section II.B.7.

injury to establish liability for deceptive advertising, evidence that some consumers were not injured or were satisfied with TurboTax's products "is no defense" to liability. *Cap. Choice Consumer Credit*, 2004 WL 5149998, at *34; *FTC v. Amy Travel Service, Inc.,* 875 F.2d 564, 572 (7th Cir. 1989) ("Contrary to defendants' claims, the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense under the FTCA. . . . [T]he existence of those [satisfied] customers is not relevant to determining whether consumers were deceived . . . ."). In any event, the record contains ample reports from consumers who believed that they were eligible to file their taxes for free with TurboTax, but ultimately learned, to their chagrin, that they were not. F. 478-483, 488-507, 510; *see also* F. 472-474. And, it has been recognized that the fact that consumers may not register a complaint is not indicative of a lack of consumer deception. *See United States v. Lasseter*, No. 3:03-1177, 2005 WL 1638735, at *4 (M.D. Tenn. June 30, 2005) (holding that lack of consumer complaints submitted to the FTC did not indicate that the defendant was in compliance with the FTC Act); *see also FTC v. Voc. Guides, Inc.*, No. 3:01-cv-170, 2006 U.S. Dist. LEXIS 82308, at *40 (M.D. Tenn. 2006) ("The meaning of a lack of complaints to the BBB is indeterminate."); *In re Brake Guard Prods., Inc.*, 125 F.T.C. 138, 1998 WL 34077346, at *247 (Jan. 15, 1998) ("The number of consumer complaints has no bearing on whether the public is being harmed by the respondents' false or unsubstantiated claims.").

### 3. Materiality

As explained above, Intuit represented to consumers that they could file their taxes for free with TurboTax when in fact many consumers were ineligible to do so. A representation is considered material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.com*, 453 F.3d at 1201 (quotation omitted); *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1063 (C.D. Cal. 2012); *In re Jerk, LLC*, No. 9361, 159 F.T.C. 885, 2015 WL 13021976, at *5 (Mar. 13, 2015). Numerous cases have found that a misrepresentation about "the cost of the product [is] an important factor in a consumer's decision on whether or not to purchase a product" and "is undoubtedly material[.]" *Commerce Planet*, 878 F. Supp. 2d at 1068 (finding material a misrepresentation about a free kit because it goes to the cost of the product); *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1138, 1146 (D. Nev. 2015) (stating that the deceptive impression as to the cost

and nature of the product is material because it goes to the central characteristics of the product and induces purchase); *see also Deception Statement*, 103 F.T.C. at 190 ("Information has been found material where it concerns . . . the cost . . . of the product or service.") (citing cases); *Book-of-the-Month Club*, 1952 WL 104729, at \*14 ("The meaning of the word 'free' remains more or less fixed, and that meaning is the actual cause of the purchase."). Therefore, Intuit's representation that consumers can file their taxes for free using TurboTax is material.

In addition to case law holding that price is a material factor, there is substantial evidence in the record demonstrating that the claim that TurboTax is free is material to consumers. The importance of cost in deciding to use a tax filing service and the importance of the expectation of free filing with TurboTax are supported by consumer testimony taken in this case. F. 511-512. Moreover, Respondent's own surveys establish the non-controversial point that price matters to consumers. *E.g.*, F. 471 (2019 Intuit study showing that of consumers leaving TurboTax, ▮▮▮▮ stated that price was a reason). Respondent's expert witnesses further confirmed that price is an important driver in consumer choice. F. 45.[32]

Respondent argues that because TurboTax Free Edition is free to everyone who is qualified to use it, any alleged misrepresentation was not about the *cost* of the product, but rather about its *qualifications*, *i.e.*, about particular consumers' ability to use the product.[33] Even if the misrepresentations here related to eligibility to use the product, rather than to price, the question of whether a consumer is qualified for the advertised product is "information that is important to

---

[32] Respondent's expert witness Professor John Hauser conducted a "census survey of all the various things that people do" when choosing a tax-preparation provider (referred to by Professor Hauser as a "Purchase Driver Survey"), which showed that 70.4% of survey respondents considered price an important factor in their choice of a tax preparation provider. F. 45. Respondent's expert witness Professor Peter Golder similarly acknowledged that "price is important to consumers" and "[c]onsumers are very interested in price." F. 45. In light of the foregoing, purported survey findings offered by Respondent's expert witness, Rebecca Kirk Fair – that the price of tax-filing products, including out-of-pocket costs, is not the primary driver of consumers' choice of a product – is entitled to little weight. (RX1555 (Kirk Fair (Intuit) Trial Dep.) at 42, 47; RX1016-A (Kirk Fair Expert Report) ¶ 36, Figure 4). It is not necessary for cost to be the primary factor in a consumer's purchase decision; it is sufficient if it is a factor that is important, and/or likely to affect the consumer's decision.

[33] Respondent characterizes Complaint Counsel's materiality argument to be that "the alleged deception was material because consumers were drawn to the TurboTax website by the challenged ads and thus wasted time, effort, and in some cases money, amounting to harm that 'can't be remedied by subsequent disclosures.'" RB at 99. This is inaccurate. In fact, Complaint Counsel argues that the claim that TurboTax is free is material because it is an important factor in deciding to use a product. *See* CCB at III.C. As shown above, the record amply supports that position.

PUBLIC

[the] consumer[] and, hence, likely to affect their choice of, or conduct regarding, [the] product." *Cyberspace.com*, 453 F.3d at 1201 (*quoting Cliffdale*, 1984 WL 565319, at *37). "Indeed, a product has no 'efficacy' for a consumer who is ineligible to use it." *Intuit*, 2023 FTC LEXIS 18, at *40. "Information has been found material where it concerns the . . . efficacy. . . of the product or service." *Deception Statement*, 103 F.T.C. at 190; *Johnson*, 96 F. Supp. 3d at 1138 (stating that the deceptive impression as to the products' efficacy is material because it goes to the central characteristics of the product and induces purchase). Thus, even if Intuit's misrepresentations related to eligibility to use TurboTax, such information is material.

### 4. Conclusion

As shown above, the evidence proves that Respondent advertised to consumers that they could file their taxes online for free using TurboTax, when in truth, for approximately two-thirds of taxpayers, the advertised claim was false. Furthermore, a false representation that a product is free is a material fact influencing a consumer's choice with respect to a product. Accordingly, the evidence proves that Respondent engaged in deceptive advertising in violation of Section 5 of the FTC Act.

### F. Affirmative Defenses

#### 1. First Defense

Respondent's First Defense is that this case is moot because "Intuit has discontinued the purportedly unfair and deceptive advertising campaigns . . . ." Answer, First Defense. To find that a case is moot "means that the defendant is entitled to a dismissal as a matter of right." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). As held in *W.T. Grant*, however, "voluntary cessation of allegedly illegal conduct does not . . . make the case moot." *Id.* (citing cases); *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1238 (9th Cir. 1999). Even where the challenged conduct has voluntarily ceased, a case is not held moot unless the defendant "can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" *W.T. Grant*, 345 U.S. at 633 (citation omitted). The Court stated that "[t]he burden is a heavy one[,]" and explained that lack of ongoing activity plus protestations that they would not engage in the conduct again "do[] not suffice to make a case moot[.]" *Id.* "In order to meet their burden, the [defendants] must show that 'subsequent events [have] made it absolutely clear that the allegedly

PUBLIC

wrongful behavior cannot reasonably be expected to recur.'" *Affordable Media*, 179 F.3d at 1238 (citation omitted).

Respondent argues that it has entered into a settlement agreement with the attorneys general of all 50 states and the District of Columbia and a related consent order in California (collectively the "State Settlement"), which Respondent argues effectively enjoin any recurrence of the violations found in this case. This assertion overlaps with Respondent's contention that the State Settlement obviates the need for an FTC cease and desist order. As shown in the remedy section of this Initial Decision, *infra* III.G, the facts do not demonstrate either that Respondent has voluntarily ceased all the conduct found to be unlawful herein or that the State Settlement will prevent Respondent from engaging in such unlawful conduct in the future. Accordingly, Respondent's mootness defense is rejected.

### 2. Second Defense

The Second Defense is that the requested relief is overbroad and impermissibly vague. Answer, Second Defense. Respondent's arguments in support of this averred defense are limited to the contentions that Complaint Counsel has failed to demonstrate that any cease and desist order is warranted and that certain provisions of the proposed cease and desist order are insufficiently clear and precise. These arguments are addressed and rejected in the section on remedy, *infra* III.G.

### 3. Third Defense

Respondent's Third Defense is that the Complaint is invalid because the Commission did not vote in favor of the final Complaint. Answer, Third Defense. Respondent does not advance this as an affirmative defense in its post-trial brief or reply brief and therefore it need not be addressed herein. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 2010). Moreover, the record is clear that the Commission did vote in favor of the final Complaint. https://www.ftc.gov/news-events/news/press-releases/2022/03/ftc-sues-intuit-its-deceptive-turbotax-free-filing-campaign. Accordingly, this defense is without merit.

### 4. Fourth Defense

Respondent argues that the doctrine of laches bars consideration of advertisements that are no longer used because such advertisements were known to the FTC for a considerable period of time prior to initiating this action. Answer, Fourth Defense. Respondent's argument is rejected. "It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940) (citing cases); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917) (citing cases); *In re Simeon Mgmt., Corp.*, 87 F.T.C. 1184, 1976 WL 180002, at *22 (Apr. 29, 1976) ("The principle of equitable estoppel – laches – may not be applied to deprive the public of the protection of a statute because of mistaken action or lack of action on the part of public officials."); *In re Rentacolor*, No. 9163, 103 F.T.C. 400, 1984 WL 565320, *15 (Apr. 16, 1984) (holding that laches is not a "defense to an action brought by the government in the public interest"); *see also In re Basic Research, LLC*, No. 9318, 2004 FTC LEXIS 211, at *14-15 (Nov. 4, 2004) (striking affirmative defense of laches); *In re Metagenics, Inc.*, No. 9267, 1995 WL 17003144, at *2 (F.T.C. Jan. 5, 1995) (same).

### 5. Fifth Defense

Respondent asserts that "[t]o the extent the complaint seeks to impose liability for conduct that occurred before March 31, 2018, it is barred by the applicable statute of limitations." Answer, Fifth Defense. Respondent's assertion is without merit. "[A]n action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it." *E. I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924); *see also United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1489 (9th Cir. 1993) ("In the absence of a federal statute expressly imposing or adopting one, the United States is not bound by any limitations period.").

It is well established that "[n]o statute of limitations attaches to administrative proceedings brought under Section 5 of the Federal Trade Commission Act. . . ." *Rentacolor*, 1984 WL 565320, at *15 (citing cases); *see FTC v. Ivy Capital, Inc.*, 2:11-CV-283, 2011 WL 2470584, at *2 (D. Nev. June 20, 2011) ("A defendant may not assert a statute of limitations defense against the United States government unless the statute in question contains an express

PUBLIC

limitations period."); *see also FTC v. Instant Response Sys., LLC,* 13-Civ-00976, 2014 WL 558688, at *3 (E.D.N.Y. Feb. 11, 2014) (citing cases). Indeed, Respondent acknowledges that "[S]ection 5 does not include an express statute of limitations[.]" RB at 113. *Compare* 15 U.S.C. § 57b(d) (setting a three-year statute of limitations for claims under Section 19(a), not Section 5 actions).

Respondent contends that even if a statute of limitations is not expressly stated in Section 5 of the FTC Act, a three-year statute of limitation should nevertheless be applied to this case, by "borrowing" such a limitation period from state and federal laws that Respondent argues are analogous. RB at 113, *citing DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151 (1983). *DelCostello*, however, does not apply to an action brought by the FTC. As the court observed in *FTC v. 4 Star Resolution*, in which the court struck a statute of limitations defense in a case brought under the FTC Act: "*DelCostello* stands for the proposition that where no applicable statute of limitations is found in federal civil law, an analogous suitable statute may be borrowed. The actions at issue in that case were brought by individual employees against their employers and unions, not by the United States Government." *FTC v. 4 Star Resolution, LLC*, No. 15-cv-112S, 2015 WL 7431404, at *2 (W.D.N.Y. Nov. 23, 2015) (*citing, inter alia, SEC v. Lorin*, 869 F. Supp. 1117, 1127 (S.D.N.Y. 1994) (holding that the practice in civil law of "borrowing" a limitations period from analogous statutes does not apply where the government is enforcing a public right and Congress is silent on a limitations period)).

### 6.    Sixth Defense

Respondent asserts that statements and actions of the Chair of the Commission indicate prejudgment of this case, in violation of Intuit's Fifth Amendment due process rights to adjudication before a neutral arbiter. Answer, Sixth Defense. Respondent bases this assertion on Chair Khan's March 29, 2022 retweet of the FTC press release announcing the filing of this action and on Chair Khan's statements at an April 22, 2022 antitrust conference. This argument, based on these two statements, has already been considered in this case and determined to be without merit. *In re Intuit Inc.*, No. 9408, 2022 FTC LEXIS 92, at *11-13 (Nov. 7, 2022) (holding that Chair Khan's retweeting of an FTC press release and factual statements that the FTC had brought a lawsuit alleging deception did not indicate any prejudgment of the merits of

PUBLIC

this case); *Intuit*, 2023 FTC LEXIS 18, at \*49 ("[T]he prejudgment argument asserted is without merit."). Accordingly, the Sixth Defense is rejected.

### 7. Seventh Defense

Respondent argues that the structure of the FTC as an independent agency violates the doctrine of separation of powers because the Commissioners and the Administrative Law Judge are impermissibly insulated from presidential removal. Answer, Seventh Defense. The Supreme Court upheld the constitutionality of removal protections for Commissioners nearly 90 years ago and has declined multiple times since then to alter that holding, which remains binding. *Humphrey's Executor v. United States*, 295 U.S. 602, 625-26 (1935). With regard to the Administrative Law Judge, Intuit relies on *Jarkesy v. SEC*, in which the Court of Appeals for the Fifth Circuit held that the statutory removal restrictions for United States Securities and Exchange Commission ("SEC") Administrative Law Judges are unconstitutional. 34 F.4th 446, 464 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (June 30, 2023). No court has extended the *Jarkesy* holding to the FTC. Until such precedent exists, Respondent's argument that the FTC's structure violates the separation of powers doctrine is unsupported as a matter of law.

### 8. Eighth Defense

Respondent asserts that the structure of FTC administrative proceedings, in which the Commission both initiates and finally adjudicates the Complaint, violates Intuit's Fifth Amendment Due Process right to adjudication before a neutral arbiter. Answer, Eighth Defense. Respondent's argument lacks merit. Congress specifically authorized the Commission, in the FTC Act, to investigate, issue a complaint, determine the facts, and, if a violation is found, to issue a cease and desist order. 15 U.S.C. §§ 45(a)(2), (b), 46(a), 49, 57b-1. "The combination of investigative and judicial functions within an agency has been upheld against due process challenges, both in the context of the FTC and other agencies." *Gibson v. FTC*, 682 F.2d 554, 560 (5th Cir. 1982) (*citing FTC v. Cinderella Career & Finishing Sch., Inc.*, 404 F.2d 1308, 1315 (D.C. Cir. 1968); *Pangburn v. CAB*, 311 F.2d 349, 356 (1st Cir. 1962); *FTC v. Cement Inst.*, 333 U.S. 683, 700-03 (1948); *Withrow v. Larkin*, 421 U.S. 35, 47-57 (1975)).

PUBLIC

In *Withrow v. Larkin*, the Supreme Court rejected the proposition that the combination of prosecutorial and adjudicative functions, "without more," "necessarily creates an unconstitutional risk of bias in administrative adjudication" that offends due process. 421 U.S. at 47, 58. Respondent argues that "evidence of case-specific prejudgment" falls under an exception noted in *Withrow* for "special facts and circumstances" that make the risk of unfairness "intolerably high." RB at 118 (*citing Withrow*, 421 U.S. at 58). This argument is without merit because the underlying "prejudgment" claim has previously been rejected. *Intuit*, 2022 FTC LEXIS 92, at *11-13; *Intuit*, 2023 FTC LEXIS 18, at *49.

### 9.    Tenth Defense[34]

Respondent asserts that Congress' giving the FTC plenary authority to choose whether to litigate claims in federal court or by administrative adjudication constitutes an unconstitutional delegation of legislative authority.[35] Answer, Tenth Defense. Under the nondelegation doctrine, Congress may not delegate "powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

The FTC Act "permits the Commission to use both its own administrative proceedings (set forth in § 5 of the Act) and court actions in exercising [its] authority" to prevent unfair or deceptive acts or practices. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1345 (2021). Respondent argues, based on the Fifth Circuit's recent opinion in *Jarkesy*, *supra*, that Congress

---

[34] Respondent's Answer includes as its Ninth Defense that the Commission's procedures violate Intuit's right to procedural due process under the Due Process Clause of the Fifth Amendment. Respondent does not advance any argument in support of this defense in its post-trial brief or reply brief and therefore it need not be addressed. *Zannino*, 895 F.2d at 17. To the extent Respondent's procedural objections are encompassed by those raised in connection with its Sixth, Seventh, Eighth, and Tenth defenses, they have been addressed and resolved herein.

[35] Respondent's reliance on *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909) – for the proposition that the Supreme Court has held that the power to choose whether to assign disputes to agency adjudication or to an Article III tribunal is "peculiarly within the authority of the legislative department" – is misplaced. As an initial matter, the words quoted by Respondent are the Supreme Court's reframing of an argument made by one of the parties: "*It is insisted that* the decisions just stated and the legislative practices referred to are inapposite here, because they all relate to subjects peculiarly within the authority of the legislative department of the Government, and which, from the necessity of things, required the concession that administrative officers should have the authority to enforce designated penalties without resort to the courts." *Id.* (emphasis added). The Supreme Court rejected that argument and upheld Congress' delegation of authority to the Secretary of Commerce and Labor to deny entry to a vessel and to impose a fine. *Id.* at 332, 343 (holding that there is "no doubt of the right [of Congress] to endow administrative officers with discretion to refuse to perform the administrative act of granting a clearance as a means of enforcing the penalty which there was lawful authority to impose").

212

violated the nondelegation doctrine by giving the FTC "unfettered discretion" to decide whether to bring cases administratively "instead of in an Article III court . . . ." RB at 121 (*quoting Jarkesy*, 34 F.4th at 461, 462). Complaint Counsel argues that a Commission decision whether to pursue an enforcement action in federal court or by administrative proceeding is not a legislative function, but constitutes a "forum choice," which is a classic exercise of prosecutorial discretion.

In making choices about whether and how to enforce the laws it is charged by Congress with enforcing, the Commission does not exercise legislative power; instead, it exercises enforcement discretion – a traditional executive power. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch . . . ."); *United States v. Nixon*, 418 U.S. 683, 693 (1974) (stating that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (noting that a federal prosecutor's decision not to indict a particular defendant "has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed'" (citation omitted)). Furthermore, the Supreme Court has held that Congress did not violate the nondelegation doctrine by enacting two criminal statutes with "different penalties for essentially the same conduct" and leaving federal prosecutors with "discretion to choose between" them. *United States v. Batchelder*, 442 U.S. 114, 121, 124 (1979).

*Jarkesy,* an SEC case, is currently on appeal to the Supreme Court. Under current Supreme Court precedent, Respondent's unconstitutional delegation of legislative authority argument is unavailing.

### G.    Remedy

#### 1.    Overview

As held above, the evidence proves that Respondent engaged in deceptive advertising in violation of Section 5 of the FTC Act. Upon finding such violation, the appropriate remedy is to issue an order to cease and desist from such practice. 15 U.S.C. § 45(b) (directing that, upon

PUBLIC

finding a violation of Section 5, the Commission "shall issue" an order to "cease and desist from
. . . such act or practice"); *FTC v. National Lead Co.*, 352 U.S. 419, 428 (1957). Courts have
long recognized that the Commission has wide discretion in fashioning an appropriate remedial
order, subject to the constraint that the order must bear a reasonable relationship to the unlawful
acts or practices found to exist. *See, e.g., FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394-95
(1965); *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952); *Jacob Siegel Co. v. FTC*, 327 U.S. 608,
611, 613 (1946). The terms of the order must also be sufficiently "clear and precise" that they
may be understood by those against whom they are directed. *Colgate-Palmolive*, 380 U.S. at 392
(*quoting Cement Institute*, 333 U.S. at 726).

Complaint Counsel submitted a proposed cease and desist order with its Post-Trial Brief
("Proposed Order"). In summary, the Proposed Order prohibits Respondent from
misrepresenting in its "advertising, marketing, promoting, or offering for sale of any goods or
services" any material fact, "expressly or by implication," including cost and various conditions
for use (Section I, II); and requires Respondent to refrain from representing that a good or
service is free, unless (A) the good or service is free for all consumers or; (B) all terms and
conditions for receiving the free good or service are set forth "Clearly and Conspicuously" [36] at
the outset of the offer "so as to leave no reasonable probability that the terms of the offer might
be misunderstood" (Section I.A, B) (emphasis added). In addition, "if the goods or services are
not Free for a majority" of United States taxpayers, this fact must be "disclosed Clearly and
Conspicuously" at the outset (Section I.C). The Proposed Order also includes various
acknowledgements (Section III); compliance reporting requirements (Section IV); recordkeeping
requirements (Section V); and compliance monitoring requirements (Section VI).

Respondent objects to the Proposed Order. Respondent first asserts that it is unnecessary
to issue any cease and desist order because Intuit has ceased the advertising at issue in this case
and will not engage in such advertising in the future. Respondent argues that a cease and desist
order is designed to prevent illegal practices in the future, not to punish past conduct, [37] and that

---

[36] "Clearly and Conspicuously" is defined in detail in the definitions section of the Proposed Order. In general, the
phrase "means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by
ordinary consumers[.]" Proposed Order, Definition A.

[37] *See, e.g., Ruberoid Co.*, 343 U.S. at 473; *Cement Institute*, 333 U.S. at 706.

Complaint Counsel has failed to meet its burden of proving a "cognizable danger of recurrent violation." RB at 102 (citing *W. T. Grant*, 345 U.S. at 633). Respondent further objects to certain provisions of the Proposed Order. These arguments are addressed below.

### 2. Necessity of Order

#### a. Applicable Legal Principles

It is well established that the "power to grant injunctive relief survives discontinuance of the illegal conduct." *W. T. Grant*, 345 U.S. at 633; *FTC v. Citigroup Inc.*, No. 1:01-CV-607, 2001 WL 1763439, at *3 (N.D. Ga. Dec. 27, 2001) ("'The fact that illegal conduct has ceased does not foreclose injunctive relief.'" (*quoting SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978))); *In re Benco Dental Supply Co.,* No. 9379, 168 F.T.C. 415, 2019 WL 5419393, at *75 (Oct. 15, 2019) (Initial Decision), decision of the Commission pursuant to 16 C.F.R. § 3.51(a). [38] Thus, "voluntary cessation of an illegal practice, even where proven, does not by itself render the entry of a cease and desist order inappropriate." *Benco*, 2019 WL 5419393, at *75; *ITT Cont'l Baking Co. v. FTC*, 532 F.2d 207, 222 n.22 (2d Cir. 1976); *Oregon-Washington Plywood Co. v. FTC*, 194 F.2d 48, 51 (9th Cir. 1952). Where there has been a voluntary cessation of challenged conduct, Complaint Counsel "'must satisfy the court that relief is needed.'" *Benco*, 2019 WL 5419393, at *75 (*quoting W. T. Grant*, 345 U.S. at 633). This requires "demonstrating that 'there exists some cognizable danger of recurrent violation, something more than the mere possibility . . . .'" *Benco*, 2019 WL 5419393, at *75 (*quoting W.T. Grant*, 345 U.S. at 633); *SCM Corp. v. FTC*, 565 F.2d 807, 812-13 (2d Cir. 1977) (remanding the order and holding that, where challenged conduct has ceased, the FTC has the burden of proving cognizable danger of recurrent violation).

Determining whether there is a cognizable danger of recurrent violation "depends 'on a consideration of all the surrounding facts and circumstances[,]'" *Benco*, 2019 WL 5419393, at *75 (*quoting Oregon-Washington Plywood*, 194 F.2d at 50), and the court's "discretion is necessarily broad . . . ." *W.T. Grant*, 345 U.S. at 633. "The factors 'relevant to the question whether to issue an order when a respondent professes to have ceased the complained-of

---

[38] Rule 3.51 has since been amended, effective July 5, 2023. 88 Fed. Reg. 42872 (FTC Final Rules July 5, 2023).

PUBLIC

activities [are]: the bona fides of the respondent's expressed intent to comply with the law in the future; the effectiveness of the claimed discontinuance; and the character of the past violations.'" *Benco*, 2019 WL 5419393, at \*75 (*quoting In re Int'l Association of Conference Interpreters*, 1997 FTC LEXIS 348, at \*108 (Mar. 14, 1997)).

### b. Voluntary Cessation of Conduct

The evidence demonstrates that Intuit has partially ceased the advertising challenged in this case, specifically, its "free, free, free" video advertising campaign. F. 534. However, the circumstances surrounding this partial cessation appear less than voluntary. The discontinuance of those advertisements did not occur until the spring of 2022, against the backdrop of then-pending deceptive advertising litigation against Intuit commenced years earlier, in 2019. These included cases brought by the county of Santa Clara, California and by the City of Los Angeles, California, as well as a consolidated consumer class action in the United States District Court for the Northern District of California, all claiming that Intuit's free tax filing advertising was deceptive. F. 535-537. The FTC's investigation in this case, which was conducted together with several state attorneys general, also commenced in 2019. F. 533. Intuit continued the challenged advertising until March 24, 2022, when, after meeting with the Chair of the FTC as part of settlement negotiations, and four days before the issuance of the FTC's Complaint, Intuit decided to discontinue a portion of the challenged advertising – its "free, free, free" video advertising campaign. F. 534. Under these circumstances, the facts weigh against a conclusion that Intuit's partial cessation of some of the challenged advertising was voluntary. *See Fedders Corp. v. FTC*, 529 F.2d 1398, 1403 (2d Cir. 1976) (holding that discontinuance of challenged claim was not "voluntary," but resulted from defendant's awareness of the Commission's investigation); *see also American Home Products*, 695 F.2d at 703 n.38 (holding that discontinuance of challenged claims was not voluntary when claims ceased after proceedings were brought); *FTC v. Sage Seminars, Inc.*, No. 95-cv-2854, 1995 WL 798938, at \*6 (N.D. Cal. Nov. 2, 1995) (finding that "defendants' claimed cessation of conduct [which] occurred only after defendants learned that the FTC had commenced an investigation into [defendant's] practices" could "hardly be considered 'voluntary'").

In addition, while Intuit has discontinued what are arguably the most egregious of its deceptive free tax filing advertisements, Intuit has continued to make free tax filing claims across all media. F. 518. Respondent concedes that the current advertisements "have the same features" as the past advertisements. RB at 104. Respondent argues that it has enhanced its current disclosures as to "simple returns only" and the identification of the specific TurboTax free filing product by making them more prominent. RB at 104. [39] However, it has been held herein that the content of such disclosures – even where visible – omit material facts and are ineffective to prevent consumers viewing the advertisements from taking away the misimpression that they can file for free with TurboTax. *See* section III.E.2. [40] Similarly, Respondent argues that Intuit's free tax filing advertisements also include the disclosure to "see if you qualify" at the TurboTax website and, in the case of online display and paid search advertisements, enable viewers to link directly to the TurboTax website landing page for the advertised free product. RB at 104. However, as explained in section III.E.2, information available on Intuit's website cannot be used to counter or cure a misleading impression induced by other advertising; the FTC Act is deemed violated if the first contact with the consumer is induced through deception, even if the buyer later becomes fully informed. *ECM Biofilms*, 2015 WL 13879743, at \*49 n.75 ("It is well-established that an advertiser cannot 'cure the deception' in one advertisement with different statements in another."); *see also Book-of-the-Month Club*, 1952 WL 104729, at \*13 ("A seller may not make one representation in one part of his advertisement and withdraw it in another part . . ."); *Deception Statement*, 103 F.T.C. at 183 (collecting cases); *Intuit*, 2023 FTC LEXIS 18, at \*32-33 (citing cases).

### c.   Cognizable Danger of Recurring Violation

In support of its claim that Intuit's deceptive advertising is unlikely to reoccur, Respondent relies principally on Intuit's May 4, 2022 settlement agreement with the attorneys general of the 50 states and the District of Columbia, which resolved an investigation of the attorneys general into whether Intuit's marketing, advertising, promotion, and sale of certain

---

[39] Intuit's advertisements for TY 2022 are described in F. 510-526.

[40] Intuit's current email marketing, similar to its prior email marketing, includes detailed disclosures regarding the "simple returns" qualification criteria, although the disclosures appear toward the end of the emails. F. 526.

PUBLIC

online tax preparation products constituted deceptive or unfair business acts or practices in violation of the states' consumer protection laws (the "Assurance of Voluntary Compliance"), and a June 25, 2022 stipulated final judgment and permanent injunction that Intuit entered into with the State of California (the "Consent Order"), which contains substantively the same terms as the Assurance of Voluntary Compliance (collectively, the "State Settlement"). [41] Respondent argues that the State Settlement constrains Intuit from engaging in the advertising practices challenged here and that Intuit is committed to complying with the State Settlement in the future. Therefore, according to Respondent, there is an insufficient basis for finding a cognizable danger of a recurring violation by Intuit.

Although the State Settlement provides a number of constraints on Intuit's conduct, as shown below, the State Settlement also contains substantial loopholes that fail to address or prevent the violations found to exist in this case. Thus, even assuming Respondent is presently in compliance with the State Settlement, and will continue to be in compliance, this does not obviate the need for a cease and desist order here. A summary of the terms of the State Settlement follows.

The State Settlement generally prohibits Intuit from misrepresenting "expressly or by implication": that consumers can "file their taxes for free with the TurboTax Free Edition Product when that is not the case"; "[a]ny other fact material to consumers concerning any tax preparation product or service, such as the price; total cost; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics." F. 540. The State Settlement specifically prohibits Intuit from publishing "in any medium (1) its 'free, free, free' Video Advertisements . . . and (2) Video Advertisements that are substantially similar in their repetition of the word free." F. 541.

The State Settlement requires Intuit to make disclosures in connection with any free tax filing claims, which vary by the type of advertising. As further described below, the requirements of the agreement vary depending on whether the advertisement is "space

---

[41] Respondent does not cite any provision of the Consent Order that incorporates the Assurance of Voluntary Compliance for enforcement purposes; nor does Respondent indicate that the Assurance of Voluntary Compliance was entered in court as a consent order. Accordingly, the term "State Settlement" is more accurate than Respondent's term, "Consent Order," to refer to the collective settlement documents.

PUBLIC

constrained" or "non-space constrained"; video or non-video; or placed on the TurboTax website. In all cases, the required disclosures must be "clear and conspicuous" and in "close proximity" to the "free" representations. F. 543, 548. "Clearly and Conspicuously" is defined to mean that the disclosure is "difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers." F 545. For example, "[a] visual disclosure, by its size, contrast, location, the length of time it appears . . . must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood." F. 545. Any required audio disclosure must "be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it." F. 545. "Close Proximity" is defined to mean that the disclosure is "very near the triggering representation and that the disclosure is made simultaneously with the triggering representation and remains or is repeated throughout the duration of the Advertisement." F. 546. This definition further provides that "disclosure made through a hyperlink, pop-up, interstitial, or other similar technique is not in Close Proximity to the triggering representation." F. 546.

For "space-constrained" online advertisements (other than space constrained video advertisements and excluding any advertisements on the TurboTax website), Intuit must disclose that "eligibility requirements apply." F. 547. In addition, for covered online advertisements, Intuit must "(1) Clearly and Conspicuously include a hyperlink to a landing page or webpage on a TurboTax website that Clearly and Conspicuously contains full disclosure of all material eligibility restrictions or (2) link by clicking on the Advertisement itself to a landing page or webpage on a TurboTax Website that Clearly and Conspicuously sets forth full disclosure of all material eligibility restrictions." F. 547. The term "Space-constrained" refers to covered advertisements that have "space, time, format, size, or technological restrictions that limit Intuit from being able" to make the required disclosures, with the burden of proving such constraint placed on Intuit. F. 544.

Space-constrained video advertisements must "visually disclose, Clearly and Conspicuously, and in Close Proximity to the representation that the product is free: (1) the existence and category of material limitations on a consumer's ability to use that free product; and (2) that not all taxpayers qualify for the free product." F. 548. If the video is 9 seconds or

longer, the video must also verbally disclose that "not all taxpayers qualify." F. 549. These provisions terminate 10 years from the date of the settlement (2032). F. 548-549.

Non-space constrained advertisements (other than those on a TurboTax website) must disclose "Clearly and Conspicuously, and in Close Proximity to the representation that the product is free: (1) the existence and category of material limitations on a consumer's ability to use that free product; and (2) that not all taxpayers qualify for the free product." F. 543.

For any advertisement of free tax preparation products on a TurboTax website and in "any space on a TurboTax Website listing, describing, offering, or promoting such free products, Intuit must disclose (1) Clearly and Conspicuously and very near to the representation all material limitations on a consumer's ability to use that free product, including, but not limited to, eligibility criteria for that free product, or (2) through a hyperlink (i) that is very near to the representation, (ii) that indicates that there are material limitations on a consumer's ability to use that free product, and (iii) that links to a landing page or webpage that Clearly and Conspicuously sets forth all material limitations on a consumer's ability to use that free product, including, but not limited to, eligibility criteria for that free product." F. 550.

As shown above, other than the prohibition against the "free, free, free" advertisements, the State Settlement generally allows Intuit to continue advertising free tax filing much as it has in the past, but with some additional disclosures designed to convey that the free offer is not free for everyone, and that limitations apply. The State Settlement does not, however, require disclosure of any material facts explaining the limiting *conditions* and therefore, as the facts found herein demonstrate, it will not prevent at least a significant minority of reasonable consumers from taking away the misimpression that the free offer is actually free for them. For example, in non-space constrained advertisements, while Intuit must disclose that not all taxpayers qualify, it is sufficient to disclose "the existence and category" of the applicable limitations, without including any material details explaining the nature of the limitations. Similarly, in space-constrained advertisements (other than video) the State Settlement allows Intuit to disclose only that "eligibility requirements apply" and to use hyperlinks to the TurboTax website to lead to complete disclosures. For space constrained videos, any required audio disclosure need only disclose that "not all taxpayers qualify." Space constrained online video

PUBLIC

advertisements of 8 seconds or less need not contain any audible disclosures at all, and it is sufficient under the State Settlement that audio disclosures in longer space-constrained online videos state only that "not all taxpayers qualify." Moreover, all visual and auditory disclosure requirements for space-constrained online videos expire after ten years. For all these reasons, Respondent's contention that the State Settlement is preventing, and will continue to prevent, the deceptive advertising found to exist in this case is rejected.

Based on the foregoing, the record supports a conclusion that there exists some cognizable danger of recurrent violation. Additional factors further support the need for a cease and desist order in this case. Intuit remains in the tax preparation industry and continues to make free tax filing claims.[42] "An inference arises from illegal past conduct that future violations may occur." *Citigroup*, 2001 WL 1763439, at *3 (*quoting Koracorp Indus., Inc.*, 575 F.2d at 698). Furthermore, without impugning the sincerity of Intuit's witnesses testifying to Intuit's commitment not to deceive its customers – including because of Intuit's own business incentives – Intuit's own copy testing and market research put Intuit on notice that a significant percentage of consumers believed that TurboTax was free for them (F. 453, 457), yet Intuit continued the advertising despite knowing that only approximately one-third of taxpayers actually qualified for the free tax filing offer (F. 36-37). Intuit also continued its free claims despite years of customer complaints regarding expecting to be able to file for free with TurboTax, but being unable to do so (F. 472-507); and despite a consumer class action (among other litigation) claiming that Intuit's free tax filing advertising was deceptive. F. 535-537.[43] Considering the totality of the circumstances, issuance of a cease and desist order is necessary and appropriate in this case.

---

[42] In support of its contention that its current free tax filing advertisements are not deceptive, Respondent points to copy testing of certain TY 2022 video advertisements for TurboTax Free Edition and TurboTax Live Basic in which between ▮▮▮ and ▮▮▮ of participants believed, after exposure to the advertisements, that TurboTax ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ RB at 103; RFF 702, 709. While these are smaller percentages than shown by copy testing of Intuit's "free, free, free" video advertisements (*see* F. 453, 457), the percentages of participants taking away the message that they can file for free are not insignificant percentages. Moreover, Respondent failed to demonstrate that participants in the TY 2022 copy test were in fact eligible for the free tax filing products in the advertisements. The fact that participants reported believing that their tax returns were ▮▮▮▮▮▮▮▮▮▮▮ (RFF 705-706) is not probative of whether they in fact had "simple returns," as defined by Intuit. In short, the TY 2022 copy test is not proof that Intuit's current advertisements are unlikely to mislead a viewer into believing they can file their taxes for free using TurboTax.

[43] In support of its claim that Intuit had no intent to deceive its customers, Respondent argues that Intuit targeted its advertising to taxpayers between 18 and 49, because, according to Respondent, this age group is more likely to meet Intuit's qualifications for "simple tax returns." *E.g.*, RB at 108-09. Regardless of whether Respondent's assumption

Having resolved that a cease and desist order is required, the specific provisions for such an order are considered below.

### 3.    Provisions of the Proposed Cease and Desist Order

Respondent challenges the specific provisions of the Proposed Order on various grounds. In evaluating these objections, the applicable standard, as noted above, is whether the provisions of the order bear a reasonable relationship to the unlawful acts or practices found to exist. *See, e.g., Colgate-Palmolive*, 380 U.S. at 394-95; *Ruberoid*, 343 U.S. at 473; *Jacob Siegel*, 327 U.S. at 613. In addition, the terms of the order must also be sufficiently "clear and precise in order that they may be understood by those against whom they are directed," and "avoid raising serious questions as to their meaning and application" in the event of the need for future enforcement, including by way of civil penalties for an alleged violation. *Colgate-Palmolive*, 380 U.S. at 392 (citations omitted).

### a.    Disclosure Requirements

Respondent objects to the provisions of I.B and I.C, which require Intuit, when advertising goods or services as free that are not in fact free for all consumers, to disclose: "All the terms, conditions, and obligations upon which receipt and retention of the 'Free' good or service are contingent are set forth Clearly and Conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood" (Section I.B); and, if the goods or services are not free for a majority of United States taxpayers, to further disclose this fact, clearly and conspicuously (Section I.C). These objections are addressed below.

### i.    Consumer Harm

Respondent first contends that disclosures beyond those presently provided by Intuit in connection with its "free" advertising would be redundant and unhelpful to consumers. Respondent relies on a survey performed by its expert witness, Professor John Hauser, referred

---

as to the characteristics of the 18 to 49 age group is factually supported, the facts show that Intuit engaged in a wide-reaching advertising campaign that extended well beyond that limited age group, including widely distributed television advertisements, which could be viewed by any age group, and paid search advertising, which could be viewed by anyone entering the relevant search terms. *See* F. 52-55, 57.

to in the record as a "Disclosure Efficacy Survey," that purported to find that revising certain disclosures in a TurboTax video advertisement for free tax filing would not have a significant effect on whether consumers would choose TurboTax. RX1017 (Hauser Expert Report) ¶¶ 85-87, 100. In summary, Professor Hauser altered the disclosures used by TurboTax in its video advertisements and webpages and created a video advertisement and webpages for a fictitious free tax filing product offered by a company that Professor Hauser named "Vertax." RX1017 (Hauser Expert Report) ¶¶ 86, 87; Hauser Tr. 853, 856-858. Specifically, Professor Hauser showed test group participants a video advertisement for Vertax that: extended the duration that written disclosures appeared on a final video screen from 5 seconds to 8 seconds; slightly increased the font size and brightness of the written disclosures; and added a voice-over to the written disclosure screen, stating "[f]or simple returns only." RX1549 (Intuit); RX1017 (Hauser Expert Report) at Appendix C-1-6; Hauser Tr. 863-864. Test group participants were also shown webpages with disclosures altered from the TurboTax website that displayed additional "see if you qualify" hyperlinks, and set forth, without a hyperlink, the full qualifications for the free product on a "products & pricing" page. RX1017 (Hauser Expert Report) at Appendix C-1-9, C-1-19, C-1-41; Hauser (Intuit) Tr. 868-869.

After exposure to the advertisement and webpages, participants in both the test group and the control group, who had not been exposed to the revised Vertax disclosures, were asked whether they would consider starting their tax preparation with Vertax. RX1017 (Hauser Expert Report) ¶¶ 16, 92; Hauser Tr. 856. Professor Hauser found no statistically significant difference between the test and control group participants with regard to whether they would choose to begin their tax return with Vertax. RX1017 (Hauser Expert Report) ¶ 92; Hauser Tr. 870, 873-875. Thus, according to Professor Hauser, this demonstrates that enhancements to disclosures related to TurboTax Free Edition eligibility are unlikely to have a material impact on consumers' consideration of using TurboTax to start their tax return. RX1017 (Hauser Expert Report) ¶¶ 16, 91; *see also* Hauser Tr. 979.

Respondent's reliance on the Hauser survey as a basis for rejecting the disclosure requirements in the Proposed Order is unavailing. Respondent has not shown that Professor Hauser tested the specific form or substance of the disclosures contemplated by the Proposed Order. For example, it does not appear that the disclosure forms tested by Professor Hauser met

the Proposed Order's definition of "clear and conspicuous." Proposed Order A.2 (requiring that, to be clear and conspicuous, "[a] visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood"); *see also* Proposed Order Section I.B (requiring that unless the product or service is free for all consumers, the advertisement must disclose: "*All the terms, conditions, and obligations* upon which receipt and retention of the 'Free' good or service are contingent are set forth Clearly and Conspicuously *at the outset* of the offer") (emphasis added).

Respondent next contends that disclosing all material eligibility requirements for Intuit's free tax filing products would harm consumers. Respondent asserts that explaining all of TurboTax Free Edition's qualifications, particularly in a brief video or display advertisement, would confuse consumers with "information overload" that they cannot effectively understand or process. RB at 111. Respondent relies on testimony from TurboTax executives opining that there would have been consumer confusion if Intuit had included detailed eligibility criteria in its free product advertising. This unsupported lay opinion is unpersuasive. Respondent also cites testimony from expert witnesses Golder and Novemsky, in which each witness recognized only the hypothetical *potential* to overload consumers with complicated information in an advertisement, particularly in the context of short television advertisements. Neither witness conducted any formal analysis using the disclosures required by the Proposed Order. It is true that Professor Novemsky acknowledged on cross-examination that the eligibility requirements to file for free "cannot be *easily* communicated in an ad to a reasonable consumer." Novemsky, Tr. 1820 (emphasis added). However, this is not a basis for rejecting disclosures designed to prevent Intuit's free tax filing advertising from being false or misleading.

Moreover, to the extent it is difficult for Intuit to communicate effectively all material eligibility requirements for Intuit's free tax filing products, the solution is to avoid claims that trigger the need for such clarifying disclosures. *See .com Disclosures: How to Make Effective Disclosures in Digital Advertising* (Mar. 2013), at 6, available at ftc.gov/business-guidance/resources/com-disclosures-how-make-effective-disclosures-digital-advertising ("If a disclosure is necessary to prevent an advertisement from being deceptive, unfair, or otherwise violative of a Commission rule, and if it is not possible to make the disclosure clear and

conspicuous, then either the claim should be modified so the disclosure is not necessary or the ad should not be disseminated.").[44] In *POM*, the Commission rejected an analogous argument. Specifically, in *POM*, the evidence proved that the respondents engaged in deceptive advertising by claiming that their products prevented, treated, or cured diseases without adequate substantiation. *POM*, 2013 WL 8364895, at *40. The Commission rejected the respondents' contention that they should not be required to substantiate their claims with randomized controlled studies ("RCTs") because it was too costly and set an "impossibly high and legally untenable" standard. *Id.* at *27. In affirming the Commission's order in *POM*, the District of Columbia Circuit adopted the Commission's reasoning for rejecting the argument:

> We acknowledge that RCTs may be costly . . . . Yet if the cost of an RCT proves prohibitive, petitioners can choose to specify a lower level of substantiation for their claims. As the Commission observed, "the need for RCTs is driven by the claims [petitioners] have chosen to make."

*POM*, 777 F.3d at 497. The above reasoning applies to the instant case as well. The need for detailed disclosures as to the terms and conditions of Intuit's free tax filing offer is driven by the claim that Intuit is choosing to make.

In addition, Respondent argues that the disclosures required in the Proposed Order "could also exacerbate the skepticism that reasonable consumers already bring to offers for free products or services" and result in fewer consumers taking advantage of the ability to file their taxes for free with TurboTax, to consumers' detriment. RB at 112. Enabling consumers to take advantage of an offering that is in fact free for them is a laudable goal; but it does not justify luring other consumers who take away the misimpression that the offering is free for them. The answer to a concern about consumer skepticism is not to restrict consumers from receiving complete and truthful information about the free tax filing claim; rather, the answer is for Intuit

---

[44] Although the .com disclosures guide is not binding law and has not been applied herein for determining Intuit's liability, a number of courts have applied the .com disclosures as a standard for determining deception. *See DirecTV*, 2018 U.S. Dist. LEXIS 139192, at *24; *FTC v. Direct Benefits Group, LLC*, 6:11-CV-1186-ORL-28, 2013 WL 3771322, at *16-17 (M.D. Fla. July 18, 2013); *see also Thomas v. FTS USA, LLC*, No. 3:13-cv-825, 2016 U.S. Dist. LEXIS 86061, at *16 (E.D. Va. June 30, 2016) (applying .com disclosure guide to issue of adequacy of disclosures under Federal Credit Reporting Act); *Milbourne v. JRK Residential Am., LLC*, 3:12-cv-861, 2016 U.S. Dist. LEXIS 33608, at *21-22 (E.D. Va. Mar. 14, 2016) (applying .com disclosures to issue of adequacy of disclosures under Truth in Lending Act). In the instant case, the .com disclosures guide is informative for purpose of establishing boundaries for Intuit's advertising going forward.

225

to modify its claim so as not to be deceptive. In this regard, the record demonstrates that Intuit has a substantial executive, marketing, and advertising team to assist.

### ii.    Compelled Speech

Next, Respondent objects to the requirement in Section I.C that, when advertising as free products that are not in fact free for the majority of taxpayers, Intuit must disclose that fact, *i.e.*, state in its advertising that a majority of taxpayers are not eligible. Respondent argues that this amounts to unconstitutionally compelled speech. RB at 112.

Respondent acknowledges that the Constitution does not bar the government from compelling certain disclosures in commercial speech, where the speech at issue is "'noncontroversial and not unjustified or unduly burdensome.'" RB at 112 (*quoting National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018)). Respondent contends that the disclosure required under Section I.C is unjustified because the totality of United States taxpayers is not the appropriate metric for measuring eligibility for free tax filing with TurboTax. This argument has previously been rejected. *See* section III.E.2. Respondent further asserts that it is unjustified and unduly burdensome to require Intuit to make such disclosures, when its competitors are not similarly required to do so. This conclusory assertion, unsupported by record evidence, is unpersuasive and is rejected.

### iii.    Clarity and Precision

Respondent argues that the required disclosures in Section I.B are insufficiently clear and precise. That provision, as set forth above, requires that, unless the products or services being advertised for free are in fact free for all consumers, Intuit's disclosures must include: "All the terms, conditions, and obligations upon which receipt and retention of the 'Free' good or service are contingent are set forth Clearly and Conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood." Proposed Order Section I.B. Respondent asserts that it is unclear how the disclosure requirements are to be carried out in practice, and what specific disclosures will be deemed to meet the requirements of I.B. For the reasons explained below, Respondent's argument is rejected.

PUBLIC

The law requires only that the provisions of the order be sufficiently clear to be understood by "those against whom they are directed" in order to "avoid raising serious questions as to their meaning and application" in the event of the need for future enforcement. *Colgate-Palmolive*, 380 U.S. at 392. As recognized in *Colgate-Palmolive*, it is sufficient under this standard if the terms "are as specific as the circumstances will permit." 308 U.S. at 393; *Sterling Drug*, 741 F.2d at 1157. On its face, Section I.B is little more than a restatement of well-established law, that "[d]isclaimers or qualifications" to an advertised offer "are not adequate to avoid liability" for a false or misleading representation in the advertisement, "unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *Removatron*, 884 F.2d at 1497. In addition, similar disclosure language has been part of FTC guidance to advertisers of free offers for decades. *See* Guide Concerning Use of the Word "Free" and Similar Representations (the "Free Guides"), 16 C.F.R. § 251.1(c) ("[C]onditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood."). While the Free Guides are not binding law, the fact that the challenged disclosure requirements are identical to long standing guidance, as well as consistent with well-established law, rebuts the notion that Intuit cannot reasonably be expected to understand or implement the requirements of Section I.B. The disclosure requirements are driven by the claim Respondent chooses to make. *POM*, 777 F.3d at 497.

The terms of Section I.B appear to be "as specific as the circumstances will permit." *Colgate-Palmolive*, 308 U.S. at 393. Under the circumstances presented, "it does not seem 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *Colgate-Palmolive*, 380 U.S. at 393 (citation omitted). If, going forward, Intuit is uncertain as to how to apply the requirements of I.B, "the uncertainty may be resolved under the Commission's Rules of Practice which permit petitioner to ascertain in advance whether a particular advertising claim comes within the scope of the

PUBLIC

order, 16 C.F.R. §§ 3.61(d), (e). *Colgate-Palmolive*, 380 U.S. at 394; *Vanity Fair Paper Mills, Inc., v. FTC*, 311 F.2d at 480, 488 (2d Cir. 1962)." *Fedders*, 529 F.2d at 1404.[45]

### b.  Multi-product Scope

The provisions of the Proposed Order apply to Intuit's advertising, marketing, promotion or offer of sale of free TurboTax online filing products, as well as any "goods or services" that Intuit advertises, markets, promotes or offers to sell as "free." Proposed Order Sections I, II. Respondent objects to this multi-product scope of the Proposed Order, arguing that because the evidence does not prove any violation as to any product other than TurboTax, "a cease-and-desist order is limited to the challenged practice." RRB at 84. Respondent is incorrect. As stated in *POM*:

> It is well established that the Commission may issue orders containing fencing-in provisions, that is, "provisions that are broader than the conduct that is declared unlawful." *Telebrands Corp.*, 457 F.3d at 357 n.5; *see also, e.g., Colgate-Palmolive Co.*, 380 U.S. at 394-95; *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952). As the Supreme Court recognized in *Ruberoid*, the Commission's orders need not be restricted to the "narrow lane" of a respondent's past actions; the Commission may effectively "close all roads to the prohibited goal, so that its order may not be by-passed with impunity." *Ruberoid Co.*, 343 U.S. at 473.

2013 WL 8364895, at *54; *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) ("[T]hose 'caught violating' the FTC Act 'must expect some fencing in.'") (*quoting Nat'l Lead*, 352 U.S. at 431).

A common form of "fencing-in" relief is a "multi-product" prohibition, such as that in the Proposed Order, which bars the respondent from using deceptive trade practices to sell not only the product that was the subject of the enforcement action, but other products sold by the respondent. "In determining whether a broad fencing-in order bears a 'reasonable relationship' to a violation of the Act, the Commission considers (1) the deliberateness and seriousness of the

---

[45] Respondent relies on *LabMd, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018) as a basis for rejecting the Section I.B disclosure requirements. In that case, the Eleventh Circuit Court of Appeals vacated an order of the Commission because the order, unlike the instant case, contained no prohibitions on LabMD's future conduct, but contained only affirmative requirements to "overhaul and replace its data-security program," without providing sufficiently clear standards for subsequent enforcement. 894 F.3d at 1224, 1236. The facts, law, and remedial order in *LabMD* are not analogous to the instant case, and *LabMD* does not constitute persuasive authority for rejecting the disclosure requirements in Section I.B of the Proposed Order.

violation, (2) the degree of transferability of the violation to other products, and (3) any history of prior violations." *Kraft*, 970 F.2d at 326. *See, e.g.*, *POM*, 2013 WL 8364895, at \*53-55; *see also Colgate-Palmolive*, 380 U.S. at 394 (upholding fencing-in that encompassed all products); *Sears*, *Roebuck & Co. v. FTC*, 676 F.2d 385, 391-92 (9th Cir. 1982); *Bristol-Myers Co. v. FTC*, 738 F.2d 554, 563-64 (2d Cir. 1984).

All three factors need not be present to find a reasonable relationship between the violation of the FTC Act and the multi-product order. *Telebrands Corp. v. FTC*, 457 F.3d 354, 358-59 (4th Cir. 2006). "The reasonable relationship analysis operates on a sliding scale - any one factor's importance varies depending on the extent to which the others are found. In other words, the more serious a violation, the less important transferability and prior history become. *See Sears,* 676 F.2d at 392 ('The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present.')." *Id.* at 358; *see Thompson Med.*, 1984 FTC LEXIS 6, at \*414 (entering fencing-in order based on finding two factors); *POM*, 2013 WL 8364895, at \*53-55 (same).

With respect to the seriousness and deliberateness of Intuit's conduct and the history of Intuit's violations, the record shows that Intuit's deceptive free tax filing advertising campaign has endured for years. F. 49. Moreover, the advertisements have run across multiple media channels and have been viewed or "clicked" millions of times over the years. F. 50, 221. In addition, regardless of whether Intuit's executives specifically or subjectively intended to deceive its customers, the facts show, as noted above, that Intuit knew that consumers believed that TurboTax was free for them (F. 453, 457) but that only approximately one-third of taxpayers actually qualified for the free tax filing offer (F. 36-37); was aware of years of customer feedback expressing dissatisfaction over expecting to be able to file for free with TurboTax, but being unable to do so (F. 472-507); and was a defendant in numerous court cases claiming that Intuit's free tax filing advertising was deceptive. F. 535-537. Respondent's actions to stop any of the challenged advertising occurred only under the pressure of governmental investigation and litigation. F. 534. This history, as well as the duration, breadth, and consistency of Intuit's conduct, weigh in favor of ordering fencing-in relief. *See Kraft*, 970 F.2d at 326 (noting Kraft's "expensive, nationwide campaign" in evaluating seriousness and deliberateness of Kraft's conduct); *Thompson Med.*, 1984 FTC LEXIS 6, \*415-16 (stating that the "seriousness of

Thompson's violations is evidenced by the size and duration of Thompson's deceptive advertising campaign"). In addition, Intuit's deceptive advertising practices found in this case are also easily transferrable to its other products, Quickbooks and Credit Karma.

Based on the foregoing, a multi-product fencing-in order is justified.[46]

### 4.    Conclusion

After consideration of all the arguments of the parties and the entire record in this case, the Proposed Order will be entered as the Order in this case. The attached Order, to be entered herewith, will serve to prohibit and prevent Respondent from engaging in deceptive practices in the future, is reasonably related to the unlawful acts or practices found to exist, and is sufficiently clear and precise.

**ORDER**

**Definitions**

For the purposes of this Order, the following definitions apply:

A.    "**Clearly and Conspicuously**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1)    In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

---

[46] Respondent argues that various provisions of the Proposed Order are materially duplicative of the State Settlement. RRB at 80-81. Respondent does not persuasively explain why this forms a basis for striking or modifying any provision of the Proposed Order. To the extent Respondent is arguing that the provisions of the State Settlement render the Proposed Order unnecessary, that argument is rejected for the reasons explained in section III.G.1.c.

2)    A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3)    An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4)    In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5)    On a product label, the disclosure must be presented on the principal display panel.

6)    The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

7)    The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

8)    The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

9)    When the representation or sales practice targets a specific audience, such as older adults, "ordinary consumers" includes reasonable members of that group.

B.    "**Free**" means that the consumer pays nothing for a good or service.

## Provisions

## I.

### Prohibition Concerning "Free" Offers

**It is ordered that** Respondent, Respondent's officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering for sale of any goods or services, must not represent that a good or service is "Free" unless:

    A.      Respondent offers the good or service for Free to all consumers; or

    B.      All the terms, conditions, and obligations upon which receipt and retention of the "Free" good or service are contingent are set forth Clearly and Conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood.

    C.      Further, if the goods or services are not Free for a majority of U.S. taxpayers, such

a fact is disclosed Clearly and Conspicuously at the outset of any disclosures required by I.B.

## II.

### Prohibited Misrepresentations

**It is further ordered that** Respondent, Respondent's officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering for sale of any goods or services, must not misrepresent or assist others in misrepresenting, expressly or by implication, any material fact, including:

    A.      The cost of any of Respondent's goods or services, including any TurboTax product or service;

B.      That consumers can only file their taxes online accurately if they use a paid TurboTax product or service;

C.      That consumers can only claim a tax credit or deduction if they use a paid TurboTax product or service; and

D.      Any other fact material to consumers concerning any good or service, such as: the total costs; any refund policy; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## III.

## Acknowledgments of the Order

**It is further ordered that** Respondent obtain acknowledgments of receipt of this Order:

A.      Respondent, within 10 days after the effective date of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after the issuance date of this Order, Respondent must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Provision titled Compliance Report[s] and Notices. Delivery must occur within 10 days after the effective date of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which a Respondent delivered a copy of this Order, that Respondent must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

# IV.

## Compliance Reports and Notices

**It is further ordered that** Respondent make timely submissions to the Commission:

A.      One year after the issuance date of this Order, Respondent must submit a compliance report, sworn under penalty of perjury, in which Respondent must:

1)      Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission, may use to communicate with Respondent;

2)      Identify all of Respondent's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

3)      Describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales;

4)      Describe in detail whether and how that Respondent is in compliance with each Provision of this Order, including a discussion of all of the changes the Respondent made to comply with the Order; and

5)      Provide a copy of each Acknowledgment of the Order obtained pursuant to this Order, unless previously submitted to the Commission.

B.      After the effective date of this Order, Respondent must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1)      Any designated point of contact; or

2)      The structure of Respondent or any entity that Respondent has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

PUBLIC

C.     After the effective date of this Order, Respondent must submit notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Respondent within 14 days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: In re Intuit Inc., Docket No. 9408.

## V.

### Recordkeeping

**It is further ordered that** Respondent must create certain records for 20 years after issuance of the Order, and retain each such record for 5 years. Specifically, Respondent must create and retain the following records:

A.     Accounting records showing the revenues from all goods or services sold, the costs incurred in generating those revenues, and resulting net profit or loss;

B.     Personnel records showing, for each person providing services in relation to any aspect of the Order, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.     Copies or records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

PUBLIC

D.     All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.     A copy of each unique Advertisement or other marketing material relating to TurboTax products or services.

## VI.

### Compliance Monitoring

**It is further ordered that**, for the purpose of monitoring Respondent's compliance with this Order:

A.     After the effective date, within 10 days of receipt of a written request from a representative of the Commission, Respondent must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury, and produce records for inspection and copying.

B.     For matters concerning this Order, representatives of the Commission are authorized to communicate directly with Respondent. Respondent must permit representatives of the Commission to interview anyone affiliated with Respondent who has agreed to such an interview. The interviewee may have counsel present.

C.     The Commission may use all other lawful means, including posing through its representatives as consumers, suppliers, or other individuals or entities, to Respondent or any individual or entity affiliated with Respondent, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## VII.

### Order Effective Date

**It is further ordered that** the final and effective date of this Order is the 60th day after this Order is served. This Order will terminate 20 years from the date of its issuance (which date

may be stated at the end of this Order, near the Commission's seal), or 20 years from the most recent date that the United States or the Commission files a complaint (with or without an accompanying settlement) in federal court alleging any violation of this Order, whichever comes later; provided, however, that the filing of such a complaint will not affect the duration of:

A.    Any Provision in this Order that terminates in less than 20 years;

B.    This Order if such complaint is filed after the Order has terminated pursuant to this Provision.

*Provided, further*, that if such complaint is dismissed or a federal court rules that Respondent did not violate any provision of the Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Order will terminate according to this Provision as though the complaint had never been filed, except that the Order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

ORDERED:                              DM chappell

D. Michael Chappell
Chief Administrative Law Judge

Date: September 6, 2023

# EXHIBIT C



UNITED STATES OF AMERICA

Federal Trade Commission

WASHINGTON, D.C. 20580

Office of the Chair

### Statement of Chair Lina M. Khan
### Regarding the Petition for Recusal from
### Involvement in Intuit Inc.
### Commission File No. 9408

Respondent Intuit Inc. ("Intuit") has filed a petition under Rule 4.17(b)(1) in this matter to seek to have me recused. Intuit cites three instances of what it believes to be statements by me that show prejudgment. After having reviewed closely its arguments and the relevant facts and law, I have determined that the petition lacks merit.

Recusal from an adjudicatory proceeding is required where "a disinterested observer" would conclude that the adjudicator "has in some measure adjudged the facts as well as the law of a particular case in advance."[1] Moreover, agency officials "are presumed objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.'"[2] As the D.C. Circuit most recently has explained, "[a] party asserting prejudgment must show that the agency official has 'demonstrably made up [her] mind about important and specific factual questions and [is] impervious to contrary evidence.'"[3]

The first two instances that Intuit raises in its petition are statements that I made at or around the time the Commission's complaint was first filed in March 2022. These two statements were: (1) my March 2022 retweet of the FTC press release announcing the filing of this action; and (2) an April 2022 Q&A session in which I referred to this proceeding in the context of discussing the importance of timely action by the agency.[4] Although Rule 4.17(b)(2) directs those who believe they have grounds to disqualify a Commissioner to make a motion for disqualification "at the earliest practicable time after the participant learns, or could reasonably have learned, of the alleged grounds for disqualification," Respondent did not file a petition

---

[1] *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 469 (2d Cir. 1959), cert. denied, 361 U.S. 896 (1959)).

[2] *Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 509 F.3d 562 (D.C. Cir. 2007) (quoting *U.S. v. Morgan*, 313 U.S. 409, 421 (1941)).

[3] *Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) (internal quotation marks omitted). *See also Fast Food Workers Comm. v. NLRB*, 31 F.4th 807, 815 n.4 (D.C. Cir. 2022) (noting that *Metro. Council of NAACP Branches* "elaborated" on the *Cinderella* standard).

[4] Specifically, I stated:

> On . . . stopping the law-breaking—I think we need to act in a more timely manner. We need to be going into court more quickly; we need to be seeking preliminary injunctions. On the consumer protection side, the FTC, a few weeks ago, filed a lawsuit against TurboTax on the consumer protection side, alleging that TurboTax had been showing all these ads that are allegedly deceptive, and that it was really important to get that relief ahead of Tax Day. I think that type of timely intervention and timely filing of lawsuits is incredibly important.

under Rule 4.17(b)(1) until August 2023, 17 months after I made the statements that it alleges show bias.[5]

Intuit's claim that these two comments evince prejudgment has already been rejected by Chief Administrative Law Judge Chappell.[6] Issuing an order denying Intuit's request for discovery related to the alleged prejudgment, he wrote, "Factual statements that the FTC has brought a lawsuit alleging deception are akin to a factual press release describing pending adjudicatory proceedings and allegations, which . . . does not evince prejudgment."[7] Judge Chappell noted that in *FTC v. Cinderella Career & Finishing Schools, Inc.*, the D.C. Circuit held that the Commission's issuance of press releases that called attention to the pending proceedings and allegations did not constitute prejudgment or violate respondent's right to due process of law.[8] I agree with Judge Chappell's determination.

The third instance Intuit cites is my answer to one question in a hearing before the House Judiciary Committee on July 13, 2023:

> REPRESENTATIVE PRAMILA JAYAPAL: I just want to go to evil actors because there's one more I really want to talk about, and that is tax preparation companies. For years, Intuit, the maker of TurboTax, flooded consumers with ads promising 'free free free' tax-filing services only to trick and trap them into paying, which is why taxpayers pay $250 on average each year just for the privilege of filing their taxes. So state attorney generals have won taxpayers money from Intuit and the FTC has also taken action. Can you just speak about that?

> CHAIR LINA M. KHAN: Yeah, absolutely. So, last year the FTC brought a lawsuit against Intuit for those very types of deceptive practices that are laid out in our complaint. That is still pending. But I couldn't agree more that claims of something being free but then ultimately it not being so really hurts people.[9]

My response to Congresswoman Jayapal's question accurately noted that "deceptive practices … are laid out in our complaint." Intuit asserts that my use of "our" shows that I placed myself "on the same team as Complaint Counsel."[10] I used that possessive to acknowledge a basic fact: the Commissioners—including me—voted to issue the complaint as required by Section 5 of the FTC Act, which instructs that the Commission file a complaint whenever it "shall have reason to believe" there is a violation of the Act. I then explicitly referenced the pending nature of this matter, signaling that the Commission has not issued a final decision and that I had not prejudged any issue in any way with respect to this matter.

---

[5] Rule 4.17(b)(2). *See In re N.C. Bd. of Dental Exam'rs*, 151 F.T.C. 607, 649 (2011).

[5] Rule 4.17(b)(2).

[6] Order Denying Respondent's Motion for Discovery Pursuant to Rule 3.36 at 5-6, *In re Intuit Inc.*, FTC Docket No. 9408 (Nov. 7, 2022).

[7] *Id.* at 5.

[8] *Id.* at 6 (citing FTC v. Cinderella Career & Finishing Schools, Inc., 404 F.2d 1308, 1314-15 (D.C. Cir. 1968)).

[9] *Oversight of the Fed. Trade Comm'n: Hearing on 15 U.S.C. §§ 41-58 Before the H. Comm. on the Judiciary*, 117th Cong. (July 13, 2023).

[10] Pet. at 5.

I then went on to make a generalized statement that "claims of something being free but then ultimately it not being so really hurt people." Contrary to Intuit's assertion, that statement was not tethered to the merits of the Intuit case, but rather was a generalized assertion that false free claims can cause consumer injury. That statement reflected a policy belief, not an adjudication of this case. As the Supreme Court noted in *FTC v. Cement Inst.*, "[No authority] would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after [the judge] had expressed an opinion as to whether certain types of conduct were prohibited by law."[11]

Intuit takes issue with Representative Jayapal's statement that she wanted to discuss "evil actors" and that Intuit "trick[ed] and trap[ped]" consumers—and claims that my response conveyed agreement with Representative Jayapal's characterization of Intuit.[12] This is belied by the text of the full exchange, where I said "Yeah, absolutely," in response to Representative Jayapal's question, "Can you speak about that?"

Rather than evincing prejudgment or bias, my response to Representative Jayapal's question, just like my two previous comments, were "[f]actual statements that the FTC has brought a lawsuit."[13] *Kennecott Copper Corp. v. FTC* involved similar prejudgment allegations based on an FTC Commissioner having mentioned a pending complaint during an interview.[14] There, the Tenth Circuit noted:

> We have examined the cases and in each instance in which the courts considering the facts have ruled that the Commissioner had to be disqualified, action was entirely justified based on comments showing what appeared to be a prejudice or a viewpoint. No such commenting or editorializing is present here. From a reading of the statement in its entirety, it is clear that Commissioner Jones was discussing the *complaint* and was doing so in an effort to illustrate a point. Thus, it does not appear that she stepped over the line, whereby she showed even a slight commitment.[15]

The cases that Intuit cites in support of its petition are factually distinguishable from this matter. As Judge Chappell noted, those cases involved instances where the adjudicator "made affirmative comments on the merits of the case."[16]

For example, in *Cinderella Career and Finishing Schools, Inc. v. FTC*, the FTC's complaint alleged that respondent's advertising falsely represented that completion of its courses would qualify students to become airline stewardesses.[17] The D.C. Circuit held that a speech by

---

[11] 333 U.S. 683, 702-03 (1948).

[12] Pet. at 8.

[13] Order Denying Respondent's Motion for Discovery Pursuant to Rule 3.36 at 6, *In re Intuit Inc.*, FTC Docket No. 9408 (Nov. 7, 2022).

[14] 467 F.2d 67 (10th Cir. 1972).

[15] *Id.* at 80.

[16] Order Denying Respondent's Motion for Discovery Pursuant to Rule 3.36 at 5-6, *In re Intuit Inc.*, FTC Docket No. 9408 (Nov. 7, 2022). The other cases Intuit cites, *Am. Cynamid v. FTC*, 363 F.2d 757, 763, 767 (6th Cir. 1966), and *Berkshire Emp. Ass'n of Berkshire Knitting Mills v. NLRB*, 121 F.2d 235, 239 (3d Cir. 1941), did not concern public statements made after the filing of an administrative complaint, and, hence, are inapposite.

[17] 425 F.2d 583 (D.C. Cir. 1970).

the then-Chair, condemning false advertising in general and specifically citing as an example a representation that one can "becom[e] an airline's hostess by attending a charm school," showed prejudgment.[18] In *In re Boston's Children First*, the judge hearing a class certification motion gave an interview to a reporter in which she said that the instant case involved class member claims "more complex" than a previous case, where "it was absolutely clear every [class member] was injured."[19] Given that issues concerning the predominance of a common injury is often key in class certifications issues, the First Circuit found that the judge's comments could be construed to relate to the merits of the case at hand and thus warranted recusal.[20] Here, by contrast, the three statements I made refer to the allegations of the complaint and do not comment on the merits of those allegations.

Finally, absent from Intuit's petition is any reference to Complaint Counsel's motion for summary decision in this matter, which was decided by the Commission in January 2023. In that opinion, I joined the Commission in ruling *in favor* of Intuit on that motion, denying Complaint Counsel's motion in its entirety.[21] It is unclear how Intuit squares my purported bias against Intuit with my vote in favor of Intuit's motion.

In sum, none of the comments cited by Intuit are such that a "disinterested observer may conclude that [I] ha[ve] in some measure adjudged the facts as well as the law of a particular case in advance of hearing it."[22] For all these reasons, I decline to recuse myself from this matter.

***

---

[18] *Id.* at 590-92.
[19] 244 F.3d 164, 167 (1st Cir. 2001).
[20] *Id.* at 167-68.
[21] Opinion and Order Denying Summary Decision, *In re Intuit Inc.*, FTC Docket No. 9408 (Jan. 31, 2023).
[22] *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 469 (2d Cir. 1959), cert. denied, 361 U.S. 896 (1959)).

# EXHIBIT D

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**      **Lina M. Khan, Chair**
                        **Rebecca Kelly Slaughter**
                        **Alvaro M. Bedoya**

<table>
<tr><td>

**In the Matter of:**

**Intuit Inc.,** a corporation.

</td><td>

**Docket No. 9408**

</td></tr>
</table>

## RESPONDENT INTUIT INC.'S APPEAL BRIEF

HOWARD M. SHAPIRO
JONATHAN E. PAIKIN
JENNIFER MILICI
DANIEL S. VOLCHOK
DEREK A. WOODMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
Howard.Shapiro@wilmerhale.com
Jonathan.Paikin@wilmerhale.com
Jennifer.Milici@wilmerhale.com
Daniel.Volchok@wilmerhale.com
Derek.Woodman@wilmerhale.com

DAVID Z. GRINGER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
David.Gringer@wilmerhale.com

September 26, 2023

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT ..................................................................................................................... 2

I.   Factual Background ................................................................................................ 2

     A.   Intuit And Its TurboTax Products .................................................................. 2

     B.   Intuit's Free Advertising ................................................................................ 3

     C.   Consent Order ................................................................................................ 8

     D.   Procedural History ......................................................................................... 9

II.  Summary Of Argument ......................................................................................... 10

QUESTIONS PRESENTED ............................................................................................. 12

ARGUMENT .................................................................................................................... 12

I.   The Initial Decision's Ruling That The Challenged Ads Were Deceptive Is
     Deeply Flawed ...................................................................................................... 12

     A.   Under A Proper Analysis, None Of The Challenged Ads Was Deceptive .......... 12

          1.   The challenged ads conveyed that specific TurboTax products
               were free to consumers who qualified ...................................................... 12

          2.   Reasonable consumers were not likely to be misled ............................... 17

               a.   Reasonable consumers expect free tax-preparation offers
                    to be qualified ............................................................................... 17

               b.   Extrinsic evidence confirms that reasonable consumers
                    were not likely to be deceived ....................................................... 21

               c.   The ALJ erroneously relied on Professor Novemsky's
                    survey............................................................................................. 29

     B.   The Initial Decision Is Premised On Fundamental Legal Errors ........................ 33

          1.   The ALJ imposed a heightened disclosure requirement that is
               both unsupported and infeasible ................................................................ 33

          2.   The ALJ improperly analyzed the ads' components piecemeal and
               from a subjective viewpoint........................................................................ 35

3.     The ALJ relied on a doctrine that has no place here and involves
disregarding detailed information readily available to consumers ........... 37

II.     There Is No Basis For The Proposed Cease-And-Desist Order........................................ 40

A.     No Cease-And-Desist Order Is Warranted ........................................................... 40

B.     The ALJ's Order Is Inappropriate........................................................................ 43

III.     The Proceeding Is Unconstitutional And Untimely......................................................... 47

A.     Constitutionality................................................................................................... 47

B.     Timeliness.............................................................................................................. 49

CONCLUSION............................................................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

Page(s)

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ...........................................48

*Adams v. Woods*, 6 U.S. 336 (1805) ...........................................................................50

*American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749 (9th
    Cir. 2019) ..........................................................................................................46

*American Home Products Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982)................35, 45

*Axon Enterprise v. FTC*, 598 U.S. 175 (2023)..............................................................48

*Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020) ..............................38

*Book-of-the-Month Club*, 48 F.T.C. 1297 (1952) ........................................................33

*DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983)............50

*Dinan v. Sandisk LLC*, 2019 WL 2327923 (N.D. Cal. May 31, 2019).........................17

*Ebner v. Fresh, Inc.*, 838 F.3d 958 (9th Cir. 2016) ..............................................19, 37

*ECM Biofilms*, 160 F.T.C. 652 (2015)..........................................................................22

*Encyclopaedia Britannica, Inc.*, 87 F.T.C. 421 (1976).................................................39

*Estrella-Rosales v. Taco Bell Corp.*, 2020 WL 1685617 (D.N.J. Apr. 7, 2020) ....................14, 17

*Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25 (2014) .........................48

*Fast Food Workers Committee v. NLRB*, 31 F.4th 807 (D.C. Cir. 2022)......................48

*FCC v. Fox Television Stations*, 567 U.S. 239 (2012)...................................................14

*Fedders Corp. v. FTC*, 529 F.2d 1398 (2d Cir. 1976) ...............................................45

*Fish v. Kobach*, 309 F.Supp.3d 1048 (D. Kan. 2018), *aff'd*, 957 F.3d 1105 (10th
    Cir. 2020) ..........................................................................................................31

*FTC v. Cement Institute*, 333 U.S. 683 (1948) ...........................................................40

*FTC v. DirecTV*, 2015 WL 9268119 (N.D. Cal. Dec. 21, 2015)..................................50

*FTC v. DirecTV*, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018)..........................................14, 19, 39

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ........................................................45

*FTC v. Mary Carter Paint Co.*, 382 U.S. 46 (1965) ...................................................................33

*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952) ...............................................................................40

*Grolier, Inc.*, 99 F.T.C. 379 (1982) ...........................................................................................39

*Gundy v. United States*, 139 S.Ct. 2116 (2019) ..........................................................................49

*Harris v. Las Vegas Sands L.L.C.*, 2013 WL 5291142 (C.D. Cal. Aug. 16, 2013)......................39

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ...........................................47, 48, 49

*In re Autozone, Inc.*, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016), *aff'd*, 789
     F.App'x 9 (9th Cir. 2019) .................................................................................................32

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S.Ct. 2688 (2023)...................49

*LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018)...........................................................43, 44

*Little Caesars Enterprises v. Smith*, 895 F.Supp.884 (E.D. Mich. 1995).....................................17

*Marksberry v. FCA US LLC*, 606 F.Supp.3d 1075 (D. Kan. 2022)................................................19

*Moore v. Trader Joe's Co.*, 4 F.4th 874 (9th Cir. 2021).................................................................38

*National Institute of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361 (2018)......................46

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014)......................................................50

*Resort Car Rental Systems, Inc. v. FTC*, 518 F.2d 962 (9th Cir. 1975) (per curiam)...................38

*Richards v. Direct Energy Services, LLC*, 915 F.3d 88 (2d Cir. 2019) .........................................36

*Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296 (1946) ................................................50

*S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232 (2d Cir. 2001)....................................35, 36

*Seila Law v. CFPB*, 140 S.Ct. 2183 (2020) ...........................................................................48, 49

*Southern States Distributing Co.*, 1973 WL 165073 (F.T.C. 1973) ..............................................28

*Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431 (9th Cir. 1986)..................................................17

*Telebrands Corp.*, 140 F.T.C. 278 (2005) .............................................................13, 15, 22, 25

*TRW, Inc. v. FTC*, 647 F.2d 942 (9th Cir. 1981) .........................................................................42

*United States v. H&R Block*, 833 F.Supp.2d 36 (D.D.C. 2011) .............................................18, 42

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953).....................................................40, 45, 46

*Washington v. Hyatt Hotels Corp.*, 2020 WL 3058118 (N.D. Ill. June 9, 2020)...........................39

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) ................................................................................47

*Withrow v. Larkin*, 421 U.S. 35 (1975)..........................................................................................47

*Wold v. Robart*, 2018 WL 1135396 (E.D. Wis. Feb. 28, 2018).....................................................42

*Wright v. Farouk Systems, Inc.*, 701 F.3d 907 (11th Cir. 2012) ....................................................46

## STATUTES AND REGULATIONS

16 C.F.R.
     §2.41.................................................................................................................................44
     §3.43(a) ...........................................................................................................................34
     §3.43(d)(1) .......................................................................................................................26
     §251.1...............................................................................................................................21

15 U.S.C.
     §41...................................................................................................................................47
     §45(b)...............................................................................................................................49
     §53(b)...............................................................................................................................49
     §57b(d) .............................................................................................................................50

Cal. Civ. Code §1783................................................................................................................50

## OTHER AUTHORITIES

*FTC Policy Statement on Deception*, 103 F.T.C. 174 (Oct. 14, 1983), *appended to*
    *Cliffdale Associates*, 103 F.T.C. 110 (1984)..............................................12, 14, 15, 17, 35

S. Rep. 63-597 (1914)................................................................................................................47

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| ALJ | Administrative Law Judge |
| CC | Complaint Counsel |
| CCB | Complaint Counsel's Post-Trial Brief |
| CCPC | Complaint Counsel's Proposed Conclusions of Law |
| CCPF | Complaint Counsel's Proposed Findings of Fact |
| CRM | customer relationship management |
| ID | Initial Decision |
| IDF | Initial Decision Finding of Fact |
| RB | Respondent's Post-Trial Brief |
| RPC | Respondent's Proposed Conclusions of Law |
| RPF | Respondent's Proposed Findings of Fact |
| RRB | Respondent's Post-Trial Reply Brief |
| RRC | Respondent's Replies to Complaint Counsel's Proposed Conclusions of Law |
| RRF | Respondent's Replies to Complaint Counsel's Proposed Findings of Fact |
| TY | Tax Year |

## INTRODUCTION

Intuit offers online tax-filing products for free to qualifying consumers. Each year, *tens of millions* of consumers use these products to file their taxes for free. Promoting free tax filing benefits consumers, and there is nothing deceptive about advertising free products as free. Yet the ALJ here deemed Intuit's free-product ads deceptive because not everyone can use the free products, and he proposed a sweeping remedial order. Both the deception finding and the order are based on an unrealistic—and unrecognizable—legal regime. The Commission should reject both.

As to the finding: None of the challenged ads was deceptive. Most stated that a particular product was free—a statement that was indisputably true; no consumer *ever* paid a penny to use any of the products in question. Each ad also communicated that only consumers who qualified could use the advertised free product, often by stating that the particular offer was for "simple tax returns only," a commonly used and understood term in the industry. And the ads invited consumers to see if they qualified on the TurboTax website (or linked to the website), reinforcing that not everyone qualified, and telling consumers how to find out whether they did. Considered together, as the law requires, these elements of the challenged ads effectively and accurately communicated the qualifications for free TurboTax offers.

Extrinsic evidence further forecloses any finding that the challenged ads were likely to mislead a substantial minority of reasonable consumers. Survey evidence, for example, revealed that consumers found the phrase "simple tax returns" easy to understand, and consumers testified that they correctly understood it. Moreover, copy testing and market research showed that roughly the same percentage of consumers who *believed* they could file for free actually *could*. And three Intuit executives—with decades of combined experience—along with four experts testified that reasonable consumers would not have been misled by the challenged ads.

1

The ALJ nevertheless found that Intuit's ads were deceptive, but only by disregarding or improperly construing evidence. The finding also rests on a heightened standard for advertising free products that is unsupported, unworkable, and in fact counterproductive. It flows from an impermissibly piecemeal analysis of the ads' disclosures, rather than the holistic analysis the law requires. And it anachronistically applies a legal doctrine ("deceptive door opener") that makes no sense—and has never been applied—in the e-commerce context.

Even if there were any sustainable deception finding here, no cease-and-desist order would be warranted. A consent order with all 51 state attorneys general that already requires changes to Intuit's advertising precludes the need for such an order. The proposed order, moreover, unconstitutionally compels speech and impermissibly encompasses Intuit products never claimed to have been marketed unlawfully. It also would all but prohibit Intuit from advertising free products in places where consumers increasingly consume content and lower the number of taxpayers who file for free.

## STATEMENT

### I.    FACTUAL BACKGROUND

#### A.    Intuit And Its TurboTax Products

Intuit was founded with the mission of helping customers manage their finances through innovative technology. RPF ¶29. "TurboTax" is the brand name for Intuit's online tax-preparation products. IDF ¶6. The TurboTax brand encompasses three tiers of products offering different levels of assistance. IDF ¶11. Each tier includes four different products, or "SKUs." IDF ¶15. The various SKUs cover tax situations of differing complexity. IDF ¶10.

The most basic SKU in each tier—including the do-it-yourself product Free Edition—is free for consumers with "simple tax returns." RPF ¶67. (Other consumers cannot pay to use Free Edition or any other free TurboTax product; those products are simply unavailable to such

consumers.)  Simple tax returns are those filed on Form 1040 with no attached schedules.  RPF ¶¶121, 124.  The phrase "simple tax return" is ubiquitous and well-understood.  RPF ¶¶119, 122, 141-142.  Most taxpayers who file online have simple returns and thus qualify to file for free using a TurboTax product.  RPF ¶¶127-128.

Intuit hopes consumers with simple returns will use TurboTax to file for free, have a good experience doing so, and thereby develop life-long relationships with Intuit, meaning they stay with Intuit as their tax situations grow more complex.  RPF ¶83.  Intuit recognizes that creating a mistaken expectation amongst consumers who do not qualify to file for free that they do would cause consumers to both leave TurboTax and share their dissatisfaction with others.  RPF ¶134.  That would erode trust in the TurboTax brand and lower customer retention, hurting Intuit's business.  RPF ¶96.

> **B.** **Intuit's Free-Product Advertising**

The challenged ads for free TurboTax products were just that—ads for free products.  They expressly stated that the free offers were available only to consumers with "simple tax returns" (or similar language).  RPF ¶322.  Nearly all the ads also identified the specific SKU or offer that was free.  RPF ¶¶215, 250-251, 266, 281, 294.  And they invited consumers to visit (or linked directly to) the TurboTax website, TurboTax.com, to "see if they qualify."  RPF ¶¶215, 253, 269, 284, 294.  No ad said that everyone could use the free TurboTax product, or made unqualified claims that TurboTax is free.

The challenged ads ran on many advertising channels, including television, online display, paid-search, email, and radio.  IDF ¶¶48, 203.  Example ads are shown below.  Each communicated, as explained, both that the free product being offered was available only to qualified consumers—those with "simple tax returns"—and that additional information was available ("see *if* you qualify") at TurboTax.com.

3



RPF ¶216 (television).



RPF ¶249 (non-video display).



RPF ¶268 (paid search).



RPF ¶282 (email).

Each year, Intuit has taken steps to make its ads clearer, both because it believes that that is the right thing to do and because doing so is in its business interest. RPF ¶¶33, 39, 363. In the ad-development process—which can take up to nine months for one ad—several stakeholders review every TurboTax ad to ensure that none is misleading. RPF ¶¶163, 165. If anyone believes a draft ad is misleading, it is either revised to eliminate the problem or is not publicly

6

released.  RPF ¶168.  At no point did Intuit's leaders believe that consumers were misled by any free-SKU ad; if they had, they would have immediately pulled the ads from circulation.  RPF ¶¶167-177.

The TurboTax website prominently featured in Intuit's free-SKU advertising includes detailed disclosures regarding eligibility for free offers, including color-contrasted hyperlinks explaining that the free offer is for simple returns only and telling consumers to click to "see if you qualify."  RPF ¶¶364-452.  A screenshot from the TY 2022 TurboTax homepage is below.



RPF ¶375.  When consumers clicked any hyperlinked disclosure on any page of the website, a pop-up screen provided "detailed information about the tax situations covered by" the free SKUs.  RPF ¶379.  A screenshot of the website's disclosures is below.



RPF ¶380.

C.    **Consent Order**

Last year, the attorneys general of all 50 states and Washington, D.C. agreed to a consent

order relating to Intuit's free-product advertising. RPF ¶¶805-806. The agreement resolved

claims relating to TurboTax free marketing. RPF ¶¶805, 807.

The consent order, lifted almost verbatim from the FTC's pre-litigation proposal to Intuit, prohibits Intuit from running the so-called "Free, Free, Free" video advertisements or any substantially similar ones. RPF ¶810. It also requires that all TurboTax free-product advertising clearly and conspicuously disclose the character and nature of any requirements to use the free product, and communicate that the free offer is qualified. RPF ¶¶812-814. These binding provisions ensure that Intuit's free-SKU advertising makes all appropriate disclosures clearly and conspicuously. RPF ¶¶811-814, 818-819. Intuit has complied with the order and will continue doing so. RPF ¶¶821-827.

### D.     Procedural History

The FTC's investigation of Intuit's advertising began in 2019. IDF ¶533. An administrative complaint issued in 2022. ID 1. The FTC concurrently sought a temporary restraining order and preliminary injunction in federal court—unsuccessfully. RPF ¶¶12, 16, 18. At a hearing, the court expressed skepticism about CC's theory of liability. It observed that Free Edition ads "don't say it is free to everybody and nobody thinks it is." RPF ¶15. It also challenged CC's assertion that Intuit's ads "omitted" disclosures, pointing out that the disclosure "is right there." *Id.*

CC then moved for summary decision. ID 2. Although the Commission denied CC's motion, it criticized Intuit's evidence, signaling the result it wanted (the one the ALJ reached).

The ALJ held an evidentiary hearing. CC introduced the challenged ads and presented testimony from one affirmative expert (who also appeared on rebuttal) as well as an additional rebuttal expert. Intuit provided testimony from three executives about topics including the company's business strategy, values, ad-making process, and understanding of whether the ads were deceptive. RPF ¶¶848-877. Intuit also presented testimony from four experts, on topics ranging from reasonable consumers in the tax-preparation industry to why Intuit's economic

incentives militate against deception to the results of a test-and-control study measuring the efficacy of the disclosures CC sought.  RPF ¶¶878-911.

The ALJ concluded after the hearing that the challenged ads were deceptive and that a sweeping cease-and-desist order was warranted.  *See generally* ID.

## II.    SUMMARY OF ARGUMENT

1.      The ALJ erroneously found Intuit's ads deceptive.  To establish deception, CC had to prove both that the ads conveyed to consumers who could *not* file their taxes for free that they *could*, and that a significant minority of reasonable consumers was likely to be misled by the claim conveyed.  CC proved neither.

*First*, each challenged ad conveyed to reasonable consumers that the advertised free offer was qualified, i.e., *not* available to everyone.  The ads never stated or implied that the offer was available to everyone or that all TurboTax was free.  Moreover, the ads contained disclosures that met or exceeded industry benchmarks under FTC guidelines, both in terms of legibility and understandability.  These disclosures told consumers that each offer applied to a specific SKU, that only taxpayers with "simple returns"—a phrase understood by reasonable consumers—were eligible, and that consumers could find additional information about the qualifications at TurboTax.com.  Just the fact that consumers were informed that eligibility was not universal defeats CC's deception theory, as did telling consumers they *might* qualify and how to find out if they did.  But the evidence also establishes that reasonable consumers understood the ads' messaging and the scope of the free claim.

*Second*, the evidence does not prove that a significant minority of reasonable consumers was likely to be deceived.  It proves the contrary.  To begin, CC did not attempt to prove what reasonable consumers took away from *any* challenged ad.  Intuit, meanwhile, offered unrebutted testimony that reasonable consumers understood that the free offers had qualifications and knew

10

where to find those qualifications, and that Intuit's ads were consistent with reasonable consumers' expectations. Intuit also showed that additional information was accessible in *seconds*. And Intuit offered (1) a test-and-control survey debunking CC's critique of the challenged ads' disclosures, (2) metrics inconsistent with CC's theory of widespread deception, and (3) expert testimony that the experience of Intuit's customer base belies CC's theory. CC— who had the burden of proof—offered only a grossly inadequate survey and a handful of unrepresentative consumer complaints, the latter of which proved the *absence* of deception.

2. The proposed cease-and-desist order is unwarranted. Intuit's *current* ads are not deceptive, and its past ads cannot justify prospective relief. Moreover, Intuit presented unrebutted testimony from its executives regarding its commitment to—and business interest in—clarity in its advertising. Perhaps most importantly, the state consent order, because it already enjoins any potentially deceptive conduct, both moots this case and assures that Intuit's advertisements going forward are without reproach. The record therefore does not reflect the cognizable danger of future unlawful activity required for injunctive relief.

Even if any cease-and-desist order were appropriate, the ALJ's is not. That order is impermissibly vague and punitive. It would also be ineffective, and likely *harm* consumers by preventing them from filing for free. And it is overbroad, impermissibly encompassing products other than TurboTax, even though the record says nothing about other products. Finally, the order's mandate that Intuit include certain language in its ads unconstitutionally compels speech.

3. This proceeding is rife with threshold infirmities. It is unconstitutional, violating due process (both because of the FTC's combination of functions and because of the Commission's biased conduct here), articles II and III of the Constitution, and the non-delegation doctrine. The proceeding is untimely as well, both because section 5 claims are subject to a

three-year statute of limitations and because the Commission inequitably waited years before

bringing this proceeding.

## QUESTIONS PRESENTED

I.     Whether the challenged ads were deceptive.

II.    Assuming deception, whether the ALJ's cease-and-desist order—or *any* cease-

and-desist order—is warranted.

III.    Whether these proceedings are constitutional and timely.

## ARGUMENT

## I.   THE INITIAL DECISION'S RULING THAT THE CHALLENGED ADS WERE DECEPTIVE IS DEEPLY FLAWED

### A.   Under A Proper Analysis, None Of The Challenged Ads Was Deceptive

Free Edition is free—*for every single person who uses it*. No case has ever held that it is

deceptive to tell consumers the true price of a product. In fact, the typical deception claim is

*hiding* a product's true price.

To support their highly unusual theory, CC had to show that (1) the challenged ads

conveyed that consumers could file for free with TurboTax when they actually could not, and

(2) a substantial minority of reasonable consumers was likely to be misled by the ads. *See FTC*

*Policy Statement on Deception*, 103 F.T.C. 174, 175-176 (Oct. 14, 1983), *appended to Cliffdale*

*Associates*, 103 F.T.C. 110 (1984). CC did not show either.

#### 1.   The challenged ads conveyed that specific TurboTax products were free to consumers who qualified

CC failed to prove that any challenged ad conveyed that *all* TurboTax products were free,

that any TurboTax product was free without qualification, or any other claim CC asserted.

First, CC failed to prove an "express claim," which requires an ad to "directly state" a

false message. RB 37-39; RRB 5-8. CC insist that they can proceed on an express claim theory,

RPF ¶206, but they already conceded that no ad directly stated the false messages asserted, RPF ¶¶302-308. The ALJ reached a contrary conclusion by misapplying the law and mischaracterizing the ads. *See* ID 169-170, 175-176, 185. The ALJ asserted, for example, that one ad expressly claimed, "you can file on TurboTax for absolutely nothing." ID 169. But the ALJ ignored that when the quoted words were spoken, the ad displayed not only the name of the product and offer being advertised—"Federal Free Edition" and "Absolute Zero"—but also "TurboTax Federal Free Edition is for simple U.S. returns only" and "See offer details at TurboTax.com." RPF ¶226. The ALJ also quoted several ads that directly stated, "TurboTax Free Edition is Free." ID 169-170, 175, 185. But because Free Edition is free, stating that fact is not a false express claim.

Nor did any challenged ad *imply* any false message. "An advertisement will only be found to contain implied claims" if, "after examining the interaction of all of the [ad's] constituent elements," the court can "conclude with confidence" that those elements together "convey a particular implied claim to consumers acting reasonably under the circumstances." *Telebrands Corp.*, 140 F.T.C. 278, 429 (2005). Here, "examining the interaction of all of the constituent elements," *id.*, makes clear that nothing false was implied. RPF ¶¶215-218, 248-252, 266-268, 281-282, 294.

In concluding otherwise, the ALJ made two critical errors. He failed to recognize that Free Edition *is* free and thus that the ads made a truthful claim. He also wrongly discounted the ads' qualifying language on the ground it was not "legible and understandable," ID 170, or was "inconspicuous" and "unclear," ID 160.[1]

---

[1] The ALJ criticized CC for presenting incomplete advertisements, ID 173 n.19, but never considered the import of that obfuscation: *He*, the adjudicator, was not presented with the full advertisements, i.e., in the form actually seen or heard by reasonable consumers.

a.      The challenged ads' qualifying language was sufficiently "legible" (and audible).

*Policy Statement on Deception*, 103 F.T.C. at 184.  The ALJ averred that the language was

"small," "faint," or too "fast[]."  ID 171.  But those adjectives require evidence.  And CC offered

*no* evidence that the qualifying language could not be seen (or heard) by reasonable consumers.

RPF ¶¶230-231, 255-256, 271, 286, 295.

The ALJ, moreover, ignored the only evidence that objectively measured the qualifying

language.  Professor Peter Golder compared Intuit's video and social-media ads to those of

eighteen benchmark companies across four industries, using seven metrics drawn from the

FTC's guidelines on "How to Make Effective Disclosures in Digital Advertising": placement,

height, color, duration, repetition, proximity in time to the claim being qualified, and whether

distracting factors were present.  RPF ¶¶234-236, 258.  On every metric, the challenged

TurboTax ads were statistically comparable or superior to the benchmark companies'.  RPF

¶¶237, 259.  CC did not even attempt to rebut Professor Golder's conclusions, responding

instead that compliance with the FTC's guidelines did not *necessarily* mean an ad was not

deceptive.  RPF ¶927.  That assertion is facially dubious, inverts the burden of proof, and if true

would raise due-process concerns, *see FCC v. Fox Television Stations*, 567 U.S. 239, 254 (2012).

The qualifying language in the challenged ads also met or exceeded the standards courts

have established.  Disclosures have been held adequate even when they were "smaller than most

of the text in the advertisement," *FTC v. DirecTV*, 2018 WL 3911196, at *8 (N.D. Cal. Aug. 16,

2018), or appeared only "in the closing seconds of the commercial," *Estrella-Rosales v. Taco

Bell Corp.*, 2020 WL 1685617, at *2 (D.N.J. Apr. 7, 2020).  The ALJ's observation that the ads'

qualifying language was "smaller" than other text, ID 176, or "appeared near the end of the

advertisement and lasted only a few seconds," ID 171—which could also be said of the ads'

references to TurboTax, RPF ¶223—is thus not answering a question that matters. The evidence showed that qualifying language is frequently smaller, because often there is more of it. *E.g.*, RPF ¶¶215-218, 232-237. Reasonable consumers know this and know where to find it. RPF ¶¶229, 232, 238, 257, 259, 514-524.

       b.     The ads' qualifying language was "understandable" to reasonable consumers. *Policy Statement on Deception*, 103 F.T.C. at 184. As elaborated below, the ads included multiple qualifications, stating that (1) the ad was for a specific TurboTax SKU, (2) consumers' ability to use that SKU was qualified, and (3) additional information about the SKU and its qualifications was on TurboTax.com. RPF ¶¶244, 262, 275, 290, 299. Taken together (as they must be), these "constituent elements," *Telebrands*, 140 F.T.C. at 429, ensured that reasonable consumers understood that TurboTax was advertising a free product available only to qualified consumers.

       *First*, most of the challenged ads (and all the challenged video ads, contrary to the initial decision's and summary decision's assertions, *see* ID 171; Summary-Decision Order 11 (Jan. 31, 2023)) conveyed that they were for a particular free product—not for every TurboTax product or for TurboTax as a whole. RPF ¶¶215, 250, 266, 281-282, 294. The ALJ's contrary conclusion, that telling consumers the product name somehow reinforced that the free claim was unqualified, ID 171, makes no sense. If Intuit has a "free *edition*," reasonable consumers understand that there are also editions that are not free. RPF ¶319. Unsurprisingly, there is unrebutted evidence that the inclusion of the product name in the challenged ads was itself sufficient to convey to consumers that there were multiple TurboTax SKUs and that only one was being advertised as free. *Id.*

*Second*, the challenged ads included language conveying that not all consumers would qualify for a free TurboTax product. Most ads, for example, specified that a free offer was for "simple tax returns only" (and/or for "Forms 1040EZ/1040A" only, until a 2017 amendment of the tax laws engendered changes in IRS forms). RPF ¶¶215-217, 248-249, 252, 267-268, 281-282, 294. The ALJ dismissed this critical language as "ambiguous." ID 172. That is wrong: The evidence, including a consumer survey and consumer testimony, shows that reasonable consumers understood the meaning of "simple tax returns." RPF ¶¶130-145; *infra* Section I.A.2.b. It is also irrelevant, because even if reasonable consumers were unsure *precisely* what constituted a "simple tax return," the disclosure that the advertised product was for "simple tax returns only" unmistakably conveyed the material limitation, i.e., that a consumer viewing the ad might not qualify for the offer based on the complexity of their return. Thus, a reasonable consumer would not conclude that "TurboTax was free." The ALJ responded that "simple tax returns only" could convey "*either* an unqualified free offer available to the viewer *or* a qualified offer that may not apply to the viewer." ID 172. That is facially incorrect; there is *no way* in which "simple tax returns only" could convey "an unqualified free offer," *id.* As Professor Golder put it, both "simple" and "only" each mean (at the very least) not "all." RPF ¶135. Even CC's own expert testified that he understood, after seeing that Free Edition was for simple returns only, that his taxes would not qualify "given that [his] tax situation [was] complicated." RX1396 at 188.

"Simple returns only," moreover, puts consumers on notice of the *nature* of the qualifications to use the free product. *See* RPF ¶¶135-136, 314-315, 322. Courts routinely uphold similar disclosures (in fact, disclosures far more ambiguous). One court, for example, held that the disclosures "[a]t participating locations for a limited time" and "[p]rices may vary"

were consistent with television advertising practices and sufficient to put reasonable consumers

on notice of the promotion's restrictions, even without further details. *Estrella-Rosales*, 2020

WL 1685617, at *2; *see also Little Caesars Enterprises v. Smith*, 895 F.Supp.884, 888, 899 (E.D.

Mich. 1995) (similar). Just so here: The phrase "simple tax returns only" conveyed that not all

tax returns were covered and that tax complexity would determine eligibility.

     *Finally*, many of the challenged ads (including all the challenged video ads) conveyed

that consumers could find more information about the qualifications for free TurboTax offers at

TurboTax.com, inviting consumers to "see if you qualify" or "see details" at that website. RPF

¶¶215, 218, 294. (Most of the ads that did not expressly refer to the website were themselves

hyperlinks that took consumers directly there. RPF ¶¶253, 269, 284.) The ALJ discounted these

disclosures on the ground that they were "'pro forma statements.'" ID 172 (quoting *Policy*

*Statement on Deception*, 103 F.T.C. at 183). But contrary to the initial decision's citation, the

phrases "see details" and "see if you qualify" are *not* identified in the FTC's policy statement as

"pro forma statements." ID 172. Those phrases, in fact, appear nowhere in the policy

statement—likely because they are not "pro forma." Rather, they both (1) clearly informed

consumers that the free product was not for everyone, RPF ¶324, and (2) directed consumers to

thorough information about the product's limitations, RPF ¶¶254, 285, 370.

        **2.**    **Reasonable consumers were not likely to be misled**

            **a.**    *Reasonable consumers expect free tax-preparation offers to be*
                  *qualified*

     CC had to show that the challenged ads were likely to mislead "not just any consumers,"

but a significant minority of "consumers acting reasonably in the circumstances." *Southwest*

*Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1436 (9th Cir. 1986). That analysis "starts with the

background knowledge of the reasonable consumer." *Dinan v. Sandisk LLC*, 2019 WL 2327923,

at *6 (N.D. Cal. May 31, 2019). CC's case (and the ALJ's decision) fails because it is rooted in an outdated view of consumer perception. The 1950s ended over 60 years ago; it is time for the FTC to modernize its case law and recognize that reasonable consumers have access to more information and are far savvier than when television was new. It is the *reasonable* consumer standard, which requires analyzing consumers as they are, not as they used to be.

Missing from CC's presentation of evidence was information about reasonable consumers in this industry. The record shows that those consumers understand both that free offers have qualifications (RPF ¶¶471-480) and, more specifically, that free online tax-preparation offers are typically available only to consumers with simple tax returns (RPF ¶¶481-484). Consumers understand that such offers are so limited because all major players in the online tax-preparation industry have both a basic free product for consumers with simple tax returns and paid products for more complex tax situations. RPF ¶¶481-482. By 2011, in fact, that model was "an entrenched part of the … market." *United States v. H&R Block*, 833 F.Supp.2d 36, 46-48 (D.D.C. 2011). The model's ubiquity led reasonable consumers to expect free online tax-preparation offers to have qualifications tied to tax complexity—even if (unlike here) those qualifications were not expressly stated. RPF ¶¶483-484. And that expectation manifested in consumer skepticism of free online tax-preparation offers, which resulted in consumers *underestimating* whether they could file for free. RPF ¶¶488-493; *see also* RPF ¶¶485-487.

The FTC's "free" guidelines likewise recognize that the "public understands" that free offers are usually coupled with the requirement to purchase paid products at full price. RPF ¶476. The ALJ ignored that guidance, even when citing other portions of the guidelines to justify his order, ID 227. The ALJ cannot selectively choose what parts of the FTC's guidance

18

should apply—either the free guides should be credited, or not. This provision—properly considered—establishes as a matter of law that reasonable consumers were unlikely to be deceived because their baseline assumption was that they would have to pay.

The record also shows that consumers were familiar with the term "simple tax returns," which originated with the IRS and is used throughout the tax-preparation industry. RPF ¶¶119-123, 141-143, 453-454, 458-459. Intuit chose to use the term precisely "



because                              and because it

                         RPF ¶123. Indeed, because the phrase is "commonplace in the [relevant] market," "reasonable consumer[s]" should be deemed *as a matter of law* to "understand[]" it. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016); *see also Marksberry v. FCA US LLC*, 606 F.Supp.3d 1075, 1081 (D. Kan. 2022) (reasonable consumers are familiar with qualifications "often … associated with" a product).

Even consumers who were not familiar with free tax-preparation offers were unlikely to be deceived, because reasonable consumers generally do not expect ads to provide every detail about an offer and understand that additional information is available elsewhere, often online, especially for an online product. RPF ¶¶510-513, 520-527. The challenged ads reinforced that understanding, expressly directing and/or linking consumers to TurboTax.com, which fully explained each offer's qualifications, including with the very form-by-form analysis CC and the ALJ would require. RPF ¶¶253-254, 269-270, 284-285.

Finally, the record shows that consumers typically choose a tax-preparation product only after engaging in a "considered" and "high involvement" process. *DirecTV*, 2018 WL 3911196, at *3; *see* RB 59-61. That process normally involves not just relying on ads but also considering alternatives and consulting with friends, family, and/or third-party reviews. RPF ¶¶502-509,

782, 786, 891. This further underscores the unlikelihood that a substantial minority of reasonable consumers would be deceived by ads saying (in sum and substance) "For simple tax returns only. Find out if you qualify at TurboTax.com." This is not the same as *requiring* consumers to do research. Instead, the evidence reveals that consumers *already* research tax-preparation products—in part explaining why there was no showing of actual deception even after the challenged ads ran billions of times.

Despite acknowledging that extrinsic evidence must be considered, ID 158, the ALJ ignored or improperly discounted the evidence just discussed. For instance, he wholly failed to address the evidence that reasonable consumers conduct substantial research before selecting a tax-preparation method or provider. RPF ¶¶502-509, 513, 782, 891. He also wrongly asserted that consumers' familiarity with the phrase "simple returns" "says little or nothing about consumers' understanding [regarding] whether, or how, the phrase applies to them." ID 193. That contradicts both fact and expert testimony, RPF ¶¶122-123, 134-136, 139-145, which the ALJ did not even acknowledge. As Professor Golder explained, for example, the widespread and consistent use of the term is "critically important" to consumer understanding. RPF ¶144. Further, the ALJ's reasoning defies common sense: Familiarity implies understanding. RPF ¶145.

Likewise indefensible is the ALJ's critique that Intuit's "contention that 'simple tax returns' is an IRS term familiar to consumers was not supported by any IRS evidence, such as public communications or other IRS documents," ID 193 n.25. Several IRS documents in evidence, as well as a report by the Government Accountability Office, show that the IRS has long used the phrase. RPF ¶¶119-120. To the extent the ALJ faulted Intuit for not presenting *additional* evidence, Intuit could not do so only because the ALJ denied its motion seeking that

evidence. *See* Order (Jan. 3, 2023). As Intuit previously explained, and the ALJ has now

recognized, documents reflecting how the IRS uses the term "simple tax returns" are relevant

and should have been discoverable. Intuit's Motion to Compel Production of Documents 6-8

(Dec. 19, 2022). Given that the ALJ's faulty ruling denying such discovery manifestly played a

role in his deception finding, that ruling itself merits remand.

Finally, the ALJ wrongly disregarded evidence concerning consumers' experience with

other free offers simply because those offers involved tiered products or bundles of products

rather than a single product. ID 195. What matters is that reasonable consumers expect free

offers to be qualified, such that they are unlikely to assume that a product is necessarily free for

them. RPF ¶¶472-483, 485-491. That does not change if the free offer relates to a single product

rather than a bundle of products. *Id.* Indeed, the FTC's own free guide deals only with tiered or

bundled products, 16 C.F.R. §251.1, yet the ALJ used the guide as the predicate for his decision

and order, ID 227.

### b. *Extrinsic evidence confirms that reasonable consumers were not likely to be deceived*

i.    Intuit copy testing and market research. Intuit's testing of the challenged ads (CC

and their experts did no such testing) established that the ads were not deceptive. Copy testing

from TYs 2020 and 2022 shows that around one-third of consumers believed they could file for

free using TurboTax, both when presented with just the TurboTax brand name in TY 2020 (RPF

¶¶609-610), and when shown recent TurboTax ads in TY 2022 (RPF ¶¶702-711). That one-third

share is far *less* than the 50% of consumers in the market for online tax-preparation who have

simple tax returns and therefore qualify. RPF ¶¶695, 709-711, 804. The 33% figure is also

lower than expected given that participants in the copy testing were likely to qualify to file for

free. RPF ¶¶689-690, 695, 702, 705, 709-711. Those results indicate that the challenged ads did

not mislead consumers into believing that TurboTax was free for them when it was not. RB 31-32, 68-69.

A TY 2020 Net Promoter Score study similarly indicated a lack of deception or customer confusion. RPF ¶721. The study demonstrated that the percentage of respondents who were aware of a free TurboTax product before they decided to use TurboTax (48%) was about the same as the percentage who in fact filed for free with Free Edition (44%). RPF ¶717. Thus, of those who even knew about a free TurboTax product, nearly all used that product and filed for free. RPF ¶¶718-721.

These tests establish as a matter of law that there was no deception, as the confusion rates are far below the lowest number ever accepted as proof of deception in any FTC enforcement action. *See Telebrands*, 140 F.T.C. at 446-448 (citing cases). Indeed, in *Telebrands*, the Commission found that a 10% confusion rate, based on a test-and-control study, met the "significant minority" standard, but that a 3.9% rate did not. *Id.* at 422, 447-448; *see also ECM Biofilms*, 160 F.T.C. 652, 667-668 (2015) ("[W]e have found percentages ranging from 10% to 22% to be sufficient to constitute a significant minority.").

The ALJ either ignored or misconstrued this evidence, finding that market research "shows that at least a significant minority of consumers believe that they can file their taxes for free with TurboTax." ID 187-188. As discussed, it showed the opposite. The ALJ's apparent belief that no consumers should believe they can file for free with TurboTax—when roughly 50% of consumers in the online tax-preparation market actually can—is the source of this serious error. Further demonstrating that infirm belief, the ALJ relied on market research from a single year revealing that 22% or 49% of respondents were confident that Free Edition is free. But Free Edition is in fact free, so those results say nothing about whether consumers were *deceived*. RRF

¶¶597-598.  The ALJ's characterization of consumer confidence that a free product is free as "not … insignificant" is thus meaningless, and his reliance on those figures erroneous.  ID 196.

The ALJ's reliance on Intuit's copy testing is similarly misplaced.  ID 188.  The TY 2018 and 2020 copy tests are not evidence that reasonable consumers were misled into believing they could file for free using TurboTax, because neither presented consumers with the final versions of ads.  RRB 29-32; RRF ¶¶601, 610; RPF 699.  Accordingly, neither test says anything about the challenged ads, including the claims conveyed by those ads or whether the ads were likely to mislead consumers.  As noted, moreover, participants in both tests were more likely to qualify for Free Edition than the general public (and therefore it is more likely that any belief they had that they could file for free was correct).  RRF ¶¶600-610; RPF 690, 699.  The ALJ simply assumed without justification (or explanation) that a minority of participants would have qualified to use Free Edition.  ID 188.[2]

The ALJ also erroneously relied on results from the TY 2018 copy test indicating that the advertisements "communicat[ed] the parent brand TurboTax well" but that "only about ~5% take away the sub brand (TurboTax Free, TurboTax Live)."  ID 194.  That merely reflected responses to the question: "Which brand do you think this ad was for?"  RRF ¶¶609-610.  Understandably, most consumers would consider the relevant "brand" to be TurboTax (which it is).

Finally, the ALJ's characterization of the percentages in the TY 2022 copy test as "not insignificant," ID 221 n.42, is neither coherent nor supported by evidence.  The TY 2022 results, which showed that ▮▮▮ and ▮▮▮ of participants believed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮, are consistent with the percentage of consumers in the general population who actually do

---

[2] For the same reasons, the ALJ was wrong that the TY 2018 and 2020 copy tests put Intuit on notice that a significant percentage of consumers mistakenly believed that TurboTax was free for them.  ID 221.

qualify to file for free using Free Edition.  RPF ¶690.  The fact that consumers accurately

understood whether they qualified for free filing is evidence of *non*-deception.  Moreover, the

evidence shows that ███████████████████████████████████

████████████████████████████████████████

███████████████████████ RPF ¶¶705-706.  Again, the ALJ failed to grapple with

the sample, offering only the conclusory claim that it was "not probative."  ID 221 n.42.

     ii.    <u>Consumer complaints and feedback</u>.  The miniscule number of consumer

complaints CC adduced further proves that a significant minority of reasonable consumers was

unlikely to be deceived.  If the challenged ads had deceived consumers in significant numbers,

Intuit would have been "overwhelmed with complaints, in every channel."  RPF ¶647; *see also*

RPF ¶¶624-625.  Instead, CC identified (at most) 228 consumer complaints.  Even if all those

complaints were both relevant and reliable (they weren't, *see* RPF ¶¶626-630, 633-635), they

represent just 0.0003% of the 86.4 million TurboTax customers who completed at least one

return between TYs 2015 and 2021, RPF ¶¶631-632, 637.  That amounts to 0.0025 complaints

per 1,000 consumers—much lower than the range of 0.35 to 143.8 complaints per 1,000

consumers found to support deception in other FTC cases (as detailed by an FTC economist in a

paper relied on here by CC's expert).  RPF ¶¶641-642; *see also* RPF ¶¶643-644, 646.  Professor

Golder's complaint-benchmarking analysis confirms that the number of complaints lodged

against Intuit is inconsistent with deception.  RB 86-87; RPF ¶¶623-625, 638-640, 646-647.[3]

     Intuit's customer-review data similarly show exceedingly low rates of negative feedback:

███████ and ██████ of TurboTax's TY 2020 and TY 2021 customers bases, respectively.

---

    [3] Bizarrely (or perhaps revealingly), just as Professor Golder was testifying about the numerous unreliable consumer complaints, the ALJ pressured him to move on.  Tr. 1206-1207.

RRF ¶¶635, 642.  That is a far cry from the "ten percent" figure that "FTC cases suggest … the Commission would be justified in considering" indicative of deception.  *Telebrands*, 140 F.T.C. at 447-448.

The ALJ discounted this consumer-feedback evidence because "evidence that some consumers were not injured or were satisfied with TurboTax's products" is not a defense to liability.  ID 205.  That is not what Intuit argued.  Intuit argued that CC could not possibly show that a substantial minority of reasonable consumers was likely to be deceived when some of the best evidence of deception (consumer complaints and other feedback) is starkly inconsistent with such widespread deception.  RPF ¶¶623-626.  To the extent the ALJ was suggesting that it is a novel concept that consumer feedback can provide evidence of deception, that is wrong; CC's own expert authored an article explaining that consumers "retaliat[e]" against brands if a product "does not meet expectations."  RPF ¶624.  And it is well-established in academic marketing literature that complaints are a "major source of information on the quality of products and companies."  *Id*.

The ALJ likewise wrongly dismissed Professor Golder's complaint-benchmarking analysis, again on the ground that "the existence of some satisfied customers" is not a defense to liability.  ID 205.  But the analysis did not show—or even try to show—merely that some consumers were satisfied; it showed that Intuit's complaint rate was entirely inconsistent with CC's theory of deception.  RPF ¶640; RRF ¶¶722, 735.  As to *that* key point, the ALJ (and CC) had nothing to say.

Nor does the record support the ALJ's unscientific assertion that there were "ample reports" from consumers indicating that they were deceived.  ID 205.  The supposedly "ample" reports are 6 customer reviews from TY 2020 and 45 reviews or complaints from TY 2021.  ID

205.  The 6 reviews from TY 2020 account for ▓▓▓▓ of the ▓▓▓▓ consumers who

filed using TurboTax in that year, and the 45 reviews or complaints from TY 2021 account for

▓▓▓▓ of the ▓▓▓▓ who used TurboTax in that year.  *See* RRF ¶¶635-662.  These few

examples do not provide a meaningful picture of consumer sentiment.  RPF¶654.  Even these

seemingly negative reviews, moreover, lack the context necessary to assess whether they support

CC's theory of deception—and often, in fact, the little context that exists shows they do not.

RRF ¶¶635-662.

Lastly, the ALJ's reliance on one source of customer reviews—Intuit's Customer

Relations Management (CRM) data, IDF ¶¶488-507—was improper because Intuit was

prevented from offering expert evidence providing essential context for the data.  CC's summary

of CRM entries was excluded by a bench ruling in which the ALJ denied both parties' requests

to introduce supplemental expert reports.  Order Memorializing Bench Rulings (Mar. 28, 2023).

But CC then circumvented that order by repurposing an appendix to their excluded supplemental

expert report as summary exhibit GXD006, which the ALJ admitted over objection.  *Compare*

Intuit's Motion for Leave to Amend Its Exhibit List, Attachment GX870 at App'x B, *with*

GXD006.  Because Intuit was denied the opportunity to offer a supplemental expert report to

respond to the evidence, the evidence must be disregarded.  *See* 16 C.F.R. §3.43(d)(1); *see also*

Attachment A (proffered supplemental expert report).

     iii.    Consumer-experience data.  Various other metrics reflecting consumers'

experiences with TurboTax provide still more evidence that consumers' expectations were met,

i.e., that consumers were not deceived.  RPF ¶656.  For instance, the fact that consumers

abandoned TurboTax's paid products at the same rate they abandoned its free products (22%)

demonstrates that consumers who abandon TurboTax do so not because they were misled about

whether they could file for free but for a reason (or reasons) common to all products. RPF ¶¶656-658. TurboTax's high customer-retention rate for its paid products—which *exceeds* the rate for Free Edition, contrary to what one would expect if the alleged deception existed— likewise reflects that consumers who paid for TurboTax did not feel misled. RPF ¶¶91-92, 649-650.

      iv.   <u>Consumer deposition testimony</u>. Numerous consumers offered deposition testimony indicating that they were not deceived by the challenged ads. *E.g.*, RPF ¶635. For example, consumers testified that they:

- understood that there were qualifications for free TurboTax offers, that free TurboTax offers were not available to everyone, and that not all TurboTax products were free, RRF ¶¶669-670;

- understood that Free Edition's qualifications were based on tax complexity and that it was available to taxpayers with simple returns, RRF ¶¶666, 669-670;

- understood the phrase "simple tax returns," RRF ¶670;

- understood that they could visit TurboTax.com to find details about what qualified as a simple tax return and determine whether they qualified, RRF ¶¶669-670; and

- understood that they could click on hyperlinks at TurboTax.com to learn more about the qualifications for free offers, RRF ¶675.

The ALJ gave no reason for ignoring this testimony while focusing intently on select deposition excerpts CC offered. IDF ¶¶511-517.

      The deposition testimony on which the ALJ relied does not support finding that a significant minority of reasonable consumers was likely to be deceived either. To begin with,

the testimony often contained "obvious inconsistencies" that rendered it "unreliable," *Southern States Distributing Co.*, 1973 WL 165073, at *19 (F.T.C. 1973). *See* RRF ¶¶664-675. For example, one consumer testified both that he did not know who qualified for Free Edition and that he understood that Free Edition was only for consumers with simple tax returns. *See* GX137 at 56, 67-68. Further, the sixteen consumers whose testimony the ALJ cited represent an infinitesimally small fraction of all TurboTax customers and are not even close to representative of Intuit's customer base. Instead, CC identified these consumers as likely to support CC's case because they had filed complaints related to TurboTax or signed a declaration *at CC's request*. *E.g.*, RRF ¶664. Meanwhile, while one would expect those consumers to uniformly testify in support of CC, only a few did. In fact, two of the ALJ's findings are supported by just one consumer's testimony; a single consumer's experience—particularly an outlier who filed a complaint related to TurboTax—does not establish how reasonable consumers would have perceived the challenged ads. IDF ¶¶516-517.

v.    TY 2021 customer-base analysis. The detailed analysis of TY 2021 customer-level data conducted by Bruce Deal, an economist and Intuit's expert, further suggests that the challenged ads were not deceptive to a substantial minority of reasonable consumers. As explained in Intuit's post-trial brief (at 89-92), those data reflect that only 510 customers out of 55.5 million, or 0.0009%, exhibited behavior consistent with deception. RPF ¶¶679-682. The ALJ failed to even address the import of Mr. Deal's analysis, much less explain why it does not undermine (if not outright eviscerate) his conclusions.[4]

---

[4] Mr. Deal's opinions were not in the record when CC moved for summary decision. When Commissioner Slaughter asked at oral argument whether Intuit would present evidence concerning the value of customer retention to Intuit's business model, Intuit answered affirmatively. Mr. Deal offers that evidence. His trial testimony is at Tr. 1291-1497, and his report is RX1027.

vi.    <u>Other expert analyses and survey evidence</u>.  John Hauser's "Disclosure Efficacy

Survey" provides additional evidence that the challenged ads were not deceptive.  RB 93-94;

RPF ¶¶722-745.  Dr. Hauser showed consumers versions of the challenged ads that were

modified to reduce the emphasis on "free" and to provide additional information about Free

Edition's qualifications.  If the challenged ads were deceptive, one would expect these revisions

to have discouraged consumers from considering the advertised product.  The survey showed

otherwise.  RPF ¶742.  Perhaps for that reason, the ALJ never mentioned the survey when

analyzing deception.

### c.    *The ALJ erroneously relied on Professor Novemsky's survey*

As Intuit first explained in its (wrongly denied) motion in limine, the survey and related

opinions offered by FTC expert Nathan Novemsky are irrelevant (because he failed to show his

participants any of the challenged ads) and unreliable (due to numerous methodological flaws).

The record subsequently developed confirms that Professor Novemsky's opinions are entitled to

no weight.  RB 71-82; RRB 13-14, 53-55; RRF ¶¶467-894.

i.    "Simple returns" results.  The ALJ erroneously concluded that Professor

Novemsky's survey constitutes "persuasive evidence that consumers do not accurately

understand the meaning of 'simple returns.'"  ID 191.  As Intuit explained (RRB 53-54), the

survey does no such thing.

To start, Professor Novemsky admitted that many of his survey participants understood

that eligibility for TurboTax's free SKUs was based on the "complexity or simplicity" of their

tax returns.  RPF ¶136.  Moreover, the survey says nothing about how consumers understood the

challenged ads' use of "simple returns" because, again, Professor Novemsky did not show

respondents the actual ads or otherwise provide respondents with all the information that the

actual ads did.  RRF ¶¶491-492, 496-497.  In the actual ads, for example, Intuit's use of the

phrase was nearly always accompanied by language (such as "see if you qualify") inviting

consumers to see additional information about the advertised product's qualifications on the

TurboTax website, as well as language specifying the product being advertised.  RPF ¶¶244,

262, 275, 290, 299.

The ALJ concluded that providing survey participants with that additional information—

i.e., the *actual ads* that are the subject of this proceeding—was unlikely to "materially alter their

perception of their qualification for 'simple returns'" because Intuit's "fail[ure] to include any

additional details about th[e] qualification … invites consumers to determine the meaning of the

phrase for themselves."  ID 191.  But the language that Professor Novemsky omitted ("see

details" or "see if you qualify at TurboTax.com") would *prevent* consumers from determining

the meaning of "simple returns" themselves.  RRF ¶¶491-492.  The ALJ hypothesized that

consumers likely have "their own pre-existing definition of 'simple,'" based on "wishful

thinking," and that they are unlikely to "seek[] out additional information."  ID 191-192; IDF

¶443.  The only cited support for that hypothesis, however, is Professor Novemsky's survey, *id.*;

*see* RPF ¶927; RRF ¶499, which provides no support since Professor Novemsky *barred*

participants from seeking out additional information, RRB 54.

The survey's results concerning consumers' understanding of "simple returns" were

further infected by the flaws and biases discussed in the balance of this subsection.

ii.    Improper survey design.  The ALJ correctly concluded that Professor

Novemsky's opinion about the "source of survey participants' beliefs … lacks a firm grounding

and is not entitled to much weight" because Professor Novemsky "did not show [his participants]

any TurboTax advertisements" and "did not use a control group."  ID 190.  But the decision fails

to appreciate the impact of this improper survey design, finding despite these acknowledged

flaws that Professor Novemsky used "an appropriate design to measure consumer existing

consumer perceptions" (IDF ¶395) and that his survey represented "reasonably reliable … proof

that a significant percentage of consumers who are ineligible to file for free have the

misimpression that they can file their taxes for free with TurboTax" (ID 190).  In reality, because

Professor Novemsky did not use a control, he had no way to estimate the effect of the survey

itself on respondents' perceptions.  RPF ¶539.  Given this shortcoming (and the survey's various

other flaws), the ALJ's conclusion that Professor Novemsky adhered to survey guidelines (IDF

¶¶400, 435) is incorrect, RRF ¶532; *see also* RPF ¶¶566-589; RRF ¶481.[5]

       iii.     <u>Leading survey questions</u>.  The Novemsky survey results concerning whether

consumers thought they could file for free are also unreliable because they are based on a single

multiple-choice question (TAT240) that invited guessing (RB 74) and "primed respondents" to

answer the way Professor Novemsky wanted (RPF ¶¶572-573).  *See Fish v. Kobach*, <u>309

F.Supp.3d 1048, 1060</u> (D. Kan. 2018) (disapproving survey that similarly "primed respondents"

to answer in a particular way), *aff'd*, <u>957 F.3d 1105</u> (10th Cir. 2020).  Several survey participants

confirmed that their responses were prompted by the survey itself, providing explanatory

answers like, "[i]t's been said a few times now during survey that you can file for free using

TurboTax."  RPF ¶¶575-577.  The ALJ dismissed those responses because they involved

"[f]ewer than 1%" of respondents (IDF ¶421), but "respondents actively not[ing] the impact of

the survey on their answers without prompting is strongly indicative of a more widespread"

problem, RRF ¶589.  Nor did the ALJ address Dr. Hauser's blind-coding analysis, which showed

---

[5] Given the ALJ's finding that the Novemsky survey says nothing about the source of participants' beliefs, the contradictory finding—that the results from one survey group (Group B) "provide[d] some indication of the power of 'free messaging,' and its potential to overcome even the past experiences of those who have previously paid to use TurboTax," ID 128—lacks any logical basis and should be disregarded.

that nearly half of Professor Novemsky's respondents provided open-ended answers that were inconsistent with their answer to TAT240, further suggesting that those participants' perceptions were influenced by the survey. RPF ¶¶579-589.

      iv.    <u>Unrepresentative and biased survey population</u>. The ALJ overlooked the numerous ways in which Professor Novemsky's survey population was unrepresentative and biased. The 607 people who completed the survey represented under five percent of the 12,239 who began it (RPF ¶542)—a "woefully low response rate" comparable to rates courts have deemed insufficient to produce reliable results, *In re Autozone, Inc.*, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016), *aff'd*, 789 F.App'x 9 (9th Cir. 2019); *see* RB 77. Furthermore, by screening out respondents who qualified for Free Edition and had already filed their taxes, Professor Novemsky crafted a survey population that was especially unlikely to be familiar with TurboTax and the challenged ads, RPF ¶¶543-549, and for whom the ads were definitionally not material since they supposedly believed they could file for free on TurboTax and yet chose not to do so. His analysis also focused on respondents who had not used TurboTax for at least three years, meaning they were more likely to be familiar with competitors' products and advertising, which likely influenced their responses. RPF ¶¶550-552.

      Finally, Professor Novemsky failed to safeguard against bias. He permitted respondents who completed his survey to opt out after informing them of the survey's purpose. RPF ¶¶555-559. Roughly 21% of participants did so, and their answers were deleted. RPF ¶557. As the FTC has recognized, such "transparen[cy] about the nature or purpose of a survey" is improper because it may "create bias in … consumers' decision to participate," which "would affect the accuracy and validity of the information collected and effectively nullify the survey." RPF

¶¶558-559.  The ALJ's dismissal of this flagrant bias because the opt-out occurred at the end of the survey (ID 127) makes no sense.  *Id.*

### B.    The Initial Decision Is Premised On Fundamental Legal Errors

The foregoing sections address the flaws in the ALJ's analysis of particular evidence, but there are several additional, overarching problems with the ALJ's ruling that further underscore that reversal is required.

#### 1.    The ALJ imposed a heightened disclosure requirement that is both unsupported and infeasible

The ALJ erred by giving the word "free" all-but-dispositive significance in advertising (and deception analysis).  Attaching supreme significance to the word "free"—the actual price of the product at issue here—lacks any basis in law.  The ALJ's only support (*see* ID 170) were decades-old cases, each about a product that was advertised as "free" but was *not* free for *anyone*.  For example, in *Book-of-the-Month Club*, 48 F.T.C. 1297 (1952), "[t]he use by the respondent of the word 'free' [was] false," because "the books designated as 'free' [were] not … without cost to the recipient," *id*. at 1306.  And in *FTC v. Mary Carter Paint Co.*, 382 U.S. 46 (1965), the advertised "can of paint was not … 'free,'" as the respondent was "allocating what [was] in fact the price of two cans to one can, yet calling one 'free,'" *id*. at 48.  Unlike in those cases, the products advertised here as free for qualifying consumers *are* free to those consumers; consumers do not have to pay Intuit anything to use any of the free products, and as explained it is *impossible* to pay to use any of them.  The principle drawn from the ALJ's cited case law— that "*[d]isclaiming* a free claim can be particularly difficult," ID 203 (emphasis added)—is therefore irrelevant.  Intuit did not need to disclaim its free claims; they were true.

The ALJ nonetheless used that principle to shift the burden of proof regarding deception to Intuit.  For instance, the ALJ held that Intuit's evidence "fails to prove" the *lack* of deception,

ID 203; that Intuit's evidence "is not proof that Intuit's current advertisements are unlikely to mislead," ID 221 n.42; and that Intuit failed to "rebut" CC's positions, ID 195, 197. Use of the word "free" does not license this inversion; the regulation instructing that "[c]ounsel representing the Commission … shall have the burden of proof," 16 C.F.R. §3.43(a), does not provide any exception for cases involving "free" claims.

Relying further on the notion that "[d]isclaiming a free claim can be particularly difficult," ID 203, the ALJ set an impracticably (and unlawfully) high bar for Intuit's disclosures. Specifically, the ALJ concluded that it is not sufficient for Intuit's digital ads "to disclose 'the existence and category' of the applicable limitations" on eligibility for its free offers while hyperlinking to full eligibility details. ID 220. That is a remarkable departure from existing FTC guidance, which provides that an ad need only disclose the "nature and relevance" of limitations, and that if details (including regarding "price") "are too complex to describe adjacent to the [relevant] claim, those details may be provided by using a hyperlink." GX316 at 10, A-8 (FTC, *.com Disclosures* (Mar. 2013)). That is the situation here: As the ALJ acknowledged, CC's expert conceded "that the eligibility requirements to file for free 'cannot be easily communicated in an ad to a reasonable consumer.'" ID 224 (emphasis omitted). But rather than applying the FTC guidance that approves the use of hyperlinks in precisely these circumstances, *see* GX316 at A-7, A-8, the ALJ declared that "the solution" is for Intuit to "avoid" describing its free products as free, ID 224. That is shocking. It is not, and certainly should not, be that the law forbids advertising a free product as free merely because the offer has qualifications. That would outlaw any hotel's "kids stay and eat free" offer, as well as countless other free offers with which reasonable consumers are familiar. RPF ¶¶473-477. It would even outlaw any IRS marketing

for the IRS Free File program, which describes the program as "free" without disclosing that it is available only to taxpayers below a certain income level.  RPF ¶¶59, 278-279.

In short, the ALJ erred in ruling that Intuit's accurate use of the word "free" both necessitated impracticable disclosures and triggered a "particularly strong" legal standard, under which the burden of proof shifted to Intuit.  ID 170; *see also* ID 201, 203; IDF ¶¶427-428.

### 2. The ALJ improperly analyzed the ads' components piecemeal and from a subjective viewpoint

a.    By analyzing the various components of the challenged ads piecemeal, the ALJ violated "the principle that the Commission looks to the impression made by the advertisements *as a whole*," *American Home Products*, 695 F.2d at 688 (emphasis added), as well as the Commission's instruction to consider "the juxtaposition of various phrases" in an ad, *Policy Statement on Deception*, 103 F.T.C. at 176.  Indeed, courts have "emphasized that in reviewing FTC actions prohibiting unfair advertising practices," a court "must consider the advertisement *in its entirety* and not … engage in disputatious dissection."  *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (quotation marks omitted; ellipsis in original; emphasis added).

The initial decision flouts this judicial mandate.  As noted, the challenged ads included at least three different types of disclosures: (1) the specific product being advertised, (2) language conveying that eligibility for the advertised product was limited based on the complexity of one's tax return, and (3) language directing consumers to full eligibility information.  In analyzing these disclosures, the ALJ expressly considered "each tile separately," rather than the "entire mosaic," as the law requires.  *S.C. Johnson & Son*, 241 F.3d at 238.

For example, as to the challenged ads' disclosure of the specific product being advertised, the ALJ concluded that "*without any further disclosures*, the mere name of the product is

35

unlikely to dispel a viewer's [mis]impression" that TurboTax would necessarily be free for them. ID 171 (emphasis added). That conclusion is irrelevant, as there *were* further disclosures. As to the disclosure that eligibility was limited based on the complexity of one's tax return, the ALJ similarly concluded that "the interjection of 'simple tax returns'" was insufficient to qualify the challenged ads' "*generalized* 'free' claim." ID 172 (emphasis added). That conclusion is flawed because, as noted, the free claims were *not* "generalized," but rather were expressly associated with specific products. Finally, the ALJ concluded that disclosures like "see details" or "see if you qualify" were—again, *by themselves*—"unlikely to alter the overall net impression of an advertisement." *Id.*

        b.      The ALJ independently erred by considering the ads and their components from his subjective perspective. That was improper because "[t]he deception standard is objective in nature." *Richards v. Direct Energy Services, LLC*, 915 F.3d 88, 100 (2d Cir. 2019).

        *First*, the ALJ ignored critical objective evidence regarding the adequacy of the challenged ads' disclosures: Professor Golder's analysis. RPF ¶¶234-236, 258. As noted, Intuit's disclosures were comparable or superior to the comparators on each of these metrics. RPF ¶¶237, 259. These metrics—not CC's or the ALJ's subjective opinions—are legally relevant, not least because, as CC's expert conceded, they were drawn from FTC guidelines. RPF ¶927.

        *Second*, the ALJ disregarded the only perspective that matters: that of reasonable consumers. As a matter of law, "reasonable consumer[s]" are deemed to "understand[]" concepts that "are commonplace in the [relevant] market." *Ebner*, 838 F.3d at 965. And as explained in section I.A.2.a, the ALJ failed to account for reasonable consumers' familiarity with free offers in the online-tax-preparation market. Likewise, as explained in section I.A.2.b, he

inappropriately ignored or disregarded evidence concerning market research, consumer

complaints, consumer-experience data, consumer testimony, Mr. Deal's TY 2021 customer-base

analysis, and other expert analyses showing that reasonable consumers in fact were not deceived

by the challenged ads.

### 3. The ALJ relied on a doctrine that has no place here and involves disregarding detailed information readily available to consumers

The ALJ erroneously relied on an antiquated and inapplicable doctrine to disregard the

detailed disclosures provided prominently and repeatedly on the TurboTax website. That ruling

threatens to render e-commerce advertisements absurdly complex and unworkable, for no sound

reason.

The ALJ acknowledged (ID 201) "that consumers must visit the TurboTax website … to

use TurboTax Free Edition, and that the website included additional information about the …

qualifications for using TurboTax Free Edition." Indeed, Free Edition's qualifications were at

the top of both the TurboTax homepage and the Free Edition landing page throughout the

relevant period. RPF ¶¶374-384, 388-398. Nevertheless, the ALJ invoked the "deceptive door

opener" doctrine to dismiss those upfront and detailed disclosures as irrelevant. ID 200. As the

ALJ observed at trial, the upshot of applying the door-opener theory in this case is that "it

doesn't matter what a consumer sees at the website"; all that matters is that the ads "induced

[consumers] to the website." RPF ¶467. (And yet, the ALJ never found that any of the ads here

induced consumers to the website.)

Intuit explained at length in its post-trial briefing why applying the door-opener doctrine

to an online product like TurboTax is anachronistic and contrary to law, especially where the ads

expressly incorporated the website disclosures through the "see if you qualify" disclosure. RB

51-56; RRB 62-65. The initial decision offers no persuasive response.

*First*, the decision ignores case law requiring that "deceptive advertising claims … take into account all the information available to consumers," *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 477 (7th Cir. 2020), or at least any "information *readily available* to the consumer," *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021). The TurboTax website was expressly mentioned in every challenged video and radio ad, RPF ¶¶215, 218, 222, 244, 294, 299, and linked to directly by every other challenged ad, RPF ¶¶253-254, 269-270, 284-285. Moreover, CC's expert recognized both that it takes only "a few seconds" to get to the website by typing "TurboTax" into a web browser, and that once on the website it takes only "five to ten seconds" to encounter the qualifications for free TurboTax offers. RPF ¶790. The information on the website was undoubtedly "readily available to the consumer," *Moore*, 4 F.4th at 882. It thus cannot be that "it doesn't matter what a consumer sees at the website," RPF ¶467.[6]

*Second*, the ALJ ignored that the doctrine, which originated in the brick-and-mortar context, is inapplicable to online products like TurboTax. As Intuit explained (RB 53-54; RRB 64-65), the door-opener concept was developed in cases about ads that either lured consumers to a physical facility under false pretenses, *Resort Car Rental Systems, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (per curiam), or induced consumers to literally open their front doors so that salesmen could "gain entrance into [their] homes," *Encyclopaedia Britannica, Inc.*, 87 F.T.C. 421, 496 (1976); *see also Grolier, Inc.*, 99 F.T.C. 379, 383 (1982). The ALJ's only justification for applying these half-century-old cases to twenty-first-century e-commerce is that "no FTC case has held that the deceptive door opener rule does *not* apply to transactions that take place online rather than in a brick-and-mortar store." ID 201 (emphasis added). But neither has any

---

[6] The cases cited above cannot be dismissed because they were not decided under the FTC Act. They were decided under state statutes that are, if anything, broader than the Act, and their legal principles reflect countless more cases than have been brought under the FTC Act.

case held that the rule *does* apply online. To the contrary, courts have rejected deception claims (under state laws modeled on the FTC Act) in the online context where price disclosures occurred at the point of sale, much later than consumers see detailed information on the TurboTax website. *See Washington v. Hyatt Hotels Corp.*, 2020 WL 3058118, at *5 (N.D. Ill. June 9, 2020); *Harris v. Las Vegas Sands L.L.C.*, 2013 WL 5291142, at *2, *5-6 (C.D. Cal. Aug. 16, 2013). The ALJ declared without explanation that these cases involved "different factual contexts," ID 201, but their contexts are far more relevant than the pre-Internet cases the ALJ cited.

*Finally*, the ALJ failed to explain why the reasons the door-opener theory was rejected in *FTC v. DirecTV* do not apply equally here. Those reasons were that (1) "nothing in [the challenged advertisement] contradict[ed] the true terms of [the advertiser's] provision of services" and (2) the advertisement was "for a complex product" and in a constrained format, such that "a reasonable consumer would understand the limitations of how information is presented." *DirecTV*, 2018 WL 3911196, at *15. So too here: Nothing in the challenged ads contradicted the true terms of the advertised offers. *See supra* section I.A.1. And as CC's expert testified, "the level of information … in the eligibility requirements" for Intuit's free TurboTax offers "could not be effectively communicated in a" constrained format. RPF ¶841. Accordingly, more detailed disclosures would have been "out of step with what consumers" expect. RPF ¶845. The ALJ declared (ID 203) that "*DirecTV* is readily distinguishable," but that assertion is unsupported. The ALJ simply provided a conclusory recitation of his own

falsity holding, which was flawed, and his observation that *DirecTV* involved "disclos[ures] on the face of the advertisements themselves," which of course describes this case as well.[7]

## II.    THERE IS NO BASIS FOR THE PROPOSED CEASE-AND-DESIST ORDER

### A.    No Cease-And-Desist Order Is Warranted

Even if any of the challenged ads—none of which is still running, RPF ¶¶336, 803—were deceptive, no cease-and-desist order would be warranted. Such orders are permitted only "to prevent illegal practices in the future," *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952), not "to fasten liability on respondents for past conduct," *FTC v. Cement Institute*, 333 U.S. 683, 706 (1948). Accordingly, CC had the burden to prove that there is "some cognizable danger of recurrent violation, something more than [a] mere possibility." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). CC did not do so. The ALJ's decision to issue an order anyway failed to account for the improvement over time in the clarity of Intuit's ads, Intuit's intent to be clear with consumers and to follow the law, and the assurance provided by Intuit's binding consent order with all 51 state attorneys general.

1.    The overwhelming and largely uncontested evidence of improvement in the clarity of Intuit's ads belies any "cognizable danger of recurrent violation," *W. T. Grant*, 345 U.S. at 633. Over the past several years, Intuit has lessened the prominence of its "free" claims, RPF ¶354, increased the size and contrast of its text disclosures, RPF ¶¶355-357, and added and strengthened verbal disclosures, RPF ¶¶355, 359, 361-362. Copy testing confirms that these

---

[7] The ALJ also asserted in a footnote (ID 204 n.31) that the TurboTax website was deceptive on its own, "independently of the deceptive door opener theory." But the decision makes clear that CC did not meet their burden of proof on that subject. *Id.* The Commission should not credit a footnoted conclusion unsupported by *any* argument. In any event, even a cursory review of the website makes clear that it is not deceptive. *See* ID §II.B.7; RPF ¶¶372-452.

efforts worked: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, RPF ¶¶702-713—the same as the share of *all*

U.S. taxpayers who qualify to file for free (even though ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, RPF ¶¶705-706).  The ALJ acknowledged that this

recent testing showed "smaller percentages" of filers believing they could file for free "than

shown by copy testing of" prior ads, but he discounted the recent testing on the ground that the

percentages of filers it showed believed they could file for free ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) was

"not insignificant."  ID 221 n.42.  The question, however, is not whether the percentage was

large or small in an absolute sense.  What matters is how the copy-testing percentage compared

to the *actual* percentage of the population who qualify.  And as just explained, the copy testing

shows that the tested and actual percentages for Intuit's current ads are extremely close.  That

strongly undercuts any conclusion that there is any realistic danger here of future section 5

violations.  In fact, CC effectively conceded that Intuit is currently complying with the laws by

not challenging any of Intuit's current ads as deceptive.  *See* RPF ¶¶336, 803.

If more were needed, "Intuit has … ceased the … 'free, free, free' video advertising

campaign" that was the centerpiece of CC's case.  ID 216; *see also* ID 163.  The ALJ discounted

this voluntary cessation because it occurred "four days before the issuance of the FTC's

Complaint."  ID 216.  But it is the FTC that decided to issue a complaint *after* the termination of

the ad campaign.  Moreover, the ALJ ignores that this cessation was undertaken—with great

effort by Intuit, RPF ¶¶7-8—as soon as the Commission first articulated specific concerns with

the ad campaign, RRB 70-71.

2.    Undisputed evidence of Intuit's past and continuing intent to be fully honest and

transparent with consumers further militates against any cease-and-desist order.  CC conceded

before trial that they lack any evidence of intent to deceive.  RPF ¶175.  And at trial, Intuit's

former and current executives consistently (and credibly) testified that the company's values,

goals, and business interests are inconsistent with deception.  RPF ¶¶30, 33-38, 73, 167-176,

353, 647, 769, 850-852, 860, 870.  That testimony was corroborated by the instructions Intuit

gave its ad agencies, RPF ¶¶172-173; expert testimony regarding economic incentives in the tax-

preparation industry, RPF ¶¶39, 89; and case law recognizing "the importance of reputation and

brand in driving consumer behavior in purchasing" online tax-preparation products, *H&R Block*,

833 F.Supp.2d at 75.  Indeed, the ALJ *credited* "the sincerity of Intuit's witnesses testifying to

Intuit's commitment not to deceive its customers—including because of Intuit's own business

incentives."  ID 221.

3.    Intuit's legally enforceable consent order with the attorneys general of all 50

states and Washington, D.C. leaves "nothing for this court to enjoin" and thus moots this case,

*Wold v. Robart*, 2018 WL 1135396, at *5 (E.D. Wis. Feb. 28, 2018).  At an absolute minimum, it

provides powerful "assurance[] of future compliance" with the FTC Act, eradicating any

"cognizable danger" of future violation and thereby foreclosing a cease-and-desist order, *TRW,*

*Inc. v. FTC*, 647 F.2d 942, 954 (9th Cir. 1981).  The consent order bars the "free, free, free"

video ads and any substantially similar ads.  RPF ¶213.  It also requires "Clear and Conspicuous"

disclosures in all free ads, including written disclosures that not all taxpayers qualify, as well as

corollary verbal disclosures in all video ads eight seconds or longer, RPF ¶¶809-819.  There is no

dispute that Intuit has complied with the consent order, that Intuit has charged an internal team

with ensuring compliance in the future, and that all relevant Intuit employees now receive comprehensive training on the consent order's provisions. RPF ¶¶821-828.

Intuit's post-trial reply brief explained at length why each of CC's quibbles with the consent order (repeated by the ALJ, *see* ID 220-221) is unavailing. RRB 72-75. To summarize, each is inconsistent with either the FTC's own guidance on the propriety of hyperlinks, RRB 73, its guidance on the context-dependent necessity of audio disclosures, *id.*, or other recent orders, RBB 74, and each would make modern-day space-constrained advertising largely impossible.

*      *      *

Because the allegedly deceptive ads are no longer running, because the ads that *are* running are demonstrably improved, because Intuit's honest intent is undisputed, and because a consent order with all 51 state attorneys general provides powerful assurances against future deception, no cease-and-desist order is warranted.

### B.    The ALJ's Order Is Inappropriate

The ALJ's order is especially unwarranted because it is vague, harmful, overbroad, and unconstitutional.

1.    A lynchpin of the ALJ's order—provision I.B—is not "stated with clarity and precision" and thus is "unenforceable." *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235-1236 (11th Cir. 2018).

Provision I.B. requires that "[a]ll the terms, conditions, and obligations upon which receipt and retention of [a] 'Free' good or service are contingent [be] set forth Clearly and Conspicuously at the outset of the [free] offer so as to leave no reasonable probability that the terms of the offer might be misunderstood." ID 232. Like the consent order, this provision requires the clear and conspicuous presentation of relevant qualifications. But *un*like the consent order, it "says precious little about how this is to be accomplished," *LabMD*, 894 F.3d at 1237.

The ALJ's response—that "[t]he terms of Section I.B appear to be as specific as the circumstances will permit," ID 227 (quotation marks omitted)—is plainly wrong given the consent order's far more specific terms, *see* RPF ¶¶810-819, and is hardly a compelling justification. And the ALJ's fallback assertion—that "uncertainty may be resolved" through the prior-restraint provision of the Commission's Rules of Practice, ID 226-227—is cold comfort, as the applicable rule allows the Commission to "at any time reconsider any advice given under this section and, where the public interest requires, rescind or revoke its prior advice," 16 C.F.R. §2.41(e). In any event, the rule of practice does not supersede precedent requiring that any cease-and-desist order's provisions be "stated with clarity and precision," *LabMD*, 894 F.3d at 1235.

2.      The ALJ's order would not help and in fact would harm consumers. Provision I.B, for example, would result in "information overload" and thus be counterproductive to consumer understanding. RPF ¶¶138, 383, 834-835. CC never rebutted the testimony of Intuit's witnesses on this subject. RPF ¶¶833, 842, 844; *see* RRB 83-84 (recounting testimony). As the ALJ acknowledged, moreover, *both* sides' experts recognized a "potential to overload consumers with complicated information in an advertisement," with CC's expert confirming that "the eligibility requirements to file for free 'cannot be easily communicated in an ad to a reasonable consumer.'" ID 224 (emphases omitted). That is especially true for space-constrained video ads (on TikTok, for example), in which it would be difficult to comply with the order. The ALJ appears to have discounted this expert consensus on the ground that "neither witness conducted any formal analysis using the disclosures required by the Proposed Order." *Id.* That is unsurprising, since the proposed order's requirements are so completely incoherent that no expert could be sure what to test. It is also impermissible burden-shifting; it was *CC's* burden to

44

prove their proposed order was warranted, *see W. T. Grant*, 345 U.S. at 633. CC failed to do so, offering *no* evidence that provision I.B would help consumers better understand free TurboTax advertising. RPF ¶832.

Provision I.C, which requires Intuit to state in its ads that its free products are "not Free for a majority of U.S. taxpayers," likewise would harm consumers. As Professor Golder explained, that provision would cause many consumers to assume—often incorrectly—that they do not qualify for the free TurboTax product being advertised. RPF ¶843. That is especially pernicious because, of consumers in the market for online tax-preparation software, most *do* qualify to file for free. RPF ¶¶129, 464; *see also* RPF ¶¶485-501.

3.     The ALJ's order inappropriately encompasses products other than TurboTax. Any cease-and-desist order must be reasonably tethered to the challenged practice. *American Home Products Corp. v. FTC*, 695 F.2d 681, 710-711 (3d Cir. 1982). Indeed, the "concept of 'reasonableness' has" often "required the narrowing of deceptive advertising orders so that they more closely relate to the offending conduct." *Fedders Corp. v. FTC*, 529 F.2d 1398, 1402 (2d Cir. 1976). That is the situation here, as CC neither made allegations nor provided evidence concerning any product other than TurboTax.

To be sure, courts have recognized that equitable relief can involve "some fencing in." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014). But the factors the ALJ considered—the deliberateness and history of Intuit's conduct, *see* ID 229—cut *against* any such "fencing." As discussed, *see* section II.A.2, the evidence shows that Intuit's ads have improved and that Intuit was and remains committed to communicating clearly and honestly with consumers. The ALJ's reliance on the fact that Intuit "was a defendant in numerous court cases claiming that Intuit's free tax filing advertising was deceptive," ID 229, is improper because

45

mere "allegations are not evidence of the truth of what is alleged," *Wright v. Farouk Systems, Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012).  The ALJ's reliance on those cases is also inappropriate because many are irrelevant, and none were successful.  RRF¶¶917-934.  There was thus no sound basis for the order to reach products beyond TurboTax.

4.       Provision I.C—again, requiring Intuit to disclose that a product is "not Free for a majority of U.S. taxpayers"—is unconstitutional.  The government may not compel commercial speech unless the speech is "noncontroversial" and the compulsion neither "unjustified [n]or unduly burdensome." *National Institute of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361, 2372 (2018).  Provision I.C fails both elements.  First, the compelled speech is far from "noncontroversial," *id*.  As the ALJ recognized at trial, the entire taxpayer population is "pretty much meaningless" for measuring eligibility to use Free Edition.  RPF ¶463.  The more relevant population is taxpayers in the market for online tax preparation, and most of them *do* qualify to use TurboTax for free.  RPF ¶¶129, 464.  Second, imposing provision I.C on Intuit but not its competitors who market similar free offers, RPF ¶¶453-460, would be "unjustified or unduly burdensome" because it would disadvantage Intuit relative to its competitors.  "[A] government-compelled disclosure that imposes [such] an undue burden fails for that reason alone." *American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019).  The ALJ's dismissal of this self-evident point on the ground that it was "unsupported by record evidence" again amounts to an impermissible shifting of CC's burden to prove that their proposal was warranted, *see W. T. Grant*, 345 U.S. at 633.

In sum, no order is warranted here, and certainly not the vague, consumer-hurting, overbroad, and unconstitutional one the ALJ adopted.

## III.    THE PROCEEDING IS UNCONSTITUTIONAL AND UNTIMELY

### A.    Constitutionality

1.    The Supreme Court has held that "an unconstitutional potential for bias" under the Due Process Clause inevitably exists "when the same person serves as both accuser and adjudicator in a case." *Williams v. Pennsylvania*, 579 U.S. 1, 4, 8 (2016); *see* RB 117-118. Such bias is present here, where the Commissioners who authorized the filing of the complaint against Intuit are now deciding its merit. That bias is underscored by the Commission's summary-decision order, which (1) criticized Intuit's evidence even before Intuit had an opportunity to develop a record, (2) incorrectly asserted that most ads failed to mention Free Edition, and (3) effectively mandated the initial decision's result. *See* Summary-Decision Order (Jan. 31, 2023).

In upholding the FTC's combination of functions, the ALJ cited (ID 211) three cases that all pre-date *Williams*. He also cited (*id.*) *Withrow v. Larkin*, 421 U.S. 35 (1975), which expressly recognized that a combination of functions violates due process when "the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable," *id.* at 47. The Commission's unblemished record before itself is that kind of "strong sign of an unhealthy and biased institutional process." RPF ¶934.

The FTC's current makeup exacerbates the risks posed by its unconstitutional structure and provides yet another reason why the Commission cannot lawfully act. The FTC was created as a five-member body with no more than three Commissioners from the same political party. 15 U.S.C. §41. *Humphrey's Executor* confirmed the need for the FTC to be "nonpartisan." 295 U.S. 602, 624 (1935); *see also* S. Rep. 63-597 at 22 (1914) ("[I]t was essential that the commission should not be open to the suspicion of partisan direction."). The FTC's current composition—three commissioners all from the same party—contravenes that statutory mandate, rendering any Commission action invalid.

The Due Process Clause is also violated when "a disinterested observer may conclude that the agency has in some measure" prejudged the case. *Fast Food Workers Committee v. NLRB*, 31 F.4th 807, 815 (D.C. Cir. 2022). Intuit renews its argument, also made in its pending motion to disqualify, that Chair Khan's participation in this case supports such a conclusion, and her continued presence taints the remaining commissioners.

Relatedly, the ALJ erred when he denied Intuit's motion for discovery related to the Commission's prejudgment. Order Denying Respondent's Motion for Discovery Pursuant to Rule 3.36 (Nov. 7, 2022). That order largely rested (*id.* at 6) on the incorrect notion that Chair Khan's conduct was not a basis for disqualification, RB122-125.

2.     "[C]ases involving 'private rights'" must be decided in article III courts. *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 32 (2014). This case involves Intuit's private right of "advertising," which is a "core private right[]," *Axon Enterprise v. FTC*, 598 U.S. 175, 198 (2023) (Thomas, J., concurring), one "integral" to Intuit's "liberty," *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part). Channeling claims involving private rights to administrative agencies not only violates article III, but also "may violate due process." *Axon*, 598 U.S. at 202 (Thomas, J., concurring). The ALJ ignored this constitutional infirmity. *See* RB 118-119.

3.     The FTC's structure contravenes article II because the Commissioners and the FTC's ALJs are impermissibly insulated from presidential removal. RB 119-121. In disagreeing, the ALJ relied (ID 211) on *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). But *Seila Law v. CFPB*, 140 S.Ct. 2183 (2020), "repudiated almost every aspect of *Humphrey's Executor*," *id.* at 2212 (Thomas, J., concurring in part and dissenting in part). To the extent *Humphrey's* survives, Intuit preserves the argument that the case should be overruled.

48

And even if it is still good law, that case blessed Commissioner tenure protection only after noting that the FTC "is to be nonpartisan," 295 U.S. at 624, which is not the case today.

As to ALJs, the ALJ acknowledged (ID 211) that "the Fifth Circuit held that the statutory removal restrictions for [SEC ALJs] are unconstitutional" in *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), *cert. granted*, 143 S.Ct. 2688 (2023). Yet he refused without explanation to extend *Jarkesy* to himself. No material distinction exists between the two agencies' ALJs, *see* RB 119-120. The FTC ALJ's double-layered removal protections are thus unconstitutional.

4.      The Commission's unfettered discretion to proceed before either an administrative or an article III tribunal, *see* 15 U.S.C. §§45(b), 53(b), is unconstitutional, *see Gundy v. United States*, 139 S.Ct. 2116, 2123 (2019) (plurality), especially where, as here, the FTC already tried and failed in a neutral forum. The Fifth Circuit recently held that the SEC's materially identical forum-selection delegation was unconstitutional. *Jarkesy*, 34 F.4th at 461. Again, no basis exists to distinguish *Jarkesy*. RB 121-122.

The ALJ rejected Intuit's non-delegation argument on the ground that the Commission is merely "exercis[ing] enforcement discretion—a traditional executive power." ID 213. But in deciding whether to proceed administratively or judicially, Congress "effectively gave the [agency] the power to decide which defendants should receive *certain legal processes* (those accompanying article III proceedings) and which should not." *Jarkesy*, 34 F.4th at 462. That power is one "Congress uniquely possesses." *Id.*

**B.      Timeliness**

This case was untimely in two respects.

First, laches—which bars equitable relief when the plaintiff engages in "unreasonable, prejudicial delay in commencing suit," *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014)—precludes the FTC from punishing Intuit for outdated ads of which the FTC has

49

long been aware.  The FTC began investigating Intuit in 2019, RPF ¶1, yet allowed nearly three whole tax seasons to pass before initiating an action in 2022, RPF ¶6, challenging ads that ran as early as 2015.  The ALJ wrongly concluded (ID 209) that laches is categorically inapplicable.  *See, e.g.*, *FTC v. DirecTV*, 2015 WL 9268119, at *3 (N.D. Cal. Dec. 21, 2015); RB 116.

Separately, ads from TYs 2014-2017 cannot support relief because they ran outside the three-year statute of limitations applicable to section 5 claims.  When statutes (like section 5) lack an express limitations period, courts "'borrow' the most suitable statute or other rule of timeliness from some other source."  *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 158 (1983); RB 113-115.  Here, analogous state and federal laws both point to a three-year limitations period.  *See, e.g.*, Cal. Civ. Code §1783; 15 U.S.C. §57b(d).  The ALJ rejected *DelCostello* because it did not involve claims brought by the government.  ID 210.  But if anything, government claims have a *greater* need for a limitations period, because time limits are "an almost indispensable element of fairness," *Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 301 (1946), and it would be "utterly repugnant to the genius of our laws" if government enforcement actions could "be brought at any distance of time," *Adams v. Woods*, 6 U.S. 336, 342 (1805).  *See* RB 114-115.

## CONCLUSION

The Commission should dismiss the complaint.

September 26, 2023                    Respectfully submitted,

                                      By: */s/ David Z. Gringer*

                                      David Z. Gringer
                                      WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                      7 World Trade Center
                                      250 Greenwich Street
                                      New York, NY 10007
                                      (212) 230-8800
                                      David.Gringer@wilmerhale.com

                                      Howard M. Shapiro
                                      Jonathan E. Paikin
                                      Jennifer Milici
                                      Daniel S. Volchok
                                      Derek A. Woodman
                                      WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                      2100 Pennsylvania Avenue NW
                                      Washington, DC 20037
                                      (202) 663-6000
                                      Howard.Shapiro@wilmerhale.com
                                      Jonathan.Paikin@wilmerhale.com
                                      Jennifer.Milici@wilmerhale.com
                                      Daniel.Volchok@wilmerhale.com
                                      Derek.Woodman@wilmerhale.com

# EXHIBIT E

PUBLIC



GOVERNMENT
EXHIBIT
**289**

Product    Us    Data Points    Client Login    Request a Demo

Finance

# TurboTax supercharges its market share during 2021 tax season

Janine Perri — 17 Jun 2021

Due to the COVID-19 pandemic, the federal income tax deadline for individuals was extended for the past two years, to July 15 in 2020 and May 17 in 2021. Consumer transaction data reveals that, consequently, sales for the tax prep industry were more spread out in 2020 and 2021 compared to previous years, resulting in smaller-than-usual sales spikes the week of and week before Tax Day. However, TurboTax continues to lead the tax prep industry and has steadily gained market share from its competitors over the past three tax seasons.

### In 2020 and 2021, fewer tax prep sales occurred the week of and before Tax Day

In 2017, 2018, and 2019, roughly 26 percent of annual sales for tax preparation services occurred during the week of or week before Tax Day, which usually takes place around April 15. Historical data also shows that after Tax Day passes, sales for tax preparation services drop significantly, with the exception of another small spike in the fall that coincides with the tax extension deadline of October 15.



Indexed Weekly Sales for Tax Preparation Services

* Indexed to tax prep industry's weekly sales the week of January 2, 2017 (=100)

Bloomberg Second Measure

For the first few months of 2020, the tax prep industry's sales volume followed roughly the same pattern as previous years. However, on March 21, 2020 the IRS announced that the tax deadline would be extended to mid-July in response to the pandemic. After the announcement, tax prep sales were spread out over the weeks approaching the new July deadline. As a result, only 17 percent of annual sales for tax prep services occurred the week of and week before Tax Day 2020.

A similar pattern occurred in 2021, with sales being generally more spread out between the IRS' March 17 announcement of the extended tax deadline and the deadline itself on May 17. In 2021, 21 percent of sales year-to-date (as of the week of May 17) occurred the week of Tax Day and the week before.

### TurboTax has the highest share of sales

A closer look at the top industry competitors within our dataset shows that over the past three tax seasons, TurboTax has increased its share of sales. In May 2021, TurboTax's share of sales was 73 percent, 3 percentage points higher than in July 2020 and 10 percentage points higher than in April 2019.



Tax Prep Share of Sales by Tax Month

Blucora    H&R Block    Jackson Hewitt    TaxSlayer    TurboTax

April 2019

July 2020

May 2021

0%  10%  20%  30%  40%  50%  60%  70%  80%  90%  100%

Bloomberg Second Measure

H&R Block is the second-most popular tax prep service, but has experienced a decreasing share of sales over the past three tax seasons. In May 2021, H&R Block's share of sales was 21 percent, compared to 23 percent in July 2020 and 31 percent in April 2019.

On the other hand, the share of sales for smaller competitors Blucora (which owns TaxAct), TaxSlayer, and Jackson Hewitt have remained roughly the same over the past three tax seasons at 4 percent, 1 percent, and 1 percent, respectively. In terms of tax prep offerings, all of these companies have an online filing option, with or without help

## Search Data Points

Search ...

Search

## Most Popular Stories

1   Which company is winning the restaurant food delivery war?
    16 Mar 2022

2   Uber vs. Lyft: Who's tops in the battle of U.S. rideshare companies
    15 Mar 2022

3   Disney+ takes customer retention crown from Netflix
    13 Jan 2021

4   Competition heats up among meal kit companies like Blue Apron and HelloFresh
    23 Feb 2021

5   TurboTax supercharges its market share during 2021 tax season
    17 Jun 2021

CC-00006221

PUBLIC

Product     Us     Data Points     Client Login     **Request a Demo**

TurboTax has the highest percentage of customers with incomes over $100,000, with a monthly average of 33 percent year-to-date as of May 2021. Jackson Hewitt has the lowest percentage of customers making over $100,000, with a monthly average of 17 percent. For Blucora, H&R Block, and TaxSlayer, the monthly average of customers with incomes over $100,000 were 26 percent, 25 percent, and 23 percent respectively.



Each tax service's fee structure may affect observed customer income. For example, these income figures do not include consumers who have simpler tax returns and are therefore eligible to file their taxes for free. Some of these services, including TurboTax and H&R Block, also charge more if the consumer has to file taxes on long or short term capital gains, which may skew observed customer income toward higher-earning individuals.

*Note: Bloomberg Second Measure regularly refreshes its panel and methods in order to provide the highest quality data that is broadly representative of U.S. consumers. As a result, we may restate historical data, including our blog content. We recommend using only the latest post in assessing metrics.*

---

**Want more insights on tax prep companies or market share analysis?**

Request a Demo

Subscribe
to our newsletter

| Product | Company | Follow Us |
|---|---|---|
| Overview | Us | Twitter |
| Investment Research | Jobs | Facebook |
| Market Research | Press | LinkedIn |
| | Data Points Blog | |

Email address    ►

By submitting your information, you agree to the privacy policy and to learn more about offers and promotions from Bloomberg.

info@secondmeasure.com
731 Lexington Avenue, New York, NY 10022

© 2022 Bloomberg Second Measure LLC     Privacy Policy     Terms of Service

CC-00006222