No. 24-60040

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

INTUIT INC.,

*Petitioner*,

*v.*

FEDERAL TRADE COMMISSION,

*Respondent*.

On Petition for Review of a Final Order of the Federal Trade Commission
Dated January 19, 2024, FTC Docket No. 9408

## BRIEF FOR PETITIONER

HOWARD M. SHAPIRO
JONATHAN E. PAIKIN
DANIEL S. VOLCHOK
DEREK A. WOODMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000

DAVID Z. GRINGER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
(212) 230-8800

April 15, 2024

# CERTIFICATE OF INTERESTED PERSONS

The following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that members of the Court may evaluate possible recusal.

Intuit Inc. has no parent corporation, and no publicly held corporation is known to own 10% or more of Intuit's stock.

| Petitioner | Counsel |
|---|---|
| Intuit Inc. | Howard M. Shapiro<br>Jonathan E. Paikin<br>Daniel S. Volchok<br>David Z. Gringer<br>Derek A. Woodman<br><br>WILMER CUTLER PICKERING HALE AND DORR LLP |

| Respondent | Counsel |
|---|---|
| Federal Trade Commission | Anisha Sasheen Dasgupta<br>Mariel Goetz<br>Bradley Grossman<br>Lois C. Greisman<br>William Maxson<br>Roberto Anguizola<br>Rebecca Plett<br>James Evans<br>Sara Tonnesen<br><br>FEDERAL TRADE COMMISSION |

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Intuit Inc. requests the Court grant oral argument. This appeal from a Federal Trade Commission decision and order presents important questions regarding constitutional law and the Commission's authority to regulate allegedly deceptive advertising. Intuit believes that oral argument will assist the Court in resolving these questions.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... ii

TABLE OF AUTHORITIES ...............................................................................v

GLOSSARY OF ABBREVIATIONS FOR RECORD DOCUMENTS.................xi

INTRODUCTION ..............................................................................................1

JURISDICTION.................................................................................................5

ISSUES PRESENTED........................................................................................5

STATEMENT .....................................................................................................5

      A.     Intuit And TurboTax ...........................................................................5

      B.     TurboTax Free-Product Advertising .....................................................7

      C.     Attorneys-General Consent Order........................................................14

      D.     Administrative Proceeding And Federal Litigation ............................15

SUMMARY OF ARGUMENT .........................................................................19

ARGUMENT ....................................................................................................21

I.       STANDARDS OF REVIEW ................................................................................21

II.     THE FTC PROCEEDING WAS UNCONSTITUTIONAL ........................................22

      A.     The FTC Proceeding Violated Due Process.......................................22

      B.     FTC ALJs Are Impermissibly Insulated From Removal ...................27

      C.     The Commission Adjudicated Private Rights Reserved
            For Article III Courts...........................................................................30

      D.     The FTC's Structure And Authority Violate Article II
            And The Non-Delegation Doctrine, Respectively ..............................33

III.  THE FTC'S DECEPTION HOLDING IS FATALLY FLAWED ..................................34

    A.  The Commissioners' Unprecedented Deception Holding Is Refuted By The Ads Themselves And By The Lack Of Evidence That Reasonable Consumers Were Likely To Be Deceived ........................................................................................34

    B.  The Commissioners' Deception Ruling Rests On Three Legal Errors ...................................................................................44

        1.  Novel and baseless heightened disclosure standard .................44

        2.  Piecemeal ad analysis..................................................48

        3.  Inapplicable "deceptive-door-opener" theory...........................51

IV.  There Is No Basis For The Cease-And-Desist Order ....................................55

    A.  No Cease-And-Desist Order Is Warranted Because The Challenged Ads Are Already Enjoined................................................55

    B.  The Commission's Order Is Unconstitutional And Otherwise Impermissible....................................................................57

CONCLUSION ........................................................................................67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ...................................30

*American Beverage Association v. San Francisco*, 916 F.3d 749 (9th Cir. 2019) .................................................................................................66

*American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966) ...........................25

*American Home Products Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982) ......48, 58, 60

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) ................................................30

*Axon Enterprise, Inc. v. FTC*, 986 F.3d 1173 (9th Cir. 2021) ...............................23

*Baran v. Port of Beaumont Navigation District*, 57 F.3d 436 (5th Cir. 1995) .....................................................................................................22

*Barber v. Johnson*, 145 F.3d 234 (5th Cir. 1998) ..................................................27

*Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020) .........................52

*Book-of-the-Month Club*, 48 F.T.C. 1297 (1952) ..................................................44

*Butz v. Economou*, 438 U.S. 478 (1978) ..........................................................28, 29

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) .......................................24

*CFTC v. Schor*, 478 U.S. 833 (1986) .....................................................................33

*Chamber of Commerce v. SEC*, 85 F.4th 760 (5th Cir. 2023) ................................33

*Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ........................22

*Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970) ..............................................................................................25

*Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023) ......................................................45

*Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021) .........................................................1

*Coit Independence Joint Venture v. Federal Savings & Loan Insurance Corp.*, 489 U.S. 561 (1989) ............................................30

*Colgate-Palmolive Co.*, 62 F.T.C. 1269 (1963)......................................60

*Collins v. Yellen*, 141 S.Ct. 1761 (2021) ....................................27, 28, 29

*Deckers Outdoor Corp. v. Team Footwear, Inc.*, 2013 WL 12131287 (C.D. Cal. July 11, 2013) ....................................................................31

*Dinan v. Sandisk LLC*, 2019 WL 2327923 (N.D. Cal. May 31, 2019) .................37

*Ebner v. Fresh, Inc.*, 838 F.3d 958 (9th Cir. 2016) ..........................38, 39

*ECM Biofilms, Inc.*, 160 F.T.C. 652 (2015)..........................................36

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)...................21, 45, 50, 63

*Encyclopaedia Britannica, Inc.*, 87 F.T.C. 421 (1976) ..........................51

*Environmental Conservation Organization v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008) ......................................................56

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ....................46

*Fedders Corp. v. FTC*, 529 F.2d 1398 (2d Cir. 1976)..............................58

*Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010) ..........................28

*FTC v. DirecTV, Inc.*, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ..................36

*FTC v. Grant Connect, LLC*, 827 F.Supp.2d 1199 (D. Nev. 2011) ................54

*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986)................22

*FTC v. Mary Carter Paint Co.*, 382 U.S. 46 (1965)................................44

*FTC v. Ruberoid*, 343 U.S. 470 (1952)..............................................55

*Grolier, Inc.*, 99 F.T.C. 379 (1982) ................................................51

*Grove Laboratories v. FTC*, 418 F.2d 489 (5th Cir. 1969) ....................58

*Harris v. Las Vegas Sands LLC*, 2013 WL 5291142 (C.D. Cal. Aug. 16, 2013)......................................................................53

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) ........................23, 32

*Illumina*, 2023 WL 2823393 (F.T.C. Mar. 31, 2023)............................32

*In re Autozone, Inc.*, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ......................42

*In re Firearm Cases*, 126 Cal.App.4th 959 (2005)....................................53

*Intel Corp.*, 149 F.T.C. 1548 (2010) .........................................................23

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ...................1, 27, 31, 32, 33

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)....................................60

*LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018)........................61, 62

*LabMD, Inc.*, 160 F.T.C. 1373 (2015) ......................................................32

*Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955 (D.C. Cir.
2003) ............................................................. 22, 34, 35, 40, 43, 62

*Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) ............................29, 30

*Litton Industries, Inc. v. FTC*, 676 F.2d 364 (9th Cir. 1982) ............58, 60

*M.D. On-Line, Inc. v. WebMD Corp.*, 2005 WL 2469668 (D.N.J. Oct.
6, 2005) ....................................................................................41

*Marksberry v. FCA US LLC*, 606 F.Supp.3d 1075 (D. Kan. 2022) ......................53

*McGinity v. Procter & Gamble Co.*, 69 F.4th 1093 (9th Cir. 2023) ......................41

*Monteon-Camargo v. Barr*, 918 F.3d 423 (5th Cir. 2019) ......................46

*Moore v. Trader Joe's Co.*, 4 F.4th 874 (9th Cir. 2021) ....................52, 53

*Motor Improvements v. A.C. Spark Plug Co.*, 80 F.2d 385 (6th Cir.
1935) .......................................................................................31, 32

*Motor Vehicle Manufacturers Association of United States, Inc. v.
State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29
(1983)........................................................................................59

*Murphy v. NCAA*, 584 U.S. 453 (2018) ................................................29

*National Association of Manufacturers v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ........................................................................... 65

*National Association of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023) ................................................................................. 65

*National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ............................................................... 64, 65, 66

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011) .............................................. 51

*Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. 325 (2018) ............................................................ 30

*Potashnick v. Port City Construction Co.*, 609 F.2d 1101 (5th Cir. 1980) ...................................................................................... 23

*Price v. Vincent*, 538 U.S. 634 (2003) ............................................. 51

*Public Citizen Inc. v. Louisiana Attorney Disciplinary Board*, 632 F.3d 212 (5th Cir. 2011) ...................................................... 66

*Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480 (5th Cir. 2022) ........... 25

*Resort Car Rental Systems, Inc. v. FTC*, 518 F.2d 962 (9th Cir. 1975) ................. 51

*S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232 (2d Cir. 2001) ................. 48

*Sears, Roebuck & Company v. FTC*, 258 F. 307 (7th Cir. 1919) ........................... 32

*Seila Law LLC v. CFPB*, 140 S.Ct. 2183 (2020) ...................................... 27

*Standard Oil Co. of California v. FTC*, 577 F.2d 653 (9th Cir. 1978) ............. 58, 59

*Steger v. Defense Investigative Service Department of Defense*, 717 F.2d 1402 (D.C. Cir. 1983) ........................................................ 47

*Telebrands Corp.*, 140 F.T.C. 278 (2005) ...................................... 35, 50

*United States v. Bonilla-Romero*, 984 F.3d 414 (5th Cir. 2020) ............................ 28

*United States v. Chambliss*, 948 F.3d 691 (5th Cir. 2020) ...................................... 22

*United States v. H&R Block, Inc.*, 833 F.Supp.2d 36 (D.D.C. 2011)......................38

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)............................................55

*Valador, Inc. v. HTC Corp.*, 242 F.Supp.3d 448 (E.D. Va. 2017) .........................41

*VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) ............................................37

*Washington v. Hyatt Hotels Corp.*, 2020 WL 3058118 (N.D. Ill. June 9, 2020) ....................................................................................................................53

*Weaver v. Massachusetts*, 582 U.S. 286 (2017) ................................................29, 30

*Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015)....................33

*Westar Energy, Inc. v. FERC*, 473 F.3d 1239 (D.C. Cir. 2007) .............................46

*Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008) ...........................41

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) ..................................................22, 26

## STATUTES AND RULES

5 U.S.C.
    §632 (1946)............................................................................................28
    §706 .........................................................................................................21
    §1202 .......................................................................................................27
    §3105 .......................................................................................................28
    §7521 .......................................................................................................27

15 U.S.C.
    §45 ........................................................................................5, 21, 22, 31, 44
    §53 ...........................................................................................................31
    §78u .........................................................................................................33

28 U.S.C. §455 ........................................................................................................24

Pub. L. No. 95-454, 92 Stat. 1111 (1978)...............................................................29

815 Ill. Comp. Stat. §505/2 ....................................................................................53

Fed. R. App. 15 .........................................................................................................5

# REGULATIONS

16 C.F.R.
  §3.26 ...................................................................................16
  §4.7 ....................................................................................23
  §251.1 ................................................................................37

60 Fed. Reg. 39,741 (Aug. 3, 1995).......................................16

# LEGISLATIVE MATERIALS

*Civil Service Reform: Hearings on H.R. 11280*, 95 Cong. 824 (1978)...................28

Staff of House Committee on Judiciary, *Abuse of Power, Waste of Resources, and Fear: What Internal Documents and Testimony from Career Employees Show about the FTC Under Chair Lina Khan* (Feb. 22, 2024), https://bit.ly/3UfQ9bW ............................................26

Transcript of House Committee on the Judiciary Hearing Regarding Oversight of the Federal Trade Commission  (July 13, 2023)..........17, 24, 26

# OTHER AUTHORITIES

Brief of the Federal Trade Commission, *Illumina, Inc. v. FTC*, No. 23-60167 (5th Cir. July 26, 2023) ............................................32

Federal Trade Commission, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (Mar. 2013), https://bit.ly/3UctvB7 ....................................................................45

*FTC Policy Statement on Deception*, 103 F.T.C. 174 (1983).....................44, 49, 50

*IRS Direct File Pilot,* https://www.irs.gov/about-irs/strategic-plan/direct-file (last visited Apr. 15, 2024) ............................................48

Ohlhausen, Maureen K., *Administrative Litigation at the FTC*, 12 J. Competition L. & Econ. 623 (2016) ....................................23

*Restatement (First) of Torts* §761 (1939) ...............................................31

# GLOSSARY OF ABBREVIATIONS FOR RECORD DOCUMENTS

| Abbreviation | Meaning |
| --- | --- |
| Continuance Denial | Order Denying Respondent's Motion To Continue Oral Argument (Nov. 15, 2023) |
| Disqualification Order | Order Denying Motion To Disqualify (Oct. 19, 2023) |
| Hr'g Tr. | Transcript of Hearing Before Federal Trade Commission Administrative Law Judge (Mar. 27-Apr. 10, 2023) |
| ID | Initial Decision |
| IDF | Initial Decision Finding of Fact |
| MIL Order | Order on Motions in Limine (Mar. 7, 2023) |
| Op. | Opinion of the Commission (Jan. 22, 2024) |
| RAB | Respondent's Appeal Brief |
| RB | Respondent's Post-Trial Brief |
| Reinstatement Order | Order Returning the Matter to Adjudication and Setting a New Evidentiary Hearing Date (Aug. 19, 2022) |
| RPF | Respondent's Proposed Findings of Fact |
| RRF | Respondent's Replies to Complaint Counsel's Proposed Findings of Fact |
| Summary-Decision Opp. | Respondent Intuit Inc.'s Opposition to Complaint Counsel's Motion for Summary Decision (Aug. 30, 2022) |
| Summary-Decision Order | Opinion and Order Denying Summary Decision (Jan. 31, 2023) |

**INTRODUCTION**

This case implicates two foundational questions about the power of our Nation's administrative state.

The first is whether an agency head can repeatedly make negative remarks about the target of an enforcement action, including publicly endorsing comments suggesting the target is an "evil actor," while serving as the adjudicator in that same action and reviewing the determination of an administrative law judge ("ALJ") insulated from removal by the very strictures this Court declared unconstitutional in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) (subsequent history omitted). The second is whether the Federal Trade Commission can order a company to stop truthfully advertising a free product as free simply because the product does not cover all consumers' tax situations, even though (1) the challenged ads (which are no longer running) disclosed the product's qualifications, (2) the evidence showed that consumers were unlikely to be deceived, (3) a federal judge expressed extreme skepticism about the FTC's theory that the ads were deceptive, and (4) a consent decree that the company has with every state in the country ensures that the company's ads will not be deceptive.

Under settled law, the answer to both questions is "no." Agencies may not "operate in a separate, anti-constitutional, and anti-democratic space"; "[t]hat is obviously not how our government is supposed to work." *Cochran v. SEC*, 20

F.4th 194, 214 (5th Cir. 2021) (en banc) (Oldham, J., concurring) (subsequent history omitted).  And predictably, the order the flawed process here produced is untethered from fact and law.  Indeed, the FTC had to invent a novel (and legally baseless) heightened standard for "free" claims in order to hold the challenged ads deceptive, because under existing law—and common sense—they plainly were not.

A.     Petitioner Intuit Inc. markets and sells TurboTax, the popular tax-preparation software.  Intuit has long offered several free TurboTax products—used by over 10 million consumers annually—as a way to develop good relationships with consumers who could later become paying customers.  Intuit has always truthfully advertised that these products are free but for simple tax returns only.

The FTC argued that these ads were deceptive because the free products were not free for *everyone*.  But when the agency sued in federal court, the judge rebuffed that theory, recognizing that the ads "don't say it is free to everybody, and nobody thinks it is."  RX73 at 17.

That rebuke from a neutral arbiter should have prompted the FTC commissioners to walk away.  Instead, they decided that the problem was not their theory or evidence but the adjudicator.  They thus abandoned litigation and proceeded solely with an internal adjudication (i.e., solely before themselves).

And to no one's surprise, they ultimately ruled in favor of their own allegations, holding Intuit's advertising deceptive and issuing a cease-and-desist order.

B.    That holding and order flowed from an administrative process that was unconstitutional.  Even if the FTC's practice of having commissioners serve as both prosecutors and adjudicators is permissible, such a structure surely warrants particular caution—especially where those prosecutors haven't lost before themselves in over 25 years.  And here, that structure led to due process violations, because FTC Chair Lina Khan created (at minimum) an appearance of bias by making repeated public statements denigrating Intuit (and the conduct at issue) while serving as an adjudicator in this matter.  As noted, moreover, FTC ALJs have the same tenure-removal protections that this Court held unconstitutional in *Jarkesy*.  Finally, the FTC did not have authority to adjudicate Intuit's private right to advertise; the Constitution commands that that private right be adjudicated in article III courts.

C.    Constitutional failings aside, the agency's opinion and order suffer from two fundamental defects.

First, it simply is not deceptive to tell consumers that a free product is free. The commissioners' contrary determination is unprecedented:  This is not a situation where hidden fees or other circumstances make a "free" product actually cost something; it is undisputed that TurboTax Free Edition is free—*no one can*

*pay to use it*.  Indeed, the infirmity of the commissioners' decision is underscored by the fact that, under the novel deception standard they applied—requiring Intuit to disclose every last detail of free products' qualifying parameters within the four corners of its ads—the IRS's marketing for its own Direct File program would be deceptive because the IRS tells consumers only that its program is for those who have "simple" returns.

Second, the cease-and-desist order—which would leave Intuit under the FTC's thumb for *20 years*—is independently unlawful because it is unnecessary, overbroad, vague, harmful to consumers, and unconstitutional for compelling speech.  It is unnecessary because a 2022 consent decree that Intuit reached with the attorneys general of all 50 states and Washington, D.C. already ensures that free TurboTax ads will not be deceptive.  It is overbroad because it encompasses hundreds of products that were never challenged.  It is impermissibly vague because it imposes a nebulous disclosure requirement with no guidance about what compliance with that requirement looks like.  It will harm consumers by making it less likely they will understand whether they can file for free using TurboTax. And it unjustifiably compels controversial speech.

Each of these multiple, independent errors requires reversal.  This Court should vacate the FTC's order and remand with instructions to dismiss.

## JURISDICTION

The Commission had jurisdiction under 15 U.S.C. §45(a)(2). Its decision issued on January 19, 2024. Intuit timely sought review three days later. *See* 15 U.S.C. §45(c); Fed. R. App. 15(a)(1). This Court has jurisdiction under 15 U.S.C. §45(c).

## ISSUES PRESENTED

1.    Whether the administrative proceeding here was unconstitutional.

2.    Whether the FTC's deception ruling was unlawful.

3.    Whether the FTC's cease-and-desist order is wholly or partly unlawful.

## STATEMENT

### A.    Intuit And TurboTax

Intuit offers "TurboTax" online tax-preparation products that provide different degrees of assistance and cover tax situations of varying complexity, based largely on the tax forms used to complete the consumer's return. Op.2-3; IDF¶10.

Several TurboTax products are free, including one called Free Edition. Op.3. The free TurboTax products challenged prepare "simple tax returns," Op.3—a government-originated and industry-standard term meaning returns filed on IRS Form 1040. RPF¶¶119, 141-142. Intuit offers free products in the hope

that consumers will have a good experience filing with TurboTax, and thus will use paid TurboTax products if their taxes later become more complex. IDF¶21.

Consumers with non-simple tax returns cannot pay to use Free Edition (or other at-issue free TurboTax products); the products simply do not cover those tax situations. IDF¶¶38-39.

Over half the consumers who file online have simple tax returns and therefore qualify to file for free using Free Edition or another free TurboTax product. Op.47; ID.198. Between 2016 and 2022, over 70 million tax returns were filed for free using one of those products. Op.36; RPF¶¶113-117.

Various metrics show that the tens of millions of consumers who filed using TurboTax (both free and paid) overwhelmingly had positive experiences. For instance, Intuit has long maintained an industry-leading customer-retention figure of over 80% for its paid products. RPF¶¶650-651. It has also consistently received industry-leading "Net Promoter Scores," which reflect customers' willingness to recommend a product (and thus their overall satisfaction). RRF¶¶45, 619. And customers have left hundreds of thousands of positive reviews on the TurboTax website (TurboTax.com). RPF¶653. Conversely, Intuit has received little negative customer feedback. RPF¶654; RRF¶49. Negative customer reviews accounted for under 0.01% of all customers in 2021 and 2022. RRF¶¶641-642; *see also* RPF¶¶655-745. Intuit's Better Business Bureau

complaint rates are likewise significantly lower than comparable companies'. RPF¶638.

## B. TurboTax Free-Product Advertising

Intuit advertises its TurboTax products, both free and paid. IDF¶46.

1. The ads the FTC challenged here stated that a particular free product was for "simple tax returns only" (or similar language). IDF¶¶64, 223. They also invited consumers to visit—or linked directly to—TurboTax.com, where consumers could "see if [they] qualify" or "see details" about the free product. *E.g.*, IDF¶¶64, 225. These disclosures' size, placement, and duration were consistent with or better than comparable ads' disclosures, RPF¶¶234-237, 258-259. No ad said that everyone could use the free product or made unqualified claims that all TurboTax products are free. IDF¶¶67-347.

Screenshots from challenged ads—across various media—illustrate these facts:



RX202 (television); *see also* IDF¶¶207-215 (radio).



GX197 (online display).



GX195 (paid search).





GX477 (email).

2.      At all relevant times, consumers had to encounter several disclosures on TurboTax.com (or its mobile equivalent) to use a TurboTax tax-preparation product.  IDF¶349.  These disclosures provided detailed information about qualifications for each free TurboTax product.  IDF¶¶351-364.  As shown in the screenshot below, the disclosures included statements that the free-tax-prep products were for simple tax returns only, with color-contrasted hyperlinks inviting consumers to "[s]ee if you qualify."  When consumers clicked on a hyperlink, a pop-up detailed the covered tax situations, and provided additional information about TurboTax free products, as shown in the second following screenshot.



RX1500.



You can file with TurboTax Free Edition, TurboTax Live Basic, or TurboTax Live Full Service Basic if you have a simple tax return.*

*A simple tax return is Form 1040 only.

**Situations covered by TurboTax Free Edition, TurboTax Live Basic, and TurboTax Live Full Service Basic**

- W-2 income
- Limited interest and dividend income reported on a 1099-INT or 1099-DIV
- Claiming the standard deduction
- Earned Income Tax Credit (EIC)
- Child tax credits
- Student Loan Interest deduction

**Situations not covered by TurboTax Free Edition, TurboTax Live Basic, and TurboTax Live Full Service Basic**

- Itemized deductions
- Unemployment income reported on a 1099-G
- Business or 1099-NEC income
- Stock sales
- Rental property income
- Credits, deductions and income reported on schedules 1-3

**How does TurboTax make any money?**

Customers with more complex tax situations will file with our paid TurboTax products that provide all the additional forms and guidance they need. We also offer additional benefits that go beyond filing your taxes, but they are optional and are not required to file simple taxes for free. We hope that, over time, as our customers with simple returns need more capabilities as their financial situations change (for example owning a home, having a child, managing investments), they have loved our products and services so much that they will choose our paid TurboTax offerings to prepare and file their returns.

View all product features

RX3.

Consumers who clicked on online ads for a free TurboTax product were taken to that product's "landing page" (also accessible through TurboTax.com or online search results). IDF¶¶365-370. And landing pages contained multiple disclosures about free products' qualifications, as shown below. Free Edition's landing page also included a chart listing several comparable TurboTax products and the forms and schedules each product covered, as shown in the second following screenshot.



RX1531.



| Commonly Filed Tax Forms and Schedules | | Free Edition – Basic Live | Deluxe – Deluxe Live | Premier – Premier Live | Self-Employed – Self-Employed Live |
|---|---|---|---|---|---|
| 1040 | U.S. Individual Income Tax Return | ● | ● | ● | ● |
| Schedule EIC | Earned Income Credit | ● | ● | ● | ● |
| Schedule 1 | Additional Income and Adjustments to Income | ●* | ● | ● | ● |
| Schedule D | Capital Gains and Losses | ●** | ●** | ● | ● |
| Schedule 2 | Additional Taxes | | ● | ● | ● |
| Schedule 3 | Additional Credits and Payments | | ● | ● | ● |
| Schedule A | Itemized Deductions | | ● | ● | ● |
| Schedule B | Interest and Dividend Income | | ● | ● | ● |
| Schedule C | Profit or Loss from Business (Income) | | ●*** | ● | ● |
| Schedule SE | Self-Employment Tax | | ● | ● | ● |
| Schedule E | Supplemental Income and Loss, including rental property | | | ● | ● |
| Schedule C | Profit or Loss from Business (Expenses) | | | | ● |

\* Limited use of schedule to report hobby and personal property rental income reported on 1099-K
\*\* Limited use of schedule to report personal item sales income reported on 1099-K
\*\*\* only if there are no Schedule C Profit or Loss from Business (Expenses)

RX1531.

## C.     Attorneys-General Consent Order

In 2022, Intuit and the attorneys general of all 50 states and Washington,
D.C. executed a consent order regarding Intuit's advertising for free-tax-
preparation products.  Op.32.  Although Intuit conceded no wrongdoing, the order
prohibits Intuit from running the advertisements at the center of these proceedings.
RX261 at 8.  It also requires that TurboTax ads prominently disclose that eligibility

requirements apply to any free-tax-prep products, along with those requirements' details. RX261 at 7-8. And it bars Intuit from misrepresenting any material fact about its tax-preparation products. RX261 at 6-7. Finally, the order includes provisions ensuring that Intuit adheres to its terms. RX261 at 13-15.

Consistent with the order (with which Intuit has complied, RPF¶¶823-827), 2023 TurboTax free-tax-prep ads disclosed the free products' qualifications and invited consumers to see if they qualified at TurboTax.com (or linked directly to TurboTax.com). *E.g.*, RX1444, RX1470.

### D.    Administrative Proceeding And Federal Litigation

In 2022, a divided FTC—including two of the three commissioners who ultimately decided against Intuit—issued an administrative complaint alleging that TurboTax free-tax-prep ads deceived consumers into believing that all "TurboTax is free." Op.33; *see also* Compl. ¶119. The Commission simultaneously sued and sought a preliminary injunction in the Northern District of California. At a hearing, Judge Breyer rejected the FTC's theory, observing that Free Edition ads "don't say it is free to everybody, and nobody thinks it is." RX73 at 17. He also rejected the FTC's assertion that Intuit's ads "omitted" disclosures, noting that the disclosure "is right there." RX73 at 39-40. The preliminary-injunction motion was denied. RX74.

Under 16 C.F.R. §3.26(c), that denial required the commissioners to withdraw their administrative complaint. But they later reinstated it—without addressing the factors that are supposed to guide any such decision, 60 Fed. Reg. 39,741, 39,743 (Aug. 3, 1995). Instead, they vaguely asserted that "the public interest warrants further litigation." Reinstatement Order 1 (Aug. 19, 2022). This was, to Intuit's knowledge, only the second such reinstatement in the last 30 years.

FTC counsel then immediately moved the Commission for summary decision, Op.34—before Intuit could take discovery (to which Intuit objected, Summary-Decision Opp. 5, 8, 29-30). On the eve of the hearing, the commissioners denied summary decision in a manner that directed the ALJ toward their predetermined outcome. For example, they pre-decided a core issue by opining that "[m]any of Intuit's television ads … convey that consumers viewing the ads can file their taxes for free with TurboTax," Summary-Decision Order 11, i.e., that the ads indicated *everyone* can do so, not just those who qualify. The commissioners also stated that FTC counsel needed no additional evidence to prevail. Summary-Decision Order 16. Again, all of this was before discovery was completed, expert reports were submitted, and Intuit's executives testified.

At trial, Intuit introduced testimony from company leaders (and supporting documentation) regarding its business strategy and reasonable consumers' understanding of the challenged ads. ID.2. It also presented four experts'

testimony on similar topics, as well as on why Intuit's economic incentives militate against deceptiveness and on the results of two studies measuring the efficacy of Intuit's disclosures and consumer expectations. ID.222-223. FTC counsel offered testimony from two FTC employees (solely about the undisputed proposition that the challenged ads were distributed) and two experts. RB.27-30.

While the ALJ's decision was pending, Intuit moved to disqualify FTC Chair Khan from the proceeding. It did so after she repeatedly made negative public statements, while serving as an adjudicator in this matter, about Intuit and the challenged conduct. For example, in testimony to Congress, she characterized this matter as concerning "deceptive" conduct that she "couldn't agree more … really hurts people," and she agreed with a congressmember's claim that Intuit was an "evil actor[]" "trick[ing] and trap[ping consumers] into paying." Transcript of House Committee on the Judiciary Hearing Regarding Oversight of the Federal Trade Commission 73-74 (July 13, 2023) ("Cong. Tr."). Shortly after the filing of the administrative complaint, moreover (i.e., while she was serving as an adjudicator), she retweeted a Commission press release emphasizing the need for an "immediate halt to Intuit's deceptive ads," RX102, and stated that the Commission's action against Intuit reflected a focus on "stopping … law-breaking[,]" RX103. Khan nonetheless refused to recuse, and her two fellow commissioners refused to disqualify her. *See* Disqualification Order.

Despite expressing skepticism about the FTC's arguments here—for instance, calling one of its key proposals essentially "meaningless," Hr'g Tr.24—the ALJ ruled for the FTC and issued its proposed cease-and-desist order verbatim, *see* ID.

Intuit appealed, but the commissioners affirmed and largely adopted the ALJ's cease-and-desist order. That order provides that if a product is not offered for free to all consumers, an ad for the product must state "the percentage of U.S. taxpayers (or other U.S. consumers, where the good or service is not offered exclusively to U.S. taxpayers) … that qualify." Order §I.B.1. Alternatively, if "a majority of U.S. taxpayers (or other U.S. consumers) do not qualify" for the product, the ad "may … disclose that a majority of U.S. taxpayers (or other U.S. consumers) do not qualify." Order §I.B.1. The order also compels Intuit to disclose "all the terms, conditions, and obligations upon which receipt and retention of [any] 'Free' good or service are contingent so as to leave no reasonable probability that the terms of the offer *might* be misunderstood." Order §I.B.2 (emphasis added). And for "space-constrained ads," Intuit must disclose the percentage of taxpayers who qualify (and/or state that a majority don't qualify) and may "direct[] consumers to view eligibility requirements on a landing page or webpage on a TurboTax website" (and, if an ad is online, link to that webpage). Order §I.C. The order additionally imposes various compliance and monitoring

requirements. Order §§III-VI. Finally, certain provisions of the order apply to all Intuit products and advertising. That includes one section that imposes requirements for "any material fact" for "any good or service," language apparently intended to sweep in dozens of Intuit's paid tax products. Order §II.

## SUMMARY OF ARGUMENT

I.     The administrative proceedings here were unconstitutional.

*First*, the proceeding violated due process because Chair Khan's public remarks created, at minimum, an appearance of bias against Intuit that required her recusal (and infected her colleagues' ultimate votes).

*Second*, the ALJ who conducted the trial is improperly insulated from presidential removal. The commissioners erroneously required Intuit to show prejudice from this unlawful insulation.

*Third*, the deceptive-advertising claim here implicated Intuit's private right to advertise, and thus had to be adjudicated in an article III court.

II.     The commissioners' unprecedented ruling that it was deceptive to tell consumers a product's actual price is unlawful. As Judge Breyer recognized, the challenged ads were not deceptive under the correct standard, which asks whether ads, considered as a whole, would likely deceive a substantial minority of reasonable consumers—considering such consumers' familiarity with both free offers and with terms common in the industry. The ads told consumers both that

the free offers were qualified and where to find qualification details.  The notion

that these ads would likely deceive a substantial minority of reasonable consumers

familiar with the notion (ubiquitous in the industry) of "simple tax returns" is

simply not credible.

Three legal errors underlay the commissioners' contrary view.

*First*, the commissioners held the challenged ads to a novel heightened legal

standard, under which free-product ads must disclose all offer qualifications in

exacting detail.  This invented standard lacks any legal basis and, as to Intuit's

online ads, directly conflicts with FTC guidance.  Intuit's ads easily satisfy the

actual disclosure requirements.

*Second*, the commissioners (in their words) "excerpted selected portions" of

the challenged ads, focusing their analysis on what they deemed the ads' "most

problematic components."  Had the commissioners instead analyzed the ads

holistically—as the law requires—they could not have held the ads' disclosures

insufficient.

*Third*, the commissioners effectively ignored the additional, unavoidable

details at TurboTax.com—to which the challenged ads directed consumers, and

which consumers must visit to use TurboTax.  They ignored the disclosures by

becoming the first adjudicator ever to apply the so-called "deceptive-door-opener"

theory to internet transactions.  The application of that brick-and-mortar theory to

online transactions makes no sense and violates the bedrock requirement in deceptive-advertising cases to consider all information readily accessible to consumers.

III.     Even apart from the foregoing, the cease-and-desist order cannot stand.  There is zero cognizable danger of future violations (as required) because the attorneys-general consent order already ensures that consumers will not be misled by any TurboTax advertising.  In addition, the cease-and-desist order improperly encompasses products that were never challenged in this case and that have entirely different attributes and marketing from the challenged products.  It is also impermissibly vague, providing no guidance as to how to comply with its nebulous core disclosure requirement.  And it would harm consumers, requiring disclosures that would make consumers believe they could not file for free when they could.  Finally, it compels controversial speech without adequate justification.

## ARGUMENT

## I.     STANDARDS OF REVIEW

Courts must "set aside" agency action that is "not in accordance with law" or otherwise "arbitrary" or "capricious."  15 U.S.C. §45(c); 5 U.S.C. §706(2)(A). Agencies act arbitrarily and capriciously if they fail to explain policy changes, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016), or to address

countervailing evidence, *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 961-963 (D.C. Cir. 2003).

Legal questions and mixed law-and-fact questions are reviewed de novo. *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 454 (1986). Factual determinations are reviewed for substantial evidence, 15 U.S.C. §45(c)—a standard agencies flunk by relying on a "clipped view of the record" that "fails to take account of contradictory evidence," *Lakeland*, 347 F.3d at 962-963. Remedies are reviewed for abuse of discretion. *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 440 (5th Cir. 2008). Remedies (or rulings) premised on legal error are an abuse of discretion. *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).

## II.    THE FTC PROCEEDING WAS UNCONSTITUTIONAL

The administrative proceeding contravened due process and the separation of powers. Each defect independently warrants setting aside the commissioners' decision and order.

### A.    The FTC Proceeding Violated Due Process

"A fair trial before a[n] … impartial … administrative agency[] is a basic requirement of due process." *Baran v. Port of Beaumont Navigation District*, 57 F.3d 436, 444 (5th Cir. 1995). And "an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator." *Williams v.*

*Pennsylvania*, 579 U.S. 1, 8 (2016).  The commissioners did that here, acting as prosecutors by voting to initiate the complaint, and as judges by deciding Intuit's appeal.  *Supra* pp.15-18.  Unsurprisingly, these dual roles have produced a win-loss record for the Commission that "[e]ven the [undefeated] 1972 Miami Dolphins would envy."  *Axon Enterprise, Inc. v. FTC*, 986 F.3d 1173, 1187 (9th Cir. 2021) (subsequent history omitted).  The Commission has lost only five of the over 150 cases decided on the merits before itself in the last 46 years, and *zero* in the last quarter-century plus.  Ohlhausen, *Administrative Litigation at the FTC*, 12 J. Competition L. & Econ. 623, 624, 632 (2016).

While this Court recently concluded that the FTC's combination of functions *alone* does not require reversal, *see Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023), vacatur based on bias is required here even under *Illumina*.  (Intuit preserves for further review the argument that *Illumina* was wrong on this point.)

1.      Chair Khan's participation here—which exemplifies the dangers of accusers acting as decisionmakers—violated due process.  Once the administrative complaint issued, she was acting as a judge and thus was "held to the recusal standards applicable to the federal judiciary."  *Intel Corp.*, 149 F.T.C. 1548, 1552 (2010); *see also* 16 C.F.R. §4.7(b)(2).  Judges must recuse whenever a reasonable person, knowing "all the circumstances, would harbor doubts about the[ir] impartiality."  *Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1111 (5th

Cir. 1980); *see* 28 U.S.C. §455(a). Courts should be especially sensitive to an appearance of bias where, as here, agency heads fill dual roles—acting as prosecutor and judge—and when doubts about impartiality exist, recusal is necessary "whether or not actual bias exists or can be proved," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009).

Khan's statements—again, made while serving as a judge here—indicate, at minimum, that a reasonable person would conclude she had prejudged that Intuit's ads were deceptive (a view reinforced by her unprecedented merits decision).

Khan's improper statements began shortly after the complaint was filed, when she retweeted a Commission press release regarding Intuit's "deceptive Turbotax 'free' filing campaign" and the need for an "immediate halt to Intuit's deceptive ads." RX102. Soon after, she stated that the Commission's preliminary-injunction motion against Intuit reflected a focus on "stopping … law-breaking[]." RX103. And then in testimony to Congress while the case was before the ALJ, she characterized this matter as concerning "deceptive" conduct that she "couldn't agree more … really hurts people." Cong. Tr.74. She also embraced a congressmember's claim that Intuit was an "evil actor[]" "trick[ing] and trap[ping consumers] into paying." Cong. Tr.73-74. All this would cause a reasonable observer to harbor doubts about her partiality. Yet Khan refused to recuse, and her two colleagues refused to disqualify her.

Each decision was erroneous. Courts have vacated FTC actions tainted by statements far less problematic. For example, one court invalidated an action because the Commission's chair had merely investigated similar "facts and issues" to those in the proceeding in question, holding that that involvement created "reasonable suspicion of unfairness." *American Cyanamid Co. v. FTC*, 363 F.2d 757, 763, 767 (6th Cir. 1966). And another court set aside an order holding a company liable for deception because that same chair made public statements appearing to condemn particular industries—including the industry of the company in question—as engaging in deceptive practices. *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 589 (D.C. Cir. 1970). Such statements, the court reasoned, can impermissibly "entrench[] a Commissioner in a position which he had publicly stated, making it difficult, if not impossible, for him to reach a different conclusion … after consideration of the record." *Id.* at 590. Khan's more egregious statements "raise[d] concerns that [she] harbored ingrained skepticism" about Intuit's ads. *Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 496 (5th Cir. 2022). That made her involvement in the case unlawful.

The commissioners' only response was a citation (Op.74) to their denial of Intuit's motion to disqualify Khan. That denial, however, was itself flawed. The commissioners claimed, for instance, that "disinterested observer[s] would plainly understand that Chair Khan was [not] describing … her personal views."

Disqualification Order 5.  But even setting aside that it is unclear who else's views she could have been describing, that claim is refuted by Khan's clear statement "I couldn't agree more" with the (anti-Intuit) question asked of her.  Cong. Tr. 74.

2.     A recent congressional report corroborates that Khan was committed to reaching preordained results.  The report documents FTC staff complaints that Khan acted "for the sake of PR" rather than based on agency cases' merits, "direct[ed] staff to bring cases unsupported by facts" and make "allegations against the evidence," and engaged in improper "public posturing on issues before the FTC."  Staff of House Committee on Judiciary, *Abuse of Power, Waste of Resources, and Fear* 18, 23-24, 29-31, 38 (Feb. 22, 2024).  The report also documents Khan's close control over FTC proceedings, *id*. at 7-17, underscoring the incurable harm from her biased involvement in this case.

Khan, of course, was one of three votes in favor of the decision and order here.  But given the "collective process of deliberation," as well as the potential that Khan, as chair, "was successful in persuading [her colleagues] to accept … her position," "it does not matter [that her] vote was [un]necessary to the disposition of the case."  *Williams*, 579 U.S. at 15.  The two other commissioners' express decision not to disqualify Khan for her biased comments reinforces that their participation in this proceeding is likewise tarnished.  Her (and their) unlawful participation requires vacatur.  *Id.* at 14.

**B.** **FTC ALJs Are Impermissibly Insulated From Removal**

This proceeding also contravened the president's article II power "to remove executive officials." *Seila Law LLC v. CFPB*, 140 S.Ct. 2183, 2197 (2020). *Jarkesy* held that the tenure protections enjoyed by Securities and Exchange Commission ALJs unconstitutionally infringe the president's removal authority. 34 F.4th at 463-464. Because FTC ALJs have materially indistinguishable removal protections, *see* 5 U.S.C. §§7521(a), 1202(d), the proceedings here were likewise unconstitutional.

The commissioners' leading response (Op.78) was that *Jarkesy* is wrong. A panel of this Court cannot accept that argument. *Barber v. Johnson*, 145 F.3d 234, 237 (5th Cir. 1998).

The commissioners also asserted (Op.78-79) that under *Collins v. Yellen*, 141 S.Ct. 1761 (2021), prejudice must be shown for a removal-power violation to require reversal. That is incorrect. *Collins*'s prejudice requirement flowed from the premise that "the unlawfulness of the removal provision does not strip the [officer] of the power to undertake the other responsibilities of his office." *Id.* at 1788 n.23. But that premise is valid only if "the unlawfulness of one provision" (here, the provision creating ALJs' tenure protections) does not "cause another" (here, the provision giving the ALJ authority to oversee the hearing against Intuit)

"to be unlawful." *Id.* at 1795 (Thomas, J., concurring). The premise holds, that is, only if those two provisions are severable. They are not.

"[W]hen a portion of a statute is unconstitutional, 'the traditional rule is that the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.'" *United States v. Bonilla-Romero*, 984 F.3d 414, 418 (5th Cir. 2020). ALJs' authority to oversee hearings comes from the Administrative Procedure Act. 5 U.S.C. §3105. And that statute's "historical context makes it 'evident' that Congress, faced with the limitations imposed by the Constitution, would have preferred no [ALJs] to [ALJs] removable at will," *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 509 (2010).

"Prior to the [APA], there was considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because … they were often subordinate to executive officials within the agency[.]" *Butz v. Economou*, 438 U.S. 478, 513-514 (1978). The APA sought to address this concern by shielding ALJs from removal unless "good cause [was] established and determined by the Civil Service Commission." *Id.* at 514. And along with this independence, Congress gave ALJs "powers … comparable to those of a trial judge." *Id.* at 513. But because Civil Service Commission members were subject to presidential removal, 5 U.S.C. §632 (1946), Congress feared they themselves were vulnerable to political "pressure." *Civil Service Reform: Hearings on H.R.*

*11280*, 95 Cong. 824 (1978). To allay this concern, Congress instituted the multi-layer tenure regime in effect today. Pub. L. No. 95-454, §§1202, 1204, 92 Stat. 1111, 1121-1122, 1137 (1978).

If ALJ removal protections are severable, then the officials overseeing agency adjudications would be simultaneously equipped with the powers of a judge and subordinate to the whims of the executive branch. Far from "preserving the independent judgment of these men and women," *Butz*, 438 U.S. at 514, such a dynamic would leave ALJs—with their judicial powers—subject to the very executive-branch pressures the APA sought to eliminate. Because such a result is "exactly backwards" as to congressional intent, *Murphy v. NCAA*, 584 U.S. 453, 483 (2018), the ALJs' tenure protections may not be severed from the APA's conferral of ALJ authority. And with the ALJ "strip[ped] … of the power to undertake the … responsibilities of his office," the proceeding against Intuit was void *ab initio*. *Collins*, 141 S.Ct. at 1788 & n.23.

Finally, the *Collins* prejudice rule is inapplicable here even apart from any severability issues because this case, unlike *Collins*, involves an adjudication. The Supreme Court has recognized, in the analogous context of criminal trials, that certain "error[s] entitl[e] the defendant to automatic reversal without any inquiry into prejudice." *Weaver v. Massachusetts*, 582 U.S. 286, 290 (2017). This automatic-reversal framework—which also governs agency adjudications, *Landry*

*v. FDIC*, 204 F.3d 1125, 1130-1131 (D.C. Cir. 2000)—applies to errors "affect[ing] the framework within which the trial proceeds," and where "the effects of [an] error are simply too hard to measure." *Weaver*, 582 U.S. at 295. Both circumstances exist here: The adjudicatory "framework" was "affected," *id.*, because the trial should not have happened, given that it was conducted "by an illegitimate decisionmaker" and thus "an illegitimate proceeding," *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191 (2023). And it is difficult if not impossible to assess how the ALJ would have ruled were he subject to at-will presidential removal. *See Landry*, 204 F.3d at 1130-1131.

### C. The Commission Adjudicated Private Rights Reserved For Article III Courts

1. "Congress [has] significant latitude to assign adjudication of public rights to entities other than Article III courts." *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 334 (2018). But that latitude is sharply limited with "private rights," which "are at the 'core' of 'matters normally reserved to Article III courts.'" *Coit Independence Joint Venture v. Federal Savings & Loan Insurance Corp.*, 489 U.S. 561, 578-579 (1989). This proceeding unconstitutionally adjudicated Intuit's right to advertise, which is "integral" to "liberty," *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring), and hence a "core private right," *Axon*, 598 U.S. at 197 (Thomas, J., concurring).

*Jarkesy* identified three factors affecting whether a claim "may be properly assigned to agency adjudication under the public-rights doctrine": whether (1) the claim is "unknown to the common law"; (2) article III adjudication "would … 'dismantle the statutory scheme' … or 'impede swift resolution'" of the claim; and (3) the claim is "uniquely suited for agency adjudication." 34 F.4th at 455. Applying these factors here confirms Intuit's right to an article III forum.

Starting with the last two, *Jarkesy* recognized that agency authority to pursue the same relief in either an administrative or judicial forum is inconsistent with a claim implicating public rights. 34 F.4th at 455-456. The FTC Act gives the Commission that choice, 15 U.S.C. §§45(b), 53(b), demonstrating that deceptive-advertising claims do not implicate public rights.

As to the first factor, deceptive-advertising claims were well-established at common law. A company "fraudulently representing that [its] goods … have ingredients or qualities which … they do not have" has long been liable in tort to competitors for sales diverted by the false marketing. *Restatement (First) of Torts* §761 (1939). And cases abound showing that deceptive-advertising claims were frequently pursued at common law. *E.g.*, *Motor Improvements v. A.C. Spark Plug Co.*, 80 F.2d 385, 386 (6th Cir. 1935); *Deckers Outdoor Corp. v. Team Footwear, Inc.*, 2013 WL 12131287, at *2 (C.D. Cal. July 11, 2013). Like the FTC, moreover, successful common-law plaintiffs could obtain an injunction prohibiting

challenged advertising. *Motor Improvements*, 80 F.2d at 386. Indeed, the FTC's authority was modeled on the common law. *Sears, Roebuck & Co. v. FTC*, 258 F. 307, 311 (7th Cir. 1919).

2. The commissioners' bases for rejecting Intuit's article III argument are meritless.

To start, the commissioners wrongly claimed (Op.79) that the argument was forfeited. Intuit raised the argument before both the ALJ and the commissioners, *e.g.*, *id.*; no FTC rule or other authority requires more. And the two FTC decisions the commissioners cited relied solely on *ipse dixit*. *Illumina*, 2023 WL 2823393, at *69 (F.T.C. Mar. 31, 2023); *LabMD, Inc.*, 160 F.T.C. 1373, 1375-1376 (2015). Unsurprisingly given this lack of support, *Illumina* rejected an analogous waiver argument by the Commission, *see* FTC Brief (Dkt. 254) at 60, *Illumina, Inc. v. FTC*, No. 23-60167 (5th Cir. July 26, 2023), addressing the merits of the supposedly waived non-delegation argument, *see* 88 F.4th at 1046.

The commissioners' substantive rationales for rejecting Intuit's argument likewise fail. They contended (Op.79) that "[t]his case involves public rights" because it "is between the government and a party subject to its authority." *Jarkesy* rejected this argument, holding that the SEC's claims involved private rights even though "the government [wa]s a party" and the statutes involved "are designed to protect the public at large." 34 F.4th at 457-458. By focusing on the

government's involvement, the commissioners thus committed the same "question-begging" *Jarkesy* rejected, *id.* at 457.

The commissioners' claim (Op.80) that this proceeding does not "impermissibly threaten" the courts' integrity is also unavailing. The commissioners relied on *CFTC v. Schor*, 478 U.S. 833 (1986). But *Schor* "[l]ean[ed] heavily on the importance of Schor's consent" to an agency proceeding in "f[inding] no structural concern implicated by the CFTC's adjudication of the counterclaim against him." *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665, 676 (2015). Intuit never consented to agency adjudication. Regardless, the same points the commissioners cited in their favor (Op.80) were all equally present in *Jarkesy*. *See* 15 U.S.C. §78u(e); *Chamber of Commerce v. SEC*, 85 F.4th 760, 767 (5th Cir. 2023); *Jarkesy*, 34 F.4th at 451. The commissioners' judicial-integrity argument is therefore a non-starter.

### D. The FTC's Structure And Authority Violate Article II And The Non-Delegation Doctrine, Respectively

Two additional constitutional defects warrant vacating the Commission's order: the commissioners' insulation from presidential removal violates article II, RB.119-120, and their discretion to proceed in either an administrative or a judicial forum violates the non-delegation doctrine, RB.121-122. *Illumina* rejected these arguments, so Intuit preserves them for further review.

### III. THE FTC'S DECEPTION HOLDING IS FATALLY FLAWED

#### A. The Commissioners' Unprecedented Deception Holding Is Refuted By The Ads Themselves And By The Lack Of Evidence That Reasonable Consumers Were Likely To Be Deceived

This is the first case *ever* holding it deceptive to advertise a product's true price—here, $0 for everyone who can use the product. That unprecedented holding is "not supported by 'substantial evidence'" because it "fails to take account of contradictory evidence," including the ads themselves, "and is not supported on the record as a whole." *Lakeland*, 347 F.3d at 961-962. It is also inconsistent with the governing standard, which asks whether ads, considered as a whole, would likely deceive a substantial minority of reasonable consumers, considering such consumers' background knowledge. The decision thus should be "set[] aside" for failing to apply "established law," *id*. at 961.

1. A review of the challenged ads shows two dispositive points that Judge Breyer (an impartial jurist) quickly recognized: (1) Free Edition ads "don't say it is free to everybody, and nobody thinks it is," and (2) the needed disclosures were not "omitted" but rather were "right there" in the ads. RX73 at 17, 39-40. The ads stated both that the advertised free products were for consumers with simple tax returns, and that details on eligibility were just where consumers would expect: at Turbotax.com, where consumers must go to use the products (unless they use the comparable mobile app), ID.201. This Court need go no further to

reject the commissioners' deception holding: If "nobody" could have the misimpression alleged, RX73 at 17, then "no reasonable factfinder could" find deception, *Lakeland*, 347 F.3d at 961, meaning the commissioners' decision should be reversed "for lack of substantial evidence," *id.*

2.   The record lacks anything resembling what courts and the FTC itself have held satisfies the deception standard, i.e., that "a significant minority of reasonable consumers" was likely to be misled, *Telebrands Corp.*, 140 F.T.C. 278, 291 (2005). For instance, as FTC economist Devesh Raval recognized, prior Commission cases deemed this standard met where there were complaint rates ranging from 0.35 to 143.8 complaints per 1,000 consumers. Here the rate was drastically lower: 0.0025 complaints per 1,000 consumers. Op.57. That amounts to one complaint for every 400,000 consumers—a complaint rate *140 times lower* than the lowest in Dr. Raval's report. While the commissioners asserted that Intuit's 0.0025 figure "ignores" certain complaints, Op.57 n.40, it in fact rests on the same sources as Dr. Raval's figures, *see* RX1552 at 170. Nor is there merit to the commissioners' claim that "complaint rates … fall as the number of affected consumers rises," Op.57 n.40. Dr. Raval found that even companies with millions of consumers had complaint rates nearly 150 times Intuit's, *see* RX1552 at 170-171 & Table 1.

Similarly, prior FTC cases deem percentages of confused consumers "ranging from 10% to 22% … sufficient to constitute a significant minority" of reasonable consumers. *ECM Biofilms, Inc.*, 160 F.T.C. 652, 667-668 (2015). Yet here, the commissioners declared deception likely even though—according to the only relevant tests in the record, RPF¶¶684-713—the percentage of consumers who believed they could file for free with TurboTax was virtually identical to the percentage who *could* do so. The percentage of confused consumers, that is, was close to zero, orders of magnitude below the 10-22% previously held sufficient to establish deception.

Customer reviews at TurboTax.com likewise were inconsistent with deception. Negative reviews, for example (not all of which even suggest deception), accounted for less than 0.01% of customers in 2021 and 2022. RRF¶¶635, 642. And Intuit maintained an industry-leading customer-retention figure of over 80% for its paid products and earned industry-leading customer-experience scores. RPF¶¶650-653. Faced with an analogous deception claim, the court in *FTC v. DirecTV*, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018), concluded that the record did "not support a finding that the company violated the FTC Act" after citing similar metrics in which "deception would have been reflected" if it had occurred—including customer-experience scores *lower* than Intuit's, *id.* at *18. The same conclusion is warranted here.

The commissioners reached the opposite conclusion by asserting that while "consumer *complaints* may be indicative of deception, the presence of … *satisfied* customers" does not show a lack of deception.  Op.56 (emphases added); *see also* MIL Order 8-10 (excluding customer-satisfaction evidence).  That Kafkaesque approach—contrary to that of the neutral judge in *DirecTV*, as just discussed—lays bare the commissioners' drive to reach a particular result.  Indeed, by ignoring the above metrics, the commissioners did just what a member of this Court recently chastised another agency for: "replac[ing] … numerical certainty with 'I-know-it-when-I-see-it' subjectivity," *VanDerStok v. Garland*, 86 F.4th 179, 200 (5th Cir. 2023) (Oldham, J., concurring), *petition for cert. filed*, No. 23-852 (U.S.).

3.      Had the commissioners applied the correct analysis, they could not have deemed Intuit's ads deceptive.  That analysis "starts with the background knowledge of the reasonable consumer."  *Dinan v. Sandisk LLC*, 2019 WL 2327923, at *6 (N.D. Cal. May 31, 2019).  Here, that knowledge includes consumers' understanding that free-tax-preparation offers (like other free offers) are qualified, and in particular are typically available only to consumers with simple returns.  RPF¶¶473-484.  The commissioners' own guidance states that the "public understands" that free offers are typically qualified.  16 C.F.R. §251.1(b)(1); *see* RAB 18.  And that guidance is particularly apt here, for two related reasons.  First, *all* major companies in the online-tax-preparation industry

have both a free product for simple tax returns and paid products for more complex returns. RPF¶¶481-482. Second, qualified free offers like Intuit's have been "an entrenched part" of the online-tax-prep industry for over two decades. *United States v. H&R Block, Inc.*, 833 F.Supp.2d 36, 46-48 (D.D.C. 2011); *see* RAB.18. There is thus no doubt that reasonable consumers understand that free online-tax-preparation offers have qualifications tied to tax complexity. RPF¶483.

Relatedly, "reasonable consumer[s]" are presumed to understand terms or concepts that are "widespread" or "commonplace" in the relevant industry. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965, 967 (9th Cir. 2016); *see* RAB.19. Again, "simple returns" is a commonplace term in the online-tax-preparation industry.

The commissioners did not deny any of this. In fact, they acknowledged that "simple tax returns" is used by the IRS, the Government Accountability Office, California's Franchise Tax Board, and virtually all tax-preparation companies, Op.43-44. But they quibbled that Intuit "provided no evidence" that consumers saw and understood *government documents* using the term. Op.43. The government's use of "simple tax returns" is relevant, however, not because consumers necessarily would have seen government documents using the term, but because the government's reliance on that term shows it is "widespread," *Ebner*, 838 F.3d at 967. The commissioners also noted that other companies defined "simple returns" slightly differently than Intuit. Op.44. But small variations do

not change the fact that it is "industry convention," RRF¶697—or, in *Ebner*'s words, "commonplace in the market," 838 F.3d at 965—to use the term as Intuit did.

The IRS (and other government agencies), Intuit, and other tax-preparation companies all use "simple tax returns" for the same reason: consumers understand it. Intuit's executives explained this at trial, RPF¶¶122-123, and other record evidence confirms it. Intuit's internal testing, for example, showed that consumers found the term "easy to understand." RPF¶¶134, 869. Furthermore, several consumers provided deposition testimony indicating that they (correctly) understood the phrase to convey that the ability to use a free TurboTax product depends on the complexity of one's tax return. RPF¶635. Even an FTC expert admitted here that participants in his survey had the same understanding. RPF¶136. Moreover, as Intuit's experts and executives testified, lengthier or more technical disclosures would have been ineffective, overwhelming consumers and confounding them with jargon. RPF¶¶138-139. Once again, consumers themselves confirmed this: Consumer feedback gathered by Intuit in 2017 revealed that consumers appreciated TurboTax disclosures that did not contain "complicated tax terminology" and were instead worded in "laymen's terms." RPF¶140.

Even if consumers were unfamiliar with free-tax-preparation offers or did not know the precise meaning of "simple tax returns," reasonable consumers do not expect ads to provide every last detail. RPF¶¶511, 514. Instead, they understand (especially with online products) that full details are available elsewhere. RPF¶¶511-527. The challenged ads were consistent with that understanding, disclosing that the free-tax-prep offers were available to customers with simple returns only, and directing and/or linking consumers to TurboTax.com, which thoroughly explained each offer's qualifications. IDF¶¶64, 215, 219, 225. Furthermore, consumers typically choose a tax-preparation product only after conducting online research, consulting with friends, family, or reviews, and otherwise examining alternatives. RPF¶¶502-513, 786. Those efforts would have revealed information about TurboTax's free-product qualifications, which is readily available. IDF¶¶359-378.

Because the commissioners failed to apply "established law" by skirting the reasonable-consumer inquiry, their decision must be "set[] aside." *Lakeland*, 347 F.3d at 961.

4. Improperly disregarding all of the foregoing, the commissioners relied on evidence purporting to reflect reasonable consumers' understanding of the challenged ads. That evidence (much of which was misconstrued) does no such thing.

a. The commissioners relied heavily on Nathan Novemsky's survey results. *E.g.*, Op.44, 62-69. Those results say nothing about reasonable consumers' understanding of Intuit's ads.

"[T]he primary evidence in a false advertising case is the advertising itself." *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Yet, in a matter that should be focused squarely on the ads, Novemsky incredibly did not show his survey participants *a single ad or webpage*, Op.44, 65. Courts consistently disregard results of such surveys, *see McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1099 (9th Cir. 2023), recognizing that surveys in which "participants [are] not shown" the subject ads produce "unjustifiably skewed … results," *M.D. On-Line, Inc. v. WebMD Corp.*, 2005 WL 2469668, at *7 (D.N.J. Oct. 6, 2005). Novemsky's results about the phrase "simple returns" say nothing about consumers' actual understanding of the phrase because he did not present it as it was used, i.e., in an ad alongside other disclosures. RRF¶491.

Novemsky's survey suffered from myriad additional flaws. RPF¶¶530-622. For example, Novemsky remarkably did not use a control group or control questions, Op.65—a defect that courts "routinely hold … constitutes [a] ground for granting a … motion to exclude," *Valador, Inc. v. HTC Corp.*, 242 F.Supp.3d 448, 463 (E.D. Va. 2017), *aff'd*, 707 F.App'x 138 (4th Cir. 2017). And Novemsky created self-selection problems by telling participants the survey's purpose was to

investigate Intuit for deceptive advertising, immediately before allowing them to opt out and have their answers deleted—an option over one-fifth of participants took. Op.69 & n.65. This "self-interest bias" is another reason why no weight can reasonably be given to the survey. *In re Autozone, Inc.*, 2016 WL 4208200, at *18 (N.D. Cal. Aug. 10, 2016), *aff'd*, 789 F.App'x 9 (9th Cir. 2019).

b.     The commissioners' reliance on Intuit's ad testing and marketing-strategy documents likewise fails. The commissioners claimed (Op.39-41) that 2019 and 2021 copy testing indicates that many consumers wrongly believed they could file for free. But the commissioners failed to address the evidence (and Intuit's argument) that consumers in those tests were more likely than the average consumer to qualify to file for free. RAB.23. Hence, those tests show that consumers had an *accurate* understanding. As for the internal strategy documents and podcast transcript the commissioners relied on (Op.45-46), those documents recognize that the advertising was designed to communicate the accurate point that consumers *who qualified* could file for free. RRF¶¶613-615, 618. The recognition that "free" was an effective message *for those consumers* is entirely unremarkable. RRF¶692.

This pattern of misconstruing or cherry-picking from exhibits continues for almost every Intuit document the commissioners cited. *See* RRF¶¶8, 26, 28, 613, 615, 619. And the commissioners' related failure of relying on their own "clipped

view of the record"—which fails to address countervailing evidence and consider "the record as a whole"—independently renders their decision arbitrary and capricious. *Lakeland*, 347 F.3d at 961-963.

      c.     The extremely small number of consumer complaints (and related testimony) the commissioners cited are not probative of widespread deception.

      The commissioners pointed (Op.57) to 228 consumer complaints. But 228 complaints (some demonstrably irrelevant, and none shown at trial to be reliable, RPF¶¶633-634) in no way establish the widespread and long-lasting deceptive-advertising campaign alleged. If Intuit's ads, which were seen *billions* of times, were deceptive, the number of consumer complaints would be many orders of magnitude greater.

      Perhaps recognizing this, the commissioners retreated to the assertion (Op.57-58) that there are "over 3,800 complaints" in customer reviews available on TurboTax.com, and additional negative consumer feedback in Intuit's records. Many of the reviews, however, *belie* the commissioners' deception holding, showing that consumers understood the free-product qualifications. RRF¶¶634, 662. In any event, those 3,800 complaints represent 0.0001% of the over 35 million returns filed using TurboTax in 2022. RRF¶642. Such a tiny percentage is, again, far too small to support a deception ruling.

      Put simply, the record does not support a deception finding.

**B.    The Commissioners' Deception Ruling Rests On Three Legal Errors**

The commissioners' unprecedented deception holding rests on three fundamental legal errors.  Each independently requires reversal—and because, as just shown, a proper analysis precludes a deception holding, the Court should remand with instructions to dismiss.

**1.    Novel and baseless heightened disclosure standard**

The commissioners held that because the challenged ads contained "a 'free' message," they triggered a "particularly strong" standard regarding whether they were deceptive.  Op.45; *accord* Op.46.  That heightened standard—that every free-product ad must disclose an offer's terms in meticulous, exhaustive detail, rather than disclosing "'the existence and category' of the limitation on a consumer's ability to use the free product," Op.84—is unprecedented, would harm consumers, and (as to Intuit's online ads) is inconsistent with FTC guidance.

The commissioners' heightened deception standard is infirm.  Neither the FTC Act, 15 U.S.C. §45(a)(4), nor the *Policy Statement on Deception*, 103 F.T.C. 174 (1983), distinguishes between "free" claims and others.  Nor is the standard supported by the cases the commissioners cited (Op.45), which concerned products that were advertised as "free" to everyone but were not free for *anyone*.  *See FTC v. Mary Carter Paint Co.*, 382 U.S. 46, 49 (1965); *Book-of-the-Month Club*, 48 F.T.C. 1297, 1299 (1952).  The ads challenged here, by contrast, truthfully

advertised that products were free and covered the tax needs of millions of qualifying consumers. *See supra* pp.7-10, 34-35.

As applied to Intuit's online ads, moreover, the commissioners' heightened standard is arbitrary and capricious because it conflicts with FTC guidance providing—with no carve-out for free ads—that online ads need only disclose the "nature and relevance" of limitations, FTC, *.com Disclosures* A-8 (Mar. 2013). The guidance further provides that if details (including about "price") "are too complex to describe adjacent to the [relevant] claim, those details may be provided" elsewhere, including "by using a hyperlink." *Id*. at 10. That is what Intuit did in the challenged online ads: disclosed that the advertised products covered "simple returns only" (conveying that eligibility was based on one's tax complexity), with full details at TurboTax.com. And on that website, additional details were available by clicking a hyperlink, often one saying "see if you qualify." *See supra* pp.11-13. There was no basis in the guidance for the commissioners to declare this insufficient. And the "unexplained inconsistency" between the commissioners' decision here and their guidance in this precise advertising scenario renders their decision "arbitrary and capricious," *Encino*, 579 U.S. at 222; *accord Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023). Indeed, their application of a "new standard" here—one that departs prejudicially from the Commission's published guidance on this issue—violates the "familiar due process

considerations of fair notice, reasonable reliance, and settled expectations."

*Monteon-Camargo v. Barr*, 918 F.3d 423, 430-431 (5th Cir. 2019); *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).[*]

The commissioners' never-before-disclosed standard allowed them to brush aside the challenged ads' disclosure on the ground that "even if consumers understand that TurboTax is not free for everybody—i.e., that there is some limitation," they may not know the *precise definition* of "simple returns." Op.45 & n.26; *see also* Op.43-45, 84. But the FTC has never indicated disapproval of well-known, commonplace ads for qualified "free" offers that do not state their qualifications *at all*, let alone in precise detail. For instance, the FTC has not required a pizza chain to specify in its buy-one-get-one-free ads that the free pizza's value must not exceed that of the purchased pizza. RPF¶474. Nor has it required a hotel's ads to specify that kids, to eat free, must stay at the hotel with a paying adult. RPF¶477. The commissioners offered no basis for nevertheless taking issue with TurboTax's advertising, even though a "fundamental norm of administrative procedure requires an agency to treat like cases alike," *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Indeed, an agency

---

[*] Although the guidance just discussed applies only to Intuit's online ads, its logic extends to other ads, which directed consumers to further details at TurboTax.com.

"can be said to be at its most arbitrary" when it "treat[s] similar situations dissimilarly." *Steger v. Defense Investigative Service Department of Defense*, 717 F.2d 1402, 1406 (D.C. Cir. 1983) (per curiam). That is exactly what happened here.

The commissioners' novel standard is even inconsistent with their cease-and-desist order. As noted, the commissioners stated that "simple returns" is inadequate because even if consumers "recognize that some people … may not be able to file for free, … that is not the same as recognizing that they themselves would not qualify." Op.45 n.26. But the only disclosure the commissioners required in the space-constrained ads that constitute a significant portion of the advertising at issue—the percentage of taxpayers who qualify, *see* Order §I.C—likewise does not tell individual consumers whether they qualify.

Indeed, the commissioners' novel standard would outlaw marketing for the IRS's own free product, which discloses only that the product "supports simple tax needs" and which requires consumers to click a link (and several links thereafter) to determine eligibility:



*IRS Direct File Pilot*, https://directfile.irs.gov/.

Finally, the commissioners' novel heightened standard would harm consumers. As the evidence at trial showed, and as discussed further below, *see* pp.63-64, ads with the level of detail and length the order appears to require would confuse consumers. The standard would also discourage free offers, which plainly benefit consumers, RPF¶833.

### 2. Piecemeal ad analysis

Precedent requires that in cases like this, "the Commission look[] to the impression made by … advertisements as a whole." *American Home Products Corp. v. FTC*, 695 F.2d 681, 688 (3d Cir. 1982); *accord S.C. Johnson & Son, Inc.*

*v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001). The rationale for this rule is that a proper deception analysis looks at advertisements' effect "under the circumstances" in which consumers actually encounter them. *Policy Statement*, 103 F.T.C. at 177. Consumers view, hear, read—and process—ads as a whole, not as isolated snippets.

The commissioners deemed the challenged ads insufficient to prevent deception only by eschewing the required holistic analysis. Indeed, the commissioners admitted they "excerpted selected portions" of Intuit's ads (their "most problematic components") and considered "other elements" only "after" assessing those "most problematic components." Op.38 n.17. The commissioners even devoted one section of their opinion to the portion of the ads they deemed "problematic," *id.*—i.e., the portion truthfully stating that the advertised product was free, which the commissioners (arbitrarily) labeled the "primary message of Intuit's ads," Op.38—and shunted to a *separate* section "other ad elements" inconsistent with their preferred outcome: the ads' (1) "references to the specific product" being advertised (e.g., Free Edition—a name indicating that other editions are not free); (2) "disclosures limiting the offer to 'simple returns'" (a familiar term that reasonable consumers understood, *see supra* p.39); and (3) "statements referring consumers to the website, such as 'See details at turbotax.com' or … 'See if you qualify at turbotax.com,'" Op.39. Worse still, the commissioners analyzed

- 49 -

these "other ad elements," i.e., the ads' several disclosures, separately from one another (Op.40-41), rather than considering their cumulative and synergetic effect on reasonable consumers.

The commissioners' analysis violates not only caselaw but also their own commitment to consider "the juxtaposition of various phrases" in an "entire" ad, *Policy Statement*, 103 F.T.C. at 176. Only by sidestepping this commitment—another "unexplained inconsistency" rendering their decision arbitrary and capricious, *see Encino*, 579 U.S. at 222—could the commissioners ignore that Intuit's ads satisfied the "key criteria" of "effective disclosure[s]," informing consumers (1) that qualifications existed, (2) the qualifications' nature (i.e., that they related to tax complexity), and (3) where consumers could find full qualification details. IDF¶64. Taken together (as the law requires, again because that is how consumers encountered them), these "constituent elements," *Telebrands*, 140 F.T.C. at 429, ensured that reasonable consumers understood that TurboTax was advertising a free product available only to qualified consumers. *See supra* pp.7-10, 34-35. Even if the multiple disclosures just mentioned were individually insufficient (as the commissioners concluded), their juxtaposition (which, again, the commissioners never considered) ensured that reasonable consumers were unlikely to be deceived. Reasonable consumers who are told that a product covers "simple returns only" and told to review the product's

qualification details do not reasonably assume, as the commissioners ruled, that they *definitely* qualify to use the product. RPF¶¶131, 311-334, 503-527. Such an assumption would in fact be utterly unreasonable.

The commissioners' response to all this was a boilerplate assertion that their deception holding was "based on a review of each ad in its entirety." Op.38 n.17. But what matters is not whether the commissioners *recited* the proper standard, but whether they *applied* it. *See Price v. Vincent*, 538 U.S. 634, 639 (2003) (unanimously reversing because "[a]though the Court of Appeals recited [the correct] standard," it then applied an incorrect one). As explained, they did not.

### 3. Inapplicable "deceptive-door-opener" theory

Adjudicators "must be acutely aware of excessive rigidity when applying the law in the Internet context," because "technologies [like the internet] require a flexible approach." *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1141-1142 (9th Cir. 2011). Disregarding this admonition, the commissioners here issued the first decision ever to extend to the online context the so-called "first-contact" or "deceptive door-opener" theory. Op.47. That theory posits that if a business's initial contact with consumers involves deception, it does not matter that that deception is cured later. *See Resort Car Rental Systems, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (per curiam); *Encyclopaedia Britannica, Inc.*, 87 F.T.C. 421, 496 (1976); *Grolier, Inc.*, 99 F.T.C. 379, 383

(1982). Here, the ALJ explained, the theory means that if the challenged ads are deceptive, then "it doesn't matter what a consumer [later] sees at the website," Hr'g Tr.32—even though (1) every challenged ad linked or directed consumers to the website, *see supra* pp.7-10; (2) consumers *must* visit the website (or mobile app) to use TurboTax, *see supra* p.11; (3) consumers encounter myriad disclosures on the website, *see supra* pp.11-14; and (4) navigating to the website's disclosures took only "five to ten seconds," RPF¶790.

Applying the door-opener doctrine here violated the principle that "deceptive advertising claims … take into account all the information available to consumers," *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 477 (7th Cir. 2020), or at least "information readily available to" consumers, *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021). Unlike information available only at a brick-and-mortar location (which consumers must travel to obtain), information online is literally at consumers' fingertips. Indeed, the FTC's expert here recognized both that it takes only "a few seconds" to reach TurboTax.com and that, once there, it takes only "five to ten seconds" to encounter full details. RPF¶790.

The commissioners brushed this evidence aside on the ground that the relevant information in the cases Intuit cited was on the products' label and thus "available during th[e] first contact." Op.49. But the cases stand for "the *general principle* that deceptive advertising claims should take into account all the

information available to consumers," *Moore*, 4 F.4th at 882 (emphasis added).

And that principle has been applied to information that was—unlike the disclosures

on TurboTax.com—very difficult to access, including information that viewers of

a truck advertisement could access only by asking to "see a dealer for a copy of the

Warranty's details," *Marksberry v. FCA US LLC*, 606 F.Supp.3d 1075, 1082

(D. Kan. 2022).

Courts, in fact, have rejected deception claims online even where price

disclosures were not made *until the point of sale*, much later than here. *See*

*Washington v. Hyatt Hotels Corp.*, 2020 WL 3058118, at *5 (N.D. Ill. June 9,

2020); *Harris v. Las Vegas Sands LLC*, 2013 WL 5291142, at *2, *5-6 (C.D. Cal.

Aug. 16, 2013). The commissioners stated that these cases "did not apply to the

FTC Act." Op.48. But they applied state statutes interpreted in step with that law.

*See In re Firearm Cases*, 126 Cal.App.4th 959, 980 (2005); 815 Ill. Comp. Stat.

§505/2. The commissioners also protested that the cases "did not even discuss the

first contact rule, let alone reject" it. Op.48. But the cases' failure to discuss an

inapplicable doctrine is unsurprising; what matters is that these cases' *holding*—

that there was no deception because the relevant information was disclosed on a

webpage that "a customer sees *before*" purchasing the product, *Washington*, 2020

WL 3058118, at *5; *see Harris*, 2013 WL 5291142, at *5—are inconsistent with

applying the door-opener doctrine online.

The single case the commissioners cited as precedent for applying the theory online (Op.47) did not apply it. That case's deception holding rested on deceptive features of multiple webpages that consumers encountered *after* initial contact, including the "first landing page," a "second web page," and a third "terms and conditions web page." *FTC v. Grant Connect, LLC*, 827 F.Supp.2d 1199, 1220-1221 (D. Nev. 2011), *aff'd in part and vacated in part*, 763 F.3d 1094 (9th Cir. 2014). If anything, the court's identification of misleading features at every step of the website's "multi-step process," *id*. at 1219, suggests that the court believed the door-opener/first-contact rule does *not* apply online.

The commissioners also asserted that "Congress has signaled that it agrees" that the door-opener theory applies online. Op.48. Their sole support, however, was a 2003 statute "outlawing the sending of emails with misleading subject information." Op.48 n.29. That legislation—which pertains only to misleading email subject lines—would have been unnecessary if the commissioners were right that the door-opener theory applies online. If anything, then, the statute shows that Congress did *not* understand the door-opener theory to apply online.

Perhaps given the foregoing points, the commissioners hedged on their application of the door-opener theory, stating that "the TurboTax website" *itself* "is inadequate." Op.50. But their halfhearted critique of the website suffers from the legal errors discussed in Parts III.B.1-2. It also is belied by even a cursory review

of the site—including, for example, the versions of the Products & Pricing webpage in the record, which as the commissioners explained "lists each TurboTax product, its price, and examples of tax situations that are applicable to each product," and which the commissioners conceded "is shown to all consumers before they start preparing their taxes with any TurboTax product," Op.30.

## IV.    THERE IS NO BASIS FOR THE CEASE-AND-DESIST ORDER

### A.    No Cease-And-Desist Order Is Warranted Because The Challenged Ads Are Already Enjoined

Cease-and-desist orders are permitted only where there is "some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), i.e., danger of "illegal practices in the future," *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952). There is no such danger here because the attorneys-general consent order already ensures that consumers will not be misled by TurboTax tax-prep advertising. The order—which overlaps significantly with the commissioners' order, forbidding misrepresentations in any tax-prep advertising—prohibits Intuit from running any of the (already discontinued) challenged ads, and requires that Intuit's free-tax-prep ads prominently disclose qualifications for free offers (which Intuit has already done). RX261 at 7-8. The FTC's conclusion that a sufficient risk of future deception exists to justify a cease-and-desist order disregards the views of the top law-enforcement official in every state and Washington, D.C.

The commissioners asserted (Op.84) that the consent order constitutes "voluntary cessation" and hence "does not render a cease-and-desist order inappropriate." That is wrong. Voluntary cessation does not apply where, as here, conduct is constrained by a "court-approved consent decree." *Environmental Conservation Organization v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008).

The commissioners also incorrectly asserted (Op.83) that disclosures in ads post-dating the consent order were insufficiently prominent. In one supposed example, the six-second ad showed—throughout the ad—clearly visible bold white font stating, "Simple returns only. See if you qualify at turbotax.com." RX1476. It also named the specific product being advertised. RX1476. The commissioners faulted the ad for not including a *verbal* disclosure, but the ad contains no verbal free claim. There is thus no chance that someone only listening to the ad would be misled. The only other examples the commissioners identified are paid-search ads, which have significant space constraints and in which all the text is roughly the same size, clearly visible, and not accompanied by other visuals or audio that might distract from the disclosure language. *E.g.*, GX723. Those ads linked to TurboTax.com, where further details were provided (well before consumers made a decision about whether to use the product). *E.g.*, GX723. Moreover, Intuit's testing of its recent ads showed that consumers were not misled into believing

incorrectly that they could file for free with TurboTax. RPF¶804. The commissioners cited no contrary evidence.

Lastly, the commissioners' criticisms of the consent order cannot justify the cease-and-desist order because they apply equally to the latter. For instance, the commissioners complained (Op.83-84) that the consent order's mandated disclosures—"simple returns only" and "see if you qualify"—do not adequately communicate qualifications. Yet the commissioners' order deems ads not deceptive where they direct consumers to TurboTax.com and disclose only that "~37% of filers qualify"—which communicates *nothing* about the consumers who qualify. Op.88-90; *see also* Order §I.C. The commissioners' criticism that the consent order allows inconspicuous disclosures (Op.84) is likewise untenable given that the cease-and-desist order uses a nearly identical definition of "Clearly and Conspicuously"—meaning that both orders require disclosures to have the same prominence and readability. *Compare* Order at 1-2, *with* RX261 at 2-3.

## B. The Commission's Order Is Unconstitutional And Otherwise Impermissible

Even if some cease-and-desist order were permissible, the one here is overbroad, vague, harmful to consumers, and unconstitutional. (These flaws, of course, reflect the bias inherent in the Commission's structure, and Khan's demonstrated bias in particular.)

1.     The cease-and-desist order is overbroad, inappropriately encompassing products not at issue here.

An order's terms must reasonably relate to the challenged practice, *American Home*, 695 F.2d at 710-711, a requirement that often "require[s] the narrowing of deceptive advertising orders" to "more closely relate to the offending conduct," *Fedders Corp. v. FTC*, 529 F.2d 1398, 1402 (2d Cir. 1976). "[M]ulti-product[] orders" in particular "should be used with caution 'because they alter the scheme of penalties and enforcement procedures defined by the [FTC] Act.'" *Litton Industries, Inc. v. FTC*, 676 F.2d 364, 371 (9th Cir. 1982). Where a proceeding focuses on a single product, a multi-product order is unlawful absent evidence that other products should be included. *Grove Laboratories v. FTC*, 418 F.2d 489, 497 (5th Cir. 1969); *Standard Oil Co. of California v. FTC*, 577 F.2d 653, 662-663 (9th Cir. 1978).

Here, the proceeding focused exclusively on Intuit's advertising of free TurboTax products; there were no allegations or reliable evidence concerning Intuit's myriad other non-TurboTax products. Yet the order prohibits Intuit—for *20 years* (a prolonged period that was never justified)—from advertising "any" TurboTax goods or services as free unless specific requirements are met (including requirements that cannot readily be transferred to non-consumer tax-preparation products, like the percent-who-qualify disclosure, *infra* p.61), and from making

certain representations about "any" material fact in advertising for "any" goods or services. Order §§I-II. It also imposes burdensome compliance-reporting and record-preservation requirements, such as maintaining personnel records, accounting records, and "all consumer complaints and refund requests," for "all goods or services." Order §§IV-V. That includes goods and services fundamentally different from the free-tax-prep products at issue. The "exceptionally broad" order thus cannot stand because it bears no "reasonable relation to the unlawful practices found to exist." *Standard Oil*, 577 F.2d at 663. The absence of any "rational connection between the facts found and the choice made" also renders the order arbitrary and capricious. *Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).

The commissioners speculated that Intuit's conduct *could* "be easily transferred to other products," Op.89, but speculation is not evidence. And Intuit's tax products—in particular, its free-tax-prep consumer products—are entirely distinct from Intuit's other offerings, such that the concerns over the challenged ads (which are unique to online tax preparation) are irrelevant to those products. The only evidence the commissioners cited, moreover (Op.86), were two draft documents. It is unclear, however, who even drafted or reviewed those—because the FTC chose not to ask. RRF¶30. The documents also reflect only that the

(anonymous) author considered offering a free version of a distinct Intuit product, *id.*, which says nothing about how that hypothetical free offer would be *advertised*. And the fact that Intuit has not offered a free version of that product, two years after the documents' creation, confirms that the FTC's reliance on them was misplaced.

The cases the commissioners cited (Op.89) show only that a multi-product order can be justified where there is evidence to support it, such as evidence that a company was "already subject to a number of outstanding orders … containing similar prohibitions with respect to other products," *Colgate-Palmolive Co.*, 62 F.T.C. 1269, 1277 & n.7 (1963); *see also American Home*, 695 F.2d at 708. Likewise, evidence that there was an "absence of internal evaluation before advertising" can "show that a broader order overseeing [a company's] practices is warranted." *Litton*, 676 F.2d at 372. None of that is present here: Intuit was not subject to similar orders regarding other products, and Intuit has an in-depth process for evaluating ads to ensure they are not misleading. RPF¶¶163-174, 821.

The cases the commissioners cited are also distinguishable because they concerned cease-and-desist orders covering *closely related* products. While the FTC may be justified in extending a bar on misleading advertising from Kraft Singles to Velveeta, *Kraft, Inc. v. FTC*, 970 F.2d 311, 324, 326 (7th Cir. 1992), or from shaving cream to soap, *Colgate-Palmolive*, 62 F.T.C. at 1276, there is no

similar justification for extending a prohibition addressing TurboTax advertising to advertising for products wholly unrelated to tax preparation.

Finally, the order's irrational results underscore its impermissible overbreadth. For example, the required disclosure regarding the percentage of qualifying consumers (Order §I.B.1) requires Intuit to disclose information based on IRS data (showing the percentage of all taxpayers who qualify) over which Intuit has no control, *see* IDF¶36. It is even less clear how Intuit is expected to apply that disclosure requirement outside the context of tax-prep products.

All this reinforces that the order, if permitted at all, should be limited to the free TurboTax products at issue in this proceeding.

2. A lynchpin of the order—provision I.B.2—is not "stated with clarity and precision" and thus is "unenforceable," *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235-1236 (11th Cir. 2018). Provision I.B.2 requires Intuit to disclose "Clearly and Conspicuously all the terms, conditions, and obligations upon which receipt and retention of [a] 'Free' good or service are contingent so as to leave no reasonable probability that the terms of the offer might be misunderstood." That mandate is impermissibly vague, "say[ing] precious little about how this is to be accomplished" and providing "an indeterminable standard of reasonableness," *LabMD*, 894 F.3d at 1236-1237. If upheld, the provision would impermissibly put the FTC "in the position of managing" TurboTax's free-product ads "as if the

Commission was [Intuit's CEO] and the court was its operating officer." *Id.* at 1237.

In rejecting this argument (Op.87-88), the commissioners never explained how the key phrase—"leave no reasonable probability that the terms of the offer might be misunderstood"—provides the clarity needed to be enforceable. They did claim (Op.88) that the definition of "Clearly and Conspicuously" cures the ambiguity, but that is wrong. While that definition provides certain requirements for disclosures, it says nothing about what it means "to leave no reasonable probability" that there *might* be consumer misunderstanding.

3.      The cease-and-desist order will harm consumers by requiring misleading and hard-to-understand disclosures.

The required disclosures increase the likelihood that consumers who qualify to use free TurboTax products will incorrectly believe they do not qualify. RPF¶843. That harm, moreover, will be widespread because most consumers in the online-tax-preparation segment *do* qualify to file for free. RPF¶¶129, 464-465. The commissioners' response to this was the evidence-free statement "[w]e disagree," and the ironic claim that Intuit's argument (which is factual) is speculative. Op.89. The commissioners' unsupported say-so is not enough to overcome Intuit's actual evidence. *See Lakeland*, 347 F.3d at 962. And their assertion that consumers would not be misled because they could easily visit

TurboTax.com (Op.89) proves too much because the commissioners rejected *that same argument* here when Intuit made it in support of the notion that the ads are not deceptive in the first place. That "unexplained inconsistency" renders the order arbitrary and capricious. *Encino*, 579 U.S. at 222.

The order also requires that Intuit replace "simple tax returns"—a descriptive and accessible phrase that the record makes clear consumers understand, RPF¶¶122-123, 135-136—with more detailed and complex disclosures. But consumers are less likely to understand such complex disclosures. RPF¶¶139-140, 333. Indeed, the record shows that consumers appreciated that prior TurboTax disclosures were "easy to understand" and worded in "laymen's terms." RPF¶¶134, 140, 869. The FTC offered no evidence that the lengthy and complex disclosures the order mandates would increase consumers' understanding of free TurboTax advertising.

Lastly, the order seemingly requires Intuit to provide more information than consumers can comprehend in a short time. Both sides' experts recognized the "potential to overload consumers with complicated information in an advertisement," with the FTC's expert stating that "eligibility requirements to file for free 'cannot be easily communicated in an ad to a reasonable consumer.'" ID.224 (emphases omitted). Yet the order requires that Intuit disclose in certain ads "*all* the terms, conditions, and obligations" of free products. Order §I.B.2

(emphasis added).  The challenged ads already did that, disclosing that the products cover only simple tax returns.  If the provision is intended to require Intuit to list in ads every example and scenario that would illustrate these conditions, consumers would be overwhelmed by such lengthy disclosures (assuming they were technologically feasible), again making it less likely that consumers will understand the qualifications for TurboTax free products.  RPF¶¶332-333, 840-846.

The commissioners' response rested largely on the claim that neither side's expert "conducted any formal analysis" concerning information overload.  Op.89.  That is wrong; Intuit offered an expert "Disclosure Efficacy Study" that showed that more detailed disclosures did not improve consumer understanding.  RPF¶¶722-745.  In any event, such analysis was unnecessary given that the fact was undisputed; it was *obvious* to both experts that consumers would experience information overload.  The commissioners failed to justify their substitution of their subjective opinions for the experts' consensus view.

4.     Last but by no means least, the order unconstitutionally compels speech, requiring Intuit's ads to state the percentage of *all* consumers who qualify for the advertised product and/or that free TurboTax products are "not Free for a majority of U.S. taxpayers."  That requirement is subject to heightened scrutiny under *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755

(2018) (*NIFLA*), because it is misleading and hence not "noncontroversial," *id.* at 768. It is misleading because most consumers *in the relevant population*, those using online-tax-preparation products, do qualify to file for free using TurboTax, RPF¶129. Indeed, the ALJ remarked at trial that the FTC's figure based on *all* consumers was "meaningless," Hr'g Tr.24. And because it is misleading, the compelled speech is "presumptively unconstitutional," and the commissioners had to "prove[] that [the requirement is] narrowly tailored to serve compelling state interests," *NIFLA*, 585 U.S. at 766. They never did.

The commissioners contended (Op.90) that the compelled disclosures *are* noncontroversial, because they merely reflect a factual dispute and because Intuit has already used the mandated language on its website. Each claim fails.

*First*, the case the commissioners cited *rejected* the argument that the compelled disclosure there was factual and uncontroversial, recognizing that the agency there had impermissibly required the speaker to adopt a message it might disagree with. *National Association of Manufacturers v. SEC*, 800 F.3d 518, 528-530 (D.C. Cir. 2015). As in that case, the compelled disclosure here implicitly conveys the objectionable message that the appropriate group for determining eligibility is all U.S. taxpayers. That compelled message, moreover, is impermissibly "misleading," *National Association of Wheat Growers v. Bonta*, 85 F.4th 1263, 1279 (9th Cir. 2023), adopting a denominator (all U.S. taxpayers) that

includes many people who will unquestionably not seek to use any online tax-preparation product.

*Second*, inclusion of the compelled language in Intuit's current advertising says nothing about the language's controversial nature. Intuit included that language because it was clear the commissioners were going to mandate it. That attempt to minimize disruption from the commissioners' order does not render the order lawful.

Even if the compelled speech were uncontroversial, the mandate would be unconstitutional because it is "unjustified [and] unduly burdensome." *NIFLA*, 585 U.S. at 768. It is unjustified because Intuit's ads already disclose TurboTax products' qualifications, and the commissioners cited no evidence that the additional disclosures were necessary to avoid consumer confusion—or would do so. *See Public Citizen Inc. v. Louisiana Attorney Disciplinary Board*, 632 F.3d 212, 229 (5th Cir. 2011). Compelled disclosures are unconstitutional even if, unlike here, they *would* be more effective at accomplishing the government's goals yet are not necessary to do so. *American Beverage Association v. San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) (en banc). Meanwhile, the compelled speech here is unduly burdensome given that (1) the IRS controls data on how many returns are "simple" and (2) ad space, and consumers' ability to process information, are limited, RPF¶¶333, 834-835, 839-842. Those burdens are

multiplied by the order's broad scope, creating myriad circumstances in which Intuit may be unable to identify the percentage of consumers who qualify for a product.

*     *     *

The commissioners had no sound basis to issue any cease-and-desist order, given the lack of deception in the challenged ads and the safeguards against deception in the attorneys-general order. They certainly had no sound basis to effectively install themselves as 20-year governors of Intuit's advertising, including ordering Intuit to say things it does not agree with and that will hurt consumers. The order here reflects a structurally biased agency and skewed adjudicative process. The Court should make clear that none of this is lawful.

## CONCLUSION

The Commission's decision and order should be vacated and the case remanded with instructions to dismiss.

April 15, 2024                          Respectfully submitted,


                                        /s/ Daniel S. Volchok
                                        HOWARD M. SHAPIRO
                                        JONATHAN E. PAIKIN
                                        DANIEL S. VOLCHOK
                                        DEREK A. WOODMAN
                                        WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                        2100 Pennsylvania Avenue N.W.
                                        Washington, D.C. 20037
                                        (202) 663-6000

                                        DAVID Z. GRINGER
                                        WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                        7 World Trade Center
                                        250 Greenwich Street
                                        New York, N.Y. 10007
                                        (212) 230-8800

## CERTIFICATE OF COMPLIANCE

According to the word-count feature of the word-processing program with which it was prepared, the foregoing brief contains 12,996 words, excluding the portions exempted by Rules 27(d)(2) and 32(f). This brief also complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office in 14-point Times New Roman font.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

## CERTIFICATE OF SERVICE

I caused the foregoing to be electronically filed on April 15, 2024, using the Court's appellate CM/ECF system, which effected service on all counsel of record.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK