No. 24-60040

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

INTUIT, INC.,

*Petitioner,*

– v. –

FEDERAL TRADE COMMISSION,

*Respondent.*

On Petition for Review of a Final Order of the Federal Trade Commission
FTC Docket No. 9408

**BRIEF OF AMICI CURIAE TRUTH IN ADVERTISING, INC.,
CENTER FOR CONSUMER LAW & ECONOMIC JUSTICE,
CONSUMER FEDERATION OF AMERICA, CONSUMER
ACTION, NATIONAL ASSOCIATION OF CONSUMER
ADVOCATES, AND PROFESSOR REBECCA TUSHNET IN
SUPPORT OF RESPONDENT**

Bonnie L. Patten
Laura D. Smith
Eliza J. Duggan
TRUTH IN ADVERTISING, INC.
736 Boston Post Rd., Suite 2
Madison, CT 06443

David S. Nahmias
   *Counsel of Record*
Seth E. Mermin
CENTER FOR CONSUMER LAW &
ECONOMIC JUSTICE
308 Berkeley Law
Berkeley, CA 94720-7200
dnahmias@law.berkeley.edu
(510) 982-5566

*Counsel for Amici Curiae*

## **CERTIFICATE OF INTERESTED PERSONS**

No. 24-60040, *Intuit Inc. v. FTC*

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the Petitioners' Certificate of Interested Persons–the following listed persons as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel further states that amici curiae have no parent corporations, and no publicly held corporation has a 10% or greater ownership interest in amici curiae.

- Petitioner Intuit Inc.

- Counsel for petitioners Wilmer Cutler Pickering Hale and Dorr LLP, Howard M. Shapiro, Jonathan E. Paikin, Daniel S. Volchok, David Z. Gringer, and Derek A. Woodman.

- Amicus curiae Truth In Advertising, Inc.

- Amicus curiae Center for Consumer Law & Economic Justice.

- Amicus curiae Consumer Federation of America.

- Amicus curiae Consumer Action.

- Amicus curiae National Association of Consumer Advocates.

- Amicus curiae Rebecca Tushnet, Frank Stanton Professor of the First Amendment, Harvard Law School.

- Counsel for amicus curiae Center for Consumer Law and Economic Justice, David S. Nahmias and Seth E. Mermin.

- Counsel for amicus curiae Truth In Advertising, Inc., Bonnie L. Patten, Laura D. Smith, and Eliza J. Duggan.

Respectfully submitted,

/s/ David S. Nahmias
David S. Nahmias

*Counsel of Record for Amici Curiae*

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .......................................... i

TABLE OF CONTENTS ........................................................... iii

TABLE OF AUTHORITIES ....................................................... iv

INTERESTS OF AMICI CURIAE ......................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................... 3

ARGUMENT................................................................ 8

    I.    The FTC Properly Focused On The Overall Impression
        Created By Intuit's Advertising. ............................... 9

    II.   Intuit Failed To Clearly And Conspicuously Disclose
        Material Qualifying Information............................ 11

    III.  Ratifying Intuit's Marketing Practices Would Undermine
        The Purpose Of Consumer Protection Laws. ........................ 18

CONCLUSION ......................................................... 24

CERTIFICATE OF SERVICE ........................................... 26

CERTIFICATE OF COMPLIANCE...................................... 27

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Am. Home Prods. Corp. v. FTC*,
   695 F.2d 681, 686 (3d Cir. 1982) .............................................................. 5, 9

*AMG Capital Mgmt., LLC v. FTC*,
   593 U.S. 67 (2021) ........................................................................................ 1

*Basic Books, Inc. v. FTC*,
   276 F.2d 718, 721 (7th Cir. 1960) ................................................................ 21

*Bell v. Publix Super Mkts., Inc.*,
   982 F.3d 468, 476 (7th Cir. 2020) .......................................................... 17, 23

*Bockenstette v. FTC*,
   134 F.2d 369 (10th Cir. 1943) ....................................................................... 9

*Book-Of-The-Month Club, Inc. v. FTC*,
   202 F.2d 486 (2d Cir. 1953) .................................................................... 10, 14

*Carter Prods., Inc. v. FTC*,
   323 F.2d 523, 528 (5th Cir. 1963) ............................................................... 3, 9

*CFTC v. R.J. Fitzgerald & Co.*,
   310 F.3d 1321 (11th Cir. 2002) .................................................................. 4, 9

*Cotherman v. FTC*,
   417 F.2d 587 (5th Cir. 1969) ............................................................... 5, 7, 17

*Donaldson v. Read Magazine, Inc.*,
   333 U.S. 178 (1948) ............................................................................. 3, 9, 23

*ECM Biofilms, Inc. v. FTC*,
   851 F.3d 599 (6th Cir. 2017) ......................................................................... 4

*Fanning v. FTC*,
   821 F.3d 164 (1st Cir. 2016) ......................................................................... 9

*Floersheim v. FTC*,
    411 F.2d 874 (9th Cir. 1969) ........................................................... 12

*FTC v. Algoma Co.*,
    291 U.S. 67 (1934) ........................................................................... 24

*FTC v. Amy Travel Serv., Inc.*,
    875 F.2d 564 (7th Cir. 1989) ........................................................... 22

*FTC v. Brown & Williamson Tobacco Corp*,
    778 F.2d 35 (D.C. Cir. 1985) ........................................................... 12

*FTC v. Colgate-Palmolive Co.*,
    380 U.S. 374 (1965) ...................................................................... 6, 7

*FTC v. Commerce Planet, Inc.*,
    878 F. Supp. 2d 1048 (C.D. Cal. 2012) ........................................... 10

*FTC v. Commerce Planet, Inc.*,
    642 Fed. App'x 680 (9th Cir. 2016) ........................................... 10, 16

*FTC v. Credit Bureau Ctr., LLC*,
    937 F.3d 764 (7th Cir. 2019) ........................................................... 22

*FTC v. Cyberspace.com, LLC*,
    453 F.3d 1196 (9th Cir. 2006) ................................................. 6, 9, 16

*FTC v. Figgie Int'l, Inc.*,
    994 F.2d 595 (9th Cir. 1993) ........................................................... 13

*FTC v. Freecom Commc'ns, Inc.*,
    401 F.3d 1192 (10th Cir. 2005) ....................................................... 21

*FTC v. Mary Carter Paint Co.*,
    382 U.S. 46 (1965) ........................................................................... 10

*FTC v. On Point Capital Partners LLC*,
    17 F.4th 1066 (11th Cir. 2021) ........................................................ 16

*FTC v. Pantron I Corp.*,
    33 F.3d 1088 (9th Cir. 1994) ........................................................................... 21

*FTC v. Standard Educ. Soc'y*,
    302 U.S. 112 (1937) ...................................................................................... 21

*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) ........................................................................... 21

*FTC v. Sterling Drugs, Inc.*,
    317 F.2d 669 (2d Cir. 1963) ............................................................................. 9

*FTC v. Tashman*,
    318 F.3d 1273 (11th Cir. 2003) ...................................................................... 23

*FTC v. US Sales Corp.*,
    785 F. Supp. 737 (N.D. Ill. 1992) .................................................................. 17

*J. B. Williams Co. v. FTC*,
    381 F.2d 884 (6th Cir. 1967) ...................................................................... 9, 13

*Keele Hair & Scalp Specialists, Inc. v. FTC*,
    275 F.2d 18 (5th Cir. 1960) ........................................................................ 5, 13

*Kraft, Inc. v. FTC*,
    970 F.2d 311 (7th Cir. 1992) ............................................................................ 9

*La Barbera v. Olé Mexican Foods Inc.*,
    2023 WL 4162348 (C.D. Cal. May 18, 2023) .............................................. 23

*Otto v. Abbott Lab'y, Inc.*, 2013 U.S. Dist. LEXIS 202888
    (C.D. Cal. Aug. 2, 2013) ............................................................................... 14

*P. Lorillard Co. v. FTC*,
    186 F.2d 52 (4th Cir. 1950) .......................................................................... 3, 9

*Removatron Int'l Corp. v. FTC*,
    884 F.2d 1489 (1st Cir. 1989) ....................................................................... 16

*Spiegel, Inc. v. FTC,*
    494 F.2d 59 (7th Cir. 1974) ................................................. 7, 17, 24

*Thompson Med. Co. v. FTC,*
    791 F.2d 189 (D.C. Cir. 1986) ........................................... 9

*Torres v. S.G.E. Mgmt., L.L.C.,*
    838 F.3d 629 (5th Cir. 2016) ............................................. 1

*United States v. An Article of Food,*
    482 F.2d 581 (8th Cir. 1973) ............................................. 9

*United States v. Ninety-Five Barrels,*
    265 U.S. 438 (1924) ........................................................... 3, 9

## REGULATIONS

16 C.F.R. § 251.1 (2024) ......................................................... 11

## ADMINISTRATIVE ADJUDICATIONS

*Book-Of-The-Month Club, Inc. v. FTC,*
    48 F.T.C. 1297 (1952) ....................................................... 10

*Cliffdale Assocs., Inc.,*
    103 F.T.C. 110 (1984) ....................................................... 12

FTC Statement on Deception,
    103 F.T.C. 174 (1984) ....................................................... 12

*In the Matter of Giant Food,*
    1962 FTC LEXIS 84 (Fed. Trade Comm'n July 31, 1962) ........................ 12

*In the Matter of Intuit Inc.,*
    Op. of the Fed. Trade Comm'n 35 (No. 9408, Jan. 22, 2024) .............. passim

## RULES

Fed. R. App. P. 29(c)(5) ......................................................... 1

## OTHER AUTHORITIES

Amy J. Schmitz, *Access to Consumer Remedies in the Squeaky Wheel System*, 39 PEPP. L. REV. 279, 312 (2012).................................................... 20

Amy J. Schmitz, *Remedy Realities in Business-to-Consumer Contracting*, 58 ARIZ. L. REV. 213 (2016) ................................................. 20

Brandon A., Customer Review: Intuit Inc., BETTER BUS. BUREAU (Mar. 10, 2022)........................................................................................ 13

Dan, Review: Intuit-TurboTax Reviews, CONSUMER AFFAIRS (Mar. 9, 2023)......................................................................................... 13

Dr. Ross B. Steinman & Emily Jacobs, *Sunk Cost Effects on Consumer Choice*, 4 BUS. MGMT. DYNAMICS 25-30 (2015) ........................ 19

Florencia Marotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, 78 U. CHI. L. REV. 165 (2011)................. 22

Gorkan Ahmetoglu, *Pricing Practices: A Critical Review of Their Effects on Consumer Perceptions and Behaviour*, 21 J. RETAILING & CONSUMER SERVS. 696 (2014) ................................................. 9

Initial Complaint, Intuit Inc., BETTER BUS. BUREAU (Apr. 12, 2023).................... 19

Initial Complaint, Intuit Inc., BETTER BUS. BUREAU (June 16, 2023).................... 19

Jamie Ducharme, *The Sunk Cost Fallacy Is Ruining Your Decisions. Here's How*, TIME (July 26, 2018) ................................................. 19

Jean Braucher, *An Informal Resolution Model of Consumer Product Warranty Law*, 1985 WIS. L. REV. 1405 (1985).......................................... 20

Katrina G., Customer Review: Intuit Inc., BETTER BUS. BUREAU (Apr. 6, 2022) ............................................................................... 19

Keith B. Anderson, *To Whom Do Victims of Mass-Market Consumer Fraud Complain?*, SSRN (May 2021) ........................................................ 20

Marguerite DeLiema & Paul Witt, *Profiling Consumers Who Reported Mass Marketing Scams: Demographic Characteristics and Emotional Sentiments Associated With Victimization*, SECUR. J. (2023) ................................................................. 20

Nancy B., Customer Review: Intuit, Inc., BETTER BUS. BUREAU (Apr. 17, 2024) ............................................................................. 7

Nicholas D., Customer Review: Intuit Inc., BETTER BUS. BUREAU (Feb. 19, 2022) ............................................................................. 15

Rebecca Tushnet & Eric Goldman, ADVERTISING & MARKETING LAW: CASES AND MATERIALS, VOL. 1 (3d ed. 2016) ............................... 3

Robert Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 HARV. L. REV. 661 (1977)............................ 7

U.S. Dep't of Justice, RIGHTS, ROLES, AND RESPONSIBILITIES: A HANDBOOK FOR FRAUD VICTIMS PARTICIPATING IN THE FEDERAL CRIMINAL JUSTICE SYSTEM (1998) ................................ 20

W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS (5th ed. 1984)....................................................................................... 10

Yannis Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to Standard-Form Contracts*, 43 J. LEGAL STUD. 1 (2014) ....................................................................................... 22

# INTERESTS OF AMICI CURIAE[1]

*Amicus curiae* **Truth in Advertising, Inc.** (TINA.org) is a nonprofit, nonpartisan consumer advocacy organization whose mission is to combat the systemic and individual harms caused by deceptive marketing. As part of its advocacy efforts, TINA.org investigates marketing campaigns, files complaints with government regulators, and participates as *amicus curiae* in cases concerning false and deceptive marketing practices.[2] TINA.org appears in this case as part of its ongoing efforts to protect consumers from deceptive advertising campaigns.

The **Center for Consumer Law and Economic Justice**, housed at the University of California, Berkeley, School of Law, is the leading law school research and advocacy center dedicated to ensuring safe, equal, and fair access to the marketplace. Through regular participation as *amicus curiae* in the U.S. Supreme Court and other federal courts, the Center seeks to develop and enhance protections for consumers and to foster economic justice. The Center appears in

---

[1] All parties consent to amici filing this brief. Pursuant to Fed. R. App. P. 29(c)(5), amici affirm that no counsel for a party authored this brief in whole or in part, nor did any person or entity, other than amici or their counsel, make a monetary contribution to fund the preparation or submission of this brief.

[2] *See, e.g.*, Brief of Amicus Curiae Truth in Advertising, Inc. in Favor of Appellees and in Support of Affirmance, *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016) (en banc), *cert. denied*, 138 S. Ct. 76 (2017); Brief of Amicus Curiae Truth In Advertising, Inc. in Support of Respondent, *AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67 (2021).

this proceeding to emphasize the importance of consumer protection laws to promote fair and transparent marketing practices.

**Consumer Federation of America** is a national association of over 250 nonprofit organizations that advances the consumer interest through research, advocacy, education, and service. CFA has a 56 year history of using its voice to advocate for honest, clear advertising in consumer transactions throughout the marketplace.

**Consumer Action**, a 501(c)(3) organization, focuses on consumer education that empowers low-to-moderate-income and limited-English-speaking consumers to financially prosper. Consumer Action's mission is to educate and advocate for consumers who face an imbalance of power in the marketplace. As part of its voluminous financial education materials, Consumer Action has a history of alerting consumers to tax-related information to save money or avoid fraud that include earned income tax credit eligibility, tax return assistance, tax refund advances, tax scams and identity theft, and multilingual tax filing guides.

The **National Association of Consumer Advocates** is a non-profit corporation with a membership of private and public sector attorneys, legal services attorneys, and law professors and law students whose primary area of practice or area of study involves the protection and representation of consumers. NACA's mission is to promote justice for all consumers by maintaining a forum

for information sharing among consumer advocates across the country and to serve

as a voice for its members and consumers in the ongoing effort to curb unfair,

deceptive and abusive business practices.

**Professor Rebecca Tushnet** from Harvard Law School specializes in

advertising law and has coauthored a leading casebook on the subject. *See*

Rebecca Tushnet & Eric Goldman, ADVERTISING & MARKETING LAW: CASES AND

MATERIALS, VOL. 1 (3d ed. 2016).

## INTRODUCTION AND SUMMARY OF ARGUMENT

For a century, federal courts have affirmed that literally true statements can

still be deceptive. *United States v. Ninety-Five Barrels*, 265 U.S. 438, 443 (1924).

"Advertisements as a whole may be completely misleading although every

sentence separately considered is literally true. This may be because things are

omitted that should be said, or because advertisements are composed or

purposefully printed in such way as to mislead." *Donaldson v. Read Magazine,*

*Inc.*, 333 U.S. 178, 188 (1948). This legal tenet has been embraced by every

Circuit Court of Appeals, including this Court, for more than six decades. *See, e.g.*,

*Carter Prods., Inc. v. FTC*, 323 F.2d 523, 528 (5th Cir. 1963) ("The Commission

need not confine itself to the literal meaning of the words used but may look to the

overall impact of the entire commercial."); *P. Lorillard Co. v. FTC*, 186 F.2d 52,

58 (4th Cir. 1950) ("To tell less than the whole truth is a well known method of

deception; and he who deceives by resorting to such method cannot excuse the deception by relying upon the truthfulness per se of the partial truth by which it has been accomplished."); *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1331 n.7 (11th Cir. 2002) ("Even literally true statements can be extremely and impermissibly deceptive when viewed in their overall context.").

Despite this clearly delineated guidance, Intuit maintains that "[t]his is the first case *ever* holding it deceptive to advertise a product's true price—here, $0 for everyone who can use the product." Pet'r's Br. 34 (emphasis in original). Much like its marketing for TurboTax Free Edition, this argument is misleading. In this case, Intuit cannot seriously maintain that the unqualified use of the word "free," over and over again, in its advertising provided consumers with accurate information. Pet'r's Br. 40. It hardly could, given that only about one-third of U.S. taxpayers were eligible for its Free Edition. *In the Matter of Intuit Inc.*, Op. of the Fed. Trade Comm'n 35 (No. 9408, Jan. 22, 2024) ["Comm. Op."]. Nor does it point to any caselaw that categorically upholds the propriety of marketing campaigns based solely on the truth of isolated words and phrases—that would not be possible. Fundamental to the law of advertising is the principle that in determining whether marketing is deceptive, the trier of fact must look beyond the specific words and phrases and assess the overall impression conveyed to consumers. *ECM Biofilms, Inc. v. FTC*, 851 F.3d 599, 610 (6th Cir. 2017) (the

FTC "examines the overall net impression of an ad" to determine whether it is deceptive). Indeed, as Intuit concedes, Pet'r's Br. 20, this case turns upon the net impression created by its marketing, and under this long-standing and well-established standard, the FTC correctly found Intuit's marketing more likely to deceive than to inform consumers. Comm. Op. 71 ("In summary, we find that Respondent's ad claims are likely to mislead at least a significant minority of reasonable consumers. The 'free' claims are false for two-thirds of U.S. taxpayers, and Respondent's arguments that such taxpayers were nevertheless not likely to have been misled are unpersuasive."); *see Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 686 (3d Cir. 1982) ("The Commission's familiarity with expectations and beliefs of the public, acquired by long experience, is especially crucial when … 'the alleged deception results from an omission of information instead of a statement.'") (citations omitted).

Further, Intuit's novel theory, which places the burden on consumers to ascertain the material facts and core limitations of its product,[3] would validate highly deceptive marketing practices and upend decades of settled precedent. *See Cotherman v. FTC*, 417 F.2d 587, 589 (5th Cir. 1969); *Keele Hair & Scalp Specialists, Inc. v. FTC*, 275 F.2d 18 (5th Cir. 1960). And its use of the phrase

---

[3] As Intuit puts it, "The ads told consumers both that the free offers were qualified and where to find qualification details." Pet'r's Br. 19-20.

"simple tax returns only," or similar language, often relegated to fine print disclosures—disclosures that consumers regularly ignore or do not see—does not save the day.[4] *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006).

It would be serious error to shackle the Commission's ability to require clear and conspicuous material disclosures, allowing Intuit a regime of caveat emptor. Courts have routinely stressed the FTC's expert role in prescribing what is a deceptive practice, especially "since the finding of a § 5 violation in this field rests so heavily on inference and pragmatic judgment." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385 (1965) (noting that the Commission's determinations warrant "great weight"). Moreover, the public interest at stake here attests to the soundness and continuing importance of deferring to the findings of the Commission, as deceptive marketing and similar forms of commercial dishonesty inflict billions of dollars in losses to cheated consumers, distort the efficient allocation of resources, and punish honest competitors focused on bringing superior products and services to market.

The central premises of modern consumer protection laws are that marketplace dishonesty is not simply deplorable in some abstract sense, but

---

[4] Pet'r's Br. 37. Moreover, Intuit did not always qualify its claims of "free" filings. *See* Comm. Op. 42 ("Indeed, based on calculations of Respondent's expert witness, … 10% of Intuit's 'free' advertising did not include language regarding 'simple returns only.'") (citation omitted).

injurious—causing real harms against which individual consumers and honest businesses alike cannot practically protect themselves;[5] and that, if uncorrected, such behavior seriously impairs the efficient allocation of resources in the Nation's market economy. *See Spiegel, Inc. v. FTC*, 494 F.2d 59, 62 (7th Cir. 1974) ("A good society depends upon promises being kept. And individuals in society have a right to be told the truth so that their choices among products, or, as in this case, among offers, can be understandingly made."); Robert Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 HARV. L. REV. 661 (1977). Armed with such knowledge, when Congress enacted section 5 with its expansive prohibition of "unfair" or "deceptive" acts or practices, it gave broad discretion to the FTC to interpret these terms as pragmatic concepts. As such, "the proscriptions … are flexible, 'to be defined with particularity by the myriad of cases from the field of business.'" *Colgate-Palmolive*, 380 U.S. at 385; *Cotherman v. FTC*, 417 F.2d at 385. Intuit's arguments that its marketing campaign was not deceptive should be rejected.

---

[5] "Tax time is stressful enough without having to deal with such a shady online filing platform. Intuit advertises you can file your taxes for free but really it is not free. I have a w2 and that is it. When it came time to submit, it would not submit without an upgrade to Deluxe. I paid and submitted." Nancy B., Customer Review: Intuit, Inc., BETTER BUS. BUREAU (Apr. 17, 2024), https://perma.cc/P2C3-DPSS.

# **ARGUMENT**

The campaigns used to promote Intuit's free tax filing service, "Free, Free, Free, Free" and "Absolute Zero," presented distinctly unbalanced portraits of who could use it. Comm. Op. 10. The actual words and how they were said and physically appeared on television and elsewhere are beyond dispute. Throughout these marketing campaigns, Intuit emphasized that the service was free while downplaying the fact that there were limitations, and wholly failed to articulate what those limitations were—restrictions that changed over time as Intuit changed the qualifications for its free service. This campaign functioned as a bait and switch.

Intuit's lack of transparency related to who qualified for free tax services was so pernicious because consumers were informed they could not continue for free only *after* they invested their time and effort gathering and inputting their sensitive personal and financial information into TurboTax. Then, TurboTax gave them no choice but to transition to a paid service in order to finish the process of filing their tax return. This brings us back to the underlying purpose of modern consumer protection laws: protecting consumers from being misled or deceived by marketing so they may exercise free choice in the marketplace—here, selecting a free service to file their tax returns. Such freedom of choice is taken away, and the autonomy of the individual severely undermined, if decision-altering information

8

is withheld from marketing until consumers have, at a minimum, lost valuable time, and might pay up just to be done with the process.[6]

## I.   The FTC Properly Focused On The Overall Impression Created By Intuit's Advertising.

Intuit's national ad campaign overemphasized that TurboTax was free and downplayed everything else, presenting an unbalanced and overall deceptive marketing message. Well-established case law from every circuit and longstanding FTC policy strongly militate against Intuit's position that its marketing of TurboTax Free Edition as free cannot be deceptive. *See* Pet'r's Br. 34. Indeed, it has been the law of the land for at least a century that "[d]eception may result from the use of statements not technically false or which may be literally true." *Ninety-Five Barrels*, 265 U.S. at 443; *Donaldson*, 333 U.S. at 188. Every Court of Appeals, including this Court, has applied this legal principle when analyzing deceptive marketing claims.[7] *See, e.g.*, *Carter Prods.*, 323 F.2d at 528 (5th Cir.

---

[6] *See* Gorkan Ahmetoglu, *Pricing Practices: A Critical Review of Their Effects on Consumer Perceptions and Behaviour*, 21 J. RETAILING & CONSUMER SERVS. 696, 700 (2014).

[7] *Accord Fanning v. FTC*, 821 F.3d 164 (1st Cir. 2016); *FTC v. Sterling Drugs, Inc.*, 317 F.2d 669 (2d Cir. 1963); *Am. Home Prods.*, 695 F.2d 681 (3d Cir. 1982); *Lorillard*, 186 F.2d 52 (4th Cir. 1950); *J. B. Williams Co. v. FTC*, 381 F.2d 884 (6th Cir. 1967); *Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992); *United States v. An Article of Food*, 482 F.2d 581 (8th Cir. 1973); *Cyberspace.com*, 453 F.3d 1196 (9th Cir. 2006); *Bockenstette v. FTC*, 134 F.2d 369 (10th Cir. 1943); *R.J. Fitzgerald*, 310 F.3d 1321 (11th Cir. 2002); *Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986).

1963) ("The Commission need not confine itself to the literal meaning of the words used but may look to the overall impact of the entire commercial.") Moreover, it is black letter law that "half of the truth may obviously amount to a lie, if it is understood to be the whole."[8]

Further, emphatic claims of a free service can substantially affect a reasonable consumer's decision-making process. Consumers are heavily influenced by suggestions of "free" in the marketing of goods and services, which is exactly why it has long been a subject of special regulatory concern. *See FTC v. Mary Carter Paint Co.*, 382 U.S. 46, 47 (1965) (referring to the word "free" as "commercially exploitable"); *Book-Of-The-Month Club, Inc. v. FTC*, 48 F.T.C. 1297, 1312 (1952) ("The word 'free' is a lure. It is the bait. It is a powerful magnet that draws the best of us against our will 'to get something for nothing.'"), *aff'd*, 202 F.2d 486 (2d Cir. 1953); *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1068 (C.D. Cal. 2012) ("This misrepresentation is undoubtedly material because the information about a free kit goes to the cost of the product, an important factor in a consumer's decision on whether or not to purchase a product."), *aff'd in part and rev'd in part on other grounds*, 642 Fed. App'x 680 (9th Cir. 2016). The FTC has thus long stressed the need for guardrails when making free offers:

---

[8] W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 106, 738 (5th ed. 1984).

Because the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived. . . .When making "Free" or similar offers all the terms, conditions and obligations upon which receipt and retention of the "Free" item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of "Free" merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset.

16 C.F.R. § 251.1 (2024).

In this case, the Commission correctly found that Intuit's marketing message presented an unbalanced portrait of its free tax service that created a grossly inaccurate picture of who was eligible to use it. Comm. Op. 38. And, as discussed below, its ambiguous disclaimer did nothing to remediate the misleading impression.

## II.     Intuit Failed To Clearly And Conspicuously Disclose Material Qualifying Information.



Comm. Op. 12.

The only qualifying information Intuit provided in its advertising—usually in inconspicuous fine print, which consumers rarely read[9]—was that its free edition was for "simple" tax returns only: a term never defined in its marketing and that changed in meaning four times between 2016 and 2021. Comm. Op. 3. [10] This lopsided advertising failed to convey that approximately two-thirds of U.S. taxpayers would not be eligible for the service,[11] and those in this majority that tried to initiate a filing with Intuit's Free Edition would be required to transition to a paid service in order to complete the process of filing their tax returns—information they would learn only after inputting their sensitive personal and financial information into TurboTax. Comm. Op. 4. That process could take hours:

> "So I tried using the free version of TurboTax to do my taxes this year. It was all well and good until the very end, after probably close to two hours of inputting information, that it finally decided to let me know that since I had a

---

[9] FTC Statement on Deception, 103 F.T.C. 174, 175 (1984) (appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)) (citing FTC decisions finding that most people do not read the fine print in ads); *FTC v. Brown & Williamson Tobacco Corp*, 778 F.2d 35, 43 (D.C. Cir. 1985) (consumers were unlikely to read the fine print in the corner of the ad under the circumstances); *In the Matter of Giant Food*, 1962 FTC LEXIS 84, *17 (Fed. Trade Comm'n July 31, 1962) ("very few if any of the persons who would read Giant's advertisements would take the trouble to, or did, read the fine print disclaimer").

[10] *See Floersheim v. FTC*, 411 F.2d 874, 876-78 (9th Cir. 1969) (affirming FTC's determination that the appearance and prominent repetition of the words "Washington D.C." on debt-collecting forms created the deceptive impression that the forms were a demand from the government even though a small-print disclaimer informed recipients that such was not the case).

[11] *See* Comm. Op. 35.

401k, they couldn't finish processing my taxes unless I bought the deluxe package for $59. Thanks for wasting my time, TurboTax."[12]

Such deception is exactly what section 5 of the FTC Act and the interpretive case law applying it condemns. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("Figgie can point to nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole."). When a majority of consumers will not benefit from a product or service, it is incumbent upon the advertiser to affirmatively disclose the limitations so that consumers are not deceived and can make informed decisions, or, as in this case, alert the majority that they will not be eligible to file their taxes for free with Intuit. *Keele*, 275 F.2d at 23 (upholding FTC Order requiring advertiser of an anti-hair loss service to disclose the limitations of its treatment as the great majority of men would not benefit from it—the treatment could not treat male pattern baldness, which accounted for 95 percent of all hair loss cases); *J.B. Williams Co.*, 381 F.2d at 890 (affirming FTC finding that supplement company's advertising was deceptive especially "in this day when the consumer is influenced by mass

---

[12] Brandon A., Customer Review: Intuit Inc., BETTER BUS. BUREAU (Mar. 10, 2022), https://perma.cc/JL5V-LR3X. *See also* Dan, Review: Intuit-TurboTax Reviews, CONSUMER AFFAIRS (Mar. 9, 2023), https://tinyurl.com/yc4j9bvs ("I find it a little disturbing that my 20 year old college student loses $197 of her $1,000 student tax credit to TurboTax which says it's free until, 'Oh but you are getting the American Tax Credit and that is only available if you pay us for every return…' Don't market yourself as free, and don't steal Student money.").

advertising utilizing highly developed arts of persuasion" because the marketing gave the net impression that most consumers would benefit from the advertised product when the supplement would not work for most people suffering from tiredness); *Otto v. Abbott Lab'y, Inc.*, 2013 U.S. Dist. LEXIS 202888, at *21 (C.D. Cal. Aug. 2, 2013) (finding that deception by omission was plausible because advertised supplement would help elderly people—targets of the ad—only if they had a sufficient blood level of vitamin D, and at least 60 percent of elderly adults did not; "it is reasonable to think that a person buying a product would find significant that it is more likely than not that the product will fail to deliver its promised benefits"); *see Book-of-the-Month Club*, 202 F.2d at 489 (upholding FTC order requiring marketer to disclose the terms and conditions of an offer for "free" books).

Unfortunately, Intuit's marketing did not provide consumers with the information necessary to make an informed choice. The single qualifying word Intuit used in its marketing, "simple," lacked the precision necessary to apprise rational consumers whether or not they would be eligible to use Intuit's free tax service. As Judge Breyer of the Northern District of California explained, Intuit's qualifying word was itself deeply, ingeniously ambiguous and thus did not cure the overall deception of its marketing:

> When you say "simple tax return," which I always thought the problem is that people don't understand what "simple" means. Simple to one person

isn't simple to another. That is the deception; that people will think that "simple" means something which it doesn't mean . . . [T]he terms "simple" doesn't – doesn't appropriately elucidate, appropriately encompass the disclaimer that ought to be considered by the consumer when the consumer gets on this website.

RX73 at 38.[13] To this point, some consumers believed that "simple" in Intuit's

marketing meant it would be easy to file their tax return:

> They advertise free simple filing. No! Absolutely not. I'd be done by now if I just avoided this awful company. I have one W-2 in one state and no deductions. How much more simple can that get? They want to charge me $168 to file that, despite saying it will be free…![14]

*See* Comm. Op. 44 (with one type of ad "the context made it read as if filing online

would be simple, rather than as any kind of qualification on offer eligibility").

Even paying lawyerly attention to the ads, consumers watching and reading Intuit's

ads could hardly have understood that its product was only available to about one-

third of taxpayers, or what "simple" meant to Intuit (especially as its definition of

"simple" changed over time). Comm Op. 43 ("A 'simple tax returns only'

---

[13] Intuit cherry-picks Judge Breyer's statements from the April 2022 motion hearing. *See* Pet'r's Br. at 15, 19. In fact, Judge Breyer acknowledged that the product was likely deception. RX73 at 38. Moreover, the court denied the FTC's motion for emergency relief because Tax Day had already passed, Intuit had already removed several advertisements at issue, and, because the FTC had already brought an administrative proceeding against Intuit, an Administrative Law Judge "with expertise in these matters" would likely rule on the issues before Intuit resumed its advertising campaign in the lead-up to the next Tax Day. RX 74 (April 22, 2022 Order Denying Motion for Emergency Relief).

[14] Nicholas D., Customer Review: Intuit Inc., BETTER BUS. BUREAU (Feb. 19, 2022), https://perma.cc/S4AX-X8GZ.

disclosure is anything but clear and unambiguous. Simply put, the phrase does not leave consumers with an accurate impression."). *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

Not only was Intuit's qualifying language inadequate and misleading, but it was often placed in inconspicuous fine print, while the "full details" of the offer were relegated to TurboTax's website. *See, e.g.*, Comm. Op. 25. Placing such qualifiers in inconspicuous or far-off locations ensured that consumers would generally not see them. And thus, the overall net impression of the marketing remained deceptive. *Id.* at 4-32. *See FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1080 (11th Cir. 2021) (disclosures were either "too small or too vague to dispel the misrepresentations otherwise created by the websites"); *Commerce Planet*, 642 Fed. App'x at 682 (consumers were likely to be deceived where, among other things, material terms of a transaction were "accessible primarily through a link on the web page, which appeared in small text in blue font on a blue background on an otherwise busy web page."); *Cyberspace.com*, 453 F.3d at 1200 (net impression of the marketing was deceptive despite the presence of small-print

disclosures); *Spiegel*, 494 F.2d at 63 ("The conditions were not stated or located in such a way that customers, without undue difficulty, would understand that the 'free trial' … offers were not truly free but were conditioned on the customer meeting [the company's] credit criteria."); *FTC v. US Sales Corp.*, 785 F. Supp. 737, 751 (N.D. Ill. 1992) ("'fine print'" disclaimers at the bottom of the screen in the final seconds of the television commercial" were "simply not readable and ha[d] no effect on the overall net impression of the advertisement"); *see also Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 476 (7th Cir. 2020) (holding that "an accurate fine-print list of ingredients does not foreclose as a matter of law a claim that an ambiguous front label deceives reasonable consumers").

Consumers were not able to make a rational decision regarding Intuit's free tax service as the company's advertisements—which used the alluring catchphrase of "free" and paired it with generally inconspicuous and ambiguous disclosure language that omitted necessary material facts—failed to disclose who was actually eligible. In short, Intuit's marketing was deceptive. *See Cotherman*, 417 F.2d at 589 (affirming FTC finding that a home loan company engaged in deceptive advertising where it advertised favorable loan terms that were available only "to borrowers who qualify for such loans" but, in reality, few applicants qualified).

### III.    Ratifying Intuit's Marketing Practices Would Undermine The Purpose Of Consumer Protection Laws.

Intuit appears to admit to ambiguity in its marketing as to who could and could not use its free tax filing service.[15] So, it pivots to claim that reasonable consumers were not misled by its lack of transparency as to who could or could not use its free service because (1) only a limited number of consumers publicly complained, and (2) quite apart from the marketing at issue, with enough time, effort and research, consumers could become well-versed in the limitations and criteria required to file tax returns using TurboTax Free Edition.

Intuit's burden shifting approach would inflict systemic damage on the American economy. The typical consumer has neither the time nor the inclination to vet every brand's marketing claims. To be sure, lying to consumers can be a highly successful business strategy. As in this case, what TurboTax does actually offer to *any* consumer is the paid version of its software, which comes in several different price tiers. Consumer welfare is lost when money set aside to purchase

---

[15] Pet'r's Br. 7, 40 (The ads "invited consumers to visit—or linked directly to—TurboTax.com, where consumers could 'see if [they] qualify' or 'see details' about the free product"; "Even if consumers were unfamiliar with free-tax-preparation offers or did not know the precise meaning of 'simple tax return,' reasonable consumers do not expect ads to provide every last detail. Instead, they understand (especially with online products) that full details are available elsewhere." (citations omitted)).

needed products instead flows to sellers who mislead consumers[16]—an issue that

arose for several consumers trying to use Intuit's free tax service:

> "I am on Supplemental Security Income and Intuit charged me for filing online. I thought this was supposed to be a free file for simple and low income individuals. Why are you making this so complicated to find the free file option? The fee is a significant chunk of my monthly stipend and I can't afford this."[17]

> "I feel I have been mislead, that I only needed the free service, and now I'm going to be in the red until next month because I'm on Disability. I called them, begging them to refund me because I really did only want the free version and was tricked into paying this ridiculous amount …. I'm going to starve this month, I didn't get really any money or service from Turbo Tax."[18]

---

[16] Even though non-qualifying consumers could abandon the tax filing process once they realized they did not qualify for TurboTax Free Edition, the reality is that by the time many consumers were informed they needed to pay in order to proceed, they had already spent time and effort inputting their personal and financial information into the program. Given that there is a general tendency for people to continue an endeavor after they have invested time and resources, and given the rush that many people experience in preparing and submitting their taxes, it is not surprising that taxpayers simply paid TurboTax instead of abandoning the process. *See* Dr. Ross B. Steinman & Emily Jacobs, *Sunk Cost Effects on Consumer Choice*, 4 BUS. MGMT. DYNAMICS 25-30 (2015); Jamie Ducharme, *The Sunk Cost Fallacy Is Ruining Your Decisions. Here's How*, TIME (July 26, 2018). *See* Katrina G., Customer Review: Intuit Inc., BETTER BUS. BUREAU (Apr. 6, 2022) ("TURBOTAX IS NOT FREE. Turbotax says 'simple returns' are free. My return was simple. I ONLY had 2 W2s and 2 dependents. Turbotax charges you for the forms. I could not process my taxes using the 'F[r]ee edition' because I was claiming childcare. I was required to upgrade, …. I spent too much time, to be mislead…."), https://perma.cc/P2C3-DPSS.

[17] Initial Complaint, Intuit Inc., BETTER BUS. BUREAU (Apr. 12, 2023), https://perma.cc/YZD9-E9BB.

[18] Initial Complaint, Intuit Inc., BETTER BUS. BUREAU (June 16, 2023), https://perma.cc/UZ77-4XBK.

Moreover, Intuit's suppositions depend on serious misunderstandings of

typical consumer behavior. For example, it is well-established that consumers who

have fallen victim to deception and fraud generally do not complain publicly.[19] In

fact, for a variety of reasons, "'the actual complaining customer' is a rarity."[20]

---

[19] *See* Keith B. Anderson, *To Whom Do Victims of Mass-Market Consumer Fraud Complain?*, SSRN (May 2021), https://perma.cc/8V54-YKWE (study showed that only 30 percent of victims complained to a seller or manufacturer and less than 3 percent complained to a government entity); *accord* Jean Braucher, *An Informal Resolution Model of Consumer Product Warranty Law*, 1985 WIS. L. REV. 1405, 1450-1 (1985) ("The percentage of noncomplainers has been reported as high as two-thirds of persons who perceived a problem.").

[20] Amy J. Schmitz, *Access to Consumer Remedies in the Squeaky Wheel System*, 39 PEPP. L. REV. 279, 312 (2012). Underreporting may be due to: (1) cultural reasons (living in an American society that generally frowns on complainers, the stigma of victimization, lack of trust in authorities, thinking law enforcement agencies will not take their complaint seriously, feeling there is little authorities can do to hold perpetrators accountable); (2) psychological reasons (self-blame, shame, fear, embarrassment, disbelief, doubt about their own judgment, a sense of betrayal, cognitive dissonance, confirmation bias, over-optimism, fatalistic attitude about their own plight, consumers not wanting to perceive themselves as complainers); (3) practical reasons (lack of time, knowledge, experience, and information regarding the filing of complaints, thinking nothing will come of the complaint even if one is submitted); and (4) socioeconomic reasons (consumers with lower socioeconomic status often become accustomed to poor treatment and have lower expectations regarding their purchases). *Id.* at 290-300. *See also* Marguerite DeLiema & Paul Witt, *Profiling Consumers Who Reported Mass Marketing Scams: Demographic Characteristics and Emotional Sentiments Associated With Victimization*, SECUR. J. (2023), https://perma.cc/J8PE-8PQV; Amy J. Schmitz, *Remedy Realities in Business-to-Consumer Contracting*, 58 ARIZ. L. REV. 213 (2016); U.S. Dep't of Justice, RIGHTS, ROLES, AND RESPONSIBILITIES: A HANDBOOK FOR FRAUD VICTIMS PARTICIPATING IN THE FEDERAL CRIMINAL JUSTICE SYSTEM (1998), https://perma.cc/ZVT3-FZNV; Braucher, *supra* note 19, at 1451-52.

*FTC v. Pantron I Corp.*, 33 F.3d 1088, 1098 (9th Cir. 1994) (consumers do not

complain "because they think it not worth the trouble, because they feel guilty for

having been deceived, because they [blame themselves], or for any one of a

number of other reasons").

Moreover, a paucity of consumer complaints does not give Intuit carte

blanche to engage in deceptive marketing. As the Supreme Court explained in *FTC*

*v. Standard Education Society*, "[l]aws are made to protect the trusting as well as

the suspicious. The best element of business has long since decided that honesty

should govern competitive enterprises, and that the rule of *caveat emptor* should

not be relied upon to reward fraud and deception." 302 U.S. 112, 116 (1937). Even

if some consumers may not fall victim to misleading advertising, that does not

change the character of the deception, which is why courts have continually held

that "the existence of some satisfied customers does not constitute a defense to a §

5 action." *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1206 n.8 (10th Cir.

2005); *see also FTC v. Stefanchik*, 559 F.3d 924, 929 n.12 (9th Cir. 2009) (quoting

same); *Basic Books, Inc. v. FTC*, 276 F.2d 718, 721 (7th Cir. 1960) ("The fact that

petitioners had satisfied customers was entirely irrelevant. They cannot be excused

for the deceptive practices here shown and found, and be insulated from action by

the Commission in respect to them, by showing that others, even in large numbers,

were satisfied with the treatment petitioners accorded them."); *FTC v. Amy Travel*

*Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989) (same), *overruled on other grounds by FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019).

The mandate to provide clear and conspicuous disclosure of material facts in marketing is required to ensure that consumers can make well-informed decisions. But Intuit advocates for doing away with such disclosures and instead requiring that consumers independently remediate any misleading impressions that an advertising campaign conveys—a standard that, if applied to all ads, would leave consumers exposed to constant deceptive omissions. To avoid the harms that its ads created, Intuit argues that it was up to consumers to discover the "full details" of its offer on TurboTax.com, and these same industrious consumers would also conduct online research, consult friends, family and/or reviews, and "otherwise examin[e] alternatives" in order to "reveal[] information about TurboTax's free-product qualifications …." Pet'r's Br. 40. [21] Such a standard would thrust the door

_____

[21] There is widespread consensus, however, that consumers rarely click on links or read information related to website services. *See* Florencia Marotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, 78 U. CHI. L. REV. 165, 178-79 (2011) (click through rates to access terms were only 8 of 11,184 visits to sites offering a hyperlink to a list of terms next to a clickable "I AGREE" box, and 40 of 120,545 visits to sites offering a hyperlink to the boilerplate terms without an "I AGREE" box); Yannis Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to Standard-Form Contracts*, 43 J. LEGAL STUD. 1, 1 (2014) ("We find that only one or two of every 1,000 retail software shoppers access the license agreement and that most of those who do access it read no more than a small portion."). Moreover, even courts holding consumers to a high standard of reasonableness when it comes to ambiguous front-of-label claims have emphasized

of deception wide open, allowing clearly misleading statements to escape FTC

enforcement, thereby thwarting the underlying purpose of consumer protection.

*See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) ("[C]aveat emptor is

simply not the law."); *Donaldson*, 333 U.S. at 189 ("People have a right to assume

that fraudulent advertising traps will not be laid to ensnare them."); *Bell*, 982 F.3d

at 477 ("Deceptive advertisements often intentionally use ambiguity to mislead

consumers while maintaining some level of deniability about the intended

meaning…. [A] rule that immunized any ambiguous label so long as it is

susceptible to one non-deceptive interpretation would validate highly deceptive

advertising. Sticking to the reasonable consumer standard avoids this temptation

and stays in touch with real consumer behavior.") (internal citations and quotations

omitted).

Bad advertising can drive out good: When consumers become suspicious of

advertising claims, persuading them that an honest representation is true becomes

more costly—a special obstacle for new market entrants, who account for a

disproportionate share of innovative products, but who must rely on advertising to

---

that consumers should not be required to conduct independent research; qualifications or clarifications should be readily available to them as part of the advertiser's initial message. *See, e.g.*, *La Barbera v. Olé Mexican Foods Inc.*, 2023 WL 4162348 (C.D. Cal. May 18, 2023) (reasonable consumers, while sometimes needing to consult the back of a package, need not use the company's website or compare reviews online).

overcome consumer wariness. Capital is likewise misdirected to fraudulently successful businesses. *See Spiegel*, 494 F.2d at 63 ("If sellers in our society are free to compete for consumers' patronage with others by unfair advertising, not only is the consumers' right violated, but our commitment to fair competition becomes a pretense.").

If Intuit has its way, companies will have free rein to manipulate consumers with deceptive and misleading marketing messages and then be able to blame the consumer for not uncovering the truth—effectively undoing truth in advertising requirements. But consumer protection laws are vital to ensure that our market-based economy works in the economic interest of both consumers and honest business, and thus benefits society as a whole. This is the essence of consumer protection, and Intuit's efforts to drive the FTC off this enforcement field will only disserve the interests in fair, rational and coherent consumer protection. As the Supreme Court warned nearly a century ago, "[t]he careless and the unscrupulous must rise to the standards of the scrupulous and diligent. The Commission was not organized to drag the standards down." *FTC v. Algoma Co.*, 291 U.S. 67, 79 (1934) (citations omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the petition for review of the FTC's Final Order dated January 19, 2024.

Dated: June 21, 2024

Respectfully submitted,

/s/ David S. Nahmias
David S. Nahmias
Seth E. Mermin
CENTER FOR CONSUMER LAW &
ECONOMIC JUSTICE
308 Berkeley Law
Berkeley, CA 94720-7200
dnahmias@law.berkeley.edu
(510) 982-5566

Bonnie L. Patten
Laura D. Smith
Eliza J. Duggan
TRUTH IN ADVERTISING, INC.
736 Boston Post Rd., Suite 2
Madison, CT 06443

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>*/s/ David S. Nahmias*</u>
David S. Nahmias

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,399 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type.


*/s/ David S. Nahmias*
David S. Nahmias

*Counsel for Amici Curiae*