No. 24-60040

# In the United States Court of Appeals for the Fifth Circuit

INTUIT, INCORPORATED,

*Petitioner*,

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

*On Petition for Review of an Order of the
Federal Trade Commission*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Smita Ghosh
CONSTITUTIONAL
 ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation. In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: June 21, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ................. i

CORPORATE DISCLOSURE STATEMENT .................................. ii

TABLE OF CONTENTS .................................................... iii

TABLE OF AUTHORITIES ............................................... iv

INTEREST OF *AMICUS CURIAE* ......................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

ARGUMENT .............................................................. 6

    I.    Prospective Relief Does Not Implicate "Private Rights" Because Regulated Parties Do Not Have a Vested Right to Be Free from Future Regulation ................................................... 6

    II.   The FTC's Cease-and-Desist Orders Do Not Implicate Private Rights and Therefore Need Not Be Issued by Article III Courts ........ 14

    III.  The FTC Act's History and Structure Are Consistent with the Understanding that Cease-and-Desist Orders Do Not Infringe on Private Rights ........................................................ 21

CONCLUSION ........................................................... 28

CERTIFICATE OF SERVICE .............................................. 1A

CERTIFICATE OF COMPLIANCE .......................................... 2A

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996) ........................................................................... 13, 14

*Agostini v. Felton*,
    521 U.S. 203 (1997) ........................................................................... 17

*AMG Cap. Mgmt., LLC v. F.T.C.*,
    593 U.S. 67 (2021) ............................................................................. 1, 21

*Axon Enter., Inc. v. F.T.C.*,
    598 U.S. 175 (2023) ........................................................................... 7

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
    575 U.S. 138 (2015) ........................................................................... 7

*Bos. Beer Co. v. Massachusetts*,
    97 U.S. 25 (1877) ............................................................................... 11, 13

*Cal. Dental Ass'n v. F.T.C.*,
    526 U.S. 756 (1999) ........................................................................... 1

*Charles River Bridge v. Warren Bridge*,
    36 U.S. 420 (1837) ............................................................................. 9, 10

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986) ........................................................................... 15

*Crowell v. Benson*,
    285 U.S. 22 (1932) ............................................................................. *passim*

*F.T.C. v. E.M.A. Nationwide, Inc.*,
    767 F.3d 611 (6th Cir. 2014) ............................................................. 18

*F.T.C. v. Klesner*,
    280 U.S. 19 (1929) ............................................................................. 27

iv

**TABLE OF AUTHORITIES – cont'd**

Page(s)

*Foster v. President, etc., of Essex Bank*,
   16 Mass. 245 (1819)................................................................ 3

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935)............................................................... 1

*I.C.C. v. Ill. Cent. R.R. Co.*,
   215 U.S. 452 (1910)............................................................. 25

*In re Nightingale*,
   28 Mass. 168 (1831)........................................................ 12, 13

*Int'l Shoe Co. v. F.T.C.*,
   280 U.S. 291 (1930)............................................................. 15

*Jarkesy v. S.E.C.*,
   34 F.4th 446 (5th Cir. 2022) ............................................ *passim*

*Johnson v. Towsley*,
   80 U.S. 72 (1871)................................................................. 7

*Marbury v. Madison*,
   5 U.S. 137 (1803)................................................................. 9

*Miller v. French*,
   530 U.S. 327 (2000)......................................................... 17, 20

*Motor Improvements v. A.C. Spark Plug Co.*,
   80 F.2d 385 (6th Cir. 1935)................................................. 19

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. 272 (1856)............................................................... 6

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982)....................................................... 2, 15, 16

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
    59 U.S. 421 (1855).............................................................. *passim*

*People v. Hawley*,
    3 Mich. 330 (1854)............................................................... 11

*People v. Morris*,
    13 Wend. 325 (N.Y. Sup. Ct. 1835)...................................... 12

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995)........................................................... 19, 20

*President, etc., of Portland Bank v. Apthorp*,
    12 Mass. 252 (1815)......................................................... 3, 12, 13

*SBC Commc'ns, Inc. v. F.C.C.*,
    154 F.3d 226 (5th Cir. 1998)................................................ 16

*Stern v. Marshall*,
    564 U.S. 462 (2011)............................................................ 15

*Thorpe v. Rutland & Burlington R. Co.*,
    27 Vt. 140 (1854).............................................................. 12

*Tull v. United States*,
    481 U.S. 412 (1987).......................................................... 18

*Vanderbilt v. Adams*,
    7 Cow. 349 (N.Y. Sup. Ct. 1827)........................................ 12

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015)........................................................... 7

*Wynehamer v. People*,
    13 N.Y. 378 (1856) ........................................................... 10, 11

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Constitutional Provisions, Statutes, and Legislative Materials

An Act to Amend an Act Entitled "An Act to Regulate Commerce,"
   Pub. L. No. 59-337, 34 Stat. 584 (1906) ........................................... 24

An Act to Create a Federal Trade Commission, Pub. L. 63-203, 38
   Stat. 717 (1914) ................................................................................... 1

51 Cong. Rec. (1914) ................................................................. *passim*

Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-
   447, 52 Stat. 111 (1938) ...................................................................... 25

H.R. Rep. 75-1613 (1938) ............................................................ 26, 27

Magnuson-Moss Warranty—Federal Trade Commission Improvement
   Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975) ................................... 27

S. Rep. 63-597 (1914) ................................................................. 22, 24

S. Rep. 75-221 (1938) ............................................................. 5, 26, 27

*To Amend the Act Creating the Federal Trade Commission, Hearing
   Before H. Comm. Interstate & Foreign Com.*, 75th Cong. 2d Sess.
   (1937) ................................................................................................ 26

*To Amend the Federal Trade Commission Act, Hearings Before S.
   Comm. Interstate Com.*, 74th Cong. 2d Sess. (1936) ...................... 25, 26

15 U.S.C. § 45 ........................................................................ 1, 17, 21

15 U.S.C. § 57b ............................................................................... 21

15 U.S.C. § 77q ............................................................................... 16

15 U.S.C. § 78j ............................................................................... 16

# TABLE OF AUTHORITIES – cont'd

Page(s)

15 U.S.C. § 78u-2 ............................................................... 17, 18

15 U.S.C. § 80b-6 ............................................................... 16

<u>Books, Articles, and Other Authorities</u>

7 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks & Monopoly* (4th ed. 2023) ............................................ 17

William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511 (2020) ............................................ 4, 6

3 William Blackstone, *Commentaries on the Laws of England* (1768) ............................................ 18

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* (1868) ............................................ 3, 8, 11, 13

Edward Corwin, *Basic Doctrine of American Constitutional Law*, 12 Mich. L Rev. 247 (1914) ............................................ 3, 11, 12

6 Gaillard Hunt, *The Writings of James Madison* (1906) ............................................ 3, 12

Interstate Commerce Commission, *Annual Report* (1916) ............................................ 24

Gary S. Lawson, *The Rise and Rise of the Administrative State*, 107 Harv. L. Rev. 1231 (1994) ............................................ 6

Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559 (2007) ............................................ *passim*

Caleb Nelson, *Vested Rights, "Franchises," and the Separation of Powers*, 169 U. Pa. L. Rev. 1429 (2021) ............................................ 8, 10, 12

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Theodore Sedgwick, *A Treatise on the Rules Which Govern the Interpretation and Construction of Statutory and Constitutional Law* (1857) ................................................................................. 3

2 I. L. Sharfman, *The Interstate Commerce Commission: A Study in Administration Law and Procedure* (1931) ....................................... 24

Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control, and Competition*, 71 Antitrust L.J. 1 (2003) ............................................................................................ 22, 23, 24

Gordon S. Wood, Lecture, *The Origins of Vested Rights in the Early Republic*, 85 Va. L. Rev. 1421 (1999) ................................................ 8, 11

11 Charles Alan Wright et al., *Federal Practice and Procedure* (3d ed. 2024)................................................................................................. 19

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works to improve understanding of the Constitution and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For almost a century, the Federal Trade Commission (FTC) has been "empowered and directed" to prevent persons, partnerships, or corporations from engaging in unfair or deceptive acts or practices. 15 U.S.C. § 45(a)(2); *Humphrey's Executor v. United States*, 295 U.S. 602, 620 (1935). And since its inception, the FTC has been authorized to use its "own administrative proceedings" to issue orders requiring parties to cease and desist from engaging in conduct that the Commission determines to be unlawful. *AMG Cap. Mgmt., LLC v. F.T.C.*, 593 U.S. 67, 71-72 (2021); *see* An Act to Create a Federal Trade Commission, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719-20 (1914). This power enables the Commission to protect consumers and the marketplace by blunting the well-known "anticompetitive effect" of false and misleading advertising. *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 771 n.9 (1999).

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

Notwithstanding this long history, Intuit claims that the FTC impermissibly "adjudicated private rights reserved for Article III courts," Pet'r Br. 30, when it issued a cease-and-desist order requiring the company to refrain from advertising its tax services as "free" when those services are, in fact, not free for most customers, *see* Order, Intuit Stay Op. Ex. B, § IB, Dkt. No. 34-4.  This is wrong.  Whatever the precise scope of "private rights reserved for Article III courts," Pet'r Br. 30, orders for prospective relief, including the FTC's cease-and-desist orders, do not interfere with such rights.

The history of the public rights doctrine makes this clear.  Although the Supreme Court has not "definitively explained" all of the distinctions between public and private rights, *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 (1982), "private rights" are generally understood to be those legal interests that have fully "vested" in private persons, *see, e.g.*, Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 565 (2007) [hereinafter *Adjudication*].  And no individual or company enjoys a vested right to conduct its business, use its property, or advertise its wares without government intervention.  *Id.* at 598.

As early as the nineteenth century, when the Court first articulated the public rights doctrine, courts and commentators made clear that there was no such thing as a vested right to be exempt from regulation when running a business.  *See, e.g.*,

Edward Corwin, *Basic Doctrine of American Constitutional Law*, 12 Mich. L Rev. 247, 275-76 (1914) ("[N]o one would have thought of suggesting before the Civil War that the right to engage in trade, the right to contract, the right . . . of the individual 'in the use of his faculties,' were 'vested rights.'" (quoting 6 Gaillard Hunt, *The Writings of James Madison* 101 (1906))). Then, as now, individuals and companies lacked "a vested right to avoid orders directed to the future." Nelson, *Adjudication*, *supra*, at 598. Because "[a]ll vested rights [we]re held subject to the laws," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 358 (1868), there simply was no vested right to avoid future regulation.

For this reason, prospective regulations did not affect the vested rights of businesses, even if they prevented those businesses from selling or advertising in a particular manner. Corwin, *supra*, at 273-75 (describing challenges to "legislative measures designed . . . to regulate business"). The right to carry on business was a "privilege" that was always subject to future government regulation. *President, etc., of Portland Bank v. Apthorp*, 12 Mass. 252, 256-57 (1815).

Given that no person or business has a "vested right to do wrong," Theodore Sedgwick, *A Treatise on the Rules Which Govern the Interpretation and Construction of Statutory and Constitutional Law* 694 (1857) (quoting *Foster v. President, etc., of Essex Bank*, 16 Mass. 245, 273 (1819)), agencies do not

3

adjudicate private rights when they employ their "powers of prospective regulation," William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1545 (2020); *cf.* Nelson, *Adjudication*, *supra*, at 597-98 (noting that agencies, including the FTC, have "considerable power to act with the force of law in regulating future conduct").

Significantly, neither this Court nor the Supreme Court has ever held that an administrative proceeding in which the government seeks only prospective relief impermissibly adjudicates private rights. This is unsurprising: unlike monetary damages or penalties, actions for prospective relief seek future compliance, rather than "redress." *Jarkesy v. S.E.C.*, 34 F.4th 446, 458 (5th Cir. 2022). And unlike the penalty at issue in *Jarkesy*, which government actors have pursued in common-law courts since the age of Blackstone, *id.* at 455, there is no history—let alone a history dating back "centuries," *id.*—of the government using common-law courts to seek prospective relief in false advertising cases. Finally, prospective relief differs from financial penalties or damages because any rights established by prospective relief are subject to subsequent changes in law, *see Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 432 (1855), and the Supreme Court has explained that "congressional control" is what distinguishes public rights from "private" ones for the purpose of Article III, *Crowell v. Benson*, 285 U.S. 22, 50 (1932).

The structure of the FTC Act aligns with this understanding of the public rights doctrine. In establishing the FTC, Congress sought to create an agency that would redress unfair or deceptive business practices without "usurp[ing] judicial powers." 51 Cong. Rec. 12,652 (1914) (Sen. Cummins). The Act thus permits the FTC to authorize prospective relief on its own, but requires judicial involvement for penalties and other monetary remedies to be assessed. When empowering the FTC to issue cease-and-desist orders, Congress explained that the Commission's jurisdiction extended only to proceedings "in the public interest," emphasizing that its orders would be "merely preventive and cooperative rather than penal." S. Rep. No. 75-221, at 1-2 (1938). In doing so, Congress sought to ensure that the Commission did not become a "forum where private disputes or controversies between competitors should be settled." *Id.* at 2.

In short, there is no basis in history or case law for Intuit's claim that it has a "private right" to advertise without government intervention that must be adjudicated in an Article III court, Pet'r Br. 30. This Court should reject that claim.

## ARGUMENT

I.  **Prospective Relief Does Not Implicate "Private Rights" Because Regulated Parties Do Not Have a Vested Right to Be Free from Future Regulation.**

**A.**  As the Supreme Court long ago explained, "private right[s]" must be adjudicated in "the common law, . . . equity, or admiralty" courts, while Congress can provide for "matters . . . involving public rights" to be resolved in other forums, *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856).

While the Supreme Court has not fully elucidated all the distinctions between "private" rights and "public" ones, private rights are generally understood to include rights that have fully "vested."  *See* Nelson, *Adjudication*, *supra*, at 565; Baude, *supra*, at 1542 ("[T]he Constitution's structure itself required a court before somebody could be deprived of a vested right.").  Because authorizing deprivations of private rights is the "substance of judicial power," scholars contend that the Constitution prevents non–Article III tribunals from making such authorizations. Baude, *supra*, at 1513; *see id.* at 1536 ("[T]he so-called 'public rights' doctrine really describes a set of adjudications that are permissible because they are a form of executive power . . . ."); Nelson, *Adjudication*, *supra*, at 565; Gary S. Lawson, *The Rise and Rise of the Administrative State*, 107 Harv. L. Rev. 1231, 1247 (1994) (positing that "the Article III inquiry merges with questions of due process:

if the government is depriving a citizen of 'life, liberty, or property,' it . . . requires an Article III court" (footnote omitted)).

Justice Thomas endorsed this approach in *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).  Dissenting from the Court's conclusion that Congress could authorize non–Article III bankruptcy judges to adjudicate private rights with the parties' consent, Justice Thomas observed that "an exercise of the judicial power is required 'when the government want[s] to act authoritatively upon core private rights that ha[ve] vested in a particular individual.'" *Id.* at 713 (Thomas, J., dissenting) (citing Nelson, *Adjudication*, *supra*, at 569).  As Justice Thomas explained, nineteenth-century American jurisprudence indicates that a "vested right"—for example, "legal title" to land—could only "be divested according to law," *id.* at 715 (quoting *Johnson v. Towsley*, 80 U.S. 72, 84-85 (1871)), but a party without a vested right "could not invoke the intervention of Article III," *id.*  For that reason, Justice Thomas has suggested that Article III adjudication is necessary in cases involving "private property right[s]," including the "right to adopt and exclusively use a trademark," *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 172 (2015) (Thomas, J., dissenting), and the right to possess monetary or intellectual property, *Axon Enter., Inc. v. F.T.C.*, 598 U.S. 175, 203-04 (2023) (Thomas, J., concurring).

7

**B.** The "private rights" that Intuit describes, *see* Pet'r Br. 30, are not vested rights. As Justice Thomas's opinions suggest, vested rights include the rights to "life and physical liberty," as well as "legal interests that count[] as real or personal property," including various interests acquired by contract. Caleb Nelson, *Vested Rights, "Franchises," and the Separation of Powers*, 169 U. Pa. L. Rev. 1429, 1433-34 (2021) [hereinafter *Vested Rights*]. But the interests protected by the vested rights doctrine do not include the right to conduct or advertise one's business without being subject to valid government regulation. *Cf.* Pet'r Br. 30 ("right to advertise"); AFP Br. 3 ("economic liberty and freedom of speech"). While the definition of vested rights has always been elastic and "inevitably somewhat arbitrary," Nelson, *Vested Rights*, *supra*, at 1435, it has never been nearly as broad as Intuit suggests.

In the early nineteenth century, when Americans first conceptualized the vested rights doctrine, *see* Gordon S. Wood, Lecture, *The Origins of Vested Rights in the Early Republic*, 85 Va. L. Rev. 1421, 1442-44 (1999), there was no private right to be free from government intervention in the future. Unlike one's property or bodily integrity, a person's "mere expectation" could not form a vested right. Cooley, *supra*, at 359. As the Supreme Court put it, any valid government action was "competent authority" to "modif[y]" a party's right to do something in the future. *Wheeling*, 59 U.S. at 432.

In *Wheeling*, the state of Pennsylvania acquired an injunction from the Supreme Court ordering the Wheeling Bridge Company to remove a bridge that blocked maritime traffic to Pittsburgh. *Id.* at 429. Several months later, Congress passed a statute explicitly permitting the bridge and declaring it to be a post road. *Id.* Pennsylvania challenged the law, arguing that it violated the state's private right to the relief authorized by the injunction. *Id.* at 431. While the Court acknowledged that parties have "private rights" to court judgments that could not be "annul[led]" by acts of Congress, it distinguished between prospective and retrospective relief. *Id.* Although a judgment for costs or damages would be "beyond the reach of the power of congress" to disturb, a "continuing decree" was always subject to future regulation. *Id.* at 431-32. In other words, Pennsylvania's right to the prospective relief protected by the injunction was incapable of becoming a vested right that would be shielded from "subsequent law." *Id.* at 431.

Even the most zealous champions of the vested rights doctrine conceded that a future right only vested when it was based on an agreement that formed a contract or "legal title." *Marbury v. Madison*, 5 U.S. 137, 165-68 (1803) (comparing Marbury's commission to a grant in land, and noting that Marbury had "legal title to the office [and] a consequent right to the commission"). In *Charles River Bridge v. Warren Bridge*, 36 U.S. 420 (1837), the Supreme Court held that Massachusetts could authorize the construction of the Warren Bridge between

Boston and Charlestown, even though it had previously granted a charter to the Charles River Bridge Company to construct a bridge between the two towns, and the new bridge would significantly impair the value of the Charles River Bridge Company's charter. *Id.* at 536-38. Justice Story dissented on the ground that the state's action interfered with the vested rights of the Charles River Bridge Company, but made clear that the diminution of profit alone would not amount to such a violation. Rather, the vested right that Story envisioned stemmed from the charter between the state and the company, which, according to Story, implied "an exclusive franchise" for the company and an obligation on the part of the state not to interfere with the bridge's operation. *Id.* at 613 (Story, J., dissenting); *see* Nelson, *Vested Rights*, *supra*, at 1460 (a company could gain private rights when "the incorporators' acceptance of the terms offered by the state" created a contract or franchise).

For this reason, "prospective" laws that inhibited the plans of newly regulated parties did not infringe on their vested rights. *Wynehamer v. People*, 13 N.Y. 378, 487 (1856). In *Wynehamer*, for instance, a New York court considered the argument that a state prohibition law violated the defendant's "vested rights of property in liquor." *Id.* at 453. In doing so, the court distinguished between the law's impact on property owned when the law took effect and that acquired afterwards. The majority invalidated the act "in its operation upon property in

intoxicating liquors existing in the hands of any person . . . when the act took effect," *id.* at 486-87, but held that it "would be competent for the legislature to pass such an act" if it were merely "prospective as to the property on which it should operate," *id.* at 487; *see Bos. Beer Co. v. Massachusetts*, 97 U.S. 25, 32-33 (1877) (distinguishing "property actually in existence, and in which the right of the owner has become vested," from the "right . . . to manufacture and sell beer for ever").[2] Legislative changes could "affect the value and stability of private possessions, and strengthen or destroy well-founded hopes," without interfering with vested rights. Cooley, *supra*, at 358.

Thus, nineteenth-century Americans never understood vested private rights to be a bar to state regulations involving the conduct of business. Corwin, *supra*, at 275-76; *see generally* Wood, *supra*, at 1444 (describing state economic regulation in the early republic). For example, the Supreme Judicial Court of Massachusetts upheld a Boston ordinance prohibiting vendors from selling produce not "of [their] own farm" because it could not "be pretended to operate as a

---

[2] Even this point was contested. For many jurists, retrospective laws could affect property rights, as long as those laws did not fully deprive people of their property. *Wynehamer*, 13 N.Y. at 467 (Johnson, J., dissenting) (suggesting that even retrospective application of New York's prohibition law "in no respect affects the title, possession, personal use or enjoyment" of property possessed at the time of enactment); *People v. Hawley*, 3 Mich. 330, 342 (1854) (brewer had no property right in "investment of money in buildings and fixtures connected with his business of brewing ale," even when rendered useless by state law).

violation of private rights." *In re Nightingale*, 28 Mass. 168, 172, 174 (1831);

*accord Vanderbilt v. Adams*, 7 Cow. 349, 352 (N.Y. Sup. Ct. 1827) ("Every public

regulation in a city may, and does, in some sense, limit and restrict the absolute

right that existed previously. But this is not considered as an injury."); *People v.

Morris*, 13 Wend. 325, 329 (N.Y. Sup. Ct. 1835) ("[I]t will not be pretended that

the right to sell spirituous liquors falls within the most extended class of vested

rights."); *Thorpe v. Rutland & Burlington R. Co.*, 27 Vt. 140, 152 (1854) (railroad

regulation did not deprive companies of property because legislature can "impose

new obligations and restrictions upon these roads materially affecting their profits,

as by not allowing them to run in an unsafe condition").

Indeed, "no one would have thought of suggesting before the Civil War that

the right to engage in trade, the right to contract, the right . . . of the individual 'in

the use of his faculties,' were 'vested rights.'" Corwin, *supra*, at 275-76 (quoting 6

Hunt, *supra*, at 101); *cf.* Nelson, *Vested Rights*, *supra*, at 1471 ("[N]o one could

acquire a vested right to be exempt from core aspects of a state's police powers.").

Put another way, the right to carry on future business was not a vested right,

but instead a "privilege" that was always subject to future government regulation.

*Apthorp*, 12 Mass. at 256-57. In *Apthorp*, the Massachusetts Supreme Court

evaluated whether a state tax on banks conflicted with "the general principles or

any positive provisions of the [state] Constitution." *Id.* at 257. The court held that

any right to profit possessed by the bank was subject to whatever "excise or duty" the legislature "should transact during the continuance of the charter of incorporation." *Id.*; *see id.* (observing that the legislature could impose the "same conditions upon every other employment or handicraft"). Likening the corporation's right to "carry on any lawful business" to a "license" that "implied permission from the government," the court held that this "privilege" could be infringed by state taxes. *Id.* at 258.

As this history makes clear, Intuit's order cannot "be pretended to operate as a violation of private rights," *Nightingale*, 28 Mass. at 174, because it affects only Intuit's right to continue advertising—not any "property actually in existence," *Bos. Beer Co.*, 97 U.S. at 32. Although it "boldly" claims otherwise, Intuit has no right to sell its products "for ever, notwithstanding and in spite of any exigencies which may occur," *id.* at 33, much less to advertise those products however it sees fit. Its interest in continuing to publicize its services is a future interest, a "mere expectation," Cooley, *supra*, at 359, rather than a vested private right that implicates Article III. This history dooms Intuit's claim that it enjoys a "private right to advertise," Pet'r Br. 19.[3]

---

[3] The only case Intuit cites in support of its so-called "right to advertise" was a First Amendment challenge to an advertising regulation. *See* Pet'r Br. 30 (citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996)); *see also* Pet'r Br. Stay, Dkt. No. 34, at 18. That a government order cannot violate the First Amendment says nothing about whether businesses enjoy a "private right" to advertise in the

**II.     The FTC's Cease-and-Desist Orders Do Not Implicate Private Rights and Therefore Need Not Be Issued by Article III Courts.**

**A.** Precedent confirms that cease-and-desist orders, which require a party to refrain from violating the law in the future, do not implicate the sorts of "private rights" that must be adjudicated by Article III courts. Private rights concern "the liability of one individual to another under the law as defined," *Crowell*, 285 U.S. at 50-51, rather than obligations to the government that are subject to change over time. Thus, adjudicating private rights is "quintessentially about the *redress* of private harms" to individuals, *Jarkesy*, 34 F.4th at 458 (emphasis added), not the prevention of future harms to the public.

In *Crowell*, the Supreme Court examined the Longshoremen's and Harbor Workers' Compensation Act, which authorized an administrative agency to adjudicate workers' compensation claims against private parties. *Crowell*, 285 U.S. at 36-37. The Court distinguished between "cases of private right" and "those which arise between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Id.* at 50. Determinations within the latter category do

---

face of lawful government regulation. Indeed, as the Supreme Court acknowledged in *44 Liquormart*, the First Amendment does not prevent the regulation of "misleading, deceptive, or aggressive sales practices." 517 U.S. at 501; *see id.* at 528 (Thomas, J., concurring) (describing regulation of speech that "concerns lawful activity and is not misleading").

not "require judicial determination," the Court explained, because they are "completely within congressional control." *Id.*; *id.* at 51 (noting that "administrative agencies created for the determination of such matters are found in connection with the exercise of the congressional power as to interstate and foreign commerce"); *id.* at 51 n.13 (citing *Int'l Shoe Co. v. F.T.C.*, 280 U.S. 291 (1930)).

More recently, the Court concluded that a bankruptcy court could not adjudicate a debtor's common-law counterclaim of tortious interference against a third party because the claim was not a matter of public right. *Stern v. Marshall*, 564 U.S. 462, 494 (2011). Rather than focusing on the "restructuring of debtor-creditor relations, which is at the core of [Congress's] bankruptcy power," *id.* at 477 (quoting *N. Pipeline Constr. Co.*, 458 U.S. at 71), the counterclaim raised a private issue of state common law that Congress had "nothing to do with." *Id.* at 493. Furthermore, the counterclaim did not "flow from a federal statutory scheme," nor was it "completely dependent upon adjudication of a claim created by federal law." *Id.* at 493 (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 856 (1986)).

In *Jarkesy*, this Court determined that individuals who were ordered to pay civil fines by the Securities and Exchange Commission (SEC) were entitled to have a jury adjudicate the facts that justified those penalties. 34 F.4th at 457. Emphasizing the importance of "history" and the "form of the action," this Court

15

reasoned that the SEC's civil penalties are "analogous to traditional fraud claims" adjudicated in common-law courts. *Id.* at 458; *see id.* at 455 (noting that "[c]ommon-law courts have heard fraud actions for centuries, even actions brought by the government for fines"). Furthermore, the SEC's penalty was "quintessentially about the redress of private harms" and rested on "alleg[ations] that Petitioners defrauded particular investors." *Id*. at 458 (citing 15 U.S.C. §§ 77q(a), 78j(b), 80b-6). Finally, the Court reiterated the importance of congressional control, explaining that "the public-rights doctrine is grounded in a historically recognized distinction between matters that could be conclusively determined by the Executive and Legislative Branches and matters that are inherently judicial." *Id.* (quoting *N. Pipeline*, 458 U.S. at 68) (quotation marks and alterations omitted).

**B.** This precedent explains why the FTC's pursuit of purely prospective relief does not require adjudication in an Article III court. A cease-and-desist order like the one at issue here does not represent a final legal judgment—which resolves "the liability of one individual to another under the law as defined," *Crowell*, 285 U.S. at 51—but rather "ongoing equitable relief" that is always subject to change, *SBC Commc'ns, Inc. v. F.C.C.*, 154 F.3d 226, 245 (5th Cir. 1998) ("[I]t has long been clear that Congress may change the law underlying

ongoing equitable relief, even if . . . the change results in the necessary lifting of that injunction.").

Put differently, prospective orders are never "beyond the reach of the power of congress." *Wheeling*, 59 U.S. at 431. Courts are, in fact, required to adjust such orders in accordance with changes in the "factual and legal landscape." *Agostini v. Felton*, 521 U.S. 203, 215 (1997) ("A court errs when it refuses to modify an injunction or consent decree in light of such changes."); *Miller v. French*, 530 U.S. 327, 347 (2000) ("Prospective relief must be modified if . . . one or more of the obligations placed upon the parties has become impermissible under federal law." (quotation marks omitted)); *cf.* 7 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks & Monopolies* § 25:28 (4th ed. 2023) (describing the FTC's power to modify cease-and-desist orders "when justified by changed conditions of fact or law, or by the public interest").

Additionally, unlike the order in *Jarkesy*, the FTC's cease-and-desist order seeks to prevent future harm, rather than provide "redress" for past injuries. *Jarkesy*, 34 F.4th at 458. The FTC's authority to issue such orders does not hinge on allegations of losses suffered by individual consumers. *Compare* 15 U.S.C. § 45(b) (authorizing the FTC to issue cease-and-desist orders if it "would be to the interest of the public"), *with id.* § 78u-2(c)(2) (instructing the SEC to consider, in determining whether a penalty is appropriate, "the harm to other persons resulting

either directly or indirectly from [an] act or omission"); *id.* § 78u-2(b)(3)

(providing that certain penalties are appropriate for actions or omissions that

"resulted in substantial losses" to other persons).  In fact, as the FTC explained in

this case, "actual consumer deception is not necessary to establish" the need for a

cease-and-desist order, Intuit Stay Op. Ex. A, Dkt. No. 34-3, at 56 (quoting *F.T.C.

v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 633 (6th Cir. 2014)), and an order must

prevent future unlawful conduct, rather than "merely . . . halt[ing] the actual

violations found," *id.* at 85 (quotation omitted).

Furthermore, there is no history of the government issuing this type of order

at common law.  *Jarkesy*, 34 F.4th at 458.  In *Jarkesy*, this Court reasoned that

securities fraud actions were not "unknown to the common law" and had been

adjudicated by common-law courts for "centuries."  *Id.* at 455.  It also cited history

and precedent in support of its conclusion that courts had traditionally been the

forum in which the government sought fines and damages stemming from fraud.

*See* 3 William Blackstone, *Commentaries on the Laws of England* *42 (1768)

(describing civil jurisdiction over fraud actions in which the "defendant [was]

liable in strictness to pay a fine to the king, as well as damages to the injured

party"); *Tull v. United States*, 481 U.S. 412, 422 (1987) ("A civil penalty was a

type of remedy at common law that could only be enforced in courts of law.").

There is no such history here.  Indeed, because Intuit can point to no evidence that common-law courts ordered injunctive relief at the government's behest in false advertising cases, it instead argues, with a single citation to a 1935 case, that private parties "could obtain an injunction prohibiting challenged advertising" in common-law courts.  Pet'r Br. 31-32 (citing *Motor Improvements v. A.C. Spark Plug Co.*, 80 F.2d 385, 386 (6th Cir. 1935)).  But as that case makes clear, such injunctions prevented injury "to a competitor's rights," *id.*, rather than broadly protecting the public from deceptive and unfair practices, like the FTC's cease-and-desist orders.

**C.**  Rejecting Intuit's claim that it has a private right to advertise in the future would also be consistent with separation-of-powers precedent.  The Supreme Court has long distinguished between prospective-only decrees and "dispositive judgments" for separation-of-powers purposes.  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995); *see also* 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2863 (3d ed. 2024) (emphasizing the deep roots of the "distinction between the present and prospective effect of a judgment").

In *Plaut*, the Supreme Court evaluated a statute that would have reopened certain cases that courts had previously dismissed as time-barred.  514 U.S. at 214-15.  The Court held that the statute violated the separation of powers because it interfered with final judgments of the judiciary.  *Id.* at 240.  The Court was careful,

however, to distinguish between these "dispositive judgments" and orders granting

ongoing prospective relief. *Id.* at 219.  It explicitly confirmed the principle

established in *Wheeling*: the government can always change prospective orders

with future legislation. *Id.* at 232 (adding that "nothing in our holding today calls

[*Wheeling*] into question"); *see also Miller*, 530 U.S. at 342, 347 (Congress did not

"encroach[] on the central prerogatives of the Judiciary" by "establishing new

standards for the enforcement of prospective relief").

* * *

The Supreme Court has never suggested, let alone held, that a case involving

solely prospective relief implicates private rights and therefore must be adjudicated

in court—and for good reason.  Unlike a "dispositive judgment" that requires the

exercise of judicial power, *Plaut*, 514 U.S. at 219, prospective relief is inherently

"within congressional control" and subject to legislative change, *Crowell*, 285 U.S.

at 50.  The FTC's prospective orders prevent future harm to the public, rather than

provide "redress" for specific past injuries, and actions seeking these orders were

not "traditionally at home in Article III courts." *Jarkesy*, 34 F.4th at 458, 461.

They are, in other words, "distinctly public in nature." *Id.* at 458.  The structure

and history of the FTC Act is consistent with this understanding, as the next

Section discusses.

20

**III.    The FTC Act's History and Structure Are Consistent with the Understanding that Cease-and-Desist Orders Do Not Infringe on Private Rights.**

The structure of the FTC Act aligns with the view that the FTC's cease-and-desist orders do not infringe upon the vested private rights of regulated entities. The FTC Act allows the Commission to seek cease-and-desist orders in its own administrative proceedings, but permits courts—and only courts—to issue orders that could affect private rights.

Section 5 of the FTC Act prohibits both "[u]nfair methods of competition" and "unfair or deceptive acts or practices in or affecting commerce," and it authorizes the Commission to seek an order requiring parties to cease and desist from engaging in such conduct before an Administrative Law Judge.  15 U.S.C. § 45(a)(1); *id.* § 45(b).  By contrast, only courts can order parties to pay monetary penalties for violating these orders.  *Id.* § 45(l).  And only courts can order relief such as the "rescission or reformation of contracts, the refund of money or return of property, [and] the payment of damages."  *Id.* § 57b; *see AMG Cap. Mgmt.*, 593 U.S. at 77 ("Congress in § 5(l) and § 19 gave district courts the authority to impose limited monetary penalties and to award monetary relief in cases where the Commission has issued cease and desist orders").

The procedural division between orders halting unlawful activity and orders imposing monetary penalties or resolving contractual or property rights stems from

the original FTC Act.  When Congress passed Section 5 of the Act, it envisioned a

Commission that would "prevent corporations from using unfair methods of

competition in commerce" by issuing complaints, considering evidence, and, when

necessary, approving orders prohibiting unfair business practices.  S. Rep. No. 63-

597, at 13-14 (1914).  The Commission would be able to obtain judicial

enforcement of those orders, but it was the Commission, not the courts, that crafted

their terms and decided whether to issue them.  Proponents of the Commission

sought an enforcement mechanism that could "preserve free, fair competition in

the business life of the United States," 51 Cong. Rec. 12,742 (1914) (Sen.

Cummins), by preventing unfair practices even when courts and the Justice

Department failed to do so, *see* Marc Winerman, *The Origins of the FTC:*

*Concentration, Cooperation, Control, and Competition*, 71 Antitrust L.J. 1, 74

(2003).

　　　The Commission, in short, would have the power to address "incipient"

violations with cease-and-desist orders, *id.* at 88, while criminal penalties, fines,

and damages—the kinds of relief that could affect private rights—would have to

be sought from the courts.

　　　During debates about the original FTC Act, lawmakers distinguished the

Commission's cease-and-desist orders from orders that could affect vested private

rights.  In response to objections that the statute unlawfully delegated judicial

power to the Commission, lawmakers emphasized that the Commission could order only prospective relief.  "Under our Constitution we can not send an offender to jail . . . [or] impose upon him a fine," one Senator remarked, because that would "trespass upon or invade the judicial functions."  51 Cong. Rec. 12,652 (1914) (Sen. Cummins).  Clearly, though, Congress had "ample and abundant" authority to "prevent the recurrence of unfair competition" by empowering the Commission to issue cease-and-desist orders, *id.*, which merely determined "what rule shall guide a particular person or corporation in its future," *id.* at 12,916 (Sen. Cummins).

That understanding was widespread.  *See id.* at 13,144 (Sen. Brandegee) ("[A]ll we have empowered the commission to do [is] . . . when they have discovered, in their opinion, a case of unfair competition, to order it to cease."); *id.* at 13,145 (Sen. McCumber) ("The only thing that is devolved upon the commission is to ascertain . . . whether any person or corporation has been guilty of unfair competition."); *id.* at 14,937 (Rep. Stevens) ("The proceeding must not concern any injured individual; he must care for himself . . . but on behalf of the public in cases like that the commission may order the offender to cease and desist from that sort of practice.").  Moreover, lawmakers considered, but did not pass, an amendment that would have created a treble damage action for private parties injured by conduct declared unfair by the commission.  Winerman, *supra*, at 72-73.

And they repeatedly distinguished between the jurisdiction of the FTC and that of the Justice Department.  *See, e.g.*, S. Rep. No. 63-597, at 12-13 (1914); 51 Cong. Rec. 12,865 (1914) (Sen. Thomas); *id.* at 12,912 (Sen. Cummins).

Furthermore, the FTC's creators drew upon the legislation creating the Interstate Commerce Commission (ICC), which itself distinguished between prospective and monetary relief.  Winerman, *supra*, at 77 (noting that the ICC was an "exemplar" for proponents of the FTC Act).  After amendments in 1906, the ICC Act differentiated orders "for the payment of money" from other orders, requiring judicial involvement for monetary orders but authorizing the agency to issue non-monetary orders on its own.  *See* An Act to Amend an Act Entitled "An Act to Regulate Commerce," § 15, Pub. L. No. 59-337, 34 Stat. 584, 589 (1906). Courts also gave less deference to the ICC's reparations orders, which required carriers to repay illegally charged rates to customers, than to its other orders.  *See* Interstate Commerce Commission, *Annual Report* 75-76 (1916); 2 I. L. Sharfman, *The Interstate Commerce Commission: A Study in Administrative Law and Procedure* 387 n.64 (1931).  To some observers, this difference in treatment reflected the fact that "orders for the payment of money" were "designed to afford private redress to particular parties, rather than to further general public ends through the process of regulation."  *Id.*

24

When Congress used the ICC Act as a model for its anti-monopoly legislation, it emphasized that Act's distinction between damages and other forms of relief. *See* 51 Cong. Rec. 13054-56 (1914) (Sen. Sutherland) (distinguishing between ICC orders "to award damages under certain circumstances" and the agency's "purely administrative" orders); *id.* at 13,005 (Sen. Cummins) (stating that ICC proceedings for reparation of illegal rates have "no relevancy or similarity to the question we are now discussing," but that ICC's non-monetary orders are "as nearly similar to the orders that are to be made by the trade commission as two human affairs can be"). The Act's sponsors endeavored to make case law protecting the ICC's power to issue non-monetary orders completely "applicable to the orders of the proposed trade commission." *Id.* at 13,045 (Sen. Cummins) (referencing *I.C.C. v. Ill. Cent. R.R. Co.*, 215 U.S. 452, 466 (1910), which upheld a non-monetary ICC order against a claim that it infringed upon a company's "right to the use of their own property").

When Congress amended the FTC Act to make the Commission's cease-and-desist orders self-enforcing unless appealed, *see* Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-447, § 5(g), 52 Stat. 111, 113-14 (1938), it was still widely understood that these orders did not touch on the vested rights of regulated businesses. Members of Congress distinguished the Commission's orders from penalties or "attempt[s] to prosecute . . . criminally," *To Amend the*

*Federal Trade Commission Act, Hearings Before S. Comm. Interstate Com.*, 74th Cong. 2d Sess., at 81 (1936) (Sen. Wheeler), reiterating that these orders were "merely preventive and cooperative rather than penal," S. Rep. No. 75-221, at 1 (1937); *Hearings before S. Comm. Interstate Com.*, *supra*, at 81 (Commissioner Freer) ("Our act is preventive and injunctive rather than penal or punitive."); *see To Amend the Act Creating the Federal Trade Commission, Hearing Before H. Comm. Interstate & Foreign Com.*, 75th Cong. 2d Sess., at 63 (1937) (Rep. Chapman distinguishing between injunctions, cease-and-desist orders, and penalties); *id.* at 56 (Commissioner Davis emphasizing that "[t]he Commission could not impose the penalties").

These lawmakers confirmed that the Commission's new power to issue self-enforcing cease-and-desist orders would be used to prevent harm to the public, reflecting the understanding that these orders vindicated public rights. Indeed, the 1938 amendments specifically provided that the Commission could proceed against a company's "unfair and deceptive acts and practices," and could do so without establishing injury to business competitors, *see* S. Rep. No. 75-221, at 3 (1938), overruling Supreme Court precedent that held otherwise, *see id.* at 5; *see also* H.R. Rep. No. 75-1613, at 3 (1938) (noting that the Act had been "construed as if its purpose were to protect competitors only and to afford no protection to the consumer without showing injury to a competitor"). This clarification reaffirmed

Congress's long-held understanding that the Commission was not a "forum where private disputes or controversies between competitors should be settled," and that its jurisdiction was limited to proceedings "in the public interest."  S. Rep. No. 75-221, at 2 (1938); H.R. Rep. No. 75-1613, at 8 (1938) (distinguishing between a "private suit" and proceedings in the public interest (quoting *F.T.C. v. Klesner*, 280 U.S. 19, 28 (1929))).[4]

\* \* \*

Congress authorized the FTC to secure "preventative and cooperative" relief in the interest of the public, S. Rep. No. 75-221, at 1 (1937), and the Commission issued the cease-and-desist order in this case to further that goal.  Intuit's request that this Court invalidate that order is at odds with history and precedent.  This Court should reject it.

---

[4] Congress further entrenched the division between the FTC's cease-and-desist orders and other remedies in the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 206(a), 88 Stat. 2183, 2201 (1975), which authorized the Commission to obtain additional relief in cases where a reasonable person would have known that the conduct was "dishonest or fraudulent," *id.* at 2202.  The Act provided that the Commission could seek relief including "rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification," but only from a district court.  *Id.*

# CONCLUSION

For the foregoing reasons, this Court should reject Intuit's claim that the

FTC's cease-and-desist order at issue in this case violates Article III.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Smita Ghosh
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: June 21, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June 2024, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: June 21, 2024

/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,444 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: June 21, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod