No. 24-60040

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

INTUIT, INC.,

*Petitioner,*

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

On Review of an Order of the Federal Trade Commission

# BRIEF OF ADMINISTRATIVE LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS

Orlando Economos
   *Counsel of Record*
Carrie Y. Flaxman
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 788-6052

*Counsel for* Amici Curiae
*Administrative Law Scholars*

## CERTIFICATE OF INTERESTED PERSONS

*Intuit, Inc. v. Federal Trade Commission*, No. 24-60040

The undersigned counsel of record certifies that, in addition to the persons and entities listed in the Certificates of Interested Persons filed by Petitioners and all *amici* up to this point, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| *Petitioner* | Counsel for Petitioner |
|---|---|
| Intuit, Inc. | Daniel S. Volchok<br>David Z. Gringer<br>Johnathan E. Paikin<br>Howard M. Shapiro<br>Derek A. Woodman |
| *Respondent* | Counsel for Respondent |
| Federal Trade Commission | Bradley Grossman<br>Anisha Sasheen Dasgupta<br>Mariel Goetz<br>Lois C. Greisman<br>William Maxson<br>Roberto Anguizola<br>Rebecca Plett<br>James Evans |

|  | Sara Tonnesen |
|---|---|
| *Amici Curiae:* | **Counsel for *Amici Curiae*** |
| William D. Araiza<br>Jeffrey Lubbers<br>Beau Baumann | Skye L. Perryman<br>Orlando Economos<br>Carrie Y. Flaxman |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................ I

TABLE OF AUTHORITIES ............................................... IV

INTEREST OF AMICI CURIAE ........................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 2

ARGUMENT ..................................................................... 4

I.   Congress may assign adjudication of claims involving public rights to non-Article III tribunals ....................................................... 5

II.   The FTC's deceptive advertising claim against intuit concerns public rights, and was properly adjudicated by the Agency.................... 8

  A.   The action here arises from a comprehensive statutory scheme, allowing claims unknown at common law, designed to address a widespread public problem ............................................. 9

  B.   Prohibiting agency adjudication of Section 5 claims would dismantle the statutory scheme .................................................. 16

  C.   Section 5 claims are often uniquely suited for agency adjudication ................................................................. 20

  D.   The fact that a seemingly private right may be implicated does not transform this case into one focused on private rights .......... 23

CONCLUSION........................................................................ 26

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) .................... 24

*Akin v. Office of Thrift Supervision Department of Treasury*, 950 F.2d 1180 (5th Cir. 1992) ................................................................... 14, 15

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442 (1977) ........................................................... passim

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) ................................ 24

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) .......... 13

*FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304 (1934) ...................... 17, 21

*FTC v. Raladam Co.*, 283 U.S. 643 (1931) ............................................. 11

*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952) ...................................... 20, 21

*FTC v. Sterling Drug, Inc.*, 317 F.2d 669 (2d Cir. 1963) ................. 11, 13

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) ................................. 12

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ......................................................................................... 12

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ................... passim

*Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797 (5th Cir. 2017) ....... 12

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ................................ passim

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .......................................... 25, 26

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272 (1855) ........................................................................................... 6

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ... 4

*Sears, Roebuck & Co. v. FTC*, 258 F. 307 (7th Cir. 1919) ...................... 16

*Slaughter-House Cases*, 83 U.S. 36 (1872) ............................................ 26

iv

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ...........................16

*Stern v. Marshall*, 564 U.S. 462 (2011) ...............................................4, 6

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985) .....7, 25

*Zorilla v. Aypco Constr. II, L.L.C.*, 469 S.W.3d 143 (Tex. 2015) ............12

## Statutes

15 U.S.C. § 45.......................................................................................9, 21

15 U.S.C. § 53(b) ................................................................................17, 21

15 U.S.C. §§ 41–58 .................................................................................. 5

29 U.S.C. § 661(a) .................................................................................14

Act of March 21, 1938, ch. 49, sec. 5, 52 Stat. 111 (amending 15 U.S.C.
§ 45(a)(1) (1934)) .................................................................................11

## Other Authorities

47 Cong. Rec. 1225 (1911)........................................................................17

51 Cong. Rec. S13047 (1914)...................................................................20

H.R. Rep. No. 75-1613 (1937) .................................................................11

M. Elizabeth Magill, *Agency Choice of Policymaking Form*, 71 U. Chi.
L. Rev. 1383 (2004)..............................................................................22

Milton Handler, *False and Misleading Advertising*, 39 Yale L. J. 22
(1929) ...................................................................................................11

Neil W. Averitt, *The Meaning of "Unfair Methods of Competition" in
Section 5 of the Federal Trade Commission Act*, 21 B.C. L. Rev. 227
(1980) ............................................................................................10, 16

Rep. of the S. Comm. on Interstate Commerce, S. Rep. No. 597 (1914).21

S. Rep. 93-151 (1973) .........................................................................19, 21

S. Rep. No. 63-1326 (1913) ........................................................16

Sophie Lefebvre & Natalie Burclaff, *Consumer Advertising During the Great Depression: A Resource Guide*, Libr. of Cong. (last updated Sept. 14, 2020) ......................................................10

Todd Phillips & Beau J. Baumann, *The Major Questions Doctrine's Domain*, 89 Brook. L. Rev. 747 (2024) .................................................22

# INTEREST OF AMICI CURIAE[1]

*Amici curiae* are administrative law scholars from universities throughout the United States. They are:

- William D. Araiza, Stanley A. August Professor of Law, Brooklyn Law School; and
- Jeffrey S. Lubbers, Professor of Practice in Administrative Law at American University, Washington College of Law; and
- Beau J. Baumann, Doctoral candidate at Yale Law School.

*Amici* have a strong interest in how this Court's decision will affect the field of administrative law and the enforcement of properly issued regulations and statutes. *Amici* seek to assist this Court in resolving questions of law that arise in the core of their professional expertise and scholarship, namely the scope of Article III of the U.S. Constitution as applied to the Federal Trade Commission's authority to regulate and adjudicate unfair and deceptive acts and practices.

---

[1] In accordance with Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part, and no one except *amici* and their counsel contributed money to the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Our nation has relied on independent expert agencies to use factfinding and adjudication to protect the health, safety and finances of the American people for more than a century. For just as long, courts have applied the public rights doctrine to approve agency adjudication where Congress has created comprehensive frameworks, subject to judicial review, with novel rights and remedies. Agency adjudication—the ability of an agency to hear and decide claims, subject to judicial review, regarding matters for which Congress has created protection—covers everything from workplace safety to interstate commerce to discrimination to labor organizations. It is critical to the ability of Congress to meet the needs of the American people.

This case arises out of an agency adjudication by the Federal Trade Commission (FTC) against Petitioner Intuit regarding deceptive marketing of its online tax filing software product, TurboTax, under Section 5 of the FTC Act's prohibition of unfair and deceptive acts and practices in trade. Section 5 is one of Congress's oldest provisions entrusting public rights to an agency. It is a cornerstone not only of American law, but of the American economy.

Since 1914 when Congress established the FTC, the country has relied on the Commission to ensure a competitive and honest market for goods and services. The FTC Act and subsequent amendments established an independent expert agency with authority to vindicate new legal claims on behalf of the public, while giving companies the chance to defend themselves through agency adjudication. Initially, the FTC was empowered to protect competitors; but in 1938, Congress amended the Act to address jurisprudential shortcomings that left American consumers without redress, and empowered the Commission to protect consumers directly. In the wake of the Great Depression, some businesses felt the need to rely on ever more aggressive tactics to take advantage of unsuspecting consumers, damaging trust in the economy and harming consumers. In response, Congress created a new public right—the right to be free from unfair and deceptive acts and practices —and authorized the Commission to bring actions to vindicate that right and protect American consumers.

Amici offer this brief applying the public rights doctrine to Section 5 of the FTC Act. Amici first consider the applicable test for public rights

as discussed in existing case law and then explain why Section 5 meets that test.

## ARGUMENT

Courts have long recognized that "[w]hen a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' . . . the responsibility for deciding that suit rests with Article III judges in Article III courts." *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982)). But where, as here, the federal government has sought to vindicate new statutory rights in the public interest under a comprehensive scheme suited to agency decisionmaking, that case concerns public rights, and Congress may constitutionally assign it to a non-Article III tribunal. *See Jarkesy v. SEC*, 34 F.4th 446, 452–53 (5th Cir. 2022) (citing *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977)).

The FTC may adjudicate Section 5 claims related to deceptive acts and practices because these claims implicate "public rights." When Congress empowered the FTC to protect consumers from unfair and deceptive acts and practices (UDAP), it addressed shortcomings in the

way consumer injury was being addressed at common law. It created a comprehensive statutory scheme with novel rights, and assigned the disposition of those rights to expert agency adjudication because Congress found the Commission would better address them in the first instance.

Under well-settled precedent, this is the beginning and end of the public rights inquiry. Claims brought by the government for deceptive marketing under Section 5 of the FTC Act were novel claims created as part of a statutory framework designed to secure a competitive marketplace and protect consumers; transference of such claims to the exclusive jurisdiction of Article III courts would dismantle that statutory scheme; and Section 5 claims are uniquely suited to the expertise of agency adjudication. *See* 15 U.S.C. §§ 41–58, as amended. The FTC can thus properly adjudicate Section 5 claims as public rights in an administrative proceeding.

## I. Congress may assign adjudication of claims involving public rights to non-Article III tribunals.

Where Congress encounters widespread problems insufficiently addressed by existing law, it may design a comprehensive scheme to address them, including by vesting their resolution in a non-Article III

administrative tribunal. *See Atlas Roofing*, 430 U.S. at 444–45 (approving the creation of "a new statutory duty to avoid maintaining unsafe or unhealthy working conditions" and "permitting the Federal Government, proceeding before an administrative agency, . . . to impose civil penalties on any employer maintaining any unsafe working condition").[2] So although, "in general, Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" *Stern*, 564 U.S. at 484 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855)), it may commit the resolution of claims "integrally related to particular Federal Government action" to administrative tribunals, *id.* at 490–91.

The government may assign those rights to agency adjudication if they go beyond the common law and are particularly suited to agency adjudication. *See Jarkesy*, 34 F.4th at 458–59. It therefore applies even

---

[2] Amici recognize that *Jarkesy*, along with most of the public rights doctrine cases discussed, implicates not only the Article III public rights doctrine, but also the Seventh Amendment. The instant case involves only equitable claims, of the sort that would have been decided in a court of equity, not a court of law. Compl. at 26–27. As such, the Seventh Amendment analysis is, as the FTC says, "inapposite." Resps.' Opp. to Mot. to Stay, at 17. The relevant question here, as far as Congress's ability to authorize the FTC to adjudicate this claim against Intuit, is whether it implicates public rights. We therefore do not address the Seventh Amendment and attendant analysis here.

in cases where Congress, "acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54 (1989) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 593–94 (1985)). "Wholly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated," but where a case concerns a regulatory scheme to deal with a widespread problem, such claims may even arise "in cases not involving the Federal Government" between two private parties. *Granfinanciera*, 492 U.S. at 51, 53–54.[3]

The inquiry regarding whether claims implicate public rights and are properly adjudicated by a non-Article III tribunal proceeds in three

---

[3] Amici note that given the doctrine's roots in principles of sovereignty the presence of the government as sovereign, as here, likely strengthens the case for public rights. As explained in *Granfinanciera*, the public rights doctrine applies "where the Government is involved in its sovereign capacity under an otherwise valid statute," 492 U.S. at 51; *see id.* at 68 (Scalia, J., dissenting) ("[W]hat we meant by public rights were . . . rights pertaining to claims brought by or against the United States. For central to our reasoning was the device of waiver of sovereign immunity."). *Cf. Jarkesy*, 34 F.4th at 457. But if public rights may arise even in seemingly private claims between private parties, surely the presence of the government as sovereign weighs as a factor in support of finding the action implicates public rights.

parts, then. First, "whether Congress created a new cause of action, and remedies therefor, unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest public problem"; second, whether adjudication by an Article III court would "dismantle the statutory scheme"; and third, whether the claim at issue is "uniquely suited for agency adjudication." *Jarkesy*, 34 F.4th at 453, 455–56 (cleaned up); *see Granfinanciera,* 492 U.S. at 60–61 (quoting *Atlas Roofing*, 430 U.S. at 461); *see Atlas Roofing*, 430 U.S. at 442 (holding OSHA could hear the workplace safety claims against employers outside of Article III because Congress had created a new statutory right with distinct elements from analogous claims at common law heard by an expert agency). As discussed below, the FTC's Section 5 claim here satisfies these criteria, and implicates public rights appropriate for agency adjudication.

## II. The FTC's deceptive advertising claim against Intuit concerns public rights, and was properly adjudicated by the agency.

To address widespread anticompetitive practices in the American market, including deception and fraud, Congress created a novel statutory framework that provided relief for claims of anticompetitive

and unfair or deceptive acts and practices—claims that were barred at common law. Prohibiting the FTC from adjudicating these claims at the core of its mission would completely unravel Congress's plan by removing its linchpin: gradual centralized development of trade law by an expert agency through iterative adjudication. Central to that scheme is the FTC's dual authority to proceed administratively or by seeking a preliminary injunction in court, because these claims, and the decision as to where they should be brought is uniquely suited to determination by an expert agency. These factors, taken together, show that this case concerns public rights.

### A. The action here arises from a comprehensive statutory scheme, allowing claims unknown at common law, designed to address a widespread public problem.

The FTC brought this administrative proceeding against Intuit for marketing its TurboTax product deceptively in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. *See* Compl. ¶¶ 5–8, 119–22. When Congress passed and subsequently amended the FTC Act, it created new rights and remedies, beyond what was available under the common law, "to cope with a manifest public problem." *Jarkesy*, 34 F.4th at 453 (quoting *Granfinanciera*, 492 U.S. at 60).

The history of the FTC stems from a record of the failures of the common law to protect competitors and consumers. Prior to the FTC's formation, the courts were solely responsible for the nation's antitrust laws, but had limited the prohibition on restraints on trade to only those restraints found "unreasonable" by individual judges in particular cases. *See* Neil W. Averitt, *The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act*, 21 B.C. L. Rev. 227, 229–38 (1980) (describing the judicial and legislative history leading up to the creation of the FTC). In response, in 1914 Congress created a new dedicated expert agency to produce a more comprehensive and more consistent body of antitrust law through case-by-case adjudication of the concept of unfairness. *Id.*

In the wake of the Great Depression, aggressive advertising campaigns abounded as businesses tried to attract customers. Sophie Lefebvre & Natalie Burclaff, *Consumer Advertising During the Great Depression: A Resource Guide*, Libr. of Cong. (last updated Sept. 14, 2020). Scholars at the time recognized that "the traditional actions of deceit and warranty as developed by the courts can be of little utility in a campaign against false advertising" because the common law lacked

"sufficient capacity for growth to originate a new action on the case for damages flowing from false statements contained in advertisements." Milton Handler, *False and Misleading Advertising*, 39 Yale L. J. 22, 27 (1929). At the same time, the judiciary limited the capacity of the FTC Act to protect consumers when the Supreme Court ruled that injury to consumers, either extant or imminent, could not sustain a Section 5 claim without harm to a competitor. *See FTC v. Raladam Co.*, 283 U.S. 643 (1931). In response, Congress amended the Act to include the instant provision prohibiting "unfair or deceptive acts or practices in commerce," also known as "UDAP." Act of March 21, 1938, ch. 49, sec. 5, § 3, 52 Stat. 111, 111–12 (amending 15 U.S.C. § 45(a)(1) (1934)).[4]

The new amendment provided redress for consumers where the common law had failed. "The central purpose of [Section 5] is in effect to abolish the rule of caveat emptor which traditionally defined rights and responsibilities in the world of commerce." *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963). Under the common law, the closest analogue to Section 5's prohibition on deceptive practices that would

---

[4] The House Report accompanying the UDAP amendment explained that the purpose of the new language was to "prevent such acts or practices which injuriously affect the general public as well as those which are unfair to competitors." H.R. Rep. No. 75-1613, at 3 (1937).

cover the false advertising alleged here would be a claim for fraudulent misrepresentation.[5] To prevail, plaintiffs had to prove that the seller knew and intended to defraud them, that they relied on their representations, and that they had actually been ripped off before the seller could be told to stop fooling consumers. *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017) ("The elements of common law fraud are (1) 'a material misrepresentation' that (2) 'was false,' (3) 'was either known to be false when made or was asserted without knowledge of its truth,' (4) *'was intended to be acted upon,'* (5) *'was relied upon,'* and (6) *'caused injury.'*" (emphasis added) (quoting *Zorilla v. Aypco Constr. II, L.L.C.*, 469 S.W.3d 143, 153 (Tex. 2015))).

Congress enacted Section 5 of the FTC Act to fix these shortcomings. To meet its burden under Section 5, the FTC need only "establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citing *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988)). "Neither proof of consumer

---

[5] Intuit agrees. *See* Appellant's Br. 31.

reliance nor consumer injury is necessary to establish a [Section] 5 violation" because its "primary purpose" is to "protect the consumer public rather than to punish the wrongdoer." *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202–03 (10th Cir. 2005). Courts have been consistent on this point, "[i]n order best to implement the prophylactic purpose of the statute." *Sterling Drug, Inc.*, 317 F.2d at 674.

The regulatory scheme here is therefore just like the comprehensive adjudicatory framework for worker safety claims approved for non-Article III tribunals in *Atlas Roofing*. 430 U.S. 442 (1977). There, Congress had found "the existing state statutory remedies as well as state common-law actions" to be "inadequate" to address the "drastic national problem" of workplace safety and "created a new statutory duty to avoid maintaining unsafe or unhealthy working conditions." *Id.* at 444–45 (quotations omitted). Although employers could be held liable for injuries or death resulting from unsafe workplaces under the common law, the new duty went much further: a violation could be shown "whether or not an employee is actually injured or killed as a result." *Id.* at 445. The Secretary of Labor was empowered to investigate violations and issue abatement orders, and review of such orders would be heard at

a dedicated commission by an expert administrative law judge, "each of whom is qualified 'by reason of training, education or experience' to adjudicate contested citations." *Id.* at 446 (quoting 29 U.S.C. § 661(a)). The Supreme Court approved the scheme and held "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency" beyond the bounds of Article III. *Id.* at 455.

The scheme here is also similar to the statutory scheme approved by this Court in *Akin v. Office of Thrift Supervision Department of Treasury*, 950 F.2d 1180 (5th Cir. 1992). There, a thrift association's president had violated a Net Worth Maintenance Agreement with the predecessor to the Office of Thrift Supervision (OTS) to contribute capital to the thrift if its net worth fell below levels required by regulation. *Id.* at 1182. The OTS brought an administrative proceeding under a statute authorizing it (like the FTC) to issue cease-and-desist orders to address statutory violations, and sought restitution and disgorgement of money alleging the bank president had been unjustly enriched. *Id.* at 1186. This Court dismissed the plaintiff's Article III argument, holding that despite the common law contractual appearance of the action, "the statute manifests a purpose of granting broad authority to financial institution

regulators" and that "unjust enrichment" under the statute "has a broader connotation than in traditional contract law." *Id.* at 1184. As such, "[w]here there is a proper administrative forum for adjudicating public rights," there is no need for resolution by an Article III court. *Id.* at 1186 (citing *Granfinanciera*, 492 U.S. at 42, 54–55). Congress saw a significant problem in undercapitalized thrifts; created a comprehensive framework to address it with features foreign to the common law; and committed its vindication to an agency particularly suited to its needs.

Intuit argues that the common law covered the action here, but this is incorrect. Section 5 authorizes the Commission to prove a violation without evidence of either injury or ill intent (again, just like unsafe workplace claims heard by OSHA). Section 5 was in fact intended to address insufficiencies in the common law, and created a "new and . . . unusual" set of "enforcement mechanisms for the sorts of claims that likely could not have been brought in legal actions before that point." *Jarkesy*, 34 F.4th at 456. Intuit relies on *Sears v. FTC* for this argument, *see* Appellant's Br. at 32, but that case dealt only with the FTC's authority to address "unfair methods of competition," not UDAP; and *Sears* predated the addition of UDAP by nearly twenty years. *See Sears,*

*Roebuck & Co. v. FTC*, 258 F. 307, 311 (7th Cir. 1919).[6] The FTC's claim against Intuit here was not actionable at common law.

## B. Prohibiting agency adjudication of Section 5 claims would dismantle the statutory scheme.

Stripping the FTC of authority to adjudicate Section 5 claims would dismantle the statutory scheme that Congress put in place to protect competitors and consumers alike for nearly a century. The FTC was created in response to Congressional concern regarding how the courts had developed the common law on restraints of trade. *See Standard Oil Co. v. United States*, 221 U.S. 1 (1911); Averitt, *supra* p. 9, at 231 ("The Standard Oil decision was not well received in Congress" because "whenever [its] rule is invoked the court does not administer the law, but makes the law." (quoting S. Rep. No. 63-1326, at xii (1913))). A lack of comprehensive legislation had allowed trade law to "drift practically into the hands of the courts" and so subjected market participants "to the varying judgments of different courts" and had produced grave uncertainty for business. Averitt, *supra* p. 9, at 231, 233 n.20 (quoting 47

---

[6] In any event, just like UDAP claims, UMC claims offer relief beyond what was available at common law. *See Sears*, 258 F. at 311 (explaining that "unfair methods of competition" applies to practices that injure competitors, "irrespective of whether the specific practices in question have yet been denounced in common-law cases").

Cong. Rec. 1225 (1911)). The FTC's centralized subject matter expertise as a commission in deciding competition and consumer protection claims was central to Congress's solution. *See FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 314 (1934) (explaining the FTC "was created with the avowed purpose of" creating "a body specially competent . . . organized in such a manner . . . as would give to them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience") (internal quotations omitted).[7]

Part of the comprehensive statutory scheme Congress created is the FTC's complementary authority to bring claims under Section 5 before Article III courts in addition to its own adjudicatory authority. 15 U.S.C.

---

[7] In assessing whether committing the SEC's authority exclusively to an Article III tribunal would "dismantle the statutory scheme," *Jarkesy* also asked whether it would "'impede swift resolution' of the claims created by statute." 34 F.4th at 453 (citing *Granfinanciera*, 492 U.S. at 60–63 (quoting *Atlas Roofing*, 430 U.S. at 461)). Although "swift resolution" was part of the design of OSHA's authority in *Atlas Roofing*, and of the SEC's in *Jarkesy*, not every statutory scheme pursues the same goal. In the case of the FTC's Section 5 authority, it is well-recognized that its authority to proceed in court was intended to offer speedier relief than the agency could offer through cease-and-desist letters by authorizing it to seek a preliminary injunction under 15 U.S.C. § 53(b). *See* S. Rep. No. 93-151, at 54 (1973). But the point of FTC's Section 5 authority, as will be discussed *supra,* Part II.A, was not to speed up relief, but to vest an expert agency with authority to offer relief that had previously been unavailable under existing law. To strip the FTC of that authority would "dismantle the statutory scheme," regardless of how quickly that relief is offered. In any event, although a preliminary injunction is faster than an administrative proceeding, it is not final, and so does not truly offer any "resolution" at all—only temporary relief.

§ 53(b). Like the FTC, the SEC has the authority to enforce the securities laws through either civil action or agency adjudication, according to the needs of the particular case and the public interest. *See* 15 U.S.C. §§ 78u–78u-7. *Jarkesy* expressed doubt that stripping the SEC of its adjudicatory authority could possibly "dismantle the statutory scheme" because "Congress has not prevented the SEC from bringing claims in Article III courts." 34 F.4th at 455.[8] Intuit appears to think this factor breaks in their favor because the FTC likewise has authority to bring both types of action. *See* Appellant's Br. at 31.

But at least regarding the FTC, the complementary nature of the agency's dual enforcement authority is itself a central feature of the scheme—not a legislative accident. Congress gave the FTC its Section 5(b) adjudicatory authority at the agency's inception in 1914. 38 Stat. 719 (codified as amended at 15 U.S.C. § 45). It was only in 1973 that it

---

[8] Indeed, until the expansion of the SEC's authority enacted by the Dodd-Frank Act, Pub. L. No. 111-203 (2010), the Commission proceeded primarily through Article III courts, and was required to do so to exact money penalties against certain parties. *See* Gideon Mark, *SEC and CFTC Administrative Proceedings*, 19 J. Const. L. 45, 46 (2016) (explaining that SEC was required to proceed against non-registered entities exclusively via civil enforcement until the passage of Dodd-Frank in 2010). But as discussed below, the same cannot be said of the FTC, which proceeded exclusively via administrative proceedings until it was authorized to go to court in 1973. *See* Pub. L. No. 93-153, 87 Stat. 576 § 408.

augmented that authority with the capacity to bring suit in Article III court under Section 13(b), specifically because critical trade investigations had been "restricted and hampered because of inadequate legal authority to enforce subpoenas and to seek preliminary injunctive relief." Federal Trade Commission Authority Act, Pub. L. No. 93-153, § 408, 87 Stat. 576, 591 (codified as amended at 15 U.S.C. § 53(b)).

The two provisions work in tandem, covering overlapping yet distinct cases. Section 5(b) applies only retrospectively, where an entity "has been or is" violating laws enforced by the commission, and offers only cease-and-desist orders as remedy. 15 U.S.C. § 45(b). Section 13(b) applies prospectively, to an entity that "is violating, or is about to violate" such laws, and offers preliminary injunctive relief. *Id.* § 53(b). Even where the two overlap, the FTC may choose to go to court "to streamline its procedures" and so "make uniform the [] ragged pattern of the Commission's representational authority." S. Rep. 93-151, at 54–56 (1973). But "Congress placed the primary responsibility for fashioning [orders to address unfair and deceptive conduct] upon the Commission, and Congress expected the Commission to exercise a special competence in formulating remedies to deal with problems in the general sphere of

competitive practices." *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952). Stripping the Commission of its first-granted authority to develop and exercise that "special competence" would not just dismantle the statutory scheme; it would eviscerate it.

### C. Section 5 claims are often uniquely suited for agency adjudication.

As above, Congress responded to inconsistent results and uncertainty for businesses and consumers alike in Article III courts by authorizing the FTC as an expert agency to regulate trade through case-by-case adjudication. Critical to Congress's design was the decision to place the responsibility of trade law and antitrust in the hands of "a commission at all times under the power of Congress, at all times under the eye of the people" rather than "upon the abstract propositions . . . argued in the comparative seclusion of the courts." 51 Cong. Rec. S13047 (1914) (remarks of Senator Albert Cummins, R-IA). The Commission was conceived as a "body specially competent to deal with" issues of trade law "by reason of information, experience, and careful study of the business and economic conditions of the industry affected," organized in such a way as to "give to them an opportunity to acquire the expertness . . . concerning industry that comes from experience." *R.F. Keppel & Bro.,*

*Inc.*, 291 U.S. at 314 (quoting Rep. of the S. Comm. on Interstate Commerce, S. Rep. No. 597, at 9, 11 (1914)).

The system Congress designed relied on the FTC's expertise not only to adjudicate claims, but to determine the most effective forum for their disposition "in the public interest." 15 U.S.C. §§ 45(b), 53(b). The FTC Act contemplates distinct and specific rationales for when each is appropriate. As above, Congress created the FTC to be an expert agency that could produce a more unified and comprehensive body of competition and consumer law. *See Ruberoid*, 343 U.S. at 473. So when the agency encounters novel or complicated cases, it may bring its significant experience to bear and ensure that its order is in harmony with existing law and the trade policy of the United States. By contrast, in clear cases that present no reason for the Commission to clarify the parameters of antitrust law, the FTC may eschew its administrative authority and promptly proceed in federal court to "seek a permanent injunction," reserving the Commission's resources for harder cases. *See* S. Rep. No. 93-151, at 31 (1973).

Those harder cases are precisely the sort uniquely suited to agency adjudication followed by judicial review. That much is clear from the fact

that Congress placed responsibility for such cases exclusively in the Commission for nearly sixty years, and only later added direct civil enforcement authority to allow for speedy preliminary relief. The fact that Congress later gave the FTC the additional alternative to take its claims to court does not mean that Congress acted unconstitutionally in originally conferring adjudicative power on the Commission.[9]

This legislative timeline is therefore the reverse of the SEC's authority in *Jarkesy*, where this Court explained that given Article III courts' long-practiced and exclusive authority to hear claims under the securities laws there was "no reason to believe that such courts are suddenly incapable of continuing that work just because an agency may now share some of the workload." 34 F.4th at 456. Here, it is the FTC that has the long decades of exclusive experience, generating significant

---

[9] As a threshold matter, Petitioner mistakenly suggests that this Court suggested in *Jarkesy* that whether rights are "public" in nature may turn on whether Congress gave the agency the choice of pursuing the vindication of those rights in *either* agency adjudications or Article III courts. Appellant's Br. at 31 (citing *Jarkesy*, 34 F.4th at 455–56). That factor is only relevant to whether a private right may nonetheless be assigned to agencies for adjudication. *See Jarkesy*, 34 F.4th at 455 (noting, in an inapposite section, that "the statutory scheme itself allows the SEC to bring enforcement actions either in-house or in Article III courts"). Congress has broad latitude in simultaneously assigning public rights to a combination of agency adjudications *and* Article III enforcement actions. *See* M. Elizabeth Magill, *Agency Choice of Policymaking Form*, 71 U. Chi. L. Rev. 1383, 1383–84 (2004) (describing existing law as leaving "unregulated by courts" an agency's choice of different adjudicatory forums); Todd Phillips & Beau J. Baumann, *The Major Questions Doctrine's Domain*, 89 Brook. L. Rev. 747, 750 n.18 (2024) (providing a short overview of the many agencies that Congress assigned the ability to choose between enforcing federal law in agency adjudications or Article III enforcement actions).

expertise. Its ability to bring that experience to court in a civil action augments its expert proceedings, but cannot replace them.

* * * *

The FTC Act generally, and Section 5 specifically, represent a comprehensive statutory scheme within Congress's power to enact that serves the public good. In it, Congress designed new rights and remedies unknown to, and indeed at odds with the common law. To prohibit the FTC from exercising its adjudicatory authority would take the Section 5 claims designed by Congress specifically to correct the courts' infidelity to Congress's intent and dismantle the statutory scheme by allowing trade policy to drift back under the control of the courts, in direct contravention of the original purpose of the Act. Therefore, Section 5 and this action concern public rights.

### D. The fact that a seemingly private right may be implicated does not transform this case into one focused on private rights.

Petitioner suggests an alternate test, that has never been adopted by any court and which conflicts with existing precedent, for whether a case may be decided by a non-Article III tribunal. Petitioner, citing only a single Justice's concurrence, argues that Congress' decision to assign

these matters to the FTC and allow the FTC to proceed by agency adjudication (as opposed to an adjudication before an Article III court) is inappropriate any time a defendant can point to what it refers to as a "core private right," and points to its own "right to advertise" as "integral" to "liberty." Appellant's Br. at 30–31 (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring)); *see Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 196 (2023) (Thomas, J., concurring) ("I have grave doubts about the constitutional propriety of Congress vesting administrative agencies with primary authority to adjudicate core private rights."). But that has never been the test for whether a claim may be committed to a non-Article III tribunal, in either this Circuit or the U.S. Supreme Court.

As explained above, the question in deciding whether a case may be decided through agency adjudication is instead whether the claim at issue implicates public rights—that is, whether it arises under a comprehensive scheme creating rights unknown to the common law that are particularly suited to agency adjudication. Petitioner's alternate theory would require a different result in the vast majority of public rights doctrine cases, potentially leading to absurd outcomes. In the first

place, this position conflicts with the Supreme Court's recognition that even a "seemingly private right" may be delegated to a non-Article III tribunal if it is "closely integrated into a public regulatory scheme." *See Granfinanciera*, 492 U.S. at 54–55 (quoting *Thomas*, 473 U.S. at 594).

Second, if this test were adopted it would change the outcome in existing public rights cases wherever the regulated entity could allege a "core private right" was implicated. Applying that test would reverse the holding in *Atlas Roofing*, for example: presumably, the employers regulated by OSHA could have argued that the statutory scheme there affected their core private right "to engage in any of the common occupations of life," recognized as fundamental to "liberty" and "the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923) (recognizing a teacher's "right [] to teach and the right of parents to engage him so to instruct their children" to be fundamental to "liberty"). Under Petitioner's proposed test, the involvement of such a private right would supersede the public purpose of the new statutory scheme, and OSHA would be prevented from vindicating the statutory authority Congress granted it.

Likewise, the bank president's argument in *Akin* that his prosecution was fundamentally one arising out of contract could simply have been paired with a citation to *Meyer* that the right to liberty includes "the right of the individual to contract." *Meyer*, 262 U.S. at 399 (citing *Slaughter-House Cases*, 83 U.S. 36 (1872)). Just like *Atlas*, Appellant's approach applied to *Akin* would reverse the result reached by this Court. That is not the law.

## CONCLUSION

For the reasons stated above, *amici curiae* urge this Court to affirm the order of the Commission, and, in any event, to reject the arguments Petitioners make regarding the scope of Article III.

Respectfully submitted,

*/s/ Orlando Economos*

Orlando Economos
  *Counsel of Record*
Carrie Y. Flaxman
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
202-448-9090

oeconomos@democracyforward.org
cflaxman@democracyforward.org
sperryman@democracyforward.org

*Counsel for Proposed* Amici Curiae
*Administrative Law Scholars*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 5th Cir. R. 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,727 words according to the word count function of Microsoft Word 365.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and 5th Cir. R. 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ Orlando Economos*

Date: June 21, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, a true and accurate copy of the foregoing motion was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

*/s/ Orlando Economos*

Date: June 21, 2024