No. 24-60040

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

INTUIT, INC.,

Petitioner,

v.

FEDERAL TRADE COMMISSION,

Respondent.

_____

On Petition for Review of a Final Order of the Federal Trade
Commission dated January 19, 2024, FTC Docket No. 9408

## BRIEF OF AMICI CURIAE ILLINOIS, DISTRICT OF COLUMBIA, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, WASHINGTON, AND WISCONSIN IN SUPPORT OF RESPONDENTS AND AFFIRMANCE

BRIAN L. SCHWALB
Attorney General for the
District of Columbia
CAROLINE S. VAN ZILE
Solicitor General
ASHWIN P. PHATAK
Principal Deputy Solicitor General
ELISSA R. LOWENTHAL
Assistant Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
Caroline.VanZile@dc.gov

KWAME RAOUL
Illinois Attorney General
JANE ELINOR NOTZ
Solicitor General
SARAH A. HUNGER
Deputy Solicitor General
JOHN R. MILLIGAN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

Attorneys for Amici States

*(Additional counsel on signature page)*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as amici curiae

are all governmental entities.  5th Cir. R. 28.2.1.

/s/ *Sarah A. Hunger*
Sarah A. Hunger
*Counsel of Record for Amici*

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICI STATES.................................... 1

SUMMARY OF ARGUMENT.................................................... 3

ARGUMENT.................................................................... 6

I.   Intuit's Deceptive Conduct Harms Amici States' Residents........... 6

    A.   Intuit's advertisements about its "free" product offerings
deceived consumers................................................ 7

    B.   Intuit took actions that steered consumers away from
the government-sponsored free filing program to its
commercial site. .................................................. 10

    C.   Intuit's deceptive conduct has harmed millions of
consumers across the country. ................................... 14

II.  The Commission Correctly Applied Longstanding Principles Of
Consumer Protection Law. .......................................... 16

    A.   The Commission did not create a heightened standard for
deception involving "free" products.............................. 17

    B.   The Commission properly applied the first-contact rule. .... 21

III. Concurrent Enforcement By The Commission And State
Governments Is A Common, Widely Accepted Practice That Does
Not Undermine The Validity Of The Cease-And-Desist Order. ... 24

    A.   The States' settlement does not render the
cease-and-desist order unnecessary............................... 25

    B.   Consumer protection law has long allowed for
enforcement by dual sovereigns. ................................. 27

CONCLUSION. ............................................................ 33

# TABLE OF AUTHORITIES

## *Cases*

*Bober v. Glaxo Wellcome PLC*, 246 F.3d 934 (7th Cir. 2001) ........... 22-23

*Carovillano v. Sirius XM Radio Inc.*, No. 23-cv-4723,
    2024 WL 450040 (S.D.N.Y. Feb. 6, 2024) ..................................... 22

*Della v. Colgate-Palmolive Co.*, No. 23-cv-04086,
    2024 WL 457798 (N.D. Cal. Feb. 6, 2024) ................................ 23, 24

*District of Columbia v. Amazon.com, Inc.*,
    2022-CAB-5698 (D.C. Super.) ................................................... 31, 32

*Fineman v. Citicorp USA, Inc.*, 485 N.E.2d 591 (Ill. App. Ct. 1985) ..... 19

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) ............................... 29

*FTC v. Equifax Inc.*, 1:19-CV-3297 (N.D. Ga.) ....................................... 31

*Garcia v. Overland Bond & Inv. Co.*,
    668 N.E.2d 199 (Ill. App. Ct. 1996) ................................................ 19

*Hernandez v. Radio Sys. Corp.*, No. 22-cv-1861,
    2023 WL 4291829 (C.D. Cal. May 10, 2023) .................................. 23

*Luskin's, Inc. v. Consumer Protection Div.*,
    726 A.2d 702 (Md. App. Ct. 1999) ................................................. 20

*Monroe v. Elmer Buchta Trucking, LLC*, No. 3:18-cv-00132,
    2020 WL 12631861 (S.D. Ind. Feb. 27, 2020) ............................... 19

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) ............. 21

*Schneider v. Chipotle Mexican Grill, Inc.*,
    328 F.R.D. 520 (N.D. Cal. 2018) ................................................... 23

*State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*,
        755 N.W.2d 583 (Neb. 2008) ............................................................ 20

*State v. Amoco Oil Co.*, 293 N.W. 2d 487 (Wis. 1980) ...................... 20, 24

## Statutes and Regulations

15 U.S.C. § 45(a)(1) ...................................................................... 28

815 Ill. Comp. Stat. 505/2 ............................................................ 29

D.C. Code § 28-3901(d) ................................................................ 28

D.C. Code § 28-3904 ............................................................... 28, 29

Minn. Stat. § 325F.69 (2023) ....................................................... 29

Tenn. Code § 47-18-104 (2021) ..................................................... 29

## Other

*$470 Million State-Federal Settlement Reached with HSBC Over
        Unlawful Foreclosures, Loan Servicing*,
        Mass.gov (Feb. 5, 2016) ........................................................... 30

*50 Attorneys General Secure $600 Million From Equifax In Largest Data
        Breach Settlement In History*, Office of the Attorney General for
        D.C. (July 22, 2019) ................................................................ 30

*Chase Bank to Change Unlawful Debt-Collection Practices Thanks to
        Agreements with State Attorneys General*, Office of the Attorney
        General for D.C. (July 8, 2015) ................................................. 30

Justin Elliott and Lucas Waldron, *Here's How TurboTax Just Tricked
        You Into Paying to File Your Taxes*, ProPublica (Apr. 22, 2019) .. 13

Justin Elliott and Paul Kiel, *Inside TurboTax's 20-Year Fight to Stop Americans from Filing Their Taxes for Free*, ProPublica (Oct. 17, 2019) .................................................. 10, 11, 14

Justin Elliott, *Intuit Will Pay Millions to Customers Tricked into Paying for TurboTax*, ProPublica (May 4, 2022) .......................... 10

*In Settlement with District, Western Union Agrees to Enact Anti-Fraud Program to Protect Consumers from Wire Fraud*, Office of the Attorney General for D.C. (Jan. 31, 2017) ................ 31

Ariana Tobin, Justin Elliott and Meg Marco, *Here Are Your Stories of Being Tricked Into Paying by TurboTax. You Often Need the Money*, ProPublica (Apr. 26, 2019) ................................................. 16

Mark Totten, *Credit Reform and the States: The Vital Role of Attorneys General After Dodd-Frank*, 99 Iowa L. Rev. 115 (2013) ................ 28

*Super Bowl 50: TurboTax Ad*, The Wall Street Journal .......................... 8

## IDENTITY AND INTEREST OF AMICI STATES

Illinois, the District of Columbia, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, and Wisconsin ("amici States") submit this brief in support of Respondent Federal Trade Commission ("FTC" or "Commission") pursuant to Federal Rule of Appellate Procedure 29(a)(2).[1]

Amici States have a substantial interest in protecting the welfare and financial security of their residents, which includes protecting them from deceptive advertising practices. This case implicates that interest. Intuit, Inc. challenges the validity of the Commission's opinion concluding that it violated Section 5 of the Federal Trade Commission Act ("FTCA") when it advertised TurboTax's commercial products as "free," even though those products were not free for most consumers. *See* Opinion of the Commission ("Op.").

---

[1] No party's counsel authored this brief in whole or in part, and no fee has been or will be paid for its preparation.

1

In fact, the Commission's opinion is consistent with prior enforcement actions that amici States have taken against Intuit. In 2022, a coalition of 50 States and the District of Columbia entered into a settlement with Intuit that resolved state investigations into whether Intuit's marketing, advertising, promotion, and sale of its TurboTax products constituted deceptive or unfair business acts or practices in violation of the States' consumer protection laws. *See* Assurance of Voluntary Compliance ("Settlement") at 1-2.[2] A key focus of the States' investigation was the tension between the free product that TurboTax offered as part of its commercial business (the "Free Edition") and a separate free product that it offered in partnership with the Internal Revenue Service (the "Free File Program"). *Id.* at 7-10. Through the settlement, the coalition obtained injunctive relief, as well as $141 million to compensate the millions of consumers who paid for a TurboTax product that should have been free to them.

Intuit's arguments in this appeal—which attempt to invalidate the Commission's opinion by claiming that it was not supported by

---

[2] The Settlement is available at https://bit.ly/4cfD6x8. All websites last visited on June 18, 2024.

substantial evidence and that the relief the Commission ordered was unnecessary given the States' settlement—would, if adopted, interfere with the States' interests in preventing deceptive advertising. Accordingly, amici States urge this Court to affirm the Commission's opinion.

## SUMMARY OF ARGUMENT

In 2022, the Commission issued an administrative complaint against Intuit, charging that Intuit's advertisements promoting TurboTax as "free" violate Section 5 of the FTCA because TurboTax is only free for some consumers. Op. 33. And though certain advertisements contained disclosures, those disclosures were inadequate to cure the misrepresentation that consumers may file their tax returns for free. *Id.* After a trial, an administrative law judge concluded that Intuit had violated Section 5 by engaging in deceptive advertising, and the Commission affirmed that ruling in a 90-page decision. *Id.* at 35.

As the Commission explained, the evidence showed that Intuit's advertisements consistently conveyed to consumers that they could file a tax return with TurboTax for free, and that the disclaimers on some of

those advertisements were insufficient to counteract this message.  *Id.*
at 37-46.  The Commission further determined that these
advertisements were likely to mislead the significant majority of
consumers.  *Id.* at 46-47.  Based on these findings, the Commission
entered a cease-and-desist order requiring Intuit to make disclosures to
cure the claims in their advertisements that TurboTax is free for
consumers.  Cease-and-Desist Order of the Commission ("Order") at 3.

Intuit filed a petition for review seeking to invalidate the
Commission's opinion on several grounds.  Amici States agree with the
Commission that Intuit's arguments should be rejected.  To start, there
is no basis for Intuit's contention that the opinion lacks substantial
evidence:  the Commission rightly concluded that Intuit engaged in
deceptive activities to depict TurboTax as free, even though it was not
free for most taxpayers.  Indeed, both the federal and state
investigations uncovered a wide range of deceptive actions by Intuit
that included running a yearslong, nationwide advertising campaign
describing TurboTax's commercial products as free and engaging in
search engine and website manipulation to promote Intuit's commercial
TurboTax products (including the Free Edition), while steering

consumers away from a different TurboTax product (the Free File Program) that was *actually* free for many consumers at or below a certain income threshold.

Additionally, Intuit incorrectly argues that the Commission's opinion contains legal errors requiring reversal. As amici States know from their own enforcement experience, the Commission's opinion is consistent with longstanding principles of both state and federal consumer protection law. Specifically, the opinion did not create a heightened standard for assessing deception involving "free" products, nor did it improperly extend the "first-contact rule."

Finally, Intuit wrongly claims that the Commission's cease-and-desist order is unnecessary because of the prior multistate settlement. While the Commission's order is consistent with the settlement, it is not duplicative because there are important differences between the two. And to the extent that the order and settlement overlap, there is nothing unusual about complementary enforcement actions brought by the federal government and the States. On the contrary, such actions are common exercises of dual sovereignty.

## ARGUMENT

## I.   **Intuit's Deceptive Conduct Harms Amici States' Residents.**

Intuit asserts that the Commission's decision is not supported by substantial evidence because its conduct was not deceptive.  Intuit Br. 34.  Amici States agree with the Commission that this is not true:  the Commission properly determined that Intuit engaged in a wide range of deceptive activities in connection with its yearslong advertising campaign depicting TurboTax as free.  FTC Br. 17; Op. 2.

Amici States write separately, however, to highlight how two of Intuit's interrelated strategies deceived their residents and caused substantial harm.  First, Intuit's advertisements consistently conveyed to consumers that they could file a tax return for free using a TurboTax product, even though that message was false for most taxpayers.  Second, Intuit conducted search engine manipulation to promote its commercial TurboTax products (including the Free Edition), while steering consumers away from a different TurboTax product that was entirely free for many consumers at or below a certain income threshold (the Free File Program).  These actions caused serious harm to amici States' residents.

6

### A.    Intuit's advertisements about its "free" product offerings deceived consumers.

During the time period addressed by the Commission's administrative complaint, Intuit ran television, radio, social media, internet display, paid search, direct email, and website advertisements to promote its commercial TurboTax products as "free."  Op. 4.  These advertisements received billions of unique impressions—for example, TurboTax's television advertising ran tens of thousands of times on hundreds of television networks in all 50 States.  *Id.* at 5.  And "[t]he central, primary message" of these advertisements was that consumers could "file their taxes for free with TurboTax."  *Id.* at 38.

As one example, in "The Power of Free" advertising campaign Intuit ran between 2018 and 2021, "free" was "essentially the only word used or spoken in the commercials."  Respondent's Proposed Findings of Fact ("RPFF") ¶ 51.  Likewise, between 2014 and 2017, Intuit ran the "Absolute Zero" campaign, which emphasized that TurboTax was free, "guaranteed."  *Id.* ¶ 50; Op. 5.  And in 2016, the actor Anthony Hopkins stated in a Super Bowl commercial that he would "never tarnish [his] name by selling you something.  Now if I were to tell you to go to turbotax.com, it's because TurboTax Absolute Zero lets you file your

7

taxes for free." Op. 7. When asked "You're not selling anything?" Hopkins replied "It's free! There's nothing to sell."[3] TurboTax's radio commercials were of a similar stripe: one 30-second ad was written as a jingle where the word "free" was spoken 32 times. Op. 14.

As the Commission recognized, however, TurboTax was not actually free for most consumers. *Id*. at 3. Instead, the TurboTax Free Edition was available only to a minority of taxpayers (approximately a third) who had "simple" returns. *Id*. at 3-4. Intuit's definition of a simple return changed nearly every year but would typically include only those returns that could be filed with no attached schedules. *Id*. In practice, that excluded any taxpayer with mortgage, property, or itemized deductions, as well as those with education expenses, small business income, or income as a "gig" or freelance worker. *Id*.

The advertisements, moreover, did not include sufficient disclosures or other information to dispel the overarching "free" message. In television advertisements, for example, Intuit's disclosures—that the Free Edition was "for simple returns only*," id*. at

---

[3] *Super Bowl 50: TurboTax Ad*, The Wall Street Journal, https://bit.ly/3V2kjhZ.

6—were "typically faint in color and . . . virtually lost against the other larger, bolder, printed messages, such as the TurboTax logo and the word 'free,'" *id.* at 11.  In fact, these disclosures, written in unlined white text, were sometimes placed over a moving white background (in one commercial, a white fishing boat, and in another, a white sheep). *Id.* at 8-9.  Similarly, in radio advertising, these disclosures were "spoken at a significantly faster rate" than the repeated claims that TurboTax is "free."  *Id.* at 14.

Even if a consumer could see or hear Intuit's disclosures, they were insufficient for the additional reason that the term "simple returns" as used by Intuit was inherently confusing.  Indeed, surveys showed that 55% of respondents mistakenly believed their returns to be "simple" under the ordinary definition of the word.  RPFF ¶ 496.

Furthermore, Intuit was aware that its advertisements were successfully communicating the "free" message but not communicating the important limiting qualifications.  Internal documents reflect that Intuit understood the clear implication of their advertising:  "[t]he website lists Free, Free, Free and the customers are assuming their

return will be free."[4]  And as the Commission noted, Intuit received

complaints from consumers that TurboTax was "not free like they

advertised," that the "TV commercials are a big lie," and that Intuit was

engaging in "false advertising." Op. 58.  As of 2022, more than 150,000

individual arbitration claims had been filed against Intuit to recoup

costs for tax preparation services that Intuit advertised as free.[5]

**B.    Intuit took actions that steered consumers away from the government-sponsored free filing program to its commercial site.**

Beyond misleading consumers into believing TurboTax's Free

Edition was likely to be free, Intuit actively prevented consumers from

seeking and using genuinely free options.  *See* Op. 18-19.  As noted in

the States' settlement, during the relevant timeframe, TurboTax offered

two products with "free" branding:  the Free Edition and a version

offered through a partnership with the Internal Revenue Service ("IRS")

that was initially called the "Freedom Edition" and later the "Free File

Program."  Settlement ¶¶ 26-28.  The Free File Program was the result

---

[4]  Justin Elliott and Paul Kiel, *Inside TurboTax's 20-Year Fight to Stop Americans from Filing Their Taxes for Free*, ProPublica (Oct. 17, 2019), https://bit.ly/3R1Gzr1.

[5]  Justin Elliott, *Intuit Will Pay Millions to Customers Tricked into Paying for TurboTax*, ProPublica (May 4, 2022), https://bit.ly/3R5htax.

of negotiations between the IRS and Intuit.  In 2002, the IRS considered
creating a free, automated filing system for taxpayers.  Intuit fought
these efforts, asserting that such a system was unnecessary because
their Free Edition already provided free tax preparation for certain
filers.[6]  Following lengthy negotiations, Intuit struck a deal with the
IRS in which Intuit "would offer free tax prep to a larger portion of
taxpayers" via the Free File Program and, in exchange, "the IRS would
promise not to develop its own system."[7]  This deal, which was
memorialized in a Memorandum of Understanding between the IRS
and Intuit (among other online tax preparation companies), was
designed to provide free filing services for low-income filers, active-duty
service members, and veterans.  *E.g.*, RPFF ¶¶ 31, 35.

Despite this agreement with the IRS, Intuit went to great lengths
to prevent consumers from accessing the Free File Program.  To start,
Intuit employed a variety of tactics to manipulate search engine results
to make it difficult for consumers to find the Free File Program on
TurboTax's website.  *E.g.*, *id.* ¶¶ 42-46; Settlement ¶¶ 47-68.  In fact, for

---

[6] *Inside TurboTax's 20-Year-Fight*, supra note 4.

[7] *Id.*

several months in 2018, Intuit made that task nearly impossible by actively prohibiting search engines from indexing its Free File Program webpage, which effectively made it invisible to search engines.  RPFF ¶ 44; Settlement ¶31.

Outside of those months, Intuit used search engine optimization to prevent consumers from reaching the Free File Program.  For instance, as both the Commission and the States concluded, a consumer searching for "free file taxes online" or "file my taxes for free" on Google were directed to TurboTax's commercial products (including the Free Edition) instead of the Free File Program.  Op. 18-19; Settlement ¶¶33-36.  And even those who were well informed about their filing options and searched for "IRS free file," "Turbotax Free File Program," or "Turbo Tax Free File Program" were still often redirected to TurboTax's commercial products—*i.e.*, the Free Edition and paid TurboTax products.  Settlement ¶¶ 33-37.

Intuit also prevented consumers from finding the Free File Program on TurboTax's own website because, as Intuit has publicly conceded, "it [was] not accessible from the 'regular' TurboTax.com

website."[8]  Instead, consumers were only presented with the commercial

products.  Settlement ¶ 54.  And, consistent with the misleading

advertising discussed above, many consumers would be assured that

filing using the Free Edition would actually be free.  *Id.* ¶ 48.

Intuit also withheld information about the Free File Program from

consumers who began the filing process with the Free Edition.  After a

lengthy "interview" in which the consumer was required to input

confidential tax information, Intuit informed millions of consumers that

they were not eligible for the Free Edition after all.  Settlement ¶¶ 50-

52, 67; Op. 51.  And although many of these individuals were eligible for

the Free File Program, Intuit never disclosed that information.

Settlement ¶¶ 55, 68.  Instead, Intuit informed consumers that they

were required to upgrade to a paid product or, if they wanted to file for

free, decide not to report certain income.  *Id.* ¶¶ 64-65.

Consumers expressed frustration about being "force[d] to upgrade

at the very end," and about a process that "start[s] with the free service

[and] then can't process any further until [they accept] the $70

---

[8]  Justin Elliott and Lucas Waldron, *Here's How TurboTax Just Tricked You Into Paying to File Your Taxes*, ProPublica (Apr. 22, 2019) https://bit.ly/3X1Z9D3.

upgrade."  Op. 58.  And Intuit was aware that "[c]ustomers are getting

upset when they have to pay more for upgrade," and only "realiz[e] they

had been upgraded . . . when they notice the (increased) charge."[9]

Internal analysis by Intuit showed that "customers have often been

confused between the two 'free' offerings and we have received

complaints that we were not transparent and/or a bait and switch."

RPFF ¶ 43.  Nevertheless, Intuit continued its online marketing

strategy, thereby engaging in an intentional effort to avoid

"cannibalization" of its bottom line by the Free File Program that Intuit

was obligated to provide under its agreement with the IRS.  Settlement

¶ 30.

### C.   Intuit's deceptive conduct has harmed millions of consumers across the country.

Intuit's deceptive actions harmed consumers throughout amici

States by costing them time or money (or both).  Indeed, as explained,

given Intuit's deceptive advertisements and manipulation of its online

presence, consumers typically did not realize the true cost of using

TurboTax until they had committed to the product by completing a

---

[9] *Inside TurboTax's 20-Year-Fight,* supra note 4.

lengthy and time-consuming interview and disclosing sensitive financial and personal information. And by that point, as the Commission recognized, many consumers were deterred from changing to another tax preparation service that might have been less expensive. Op. 49.

Intuit's deception was especially harmful to those who would have qualified for the Free File Program but were steered to another, paid TurboTax product. Intuit made millions in profits from taxpayers who would have been eligible to pay nothing to file their taxes through the Free File Program but instead paid Intuit for their commercial product. RPFF ¶ 45. These profits were made at the expense of low-income taxpayers and military families, since the Free File Program was only available to taxpayers with an aggregate gross income not exceeding a certain threshold. Settlement ¶ 12. In 2020, that threshold was $39,000 for civilians and $72,000 for active-duty service members. *Id.* ¶¶ 14-15.

There are many examples of the harm that Intuit's actions caused these taxpayers. One woman reported that she was never offered a free product by Intuit and instead paid $200 to file her taxes on an income of

$32,877.[10]  At the time, she was relying on short-term loans to pay for

rent while undergoing chemotherapy and while her husband, who had

Parkinson's disease, was only able to work part-time.[11]  Another

woman—an 87-year-old living on social security and her late husband's

military pension—was charged $124.98 to file her taxes, which was

approximately 1% of her annual income.[12]  Based on their incomes,

these taxpayers, among millions of others, would have qualified for the

Free File Program.

## II.    The Commission Correctly Applied Longstanding Principles Of Consumer Protection Law.

Intuit also argues that the Commission's opinion rests on several

legal errors, including that the Commission applied a "novel and

baseless heightened disclosure standard" for advertising messages

offering a "free" product, Intuit Br. 44, and erroneously extended the

"first-contact" rule to the online context, *id.* at 51.  These arguments are

---

[10]  Ariana Tobin, Justin Elliott and Meg Marco, *Here Are Your Stories of Being Tricked Into Paying by TurboTax. You Often Need the Money*, ProPublica (Apr. 26, 2019), https://bit.ly/3VkZcJ3.

[11]  *Id.*

[12]  *Id.*

incorrect.  The opinion is consistent with longstanding principles of consumer protection law that are employed throughout the country.

## A.   The Commission did not create a heightened standard for deception involving "free" products.

Intuit asserts that the Commission improperly applied an unprecedented, heightened deception standard to advertisements containing a "free" message.  Intuit Br. 44.  But this is untrue:  the Commission applied basic principles of consumer protection law to the advertisements at issue here.

As the Commission explained, determining what claim is conveyed by an advertisement requires discerning "the overall net impression of the advertisement for the reasonable consumer-viewer."  Op. 37.  When there are disclaimers or qualifications in an advertisement, they must be "sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression."  *Id.*; *see also* FTC Br. 4, 33-36 (collecting cases).  Applying this well-settled standard, the Commission concluded that Intuit's advertisements "conveyed to reasonable consumers the message that they can file their taxes with TurboTax for free," Op. 37, and that the disclosures "did not alter the overall message conveyed" by those advertisements, *id.* at 40.

17

One reason that the disclosures were "particularly inadequate," the Commission also explained, was because they had to be "considered in the context of the prominent, repeated 'free' claims." *Id.* at 45. In other words, "to affect or qualify the claim conveyed, the disclosure must be commensurate with the strength of the claim." *Id.* at 46. And where there is a "[r]epeated emphasis on free filing," which conveys a "clear, strong, and compelling message," the disclosures must "be similarly clear and strong to make a difference." *Id.* Intuit's disclosures, which were "vague" and "often barely visible," did not suffice to change the message conveyed by the advertisements. *Id.*

By addressing the "free" claims made by Intuit, the Commission was not creating a new or heightened standard. Rather, it was employing principles that have been consistently applied for decades. As the Commission explained, federal consumer protection law recognizes that as part of the context-driven analysis for deception claims, advertisements claiming that a product is "free" must clearly identify any conditions or disclaimers associated with that offer to ensure that the terms are properly understood. FTC Br. 29-30.

18

States, too, have recognized and applied these principles under their own consumer protection laws. In Illinois, for example, determining whether an advertisement is deceptive turns on "the net impression that it is likely to make on the general populace." *Garcia v. Overland Bond & Inv. Co.*, 668 N.E.2d 199, 203 (Ill. App. Ct. 1996) (cleaned up). A disclosure may cure a misrepresentation only if it "negates the net impression" made by the advertisement. *Id.* When applied to claims that an item is "free," Illinois courts (like their federal counterparts) have determined that the "conditions, obligations, or other prerequisites to the receipt of" a free item be so clearly explained at the outset "as to leave no reasonable probability that the terms of the advertisement or offer might be misunderstood." *Fineman v. Citicorp USA, Inc.*, 485 N.E.2d 591, 594 (Ill. App. Ct. 1985) (citing federal law).

Other States also consider the presence of a "free" offer when determining whether a claim was deceptive under state consumer protection laws. *See, e.g.*, *Monroe v. Elmer Buchta Trucking, LLC*, No. 3:18-cv-00132, 2020 WL 12631861, at *3 (S.D. Ind. Feb. 27, 2020) (allegations that defendant advertised free training for truck drivers, but then deducted cost of training from wages, stated a claim for

19

deception under Indiana law); *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 590-91 (Neb. 2008) (evidence that company represented to consumers that they would receive free freezer as part of membership contract, but contracts required monthly payments for freezer, established deception under Nebraska law); *Luskin's, Inc. v. Consumer Protection Div.*, 726 A.2d 702, 716 (Md. App. Ct. 1999) (applying federal requirement that "free" offers must set forth disclaimers in clear and conspicuous manner and collecting state authority from Connecticut, Idaho, Ohio, and Utah doing the same); *State v. Amoco Oil Co.*, 293 N.W. 2d 487, 493 (Wis. 1980) (given the "unique appeal to the consumer of a 'free' item," consumers must be able to "gauge from the advertisement itself" whether the item is actually free).

In short, the Commission properly considered Intuit's representations that consumers could use its product for "free" as part of the Commission's broader analysis into whether Intuit's advertising was deceptive.

**B.   The Commission properly applied the first-contact rule.**

Intuit also asserts that the Commission's order should be reversed because it inappropriately extended the "first-contact" rule (also called the "deceptive-door-opener theory") to e-commerce.  Intuit Br. 51-55.  But the Commission correctly applied a rule that has been employed by state and federal courts to a wide range of circumstances, including online transactions and advertisements.

As the Commission explained, under the first-contact rule, if a company's first contact with the consumer is deceptive, later disclosures "do not absolve the company of liability for the ads."  Op. 47.  In other words, a company may violate the FTCA if it "induces the first contact through deception, even if the buyer becomes fully informed before entering the contract."  *Id.* (cleaned up).  That is so because when assessing deceptive advertisements, "[e]ach advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims."  *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496-97 (1st Cir. 1989).

Applying that rule, the Commission correctly rejected Intuit's argument that it should consider the information available on its

website in addition to its advertisements to determine whether the advertisements were deceptive.  Op. 47-48.  Contrary to Intuit's suggestion, Intuit Br. 53, this conclusion is not an outlier; courts across the country have reached similar determinations in the context of e-commerce based on these same principles.

As one example, in *Carovillano v. Sirius XM Radio Inc.*, No. 23-cv-4723, 2024 WL 450040 (S.D.N.Y. Feb. 6, 2024), the court analyzed a claim that promotional mailers sent by Sirius XM were deceptive under New York law.  *Id.* at *2.  The mailers, which offered a discounted promotional rate, did not mention that subscribers would be subjected to another "flat-rate charge imposed at Sirius XM's sole discretion"; instead, it referred consumers to a "Consumer Agreement" on Sirius XM's website, which disclosed the fee.  *Id.*  Sirius XM argued that the fee was "clearly disclosed in its online materials, such that no reasonable consumer would be misled."  *Id.* at *1 (cleaned up).  The court disagreed, concluding that "a reasonable consumer is not expected to look beyond misleading representations in one part of an advertisement to discover the truth . . . in small print online."  *Id.* at *8 (cleaned up); *see also, e.g., Bober v. Glaxo Wellcome PLC*, 246 F.3d 934,

944 (7th Cir. 2001) (Wood, J., concurring) ("I find no Illinois case holding that a company can avoid potential liability for deceptive statements if it has buried further explanatory material on a web site or in a brochure that some consumers may never see.").

Several federal courts have applied similar principles to claims arising under California law. For example, a court recently rejected Colgate's reliance on online disclaimers about the recyclable material used in its product packaging, stating that consumers are not required "to conduct a research project (or even to flip the product over to read fine print elsewhere on the package) prior to purchasing a product." *Della v. Colgate-Palmolive Co.*, No. 23-cv-04086, 2024 WL 457798, at *23 (N.D. Cal. Feb. 6, 2024); *see also Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 532 (N.D. Cal. 2018) ("It would not be reasonable to expect a consumer to search for disclaimers on a website to clarify a purported misrepresentation on in-store signage."); *Hernandez v. Radio Sys. Corp.*, No. 22-cv-1861, 2023 WL 4291829, at *8 (C.D. Cal. May 10, 2023) (in declining to consider online disclaimers and statements made in product manuals, court rejected "the notion that . . . as an empirical matter, reasonable consumers engage in exhaustive

research before purchasing items" or that they should be required to do so.); *see also Amoco Oil Co.*, 293 N.W.2d at 493 ("the advertiser should supply the information, the consumer should not have to search for it").

This conclusion, as the court in the Colgate lawsuit explained, does not break new ground; rather, it is consistent with longstanding precedent that a consumer is not expected to seek out information—online or elsewhere—that would cure misrepresentations made about a product in a company's advertisements. *Della*, 2024 WL 457798, at *23. The Commission's application of the first-contact rule to e-commerce thus does not deviate from, and instead follows, long-settled law.

**III.  Concurrent Enforcement By The Commission And State Governments Is A Common, Widely Accepted Practice That Does Not Undermine The Validity Of The Cease-And-Desist Order.**

Finally, Intuit challenges the Commission's cease-and-desist order as unnecessary because, in its view, the States' settlement "already ensures that consumers will not be misled by TurboTax tax-prep advertising." Intuit Br. 55. But this is incorrect:  that States have undertaken similar enforcement actions pursuant to their own consumer protection laws does not undermine the validity of the cease-and-desist order.  Indeed, while the Commission's cease-and-desist

order has some similarities to the States' enforcement actions, there are also important differences between the Commission's order and the multistate settlement that demonstrate that they are not duplicative. And even if the order and settlement prohibited the same conduct, concurrent enforcement by the federal government and the States is a longstanding practice that is well-supported by principles of dual sovereignty. In fact, state and federal consumer protection regimes are specifically designed to provide complementary enforcement mechanisms.

## A.    The States' settlement does not render the cease-and-desist order unnecessary.

While the settlement by the States shares some similarities with the Commission's cease-and-desist order, the two are different in subtle but important ways. For that reason alone, the cease-and-desist order is not unnecessary.

Indeed, the Commission's cease-and-desist order is different from the multistate settlement in several respects. *See* Op. 97. To start, the Commission's order prohibits a wider range of conduct, broadly requiring that Intuit "must not represent that a good or service is 'Free'" unless it is actually "Free to all consumers" or meets certain

other narrow exceptions.  Order at 6.  By contrast, the settlement

prohibits Intuit from engaging in certain specific and enumerated

conduct, such as claiming that "consumers can only file their taxes

online accurately if they use a TurboTax Paid Product or TurboTax Free

Edition Product" or that "consumers can only claim a tax credit or tax

deduction if they use a" certain product.  Settlement at 19.

Additionally, the Commission's cease-and-desist order provides

specific language that Intuit must use in its advertisements to ensure

that consumers are adequately informed that the Free Edition is

actually free for only a limited group of taxpayers.  Order at 6-7.  By

contrast, the multistate settlement does not provide specific language

that Intuit must use to make clear that its free products are not

actually free for all users.  Settlement at 20.  Furthermore, the

Commission's order requires 20 years of compliance, Order at 7, while

the settlement requires Intuit to create and submit compliance reports

for up to 10 years, Settlement at 29-30.

Finally, the multistate settlement is broader than the

Commission's order in certain respects.  For instance, the settlement

specifically addresses Intuit's misconduct with respect to the Free File

Program that it hid from qualified taxpayers by leading website visitors to the paid TurboTax products. Settlement at 11-14. Accordingly, pursuant to the settlement, Intuit is prohibited from participating in the Free File Program. *Id.* at 22. The Commission's order, by contrast, does not specifically address Intuit's deception with respect to the Free File Program.

All told, the differences between the two confirm that the existence of one does not undermine the validity of the other.

### B.   Consumer protection law has long allowed for enforcement by dual sovereigns.

Furthermore, the existence of the Commission's order and the multistate settlement is consistent with principles of dual sovereignty and the longstanding practice of the States and federal government. To begin, these concurrent enforcement efforts illustrate the equally compelling interests in preventing unfair and deceptive conduct between two sovereigns with similar consumer protection laws. Principles of dual sovereignty support the existence of concurrent enforcement efforts between the federal government and the States.

After all, the federal government's interests can vary from the States',[13] so each entity should be able to pursue enforcement efforts in a wide array of subject-matter areas concurrently.  Indeed, federal and state actions often complement each other and together target a wider swath of deceptive conduct.

So too with consumer protection law, which also reflects our well-entrenched system of enforcement by dual sovereigns.  All 50 States and the District have consumer protection laws that work alongside—and sometimes beyond—the FTCA and other federal measures to protect consumers from deceptive and unfair business practices.  For instance, both the District of Columbia's Consumer Protection Procedures Act ("CPPA") and the FTCA prohibit "unfair or deceptive" acts or practices.  15 U.S.C. § 45(a)(1); D.C. Code § 28-3904.  And the CPPA specifically affords "due consideration and weight . . . to the interpretation by the [FTC] and the federal courts of the term 'unfair or deceptive act or practice,' as employed in" the FTCA.  D.C. Code § 28-3901(d).  As such, the two statutes necessarily have overlapping reach.

---

[13] *See* Mark Totten, *Credit Reform and the States: The Vital Role of Attorneys General After Dodd-Frank*, 99 Iowa L. Rev. 115, 163-64 (2013).

The statutes also diverge in some respects: the CPPA, for example, expressly enumerates a long, non-exhaustive list of prohibited conduct while the FTCA does not. *Id.* § 28-3904; *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 384-85 (1965).[14] These separate schemes demonstrate that while both the federal government and States are seeking to remedy unfair and deceptive conduct, they each also have their own interests in enforcing their respective laws.

The federal government and the States therefore often target similar, if not identical, conduct under their respective consumer protection laws. Sometimes this results in *joint* enforcement efforts, where the federal government and States work together to enforce their respective laws and protect consumers on a state and federal level. For instance, in 2016, multiple federal agencies, including the Department of Justice, and all 50 States and the District entered into a $470 million joint settlement targeting abusive practices in mortgage lending by

---

[14] The same is true for other state consumer protection acts, which share similarities with the FTCA but also have differing enforcement schemes that reflect each State's unique interests. *See, e.g.*, 815 Ill. Comp. Stat. 505/2; Minn. Stat. § 325F.69 (2023); Tenn. Code § 47-18-104 (2021).

HSBC.[15]  And, in 2015, the Consumer Financial Protection Bureau and the attorneys general from 47 States and the District entered into a $136 million joint settlement with Chase Bank that protected consumers from "deceptive and unlawful debt-collection practices."[16]

But sometimes the federal government and States tackle consumer protection suits concurrently but independently.  For example, in 2019, a coalition of 50 attorneys general reached a settlement with Equifax to resolve a multi-state investigation into a data breach that put "millions of Americans at risk for identity theft, financial losses, and other serious harms."[17]  Equifax agreed to strengthen its security practices, assist its customers with preventing and recovering from identity theft, and pay $175 million to the States. The FTC concurrently filed a complaint against Equifax challenging the

---

[15] *$470 Million State-Federal Settlement Reached with HSBC Over Unlawful Foreclosures, Loan Servicing*, Mass.gov (Feb. 5, 2016), https://bit.ly/3X3WJnG.

[16] *Chase Bank to Change Unlawful Debt-Collection Practices Thanks to Agreements with State Attorneys General*, Office of the Attorney General for D.C. (July 8, 2015), https://bit.ly/3R4oLLM.

[17] *50 Attorneys General Secure $600 Million From Equifax In Largest Data Breach Settlement In History*, Office of the Attorney General for D.C. (July 22, 2019), https://bit.ly/4bZ1bs4.

same conduct under federal law, which resulted in a settlement that included nationwide injunctive relief.[18]

And sometimes the state and federal enforcement actions are handled separately. For example, in 2022, the District filed a complaint against Amazon.com, Inc. and Amazon, Logistics, Inc. (collectively "Amazon") for using a deceptive payment model for its Amazon Flex drivers in violation of the District's CPPA.[19] Amazon sought to have the complaint dismissed, in part because it had previously reached a settlement with the FTC for the same conduct and was already subject to a 20-year injunction.[20] The D.C. Superior Court found, however, that

---

[18] Complaint, *FTC v. Equifax Inc.*, 1:19-CV-3297 (N.D. Ga. July 22, 2019); Stipulated Order For Permanent Injunction And Monetary Judgment, *FTC v. Equifax Inc.*, 1:19-CV-3297 (N.D. Ga. July 23, 2019); *see also In Settlement with District, Western Union Agrees to Enact Anti-Fraud Program to Protect Consumers from Wire Fraud*, Office of the Attorney General for D.C. (Jan. 31, 2017), https://bit.ly/3yD0A0G (concurrent enforcement efforts from a 49-State coalition and federal officials against Western Union that ensures anti-fraud measures).

[19] Complaint, *District of Columbia v. Amazon.com, Inc.*, 2022-CAB-5698 (D.C. Super. Ct. Dec. 6, 2022).

[20] *See* Motion to Dismiss at 7-11, *District of Columbia v. Amazon.com, Inc.*, 2022-CAB-5698 (D.C. Super. Ct. Feb. 7, 2023).

the District could still seek its own injunctive relief despite the FTC's settlement.[21]

These examples illustrate how it is common for an entity to be subject to enforcement actions by the federal government and the States that seek to address the same deceptive conduct—a practice that reflects the well-entrenched principle of dual sovereignty.  And regardless of the order of enforcement—whether jointly, concurrently, or in succession—all are valid exercises of each jurisdiction's independent enforcement power.

---

[21] Order at 8-9, *District of Columbia v. Amazon.com, Inc.*, 2022-CAB-5698 (D.C. Super. Ct. June 8, 2023).

# CONCLUSION

This Court should deny the petition for review.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

KWAME RAOUL
Attorney General
State of Illinois

CAROLINE S. VAN ZILE
Solicitor General

JANE ELINOR NOTZ
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor
General

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
JOHN R. MILLIGAN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

ELISSA R. LOWENTHAL
Assistant Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

June 21, 2024

KRIS MAYES
Attorney General of Arizona

ROB BONTA
Attorney General of California

PHILIP J. WEISER
Attorney General of Colorado

WILLIAM TONG
Attorney General of Connecticut

KATHLEEN JENNINGS
Attorney General of Delaware

ANNE E. LOPEZ
Attorney General of Hawaii

AARON M. FREY
Attorney General of Maine

ANTHONY G. BROWN
Attorney General of Maryland

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

DANA NESSEL
Attorney General of Michigan

KEITH ELLISON
Attorney General of Minnesota

AARON D. FORD
Attorney General of Nevada

MATTHEW J. PLATKIN
Attorney General of New Jersey

LETITIA JAMES
Attorney General of New York

JOSHUA H. STEIN
Attorney General of North Carolina

ELLEN F. ROSENBLUM
Attorney General of Oregon

MICHELLE A. HENRY
Attorney General of Pennsylvania

PETER F. NERONHA
Attorney General of Rhode Island

ROBERT W. FERGUSON
Attorney General of Washington

JOSHUA L. KAUL
Attorney General of Wisconsin

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,855 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 365.

/s/ Sarah A. Hunger
SARAH A. HUNGER

June 21, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
SARAH A. HUNGER