2024 WL 3934796
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

TESLA, INCORPORATED; Tesla Lease Trust; Tesla Finance, L.L.C., Plaintiffs—Appellants,

v.

LOUISIANA AUTOMOBILE DEALERS ASSOCIATION, In itself and on behalf of its members, executive committee, and board of directors; Gregory Lala, In his official capacity as Chairman of the Louisiana Motor Vehicle Commission; Allen O. Krake, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; V. Price Leblanc, Jr., In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Eric R. Lane, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Kenneth Mike Smith, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; P.K. Smith Motors, Incorporated; Keith P. Hightower, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Keith M. Marcotte, In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Wesley Randal Scoggin, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Scott A. Courville, In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission; Donna S. Corley, In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and her private capacity; Terryl J. Fontenot, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; T & J Ford, Incorporated; Maurice C. Guidry, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Golden Motors, L.L.C.; Raney J. Redmond, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; Joseph W. Westbrook, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity, also known as Bill Westbrook; Stephen Guidry, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Joyce Collier LaCour, In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; Thomas E. Bromfield, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; Edwin T. Murray, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; Ford of Slidell, L.L.C., doing business as Supreme Ford of Slidell; Gerry Lane Enterprises, Incorporated, doing business as Gerry Lane Chevrolet; Holmes Motors, L.L.C., doing business as Holmes Honda; Airline Car Rental, Incorporated, doing business as Avis Rent-A-Car; Shetler-Corley Motors, Limited; Leblanc Automobiles, L.C., incorrectly named as Leblanc Automobiles, Inc.; Morgan Buick GMC Shreveport, Incorporated, incorrectly named as Morgan Pontiac, Inc.; P.K. Smith Motors, Incorporated, in his private capacity; Commissioners of the Louisiana Motor Vehicle Commission and their Dealerships; Stephen L. Guidry, Jr., Defendants—Appellees.

No. 23-30480
|
FILED August 26, 2024

**Synopsis**
**Background:** Electric vehicle manufacturer brought action against automobile dealers' association, commissioners of Louisiana Motor Vehicle Commission in their private and official capacities, and dealerships owned by commissioners, asserting claims that Louisiana statutes and regulations prohibiting automobile manufacturers from selling directly to consumers or performing warranty services for cars they did not own, and tasking Commission with enforcing such provisions, violated federal Sherman Act, Due Process Clause, and Equal Protection Clause. The United States District Court for the Eastern District of Louisiana, Sarah S. Vance, J., 677 F.Supp.3d 417, granted defendants' motion to dismiss for failure to state a claim. Manufacture appealed.

**Holdings:** The Court of Appeals, Smith, Circuit Judge, held that:

manufacturer was not required to allege actual bias to plead that Commission's composition violated its due-process right not to be subjected to business license revocation proceedings conducted by interested decisionmakers;

manufacturer adequately alleged Commission had begun exercising power over manufacturer;

manufacturer plausibly alleged commissioners had possible bias;

legislative classification at issue in manufacturer's equal protection challenge was all vehicle manufacturers; and

challenged statutes were rationally related to legitimate state interest of preventing consolidations of monopoly power.

Affirmed in part, reversed in part, vacated in part, and remanded.

Haynes, Circuit Judge, concurred in part and concurred in the judgment in part.

Douglas, Circuit Judge, filed opinion dissenting in part and concurring in part.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

Appeal from the United States District Court for the Eastern District of Louisiana, USDC No. 2:22-CV-2982, Sarah S. Vance, U.S. District Judge

**Attorneys and Law Firms**

Mark Raymond Beebe, Esq., Diana Cole Surprenant, Adams & Reese, L.L.P., New Orleans, LA, David Gringer, Wilmer Cutler Pickering Hale & Dorr, L.L.P., New York, NY, Ari Holtzblatt (argued), Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC, for Plaintiffs—Appellants.

Paul D. Clement (argued), Matthew Rowen, Clement & Murphy, P.L.L.C., Alexandria, VA, Jeanne C. Comeaux, Claude Favrot Reynaud, Jr., Esq., Breazeale, Sachse & Wilson, L.L.P., Baton Rouge, LA, for Defendant—Appellee Louisiana Automobile Dealers Association.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Lamont P. Domingue, Voorhies & Labbe', A.P.L.C., Lafayette, LA, Harry Joseph Philips, Jr., Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, Timothy William Hassinger, Esq., Galloway, Johnson, Tompkins, Burr & Smith, A.P.L.C., Mandeville, LA, for Defendant—Appellee Gregory Lala.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Chloe Marie Chetta, Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C., New Orleans, LA, Harry Joseph Philips, Jr., Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, Timothy William Hassinger, Esq., Galloway, Johnson, Tompkins, Burr & Smith, A.P.L.C., Mandeville, LA, Richard E. Sarver, Trial Attorney, Robert A. Waldrup, Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C., New Orleans, LA, for Defendant—Appellee Allen O. Krake

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Patrick Shaw McGoey, Andrea V. Timpa, Schonekas, Evans, McGoey & McEachin, L.L.C., New Orleans, LA, Harry Joseph Philips, Jr., Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, Timothy William Hassinger, Esq., Galloway, Johnson, Tompkins, Burr & Smith, A.P.L.C.,

Mandeville, LA, for Defendants—Appellees V. Price Leblanc, Jr., Keith P. Hightower, Keith M. Marcotte, Wesley Randal Scoggin, Donna S. Corley, Terryl J. Fontenot, Maurice C. Guidry.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Harry Joseph Philips, Jr., Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, Colin D. Sherman, Sherman & Lacey, Mobile, AL, Timothy William Hassinger, Esq., Galloway, Johnson, Tompkins, Burr & Smith, A.P.L.C., Mandeville, LA, for Defendant—Appellee Eric R. Lane.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Harry Joseph Philips, Jr., Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, Timothy William Hassinger, Esq., Galloway, Johnson, Tompkins, Burr & Smith, A.P.L.C., Mandeville, LA, for Defendants—Appellees Kenneth Mike Smith, Scott A. Courville, Raney J. Redmond, Joseph W. Westbrook, Stephen Guidry, Joyce Collier LaCour, Thomas E. Bromfield, Edwin T. Murray.

William Raley Alford, III, Esq., Patrick M. Bollman, Stanley Reuter Thornton Alford, L.L.C., New Orleans, LA, for Defendants—Appellees P.K. Smith Motors, Incorporated, P.K. Smith Motors, Incorporated.

Patrick Shaw McGoey, Andrea V. Timpa, Schonekas, Evans, McGoey & McEachin, L.L.C., New Orleans, LA, for Defendants—Appellees T & J Ford, Incorporated, Golden Motors, L.L.C., Holmes Motors, L.L.C., Airline Car Rental, Incorporated, Shetler-Corley Motors, Limited, Leblanc Automobiles. L.C., Morgan Buick GMC Shreveport, Incorporated.

Chloe Marie Chetta, Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C., New Orleans, LA, Richard E. Sarver, Trial Attorney, Robert A. Waldrup, Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C., New Orleans, LA, for Defendant—Appellee Ford of Slidell, L.L.C.

Colin D. Sherman, Sherman & Lacey, Mobile, AL, for Defendant—Appellee Gerry Lane Enterprises, Incorporated.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Lamont P. Domingue, Voorhies & Labbe', A.P.L.C., Lafayette, LA, for Defendant—Appellee Stephen L. Guidry, Jr.

Thomas Reger, II, Attorney, Fish & Richardson, P.C., Dallas, TX, for Amicus Curiae Legal and Economic Scholars.

Matthew C. Mandelberg (argued), Nickolai Levin, Brandon Storm, Attorney, Stratton Christopher Strand, Esq., Trial Attorney, U.S. Department of Justice, Antitrust Division, Appellate Section, Washington, DC, for Amicus Curiae United States of America.

Robert Thompson Mowrey, W. Scott Hastings, Esq., Daron L. Janis, Esq., Thomas George Yoxall, Attorney, Locke Lord, L.L.P., Dallas, TX, for Amicus Curiae Texas Automobile Dealers Association.

Before Smith, Haynes,[*] and Douglas, Circuit Judges.

[*] Judge Haynes concurs in full in the affirmance of the dismissal of the equal protection claim and concurs in the judgment only as to the reversal of the dismissal of the due process claim and the vacatur and remand of the antitrust claim.

**Opinion**

Jerry E. Smith, Circuit Judge:

**\*1** Louisiana law generally prohibits automobile manufacturers from selling directly to consumers or performing warranty services for cars that the manufacturers do not own. The Commission, which by law is composed of market incumbents, is tasked with enforcing those provisions.

Plaintiffs are three Tesla entities (together, "Tesla"). Defendants are Commissioners of the Louisiana Motor Vehicle Commission in their private and official capacities, the Louisiana Automobile Dealers' Association ("LADA"), and dealerships owned by

the Commissioners. Tesla challenged the aforementioned law, alleging, *inter alia*, violations of (1) federal antitrust law, (2) its federal due process rights, and (3) its federal equal protection rights. The district court dismissed, and Tesla appeals. We reverse the dismissal of the due process claim, vacate and remand the dismissal of the antitrust claim, and affirm the dismissal of the equal protection claim.

I.

Tesla began manufacturing cars in 2008. Its business model has several distinct features. Most relevant is that it exclusively markets, sells, and leases its cars directly to consumers and through a network of stores that it owns and operates. It does not do so through third-party dealers.

Louisiana passed the first rendition of its dealership-regulation regime in 1954. *Benson & Gold Chevrolet, Inc. v. La. Motor Vehicle Comm'n*, 403 So. 2d 13, 16 (La. 1981). Before 2017, that law provided that no manufacturer (save for a few exceptions) may "sell or offer to sell a new or unused motor vehicle directly to a consumer." LA. REV. STAT. ANN. § 32:1261-(A)(1)(k)(i) (2016)).

In 2017, Louisiana amended the statute. 2017 La. SB 107. Tesla avers that, before the amendment, it would have been allowed to sell because "state law then only prohibited franchising manufacturers from competing with their own franchise dealers." Defendants disagree. LADA notes that "Tesla has *never* lawfully sold its cars directly to consumers in Louisiana." (Emphasis added.) The Commission avers that though "[t]here is no pre-2017 caselaw interpreting [the relevant] language," direct-to-consumer sales by a manufacturer would have violated the law "full stop." Either way, there is no dispute that after the amendment, Tesla would not be permitted to sell directly to consumers except through an in-state dealer. Tesla contends that that change was made "at the behest of Tesla's competitors."[1] LADA concedes that it successfully lobbied the legislature to, as they put it, "clarify" the law. Tesla says that because of that change, "if Tesla wishes to participate in the market for automobiles in the State of Louisiana, Tesla must forgo its successful (and necessary) business model."

[1] Tesla limits the scope of its challenge to the 2017 amendment:
> Plaintiffs do not challenge the enactment of this law as part of their antitrust or unfair trade practice claims. Nevertheless, a plaintiff may properly include evidence of immune lobbying activity in its antitrust allegations insofar as that evidence serves to illustrate the context and motive underlying the alleged anticompetitive conduct.

(Cleaned up.)

**\*2** Though Tesla does have a license to lease vehicles in Louisiana, it has not sought a license to sell vehicles there. Tesla posits, however, that there is an exception in Louisiana law that allows it to perform warranty repairs in the state—namely, though Louisiana law generally prohibits "a manufacturer ... [from] operat[ing] a satellite warranty and repair center," there is an exception for "fleet owner[s]." LA. REV. STAT. ANN. § 32:1261-(A)(1)(t). Tesla maintains that, through its entities, it is a fleet owner.

As of early 2023, there were "thousands of registered Tesla vehicles in Louisiana" even without direct sales. It currently provides warranty services at its New Orleans service center. Tesla worries that the Commission threatens this practice by being able, as Tesla puts it, "improperly [to] construe" the "fleet-owner provision ... to exclude Tesla."

Tesla avers that its "competitors have pursued every avenue to bar Tesla from the market," including "block[ing] Tesla from local markets altogether by promoting protectionist legislation and by coopting state regulatory authority." Tesla avers that the loss of its ability to perform warranty repairs in the state would make it unable to compete in that market. Tesla sees the 2017 restrictions on direct sales as one example of interference by competitors. It also avers that competitors in the state have coopted the Commission.

The Commission is the body charged with enforcing much of state law governing "distribution and sale of motor vehicles." LA. REV. STAT. ANN. §§ 32:1251, 32:1253(E). And it is given broad powers to do so. *Id.* § 32:1253(E). The Executive Director of the Commission "has the authority to issue all licenses upon receipt of applications that comply with the statutes and rules of the commission." LA. ADMIN. CODE tit. 46 § V.105(A). He or she also has subpoena power. *Id.* § V.303(B). "The commission has the responsibility to consider and determine the action necessary upon all charges of conduct which fail to conform to" the laws the Commission is charged with enforcing. *Id.* § V.301(A).

According to Tesla, competing dealerships "comprise[ ] a controlling majority of the government" Commission. Tesla adds that the Commission seeks to "drive Tesla from the ... market" by interpreting existing Louisiana law in a way that would bar Tesla's leasing and warranty repair activity in the state. The Commission has also used its power to "initiate a costly investigation of Tesla."

The Commission is composed of 18 members, 15 of whom exercise the power relevant here. *See generally* LA. REV. STAT. ANN. § 32:1253.[2] Each of those 15 members must be a licensee of the Commission. *Id.* § 32:1253(A)(2). Nine of those 15 are associated with competitor dealerships and defendants in this case.[3] They are also all members of defendant LADA—which "represent[s] nearly 350 new motor vehicle car and heavy truck dealers in Louisiana." At least one commissioner has served on the board of LADA. LADA met with the Commission numerous times over the course of five years to urge it to revise its interpretation of Louisiana law in a way not favorable to Tesla.

[2] *See also id.* § 32:1253(A)(3)(a) (laying out a more limited role for 3 of the 18 members of the Commission who are appointed from the state at large). The Commission agrees with Tesla that those members' responsibilities are not relevant to this case.

[3] The other 6 commissioners are involved in the motor vehicle industry but are not direct competitors with Tesla, though they might associate with direct competitors.

**\*3** Once Tesla announced that it would be opening a New Orleans service center in 2018, there was a flurry of activity. The former Chairman of the Commission and a member of LADA, Ray Brandt, forwarded an article about the announcement to the Commission's Executive Director, Lessie House, who responded "I am on it." Another member of LADA, Matt Baer, also raised the issue with House, to which House responded, "We are on top of this." Paul Stroed, a member of Louisiana's largest dealer group, said, in an email ultimately forwarded to House, that it "[was] not good for the future of our business if the state lets" Tesla open the center. House responded, "On top of it."[4] And LADA admits that it "lobb[ied] the Commission ... to rule that Tesla could not do as it planned."

[4] None of Brandt, House, Baer, or Stroed is a defendant.

Much later, in March 2020, LADA wrote a letter to the then-Chairman, Allen Krake, suggesting ways to impede Tesla's ability to open the service center. In June of that year, a state representative, Phillip Devillier, requested a formal opinion from the Attorney General of Louisiana about the lawfulness of Tesla's activities and suggested that LADA's answers were correct. The Attorney General turned to the Commission, which sided with Tesla. The Commission's opinion was quite clear:

(1) "It is not a violation of law for a manufacturer or distributor to lease new vehicles directly to consumers."

(2) "[A] manufacturer ... may perform warranty services directly without using a dealer ... when the manufacturer ... is a fleet owner and performs warranty work on its own fleet."

Tesla took issue with the fact that the Commission's answer was based on the implicit assumption that Tesla was a "fleet owner"—a determination made by the Commission. But the opinion also plainly states that the "definition [of 'fleet owner'] applies to Tesla Lease Trust." The Commission also referenced its discussions with LADA and expressed concerns about potential antitrust liability for itself and its members. Though LADA had tried numerous times "to convince [the Commission]

to revise its interpretations," the Commission "has always openly held (and directly stated to LADA) that it would issue a license to Tesla if Tesla met the statutory guidelines." In fact, it had done just that, approving a motor vehicle lessor license for Tesla Lease Trust in 2019. Nevertheless, in August 2020, the Attorney General sided with LADA and against the Commission.

Five days before the Attorney General's opinion was published, the Commission began an investigation of Tesla and issued a subpoena to Tesla Lease Trust ("TLT"). [5] LADA avers that that subpoena was motivated by the "complaints [to the Commission] that Tesla was skirting the law by performing warranty repairs on vehicles not titled to TLT." TLT responded to this first subpoena. Tesla says that it responded because it was "[u]naware of the illegal conspiracy" and because the subpoena had a "narrow scope."

[5]  The subpoena was issued by House, who again is not a defendant.

A month later, the Commission issued a second subpoena, which was withdrawn, for records stretching back to 2013. In February 2021, the Commission issued a third subpoena "for any records identifying vehicles leased in Louisiana by Tesla Lease Trust and identifying and/or referencing warranty service and/or warranty repair performed on any and all motor vehicles in Louisiana from June 1, 2019, to the present" (cleaned up). In Tesla's words, "This third subpoena expressly targeted Tesla Lease Trust over Tesla's performance of warranty repairs in alleged violation of La. Stat. § 32:1261(A)(l)(t)(i), under a strained interpretation of 'fleet owner' by the Commission." The Commission characterizes the subpoena differently: "[T]he commission asked Tesla Lease Trust, as a 'fleet owner,' to identify its 'fleet' and then identify whether it was performing warranty repairs on cars beyond its fleet—which would be unlawful" (footnote omitted).

**\*4**  Tesla objected, stating that it was a "fleet owner" and therefore outside the authority of the Commission. In continuing to press the subpoena, Tesla alleges that the Commission has revealed "it intends to adopt the view that Tesla is not a fleet owner." In April, the Commission filed a motion to compel Tesla to respond to the subpoena in proceedings before the Commission. Tesla asked for a continuance and for a determination of whether it was a fleet owner. The Commission denied the continuance and ordered Tesla to respond to the subpoena. But it also stayed Tesla's obligation to respond while Tesla sought judicial review. Tesla asked for rehearing on the motion to compel, which was denied. Tesla's direct competitors participated in those votes. [6]

[6]  For the purposes of our proceedings, "Tesla does not ask this Court to enjoin those proceedings or to issue any declaration on the requirements of state law. Rather, Tesla asks this Court to declare that—whatever the proper construction of state law—the Commission as currently structured is not constitutionally fit to answer those questions consistent with Due Process."

Tesla sought review of those decisions in state court. Those proceedings are ongoing. Tesla has continued to perform warranty repairs in Louisiana. The Commission avers this service extends to "vehicles beyond Tesla Lease Trust's fleet" (footnote omitted).

Tesla filed this lawsuit in August 2022. As relevant here, the first amended complaint asserts (1) a violation of federal antitrust law, (2) a violation of Tesla's due process rights under the Fourteenth Amendment, and (3) a violation of its equal protection rights under the Fourteenth Amendment.

The district court dismissed each claim with prejudice. On antitrust, it reasoned that the private defendants were immune from liability under the Sherman Act, and that Tesla had not plausibly pleaded a Sherman Act violation against the governmental defendants under *Twombly*. On due process, it decided that there was insufficient probability of actual bias to rise to the level of a constitutional violation. On equal protection, the district court ruled that the regulations passed rational-basis review.

II.

Our standard of review is well established:

> We review a Rule 12(b)(6) dismissal de novo.... Although we accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true.

*Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) (cleaned up).

### III.

Tesla's sense that there is something wrong with this scheme is vindicated by its due process claim. We reverse the dismissal of that claim.

*The Gibson-Wall Framework.* The seminal due process case on industry self-regulation is *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). It involved the Alabama Board of Optometry, which was composed only of independent optometrists. *See id.* at 567, 93 S.Ct. 1689. That board sought to revoke the licenses of non-independent optometrists. *See id.* That attempt was enjoined by a three-judge district court. *Id.* at 570, 93 S.Ct. 1689.[7] "For the District Court, the inquiry was not whether the Board members were 'actually biased but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him.'" *Id.* at 571, 93 S.Ct. 1689 (citation omitted).

[7] And appealed directly to the Supreme Court. 411 U.S. at 572, 93 S.Ct. 1689.

The Supreme Court affirmed the district court, which had found, in part, that where the composition of the board meant that "success in the Board's efforts would *possibly* redound to the personal benefit of members of the Board, sufficiently so that in the opinion of the District Court the Board was constitutionally disqualified from hearing the charges filed." *Id.* at 578, 93 S.Ct. 1689 (emphasis added). And the Court did so quite explicitly: "[W]e affirm, only on the ... ground of *possible* personal interest." *Id.* at 579, 93 S.Ct. 1689 (emphasis added). The Court concluded that "those with substantial pecuniary interest in legal proceedings should not adjudicate ... disputes" governing revocation of a competitor's license to practice in the relevant industry. *Id.* at 579, 93 S.Ct. 1689.[8]

[8] "This fundamental right applies equally to proceedings before an administrative agency." *Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 511 (5th Cir. 2001) (citing *Gibson*, 411 U.S. at 569, 93 S.Ct. 1689).

**\*5** More color is provided by *Wall v. American Optometric Association*, 379 F. Supp. 175, 178–79 (N.D. Ga.), *aff'd mem.*, 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974).[9] There, the district court stopped a board composed of mainly "dispensing" optometrists from exercising "complete control over who may enter the optometry profession in Georgia." *Id.* at 179. That includes control over "prescribing" optometrists who distribute their products to customers in a different way. *Id.* at 178.[10]

[9] At least in some contexts, summary affirmances by the Supreme Court can be "highly persuasive—if not controlling." *Rios v. Dillman*, 499 F.2d 329, 334 n.8 (5th Cir. 1974). Such affirmances are particularly salient where the Supreme Court has later relied on the summarily affirmed case. *See Friedman v. Rogers*, 440 U.S. 1, 18, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (discussing "*Gibson* and *Wall*.")

10   The Commission fails to distinguish *Wall*. It places undue emphasis on the district court's observation that "every current incumbent member of the board [was] a member of the" trade association. 379 F. Supp. at 188. That cannot be fairly read to say that a plaintiff can obtain relief only where *every* member of a board is financially interested. Is there any reason to believe that a board skewed 99-1 would not be a problem, but a board skewed 100-0 would?

*Tesla need not plead actual bias.* Tesla maintains that actual bias is not a pleading requirement. [11] Tesla criticizes the actual-bias requirement used by the district court and drawn in part from *Megill v. Board of Regents*, 541 F.2d 1073, 1079 (5th Cir. 1976), as having been "drawn from a line of inapposite cases that uniformly involve tenure and disciplinary proceedings at universities." Those cases are different, says Tesla, because (1) the adjudicators do not have the same sort of structural economic incentives for bias, (2) those cases were further along in the litigation process when there was enough evidence to adjudicate actual bias, and (3) "federal courts should be loath to intrude into internal school affairs." *Megill*, 541 F.2d at 1077. Tesla also notes that in *Megill*, pecuniary bias does not seem to have been alleged. *See id.* at 1079. [12]

11   *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) (noting that the Due Process Clause "preserves both the appearance and reality of fairness." (citation omitted)).

12   Though the procedural posture of *Megill* is unclear, it also seems to be at a stage other than the motion to dismiss. *See id.*

The Commission points to *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) as a "good example of why Tesla entities' due-process claim fails." There the Court upheld what the Commission sees as a lawful investigation by an agency. As the Commission describes it, in *Withrow* the "Court then rejected the plaintiff's claim that the board was unconstitutionally biased because its investigatory efforts allegedly dictated how it would adjudicate potential discipline." As Tesla notes, that's not so much about regulating direct competitors but is, instead, about the negative effects of the "combination of the investigative and adjudicative functions." *Id.* That is not the issue here.

Moreover, it is true that *Withrow* uses the language "actual bias" three times. But in two of those instances—spoken about in the immediate context of pecuniary interest—the Court used the phrases "probability of actual bias" and "risk of actual bias." *Withrow*, 421 U.S. at 47, 95 S.Ct. 1456. There is no apparent daylight between "risk of actual bias" and "possible bias." [13] The third instance is in a footnote that discusses an issue not reached by the district court and is apparently about bias based on deeply held ethical differences. *See id.* at 54 n.21, 95 S.Ct. 1456.

13   Risk is the "*possibility* of ... injury." *Risk*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/risk (emphasis added).

**\*6** Tesla is right that there is no need for it to plead actual bias, for at least three reasons. First, *Gibson* and *Wall* do not impose a showing of actual bias; rather, the most natural reading strongly suggests that possible bias is sufficient. *See, e.g., Gibson*, 411 U.S. at 579, 93 S.Ct. 1689 (affirming on a "ground of *possible* personal interest."). Second, for the reasons Tesla advances, neither *Megill* nor *Withrow* adds such a requirement. Finally, it is hard to imagine what a pleading of actual bias at the motion-to-dismiss stage would even mean. What is "plausible actual bias" other than "possible bias?" [14]

14   Were we to reach whether Tesla has plausibly pleaded actual bias, we should still reverse. At the motion-to-dismiss stage, it is impermissible to do the sort of weighing that the Commission and LADA want us to do. *Cf. Gen. Land Office of Tex. v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023) ("[A]t the pleading stage, they are not yet obliged to produce specific evidence to counter the ... defendants' merits arguments."). Tesla has alleged that various dealers reached out to the Commission and received responses along the lines of "We're on it." The Commission subsequently started investigating Tesla for regulatory violations. That is plausible actual bias based on well-pleaded facts.

*We need not wait longer to intervene if there is a due process violation.* The Commission points out that the district court in *Wall* initially withheld relief when the plaintiffs made a claim just based on the board's composition. *See Wall*, 379 F. Supp. at 180. Only once the board levied a disciplinary action against an optometrist did the court act. *See id.* In *Gibson*, "disciplinary

proceedings had been instituted against the plaintiffs." *Friedman*, 440 U.S. at 18, 99 S.Ct. 887. Here, the Commission posits that "the commission has not taken any disciplinary or enforcement action against any Tesla entity." Any such action is—at this point—merely potential.

Tesla responds that the Court intervened in *Gibson* and *Wall* only after hearings had been noticed but before the actual hearings. *Gibson*, 411 U.S. at 569, 93 S.Ct. 1689; *Wall*, 379 F. Supp. at 180. The court in *Gibson* found that the fact "that the administrative body itself was unconstitutionally constituted" rendered it "not entitled to hear the charges filed against the appellees." 411 U.S. at 577, 93 S.Ct. 1689.

In other words, there is no need to wait for the unconstitutional hearing to occur; notice of intent is sufficient. Tesla is right on this point. The Commission has already begun exercising power over Tesla at the very least by issuing subpoenas to TLT. [15]

[15] One might draw a line between adjudicative and executive—here, investigatory —power. In this context, that is a distinction without a difference. It would be odd to suggest that a board which cannot constitutionally adjudicate a claim because of bias could investigate and prosecute that claim. Prosecutors and judges alike recuse when they are personally biased. There is reason to believe that authorities with rule-making power differ. *See Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 27 n.3 (D.C. Cir. 2016). But this clearly falls on the adjudicative/executive rather the rulemaking side.

*Friedman*, 440 U.S. at 18, 99 S.Ct. 887, does not indicate otherwise. That decision foreclosed pre-enforcement challenges to regulatory authority based on the composition of the regulatory body alone. *See id.* It held that a plaintiff "ha[d] no constitutional right to be regulated by a Board that is sympathetic" to his preferred business model. *Id.* The Court distinguished *Gibson*, saying that in that case "courts were able to examine in a particular context the possibility that the members of the regulatory board might have personal interests that precluded a fair and impartial hearing of the charges." *Id.* On the other hand, "the *Friedman* plaintiffs never alleged the Board members would act out of self-interest instead of fairness, only that the board's composition itself was unfair." *Ass'n of Am. R.R.s*, 821 F.3d at 35.

**\*7** In short, Tesla does not have a right to a specific Commission composition, but it does have a "right to a fair and impartial hearing." *Friedman*, 440 U.S. at 18, 99 S.Ct. 887. Tesla reads *Friedman* as standing at most for the proposition that "*some* action must be taken against a plaintiff before suing." Tesla is correct. *Friedman* supports the earlier requirement that some action must be taken. That criterion is met here.

Gibson *and* Wall *control this case.* Ultimately, we must determine whether Tesla's claim falls within the *Gibson* and *Wall* line of cases. Tesla avers that it does, pointing to allegations that members of the Commission compete directly with Tesla, that they have a general interest in the franchised-dealer model, and that Commissioners have strong financial incentives to keep Tesla out of Louisiana. Tesla also notes that dealers have made statements to the effect that its entry into Louisiana is "not good for the future of our business." Tesla points to examples of what it sees as "concrete evidence that the Commissioners have joined with other private dealers in the common purpose to exclude Tesla from the market," including

- votes against Tesla,

- issuance of subpoenas,

- further votes to enforce those subpoenas,

- numerous meetings between LADA and the Commission to try to get the Commission interpretively to exclude Tesla from the market,

- an email from a dealer to Executive Director House complaining about Tesla's entry, and House's response that he was "[o]n top of it," and

  • the Commission's determination that the fleet-owner exception does not allow warranty repairs on sold vehicles.

LADA avers that these concrete examples are insufficient because the Commission sided with Tesla against LADA and the attorney general. [16] LADA defends the subpoenas as lawfully issued and urges that the only way to demonstrate that they were the products of bias is to show that they were completely off-base legally. In defendants' view, the Commission was just acting as the enforcer of Louisiana law. That's especially apparent when "the subpoenas are a logical outgrowth of the Commission's decision to side with Tesla in determining that TLT could lease and service cars in the state if it complied with the terms of the fleet exception."

[16] Tesla responds that even if it were proper to consider the siding of the Commission against the Attorney General at this stage of the pleading, it is still not dispositive. After all, the Commission's decision letter suggests that the Commission may have been driven by fear of antitrust liability rather than neutral interpretation of the law. Tesla avers that the Commission would obviously not adopt what it sees as a "facially absurd" legal interpretation where then are other more perceptibly neutral ways to achieve its anticompetitive goals, such as barring Tesla from servicing sold vehicles and discouraging other direct-to-consumer models.

The Commission expands on the context relevant here, adding that

  • the Commission has never taken action based on the Direct Service Ban,

  • the Commission advocated in favor of Tesla and against the Attorney General regarding the applicability of the warranty services ban, and

  • the Commission has not adopted any rules or regulations to enforce the attorney general's interpretation.

As a result, the Commission thinks that the only conduct relevant here is the issuance of the subpoenas, which it sees as a lawful use of investigatory power. After all, in its view, the subpoenas are a logical outgrowth of the Commission's decision to *side with Tesla* in determining that TLT could lease and service cars in the state if it complied with the terms of the fleet exception.

**\*8** Ultimately, Tesla is right that this falls within the unconstitutional mire that *Gibson* and *Wall* proscribe, for two reasons. *First*, these cases do not require a showing of actual bias. *See supra.* Even if LADA is one hundred percent right that this investigation is completely above board legally, that is not the problem at which *Gibson* and *Wall* take aim. They stand for a much broader proposition: "[T]hose with substantial pecuniary interest in legal proceedings should not adjudicate disputes" governing revocation of a competitor's license to practice in the relevant industry, *Gibson*, 411 U.S. at 579, 93 S.Ct. 1689—even if that authority is otherwise lawfully exercised.

*Second*, even if these cases did require a showing of actual bias, Tesla has pleaded enough to survive a motion to dismiss. Of particular concern are the emails from the Executive Director of the Commission to Tesla's competitors assuring them that Tesla's entry into the market would be dealt with. Even if in one instance—going against the Attorney General's interpretation, the Commission did not take a maximally anti-Tesla view, Tesla has pleaded enough specific facts to demonstrate *plausible* actual bias.

*Remaining objections.* There are a few more unpersuasive objections to Tesla's due process claim. First, the district court objected to Tesla's claims about the bias of the Commission for at least one more reason: that, in the court's view, the Commission had an incentive to compete with Tesla only in the *sales* market but not the *leasing and warranty services* market. But the complaint alleges that Tesla does compete with the members of the Commission in the leasing and warranty-servicing market, and that there are spillover effects into the sales market as well.

Second, LADA contends that the Commission is not the ultimate decisionmaker with respect to its rulings against Tesla because the legislature can change the laws and Tesla can get review in the courts. But the ability to petition the legislature and seek review in the courts does not obliterate Tesla's due process rights before the executive. [17]

[17]  *See Gibson*, 411 U.S. at 577 n.16, 93 S.Ct. 1689 (recognizing that Alabama courts had provided *de novo* review of licensing decisions); *cf. Ward v. Monroeville*, 409 U.S. 57, 61, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) ("Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication.").

Nor does *Chrysler Corp. v. Texas Motor Vehicle Commission*, 755 F.2d 1192 (5th Cir. 1985), resolve this claim against Tesla. That case involved a dealer-majority commission that resolved "warranty-related disputes between the purchasers of new vehicles and automobile manufacturers." *Id.* at 1195. The court found that "the predictors of bias ... point in opposite directions." *Id.* at 1199.

Here, however, the bias is predictable. The Commission will always be incentivized to exclude new business models from entering the market. [18] Moreover, *Chrysler* supports the idea that the *possibility* of bias is a sufficient showing—at least where there is a pecuniary interest. *See id.* at 1199. [19]

[18]  Look at how *Chrysler* described the key dynamic:
> Perhaps the dealers on the Commission will be unsympathetic to manufacturers who contend that a claimed defect was only an inept repair effort by a dealer. Yet, we can equally speculate, if we are to speculate, that a dealer will be quick to find fault with his direct competitor—the dealer. Moreover, it is also possible that a dealer member of the Commission would tend to be biased in favor of manufacturers of his own make of car so that the brand he sells will not develop a reputation as a "lemon."

755 F.2d at 1199. That dynamic is not at play here.

[19]  In delineating the line of cases culminating in *Gibson*, our court described the holding in *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) as follows:
> The Court adopted an objective test, not set by "... men of the highest honor and the greatest self-sacrifice ..." but that of whether the procedure "offers a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true...."

*Chrysler*, 755 F.2d at 1198. Of course, *Tumey* a criminal case. But we read this passage as expressing one standard's being passed from *Tumey* to *Ward* and *Gibson*.

**\*9** Finally, LADA advances that none of these due process concerns arises where members of a regulatory scheme "function subordinately" to a governmental actor such that the governmental actor makes the market-impacting determinations that there is no due process violation. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399, 60 S.Ct. 907, 84 L.Ed. 1263 (1940). Tesla correctly retorts that this is a "brand-new rule [taken] from irrelevant private nondelegation cases." In context, the language about subordinate functioning concerns whether "Congress has delegated its legislative authority to the industry." *Sunshine Anthracite*, 310 U.S. at 399, 60 S.Ct. 907. Decisions that "sound in ... due process ... have little bearing" in the private-delegation context. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 890 (5th Cir. 2022). The inverse is also true.

Because Tesla has pleaded a due process claim in line with *Gibson* and *Wall*, we reverse the dismissal of the due process claim. [20]

[20]  The brief treatment of the due process claim in *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 420 (5th Cir. 2024), does not call our analysis into question. In that case, we "agree[d] that HISA does not violate the Due Process Clause by putting financially interested private individuals in charge of competitors." *Id.* But our holding was predicated on two bases not present here.

First, the challenged regime had conflict-of-interest provisions that screened out "individuals with financial interests in, or who provide goods or services to, covered horses; officials, officers, or policy makers for an equine industry; and employees, contractors, or immediate family members of the prior individuals." *Id.* at 436 (citation omitted). Second, based on the facts established at a bench trial, the plaintiffs in that case "relied only on the committee members' biographical information but adduced no other evidence showing their adverse interests, financial or otherwise." *Id.* (citation omitted).

The present case is at a very different stage of litigation. At the motion to dismiss, Tesla need only plead enough specific facts plausibly to allege a "substantial pecuniary interest in [the] legal proceedings" such that members of the commission "should not adjudicate [this] dispute[ ]." *Gibson*, 411 U.S. at 579, 93 S.Ct. 1689 (citations omitted).

IV.

We vacate and remand the dismissal of Tesla's antitrust claim because our due process ruling fundamentally alters the grounds on which Tesla's alleged antitrust injury was based.

A.

Antitrust law has its own threshold for standing. Indeed, "an antitrust plaintiff must do more than meet the requirements of Article III to establish its standing to bring suit." *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (citation omitted). In turn, such a plaintiff must show "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Id.* (citation omitted).

The parties contest only antitrust injury, which requires a demonstration of "injury to [a plaintiff's] business or property." *Hawaii v. Stand. Oil Co.*, 405 U.S. 251, 261, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (cleaned up). In more detail,

> The Supreme Court has defined antitrust injury as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful .... The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation. Typical anticompetitive effects include increased prices and decreased output. This circuit has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition.

**\*10** *Anago, Inc. v. Tecnol Med. Prods.*, 976 F.2d 248, 249 (5th Cir. 1992) (cleaned up). This court has rejected the idea that "the competitor of a monopolist always has standing to challenge the monopolistic conduct forcing it from the market." *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988). For example, a court cannot "grant relief if there is simply a significant probability that the merger will adversely affect competition in the market in which the plaintiff must compete." *Id.* (cleaned up).

On the other hand, where a competitor can show that it has been "squeezed out of the market because [another market participant] exploits its dominance to impose supra-competitive prices on [some of its customers] and simultaneously undercut competitors' ... fees," it has shown "textbook antitrust injury." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491 (5th Cir. 2022).

Though the "threat of decreased competition" is not enough to establish antitrust injury, *Anago*, 976 F.2d at 249, "competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). For example, where "[p]roof that a plaintiff *will be* adversely affected by [a] merger" and "the injuries are related to the anticompetitive effects of the merger," an upcoming merger might provide an antitrust injury. *Anago*, 976 F.2d at 251 (emphasis added).

B.

Tesla's alleged antitrust injury is based entirely on the pending investigation by the Commission that would exclude it from the warranty-servicing and leasing markets. In Tesla's words,

> ... Tesla plausibly alleged quintessential antitrust injury: It alleged that defendants' agreement (1) would exclude Tesla from Louisiana by eliminating its leasing and warranty-service activities; and (2) has deterred other direct-to-consumer manufacturers from entering Louisiana. [21]

| | |
|---|---|
| 21 | Though this language in itself is vague, it is apparent that Tesla is referring to the actions taken by the Commission. *See, e.g.*, Appellants' Reply Br. at 11 ("The Dealer Cartel is (through the Commission) admittedly seeking to exclude Tesla from the warranty service market by preventing Tesla from servicing sold vehicles."); *id.* at 12 (contrasting the "direct-sales ban," which Tesla does not challenge, with "the Commissioners' investigation" which is the subject of Tesla's challenge). |

Defendants are wrong to suggest that there is a *per se* bar on pointing to pending actions to allege antitrust injury. *See Anago*, 976 F.2d at 251; *cf. Brunswick*, 429 U.S. at 489 n.14, 97 S.Ct. 690. Importantly, here the pending action is an investigation that we declare unlawful. Given that our ruling substantially alters the grounds on which Tesla pleads antitrust injury, we vacate and remand the dismissal of the antitrust claim for further evaluation in light of our conclusion that Tesla has pleaded a valid due process claim.

V.

Tesla challenges two regulations under the Equal Protection Clause: (1) the direct sales ban and (2) the warranty services ban. We reject each of those attacks.

Because Tesla concedes that it "is not a member of a protected class and the" regulation at issue here "does not infringe upon a fundamental right ... we apply a rational basis review." *WalMart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 225 (5th Cir. 2019) (citation omitted). "Under this standard, a legislative classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Glass v. Paxton*, 900 F.3d 233, 244–45 (5th Cir. 2018) (cleaned up). That analysis typically breaks into two parts: (1) a legitimate state purpose and (2) rational relationship between the regulation and the legitimate state purpose:

> **\*11** [R]ationality analysis requires more than just a determination that a legitimate state purpose exists; it also requires that the classification chosen by the state actors be rationally related to that legitimate state purpose. Although the legitimate purpose can be hypothesized, the rational relationship must be real.

*Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 937 (5th Cir. 1988) (citation omitted).

As to (1), "[p]arties attacking the presumption of validity extended to legislative classifications have the burden to negative every conceivable basis which might support it." *Glass*, 900 F.3d at 245 (cleaned up and emphasis added). That is, "rational basis review places no affirmative evidentiary burden on the [state]." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

As to (2), a regulation passes muster where "a reasonable legislator could have believed [it] would further ... legitimate interests." *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 728 (5th Cir. 2004) (describing *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 504 (5th Cir. 2001)).

Our review is deferential in a lot of ways. "[A]rguments [that] relate to the economic efficacy of the statute ... are misdirected to this Court." *Ford*, 264 F.3d at 503. Even so, despite "[t]he great deference due state economic regulation," the court may consider "the history of [the] challenged rule [and] the context of its adoption" and may refuse "to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226.

Taken together, this yields a high bar for a successful challenge.

A.

We will turn to the rationales that justify Louisiana's laws. But first, a threshold question: What is the legislative classification at issue?

The legislative classification that we are examining is the class of all vehicle manufacturers. The text of the law plainly begins, "It shall be a violation of this Chapter for *a* manufacturer ...." 2018 La. SB 2017 (emphasis added).

Tesla wants us to view the challenged provisions as a classification of only non-franchising car manufacturers. We reject that suggestion for three reasons.

First, what is at issue is the "legislative classification." *Glass*, 900 F.3d at 244. In other words, we examine "classification created by the regulatory scheme." *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009).

Second, Tesla's request borders on asking us to apply a more rigorous standard of scrutiny even though in this context "[i]mperfect classifications that are underinclusive or over-inclusive pass constitutional muster." *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021).

Finally, our decision in *Ford* undermines Tesla's view. There, we apparently refused to consider, as a class, manufacturers that were selling *preowned* vehicles. *See Ford*, 264 F.3d at 510 (rejecting the argument that "there is no rational basis for classifying manufacturers differently than dealers because manufacturers do not have disproportionate power in the *pre-owned* vehicle market." (Emphasis added.)). That should push us to accept a broader reading of the legislative classification here.

B.

So, what rational basis could the legislature have for barring manufacturers from serving also as dealers? The answer is that preventing vertical integration or analogous consolidations of monopoly power is a sufficient rational basis to uphold both the warranty-services ban and the direct-sales ban.

**\*12** Preventing vertical integration is a legitimate state interest and is one of the interests that the district court relied upon. In *Ford*, we upheld a statutory provision prohibiting Ford from selling cars directly to consumers online. 264 F.3d at 498. The court recognized a legitimate interest in "prevent[ing] vertically integrated companies from taking advantage of their incongruous market position." *Id.* at 503. And that is not even the broadest language that this court used: "[W]e have no hesitancy in concluding that [the regulation] bears a reasonable relationship to the State's legitimate purpose in controlling the automobile retail market." *Id.* at 510 (cleaned up). The court rejected Ford's argument that "manufacturers do not have disproportionate power in the preowned vehicle market." *Id.*

Tesla avers that *Ford* upheld a regime that prevented manufacturers from competing with *their own* dealerships. *See, e.g., Ford*, 264 F.3d at 504 (expressing concern that "Ford seems to remain in a superior market position to *its* dealers" (emphasis added)). Scholarly *amici* point out that *Ford* "was decided long before a single mass-market electric vehicle was sold in the United States and at a time when every car manufacturer sold through franchised dealers." Neither of those factors is present here.[22]

[22] And at least one district court has drawn this distinction. *See Lucid Group USA, Inc. v. Johnston*, 2023 WL 5688153 at \*5 (W.D. Tex. 2023).

The crucial element of *Ford* was not abuse of one's own dealers but the "prevent[ion of] vertically integrated companies from taking advantage of their incongruous market position and ... frauds, unfair practices, discrimination, impositions, and other abuses of our citizens." *Id.* at 503. That language is broad. And taken in the context of even broader language, *see id.* at 510, *Ford* readily controls this case.

Tesla insists that defendants must explain why vertical integration is bad for consumers. That is a bridge too far. It is contrary to *Ford*, which sets out an open-ended array of possible harms of vertical integration that are not limited to specific consumer harms. *See id.* at 503. Instead, we can assume that the state has a legitimate interest in preventing firms from vertically integrating and abusing the resulting power not only on its own dealers, but other dealers, and yes even consumers down the run. It is Tesla's burden, not defendants', to dispel the notion that fear of vertical integration is not a *conceivable* rational basis.

In short, even if we accept Tesla's and scholarly *amici*'s reading of *Ford* that it was principally concerned with abuse of power by a manufacturer against its dealers, *Ford* also has clear language indicating broader concerns with vertical integration, monopoly power, and state control of the automobile industry more broadly. All of these constitute legitimate state interests.

Both the warranty-services ban and the direct-sales ban find a rational basis in this broader language. There is hardly a more quintessential example of vertical integration than a manufacturer's extending itself into distribution. And extension into the provision of auxiliary services (here, in the warranty-services context) evokes sufficiently similar concerns.

\* \* \* \* \*

For the reasons explained, we REVERSE the dismissal of Tesla's due process claim, VACATE the dismissal of its antitrust claims, AFFIRM the dismissal of its equal protection claim, and REMAND. We place no limitation on the proceedings that the district court may undertake on remand, and we intimate no view on what decisions it should reach.

Dana M. Douglas, Circuit Judge, dissenting in part and concurring in part:
Tesla's complaint that the makeup of the Commission violates due process is meritless. In deciding in Tesla's favor, the majority opinion misconstrues the fundamentals of due process and contravenes well-settled precedent. The majority's decision also reflects a sea change for state regulations and how courts interpret them. Thus, I must respectfully dissent as to Parts II, III, and IV.[1]

1  As to Part V, I concur in the judgment only.

## I

**\*13** A Rule 12(b)(6) motion to dismiss is an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014). A plaintiff's complaint must do more than "stat[e] facts merely consistent with liability"; it "must instead state a 'plausible claim for relief.' " *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim is merely conceivable and not plausible if the facts pleaded are consistent with both the claimed misconduct and a legal and 'obvious alternative explanation.' " *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 897 (5th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). While we accept a plaintiff's allegations as true, we do not blindly accept " 'conclusory allegations, unwarranted factual inferences, or legal conclusions as true.' " *Hodge v. Engleman*, 90 F. 4th 840, 843 (5th Cir. 2024) (quoting *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023)).

Tesla brought each of its three constitutional claims pursuant to 42 U.S.C. § 1983. "To state a Fourteenth Amendment due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (internal quotation marks and citation omitted). In procedural due process claims, "the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (internal quotation marks and citations omitted); *accord Calhoun v. Collier*, 78 F.4th 846, 852 (5th Cir. 2023), *as revised* (Aug. 31, 2023). "[A] fair trial in a fair tribunal is a basic requirement of [procedural] due process." *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (internal quotation marks and citations omitted). This applies to courts and administrative agencies alike. *See Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *see also Baran v. Port of Beaumont Nav. Dist. Jefferson Cnty. Tex.*, 57 F.3d 436, 444 (5th Cir. 1995); *Wall v. American Optometric Assn.*, 379 F. Supp. 175 (N.D. Ga.), *summarily aff'd sub nom., Wall v. Hardwick*, 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974).

## II

The majority opinion declared the Commission's investigative subpoenas as "unlawful" under the Due Process Clause. Op. at ––––. In so doing, the majority opinion contends that Tesla has plausibly alleged a due process violation because *Gibson* and *Wall* broadly indicate that "those with substantial pecuniary interest in legal proceedings should not adjudicate disputes" even if that authority is lawfully exercised. Op. at ––––. Specifically, the majority opinion agrees with Tesla that the "Commission will always be incentivized to exclude new business models from entering the market." Op. at –––– – ––––. Such allegation is conceivable, but conclusory and not plausible. But critically, it is also foreclosed by this court and the Supreme Court's precedent.

In Part A, I address the due process standard and how it applies in the context of Tesla's case. Then, in Part B, I address Tesla's anti-trust claim. Throughout, I highlight multiple pitfalls to the majority's conclusion.

### A

To begin, this court and the Supreme Court's precedent on due process is well-settled. But today's decision upends that.

1

As to this court's precedent regarding *Gibson* and its progeny, the majority opinion misconstrues the holding in *Chrysler Corporation v. Texas Motor Vehicle Commission*, 755 F.2d 1192, 1198-99 (5th Cir. 1985). Specifically, the majority opinion suggests that a due process violation exists when "bias is predictable." Op. at —— – ——. That is opposite to the holding in *Chrysler*. There, Chrysler alleged that certain disputes resolved by the Texas Commission of Motor Vehicles violated due process because dealers adjudicating disputes related to car defects had a financial incentive to lay blame on manufacturers. *Id.* at 1198. This court explained that although it was possible that the dealer-commissioners would align against manufacturers in resolving disputes, it was also possible that "a dealer [would] be quick to find fault with his direct competitor—the dealer." *Id.* at 1199. Moreover, the "suggestion of possible temptation ... ignores the fact that four of the nine members of the commission are not dealers," which was "relevant to the possible bias of the full decisionmaker—the Commission." *Id.* Ultimately, the court held that "in a system of peer review, with arbiters drawn from the same industry as the disputants, possibilities of improper motive can always be imagined ... however, we cannot find that the decisionmaker is impermissibly biased in the constitutional sense." *Id.* at 1198-99.

**\*14** *Chrysler* mirrors the case at bar. Tesla challenges the Commission's composition by suggesting that nine of the fifteen commissioners compete with Tesla, and that dynamic violates due process. As in *Chrysler*, Tesla's argument "rests on the assertedly antagonistic relationship" between it and the dealer-commissioners. *Id.* at 1197. "Perhaps the dealers on the Commission will be unsympathetic to manufacturers who" use a different business model, but "if we are to speculate ... [such] dealer will be quick to find fault with his direct competitor—the dealer." *Id.* at 1199. It "is also possible that a dealer member of the Commission would tend to be biased in favor of manufacturers of his own make of car ....". *Id.* at 1199. But the laws enforced by the Commission apply across the board. Thus, the "predictors of bias here point in opposite directions." *Id.* Any "possible temptation" here also "ignores the fact that" six of the fifteen members of the Commission are not Tesla's competitors. *Id.* Further, the Commission is not the ultimate "decisionmaker" for most (if not all) of the hypothetical actions that the Commission could take against Tesla. *Id.* Louisiana's legislature is the source of the laws that Tesla challenges, not the Commission. Accordingly, Tesla fails to plausibly allege that the Commission violates due process.

The Supreme Court has clarified that regulatory boards are not unconstitutional merely because they are composed of competitors of the entities they regulate. *See Friedman v. Rogers*, 440 U.S. 1, 18–19, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). In *Friedman v. Rogers*, the plaintiff argued that he was deprived of due process because he was "subject to regulation by a Board composed primarily of members of the professional faction." *Friedman*, 440 U.S. at 6, 99 S.Ct. 887. The Court rejected the *Friedman* plaintiff's arguments because it was a generalized challenge to the board, and he had "no constitutional right to be regulated by a Board that is sympathetic to the commercial practice of optometry." *Id.* at 18-19, 99 S.Ct. 887. The majority opinion's attempts to distinguish *Friedman* here fails.

The *Friedman* plaintiffs alleged "that the board's composition itself was unfair." Op. at ——. Tesla did the same, alleging that the Commission violates due process because some of the commissioners include its competitors. That allegation is conclusory at best.[2] It is insufficient to merely suggest that members of the Commission directly compete with or have a financial interest against Tesla. Indeed, Tesla has "no constitutional right to be regulated by" any agency "that is sympathetic" to its business model. *Friedman*, 440 U.S. at 18-19, 99 S.Ct. 887. In a similar vein, this court found no due process violation where the government placed "financially interested private individuals in charge of competitors." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415 (5th Cir. 2024).[3] Thus, contrary to the majority opinion, there is no "per se rule disqualifying administrative hearing bodies" and absent plausible allegations, the court "must assume ... that the administrative hearing body acted independently and properly." *Megill v. Bd. of Regents of Fla.*, 541 F.2d 1073, 1079 (5th Cir. 1976).[4] As discussed further below, Tesla's assertion that the subpoenas are sufficient "action" to establish a due process violation is a red herring.

2   It is commonplace for trade associations and government entities to work collectively in regulating an industry. *See Chrysler*, 755 F.2d at 1199; *N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, 198 F.3d 1, 13-14 (1st Cir. 1999) (explaining that industry representation on regulatory boards is a "common and accepted practice."); *Stivers v. Pierce*, 71 F.3d 732, 743 (9th Cir. 1995) ("[T]he system of industry representation on governing or licensing bodies is an accepted practice throughout the nation."). The Due Process Clause does not inhibit that. *See Reyes v. North Texas Tollway Auth.*, 861 F.3d 558, 566 (5th Cir. 2017) (holding that "the Due Process Clause's role" is not "to fine tune" regulatory systems as a substitute for the political process). Thus, the majority decision cannot be squared with any precedent or common practice.

3   To be clear, as LADA explains, the present case is not one in which the government has given private parties regulatory power. It is a case in which a state legislature has created a multimember executive agency and required that some of the agency's members be licensed by it. The Supreme Court has held that involving economically self-interested private actors in a regulatory scheme does not violate due process where the private actors "function subordinately" to a government agency. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399, 60 S.Ct. 907, 84 L.Ed. 1263 (1940). Thus, even at the pleading stage, the conclusory allegations asserted by Tesla do not plausibly allege a violation of due process.

4   *See also Withrow*, 421 U.S. at 49, 95 S.Ct. 1456 (explaining that nothing warrants "imposing upon administrative agencies a stiffer rule, whereby [agency] examiners would be disentitled to sit because they ruled strongly against a party in the first hearing.") (internal quotation marks and citations omitted).

**\*15**  In determining whether a due process violation exists, *Friedman, Gibson*, and *Wall* require that we consider the "particular context" of the case. Yet the majority opinion is void of any context. *Friedman*, 440 U.S. at 18–19, 99 S.Ct. 887. The Defendants highlighted what Tesla prefers that we ignore:

- Tesla does not allege that Louisiana's laws or direct sales ban violate due process.

- Tesla does not allege that the Commission has ever charged Tesla with violating the direct sales ban.

- The Commission has neither adopted rules or regulations to enforce state law against Tesla, nor voted on any rules or enforcement actions regarding the direct sales ban against Tesla.

- The Commission has never charged Tesla with violating the warranty repair ban as interpreted by the Attorney General.

- Nor has the Commission adopted any rules or regulations to enforce that ban, despite Tesla's ongoing operation of a warranty service center in New Orleans.

- Tesla does not contend that the Commission is responsible for preventing Tesla from implementing its business because Tesla concedes that Louisiana's laws regulate the sale and service of vehicles, not the Commission.

Accordingly, the "particular context" of this case is cabined only to the Commission's investigative subpoenas.

Contrary to the majority's opinion, " 'the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare.' " *N. Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 165, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973) (quoting *Lincoln Fed. Lab. Union No. 19129, A.F. of L. v. Nw. Iron & Metal Co.*, 335 U.S. 525, 536-537, 69 S.Ct. 251, 93 L.Ed. 212 (1949)). "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be ... out of harmony with a particular school of thought." *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Indeed, as the district court explained, if Tesla had a claim under these facts, any entity regulated by its peers could ask federal courts to dismantle state regulatory boards.

2

Now that I have addressed the particular context of Tesla's due process claim, I will turn back to the issue of whether the investigative subpoenas violate due process.

As Tesla concedes, the subpoenas are a "legal and 'obvious alternative explanation' " for the Commission's conduct. *Baylor Scott & White Health*, 816 F. App'x at 897 (quoting *Ashcroft*, 556 U.S. at 682, 129 S.Ct. 1937). "The commission is empowered to conduct investigations to determine compliance with the laws and rules and regulations it administers," so "[t]he executive director ... may issue a subpoena prior to the filing of charges if, in the opinion of the executive director subpoena is necessary to investigate any potential violation or lack of compliance with [the Motor Vehicle Commission Law]." LA. ADMIN CODE, tit. 46, pt. V, § 303(B). There is no basis to conclude that Tesla plausibly alleged that the Commission's investigative subpoenas violate due process.

To determine if a regulated entity is operating in compliance with a statutory exception that the Commission itself recognized over serious opposition is plainly a valid government objective. As a result, the only way the subpoenas could be evidence of bias would be if the construction of state law underlying them were objectively baseless. But Tesla has *explicitly disclaimed* any challenge here to the "construction of state law" underlying the subpoenas. Tesla does not even argue that the subpoenas are unduly burdensome. *See* FED. R. CIV. P. 45.

**\*16** Nonetheless, the majority opinion suggests that we need not wait until the Commission commences a proceeding against Tesla, or consider "actual partiality," to find a due process violation. The majority opinion avers that we may speculate that Tesla may be subject to future disciplinary action. Op. at ——. "Where the speculations tumble against each other, however, we cannot find that the decisionmaker is impermissibly biased in the constitutional sense." *Chrysler*, 755 F.2d at 1199. Importantly, our precedent provides that mere "possibilities of improper motive" do not *ipso facto* create a due process violation. *Chrysler*, 755 F.2d at 1199. And to establish a due process violation, Tesla must allege that a "governmental action resulted in a deprivation of" its life, liberty, or property. *Gentilello*, 627 F.3d at 544. Tesla has failed to do so.

All we are left with, then, is the allegation that the issuance and enforcement of legally proper subpoenas subject to judicial review constitutes evidence of illicit bias so severe that it violates dues process. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738, 133 S.Ct. 2720, 186 L.Ed.2d 794 (2013). For these reasons, Tesla has failed to plausibly allege that the Commission's makeup, and investigative subpoenas, violate due process.

B

Strangely, after concluding that the investigative subpoenas violate due process, the majority opinion raised sua sponte whether that erroneous conclusion "fundamentally alters the grounds on which Tesla's alleged antitrust injury was based." Op. at ——. In so doing, the majority opinion conflates two separate doctrines and vacates and remands the district court's decision on Tesla's anti-trust claim. But the opinion does not (and cannot) explain how due process laws merge with anti-trust laws. Neither does it explain how this impacts the various parties who filed a total of seven motions to dismiss.

Again, the only due process issue Tesla presents is the investigative subpoenas. According to the complaint, Tesla's due process claim is only against the commissioners in their official capacity. Meanwhile, Tesla's anti-trust claim is against LADA, LADA members, dealers, and the commissioners in their official and private capacities. Thus, for the due process claim, we cannot rely on allegations concerning efforts by LADA, the dealers, or the commissioners in their private capacities. We also cannot rely on the subpoenas to conclude that the district court erred in assessing the anti-trust claim. It should go without saying that we also cannot rely on the due process legal standard to assess an anti-trust claim.

Worse, the majority opinion credits the anti-trust allegations, failing to address their implausibility.[5] For example, Tesla mentions several emails that the Executive Director of the Commission received from LADA members regarding Tesla's plans to open a service center in New Orleans. But this court has clarified that "one-sided complaint[s] [are] just not a suitable basis for an inference of conspiracy." *Abraham & Veneklasen Joint Venture v. American Quarter Horse Ass'n*, 776 F.3d 321, 333 (5th Cir. 2015). Moreover, there are no specific factual allegations supporting an inference that the commissioners agreed with LADA to take any action that would keep Tesla out of the market.[6] *See Twombly*, 550 U.S. at 557, 127 S.Ct. 1955 (noting the "threshold requirement" of "allegations plausibly suggesting (not merely consistent with) agreement").

[5]   Tesla's claim is also paradoxical. A federal court recently held that Tesla's customers plausibly alleged that Tesla's approach to selling, leasing, and servicing vehicles is anti-competitive behavior. *Lambrix v. Tesla, Inc.*, No. 23-CV-01145-TLT, ––– F.Supp.3d ––––, 2024 WL 3403777 (N.D. Cal. June 17, 2024) (denying Tesla's motion to dismiss a putative class action as to Sherman Act claims). These are the same strategies that Tesla claims are now being stifled by the Commission.

[6]   *See, e.g., Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 786 (E.D. La. 2019) ("While plaintiff alleges that members of the [agency] were simultaneously members of the [private industry association], that alone does not result in a finding that both associations are engaged in an unlawful conspiracy."); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993)("The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.").

**\*17** The only plausible inference from Tesla's allegations is that despite being asked to agree with LADA's position, the Commission repeatedly refused to yield to LADA's requests. *See Golden Bridge Technology, Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008). Indeed, some of Tesla's allegations directly show that the Commission favored Tesla's continued business operation in Louisiana. Nonetheless, the majority opinion appears to consider arguments Tesla, itself, has not made.

### III

The majority opinion misses the forest for the trees. The issue is whether a company can change the composition of a state's regulatory commission because it merely disagrees with state law which the commission is required to enforce. But Tesla cannot use this court as an end-run around the legislative process.[7] Because Tesla has not plausibly alleged that the Commission has violated due process, I would affirm the district court. Therefore, I respectfully dissent.

[7]   *See, e.g., Hopkins v. Watson*, 108 F.4th 371 (5th Cir. 2024) (en banc) ("In other words: go and convince the State legislatures. Do the hard work of persuading your fellow citizens that the law should change.").

**All Citations**

--- F.4th ----, 2024 WL 3934796